IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION


UNITED STATES OF AMERICA          )
                                  )    CASE NO. 6:22cr146
     -vs-                         )
                                  )    Tyler, Texas
                                  )    1:12 p.m.
KELLY JASON SMITH                 )    June 26, 2023


TRANSCRIPT OF JURY TRIAL
DAY 1 - AFTERNOON SESSION
BEFORE THE HONORABLE JEREMY D. KERNODLE,
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

FOR THE GOVERNMENT:

MR. LUCAS MACHICEK
ASSISTANT U.S. ATTORNEY
110 North College, Ste. 700
Tyler, Texas 75702

MS. TRACEY BATSON
ASSISTANT U.S. ATTORNEY
101 E. Park Blvd., Ste. 500
Plano, Texas 75074

FOR THE DEFENDANT:

MR. CODY SKIPPER
LAW OFFICE OF CODY SKIPPER
2001 Bryan St., Ste 1905
Dallas, Texas 75201

MR. TOBY SHOOK
SHOOK GUNTER & WIRSKYE
2001 Bryan St., Ste. 416, LB 92
Dallas, Texas 75201

COURT REPORTER:           MS. SHEA SLOAN
                          FEDERAL OFFICIAL COURT REPORTER
                          211 W. Ferguson
                          Tyler, Texas 75702
                          shea_sloan@txed.uscourts.gov

Proceedings taken by Machine Stenotype; transcript was produced by computer-aided transcription.

INDEX

                                                        PAGE

COURT'S PRELIMINARY INSTRUCTIONS      16

PRESENTATION OF THE INDICTMENT        25

OPENING STATEMENTS

      BY MS. BATSON                    27

      BY MR. SKIPPER                   30


                        * * * * * * * *

GOVERNMENT'S
WITNESS                DIRECT  CROSS  REDIRECT  RECROSS


JAMES CROWELL          48




CERTIFICATION - PAGE 140

4

EXHIBIT INDEX

GOVERNMENT'S
EXHIBIT NO.    DESCRIPTION                                    PAGE

1              Video Recording from                            80
               Austin Milbourn's Body Worn
               Camera - Part 1

1A             Transcript of Exhibit 1                         80

1B             Video Recording from                            83
               Austin Milbourn's Body Worn
               Camera - Clip

1C             Video Recording from                            83
               Austin Milbourn's Body Worn
               Camera - Slow Motion Clip

1D             Still Shots from Milbourn                        83
               Body Worn Camera

2              Video Recording from                            80
               Austin Milbourn's Body Worn
               Camera - Part 2

2A             Transcript of Exhibit 2                         80

3              Video Recording from                            80
               John McQueen's Body Worn Camera

3A             Transcript of Exhibit 3                         80

4              Video Recording from                            80
               Kelly Smith's Body Worn Camera

4A             Transcript of 4                                 80

5              Video Recording from                            80
               Adam Newell's Body Worn Camera

5A             Transcript of 5                                 80

6              Video Recording from                            80
               Eric Tuma's Body Worn Camera

6A             Transcript of 6                                 80

P R O C E E D I N G S

(Defendant present in the courtroom.)

(Jury out.)

THE COURT:  You may be seated.

I did want to address this evil motive issue.

I'm going to overrule the United States' objection. The 2001, 2012, and 2015, the Fifth Circuit Pattern Jury Instructions for the second element of a Section 242 offense all defined "willfully" as:  Committing such act or acts with a bad purpose or evil motive, to disobey or disregard the law.

The 2019 pattern instructions no longer include that term "evil motive," but the Court is unable to ascertain why that language was removed.

So I'm overruling for two reasons.

First, in 2007 the Fifth Circuit upheld the use of the phrase in the jury instructions in a Section 242 trial. That is United States vs. Ruiz.

Second, the phrase is disjunctive, as we discussed. The United States is under no obligation to prove that the Defendant acted with an evil motive.  They can prove it by the other bad purpose point there.

So I found also the United States' cases to be inapposite, the Darby case we reviewed, as well as Stokes and Ragsdale.

Okay. Anything further before we bring the jury in?

MS. BATSON: Yes, Your Honor. During the lunch break, we attempted to preadmit exhibits and were unsuccessful in doing so.

It appears that some of the exhibits the Government redacted to comply with the Court's order in the motion in limine, and Defense counsel wants to, I guess, relitigate the Court's rulings on the motions in limine.

THE COURT: Okay. Be more specific. What is it that is redacted.

MS. BATSON: The information about what the warrants were for, for Robert Evans.

THE COURT: Okay.

MS. BATSON: In some of the other exhibits it is information as to his drug use, methamphetamine.

It was a lot of stuff, Your Honor. It was just in compliance -- let me just look. Sorry, Your Honor. I am extremely frustrated.

We redacted any testimony or transcripts of testimony regarding rulings by the Court in the pretrial matters, specifically dealing with the information on Robert Evans.

And, specifically, it is any reference, again, to what he was arrested for. We redacted any of his statements

that were made post-arrest, based on a case that was found that says that can't come in unless he testifies.  Then when he testifies -- or if he testifies, it can come in then.  We redacted everything after the arrest.

And, basically, that is it.

THE COURT:  Okay.  Mr. Skipper.

MR. SKIPPER:  Unless he testifies, Your Honor -- if I may, the standard under Graham vs. Connor, that is why we are here.  That is a material element that the U.S. Government must prove beyond a reasonable doubt.  And that is a use of force continuum based upon the totality of the circumstances.

So when the prosecutor says that it is irrelevant -- I am not trying to relitigate a question, Your Honor, about anything.  Your Honor's order on the motion in limine specifically says, contrary to what many lawyers think that a limine means, is that counsel should approach and -- at the pertinent time, and Your Honor would make a final ruling at that point.

But the issue with not telling a factfinder the specific charge of what Robert Evans was facing would preclude the Defense from casting doubt on reasonableness.

Under Graham vs. Connor, there are three factors when you are looking at what is objectively reasonable based on the totality of the circumstances on the use of force

continuum.

One, severity of the crime. So it might be important for a law enforcement officer to know, hey, it is a felony. But it is not a felony with five pounds of marijuana. It is a felony for a guy who has raped some innocent child.

THE COURT: But my understanding is that the Defendant didn't know what the charges were; is that correct?

MR. SKIPPER: No, he did. That's -- that's another issue that I have. And I don't want to go back to what the representations were at the hearing before Your Honor on May 31st.

It is clear on the video, Kelly Smith asked that, what is this for? Because if it is for felony theft, I'm not going to use a dog. If it is for capital murder, I need to know those things because it ratchets everything up over the imminent threat.

Officer Eric Tuma, right when Kelly walks up -- it is on their video -- Kelly says: What's it for?

Felony injury to a child.

Officer Eric Tuma, the Acting Chief of Police and on-scene commander goes: I put it on him.

So Kelly did know. He had to know that before he makes a decision to do what he did.

And it is not about me questioning Your Honor about

any of this, but for them to send -- upload transcripts -- I was about to just blindly admit these and say no objection to all of these items, Your Honor.  So I assume there has been no changes.  Well, no, we have made all of these redactions in the video and the transcripts.

They sent me a USA affix on Saturday without some cursory email just to say -- that you would normally do, hey, by the way, this is my interpretation of Judge Kernodle's order.  We have redacted page, line here.  Let me know if you have anything to add or say to that.

But going back to my issue with -- and, again, not trying to question Your Honor about whether or not we can talk about injury to a child.  I believe it would be -- if were something to come back against Mr. Smith and he cannot adequately present his defense in front of his accuser under the Sixth Amendment, how could one defend that reasonableness inquiry when every expert -- they say they are experts in this courtroom, is going to have to have knowledge of those three factors under United States vs. Graham -- pardon me, Your Honor, Graham vs. Connor.

As far as the methamphetamine use, so I asked about the business record affidavit with Robert Evans's medical records.  Well, that is fine, if you didn't redact anything out of there.  Then she says, well, we redacted his positive test for methamphetamine.

MS. BATSON:  And his date of birth.

MR. SKIPPER:  Pardon me, Your Honor.  We don't want to disclose any date of birth here.

The Government wants this Court to believe that it can sponsor a witness under oath and only tell a factfinder of the good things about this person and --

THE COURT:  Well, let me -- let's do this in stages here.

So, first, let's talk about what is in the warrant. I want to hear from the Government, is there evidence that Defendant knew what Mr. Evans was -- what the warrant was for?

MS. BATSON:  Your Honor, according to the transcript, Mr. Smith says, confirm there is a felony warrant.  Not what it is for.

MR. SKIPPER:  Your Honor --

THE COURT:  Well, hold on.

MS. BATSON:  So if there is a transcript that, Mr. Skipper has --

MR. SKIPPER:  No, I don't --

THE COURT:  Hey, we're not going to argue about it like that, okay?  Let me hear from the Government, and then I will hear from you, Mr. Skipper.

MS. BATSON:  If there is a transcript, Your Honor, that says or that shows that Mr. Smith knew what the warrants

were for, then Defense counsel must have that.

THE COURT:  Let me just say this:  On the charges against Mr. Evans, they are not coming in unless there is evidence that Mr. Smith knew about those charges before he entered the house.

We are not going to litigate it right now.  We are going to see if the evidence comes in, and then we will address it at that point.

MR. SKIPPER:  May I make a statement --

MS. BATSON:  Your Honor --

MR. SKIPPER:  -- Your Honor.

THE COURT:  You may make a brief statement.

MR. SKIPPER:  Because we are about to give opening statements.

I can say, as an officer of the Court and former federal prosecutor, the way these things have come out -- these representations before Your Honor, it is on video.  I don't need a draft transcript of what someone else says they heard.  Eric Tuma looks right at him, Kelly, it is on video.

MS. BATSON:  Your Honor --

THE COURT:  Ms. Batson, just a second.

MS. BATSON:  I'm sorry.

MR. SKIPPER:  Just before we get to opening statements, it is the ruling before the Court that we just say he had a warrant for a felony.

THE COURT:  Correct, yeah.

And then on the methamphetamine use, we have looked at this, and my understanding of the case law is that, obviously, if there is methamphetamine use by the witness related to his testimony at trial, that could come in.  I don't think that is the issue here.

So my understanding is the only way it would be relevant with respect to Mr. Evans is if there is some evidence it that affected his ability to perceive what happened on the day in question.  Absent some evidence, I don't think it comes in.  I think it's too prejudicial.

MR. SKIPPER:  Well, if he has -- that is the point of the medical records, if he has it in his blood stream.

THE COURT:  Right.  If there is no evidence that it affected the way he perceived the events in question, then it is not admissible.

MR. SKIPPER:  Well, the only way that would do that would just be by inquiry, Your Honor.

THE COURT:  Right.  So I think at this point there will be no mention of methamphetamine.  If we get to the point later on where things look different, we can address it at that point.

MR. SKIPPER:  Yes, Your Honor.

THE COURT:  Okay.

MR. SKIPPER:  May I just -- I want to -- Ms. Batson

read a transcript to you, and it would, I assume, be the same transcript she provided to us, on March 16th of 2023.

She stopped -- she didn't say the second line. Smith says:  Confirm that there is a felony warrant, though, right?

He is looking at Eric Tuma, who is on a video.

Injury to a child.  Tuma:  I put it on him, yeah, injury to a child.  That is what he says.

THE COURT:  Okay.

MS. BATSON:  And, Your Honor, that is correct.  We just found the transcript.  I was reading from the redacted one, and that is what I was going to tell the Court.

MR. SKIPPER:  The redacted one would certainly serve her purpose.  That is the reason she is reading from the one that doesn't say what was actually said.

When the Court inquires to a lawyer, do you have evidence that Kelly Smith knew and you did this on May 31st of 2023?  And they knew that, they knew that, Your Honor.

THE COURT:  Mr. Skipper, let's not litigate these little sideshows.  Okay?  I think everybody is trying to do their best to have full candor and that should be the rule that governs all proceedings in this court.

So given that, Ms. Batson, what is your argument that that information shouldn't be heard by the jury?

MS. BATSON:  Your Honor, it is absolutely

prejudicial. Because he still -- the case is still pending, as far as I know. It hasn't been dismissed. Right. The case is still pending.

And so if we mention it now, and if he takes the stand, we can't talk about that because he is going to assert a Fifth Amendment right, which he is entitled to.

THE COURT: You are talking about Mr. Evans?

MS. BATSON: Yes.

THE COURT: Let's -- at this point, no mention of the charges. Again, we can revisit. So in the opening statements, there should be no mention of methamphetamine use or the charges against Mr. Evans, other than that he had a felony warrant. And then we can revisit this issue once some evidence has come in.

Anything else?

MS. BATSON: Your Honor, our expert witnesses are here and present, and we would like them to be excluded from the Rule pursuant to Rule 16.

THE COURT: Okay. Any objection?

MR. SKIPPER: We don't have any objection to that, Your Honor. While we are on that point, and, Judge, I know you are ready to get the jury in here -- well, I will address the exhibits later. They have offered the opinions of the experts as exhibits. I didn't mark mine. There is no case that I have ever read that says it is not hearsay, doesn't

have any exceptions.  So I will address the Court on that later.

THE COURT:  Thank you.

MS. BATSON:  One other thing, Your Honor, one of our witnesses John McQueen, he is scheduled to leave on Saturday for a prepaid trip.  In light of the Court indicating that the trial may go into next week, we have subpoenaed him.  We anticipate he will either go on today or first thing tomorrow and because he has a prepaid trip that is non-refundable, we would ask that he be finally excused, once he is through testifying.

I believe that Mr. Skipper may have subpoenaed him. He subpoenaed several of our witnesses, and I just wanted to say Mr. McQueen is the only one who has a conflict.

THE COURT:  Okay.  We will address that when he is here.

MS. BATSON:  Thank you.

THE COURT:  Okay.

Okay.  Bring the jury in.

(Jury in.)

THE COURT:  Okay.  You may be seated.

Welcome back.

At this time I am going to read the preliminary jury instructions that I mentioned before lunch, and then we will proceed with the trial.

Members of the Jury:

Now that you have been sworn, I will give you some preliminary instructions to guide you in your participation in the trial.  At the end of the trial I will give you more detailed instructions.  You must follow all of my instructions in doing your job as jurors.

It will be your duty to find from the evidence what the facts are.  You, and you alone, will be the judges of the facts.

You will then have to apply to those facts the law as the Court will give it to you.  You must follow that law whether you agree with it or not.

Perform these duties fairly.  Do not let any bias, sympathy, or prejudice that you feel toward one side or the other influence your decision in any way.  In particular, do not let racial, ethnic, national origin, or other bias influence your decision in any way.

Nothing the Court may say or do during the course of the trial is intended to indicate or should be taken by you as indicating what your verdict should be.

The evidence from which you will find the facts will consist of testimony, witnesses, documents, and other items received in the record as exhibits and any facts that the lawyers agree to or stipulate to or that the Court may instruct you to find.

Certain things are not evidence and must not be considered by you.  I will list them for you now.

One, statements, arguments, and questions by lawyers are not evidence.

Two, objections to questions are not evidence. Lawyers have an obligation to their clients to make objections when they believe evidence being offered is improper under the Rules of Evidence.

You should not be influenced by the objection or by the Court's ruling on it.  If the objection is sustained, ignore the question.  If it is overruled, treat the answer like any other.  If you are instructed that some evidence is received for a limited purpose only, you must follow that instruction.

Three, testimony that the Court has excluded or told you to disregard is not evidence and must not be considered.

Four, anything you have seen, heard, or read outside the courtroom is not evidence and must be disregarded.

You are to decide the case solely on the evidence presented in the courtroom.

There are two kind of evidence, direct and circumstantial.

Direct evidence is proof of a fact, such as

testimony of an eyewitness.  Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist.

I will give you further instructions on these, as well as other matters, at the end of the case, but keep in mind, you may consider both kinds of evidence.

It will be up to you to decide which witnesses to believe, which witnesses not to believe, and how much of any witness's testimony to accept or reject.  I will give you some guidelines for determining the credibility of the witnesses at the end of the case.

As you know, this is a criminal case.  There are three basic rules about a criminal case that you should keep in mind.

First, that the Defendant is presumed innocent until proven guilty.  The Indictment brought by the United States against the Defendant is only an accusation, nothing more.  It is not proof of guilt or anything else.  The Defendant, therefore, starts out with a clean slate.

Second, the burden of proof is on the United States until the very end of the case.  The Defendant has no burden to prove his innocence or to present any evidence or to testify.

Since the Defendant has the right to the remain silent, the law prohibits you from arriving at your verdict

19

by considering the Defendant may not have testified.

Third, the United States must prove the Defendant's guilt beyond a reasonable doubt.  I will give you further instructions on this point later, but bear in mind that in this respect, a criminal case is different from a civil case.

Because this criminal case has been brought by the United States Government, I may sometimes refer to the United States as the prosecution.

The United States is represented at this trial by Assistant United States Attorneys, Tracey Batson and Lucas Machicek.

The Defendant, Kelly Jason Smith, is represented by Cody Lee skipper and Toby Boyd Shook.

In this case the Defendant is charged with two crimes.  He is charged with one count of deprivation of civil rights, and one count of destroying, altering, or falsifying a document in a federal investigation.

I will give you detailed instructions on the law at the end of the case, and those instructions will control your deliberations and decision.  But in order to help you follow the evidence, I will now give you a brief summary of the elements of these crimes that the Government must prove beyond a reasonable doubt.

For you to find the Defendant guilty of deprivation of civil rights, you must be convinced that the United States

has proved each of the following elements beyond a reasonable doubt.

One, that the Defendant deprived the person, R.E., of a right secured by the Constitution or laws of the United States by committing one or more of the acts charged in the Second Superseding Indictment.

Two, that the Defendant acted willfully, that is, that the Defendant committed such acts or act with a bad purpose or evil motive to disobey or disregard the law, specifically intending to deprive the person of that right.

Three, that the Defendant acted under color of law. And, four, that bodily injury resulted from the Defendant's conduct.

For you to find the Defendant guilty of destroying, altering, or falsifying a document in a federal investigation, you must be convinced that the United States has proved each of the following elements beyond a reasonable doubt.

One, that the Defendant knowingly altered, destroyed, mutilated, concealed, covered up, falsified, or made a false entry in a record document or tangible object.

Two, that the Defendant acted with the intent to impede, obstruct, influence the investigation, or the proper administration of, in relation to, or in contemplation of a matter.

21

And, three, that the matter was within the jurisdiction of the Federal Bureau of Investigation, which is an agency of the United States.

Again, I will repeat these instructions and provide additional information about the elements of these two crimes at the end of the trial before you make your decision.

Now, a few words about your conduct as jurors.

During the course of the trial, do not talk with any witness or with the Defendant or with any lawyers in the case.  Please do not talk with them about any subject at all.

You may be unaware of the identity of everyone connected with the case.  Therefore, to avoid even the appearance of impropriety, do not engage in any conversation with anyone in or about the courtroom or courthouse.  It is best that you remain in the jury room during breaks in the trial and not linger in the hall.

In addition, during the course of the trial, do not talk about the trial with anyone else, not your family, your friends, not the people that you work with.  Also, don't discuss this case among yourselves until I have instructed you on the law, and you have gone to the jury room to make your decision at the end of the trial.

Otherwise, without realizing it, you might start forming opinions before the trial is over.  It is important that you wait until all of the evidence is received, and you

have heard my instructions on rules of law before you deliberate among yourselves.

And let me add that, during the course of the trial, you will receive all of the evidence you may properly consider to decide the case.  Because of this, do not attempt to gather any information on your own which you might think helpful.  Do not attempt to visit any places mentioned in the case, and do not in any way -- in any other way try to learn about the case outside the courtroom.

You, as jurors, must decide the case based solely on the evidence presented here within the four walls of this courtroom.  This means that during the trial, you must not conduct any independent research about the case or the individuals involved in the case.

In other words, you should not consult dictionaries or reference materials, search the Internet, or use any other electronic tools to obtain information about this case or to help you decide the case.

Please don't try to find out information from any source outside the confines of the courtroom.

I know that many of you use cell phones, the Internet, and other tools of technology.  You also must not talk to anyone at any time about this case or use these tools to communicate electronically with anyone about the case. This includes your family and friends.

You may not communicate with anyone about the case, or use these tools to communicate with anyone about the case through any means, including your cell phone, email, iPhone, or other smart phone, text messaging, or SnapChat, or Twitter, or through any blog or website, including Facebook, Google, LinkedIn, TikTok, or YouTube.

You may not use any similar technology of social media, even if I have not specifically mentioned it here.

I expect you will inform me as soon as you become aware of another juror's violations of these instructions.  A juror who violates these instructions jeopardizes the fairness of the proceedings, and a mistrial could result, which would require the entire trial process to start over.

I will give you a roadmap to help you follow what will happen over the entire course of the trial.

First, the United States will make an opening statement, which is simply an outline to help you understand the evidence as it is admitted.

Just as the Indictment is not evidence, neither is the opening statement evidence.  Its purpose is only to help you understand what the evidence will be and what the United States will try to prove.

Next, the Defendant's attorney may, but does not have to, make an opening statement.

Opening statements are neither evidence nor

24

argument.

Next, the United States will offer evidence that it claims will support the charges against the Defendant.  The United States' evidence may consist of the testimony of witnesses, as well as documents and exhibits.  Defendant's counsel may cross-examine these witnesses.

Following the Government's case, the Defendant may, if he wishes, present witnesses whom the United States may cross-examine, and may offer documents and exhibits as well.

If the Defendant decides to present evidence, the United States may introduce rebuttal evidence.  After all of the evidence is in, the attorneys will present their closing arguments to summarize and interpret the evidence for you, and the Court will instruct you on the law.

After that, you will retire to deliberate on your verdict.

At the end of the trial, you will have to make your decision based on what you recall of the evidence.  You will not have a written transcript to consult, and it is difficult and time-consuming for the court reporter to read back lengthy testimony.  I urge you to pay close attention to the testimony as it is given.

If you wish, you may take notes.  But if you do, leave them in the jury room when you leave at night.  And, remember, they are for your own personal use.

25

You will not be permitted to ask questions of witnesses or of the attorneys in the case.  Therefore, please do not interrupt the lawyers during their examination of witnesses or otherwise.

If, however, you are unable to hear a witness or lawyer, please raise your hand, and I will see the situation is corrected.

Okay.  The trial will now begin.

Mr. Machichek, if you would please read the Indictment against the Defendant.

MR. MACHICEK:  Yes, Your Honor.

If it pleases the Court.

Counsel.

Members of the Jury.

In the United States District Court for the Eastern District of Texas, Tyler Division, in the United States of America vs. Kelly Jason Smith, Second Superseding Indictment, the United States Grand Jury charges:

Count 1.  Violation, Title 18, United States Code, Section 242, deprivation of rights under color of law.

On or about July 25th, 2022, within the Eastern District of Texas, the Defendant, Kelly Jason Smith, while acting under color of law as constable of Wood County, Precinct 2, willfully deprived R.E., a person known to the United States Grand Jury, of the right secured and protected

by the Constitution and laws of the United States to be free from unreasonable seizures, which includes the right to be free from the use of unreasonable force by a law enforcement officer acting under color of law by unreasonably causing and directing his police dog Mata to bite R.E. while R.E. did not pose a threat that warranted the use of the police dog.  The offense resulted in bodily injury to R.E., in violation of Title 18, United States Code, Section 242.

Count 2.  Violation Title 18, United States Code, Section 1519, falsification of a document.

On or about July 25th, 2022, within the Eastern District of Texas, the Defendant, Kelly Jason Smith, while acting in relation to and in contemplation of a matter within the jurisdiction of the Federal Bureau of Investigation, an agency of the United States, knowingly falsified and made false entries in a document and record with the intent to impede, obstruct, and influence the investigation and proper administration of the matter, in violation of Title 18, United States Code, Section 1519.  Signed, Foreperson of the Grand Jury.

THE COURT:  Thank you, sir.

Mr. Smith, if you would please stand.

How do you plead?

MR. SMITH:  Not guilty, Your Honor.

THE COURT:  Okay.  Thank you, sir.  You may be

27

seated.

As I understand, the parties want to invoke the Rule.

MR. SKIPPER:  Thank you, Your Honor.

THE COURT:  At this time if any witness is present who is not an expert witness or an agent with the Government, then I would ask you to leave.

Okay.  The Government may present its opening statement.

MS. BATSON:  May it please the Court.

Counsel.

Good afternoon, ladies and gentlemen of the jury.

A Constable, his K9, his violation of a citizen's constitutional rights, and his attempt to cover up his actions, that is what this case is about.

As the Judge told you, this part of the trial is called the "opening statement."  This is where we, the attorneys, get to tell you what we believe the evidence will show.

I believe that the evidence will show that on July 25th of 2022, Hawkins Police Department officers had warrants for an individual by the name of Robert Evans.  They proceeded to a location where they believed Robert Evans to be.  When they got to that location, they did, in fact, see Mr. Evans.  He poked his head out, and then went back in.

You will see that Mr. Evans did not come back out. So, as a result, the Hawkins police officers contacted other law enforcement officers in the area and asked for assistance in executing the warrants.

One of the officers who responded was this Defendant, Kelly Smith. Now, you will hear that Kelly Smith is a K9 handler. He is also the Constable for Precinct 2 of Wood County.

He got to the scene with his dog. And once he arrived, the decision was made that he would deploy the dog in an effort to arrest Mr. Evans.

You will hear that the K9 warnings were given: K9. Come out, or you will be bitten.

And you will see and hear that once Mr. Evans knew that he was going to be arrested or bitten by a dog, he attempted to surrender. He told Kelly Smith: Put the dog up. I'm showing you my hands. I will come out. I will come out. Put the dog up.

This exchange went back and forth, back and forth. There was numerous times when Robert Evans attempted to surrender.

But the Defendant, Kelly Smith, was not having it. He absolutely was not having it. He had one job. One job. And that was to arrest Robert Evans with the least amount of force possible. The least amount of force.

He failed at his job.  He failed at his job by not arresting Robert Evans with the least amount of the force possible.

He failed at his job by not downing his dog, by not calling his dog off when Robert Evans was no longer posing a threat.

He failed at his job when he abused his authority, and that abuse of authority resulted in pain and injury to a citizen of the United States.

Then, on top of that, he files a false affidavit in which he lied, or tried to spin the narrative of what happened during Robert Evans's arrest on July 25th of 2022.

And, ladies and gentlemen, who does that?  Who does that?  Someone who is guilty.

And at the end of the trial, we will ask you to find this Defendant guilty, find him guilty of depriving Robert Evans of his constitutional right to be free from unreasonable force during his arrest, and find him guilty of falsifying an affidavit to cover up his unlawful and his willful actions.  Thank you.

THE COURT:  Thank you, ma'am.

Mr. Skipper.

MR. SKIPPER:  Your Honor, would you like me there or there?

THE COURT:  There would be better.  Thank you.

MR. SKIPPER:  May it please the Court.

Counsel.

Members of the Jury.

President Reagan once said the nine most terrifying words in the English language are:  I'm from the Government, and I'm here to help.

Contrary to what you just heard on this side of the room here, this case is not about that.  This case is about three things:  Credibility, integrity, reasonableness. That's it.  Three things.  One side of this room has them; one side of this room does not.

July 25th, you were given the 30,000-foot view, and I am going to give you the Paul Harvey version.

Kelly Smith is going home.  There is a man barricaded in a trailer home in Hawkins who had been on the run for 34 days from this felony.  34 days of his life he had thumbed his nose at the law-abiding citizenry of this community.  For 34 days, he said, I'm going to do what I want, for 34 days.

And on that unlucky 34th day when his estranged wife, Jennifer Evans, dimed him out, he got caught because there is other people who wanted him caught because he was wanted on a felony.

And so when his estranged wife, Jennifer Evans, dimes him out, there are two people that go to this scene,

both of whom you will hear from, either by me or by them, one of whom's name is Eric Tuma. He is the Acting Chief of Police of Hawkins, Texas, at this time.

The previous Chief of Police a guy, Manfred Gilow had resigned, and so Eric Tuma is the man. He is man in charge. He is the on-scene commander for that crime scene and for that perimeter. And nothing is going to get done unless he tells them to do it.

Eric Tuma arrives on the scene, along with another agent -- pardon me, another officer named Adam Newell. And these two guys, when they talk to the FBI, they spin a little story and talk about how, well, I checked the air conditioner. You know, I saw some tracks, like they were looking for some deer tracks down there.

And they go back and forth, as opposed to just saying, hey, Jennifer Evans called us, and wants this guy to be arrested. He is wanted for a felony.

They go out there. When they walk up to the scene -- this is going to be on body camera footage -- Robert Evans, who they both knew. Everyone in this case knew this guy Robert Evans except Kelly Smith. And Robert Evans pokes his head out the door. There is a tarp there. He sees Eric Tuma, and he sees Adam Newell. Shuts the door, locks it, and goes back inside.

And he doesn't come outside. He does not comply.

See, that is what happens when you are wanted for a felony -- and he will later tell the FBI, after he has lied to them about three times and they just disregarded it, I didn't want to go to jail.

Well, no kidding.  Most people don't want to go to jail.  But he lies about it after his arrest when they pick him up to be their prime witness in this case.  And he keeps looking at them and lying through his teeth and said, no, I was in there just using the bathroom.  He says some salty language about using the bathroom and wiping his rear end.  And he sticks to that story.

Because once he picks a pony, he has got to ride that story.  And the FBI lets him do it.  And they keep letting him do it.  Because it hurts your narrative if you have a predetermined outcome to put somebody away.  That is what is called tunnel vision.

So if someone is not telling you what you want to hear or seeing -- this is very important on this video that is brought up -- or seeing what they want you to see.  See, the Government doesn't get to tell you what your two eyeballs see.  It doesn't get to tell you what your two ears hear.  You are each an independent factfinder.  And that is the way this case is going to play out.

So Tuma and Newell are on scene.  They see Robert Evans run back inside.  They are telling him, come out,

Robert, I know you are in there.  Eric Tuma actually goes up to the door, walks up, tries to open it, and it is locked.  So he comes back out.

And it is interesting to note that -- I don't believe this got mentioned in the opening statement, those are Eric Tuma's warrants.  I will repeat that again.  These four warrants and this one felony are Eric Tuma's warrants.  He put them on this guy.

Do they go in?  No, they give him the Uvalde treatment there in Hawkins.  They sat around.  That is what happened on their warrants.  They are the guys who want other people to clean up the trash.  Walking your dog on the sidewalk downtown over here on the square, and he wants to relieve himself, they don't have a doggie bag to clean it up.  They want you to do it after you step in it.  That's what the evidence is going to show.

So Eric Tuma, he gets on the radio because he wants someone else to clean up his mess.  Hey, I need assistance out here.  We have just seen Robert Evans poke his head out the trailer, and he went back inside.

Dispatch:  Is he wanted?

Yes.

For what?

Felony, three misdemeanors.  I put them on him.  We are going to wait for relief.

So he and Adam Newell hang out outside the front there.  It is burning hot outside, July 25th of last year, and they wait.  And he tells Adam Newell, he says, we are going to wait for John to get here before we breach.

Well, this guy is named John McQueen.  He is the Constable over in Precinct 3, Wood County.  And what you also didn't hear is John McQueen has been a long-time friend of the Evans family.  Knows Robert Evans.  Knows his mom, Cheryl Evans.  As a matter of fact, this trailer house on this video, his mom, Cheryl, owns a daycare center across the street from it where Robert goes to take showers.

It is hard to imagine someone using the bathroom if you don't have running water, isn't it?  Or when the light bulb doesn't work in the room, or you don't have any toilet paper in there.  He is a liar is what he is.

So while these two cops in Hawkins are giving the Uvalde treatment waiting for someone else to come, John McQueen shows up.  And he exchanges information with Eric Tuma.  John McQueen, he goes around to the south side of the trailer.  If I am here and the Court's bench is here, there is the trailer home here.

Adam Newell is on the back north side, Eric Tuma is on the front north side, and John McQueen walks around to the south side of the trailer.  And he is just hanging out.  He is wiping some ants or grasshoppers off his pants, doing what

people do while they wait it out.

But did they breach when John McQueen got there? Absolutely not.  We wouldn't want to do that.  We are going to wait some more.

While they are waiting some more, John McQueen -- you didn't hear any of this in their opening -- gets a phone call from Cheryl Evans, the mother of the person who is now barricaded inside the trailer home.  Nowhere did he ever tell that to the FBI.  No agent that testifies here will ever testify to that.  It is not in any notes.

When that call comes, you will hear it on his body camera.  Call from -- and it is like this automated notice, Cheryl Evans.  You see his body camera move this way, and he is doing something with his fingers.  And then he goes back.  The only time he does that.

If he is not checking on -- Robert Evans has a dog in the backyard.  He is black.  He named him Spook.  So he is checking on the dog.  And then he comes back around and is waiting for these other people to help clean up their mess.

And the very person who could de-escalate and extract this individual from the situation is calling his phone while he is outside.  Never admitted this one time to the FBI.  Not until his third statement to the FBI did he ever admit that, hey, by the way, you guys may want to know, Robert Evans called me a week prior to July 25th and told me

36

he wanted to surrender to me because he doesn't trust the Hawkins Police Department.

Most FBI agents would say, man, that's probably something you should have mentioned to me the first time we sat down. Not them. That may be something you should mention before the Grand Jury. Oh, I'm sorry. You already gave sworn testimony before the Grand Jury. That may be something an FBI agent would like to say. Why didn't you say that when you swore under oath to the Grand Jury and provided your testimony. On September 15th, why didn't you say that? Because it hurts the narrative. It hurts them.

Just like the things you are going to see on the video with your eyes, not the Government's eyes. They don't dictate what you see. They don't dictate what you hear. If it doesn't fit what they want, they are going to force that square peg in that round hole. They are going to grind that thing down.

So McQueen is hanging out now. Guess who shows up next? Sgt. Austin Milbourn. He is a deputy sheriff at the Wood County Sheriff's Office under Kelly Cole there, Austin Milbourn shows up.

It is important now because you are going to see a Wood County K9 on Austin Milbourn's gear. He does not have a dual-purpose K9. Okay. His is just a detection only, narcotics. So you have either -- in broad terms you have got

narcotics, or you have got what is called patrol, okay, the dual purpose. They are going to do apprehension, protection along with that.

He only has narcotics. And so when he comes out, Austin Milbourn, he can't use his dog. Austin Milbourn walks up. Well, just before that a guy named Justin Graham walks out of that trailer home, a felon, with a pipe in his hand. He just walks out and is sitting there and starts lying to everybody. Oh, I have been in there sleeping. I didn't know you guys were out here.

They are like, come over let here. Let me detain you for a minute and make sure we are all safe.

So Austin Milbourn comes up -- you will see it on camera -- hey, may, just man shoot me straight, is there anybody else in there? You know, we are worried about our safety.

That is kind of important. Because we try to help people from unsafe people. And he is sitting there lying, just like his buddy Robert in there lying.

And so what do they do? They wait. And who tells them to wait? Eric Tuma. The Acting Chief of Police and on-scene commander, when Austin Milbourn says, hey, boss, we have got an apprehension K9. It is going to be this guy right here, my client, on the way. Because Kelly gets on the radio and says, I will head that way. If you don't need me,

call me off.  That's a 10-22.  If you don't need me, I'll go back to what I was doing, going home to my wife and kids.

Do they do that?  No.  Do they let him stay?  Yes. When Kelly gets there, they want him there.  They need him there because he has a dog, which is tool, less than lethal effect a lawful, reasonable arrest of a guy with a felony warrant who has been on the run for 34 calendar days. Barricaded.  Not complying.

So Austin Milbourn gets there.  He continues his conversation with Justin Graham.  And Justin Graham, again, says, I don't know if anybody is in there.  Well, that is nonsense.  If anybody grew up -- I grew up in Kilgore right down the road.  I grew up in trailer homes.  If you are in a trailer home, you know if someone else is in there.  And he dang near sure knew that Robert Evans was in there.

And they detained Justin Graham, like I mentioned. And Graham says that Cheryl, Robert's mother, wanted him down there to work on the water, the water line, even though there is no water in there.

And as he is waiting, Kelly Smith, Constable Smith here, he drives up.  You are going to see this on a video. Because, see, the Government wants you to believe that you are dealing with a cowboy, a renegade.  Not in the United States.  We are going to take down this guy.  That is what they want you to believe.

39

This man pulls up with a dog in the back of his car, gets out of the car with no dog, walks up.  You will see this.  And he talks to the Acting Chief of Police and on-scene commander, Eric Tuma.  Hey do you need me?  And Tuma tells him yes.

He goes back to his car and grabs Mata.  Mata is the name of the dog.  It is a Belgian Malinois.  And Kelly comes up with the dog.  He doesn't jump out of the car with this dog throwing his gear on.  What is this guy's name?  Where is he?  Let's go get them.

That is why Toby was talking to you about willful.  It is going to very important in this trial.  If you even think it is unreasonable, in light of all of the testimony that you are going to hear, experts on both sides, only then will you move to the state of mind of willfulness.

So Kelly Smith, the Constable, gets out with his dog, and they walk up.  And he confirms, he goes, hey, what do you got here, Eric Tuma?  Again, on-scene commander, Acting Chief of Police.  Felony warrant.  I put it on him.  That is what Eric Tuma said.

Okay.  Well, what do you want?  And then Austin Milbourn says, well, you can do a building search.  And Kelly looks at Tuma.  See, I didn't do a building search.  Are you sure no one else is in there?  Yeah, as far as we know.  All right.

40

I want you to watch very closely to the questions asked of the people who sit in the box right now in this trial, every person who subjects themselves to the crucible of cross-examination. Don't just listen to the answer. Listen to the question.

At no point, this is very important, did Eric Tuma ever say, by the way, I just want to use your dog as a scare tactic. This is what we get into, a fluidity of a narrative. So when your points start falling apart on the board, you have to go somewhere else.

So when their case develops, they say, well, maybe you just wanted to use him as a scare tactic. When you see this video and hear these people swear under oath and testify, remember all these things.

He never said, yeah, Kelly, put him in there to scare him. No. Go get that person. I don't want to do it. I am too afraid to do it. You know, I can't even take care of my own business, and I run Hawkins PD at this point. I want you to do it. So Kelly says, okay, we need to give the K9 warnings.

So Austin Milbourn, he walks up to the side of the trailer home right here. The porch is to his left, and the door right is here, and he yells. In the distance from which you enter right there, he is yelling directly across that bathroom. And you watch this video, Robert Evans is tucked

into his bathroom with no lights, no working light switch.

He has the complete tactical advantage over any law enforcement officer who tries to come into that residence, inside that perimeter.  He chose where he is going to hide. He chose where he was going to barricade himself.  And he chose to do it in a bathroom that he knew had no light switch with the door closed that he could control.  Because, again, he has finally admitted, I didn't want to go to jail.

And so Austin Milbourn, he says, K9, come out with your hands up, or you will be bit.  K9.  He says a lot louder than that.  Come out with your hands up, or you will be bit. Again, two more opportunities for this person, who was unreasonably injured, to come out with his hands up and surrender.

He doesn't do that.  Do they go -- does Kelly Smith and Austin Milbourn go to the back of the tailgate and make s'mores and warm up some hot milk and hang out for a while? No.  They do their job to protect us.  That is what their job is.  They are police officers.

I don't know what commanding officer Newell's job is other than -- pardon me, Tuma, in Acting Chief of Police of and being the lead singer of a garage band on the weekends.  He sings for some group called Gallows Crow.  But he certainly doesn't want to be a police officer.

So when Adam Newell -- pardon me, when Sgt.

42

Milbourn and Kelly Smith approach the door, the door is now barricaded.  After Justin Graham came out, Robert Evans barricades the door.  He admits to lying about this later again.

And Austin Milbourn goes to breach, where you are kicking the frame of a door to try to open it.  And he doesn't have so much muscle, and they call John McQueen, who is sitting over there, just standing there on the perimeter to come in.  John McQueen is a little bit bigger, and he could put some more force into that door frame.

They pop the door.  Again, they say, K9, come out with your hands up.  You will be bit.  22 minutes, you guys remember this, whether you want to the take notes on it or not, 22 minutes from the time Robert Evans stuck his head out, saw two police officers, knowing they were there to serve him with a warrant that he was running from and thumbing his nose for 34 days, he goes back inside his residence, 22 minutes from that point until they breach that door.

Never any evidence from any person you are going to hear in this trial that he tried to come out peacefully, lawfully, what he was supposed to do as a law-abiding citizen.  Not one shred of evidence, not bit of video evidence will you see where Robert Evans tried to come out peacefully and surrender.

43

These are words.  Words are hollow.  You don't have to believe anything that I am going to say.  I am telling you what the evidence is going to show you.  One thing I am not going to do is tell you what to see and what to hear.

He does not show him his hands, Robert Evans.  He never does.  Never happened.  There is experts here, some of them are sitting here right now, that are going to try to say this man had his hands out.  Never happened.

When Kelly Smith goes into the hallway, he comes in, Austin Milbourn and John McQueen -- well, as soon as he looks down, there is a black pit bull there, another external factor no one knew, there was a black pit bull mix.

So the officers have to take this dog out and give it to the felon who has handcuffs behind his back as opposed to Adam Newell, because he is not doing anything productive.  Can't even hold the dog.

So they have a guy in handcuffs holding a dog like this, because that is a wise idea, while Kelly is now inside by himself.  You actually -- you hear this man yell, cover.  He is by himself in a completely tactical disadvantage, when he finally figures out, because Mata is running around, that Robert is inside the bathroom, and he is pushing this door to.  There is no doorknob.  You will see all this.  He is forcing that door shut.  Come out.  Come out.  Oh, if you will put the dog up, I will come out.  If you'll put the dog

44

up, I will come out.  I am in here taking an S-H-I-T, and wiping my rear end.  That is what he is saying.  That didn't happen.

What you will next see is that right when Kelly is in front of the door, again, poor tactically -- no one ever is going to say in any of these cases that any of these incidents are perfect far as tactically, whether SWAT is there or not, whether things happen.  Anyone can always do things better.  Well, you shouldn't have stood right in front of the door where you thought a guy could have a weapon.

Well, sure.  But we are talking about charging a man with a crime.  Again, he is in there.  He is not a Uvalde guy.  He is taking care of the citizens.  And Kelly specifically says, first thing, show me your hands.  I don't know if you have any weapons.  You are barricaded, brother.

What does he do?  He keeps his shoulder on that door.  Again, he is in pitch black.  If you know anything about ambient light, so Kelly is on the other side of that door.  The light is going to be coming into that room, where he, Robert Evans, is in control.

So people want to talk about a tactical advantage, the only tactical advantage when you have a guy in his own home choosing where he hides, where he barricades himself, where he chooses not to comply, that is the tactical advantage.  Kelly is on the outside of the door trying to get

this guy under arrest.

The next thing you will see is he is saying, I'm showing you my hands.  He is not showing his hands.  He puts his right hand out.  You will see it in the video.  You will see it just like this.  And he grabs the right side of that door frame just like this.  You will see his hand grab the right side of that frame, and then you will see that door going again before John McQueen comes over and puts his shoulder in the door.

The next thing you will see is for six seconds, six seconds, nothing but blackness because the guy Robert Evans, the liar, the fugitive, chose a room with no light switch.

Mata goes in, the dog, to try to do what he is trying to do.  He is not apprehending him.  It is chaos.  And there is a black pit bull coming in.  There are all kinds of things going on.

And during that six seconds, you will see this red dot that is painting Kelly Smith's -- that is John McQueen, actually has his taser extended.  John McQueen knows the Evans family, who got called by Cheryl about two minutes earlier, painting the back of Kelly Smith.

Austin Milbourn finally comes around with his light because John McQueen is doing nothing.  He is a paperweight at this point.  He comes around with the flashlight, and finally lights the thing up.

46

At that point you see Robert do this, he grabs the dog's equipment.  He grabs Mata's equipment.  Kelly is literally -- Robert Evans has his right hand under his legs grabbing that dog by the collar.  He will not let go.  Kelly is giving commands, let go of my dog, let go of my dog.  You don't grab a dog.  You comply, and you surrender.  He would not let go of the dog.  He would not let go of the collar.

So Kelly finally turns around and issues some soft blows to Robert Evans.  Mata is coming in and out.  He is not apprehending.  A lot of chaos is ensuing.

Robert Evans says -- tells the dog, don't you bite me, bitch.  That's what he tells that dog.  Don't you bite me, bitch.

90 seconds, folks.  This man is sitting in this chair under Indictment in a federal courtroom for 90 seconds of his life, is all that took.  28 kicks on that door, 28.  After 20 minutes of doing absolutely nothing but soaking up Vitamin D in Hawkins, Texas, Eric Tuma and Adam Newell, 22 minutes it took them to breach that door, and 90 seconds in which you are making split-second decisions from someone who was not compliant.  They want to say he wasn't resisting.  He was not complying.

You don't put handcuffs on a man who is sitting there Indian style in a bathtub.  They are going to make this hoopla about Kelly gets over here and puts his hands on his

shoulder.  He can't handcuff him in there.  Tactically, it is not going to happen.

You are going to have experts disagree about all of this stuff, but a tactical decision that in hindsight, which is not the legal standard, poor tactical decisions do not equate to a crime.

THE COURT:  Mr. Skipper, you have got two minutes.

MR. SKIPPER:  Thank you, Your Honor.

You don't come to the water cooler even though you are irritated with Dak Prescott throwing another pick on Sunday and start chopping this thing up like they want to do.  That is not the law.  It is not the standard.

They finally get Robert Evans into custody.  And he goes to jail after being treated at the hospital.

On August 12th, enter the FBI.  They go to the jail, and they interview Robert Evans.  He lies to their face.

September 23rd, interview him again.  Lies to their face.  October 3rd, again, lies to their face.  I was really using the bathroom.  November 30th of 2022, lies again in front of his lawyer with the two prosecutors at the table.

And, finally, says, you know what, you got me.  I didn't want to go to jail.  These people are asking you to convict this man for doing his job and Monday morning

quarterbacking 90 seconds of his life.

That's all I have, Judge.

THE COURT:  Thank you, sir.

Okay.  Ms. Batson, you may call your first witness.

MS. BATSON:  Yes, Your Honor.

Your Honor, the Government calls Special Agent James Crowell.

THE COURT:  Mr. Crowell.

If you would please raise your right hand to be sworn.

(Witness sworn.)

THE COURT:  You may be seated.

MS. BATSON:  May it please the Court.

THE COURT:  You may.

JAMES CROWELL, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. BATSON:

Q.   State your name, please.

A.   James Crowell.

Q.   And how are you employed?

A.   I'm a Special Agent with the Federal Bureau of Investigation.

Q.   How long have you be employed in that capacity?

A.   Be 12 years in July.

49

Q.   And to what division are you currently assigned?

A.   So I am part of the Dallas Division, Tyler Resident Agency.

Q.   Okay.  And what does that mean?

A.   That means that Dallas is our main division, and we are a small office, suboffice of Dallas that covers the East Texas area.

Q.   Okay.  And what types of cases do you specifically work?

A.   So I am currently working public corruption and civil rights.

Q.   All right.  How long have you been working those types of cases?

A.   Approximately two years.

Q.   Two out of the 12?

A.   Right.

Q.   How many, to date, in the last two years, how many civil rights cases have you worked?

A.   Approximately 10.

Q.   10?

A.   10.

Q.   In a two-year period?

A.   In two years.

Q.   Now, what is your previous employment prior to being employed at FBI?

50

A.    So just prior to the FBI, I was a police officer for the Bay Area Rapid Transit Police Department out of Oakland, California, stationed in San Francisco.

Prior to that, I was a sheriff's deputy with Sacramento County Sheriff's Office in Sacramento, California.

Q.    All right.  And so what is your total number of years in law enforcement?

A.    Approximately 16.

Q.    Now, back around the time when you went to the academy, did you receive use of force training?

A.    Yes, I did.

Q.    And did you receive any subsequent use of force training?

A.    Yes.  Upon completion of the Sacramento County Sheriff's Police Academy, when I went to BART PD, I had to do six weeks of like on-board training as a lateral transfer.  We covered use of force training then.  I was -- I learned how to use the taser at that point.  I wasn't certified prior to that.

And then in 2011, when I went to the FBI Academy, we did 22 weeks at Quantico.  And a lot of that had to do with defensive tactics and use of force.

Q.    And that was 22 weeks at FBI?

A.    Correct.

Q.    All right.  And in your law enforcement career, have you

51

also been a defensive tactics instructor?

A.    Yes.   Approximately four years ago, I became certified as a defensive tactics instructor for the FBI.

Q.    And can you tell the jury kind of what the training is that you went through to become a defensive tactics instructor?

A.    Yes.   Part of becoming an instructor, we kind of start at the beginning.   We talk about the use of force continuum, everything from passive, just being present, all the way through deadly force.   So we cover baton training, taser training, all of the less than lethal, all the way up to lethal force.

Then we also talk about what we call defensive tactics, which is arresting individuals, mainly using our hands.   So different wristlocks, different things you can do to control a subject with the idea of using the least amount of force necessary to take the subject in custody.

Q.    All right.   Now, I think you just stated it, but, in general, what is the rule on how much use of force that a law enforcement can use?

A.    You can use only the amount that is reasonable and necessary to effect the arrest.

Q.    Okay.   And can you say it one more time, just a little slower?

A.    Yes.   The amount that is reasonable and necessary to

effect the arrest.

Q.   And is it safe to say that all law enforcement officers are taught this rule?

A.   Yes, everyone is taught that rule.

Q.   So may officers use force to punish somebody?

A.   No.

Q.   Can they use force if they are angry with someone?

A.   No, they cannot.

Q.   Can they use force if they are frustrated with someone?

A.   No.

Q.   Now, again, it is fair to say that all law enforcement officers should know this?

A.   Yes.

Q.   It is taught?

A.   All officers -- if you go to any police academy, you will be taught that.

Q.   Is it also taught and is it fair to say that all officers must have a legitimate reason to use force?

A.   Yes, you must be able to justify your force.

Q.   Okay.  I think you mentioned just now about active resistance, did you mention that?  If not, can you explain what active resisting is?

A.   So, like, actively resisting is when a subject is engaging the officer, maybe attacking an officer, or doing

something actively to not be arrested, as opposed to just not giving their hands or going limp or refusing to comply with verbal commands.  That is something above the basic stages of verbal commands and noncompliance.

Q.    Okay.  And what is passive?

A.    So passive is maybe not giving up your hands or laying on the ground on top of your arms and not giving them up. You are not really fighting.  Maybe even running away.  So something that is not an attack to the officer.

Q.    Now, I think you just mentioned the use of force continuum?

A.    Yes.

Q.    Can you explain that a little bit more to the jurors?

A.    Yes.  So there is a continuum that we are taught, and I have been taught this in every academy that I went to, that it kind of starts at the lowest level, which is uniformed officers, when you enter a room, come to a scene, sometimes that is enough to gain compliance.

Next, would be verbal commands.  Then it goes up through your different tools that you may have, OC spray, taser, baton, K9, whatever tool you have at your disposal, all the way to deadly force.

So it starts at the lowest level and goes up to the top level.

Q.    So in between there you said verbal commands?

A.   Yes.

Q.   And is there something called soft control?

A.   Soft control would be more like just putting your hands on someone to handcuff them.  At some point you are going to have to touch them to put handcuffs on, and sometimes that passive soft control is all you need.

Q.   So soft control, like you said, is handcuffing?

A.   Yes.

Q.   And then in the soft control spectrum, on the spectrum, is like where there is like hardly any -- it is a low risk of physical injury --

A.   Right.

Q.   -- to a person?

A.   Correct.  It is low risk to the officer and to the subject.

Q.   Okay.  And that is soft control?

A.   Correct.

Q.   What is hard control?

A.   Hard control would be more of your -- you may have to provide strikes.  We are taught to strike different areas of the body to gain compliance.  That might go up to your tools on your belt, a baton, a taser, things that are going to have pain compliance.  That is going to be more -- a harder control.

Q.   And that may cause some injury to the suspect?

A.    Potentially.

Q.    And is that also including K9?

A.    Yes.

Q.    Using those weapons with the pepper spray, the baton, and the K9?

A.    Yeah, from learning things in this case with K9s, I am not a K9 officer, I believe the K9 falls in that same use of force.

Q.    Okay.  And then there is lethal force?

A.    And lethal force --

Q.    And that is the highest end on spectrum?

A.    That is the highest.

Q.    All right.  And, of course, that is something that results in death?

A.    Potentially, yes.

Q.    And like a firearm?

A.    Firearm, yes.

Q.    Now, based on your training and experience, when an officer is deciding to use force, is it true that that officer must assess the situation in that moment?

A.    Yes.  When you are going to a scene where maybe you have to arrest somebody, you decide at that moment you have to arrest them, you have got to determine what is happening. You are kind of reacting to what you are getting from the subject.

And it can change.  It can change from just verbal compliance, to soft control.  It can go all the way to deadly force in the blink of an eye.  You have to be able to adjust what you are doing based on what they are doing.

One moment you might be justified using a taser, and then a few seconds later not be justified in using it.  So you have to be able to adapt to what is happening in front of you.

Q.   And, again, this is taught?

A.   This is taught --

Q.   -- to law enforcement officers?

A.   Yes.

Q.   Yes.

All right.  And how many years have you been a law enforcement officer?

A.   16 years.

Q.   All right.  And so, again, in 16 years, have you had to make adjustments in calling on -- changing of tactics, given what is occurring in the situation?

A.   I have been in situations where I have had to use force, and that force changes in the moment, yes.

Q.   Now, at what point does force become excessive?

A.   Force becomes excessive when you have gone beyond what is reasonable for what is happening.

So, again, you are trying to assess what is

57

happening at the moment as to how much force you are going to use. And, of course, we are supposed to use the least amount of force necessary.

When you use more force than is necessary and reasonable, you have now crossed over, potentially into the excessive force category.

Q. So when an officer uses too much force, is it safe to say that they put other law enforcement officers in danger?

A. They are putting other law enforcement officers in danger. They are putting themselves in danger. And the subject they are trying to arrest.

Q. And other citizens?

A. Yes.

Q. Okay. So is it safe to say that the goal in arresting someone, again, is using the least amount of force necessary?

A. Yes.

Q. And then also compliance, getting a suspect to comply so they can be arrested?

A. Getting compliance and in doing it the safest way possible.

Q. Okay. Because safety is the primary concern?

A. Right. We want to go home at the end of the day, and we want everyone that we deal with to go home at the end of the day or to go to jail would be safe.

Q.    Now, based on your training and experience, what are the normal rules for reporting use of force?

A.    So when an officer uses force, they are supposed to report that, and that starts with their report that they are writing.

So they are going to write a report.  Someone -- departments have a special use of force report.  It may just be an incident report.  But they have to put the who, what, when, where, why; all of the circumstances that surround what led up to that, what force they used, who was there, and injuries sustained, if there were any, by the subject.

Q.    So they write all this information down, and they also report it to a supervisor?

A.    Yes.  You would typically report to your first-level supervisor.

Q.    And if an officer does not have a supervisor, then what is the protocol for that?

A.    So in that unique situation where you are the top law enforcement person for your department, from my experience, it would go to the District Attorney's Office, because typically that is going to -- there is going to be a report that is going to go to them, and they are the -- kind of the next level up.  They are going to read your reports, and they are going to review it.

And so I would say that in certain instances like

that, a District Attorney's Office or another law enforcement person higher than you is who you would report that to.

Okay. So if you are the constable of a precinct, then your supervisor would be the DA's office?

A.   In a way, yes. Again, that is a unique situation.

Q.   Okay. Now, you stated you have been doing civil rights investigations for approximately two years?

A.   That's correct.

Q.   And then when you start and you open up a civil rights investigation, one of the elements you have to ascertain is whether or not an individual has been deprived of a right; is that correct?

A.   That's correct.

MR. SKIPPER:   Your Honor, I'm going to object to the leading at this point.

THE COURT:   Sustained.

BY MS. BATSON:

Q.   What is -- what are the elements that you look for when you are opening and starting and your investigation?

A.   So if we are opening and starting a civil rights investigation, specifically like an excessive use of force case, we are looking for, first, the color of law violation. Is the officer acting -- sorry. The -- we are looking for four elements. We are looking for was the officer acting in the capacity of a law enforcement officer? Were they in

uniform?  Were they in the duties of their job?

We are looking for --

Q.   And is that considered color of law?

A.   Color of law.

Q.   All right.  And that is one of the elements.

And you look, again, under color of law whether the officer is what?

A.   Acting in the capacity as a law enforcement officer.

Q.   Okay.  Then what else?

A.   So then next we are looking for the willfulness part. That is the most difficult part.  They deprive a person of their constitutional right, in this case Fourth Amendment violation of search and seizure, and did they deprive them of that right, and did they do it willfully.  So we are looking for that.  And then any injuries.  Did the victim suffer injuries as a result.

Q.   So let's break that down a little bit.  You said color of law.  You have explained that is when an officer is working --

A.   Correct.

Q.   -- in an official capacity --

A.   Yes.

Q.   -- as an officer?

And then you indicated that -- willfulness?

A.   Willfulness.

Q.   Is one of the issues that you have to look at?

A.   Correct.

Q.   And so what evidence do you gather in order to determine willfulness in an investigation?

A.   So we are looking at the willfulness of the officer.  We are looking at the evidence that we have available to us, so body camera footage.  Specific on body camera footage, we are watching if there is good video of the officer, their actions.  How are they acting?  What are they saying?  What are they not saying?  What is their demeanor?  Do they appear to be upset?  So we are looking for things of that nature in the videos.

And then next we are looking for reports.  We are looking for any type of concealment.  Did they write a report that doesn't reflect what actually happened on the video?  Did they file anything with the Court that is different than what actually happened, in an effort to conceal their actions?

Q.   Okay.  Then you also indicated that you have to determine whether there is a Fourth Amendment violation of search and seizure.  Can you explain that a little bit?

A.   Yeah, so when you arrest somebody, that is basically Fourth Amendment rights people have against unlawful search and seizure.  So an arrest is a seizure of their person.  So if that is done not lawfully, that is a violation of their

rights.

Q.   And, again, it has to be reasonable force to arrest someone?

A.   Right.  You have to use reasonable force when arresting someone, yes.

Q.   When it becomes an unreasonable force, then that is a violation of the constitutional right?

A.   That's correct.

Q.   All right.  And then you indicated bodily injury?

A.   Yes.

Q.   Okay.  So can you tell the jury what kind of evidence that you gathered to determine whether pain or bodily injury has resulted?

A.   Yes.  So we will look for things like medical records. Did the victim have to go to the hospital as a result of their interactions with the officer?  What treatments did they have?

     Then we will go, and we will interview the victim. We will ask them, you know, how did it feel?  You know, and if they said they felt pain or anything like that, then we will look for them to tell us the extent of their injuries and couple that all together to determine if there was bodily injury.

Q.   Okay.  And what about video evidence if the victim suspect is screaming?

A.   Yeah.  So, again, if you have good video, you are looking at what the victim is doing and how they are reacting to what is happening.  Are they screaming out in pain?  Did they make comments about being in pain.  Things like that, yes.

Q.   What about contortion of their facial features?

A.   Yeah.  Sometimes you can see the pain on somebody's face.  I think we have probably all seen that before.  Sometimes that is enough to look at it and go, yes, this person was in pain when this particular incident was happening.  Pictures, a lot of times there is pictures taken by officers on the scene if there are injuries.

Q.   Now, specifically, in this case on July 25th of 2022, did you receive information that the Defendant, Kelly Smith, engaged in excessive force?

A.   Yes.

Q.   And then who did you receive that information from, and then what did you do with that information?

A.   So I initially found this information out from Constable John McQueen, who was Precinct 3, who was on the scene that day.  He had gotten in touch with me through another law enforcement officer that we both knew, and so -- that he felt like he had witnessed something that he needed to report on July 25th of the arrest of Robert Evans, and he wanted to talk about it.  And so we set up an interview to tell us what

happened.

Q.   Okay.  And do you recall how long after the incident occurred on July 25th that you spoke initially with Constable McQueen?

A.   We spoke on July 26th.

Q.   Okay.  The following day?

A.   Following day.

Q.   After the incident?

A.   That's correct.

Q.   Were you able to meet with him in the person that day?

A.   No, we didn't meet until I believe August 1st.

Q.   August 1st, okay.

And then what was the delay?

A.   There were -- I don't remember exactly what was the delay.  I think it was the scheduling with my schedule.  I had other cases I think going on.  So that is just the day that we decided that would work best for everybody.

Q.   Now, do you recall what information Constable McQueen provided to you over the phone?

A.   He just kind of gave me the basics of what happened.  He explained that Hawkins PD had a warrant, had a barricaded subject that he and other officers, including the Defendant, had come to help with that arrest.  And that during that arrest, what he had observed was K9 -- I don't think he knew the K9's name, but the K9 had bit the victim, and had drug

him out of the bathroom.  He was kind of dragging him down the hallway.  That is what he had seen with his own eyes, and that's what he had a problem with.

Q.    Okay.  At that point he had just -- the problem with dragging, the dog dragging --

A.    Correct.

Q.    -- Mr. Evans down the hallway?

A.    Yeah. He said that is what he saw that he didn't feel was right, and he felt he needed to report it.

Q.    And then when you met in person with Constable McQueen, did he provide you any information and then discuss further concerns?

A.    Yes.  So when we finally got to meet, he said he had an opportunity to review other body cam footage from the incident.  Wood County Sgt. Austin Milbourn's body camera caught the majority of the incident, and he had a chance to review that, and saw other things on that video that he had an issue with as well.

Q.    Okay.  And what were some of those other things?

A.    At one point the Defendant had punched Robert Evans in the face, dropping him to the ground.  He felt that that was unnecessary.  And then at one point the Defendant held Robert Evans down while the K9 bit him, and then dragged him out of the room.

Q.    Okay.  And based on that information, had you determined

66

that you were going to open a case?

A.   Yeah.  So based on his statements and his observation, we decided there was enough to at least open an investigation to do a full look into what happened.

Q.   Okay.  And then once that determination was made, did you subsequently receive other video recordings from the other officers who were present?

A.   Yes.  So once we had talked to Constable McQueen and learned all who was on scene that day, we started gathering all of the other body camera footage and reports and things of that nature.

Q.   And did you also in your gathering of the videos and other reports, did you also obtain an affidavit that the Defendant had filed, specifically dealing with interference with police service handler?

       MR. SKIPPER:  I am going to object to leading.

       THE COURT:  Sustained.

BY MS. BATSON:

Q.   What other documents specifically did you obtain?

A.   So we obtained, like I said, all of the body camera and then all of the written reports, along with two affidavits that were sent to the Wood County DA's office to add additional charges to Robert Evans from the incident.  One was a misdemeanor for resisting arrest and one was a felony for interfering with the K9.

67

Q.    Okay.  So you said there were two affidavits filed?

A.    Correct.

Q.    Were both of those filed by the Defendant?

A.    Yes.

Q.    Again, what were they?

A.    So the first one was resisting arrest, and the second was interference with a K9.

Q.    The first one, the resisting arrest, was that a misdemeanor or a felony?

A.    That was a misdemeanor.

Q.    And then the interference with a police dog?

A.    That was charged as a felony.

Q.    Now, you decided to open up your own investigation, and then what date -- can you tell the jurors what the procedure is when you open up one of these types of cases, what is the approval process?

A.    So when we are opening a civil rights investigation, we have to get certain levels of approval from our management, as well as from the U.S. Attorney's Office.

        So what we do is we write up our initial predication for the case, so kind of what we know at that time that is giving us enough to at least open an investigation to start the investigation.

        That goes through multiple layers of approval.  It goes to our direct supervisor.  It goes to our chief division

counsel in Dallas, who is an attorney for the FBI and also an agent. They review it and approve it. It goes to our assistant special agent in charge. And then our special agent in charge, who is the main agent for the Dallas Division. So you have to have four levels of approval before they will let you investigate a case like this.

Q. To even open a case?

A. To even open it.

Q. Four levels?

A. Correct.

Q. All right. And you subsequently got the approval?

A. Yes.

Q. Okay. And then so your investigation was already in process?

A. Yes. We had already gotten some basic information, at least enough to open the investigation to move on to a more thorough investigation.

Q. Again, what day was it that you met with Constable McQueen?

A. I believe it was August 1st.

Q. Do you remember when you got the approval to open up the investigation?

A. I want to say it was August 10th. It took a little while to get all of the layers of approval for that.

Q. Okay. Then on August 16th, six days after you got the

approval, did the Defendant contact you?

A.    Yes.  I believe I was driving home, and I got at phone call from the Defendant.  We had previously asked for copies of body camera footage, you know, everything from this incident from the Defendant.

He called me and said that he wanted to cooperate with the investigation and was putting together all of the information we had requested, that he did have an attorney, and that this attorney was going to review the information before providing it to us, which we were fine with.

And then he went on to make some statements about the incident itself.  He had stated that he had gone to help and that -- deployed the K9, and that the K9 did bite Robert Evans.  But he said that Robert Evans was trying to strike K9 Mata and himself with a plunger, and that he was proud of the dog for not biting him at one point, and that the dog only bit after Evans tried to kick the dog, and the dog bit defending itself basically.

Q.    Okay.  Did he indicate to you that Evans had tried to grab the dog's collar?

A.    Yes, he did make the statement that Evans had grabbed the dog at one point.

Q.    Okay.  And did he indicate to you where this whole incident took place inside the residence?

A.    Yes, it was inside a trailer home in a small confined

space in the bathroom.

Q.    And he indicated that the bathroom was small?

A.    I think he said confined.  He may have said small.  But I remember thinking it was a confined space, so a small space.

Q.    Okay.  Did he indicate to you anything about a particular area of the body that his dog liked to bite?

A.    He made the comment that K9 Mata likes to bite feet, because he said he had drug him out by his foot.

Q.    Okay.  And then you mentioned something about a plunger?

A.    Yes.  He made the statement that at one point during the interaction with Evans, Evans picked up a plunger and tried to strike both K9 Mata and himself with the plunger.

Q.    So Constable Smith is telling you that Evans picked up a plunger and tried to strike not only him but also the dog?

A.    That's correct.

Q.    Okay.  And I think you just stated something about Evans kicking the dog?

A.    Yes.  He said that K9 Mata bit Evans after Evans tried to kick K9 Mata, and Mata defended himself by apprehending his foot -- or biting his foot and dragging him out of the tub.

Q.    And this was a conversation in which the Defendant called you, again, on August the 16th?

A.    That's correct.

Q.    All right.  And this was after you had already contacted other law enforcement officers, as well as the Defendant himself, asking for documents and records?

        MR. SKIPPER:  Your Honor, I am going to object to leading.

        THE COURT:  Sustained.

BY MS. BATSON:

Q.    So did the Defendant reach out to you again on August the 23rd?

A.    Yes.

Q.    Okay.  Was that by text?

A.    He sent me a series of text messages, yes.

Q.    What was the contents of those text messages?

A.    So he forwarded me a YouTube video from a guy named Todd Eddington.  In the YouTube video it was Todd Eddington recording his screen, and what it sounded like he had called in a welfare check on the Defendant saying that he hadn't posted on social media in a long time and was worried about him and wanted the Wood County Sheriff's Office to go do a welfare check.

        In the caption of the text there was something to the effect of this is what I deal with on the daily with this guy Eddington.  I responded, must be exhausting.  He said, it is, or something to that effect.

Q.   And so when the Defendant sent you this text message, what did you think?

A.   So I had already known who Todd Eddington was.  He is kind of a blogger in Wood County and likes to make statements about local law enforcement not doing their job right, things like that.  Thinks he is blowing the whistle on a lot of corruption and things like that.  So I had heard of him before.

      So, in my mind -- and I knew that he had talked about Kelly Smith on his page before, that he and Kelly didn't like each other, and that he was just basically telling me, hey, look, this guy Eddington is a problem for me, and you should see what he is doing.

Q.   Okay.  And at the time that you received this text, did Constable Smith know that you were investigating him?

A.   Yes.

Q.   Did anything about your -- either conversations with the Defendant or the texts from the Defendant lead you to believe that he believed that Todd Eddington was the source of this complaint?

A.   Yes.  Because we had -- previously, I believe it was two days after the incident of July 27th, the Defendant had gone on the FBI tip's website and made a complaint against Todd Eddington saying that he was making threats against him.

      So that came into our office.  I did not initially

review that.  We have an agent those things go to.  That agent reviewed the information in that.  I had known he had already made a complaint against Todd Eddington about threats.

Then on the 23rd of August I get the text message kind of complaining about Todd again.  So I felt like he was trying to push us in that direction, and he had made statements about Eddington was going to complain about Robert Evans being bit.  So we knew that as well.

Q.   Okay.  So this incident, this arrest of Robert Evans, occurred July 25th of 2022?

A.   Correct.

Q.   Subsequent to that, the Defendant made a complaint through FBI --

A.   Yes.

Q.   -- about Todd Eddington?

A.   Yes through our tip line.

Q.   What day was that?

A.   I believe it was July 27th.

Q.   Again, what was the substance of the complaint made by the Defendant?

A.   The Defendant complained that Mr. Eddington posted a lot of stuff about him, and that there were some threats made from Mr. Eddington to the Defendant, and the Defendant was worried about the complaints -- or worried about the

threats.

Q.    Okay.  And were the alleged threats investigated?

A.    Yes.  So the agent who was in charge of investigating the tip line, looked into it, contacted the United States Attorney's Office, talked to them about it.  And there was a determination made that they were not credible threats.  They were not threats that were to be deemed credible, so there was no investigation opened on that on our part.

Q.    Okay.  I believe you also stated that during the complaint, that the Defendant indicated to the FBI that Eddington would be calling the FBI to complain?

A.    So I think there was a subsequent phone call made to the Defendant from the agent who was investigating.  And that is when that statement was made.  Not in the written complaint, but later there was a telephone conversation between the agent and the Defendant.

Q.    All right. And what was the substance of that statement by the Defendant?

A.    That he kind of went over the incident again and said that Eddington -- he was sure that Eddington was going to file a complaint against him on that, about the bite of the Robert Evans.

Q.    Did he indicate why?

A.    He said he just doesn't like him and had it out for him.

75

Q.    Now, did you subsequently obtain all of the videos in this case from all of the officers who were on the scene?

A.    Yes, I did.

Q.    Did you review all of those videos?

A.    Yes, I have.

Q.    And which officer's video has the best view of what happened in the small bathroom?

A.    Sgt. Milbourn's video.

Q.    And, also, during your investigation, did you determine the commands that Kelly Smith uses for his dog?

A.    Yes.

Q.    And what is the bite command?

A.    The bite command -- I'm probably not pronouncing it right, but it sounds like foogosh, is what it sounds like. It is Hungarian.

Q.    Okay.  And -- oh, you learned that his dog responds to commands in Hungarian?

A.    In Hungarian, yes.

Q.    So the bite command is what again?

A.    Foogosh is what it sounds like.

Q.    And what is the "come here" command?

A.    Hozam.

Q.    And then what is the heel command?

A.    I believe it is pronounced like labost.

Q.    And, again, you indicated that it was Austin Milbourn's

video that captured what occurred best in the bathroom?

A.   Yes.

Q.   Okay.  And you have reviewed that video?

A.   I have reviewed it many times, yes.

Q.   All right.  And when you received that video, did you also receive the videos from Kelly Smith?

A.   Yes.  So subsequent to our phone call on August 16th, we did get the information that we requested from the Defendant's attorney at the time, and it had all of the body cam footage, including the Defendant's.

Q.   Okay.  And so you reviewed those, and did you review them again in your preparation for your testimony?

A.   Yes.

Q.   And are they an accurate representation of what is depicted?

A.   Yes.

Q.   No changes?

A.   No, no changes.

Q.   And that is for every video?

A.   For all five body cam videos, yes.

Q.   And were transcripts prepared to accompany the videos?

A.   Yes.

Q.   And have you reviewed the transcripts?

A.   Yes, I have.

Q.   And are they accurate representations of what is

reflected in each of the videos?

A.   Yes.

MS. BATSON:  Your Honor, at this time I move to admit Government's Exhibits 1 through 6, as well as the transcripts, 1A through 6A.

THE COURT:  Objection?

MR. SKIPPER:  No objection, just subject to the Court's ruling, Your Honor.  No objection, but in light of the Court's ruling.

THE COURT:  All right.  Why don't y'all approach.

(Bench conference.)

THE COURT:  This is the mic.

What are you talking about?  Are you talking about the redactions?

MR. SKIPPER:  Yes, sir, that's all.

THE COURT:  So what is redacted?

MS. BATSON:  It is any reference to what warrants are for, and then any statements post-arrest of Evans.

THE COURT:  What are the post-statements -- or post-arrest statements.

MS. BATSON:  Basically, you know, why did you sic your dog on me?  I was putting my hands out.  All that kind of stuff.  We are not going to bring that in through the videos.  We can.

MR. MACHICEK:  Your Honor, we considered those to

be testimonial statements that require documentation, and should that witness not testify, they would not be admissible.

THE COURT:  Evans, you mean?

MS. BATSON:  Uh-huh.

THE COURT:  Okay.  So what is your objection?  Just to the -- redacting the charges.

MR. SKIPPER:  Yes, Your Honor.  The Government unilaterally -- now we are talking about testimonial objections that have never been brought up before.  But, yes, Your Honor, just note my objection for the record.

THE COURT:  Well, I didn't realize that he knew the charges, that Smith knew the charges before entering.  I think that is one of the circumstances that the jury can consider.  We aren't going to have a second trial on those charges, but just the statements that are made in the video about it.  I don't understand why that would be --

MS. BATSON:  That's fine, Your Honor.  But if you want to play the entire video, we will absolutely do that.

MR. SKIPPER:  Your Honor, I mean, we are going to play the whole video.  I think it is important.

THE COURT:  Okay.  But just, again, and we will talk about this again later, but I don't want to have a second trial on Robert Evans.

MR. SKIPPER:  Yes, yes, Your Honor.

THE COURT:  How long do you think this will take?  Should we take a break?

MS. BATSON:  Probably.  Probably because we are also going to have to unredact if we are going to play everything.

THE COURT:  Is 15 minutes enough.

MS. BATSON:  Yes.  Thank you.

(Bench conference concluded.)

THE COURT:  Ladies and gentlemen, we are going to take our afternoon break at this time.  So, if you would, please go back to the jury room, you can get some coffee, water, use the restroom, stretch your legs.

Again, all my instructions about not talking about the case amongst yourselves still apply.  Okay?  Be back in about 5 to 10 minutes after 3:00.

(Jury out.)

THE COURT:  Okay.  Anything further before we break?

MR. SKIPPER:  No.

THE COURT:  We are in recess.

(Recess was taken at this time.)

(Jury out.)

THE COURT:  Are we ready for the jury, Ms. Batson?

MS. BATSON:  Yes, Your Honor.

THE COURT:  Bring the jury in.

(Jury in.)

THE COURT:  Okay.  You may be seated.

You may proceed.

MS. BATSON:  And, Your Honor, I move to admit Government's Exhibits 1 through 6, and 1A through 6A.

THE COURT:  Okay.  Any objection?

MR. SKIPPER:  No objection, Your Honor.

THE COURT:  Okay.  They are admitted.

MS. BATSON:  All right.  And, Your Honor, we are going to play -- after conversation with Defense counsel, we are going to play the videos in their entirety.

Start with Exhibit 1.

(Video played.)

THE COURT:  Ms. Batson, how much more do we have?

(Video stopped.)

MS. BATSON:  Oh, quite a bit.

THE COURT:  I'm sorry?

MS. BATSON:  Oh, quite a bit, Your Honor.  On the transcript, it is page 28.  And we have 20 more pages to go.

THE COURT:  Okay.  Why don't y'all approach.

(Bench conference.)

THE COURT:  I mean, I don't want to watch a bunch of video.

MS. BATSON:  I don't either, but they wanted it.

81

THE COURT:  Is there anything more relevant on this particular video?

MS. BATSON:  No, but they wanted the entire video. And Mr. Skipper was talking about the rule of optional completeness, he wants the whole video in.

MR. SKIPPER:  Sure, Judge, it is your option to play whatever.

MS. BATSON:  You said you wanted to play the entire video.

THE COURT:  Well, I hope we are not watching multiple videos multiple times.

MR. SKIPPER:  I'm not going to play the entirety of every single video, but there are parts of other videos is all I am saying that would require the videos to be in their totality.  That's all I'm saying.  Once they are in, it is going to part of my examination.  That is all I am saying.

THE COURT:  So you wouldn't object to stopping at this point.

MR. SKIPPER:  No, Your Honor.

MS. BATSON:  No objection, so we can go to the next video.

MR. SKIPPER:  That's fine.  No objection, Your Honor.

MS. BATSON:  I just want to do what you want.

(Bench conference concluded.)

82

BY MS. BATSON:

Q.   Agent Crowell, and is this Austin Milbourn's video that you have watched several times?

A.   Yes, it is.

Q.   Okay.  And then also what occurred in the bathroom was a little dark?

A.   Yes, it was.

Q.   And so did we lighten up the video?

A.   Yes.

Q.   And then did we shorten also the video?

A.   Yes, shorten it down just to the time in the bathroom.

Q.   So we made clips; is that correct?

A.   That's correct.

Q.   All right.  And clips are 1B and 1C, and you reviewed those in preparation for your testimony?

A.   Yes.

Q.   And, again, they are shortened versions of the video we just saw --

A.   That's correct.

Q.   -- in Exhibit 1?  Is that correct?

A.   Yes, that's correct.

         MS. BATSON:  Your Honor, at this time I move to admit Government's Exhibits 1B and 1C.

         THE COURT:  Any objection?

         MR. SKIPPER:  No objection.

THE COURT:  Okay.  They are admitted.

BY MS. BATSON:

Q.   Then, also, did we take still photographs from this particular video that we just saw?

A.   Yes, we did.

Q.   All right.  And are those -- I think you have a book in front of you?

A.   I do.

Q.   If you can look behind the tab marked 1D?

A.   Okay.  I found it.

Q.   And then what are those, what is behind 1D?

A.   So the photos behind 1D are still shots from this body cam, and it looks like there is one maybe from Smith's body cam -- from the Defendant's body cam as well.

Q.   But they are photographs taken from the videos --

A.   That's correct.

Q.   -- collectively?

     And are they accurate representations of the video, just the still shots of was is on the video?

A.   Yes, they are.

     MS. BATSON:  Your Honor, at this time I move to admit Government's Exhibit 1D.

     MR. SKIPPER:  No objection, Your Honor.

     THE COURT:  It is admitted.

     MS. BATSON:  All right.  Your Honor, may I have

just a minute to confer.

THE COURT:  You may.

(Pause in proceedings.)

BY MS. BATSON:

Q.   All right  We will play 1B and 1C later.  Let's go ahead and play Exhibit 2.

THE COURT:  And would you identify again what this is?

MS. BATSON:  Yes, Your Honor.  Exhibit 2 is the second part.  It is part 2 of Austin Milbourn's body worn camera.

(Video played.)

(Video stopped.)

(Video played.)

(Video stopped.)

BY MS. BATSON:

Q.   Okay.  Agent Crowell, this was one of the videos that you did watch in relation to this investigation --

A.   Yes, it is.

Q.   -- isn't that correct?

Okay.  In particular, can you tell the jury what parts of this video caused you concern?

A.   So at the -- we didn't watch, but the end of the first part of the body cam before Austin Milbourn turns it off, he walks up to the Defendant's patrol vehicle.  Defendant is

sitting in the vehicle.  They start to have a conversation. Defendant says something to the effect of he had ahold of my dog, and the body camera goes off.

When we see it pick back upon on this video, he is walking back to Officer Newell and asking about putting a resisting charge on.

So when you have that gap in time where there is a conversation that is not recorded and then the first thing we hear is, hey, you going to add resisting, I believe there is something that happened in that time frame to cause that action.

And then later as you are reviewing the video, the conversation with Evans and where Evans is talking about what is going on, how you didn't have to put the dog on me, I was trying to give up, things like that, we thought that was important.

Q.   Okay.  And then did you subsequently focus on what occurred in the bathroom?

A.   Yes.  After reviewing the videos, we felt like the substance of this investigation was going to be about that two-minute time span that happened in the bathroom.

Q.   Okay.  And you did watch the other videos?

A.   We did.  We watched all of the videos.

Q.   And did each of the other videos capture different perspectives of what had occurred?

A.    Yes.   Each body cam video from the officers on the scene that day caught a different version of what they saw. Everybody was in different places.   So we got to see everything that was happening outside the trailer and inside the trailer from everybody else's perspective.

Q.    Okay.   Now -- and we will watch the slow-motion video and the brightened video probably later today or tomorrow.

But in those -- watching those, what occurred in the bathroom caused you concern?

A.    So from watching Austin Milbourn's body camera video, what concerned the most was the conversation that is happening between the Defendant and Evans before he enters -- Evans is telling him he is going to give up and he doesn't want to be bit, and there is no time that the Defendant is giving him that opportunity.

Again, when we are using force -- when I am evaluating for myself, you know, that is the best way to do. I don't want to go through a door where I don't know what is on the other side.   If I can get them to come out to me.   So saw that, and that concerned me first.

Then the initial entry into the bathroom, you hear the bite command given immediately, and the dog is not engaging.   He is backing out.   And it looks like he even goes between the Defendant's legs or next to him.   But the dog is behind the Defendant at one point, and the Defendant

continues to move forward dealing with Evans.

And then Evans grabs the dog and a strike is given to Evans to let go of the dog.  That continues for I think six or seven strikes.  But then the dog then backs out of the room again.  And you hear the constant recall of the dog, hozam, which is getting the dog to come back.

The dog is already disengaged; it's not in there.  Instead of just taking him into custody, he is continuously bringing the dog back to him.  At one point he even grabs the harness of the dog and drags the dog to Evans because the dog is not engaging.

I think that is when the plunger is picked up, and he has immediately disarmed.  I think he has it for less than a second, and then he gets punched in the face and drops down into the tub.

So that whole sequence of events, I thought it was concerning because there was so many different, better ways that could have been handled.

However, the most concerning part was what happens after the punch.  Evans drops to the ground, Smith puts his hands on his shoulders.  And then everything kind of calms down.

Then is no movement.  Evans is not moving.  The dog is not in the room.  Instead of dealing with Evans, the attention from Smith, the Defendant, is to call the dog back

88

in.

The dog comes back in again. Bite command is given. Still not engaging. So instead of handcuffing Evans, he keeps going until he gets him completely immobilized. Hands above his head. Full positive control. Bite command is given two more times. Finally, the dog bites and is pulled out of the bathroom.

Q.   So based on what you just relayed to the jury, did you believe that the force used was excessive?

A.   Yes, I did.

MS. BATSON:  May I have a minute, Your Honor?

At this time I would like to play Government's Exhibit 1C, which is the slowed-down version of 1 that we just observed.

And your Honor, we will play this with no audio.

THE COURT:  Okay.

(Video played.)

MS. BATSON:  Can you stop it right there?

(Video stopped.)

BY MS. BATSON:

Q.   And what are we observing here?

A.   So this is the initial entry into the bathroom by the Defendant.

Q.   Okay.

A.   And the dog initially goes in, and then immediately

89

comes back out between the Defendant's legs.

Q.   Okay.  And do we see -- now, this is Constable Smith, the Defendant?

A.   Correct.

Q.   All right.  And then his dog -- what kind of dog is it?

A.   It is a Belgian Malinois.

Q.   Okay.  And what is the dog's name?

A.   Mata.

Q.   Okay.  Here, did we see the Defendant lift his leg up for the dog to get in?

A.   Yeah, you could see that the Defendant kind of has to move his body so the dog can get back into the room.

         MS. BATSON:  Okay.  Go ahead.

         (Video played.)

         (Video stopped.)

BY MS. BATSON:

Q.   And, again, what do we see here?

A.   So we are seeing is we are seeing Mata in the room with Evans and the Defendant, and Evans has now put his hands on the collar of the dog --

Q.   Okay.

A.   -- pushing down.

Q.   And do we see the Defendant again have to lift his leg --

A.    Yeah, the Defendant --

Q.    -- in order to get the dog up to Mr. Evans?

A.    Yes.  The Defendant had to kind of contort his body to get the dog to Evans.

Q.    And right here you said we see Mr. Evans grab Mata's collar?

A.    Yes.

Q.    And is it -- what do you believe is going on right here?

A.    So what I believe, from the totality of watching this several times, is Evans is afraid of the dog, which I think most people would be, and is trying to prevent the dog from biting him, so he is trying to push the dog back away from him to keep it from being able to bite him.

Q.    And based on your review of the video and based on your investigation of this case, does it appear that Mr. Evans is trying to hurt Mata?

A.    It does not appear that way.

        MS. BATSON:  Go ahead, please.

        (Video played.)

        (Video stopped.)

Q.    What do you see here?

A.    So I see Evans's right hand holding on to Mata's collar. Mata is kind of lifting up.  And you see Evans kind of pull his left hand away in like a motion so that he doesn't get

bit.  He kind of pulls his hand away.  So his right arm is extended holding Mata back, pulling his left hand away from his mouth.

MS. BATSON:  Play it.

(Video played.)

MS. BATSON:  And then stop.

(Video stopped.)

BY MS. BATSON:

Q.   What do we see occurring right here?

A.   Defendant is now commanding Evans to let go of the dog and is providing strikes to Evans.

Q.   Okay.  Now, when we were talking about the use of force continuum --

A.   Yes.

Q.   -- what level is this on the continuum?  What is this called?

A.   So this would be more of like a passive.  He is not attacking the officer.  Some people may consider it more defensive.  He is trying not to get bit.  And so he is not giving up, but he is not attacking the officer.

Q.   Okay.  And then what kind of -- is this hard control what the Defendant is doing when he is striking him?

A.   I would consider that -- if you are providing pain compliance, that would be more of a hard control.

MS. BATSON: All right.  Let's play it.

(Video played.)

BY MS. BATSON:

Q.   How many strikes do you see?

A.   I believe it was six.

MS. BATSON:  Okay.  Stop.

(Video paused.)

BY MS. BATSON:

Q.   Do you know whose arm that is?

A.   That is Austin Milbourn's arm.

Q.   All right.

MS. BATSON:  Go ahead.  All right.  And then right here stop.

(Video paused.)

BY MS. BATSON:

Q.   What did we just see?

A.   So we just saw the Defendant grab Mata by his harness and drag him up to Evans.  And we saw Evans pick up a plunger.

Q.   Okay.  And throughout this, I know we are listening to it without sound, but is the Defendant giving the dog the bite command?

A.   Yes.  So you are hearing both the hozam, come here; and the bite command be given.

Q.   And, again, what is the bite command?

A.   Foogosh.

MS. BATSON:  All right.  Play it, please.

(Video played.)

MS. BATSON:  Okay.  Stop.

(Video paused.)

BY MS. BATSON:

Q.   Now, the dog is -- where is the dog on this video?

A.   The dog looks like it has left the room again.

Q.   Okay.  And then what did we just see?

A.   We saw the Defendant move the plunger from Evans's hands and provide a strike to Evans's face area.

Q.   Now, tell us about the plunger, what you observed on the video once the Defendant grabbed the plunger?

A.   As Constable Smith is bringing -- the dog dragging back in, Evans grabs the plunger and kind of does like a poking motion towards the dog as if to create space between him and the K9.  So gives it like one little poke trying to keep the dog back.

Q.   Okay.  To keep from getting bit?

A.   To keep from getting bit.

Q.   Then what do we see?

A.   Then we see the Defendant grab the plunger and kind of throw it to the side and then kind of take a half a step back or step back and then provide a punch to the face.

Q.   Okay.  Now, in this punching episode, is the dog anywhere around?

94

A.    No.  The dog is behind.  You can't see exactly where Mata is, but he is definitely behind the Defendant at this point.

Q.    All right.

MS. BATSON:  All right.  Let's Play it.

(Video played.)

MS. BATSON:  Okay.  Stop.

(Video paused.)

BY MS. BATSON:

Q.    What happened there?

A.    Mata reentered the bathroom, moved to the right side. The Defendant reached down and grabbed the plunger and ran out with it -- or at least left the area of the video.

Q.    And what are we seeing right here?  In this particular shot, where are the Defendant's hands, and where are Robert Evans's hands?

A.    So we see the Defendant kind of standing over the top of Evans straddling the tub.  He has got his left hand on the shoulder, and Evans is curled up, turtled up -- however you want to describe it, with hands overhead like in a protective posture.

MS. BATSON:  Okay.  Play very slowly, please.

(Video played.)

MS. BATSON:  Okay.  Stop.

(Video paused.)

BY MS. BATSON:

Q.   What do we see right here?

A.   First, we see the Defendant look to his right side, and what you can't hear is he is calling the dog back, saying hozam, bring the dog back.  And Evans has now looked and peeked to see what was going on.  And makes a statement about, worried about his dog, worried about what happened with that.  We have both hands on Evans's shoulders.

Q.   Both of the Defendant's hands?

A.   Both of the Defendant's hands are on Evans's shoulders.

Q.   All right.  And do we see anything in Evans's hands?

A.   We don't see anything in his hands at this point, no.

Q.   Is there anything about Evans right here, based on your training and experience, that would indicate to you that he is resisting?

A.   None.

         MS. BATSON:  Play it, please.  Slowly.

         (Video played.)

         MS. BATSON:  All right.  Stop.

         (Video paused.)

BY MS. BATSON:

Q.   All right.  What is going on right here?

A.   So Mata has reentered the room, and Evans Sees Mata coming.  You can see him kind of cover his face and head area

in anticipation of being bit.

Q.   Okay.  And where do we see the Defendant's hands?

A.   And Defendant's hands appear to still be on the shoulders of Evans.

Q.   Okay.  Now, based on your training and experience as a law enforcement officer, is there any point right up to here where Evans could have been taken into custody?

A.   Yes.

Q.   And handcuffed?

A.   Yes.

Q.   Can you explain to the jury, please?

A.   So at the moment when Evans falls into the tub and the Defendant is straddling him and has his left hand on the shoulder, the dog is not in the room anymore.

There is ample time at that point -- the situation has calmed down.  The chaos has stopped.  There is no defensive aggression.  There is nothing happening from Evans. He is completely in a passive position.  He can't do anything.  He is not doing anything.

You have got multiple officers right there with you.  That is the perfect time to start giving commands to Evans to tell him what you want him to do.

So, hands behind your back.  Don't move.  You know, whatever you want him to do, that is the time to start commanding him and focusing your attention on him to get him

in handcuffs safely.

Q.    Now, prior -- so far the only comment we heard was, let go of my dog?

A.    That's correct.

Q.    Did you hear any other commands given to Robert Evans as to what to do?

A.    So after the last time you hear the Defendant tell him to let go of his dog, you hear no commands given to Evans until he is already bit and they are trying to get him out of the tub and they are yelling at him to lay on his stomach or roll over.

So between that time, let go of my dog, until he is actually bit, no commands are given to Evans.  The Defendant is not telling him what he wants him to do.

Q.    Now, based on, again, your training and experience as a law enforcement officer, and I think you just mentioned, what are some of the commands that could have been given to Evans in order for him to comply?

A.    So in that moment, don't move.  He is already not moving but you tell him, don't move.  You can tell him, keep your hands on your head.  You can tell him to put his hands behind his back.

There are a lot of different, but those are the ones that come to mind that I would start telling him to do so that I know at this point is he going to be listening, or

is he not going to be listening to me.  So I have got to start giving him commands and see what he is going to do.  If he is listening, we can easily take him into custody, and there is no need for additional force beyond handcuffing at this point.

Q.   And, again, the Defendant's hands are where?

A.   At this point, the hands are on the shoulders -- two hands on the shoulders of Evans.

Q.   And you mentioned something about positive control?

A.   At this point, he has fairly positive control.  He is standing over him.  He is in a dominant position over Evans to help keep him in control.  Evans's feet are crossed, which is a weak position to be in.  Hands on head, kind of turtled over.  Not a whole lot he can do from that position.

          MS. BATSON:  Okay.  Play it.

          (Video played.)

          MS. BATSON:  Okay.  Stop.

          (Video paused.)

BY MS. BATSON:

Q.   Again, what are we seeing here?

A.   So what we are seeing now is the Defendant has taken his left arm and is starting to put it in front of the face of the Defendant to kind of control the head and neck area.

Q.   And where are Robert Evans's hands?

A.   Still on top of his head.

Q.   Anything visible in his hands?

A.   Nothing visible in his hands.

Q.   No weapons?

A.   No weapons.

Q.   Okay.  Not balled up in a fist --

A.   No.

Q.   -- and is attempting to strike or anything like that?

A.   Doesn't appear to be doing anything except for not being bit.

         MS. BATSON:  Let's play it, please?

             (Video played.)

          MS. BATSON:  Stop.

             (Video paused.)

BY MS. BATSON:

Q.   What is going on here?

A.   So now we have moved -- Defendant has moved his left arm underneath the chin of -- at least it appears to be under the chin of Evans, and his right hand is kind of grabbing it, putting him in a -- some type of control hold, neck hold, to have full positive control of the subject.

Q.   Okay.  And, again, you said "positive control."  What does that mean?

A.   So that means you have got control of the subject at this point.  You have got a dominant position over them.

         MS. BATSON:  All right.  Let's play it.

(Video played.)

MS. BATSON:  All right.  Stop.

(Video paused.)

BY MS. BATSON:

Q.    What do we see here?

A.    So we see the Defendant kind of pull Evans backwards and up.  You see Evans's legs kind of extend out, and you see Evans's hands kind of swatting at the dog in kind of a defensive, trying not to get bit -- he is moving his arms as the dog is coming in.  Looks like he is kind of biting at him.

MS. BATSON:  Okay.  Let's play it.

(Video played.)

MS. BATSON:  Now stop.

(Video paused.)

BY MS. BATSON:

Q.    What is going on here?

A.    We saw Evans reach out with his right hand and kind of push Mata away from him.  When that happens, the Defendant moves his right arm under the right arm of Evans and puts him -- I think it is called like an arm triangle or something to that effect.  Now he has him in a higher level of control than he had before.  Hands above head.

Q.    All right.  And Mr. Evans, focusing on him, what area is exposed on his body?

A.   So now his entire right torso from his armpit, tricep area, down to his hip is completely exposed to the K9, including his right leg.

Q.   And then is the bite command being given here?

A.   Yes.

Q.   And anything about this part of the video indicates that Mr. Evans is either resisting arrest or causing a threat?

A.   No.

Q.   Does he pose a threat at all?

A.   He does not pose a threat to anyone at this point.

Q.   And, again, the bite command is still being given?

A.   Yes.

        MS. BATSON:  Let's play it.

        (Video played.)

        (Video paused.)

BY MS. BATSON:

Q.   Okay.  What is going on here?

A.   So Mata has finally bitten the foot of Evans and has started to drag him out of the bathtub.  You see Evans -- I think that is a left arm and another officer -- I can't tell who it is at this point -- has got ahold of his hand, and they are like lifting him up to get him out of the tub.  So Mata is pulling, and the officers are lifting him and getting Evans out of the tub.

        MS. BATSON: Okay.  Play it.

(Video played.)

MS. BATSON: All right. Stop. Stop.

(Video paused.)

BY MS. BATSON:

Q.   What is going on here?

A.   So at this point there is finally commands being given to Evans to roll over. The dog has gotten his foot, dragging him down the hall -- or out of the bathroom, at least. You can see by the look on Evans's face it appears to be painful.

Q.   Okay.

MS. BATSON: All right. Let's play it.

(Video played.)

MS. BATSON: Stop.

(Video paused.)

BY MS. BATSON:

Q.   Do we see the jerking movements of Evans's leg?

A.   Yeah. So you see Evans has been finally been removed from the bathroom, and you can see his body being pulled down the hallway.

Q.   Okay. Even as the officers are putting handcuffs on him?

A.   Right. You see multiple officers appear to have Evans's hands or arms, and you have got cuffs out. You can see the cuff in the picture here, and they are preparing to put the

handcuffs on.

MS. BATSON:  Okay.  Let's play it.

(Video played.)

BY MS. BATSON:

Q.   And Evans has shoes on, correct?

A.   Yes, he was wearing shoes.

MS. BATSON:  Stop.

(Video paused.)

BY MS. BATSON:

Q.   Do you see the jerking?

A.   Yes.  You can still see kind of his lower body kind of jerking and being pulled backwards.

MS. BATSON:  Let's play it, please.

(Video played.)

(Video paused.)

BY MS. BATSON:

Q.   All right.  What just happened there?

A.   So you see Evans has got the handcuffs on, he is on his stomach.  Mata kind of comes out of that side room still holding on the shoe and still kind of pulling down the hallway even after he was handcuffed before the shoe finally comes off, and Mata runs out with the shoe.

Q.   Okay.  And the areas of concern that you showed the jury, or explained to the jury, were they shown in that particular video?

A.    Yes, they were.

Q.    And, again, what were they?

A.    So the main area of concern is -- starts from the beginning as far as the excessive use of force goes.  Once Defendant punches Evans and he falls down to the tub and he is standing over the top of him, hands on his shoulders, K9 Mata is no longer even in the room.  Being held down and then putting him to even greater control, which it almost immobilizes Evans, and continuing to have the dog come back in until he bites.  That is what I had the main concern about.

Q.    All right.  Prior to Mata pulling off Evans's shoe, was there any commands given?

A.    So the only commands you get -- you hear is, roll over, get on your stomach.  And then you don't hear any commands given once the dog -- the dog releases on its own.  Basically the shoe comes off, but there is no command for the dog to come off the bite.

Q.    Okay.  Was there any commands given to the dog?

A.    There were no commands after Mata bit.  There were no commands given to him until the shoe came off, and he started to run out of the room.

Q.    So based on your knowledge of this investigation, when a dog bites, is there usually a release command given --

A.    Yes.

Q.   -- for him to let go?

A.   Yes.  From my understanding from learning how these K9s are trained, that one of the commands is a release command. So once they do bite, there is a command given that the dog knows to release and let go.

Q.   Okay.  So does it appear here that Mata just released on his own?

A.   Yes.

Q.   No commands?

A.   No commands.

Q.   Now, you indicated that it was Constable McQueen that reported this excessive use of force; is that correct?

A.   Yes, he is the one who contacted me first.

Q.   Okay.  And, initially, you received his video; is that correct?

A.   That's correct.

Q.   And did you watch that one first?

A.   I did.

Q.   Because that is the first one you have?

A.   Correct.

          MS. BATSON:  If we could play Government's Exhibit 3, please.

          (Video played.)

          MS. BATSON:  Can you stop right there?

          (Video paused.)

BY MS. BATSON:

Q.    All right.  And so we hear McQueen refer to Austin?

A.    Yes.

Q.    Who is Austin?

A.    That is referring to Austin Milbourn.

Q.    Okay.  And he says that Austin is coming with his K9?

A.    Yes.

Q.    And is Austin Milbourn also a K9 handler?

A.    Yes, Austin Milbourn is a K9 handler with the Wood County Sheriff's Office.

Q.    Okay.  Does he have an apprehension dog?

A.    No, his is a single-purpose dog, so it is just good for tracking and narcotics detection.

Q.    Okay.  So can you explain to the jury what a single-purpose dog is, and what a dual-purpose dog is?

A.    Yes.  So a single-purpose dog, like I just explained, they are trained in one part of police activity, which is they will come out and do drug sniffs like around cars or in a house, or they can do tracking.  If someone needed to be tracked, they can come out, and they can do the tracking part.  So they are trained in those two aspects.

A dual-purpose dog is generally trained in that aspect, and also trained in the apprehension of suspects as well.  So that is why they are called dual purpose; they can do both.  Where a single purpose is only going to do one.

And, typically, your single purpose is your detection dog.

Q.   Okay.

            MS. BATSON:   Let's continue to play it.

            (Video played.)

            MS. BATSON:   Pause it.

            (Video paused.)

BY MS. BATSON:

Q.   Agent Crowell, what did we just hear Sgt. Milbourn say?

A.   We heard Sgt. Milbourn give the warnings telling Evans to come out.   There is a police K9.   Come out, or you will be bit.

Q.   Okay.

            MS. BATSON:   If you can fast forward just a little.

            Okay.

            (Video played.)

            MS. BATSON:   Stop right there.

            (Video paused.)

BY MS. BATSON:

Q.   Okay.   So what are we seeing right now?

A.   So we are seeing Constable McQueen attempting to breach the door.

Q.   Okay.   And then prior to Constable McQueen actually kicking the door in, who attempted to kick the door in previously?

A.   So, originally, Austin Milbourn attempted to kick the door in.

Q.   Was he successful?

A.   He was not.

Q.   Do you recall about how long it took him to try to kick the door in before calling McQueen over to kick it in?

A.   I know he kicked it numerous times, over 20 attempts to kick the door by Austin Milbourn before Constable McQueen came up and finally breached.

Q.   And this door has glass in it?

A.   Yes.

Q.   Correct?

So were the officers exposed -- was this a safe tactical move right here?

A.   Based on the amount of time it took and where they were standing, I would say it is not very tactically sound, in my opinion.

Q.   And why?

A.   Because the trailer -- trailer houses, in general, provide no cover -- absolutely no cover.  There is a difference between cover and concealment.  They may not be able to see you, but you can -- if has a weapon on the other side of that wall, he can shoot through the wall and shoot through the glass and hit you easily.  There's nothing to stop it.  The walls are paper thin, so there is no cover at

this point to hide behind to stop bullets from coming at you if that is what you think is on the other side of that door.

Q.    It might be self-explanatory, but can you just tell the jury what the difference is between cover and concealment?

A.    Yeah.  So cover, like I explained, it prevents somebody from seeing you.  So a wall, a tree, bushes, you know, something like that that obscures the view but doesn't stop -- basically, the way we describe, it doesn't stop bullets.  That is cover.

Concealment is -- I'm sorry.  That is concealment.

Cover is something that stops bullets.  If I say I need to take cover, I am going to go somewhere like behind a tree that is wide enough to cover my body.  An engine block of a police cruiser, something like that is cover.

Concealment just conceals you so they can't see you.  So cover stops bullets.  Concealment does not.

Q.    All right.  And you indicated this was a trailer, and the walls are paper thin?

A.    Yes.

Q.    All right.  So have you -- do you know -- do trailers provide any cover for an officer?

A.    There is generally no cover in a trailer home, absent something else being inside the home that could be used that way.  But the walls, doors, things like that are not cover.

Q.   As you stated, it took quite a bit of time to get through this door?

A.   Yeah, they were standing on that porch for a long time before that door finally came open.

Q.   In a trailer with a glass door?

A.   That's correct.

MS. BATSON:  Let's play it, please.

(Video played.)

MS. BATSON:  Stop it right there.

(Video paused.)

BY MS. BATSON:

Q.   All right.  So, again, from another camera, did we hear Evans talking to the Defendant?

A.   Yes, as soon as the door is breached, and they start to make entry, you can hear Evans talking -- or yelling out to the officers that he is going to come out and going to put his hands up.

Q.   And do we also hear the Defendant giving the "come here" command?

A.   Yeah, you hear the hozam, calling Mata to him.

Q.   Do we hear him call for cover?

A.   Yes.  And cover, in this instance, means something different.  When an officer is asking for cover, what he is asking for is another officer to come with him to cover him so that you have two, maybe three people there to help in the

situation.  So when you are calling for cover in this situation, you are asking for somebody to come help you.

Q.   All right.  And then we hear Evans say, I told you I'd come out if you put the dog up?

A.   Yes.

Q.   And then the Defendant is saying, come out.  Show me your hands?

A.   Yes.

Q.   And then Evans is saying, will you put the dog up, correct?

A.   Yes.

Q.   And then the Defendant says, you are barricaded, brother.  I don't know if you have any weapons?

A.   Yes.

Q.   He says, no, I am wiping my butt?

A.   Correct.

Q.   And then he says, I will come out if you put the dog up?

A.   Yes.

          MS. BATSON:  Okay.  Let's play it.

          (Video played.)

          MS. BATSON:  Okay.  Can we stop it?

          (Video paused.)

          MS. BATSON:  Can you back up just a little bit please?  Right here.

BY MS. BATSON:

Q.   All right.  What is a fatal funnel.  A fatal funnel is -- it can be a doorway, a hallway.  It is an area that is a very dangerous place to be as an officer.  It is a situation where you don't have a way out usually, left or right.  This way, this long hallway is going to be the fatal funnel.

As soon as you step into that, if somebody were to come around the corner with a firearm and start shooting at you, you have nowhere to go.  They have a direct line of sight to you, and you can't get cover or concealment or anything to get out of the way.  So we call like doorways or hallways, or things like that, are considered the fatal funnel.

Q.   Okay.  And we see the Defendant going down this hallway?

A.   Correct.

Q.   Okay.  Alone?

A.   Alone, yes.

Q.   Is his weapon drawn?

A.   Not that I can see, no.

MS. BATSON:  Play.

(Video played.)

MS. BATSON:  Okay.  Stop.

(Video paused.)

BY MS. BATSON:

Q.   What is going on right here?

A.   So the Defendant is telling Evans, I don't know if you have any weapons.  You are barricaded.  So, you know, he is voicing his -- the concern that every officer should have in this situation.  I don't know what is on the other side of this door.  I hear you talking.  But you are barricaded, and you don't have any -- I don't know if you have weapons.  He is kind of voicing what all officers would be thinking in that situation.

Q.   Okay.  Where is the Defendant standing?

A.   So Defendant is standing where we would call the fatal funnel of this situation, right in front of the door where the subject likely is, and he is talking to him on the other side of that door.  So he is in the most dangerous spot you can be.

Q.   The Defendant is standing in the most dangerous spot?

A.   The Defendant is standing in the most dangerous spot, not knowing what is on the other side of that door.

Q.   Do you know if the Defendant has received any training as far as defensive tactics?

A.   Yes.  From what we found on posts by the Defendant himself, he had a significant amount of tactical training, claims to have certificates that are posted on websites.  20-plus years in law enforcement.  Has had significant

tactical training, according to what we could find.

Q.    Okay.  And you have also had some training yourself?

A.    Yes, I have.

Q.    And tell the jury, is this a tactically sound position for the Defendant to be in?

A.    Absolutely not.

Q.    And, again, why not?

A.    Because he is standing in the most dangerous place you could possibly be at that moment.

Q.    And when he says, you're barricaded, brother, I don't know if you have any weapons, right?

A.    Right.

Q.    If you believed, you, based on your training and experience, if you believed that a suspect had weapons would you be standing in this spot?

A.    I would not.

          MS. BATSON:  Play.

          (Video played.)

          (Video paused.)

          (Video paused.)

BY MS. BATSON:

Q.    What is going on right here?

A.    So the Defendant decided to make entry into the bathroom, asked McQueen for help to push the door open.  The door comes open, and the Defendant and Mata enter the room.

And you hear the bite command given immediately.

Q.   Evans is saying, I am putting my hands out, and then the Defendant is giving the bite command?

A.   That's correct.

          MS. BATSON:  All right.  Play it.

          (Video played.)

          (Video paused.)

BY MS. BATSON:

Q.   All right.  And we hear -- are we hearing the bite command given several times?

A.   Yes.

Q.   And then what is Evans saying?

A.   Evans is saying, don't bite me.  And, basically, just keeps saying that.  Don't bite me.  Don't you bite me. Things to that effect.

Q.   All right.  Then get ready to hear the Defendant say, let go of my dog.

          MS. BATSON:  Let's play it.

          (Video played.)

          MS. BATSON:  Stop.

          (Video paused.)

BY MS. BATSON:

Q.   Now, this is from Constable McQueen's video, correct?

A.   Yes.

Q.   And he never makes it into the bathroom?

A.    He never makes it past the threshold of the door.

Q.    And so based on Milbourn's video, compared to this one, what is going on in the bathroom right now?

A.    So based on this same time, Mata is backing out, and the Defendant had previously moved forward, brought Mata in there, and then the plunger was picked up, and now the strike was given to Evans dropping it.

MS. BATSON:  Play.

(Video played.)

(Video paused.)

BY MS. BATSON:

Q.    All right.  So we hear the bite command, Milbourn asking, what do you want me to do, and the Defendant responds, takedown?

A.    Correct.

Q.    What do you know that to mean?

A.    So I know that to mean, at least when we talked to Austin Milbourn and asked him what takedown meant, in his mind it meant the dog wasn't going to bite.  That is what was about to happen.

Q.    And then, here, where it is paused and we hear Evans screaming, ow, ow, ow, and help me?

A.    Yes, you hear him screaming out in pain.

(Video played.)

MS. BATSON:  I think we can stop.

(Video stopped.)

MS. BATSON:  Your Honor, may I have just a minute?

Okay.  At this time I would like to show 1B.

(Video played.)

(Video paused.)

BY MS. BATSON:

Q.   Okay.  Again, this is from Sgt. Milbourn's video, but it has just been brightened because it is so dark?

A.   Yes, we had our photography unit brighten it up so we could see better because it was so dark.

Q.   Earlier you testified that you shortened the video to about two minutes?

A.   Yes, approximately two minutes and 10 seconds.  A little over two minutes.

(Video played.)

(Video paused.)

BY MS. BATSON:

Q.   What did we just see happen right here?

A.   So we heard, in essence, I put my hands out.  And you see a hand come out of the bathroom and kind of fingers kind of go around the door frame on the right side -- or the Constable -- or Defendant's left side.

MS. BATSON:  Can we back it up just a little, please.  And play it.  And freeze it when the hand comes out.

(Video played.)

MS. BATSON:  Right there.

(Video paused.)

BY MS. BATSON:

Q.   So what do we see here?

A.   Yes.  We are seeing Evans's hand.  It appears to come out and go around the wall there --

Q.   Okay.

A.   -- the door frame.

Q.   So Evans is sticking his hand out?

A.   Sticking his hand out.

Q.   At least one?

A.   At least the one we can see.

Q.   And then who is right there in the front going in the door?

A.   So that is the Defendant going through the door.

Q.   And then who is this standing behind the constable?

A.   That is Constable McQueen.

Q.   All right.  And then I just asked you about the hand being visible.  Is there a weapon in it --

A.   No, no weapon.

Q.   -- his hand?

MS. BATSON:  Okay.  Play.

(Video played.)

(Video paused.)

BY MS. BATSON:

119

Q.   All right.  Right here.  What is going on?

A.   So we see the Defendant and -- call Mata back in after Mata went out.  Drag Mata up to Evans.  Evans picked up the plunger and poked one time towards Mata, and the Defendant grabs the plunger.  So he is holding on to the plunger with his right hand and holding on to Mata with his left.

Q.   And you watched this video several times?

A.   Yes, I have.

Q.   Did you time how long that Evans had that plunger in his hand?

A.   It appeared to be about .53 seconds.

Q.   Then who takes the plunger out of his hand?

A.   The Defendant removes the plunger out of his hand.

Q.   And then he disarms him?

A.   Correct.

Q.   What is the Defendant doing right there with Mata?

A.   So the Defendant is dragging Mata towards Evans with his left hand and holding on to the harness.

Q.   Dragging him to Mr. Evans?

A.   Dragging him.

Q.   And is giving the bite command --

A.   Is giving the bite command at the same time.

          MS. BATSON:  Play it.

          (Video played.)

          MS. BATSON:  Okay.  Stop.

(Video paused.)

BY MS. BATSON:

Q.   All right.  So what just happened now?

A.   So Defendant removed the plunger from Evans's hands, took about a step back, and then punched Evans in the face.

Q.   On that punch right there, did Evans subsequently kneel down on the floor?

A.   No, it appeared he dropped to the floor.

Q.   The punch knocked him to the floor?

A.   It knocked him down.

        MS. BATSON:  Play.

           (Video played.)

        MS. BATSON:  Okay.  Stop.

           (Video paused.)

BY MS. BATSON:

Q.   Right here, what do we see?

A.   So now we are seeing the Defendant with two hands on Robert Evans's shoulders.  Robert Evans is curled up.  He has got his hands over his head protecting his head.  And you see the Defendant focused on Mata.

Q.   Is there any reason right here why Evans could not be taken into custody?

A.   No.

Q.   Where are the Defendant's hands?

A.   On Robert Evans's shoulders.

Q.   And where are Robert Evans's hands?

A.   His hands are on his head.

Q.   Any weapons?

A.   No weapons.

Q.   Any threat?

A.   No threat.

          MS. BATSON:  Play.

               (Video played.)

               (Video paused.)

BY MS. BATSON:

Q.   All right.  And then you did also obtain the body camera from Kelly Smith, the Defendant?

A.   Yes, I did.

Q.   And what is the difference between his video and the other videos?

A.   So the difference between the Defendant's video and I would say Austin Milbourn's video, the Defendant is really up close with Robert Evans.  This is very normal in these situations where he is so close that you really can't see what is going on because there is not enough space between the two of them.  So there is a lot of black, dark spots.

          And you kind of get glimpses here and there as they kind of have space between them and then the bathroom lights up.  You can kind of see what Robert Evans is doing in that situation.  But it is kind of in and out.  It is difficult to

see.  At one point the body camera falls to the ground, and we don't see anything after that.

Q.   Okay.

A.   You can hear the audio but there is no video after a certain point.

Q.   Okay.  But this camera will show what the Defendant was seeing?

A.   Yes.  The Defendant's camera will show basically what he was seeing as he was entering.

Q.   Okay.

All right.  Let me back up.  When -- you just testified about the Defendant's hands being on Evans's shoulder --

A.   Yes.

Q.   -- he could have taken him into custody?

A.   Yes.

Q.   Was the Defendant giving any commands to Robert Evans at that time?

A.   There was no command given to Robert Evans at that point.

MS. BATSON:  Let's play Kelly Smith's body camera, Exhibit 4.

(Video played.)

(Video paused.)

BY MS. BATSON:

Q.   What is the labost command?

A.   Heel.

          MS. BATSON:  Let's play.

               (Video played.)

          MS. BATSON:  Stop.

               (Video paused.)

BY MS. BATSON:

Q.   Okay.  What just happened here?

A.   So Austin Milbourn attempted to breach the door, was unsuccessful after numerous attempts.  Then asked Constable McQueen, a larger guy, to try to use his strength to open door.

Q.   Then did we just hear the Defendant say, once you get the door open, I will just send him in?

A.   Yes.

Q.   Who is he referring to?

A.   He is referring to Mata.

          MS. BATSON:  Let's play, please.

               (Video played.)

          MS. BATSON:  Stop.

               (Video paused.)

BY MS. BATSON:

Q.   What is going on right here?

A.   So they made entry into the residence.  The Defendant has entered with Mata and is giving Mata a command basically

to go find Evans, where is he at.  And they do a search of the residence to find him.

Q.   And is Mata on leash?

A.   Mata is off leash.

Q.   Off leash.

All right.  And, again, is this the fatal funnel area?

A.   Yes, this is definitely in the fatal funnel.

MS. BATSON:  Play.

(Video played.)

MS. BATSON:  Stop.

(Video paused.)

MS. BATSON:  Back it up just a little bit, please.

(Video played.)

MS. BATSON:  Stop.

(Video paused.)

BY MS. BATSON:

Q.   What is going on right here?

A.   So the Defendant has located Evans in the bathroom, sees that Mata is not there, so he is tapping on or near his body cam telling him to follow this.  So he is getting Mata to follow him to the location where he has located Evans.  You see the door coming open and then close.  And then the Defendant stands at the door with both hands on the door.

Q.   Okay.  Again, not tactically sound?

A.   Correct.

MS. BATSON:  Let's play it.

(Video played.)

MS. BATSON:  There.  Right there.

(Video paused.)

BY MS. BATSON:

Q.   All right.  So this area right here is not a tactically sound position for the Defendant to be in --

A.   No, it is not.

Q.   -- is it?

(Video played.)

MS. BATSON:  Stop.

(Video paused.)

BY MS. BATSON:

Q.   What is going on right here?

A.   So Defendant has made contact with Evans.  Evans grabbed the dog's harness.  He was given commands to let go of the dog.  Gives him strikes.  The dog -- finally let's go of the dog.  He runs out of the room.  And then we see them move back -- or Evans moves back into the tub and picks up the plunger.

Q.   Now, you said Evans moves back into the tub.  Is there anywhere else for him to go?

A.   No.  It is a very small confined space.  There is only one way in and one way out, and the Defendant would have

taken up that entire doorway with his size.  So there is nowhere to go but backwards.

Q.   So you have the Defendant taking up most of the space, like you said?

A.   Yes.

Q.   Then who is behind him?

A.   Then Austin Milbourn is directly behind him.

Q.   Okay.  And so you have two officers basically in the doorway and then Evans is further in the bathroom?

A.   Correct.

Q.   And nowhere to go?

A.   Nowhere to go.

MS. BATSON:  Let's play it, please.

(Video played.)

(Video paused.)

BY MS. BATSON:

Q.   All right.  And what do we see right here?

A.   We saw the strike to Evans's face.  He falls down in the tub.  And now Defendant is standing over top of him with both hands on his shoulders.

Q.   Okay.  And this is from Kelly Smith's video?

A.   This is from Kelly Smith's video.

Q.   And he has got both of his hands on Mr. Evans's shoulders?

A.   Yes.

Q.   And then where are the suspect Mr. Evans's hands?

A.   On his head.

Q.   No weapons?

A.   No weapons.

Q.   No threat?

A.   Correct.

          (Video played.)

          (Video paused.)

BY MS. BATSON:

Q.   Okay.  What is going on right here?

A.   Evans has been bit, dragged out of the tub.  They are trying to get him handcuffed.  And Evans is basically begging for them to handcuff him because he was told we will get Mata off once the handcuffs are put on.  So he is asking for the handcuffs so he can get the dog off.

Q.   Do we hear him screaming in pain?

A.   Yes.

Q.   And as you stated, they said we will get the dog off once you have been cuffed?

A.   Correct.

Q.   Then he is going cuff, cuff?

A.   Correct.

          MS. BATSON:  Play it.

          (Video played.)

          MS. BATSON:  Stop.

(Video paused.)

BY MS. BATSON:

Q.   Sgt. Milbourn is asking Evans where is he hurt?  And what is his response?

A.   His response was, my foot and my head.

Q.   And his foot why?

A.   Because he has just been bitten.

Q.   Through the shoe?

A.   Through the shoe.

Q.   And his head?

A.   His head because he had been punched numerous times.

Q.   By whom?

A.   By the Defendant.

Q.   All right.  The rest of the transcript, does it show that photographs were taken?  Newell is taking photographs?

A.   Yes.  Officer Newell does take photographs of the injuries on the scene.

Q.   And have you --

          MS. BATSON:  Let's keep playing, please.

          (Video played.)

          MS. BATSON:  Stop.

          (Video paused.)

BY MS. BATSON:

Q.   Okay.  Now, there is -- according to the recordings, Evans had warrants out for his arrest?

A.    That's correct.

Q.    And what were the warrants for, do you recall?

A.    So the felony warrant was for injury to a child and misdemeanor evading arrest, and assault and family violence, I believe.  I can't remember what the last one was.  Three misdemeanors and one felony.

Q.    Okay.  And then here we just heard Justin Graham, the one who came out with a pipe wrench --

A.    Yes.

Q.    -- discussing that with Evans; is that correct?

A.    Yes, he wanted to know what this was all about.

Q.    And what did Evans say?

A.    He said that they thought they hurt his child and -- but, really, one of the other children had injured him, something to that effect.  I don't know the exact quote.  He is explaining what the injury was.

Q.    He said, I didn't beat that kid up.  June Bug hit him in the back of the head --

A.    Yes.

Q.    -- with a soft ball?

       Do you know if that case is still pending?

A.    As far as I know it's still pending.

Q.    It hasn't been adjudicated?

A.    That's correct.

Q.    And Evans hasn't been convicted?

A.    That's correct.

MS. BATSON:  Let's go to 1D.  And publish those pictures, please.

BY MS. BATSON:

Q.   All right.  Agent Crowell, what is shown in this photograph?

A.    This is Defendant, I believe, making the initial entry into the bathroom, and you can see between his legs, and Mata is back behind him between the legs.

Q.   Okay.  All right.  And what people are in this picture?

A.    So that is the Defendant, and on the right side you can kind of tell, but that is Constable McQueen to the far right. I can see his midsection and pants.

Q.   All right.

MS. BATSON:  The next picture, please.

All right.  And for record purposes, this is Exhibit 1D, page 2.

BY MS. BATSON:

Q.   What is shown in this particular photograph?

A.    So this is from the Defendant's body cam.  This is just right after the initial entry.  As soon as there is enough light to see, you can see Robert Evans kind of standing hunched over, hands out in front of him.  You can see Mata at the lower part of the screen looking up at him.

Q.   And you said this is from the Defendant's body camera?

A.   I believe that is correct.

Q.   And what is Mr. Evans doing?

A.   So he is standing there and he is kind of hunched over, addressing -- looks like he is looking at Mata and has his hands out in front of him; hands up, palms out.

Q.   Any weapons in his hands?

A.   No weapons.

Q.   Does he look like he is posing a threat?

A.   No, looks like he is focused on Mata.

Q.   Are his hands up?

A.   His hands are up.  He has got his -- shoulder height a little bit below out in front of him.

Q.   Based on your training and experience, would this be considered a surrender position?

A.   It could be, yes.  He has got his hands out.  He is showing you his hands.  You can see there is nothing in it. So, yes.

Q.   Okay.  And was the bite command given even after Mr. Evans was in this position?

A.   Yes.

        MS. BATSON:  Next photograph, please.

BY MS. BATSON:

Q.   What is shown in this particular photograph?

A.   So this is the Defendant's left arm, and he has got his

hand kind of around the neck area of Robert Evans.

Q.   Okay.  And is this exerting some kind of control over the Defendant -- I mean, over Mr. Evans?

A.   Yes.

        MS. BATSON:  Next page, next photograph, page 4?

BY MS. BATSON:

Q.   Then what is shown here?

A.   So we see Robert Evans kind of -- both hands on top of the head, no weapons in his hands, covering himself, and Defendant's left hand on Evans's left shoulder.

Q.   Do you recall whose video camera this one came from?

A.   This one came from Defendant's body cam.

        MS. BATSON:  Next photograph, please.

BY MS. BATSON:

Q.   What is shown here?

A.   So we see the Defendant and Robert Evans.  We see Defendant's two hands on Robert Evans's shoulders.  Robert Evans's hands are on his head.  No visible weapons.  Both kind of looking towards the door of the bathroom, and this would have came from Austin Milbourn's camera.

        MS. BATSON:  Next photograph, please.

BY MS. BATSON:

Q.   What is shown here?

A.   So, again, this is just right after the previous one.  Again, we have got Defendant both hands on shoulders, Robert

Evans curled up even further.  Hands on top of the head.  No weapons seen.  And you can see Defendant is still looking to the right towards the door.  This would have been from Austin Milbourn's camera.

MS. BATSON:  And then the next one, page 7.

A.   So another picture from Austin Milbourn's camera.  Still both hands on Robert Evans's shoulders.  Robert Evans has got his hands on his head.  No visible weapons.  You can see Mata comes in the lower part of the frame approaching Robert Evans.

BY MS. BATSON:

Q.   And where is Evans's hands?

A.   I'm sorry?

Q.   Evans's hands?

A.   Evans's hands are on top of his head.

MS. BATSON:  All right.  Page 8.

A.   Again, Austin Milbourn's camera.  Now I can see Mata more clearly has entered approaching Robert Evans.  Robert Evans is still kind of curled up in an almost fetal position at this point.  Hands on top of the head.  No visible weapons.  And the Defendant still has both hands on the shoulders.

MS. BATSON:  Page 9, please.

A.   Again, Austin Milbourn's camera.  Defendant still has control on the shoulders.  Robert Evans still curled up,

hands on top of the head.

MS. BATSON:  Page 10.

A.   Now, again, Austin Milbourn's camera.  This time the Defendant has now moved his left arm underneath the chin area of Robert Evans and is grasping -- using his right hand to grasp his left hand to have full control in that situation, and Evans is kind of pushing his hands out like towards Mata, and Defendant has got his feet crossed.

BY MS. BATSON:

Q.   And you said this is a position of weakness?

A.   Yeah, sitting with feet crossed like that on your back side is a very weak position to be in.

Q.   And why is that?

A.   You don't have a lot of power with your legs to move quickly if you needed to, or to get up from that position would be very difficult.  So it is a very kind of passive position to be in without a lot of chance or opportunity to move very quickly or powerfully to do much at all.

Q.   Then we see -- what do we said we see here with Evans's hands?

A.   We see hands out in front of him, nothing in his hands, pushing out towards Mata.

Q.   Okay.  And, again, what is the Defendant doing?

A.   The Defendant has got his left hand underneath the chin and Defendant's right hand is grabbing Defendant's left hand

to kind of lock in that position.

Q.   And were any commands given to Evans from the Defendant during this exchange right here?

A.   No.

Q.   Were any commands given to the dog Mata?

A.   Yes, the bite command was given.

Q.   Even in this position?

A.   Even in this position.

        MS. BATSON:  Next page, page 11.

A.   Now, we have got -- the Defendant has moved his right arm underneath Evans's right arm lifting it directly over his head and putting him into a position of disadvantage or control position, and Evans is using his left hand to push out towards Mata.  And they are kind of moved backwards in the tub, kind of laying out -- Evans kind of exposing his whole right side to Mata.

BY MS. BATSON:

Q.   Is there anywhere for Evans to go?

A.   No.  The Defendant has got him in full control.  Evans isn't going anywhere at this point.

        MS. BATSON:  Next page.

A.   Now, looks as if Mata has now moved down towards Evans's feet.  And Evans is also with his left arm down there as well.  Kind of moves his right leg away from Mata.  So he is pulling his right leg away because he is kind of left handed

to push towards Mata.

BY MS. BATSON:

Q.   Okay.  Do you think -- do we see him kicking?

A.   No, you don't see any kick from this picture, no.

          MS. BATSON:  Next page.

BY MS. BATSON:

Q.   What is going on here?

A.   Looks to be the same picture.  Oh, there it is.

          So now we see Austin Milbourn's arm come in, because, again, this is from Milbourn's camera, and he is trying to grab the harness of Mata.  You can see up in the upper left-hand corner the Defendant still has full control with the right arm over Evans's head.  Evans is now kind of leaning to his left, and his right leg is coming up even or just a little bit above the bathtub.

Q.   Now, is anything about this particular photograph, does it indicate resistance to you?

A.   No.

Q.   So Mr. Evans is still not resisting arrest?

A.   He is not resisting, and Defendant has control.

Q.   Okay.

          MS. BATSON:  Next page, please.

A.   This looks like just right after that one.  Milbourn is still kind of grabbing towards Mata's harness, and Defendant still has Evans in that positive control.  Evans's right foot

has kind of come up even further like he is pulling up towards his chest, and Mata is kind of lower towards Evans's foot.

BY MS. BATSON:

Q.   To get the bite?

A.   This is right about the time he bites, yes.

Q.   And is this about the time on the video when Sgt. Milbourn is going, what do you want me to do, Kelly?

A.   Yeah, it is right in the sequence of the picture where Milbourn asks Kelly, or the Defendant, what do you want me to do?

Q.   And what was the Defendant's response?

A.   Takedown.

Q.   And then the bite command?

A.   Then the bite command.

        MS. BATSON:   Next page.

A.   So now Mata has bit Evans's right foot.   Defendant still has control of Evans, and Evans is starting to -- as you see his foot starting to move over the top of the bathtub back towards the door.

        MS. BATSON:   And then the last page, page 17 in this exhibit.

BY MS. BATSON:

Q.   What is shown here?

A.   So we are seeing -- Evans has now been moved from the

bathtub.  Austin Milbourn has got at least his right hand on Evans's left arm, and Evans is screaming out in pain.

THE COURT:  Ms. Batson, if you could find a good stopping point for the rest of the day.

MS. BATSON:  Right now, Your Honor.

THE COURT:  Okay.

MS. BATSON:  Thank you.

THE COURT:  Okay.  Ladies and gentlemen, we will break there for the day.  I know it has been a long one for most of you.  All of the instructions I gave you earlier still apply, so no discussing the case amongst yourselves or talk about it with friends or family, no looking up anything online.  I'd ask you to be back here ready to go at 8:45 in the morning.  Okay.

(Jury out.)

THE COURT:  Okay.  You may be seated.

Ms. Batson, are you intending to call Mr. Evans tomorrow or --

MS. BATSON:  Not tomorrow, Your Honor.

THE COURT:  I want to make sure he has counsel present when he is examined.  Does he have counsel?

MS. BATSON:  He does have counsel.

THE COURT:  Okay.

MS. BATSON:  Yes, Your Honor.

THE COURT:  And that person will be present.

MS. BRUMBELOW:  I am one of the counsel, Your Honor.  The other person is actually not present at this time.  Mr. Waldron will also be present.

THE COURT:  Okay.  If you could just identify yourself for the record.

MS. BRUMBELOW:  I am Tina Brumbelow, his civil counsel with regards to the divorce case.

THE COURT:  Okay.  Thank you.

MR. MACHICEK:  And, Your Honor, we have been in contact with Mr. Waldron about any prospective testimony of Mr. Evans, and we have notified that we will give ample notice of when we expect to call him.

THE COURT:  Anything else for us to discuss?

MS. BATSON:  No, Your Honor.

MR. SKIPPER:  Your Honor, could we just get a line-up of the Government for the next days so we can get ready to expect who the witnesses are.  Would that be okay?

THE COURT:  Do you have your list for tomorrow, Ms. Batson.

MR. SKIPPER:  We can email later on tonight --

MS. BATSON:  Yes, because I don't want to tell him the wrong people.

THE COURT:  Why don't you get that confirmed and just let counsel know.

Then how much longer do you think you will have

with Agent Crowell.

MS. BATSON:  Probably another 30, 40 minutes.

THE COURT:  Okay.

Okay.  Anything else?

MR. SKIPPER:  No, Your Honor.

MS. BATSON:  That's it.

THE COURT:  Okay.  All right.  We are in recess.

And, Mr. Crowell, you will be recalled in the morning.

THE WITNESS:  Yes, sir.

(Court in recess until 6/27/2023.)


CERTIFICATION


I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.


/s/ Shea Sloan                              August 3, 2023
SHEA SLOAN, CSR, RPR
Federal Official Court Reporter