IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION


UNITED STATES OF AMERICA          )
                                  )      CASE NO. 6:22cr146
      -vs-                        )
                                  )      Tyler, Texas
                                  )      8:59 a.m.
KELLY JASON SMITH                 )      June 27, 2023


TRANSCRIPT OF JURY TRIAL
DAY 2
BEFORE THE HONORABLE JEREMY D. KERNODLE,
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

FOR THE GOVERNMENT:

MR. LUCAS MACHICEK
ASSISTANT U.S. ATTORNEY
110 North College, Ste. 700
Tyler, Texas 75702

MS. TRACEY BATSON
ASSISTANT U.S. ATTORNEY
101 E. Park Blvd., Ste. 500
Plano, Texas 75074

FOR THE DEFENDANT:

MR. CODY SKIPPER
LAW OFFICE OF CODY SKIPPER
2001 Bryan St., Ste 1905
Dallas, Texas 75201

MR. TOBY SHOOK
SHOOK GUNTER & WIRSKYE
2001 Bryan St., Ste. 416, LB 92
Dallas, Texas 75201

COURT REPORTER:          MS. SHEA SLOAN
                         FEDERAL OFFICIAL COURT REPORTER
                         211 W. Ferguson
                         Tyler, Texas 75702
                         shea_sloan@txed.uscourts.gov

Proceedings taken by Machine Stenotype; transcript was
produced by computer-aided transcription.

3

INDEX

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | FURTHER REDIRECT | FURTHER RECROSS |
|---|---|---|---|---|---|---|
| JAMES CROWELL | 5 | 61 | 182 | 202 | 216 | 220 |
| JOHN MCQUEEN | 222 | 267 | | | | |
| AUSTIN MILBOURN | 295 | | | | | |

CERTIFICATION - PAGE 332

4

EXHIBIT INDEX

GOVERNMENT'S
EXHIBIT NO.      DESCRIPTION                                      PAGE

10               Spherical Panoramic View of                        12
                 199 Ruth Street, Hawkins, Texas

13               Robert Evans' Medical Records                       19
                 with Business Record Affidavit

14               Photos of Robert Evans's Injuries                   24

16               Kelly Smith's Affidavit                             30

17               Texas Penal Code 38.151                             46

20               Wood County Precinct 2                               9
                 Approved Canine Policy

33               Text Messages between                               50
                 Stanze and Smith

34               Text Messages between                               50
                 Williams and Smith


DEFENDANT'S
EXHIBIT NO.      DESCRIPTION                                      PAGE


14               Kelly Smith HR Claim                              139

P R O C E E D I N G S

(Defendant present in the courtroom.)

(Jury out.)

THE COURT:  Good morning.  Anything to discuss before we bring the jury in?

MS. BATSON:  Not from the Government, Your Honor.

MR. SKIPPER:  No, Your Honor.

THE COURT:  Okay.

(Jury in.)

THE COURT:  Okay.  You may be seated.

Good morning and welcome back.

Ms. Batson.

MS. BATSON:  Yes, Your Honor.

THE COURT:  Agent Crowell, I will remind you that you remain under oath.

THE WITNESS:  Yes, Your Honor.

THE COURT:  You may be seated.

JAMES CROWELL, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION CONTINUED

BY MS. BATSON:

Q.   Agent Crowell --

A.   Good morning.

Q.   Good morning.

All right.  So yesterday we left off after we showed the jury some still photographs; is that correct?

6

A.   That's correct.

Q.   And we had gone through several of the videos from the officers that were on the scene?

A.   Yes, we did.

Q.   Correct?

All right.  So let's start with -- we are not going to play the entire video, but let's start with Exhibit 5, and this would be Adam Newell's video.

And, again, you have watched this, correct?

A.   Yes, I have.

Q.   We are just going to play portions of this particular video.

MS. BATSON:  So if we could just play the first portion, please.

THE COURT:  Which exhibit is this?

MS. BATSON:  Exhibit 5, Your Honor.

And then for your purposes, Your Honor, we are going to start on the transcript, Exhibit 5 -- 5A, page 40.

(Video played.)

(Video stopped.)

MS. BATSON:  Then go to the next one, please.

(Video played.)

MS. BATSON:  This is for 5A, page 83.

(Video played.)

(Video stopped.)

BY MS. BATSON:

Q.   All right.  Agent Crowell.  In the first clip we played this morning, can you tell the Court is this when Newell, Sgt. Newell, was documenting taking the photographs of the injury?

A.   Yes, this was I believe just after that had happened, and he was having the conversation with Sgt. Milbourn about adding the resisting charge to Evans for the dog bite.

Q.   And why is it important to add a resisting charge?

A.   Whenever an officer uses force, obviously, it would have to be justified -- the force and that force that can be used because the subject is resisting.  So, typically, if you are going to use force on somebody, it will be a resisting that happened prior to that force being used or at the same time. So then you can charge a resisting arrest charge with that.

Q.   Okay.  So you file a resisting arrest to justify use of force?

A.   That's correct.

Q.   Then, again, going to the part about the pictures, Sgt. Newell took pictures of Mr. Evans's injuries?

A.   Yes.  He used a cell phone to take pictures of the injuries at the scene.

Q.   Then, again, what we just heard Mr. Evans saying, I put my hands up.  That's what you told me to do.

A.   Yes.  There was a conversation between Evans and the

8

Defendant, you told me to put my hands up and I did and you kept siccing the dog on me.

Q.   All right.  And in this last clip here, where is this taking place?

A.   So Officer Newell had transported Evans to the hospital. The Defendant followed them to the hospital.  As Officer Newell is getting out of his police cruiser, he sees the Defendant behind him and has a conversation with him.  And the Defendant asks him, are you going to hit him with resisting or file resisting charges?  Since I used force, we have to have a resisting arrest charge to go with it to justify the action.

Q.   So, again, filing that resisting supports the use of force?

A.   Right.  He followed him all the way to the hospital to make sure they did that.

Q.   That happened.

     Okay.  Now, in front of you should be a notebook or on the ledge.

A.   Yes.

Q.   And if you could flip behind tab 20 and tell me if you recognize what is shown in that exhibit, please.

A.   Yes.  Tab 20 is the Wood County Precinct 2 approved K9 policy.

Q.   Okay.  And did we obtain this document from the

Defendant, Kelly Smith?

A.   Yes, we did.

Q.   And it accompanies with a business record affidavit; is that correct?

A.   That's correct.

Q.   It is the K9 policy that he authored?

A.   Yes.

MS. BATSON:  Your Honor, at this time I move to admit Government's Exhibit 20.

MR. SKIPPER:  No objection.

THE COURT:  It is admitted.

BY MS. BATSON:

Q.   I just want to point out one part on this one, page 15 of Exhibit 20.

And, Agent Crowell, if you could look at the -- where it says:  Decision to utilize and terminate canine use.

Near the bottom of the page.  Right before assisting other agencies.

A.   Yes.

Q.   Do you see that?

A.   I do.

Q.   Can you read that last line, that last sentence in that paragraph?

A.   So the very last sentence is:  Any canine search may be terminated by the canine handler or constable.

Q.   Okay.   What does that mean to you?

A.   What that means is when the K9 officer is on the scene and they are utilizing their dog, they have the ultimate authority to determine if that dog is used, how much it is use, and when the dog is no longer to be used.

Q.   Okay.   And based on your training and experience in this investigation also, what is the purpose of deploying the dog?

A.   So the purpose of deploying the dog in the situation that we are here to talk about was to do a building search to find the subject in the house.   That was the main reason for utilizing the dog was to locate where Robert Evans was in the house.

Q.   Okay.   We, in fact, hear on the video, find him, find him, buddy?

A.   Correct.   When they enter the house, the Defendant tells Mata, find him.

Q.   And so number one, the main reason, is to find -- to locate the suspect?

A.   Locate the person in the house, yes.

Q.   Once the suspect is located, is the reason for deploying the dog over?

A.   At that moment, yes, the initial reason is to find the subject.   So if the subject is found, utilizing the K9 in that situation is done.

Q.   Okay.  And what is the second reason if you need to keep deploying the dog?

A.   So if the subject is resisting or is a threat, then the dog then can be used in the second capacity, to apprehend the suspect.

Q.   And to gain compliance?

A.   That's correct.  To gain compliance to effect the arrest.

Q.   Okay.  And then, in this particular instance, Mr. Evans was located?

A.   Yes, he was.

Q.   And we even hear him say where his location was?

A.   Right.  Immediately upon entry to the residence, he is giving his location.

Q.   And it is consistent with where he is found?

A.   That's correct.

Q.   Did you have an opportunity to go to this residence located at 199 Ruth Street in Hawkins?

A.   Yes, I did.

Q.   And is this particular residence in the Eastern District of Texas?

A.   Yes, it is.

Q.   And when you went there, did you observe what -- the area, the bathroom area?

A.   Yes, so I kind of took a look around the residence, the

front, the sides, kind of get a feel for what it looked like myself.  Then I was able to walk through the residence and see what the layout was and where everything was located.

Q.   Okay.  And then during this investigation, were there -- like, was there spherical photographs, as well as a graph drawing?

A.   Yes.  We had photographs taken of the entire inside of the residence, the parts that we can access, some of it was not accessible, that show a kind of 360 view of what each room looked like, including the bathroom.  And then we also took individual photos as well.

Q.   If you look in that same book under tab 10.

A.   Got it.

Q.   Okay.  And do you recognize what is behind that tab?

A.   Yes.  This is a hand-drawn sketch of the parts of the residence that were accessible to us.

Q.   Okay.  And is it an accurate representation of what it have depicts?

A.   Yes.

        MS. BATSON:  Your Honor, at this time I move to admit Government's Exhibit 10.

        MR. SKIPPER:  Your Honor, I object to improper foundation.  May I have a brief voir dire with the witness?

        THE COURT:  You may.

        MR. SKIPPER:  Thank you.

13

VOIR DIRE EXAMINATION

BY MR. SKIPPER:

Q. Agent Crowell, you just stated that you went out to this residence. What date was that?

A. I don't know the exact date, but it was recently.

Q. Well, if I tell you the date was September 12th of 2022, you wouldn't dispute that, would you?

A. That is not the date that I went, no.

Q. Let's talk about the spherical photos that the prosecutor is asking you about.

A. Yes.

Q. Was that a separate date than when you said you went out there?

A. Yes, that done prior to me going out there.

Q. Prior to you going out there. Okay.

And the sketch that Ms. Batson was asking you about was not drawn by you, was it?

A. No, it was not.

Q. It was actually drawn by your colleague here, Stephanie Davis, right?

A. Yes, it was.

Q. Were you there when she drew the sketch?

A. No, I was not.

Q. You were not.

In order to be in that residence, Ms. Davis, in all

of her training and experience, knew she had to obtain a consent to search form, right?

A.    She did obtain one.

Q.    Remind me again the location of this trailer in which you were not present when your colleague took these photos and drew these maps was actually 199 Ruth Street, right?

A.    Yes, 199 Ruth Street.

Q.    Do you know why the consent form would actually say 183 Ruth Street?

A.    I would not.  I was not there.  I do not know why it was the wrong address.

Q.    Do you agree with me that the numbers 183 are not the same as the numbers 199?

A.    That's correct.

        MR. SKIPPER:  Thank you.  That is all we have, Judge.

        THE COURT:  Okay.

                    DIRECT EXAMINATION CONTINUED

BY MS. BATSON:

Q.    Agent Crowell, what is reflected in Government's Exhibit 10, the graph and the photo, is it an accurate representation of the residence at 199 Ruth Street?

A.    Yes, it is.

        MS. BATSON:  Your Honor, I move to admit Government's Exhibit 10.

MR. SKIPPER: I maintain my objection.

THE COURT: The objection is overruled. It is admitted.

MS. BATSON: May we publish?

THE COURT: You may.

BY MS. BATSON:

Q. All right. Agent Crowell, can you tell the jury what is shown on the screen?

A. So this is the outside of the residence. You can see the trailer in the back, the back room.

Q. All right. And, again, on the graph, or the drawing, it does say 199 Ruth, is that correct, up in the corner, location?

A. Yes, it does.

Q. And that is where this pano was done; is that correct?

A. That's correct.

MS. BATSON: And if we could just hit, yeah, each arrow and show the jury what is depicted.

A. This is the front of the residence with the front door shown.

BY MS. BATSON:

Q. Okay. Is this the door that they went in?

A. Yes, that was the door that was breached to enter the residence.

MS. BATSON: Next one, please.

16

BY MS. BATSON:

Q.   Okay.  What is shown here?

A.   So this is the hallway when you enter the residence directly to the right.  And you can see the first doorway there leads to a bedroom, and then the second one with the light on is the bathroom.  And another bedroom down the far end of the hallway there.

Q.   Okay.

     Okay.  What is shown right here?

A.   So that is the entry into the bathroom.

Q.   Okay.

     MS. BATSON:  All right.  And then, again, if we go back a little bit to that same hallway.  Right there.

BY MS. BATSON:

Q.   Again, when you testified yesterday about the fatal funnel, again, this is that area?

A.   Yes, this is what I was referring to.

Q.   All right.  Okay.

     MS. BATSON:  All right.  If we could go to the bathroom next.

BY MS. BATSON:

Q.   All right.  See what is shown here.

     Okay.  Now, you said that you did go to this residence, and you went recently?

A.   I did.

Q.   And this is accurately depicting the size and dimensions of what you saw; is that correct?

A.   Yes.

Q.   All right.  And then did you stand inside the bathroom?

A.   I did.

Q.   All right.  And were you able to kind of judge the dimensions of this bathroom?

A.   Yes, it was fairly small.  I kind of reached out, standing in this same direction we are seeing now, and tried to touch both walls.  And I have about a 74-inch wingspan I could touch both walls with my palms.  It is fairly narrow going in.

        And then lengthwise, it was about the same length. It was just a little longer than my wingspan.  So it is a fairly small room.  Not a lot of room in there.

Q.   Also, just to give the jury a better picture of it --

        MS. BATSON:  Your Honor, may we?

        THE COURT:  You may.

BY MS. BATSON:

Q.   Just for demonstrative purposes only, can you see that?

A.   I can see it.

Q.   Just for demonstrative purposes only, again, this is the bathroom that is depicted in Government's Exhibit 10, just on the foam board?

18

A.    Correct.  It is a kind of closeup of the sketch of the bathroom.

Q.    And the dimensions, are they accurate representations of what you observed when you went?

A.    Yes.

Q.    And what are the dimensions of the bathroom?

A.    Approximately 54 inches wide and 8 inches long.

Q.    And is that about the size of a queen size mattress?

A.    Yeah, it's actually a little bit smaller.  I think a queen size is 80 by 60, to kind of give you an idea of how small it really is.

Q.    Okay.  Now, are you aware that Evans did go to the hospital?

A.    Yes.

Q.    Okay.  And he had to have medical treatment while he was there; is that correct?

A.    Yes, he did.

Q.    And did you subsequently subpoena his medical records?

A.    I did.

Q.    If you could look behind tab number 13.

A.    Okay.

Q.    Do you recognize what is behind that tab?

A.    Yes, these are the medical records from UT Health Quitman that we received subsequent to the subpoena.

Q.    Again, we received a business record affidavit for these

medical records?

A.    Yes, we did.

Q.    Is that reflected on Exhibit 13, page 1?

A.    Yes.

        MS. BATSON:  At this time, Your Honor, I move to admit Government's Exhibit 13.

        MR. SKIPPER:  No objection, Your Honor.

        THE COURT:  It is admitted.

BY MS. BATSON:

Q.    Now, these records are from the most current date back; is that correct?

A.    Yes, they sent us records from I believe July 30th and July 25th.  So starts with July 30th.

Q.    So we look at Exhibit 13, page 80.

        Okay.  And then do you see where it says arrival date and time.

A.    Yes.

Q.    What does it show there?

A.    Shows July 25th, 2022.  1737 hours, which is 5:37 p.m.

Q.    Okay.  And what was the admission type?

A.    Police.

Q.    The admission type.

A.    Oh, admission type.

Q.    It is right under the date?

A.    Emergency, emergency room, yes.

Q.   So checked in through the emergency room?

A.   Yes.

Q.   And you already mentioned the means of arrival, came with the police?

A.   Yes.

Q.   Okay.

     MS. BATSON:  If we could look at page 46 of the same exhibit.  Actually, 47.

BY MS. BATSON:

Q.   Okay.  And here I believe the second sentence or -- yes, third, under about this topic where it says "depending"?

A.   Yes.

Q.   Can you read that, please?

A.   It says:  Depending on how serious the bite is, you may need stitches.

Q.   All right.  And did Mr. Evans subsequently receive stitches?

A.   Yes, he did.

Q.   All right.  And do you recall how many?

A.   Three.

     MS. BATSON  If we could go to 46 now.  I'm sorry.  46.

BY MS. BATSON:

Q.   All right.  And, here, where it says changes to your medication, what medication was he prescribed?

A.   So it was amoxicillin, hydrocodone, hydroxyzine, and sertraline.

Q.   Sertraline.

And do you know what hydrocodone is used for?

A.   It's a pain reliever.

MS. BATSON:  If we go to page 33, please.

BY MS. BATSON:

Q.   Okay.  Up at the top where it says "procedure," what was done?

A.   A laceration repair.

Q.   And then about what time is this now this is documented?

A.   It is still July 25, 2022, about 7:44 p.m.

Q.   Okay.  And then when it talks about risks discussed, what is shown in that entry right there?

A.   It says, infection, pain, tendon damage, and poor wound healing.

Q.   Then if we go down a little bit where it says "repair method"?

A.   I'm looking for that.

Q.   It is right under "skin repair."  I'll try to do it from here.

A.   There you go.

All right.  So that repair method was sutures, size 4, three sutures.

22

Q.   All right.  And then if we can go to page 54 where it says "triage note."

A.   Yes.  Patient brought in by Mineola PD post-canine bite. Bite on right foot.  Right upper leg and left calf.  Right foot wrapped.  PTA with bleeding controlled.

Q.   And so Mr. Evans was bitten in other areas other than just his foot?

A.   Yes.

     MS. BATSON:  Page 61, please, where it says "pain assessment."  Highlight there.  Kind of like three-fourths down.  Right there.  Yes.

BY MS. BATSON:

Q.   And what is shown in this portion?

A.   Says his pain score was a 10, 10 out of 10.

Q.   And then, again, what time was this?

A.   This is at 1754, so 5:54 p.m.

Q.   Not too long after he was admitted?

A.   Correct.

Q.   And then page 62 where it is under "general complaint." When it says "pain related to recent injury."  Do you see that?

A.   Yes, and it says -- the comment is yes.

Q.   And the recent injury is the dog bite?

A.   Yes.

Q.   Page 65.  Oh, we did that one.  I'm sorry.

Page 69.  Then, here, it says "medications administered while he was there"; and do you see that?

A.    Yes.

Q.    Okay.  All right.  So Toradol, do you know what that is?

A.    I believe Toradol is also a pain reliever.

Q.    The acetaminophen, Tylenol, do you see that up at the top?

A.    Yeah, also a pain reliever.

Q.    What is lidocaine?  Do you know what it is used for?

A.    It is used for like a local anesthetic, like to numb an area.

Q.    Now, while Mr. Evans was in custody, did something happen to him?

A.    Yes.  While in custody, he was provided medication by the jail staff.  And it turned out to not be his medication, and he had a severe side effect to that medication.

Q.    Okay.  And he had to go to the hospital?

A.    Yeah, he had to be transported back to UT Health Quitman for treatment.

        MS. BATSON:  And then got to page 13.

BY MS. BATSON:

Q.    What is his chief complaint, down there at the bottom?

A.    Yes, ingestion, given wrong meds.

Q.    And he had to go back to the hospital?

A.    Yes.

Q.    Okay.  Now, during your investigation, did you receive photographs of Mr. Evans's injuries?

A.    Yes.

Q.    All right.  And if you could look behind tab 14.

       You obtained these photographs during your investigation; is that correct?

A.    Yes.

Q.    All right.

       MS. BATSON:  Your Honor, at this time I move to admit Government's Exhibit 14.

       MR. SKIPPER:  No objection, Your Honor.

       THE COURT:  It is admitted.

       MS. BATSON:  May we publish the first page, please?

       THE COURT:  You may.

BY MS. BATSON:

Q.    Okay.  Agent Crowell, what is shown here?

A.    This is the puncture wound to Evans's right foot from the K9.

Q.    And then page 2 -- we can just scroll through them and discuss them.

A.    So it's the second picture of the puncture wound.

Q.    All right.  Page 3?

A.    That is another bite to the calf area of the right foot, right leg.

Q.   Okay.  Which was also noted in the medical records?

A.   Yes.

Q.   Okay.

A.   And second photo, same thing.

Q.   Page 5?

A.   That is another photo from the bottom of the foot, puncture wound.

Q.   Okay.  And, again, Mr. Evans was wearing both shoes at the time this occurred?

A.   Yeah, when he was bitten, he had both shoes on at the time.

Q.   Okay.  Page 6.

A.   Another picture of the bottom of the foot.

Q.   Page 7.

A.   That is a closeup version of the same picture, the puncture wound.

Q.   Page 8.

A.   That is a laceration to the upper right thigh of Evans.

Q.   Page 9.

A.   It's another picture of the same wound.

Q.   Okay.  And then page 11 -- or page 12.

A.   So that is a picture of the shoe, showing the hole in the shoe from the dog bite.

Q.   Okay.  And then page 15.

A.   That is another wound from -- looks like -- I can't tell which leg.  Maybe left leg.

Q.   Okay.  Let's go back to page 14.  And what is shown here?

A.   So that is another picture of the shoe that was bitten through by the K9.

Q.   And you can see the holes in the shoe?

A.   You can see the punctures through the shoe.

Q.   Okay.  Page 16.

A.   So this is another picture of the puncture wound, laceration to the foot that has been cleaned up at the hospital prior to being sutured.

Q.   And then page 17, is that another angle?

A.   Yes.

Q.   And then page 19?

A.   These are injuries to the leg.

Q.   And then page 20?

A.   That is kind of a view for the whole leg.  You can see the wounds on the calf and the foot.

Q.   Page 21.  Is this a closeup?

A.   Just another version of that, yes.

Q.   Okay.  Page 23?

A.   More wounds.

Q.   Okay.  And where are these wounds?

A.   It is hard to tell.  I think it looks like his arm.  But

27

I am not 100 percent sure.

Q.   All right.  Then page 26.

A.   This is a picture of the wound after it had been sutured.

Q.   Reflecting the three stitches --

A.   Three --

Q.   -- in order to close it up?

A.   -- correct, three stitches to the foot.

Q.   Now, about -- let's see, this occurred July 25th, 2022, correct?

A.   That's correct.

Q.   And did you have an opportunity to meet with Mr. Evans sometime in September, September?

A.   Yes.

Q.   And did you observe his wounds at that time?

A.   Yes, we asked him to show us the wounds to see how they are healing.  He took his shoe off, showed his foot --

        MR. SKIPPER:  Your Honor, I am going to object to hearsay.  It's testimony that Evans testified to that.

        MS. BATSON:  He is not testifying about statements. He is testifying what he observed.

        MR. SKIPPER:  That is hearsay, Your Honor. Observation, that is hearsay.

        THE COURT:  Overruled.

BY MS. BATSON:

28

Q.   What did you observe?

A.   So I observed the injuries that he sustained on July 25th to his foot and leg, and they were still in the process of healing.

Q.   And this was in September?

A.   Correct.

Q.   Okay.  Now, are you aware that the Defendant went to the hospital?

A.   Yes.

Q.   Okay.  And then we even saw some of the video from Sgt. Newell showing the Defendant at the hospital?

A.   That's correct.

Q.   Is that correct?

     Are you aware that after leaving the hospital, that the Defendant went and watched the video?

A.   Yes.

Q.   All right.  And he watched Milbourn's video?

A.   That's right.

Q.   Do you know who was with him that day he watched the video?

A.   So is it was the Defendant; Sgt. Milbourn; Nicholas Gaines, who was a ride-along with the Defendant that day; and then there were two Wood County officers who were not identified.

Q.   Okay.  And, again, the day is July 25th of 2022?

A.    That's correct.

Q.    All right.  And thereafter did this Defendant file an affidavit with the Wood County DA's office?

A.    Yes, he did.

Q.    If you will look behind tab number 16, please.

Do you recognize what is shown there?

A.    Yes.  So we have a business record affidavit from the Defendant.  He provided these records.  And the records were the probable cause affidavit charging interference with a police K9.

Q.    Again, we have a business record affidavit that came from the Defendant?

A.    Yes.

MS. BATSON:  Your Honor, at this time I move to admit Government's Exhibit 16.

THE COURT:  Any objection?

MR. SKIPPER:  Your Honor, I do briefly, for optional completeness.  If I may take the witness on voir dire.

THE COURT:  Okay.

MS. BATSON:  Optional completeness of the affidavit?

VOIR DIRE EXAMINATION

BY MR. SKIPPER:

Q.    Agent Crowell, you mentioned that you wanted to put in

an affidavit for interference with a police handler?

A.   That is what I am looking at here.

Q.   He also filed an affidavit for resisting arrest, correct?

A.   Yes.

Q.   Do you intend to offer that, as well, or are you just going to pick and choose which one?

A.   Well, the two affidavits --

MR. MACHICEK:  Your Honor, this is improper voir dire.

THE COURT:  Sustained.

MR. SKIPPER:  That is all we have, Judge.

MS. BATSON:  So if we want to pick and choose, we can add that one as well, but let's focus on Exhibit 16 right now.  And is it admitted?

THE COURT:  Any other objections to 16?

MR. SKIPPER:  No, Your Honor.  Thank you.

THE COURT:  Okay.  It is admitted.

MS. BATSON:  Thank you.

If we could publish.

DIRECT EXAMINATION CONTINUED
BY MS. BATSON:

Q.   All right.  So this is the business record affidavit, again, that was provided from the Defendant --

A.   Yes --

Q.    -- is that correct?

A.    Yes, that's correct.

Q.    All right.  And if we could go to page 4 of this exhibit.

All right.  All right.  Agent Crowell, start up at the top where it indicates that -- the name on the affidavit is for Robert Charles Evans?

A.    Yes.

Q.    And that is the suspect that was arrested on July 25th --

A.    Yes.

Q.    -- 2022.

All right.  And the complainant is whom?

A.    The complainant is.

Q.    At the top.

A.    The Defendant, Kelly Smith, Constable.

Q.    And here it says -- in that first paragraph, can you tell the jury what is basically stated in that where it says "before me"?

A.    Yeah.  So it says:  Before me, the undersigned authority, on this day did personally appear complainant, who being first duly sworn, charges and swears that he/she has good reason to believe and does believe that one Robert Charles Evans, on or about the 25th day of July, AD, 2022, at approximately 4:25 p.m., County of Wood, and before the

making and filing of this complaint in Wood County, State of Texas, Defendant did then and therein:  commit the offense Interference with Police Service Animals, K9, Offense Code PC 38.151(3)(b)(7).  Degree:  Second Degree Felony.

Q.   So tell the jury what an affidavit is.

A.   An affidavit is a sworn statement to a court for charging instrument such as this or a search warrant, that you are providing a sworn statement to the court for something.

Q.   Okay.  And in this particular affidavit, there were two filed; is that correct?

A.   There were.

Q.   Okay.  And the narrative in both this one and in the other one, that Mr. Skipper referred to, are they basically the same?

A.   Yes.

Q.   So there were two affidavits that were filed?

A.   There were two affidavits for two different charges. The substance of the information affidavit was the same.

Q.   Okay.  And in both affidavits did you find misstatements?

A.   Yes.

Q.   So two affidavits were filed with misstatements in both of them?

A.   That's correct.

Q.   All right.  Let's talk about this particular one and where it says:  Second Degree Felony.  Do you see that?

A.   Yes.

Q.   All right.  And so Mr. Smith is trying to charge Mr. Evans with a felony?

A.   Yes, he is.

Q.   And the resisting arrest, is that a felony or misdemeanor?

A.   It is a misdemeanor.

Q.   Again, you stated that the resisting has to be filed because of the use of force?

A.   Correct.

Q.   All right.  But, here, this is a felony?

A.   That's correct.

Q.   Interference with Police Service Animal?

A.   Yes.

Q.   Okay.  If we could go to page 5.  And let's see I guess is this the second full paragraph that says "I approached"?

A.   Yes.

Q.   All right.  And you have read this affidavit several times; is that correct?

A.   Yes, I have.

Q.   Okay.  And what specific misstatements do you see in this document?

A.   So there are multiple misstatements, kind of starting in

order.  The Defendant is recounting the story or the observations of what happened, in this affidavit.

And the first one, about a third of the way down, is:  I maintained cover not knowing if Evans was armed.

As we talked about yesterday, there was no cover to be had in that trailer.  So maintaining cover was not something that was happening.

Q.   Okay.  And then another one.  We can just take it paragraph by paragraph.

A.   Going down to the second paragraph, next one down, where it says:  Attempted to open the bathroom door.

Q.   Can you try to circle on your screen?  See if it does it.

A.   See if it works.  Oh, it does.

Q.   All right.  So can you now, like, highlight with your finger what area of this affidavit that you are referring to?

A.   Yeah.  As we come down here:  I maintained physical control of K9 Mata hoping that Evans would open the door and comply.

I didn't see any physical control.  When they entered the residence, Mata is immediately taken off the leash.  He is not in any kind of physical control.  Went around searching the house.  When the Defendant comes up to the door, which is what he is recounting at this part, and

having the conversation with Evans where Evans is telling him to put the dog up, don't come out, he puts "I maintained physical control of K9 Mata hoping Evans would open the door," I did not see any physical control of Mata.

Q.   Okay.  And -- all right.  What is the next one?

A.   So come down here:  Evans is still not complying with verbal commands and continued to exhibit defensive resistance.

Q.   Now, this sentence right here prior to that says:  Entry into the bathroom was made?

A.   Right.

Q.   So the following sentence says:  Evans was still not complying with verbal commands and continued to exhibit defensive resistance --

A.   Correct.

Q.   -- after entry was made into the bathroom?

A.   Right.  So at this point in what we saw in the videos yesterday, when they make entry into the bathroom, there is no verbal commands given to Evans.  The commands are given to the dog to bite, which we will see down here.

Q.   Okay.

A.   So there were no verbal commands given to Evans as they were entering the bathroom.

Q.   After entry was made to the bathroom --

A.   After entry.

Q.    -- there were no verbal commands given to Evans?

A.    Correct.

Q.    Okay.  And as discussed, what types of verbal commands would be given normally in a situation like this?

A.    So you would say -- very first one would be, show me your hands.  We want to see the hands of the suspect.  Those are what can hurt you.  So you are going to say, show me your hands.  You tell them, don't move.  Or you might tell them, get on the ground.  But the first thing you do is, show me your hands.  And stop moving.  You want them to stop moving, and you want to see their hands.

Q.    All right.  And so if no commands were given, is there a way to comply?

A.    No, you can't comply with -- you can't not comply if you are not given commands.  You have to have commands to comply with to be able to do that.

Q.    And so what is defensive resistance?

A.    So "defensive resistance" is generally a term used when a person is defending themselves, not attacking the officer but kind of defending themselves from what the officer is doing to them.  So they might be moving their hands and grab them, or they may be backing up.

        Or, in this case, you know, pushing away towards the dog not to get bit.  So he is not attacking the officer. He is kind of defending himself from what is happening to him

from the officer.

MS. BATSON:  Can we go to another exhibit, 1D?

One second.  The one where he has his hands up. I'll find it.  Okay.  Sorry.  Let's go back to the affidavit.

The page we were on.  Sorry.

BY MS. BATSON:

Q.   All right.  Again, if you could -- I'm sorry.  I didn't know that was going to erase -- can you rehighlight that?

A.   (Witness complies.)

Q.   All right.  So right after this one then, what is the next misstatement?

A.   So the very next line:  We were able to open the bathroom door, and Evans continued to scream at officers and would still not comply with verbal commands to get on the ground.

From my review of the video and the transcripts, the Defendant never tells him to get on the ground.  He is saying he is giving verbal commands, but those verbal command are not given.

Q.   Again, this is after entry into the bathroom?

A.   Correct.

Q.   This is what this is referring to.  No verbal commands were given --

A.   That's correct.

Q.   -- at that point.

All right.  The next one.

A.    The next one down is:  Called K9 Mata to my side in case he was needed.

We see from the video that as soon as entry into the bathroom was made, you hear the bite command given immediately.  So Mata was not just standing by his side.  In case he was needed, he was given the bite command upon initial entry into the bathroom.

Q.    Let's go back.  It is Exhibit 1D, page 2.

Okay.  Now, on entry into the bathroom where he is telling him he is giving commands, which you just highlighted for the jury, what is going on right here?

A.    So this is from the Defendant's body cam video that we watched yesterday.  This is the initial entry into the bathroom.  You see Robert Evans's hands out, palms facing showing you he doesn't have any weapons, and looking at K9 Mata.  He is at the bottom part looking up towards Evans as they are coming in and the bite command is being given.

Q.    Okay.  So he is giving the bite command.  Again, he's got his hands up?

A.    That's correct.

Q.    Is this considered defensive resistance?

A.    At this point, I mean, with the still frame you could say it is defensive because he is pushing -- like he is pushing out.  He is not a threat to anybody.  He is just

standing there, hands out, focused on the dog that is coming in front of him.

Q.    And prior to entry into the bathroom, was one of the command, show me your hands?

A.    Yes.

Q.    And is that what he appears to be doing?

A.    Yes.  We saw the hand come out of the bathroom.

Q.    Now, let's go back to the affidavit, page 5 of Exhibit 16.

Okay.  And I believe the last one that you left off on was no commands.

A.    Right.

Q.    Verbal commands to get on the ground.  Okay.  There were no commands given?

A.    Correct.

Q.    And you said call K9 Mata to my side?

A.    Yeah.

Q.    As he was needed.

And what did you say about that?

A.    That Mata was already there, and was already being given the command to bite, so there was no -- as it is saying here, he wanted him there just in case he needed him.  But it was clear from the video that as soon as the door was pushed open, he gave the bite command.

Q.    Then the next sentence, Evans was not complying with the

verbal commands and soft empty control -- hand control.

A.    Correct.

Q.    What does that mean?

A.    The Defendant was saying that he was giving verbal commands and Evans was not complying.  We still know -- we know there was no verbal commands given.

Q.    Okay.  And then what is the next misstatement?

A.    Down here we have:  I called K9 Mata back to me in order to keep him in the bathroom and maintain physical control of him due to Evans being isolated in the bathtub.

So we saw Mata go in and out of the bathroom.  So this is referring to one of the times that Mata is not in the bathroom.  He called him back in and maintained physical control of him.  Again, you can see from the video he has no physical control of him other than the time that he grabbed Mata and dragged him up to Evans to get Mata to bite.

Q.    It says in that sentence:  Evans being isolated in the bathtub?

A.    That's correct.

Q.    So what does that mean to you?

A.    So that means to me that Defendant recognized that Evans was in the bathroom, nowhere to go, he had him isolated into an area, and there was nowhere for him to go.

Q.    And based on your training and experience as a law enforcement officer, could Evans...

(Reporter unable to hear and asks the question to be repeated.)

Q.   Based on his training and experience as a law enforcement officer, could Evans have been arrested?

A.   Yes.  Defendant had him in the disadvantage with him backed up into a corner.  We see from the video that Evans is standing up and kind of telling him, stop, no more, you know, like he is trying to give up.  And he could have taken control of the situation right there because he had him pinned up against the wall with nowhere to go.

Q.   All right.  Then the next sentence is:  Evans continued to yell and picked up a wooden plunger -- wooden handled plunger --

A.   Yes.

Q.   -- and attempted to strike Mata?

A.   Correct.

Q.   Did you find that to be true?

A.   No.  So Evans does pick up the plunger, we can see that, for a very short amount of time.  Defendant immediately disarms him.  Prior to taking it away from him, the only action you see is he picks up the plunger and pokes one time towards Mata trying to keep distance between him, and the dog is trying to bite him.

He never raises it above his head or above his waist.  Never tries to strike Mata or the Defendant at any

time.

Q.    And we see that on the brightened video, as well as the slow motion video?

A.    That's correct.

Q.    That just didn't happen, correct?

A.    That is correct.

Q.    All right.  And then the next misstatement?

A.    Down here.  Kind of mark it out.  Sorry.

It says:  A hard empty strike was applied, and he knelt down in the tub.

We know from the video that when Evans is punched in the face, at that moment he falls down, and he doesn't just slowly kneel down or anything like that, which is what is being said here.  He falls down in the tub for being punched in the face.

Q.    Okay.  And this punch that you are referring to, is it -- is it the one where Mata is out of the bathroom, where he is not in the tub?

A.    This is right after the plunger is picked up.  Defendant grabs it and throws it to the side.  You can kind of see Mata back up out of the frame of the body camera video, and then kind of steps back by the Defendant, and he punches him in the face.  So at that moment right there.

Q.    That is the punch that knocks him to the floor of the bathtub?

A.   That's correct.

Q.   All right.  Now, the next sentence:  While seated in the bathtub, he covered his head, thinking that Mata was going to bite him?

A.   Right.

Q.   Was that after the bite command was given?

A.   Yes.  So this is -- this is at the point that we saw yesterday where the Defendant is standing over the top of Evans and has got both hands on the shoulders.  Evans is curled up, hands on top of his head, seated in the bathtub.  Covered his head thinking K9 Mata is going to bite him.  Then we have where it says:  Yet only the heel command is given.  I think if you go down a little bit, you can see that part.

     MS. BATSON:  Next page.

A.   Yeah.  So this is when he has called Mata back into the bathroom.  You see him kind of approach Evans.  He is saying that only the heel command was given, and K9 Mata maintained his position near the bathtub.

     Well, we know from the video that, in fact, the bite command was given.  Not the heel command.  You never hear the heel command being given.

Q.   Only the bite command?

A.   Only the bite command.

Q.   Okay.  The next line?

A.   Evans kicked K9 Mata with his right foot.  K9 Mata

defended himself by apprehending Evans's right foot.

Again, according to this affidavit, Defendant is saying that K9 Mata only bit Evans, defending himself from Evans, on the right foot.  But we know that Mata bit Evans because he was told to, by giving the bite command.

Q.  Okay.  And did you -- does the video show him kicking Mata?

A.  No, you see Evans foot kind of moving away from Mata. He sees that Mata is right there.  He is trying not to get bit.  But there is never a forceful kick forward.  He is not trying to kick the dog.  He is moving his foot so it is not -- so he will not get bitten.  So there is not a kick that we see at Mata at the time that he bit him.

MS. BATSON:  All right.  And if we could get rid of some of those lines.  Then move to the next paragraph that says "once handcuffs."

A.  So once handcuffs were applied, K9 Mata was immediately released off the apprehension.  We talked about this yesterday.  So, as Evans is laying on the ground, they are starting to apply the handcuffs.  Defendant tells them, we will get them off when you are handcuffed.  Evans starts begging to be handcuffed.  Get the handcuffs on.

We see that Mata still has ahold of the foot even after the handcuffs are on, pulling, at least two more pulls down the hallway.  And then the shoe comes off, and Mata runs

out of the room.

At no time do you hear any commands being given to the dog to release off the bite.  The dog kind of releases himself because the shoe comes off.

BY MS. BATSON:

Q.   We saw that in the video?

A.   We saw that in the video.

Q.   Takes the shoe and runs out?

A.   Right.

Q.   So based on your review of this affidavit and your investigation of the case and review of the video, is the video consistent with this affidavit that was filed by the Defendant?

A.   It is not.

Q.   Or the other affidavit, for that matter?

A.   Correct.

MS. BATSON:  And, just to be clear, let's go back to page 2 of paragraph 16.

Okay.  Scroll down to the timestamp.

BY MS. BATSON:

Q.   Okay.  And this was filed with the Wood County DA's office on what date?  What date do you show reflected there?

A.   It says received July 29th, 2022.

Q.   And, again, the Defendant watched Milbourn's video after leaving the hospital on July 25th, 2022?

46

A.    Yeah.

Q.    And this was filed at the DA's office July 29th, four days later.

A.    That's correct.

MS. BATSON:  Your Honor, at this time we would ask the Court to take judicial notice of Exhibit 17, which is the Texas Penal Code Statute 38.151, Interference with Police Service Animals.

THE COURT:  Objection?

MR. SKIPPER:  No objection, Your Honor.

THE COURT:  Okay.  Are you seeking to admit it?

MS. BATSON:  Yes, Your Honor.

THE COURT:  It is admitted.

MS. BATSON:  Thank you.  If we may publish?

THE COURT:  You may.

BY MS. BATSON:

Q.    Okay.  Agent Crowell, this right here is the statute that the Defendant put on the affidavit trying to charge Mr. Evans with a felony offense.  Is that consistent with what is on the affidavit, the statute?

A.    This is the same statute, yes.

Q.    Okay.  And, specifically, if we could highlight the affidavit, (3)(B)(7).  This is the provision that the Defendant put on the affidavit --

A.    That's correct.

Q.   -- correct?

Can you read this provision please to the jury?

A.   It says:  Engages in conduct likely to injure or kill a police service animal, including administering or setting a poison, trap, or any other object or substance.

Q.   Now, higher on this document there are other ways to commit an offense, but those are misdemeanors; is that correct?

A.   That's correct.

MS. BATSON:  All right.  Scroll back down.

BY MS. BATSON:

Q.   This is the felony though?

A.   Yes.

Q.   Okay.  And in the videos that you have observed and that the jury has now seen, was Mata only -- or what other officers touched Mata?

A.   So Mata -- you see Austin Milbourn grab Mata by the harness a couple of times, and you see the Defendant himself grab and drag Mata up to Evans.  So you have Austin Milbourn, Kelly Smith, and Evans all grabbing the harness of the dog.

Q.   Okay.  Pretty much in the same area?

A.   Correct.

Q.   And yet only the Defendant is being charged with a felony offense of engaging in conduct likely to injure or kill a police dog?

A.    Yes.

Q.    And, again, is what you observed on the video consistent with this behavior?

A.    No.

Q.    Okay.

        MS. BATSON:  May I have a minute, Your Honor?

        THE COURT:  You may.

        (Pause in proceedings.)

BY MS. BATSON:

Q.    I am sorry.  I may have misspoken.  But it was only Evans that was charged with a felony?

A.    Yeah.

Q.    Not the Defendant.  The Defendant was the one trying to do the charging?

A.    That's correct.  Robert Evans was the only person charged with a felony offense for interference with a K9.

Q.    Okay.  Now, in your investigation, did you interview numerous witnesses who either -- had received information from the Defendant himself, including text messages?

A.    Yes, I did.

Q.    And did you subsequently photograph those text messages that were shown to you?

A.    Yes.

Q.    And, again, these are statements from the Defendant to other individuals?

49

A.   Yes.

Q.   Okay.  If you could look behind tab number 33 and 34, and then tell me once you finish looking through those exhibits.

A.   (Witness complies.)

          MS. BATSON:  Your Honor, these were provided in discovery, but I just want to make sure that the Defense knows which ones that I have selected.

          THE COURT:  Okay.

A.   Okay.  I have reviewed the exhibits.

BY MS. BATSON:

Q.   Are they an accurate representation of what you yourself photographed --

A.   Yes, they are.

Q.   -- from the interviews?

          MS. BATSON:  Your Honor, at this time I move to admit Government's Exhibits 33 and 34.

          THE COURT:  Yes.

          MR. SKIPPER:  Your Honor, I will object as to optional completeness.  I am not sure they have all been offered.  So in an effort to give the jury a full representation under Rule 106, I ask that they all be offered in evidence.

          THE COURT:  Are you only offering portions of the exhibits or the whole?

MS. BATSON: Your Honor, we are offering all of the text messages either the Defendant sent to Jason Stanze, as well as Cleve Buddy Williams.

BY MS. BATSON:

Q.   Are they all the ones that you took photographs of?

A.   Yes, they all are going to be there, yes.

THE COURT: Okay.  So what is your objection?

MR. SKIPPER: Just those two witnesses -- he sent numerous text messages to a lot of people.  And my objection is under Rule 106, optional completeness.

THE COURT: Overruled.

BY MS. BATSON:

Q.   And just to be clear, we are not admitting all of the text messages that the Defendant sent to all of the different, potential witnesses, correct?

A.   Right.  These are just for two of the witnesses.

Q.   And all of the ones for Jason Stanze are in one exhibit, and all of the ones to Buddy Williams are in another?

A.   That's correct.

Q.   Okay.

All right.  So starting with Exhibit 33.  Now, who is the Defendant communicating with here?

A.   The Defendant is communicating with Jason Stanze, who is the owner and trainer of Houston K9 Academy.

Q.   All right.  And what is the significance of Houston K9

Academy?

A.    That is where the Defendant went to be trained on how to use Mata.

Q.    Did you find out in your investigation that actually the Stanzes owned Mata?

A.    Yes.  So the Stanzes had Mata as a working detection dog prior to the Defendant getting Mata.

Q.    And do you know if the Defendant went and selected Mata from their academy?

A.    Yes.  So the Defendant contacted them and kind of gave them specifically what type of dog he was looking for as far as demeanor and capabilities.  And they matched him up with Mata.

Q.    And did the Defendant subsequently train with Mata at that academy?

A.    Yes.

Q.    And so he and Mr. Stanze know each other from that relationship; is that correct?

A.    Yes.

Q.    So with this particular exhibit right here, can you tell the jurors what is shown?

A.    So we are seeing three photos of the injuries of Robert Evans with caption number 6 sent from the Defendant to Jason Stanze.

Q.    And based on your investigation, what does number 6

mean?

A.    This is the sixth dog bite that Mata has had.

Q.    Okay.  How long has the Defendant had Mata?

A.    Approximately two years.

Q.    At that time?

A.    At that time.

Q.    And six bites?

A.    And six bites.

Q.    All right.  And if we could look at page 2 of this exhibit.  What is reflected here?

A.    So we are seeing the conversation that is going on between the Defendant and Jason Stanze on July 26th.  And the Defendant is telling him kind of what happened, explaining that he had to hit Evans and use what he is calling a Kimura, which is some type of Jiu-Jitsu hold, I believe, and Mata was hit with a plunger.  So the Defendant is telling Jason Stanze kind of what happened.

Q.    Do you know what a Kimura is?

A.    I don't know exactly.  It is some type of control hold, a Jiu-Jitsu move named after a person named Kimura, but I don't know exactly what it is.

Q.    Okay.  And do you know if the Defendant has been trained in Jiu-Jitsu?

A.    That is my understanding, yes.

Q.    And here it says he tried to hit Mata with a plunger.

Who is he referring to?

A.    He is referring to Robert Evans trying to hit Mata with a plunger.

Q.    Okay.  And did that happen?

A.    No.

Q.    Then page 3.

A.    So Defendant is telling him that he also had a pit bull trying to get him from the rear.  He is talking about K9 Mata.  Tell me what you think.  And then he sends Jason Stanze a body cam footage from that day.

Q.    And do you know if that is his body cam footage, Mr. Smith?

A.    I believe it was a portion of Milbourn's, not Kelly's.

Q.    Okay.

      All right.  And then page 4.

A.    The Defendant --

Q.    I'm sorry.  I'm sorry.  Let's back up.

      On page 2, what is the date that the Defendant was corresponding with Jason Stanze?

A.    July 26th, between -- 2022 and 7:05 a.m.

Q.    This is the day after?

A.    Correct.

Q.    And, again, the affidavit reflects that the incident took place around 4:00 o'clock on the 25th?

A.    Yes.

Q.   So this is early the next morning --

A.   Correct.

Q.   -- when he is sending this; is that correct?

A.   That's correct.

Q.   Now, we can go to page 4.  What is the date shown on this particular conversation?

A.   So now this is Tuesday, August 2nd at 11:40 a.m.

Q.   And what is shown here?

A.   Text messages sent from the Defendant to Jason Stanze, and:  Only three photos sent.  With a resistant suspect like that, the training made minimal injury possible with a solid apprehension.

Q.   What did you take this to mean?

A.   The Defendant is saying that Robert Evans was resisting and that the training that was provided by Houston K9 Academy made it so that there was minimal injury and a solid apprehension.  So it is kind of giving kudos to the training.

Q.   All right.  Now let's turn to Exhibit 34.  And, again, where were these text messages obtained?

A.   These were obtained from the cell phone of Cleve Buddy Williams, who is a Sulphur Springs police officer, K9 handler, and trained with the Defendant.

Q.   And looking at page 1 of Exhibit 34, what is the time that the Defendant sent these pictures to Mr. Williams?

A.   So this is Tuesday, July 26th at 8:06 a.m.

Q.   Do these appear to be the same pictures that he also sent to Jason Stanze?

A.   Yes.

Q.   Okay.  And he sent those at 7:05 in the morning?

A.   Right.  So approximately an hour after he sent them to Jason Stanze.

Q.   Okay.  What is -- I'll let you read that page 2.  Up at the top?

A.   So the Defendant sends a text message saying:  Dog fight.  Plus we fought a pit bull off of us while bad guy had ahold of his harness and tried to hit him with a plunger.

     And "him" he is talking about K9 Mata.

Q.   Fought a pit bull off.  Do we see anything like that happening in any of the videos?

A.   No.  We do see Robert Evans's pit bull kind of running around, but there was no fight, no confrontation with the dog at all.

Q.   Okay.  And even in some of the recordings and video that we heard that said that the dog is not vicious?

A.   Yeah, the dog wasn't vicious, didn't bark, didn't growl.  Just kind of running around trying to figure out what was going on.

Q.   So fighting a pit bull off, we don't see that?

A.   No, that didn't happen.

Q.   Bad buy had hold of his harness and tried to hit him

with a plunger.  We didn't see that?

A.    Did grab his harness but did not hit him with a plunger.

Q.    And then what is Mr. Williams' response once Kelly Smith tells that narrative?

A.    He says:  Please tell me that is the bad guy's foot.

Referring to the pictures of the injuries.

Q.    Then what?

A.    Smith replies:  Yep.

And the reply from Williams is:  Mata is hell on feet and legs.  LOL.

Which means he is laughing out loud.

Q.    And then the videos?

A.    Then we see two videos sent by the Defendant, and he asks him not to share.  And he will call him after court.

Q.    And page 3.  On August 2nd about 11:24 a.m.

A.    Yes.  And the Defendant asks Mr. Williams:  Did you get a chance to look at the last K9 apprehension video?

And then sends the videos again.

Q.    And then page 4.

A.    The Defendant is asking Mr. Williams to call him after he watches it.  He then sends the same text that he sent to Jason Stanze with the:  Only three photos sent.  With a resistant subject [sic.] like that, the training made minimal injury possible with a solid apprehension.

Q.   And then there is a reference to USPCA?

A.   Yes.

Q.   And what is that?

A.   That is an organization that certifies police K9s, and they have different regions throughout the United States.  He is asking for the name of the region they are in, in East Texas.

Q.   And what is the group again, the USPCA, what is it?

A.   United States Police Canine Association.

Q.   Okay.  And what do they do?

A.   So they are a governing body or a group that provides training and education to K9 handlers, and they have a large network throughout the United States.  They have a certification that K9s can go through that is pretty rigorous, I guess, and just shows the level of the dog and what the dog is capable of.

Q.   Okay.  Page 7.  Oh, I'm sorry, let's take it to page 5 when it says:  What FBI guy?

A.   That's on the next page.

Q.   Oh, page 7, I'm sorry.

A.   Yeah, from my understanding from talking to Mr. Williams about these text messages, when he says --

     MR. SKIPPER:  Your Honor, I'm going to object again to hearsay.  If Buddy Williams wants to testify about it, he can do that.

58

MS. BATSON:  That's fine, Your Honor.

THE COURT:  Sustained.

BY MS. BATSON:

Q.   Page 7.  What is Kelly Smith saying in this particular text message?

A.   So down at the bottom after Buddy replies "what are friends for," he says:  Just to make sure when you go in a house for a deployment that the other badges don't stay outside in fear.  I'll stop now.  Or give the bad guys the video.  Not too many good cops over here.  It will be a cold day in hell before I run for them again.

So, essentially, he is complaining about the other officers that are on the scene that day Milbourn, Tuma, Newell, McQueen, he is saying that they didn't help him. They stayed outside.  They were afraid.  And that he wouldn't work with them again.

Q.   Okay.  And so what do you take this text to mean?

MR. SKIPPER:  Object to speculation.

THE COURT:  Sustained.

MS. BATSON:  All right.

BY MS. BATSON:

Q.   But, again, the Defendant is sending this to another officer?

MR. SKIPPER:  Object.  Asked and answered and leading.

THE COURT:  Sustained.

MS. BATSON:  All right.  I will move on.

BY MS. BATSON:

Q.   Page 17.  Let's start at 16.  Do you see any reference in this particular page where the Defendant is referring to surgery?

A.   Yes.

Q.   Can you read that?

A.   He says:  Awesome.  My surgery is in the AM, so I'll be out of pocket most of tomorrow.

He says:  For your knee?

Asking the question.

Defendant responds:  Hand.

Q.   And this was sent on what date?

A.   This was September 27th, 2022.

Q.   And then page 17, what is shown on this particular page?

A.   So this is a picture sent by the Defendant to Mr. Williams of -- appears to be his left hand wrapped in some type of dressing after his surgery.

Q.   Okay.  And it is the left hand?

A.   Left hand.

Q.   Now, you testified earlier about the types of evidence you gather in an investigation to prove --

A.   That's correct.

Q.   And in this particular case, what evidence did you gather that Mr. Smith was acting under color of law?

A.   So we saw from the camera that he was on duty in his police cruiser dressed in full uniform and acting in a capacity of official duties as a law enforcement officer.

Q.   Okay.  And did Evans suffer pain from the injury?

A.   Yes.

        MR. SKIPPER:  Your Honor, I'm going to object to asked and answered.  This was all discussed yesterday.

        THE COURT:  Overruled.

A.   So can you ask the question again?

BY MS. BATSON:

Q.   I'm sorry, yes.  What evidence did you gather in your investigation that -- specifically about Evans's injuries and pain?

A.   Right.  So we saw the video.  We heard the screams for pain.  Evans's own words talking about what hurts, his head, his foot.  We saw the pictures of the injuries.  And then the medical records where he says his pain was a 10 out of 10 and received pain medication for that.

Q.   And then what evidence did you gather that Mr. Evans was deprived of a constitutional right?

A.   So he was in a situation where he had been arrested, Fourth Amendment right.  And the excessive force that was used to apprehend him was a violation of the Fourth

Amendment.

Q.   And what about the deprivation of that right was on purpose?

A.   It was on purpose, yes, willful --

MR. SKIPPER:  I'm going to object.  Improper opinion.  Invades the province of the jury.

THE COURT:  Sustained.

MR. SKIPPER:  It's a legal conclusion.

MS. BATSON:  All right.

Your Honor, will pass the witness.

THE COURT:  Okay.

Mr. Skipper.

MR. SKIPPER:  May I proceed, Your Honor?

THE COURT:  You may.

CROSS-EXAMINATION

BY MR. SKIPPER:

Q.   Agent Crowell, just I'm going to jump real quick, there's a lot of testimony given about these sutures.  That's a fancy phrase for just saying he got three stitches in his foot, right?

A.   A suture and a stitch are the same.

Q.   It's a stitch?

A.   Correct.

Q.   He got three of them?

A.   He did.

Q.   Now, you mentioned yesterday that you are originally from California?

A.   Yes, I am.

Q.   And you worked as a BART officer out there?

A.   I was.

Q.   In San Francisco, I believe?

A.   Yes.

Q.   You didn't grow up here?

A.   I did not.

Q.   And your colleague, Agent Davis here, is she from Jersey?

A.   I'm not sure where she was originally from, but she was working in Jersey for a while, yes.

Q.   And then she now works for the Washington Field Office, or what is commonly referred to as WFO?

A.   No, she is working at headquarters.

Q.   And where is headquarters?

A.   In Washington, DC.

Q.   In Washington, DC.

A.   They are separate buildings.  They are not the same.

Q.   It is separate from Tyler.  She works in DC, right?

A.   That's correct.

Q.   Okay.  Did she grow up in Tyler?

A.   Not that I am aware of.

Q.   And how long have you been working for the FBI?

63

A.    For 12 years next month.

Q.    12 years.  And during all that time, by way of San Francisco, how many SWAT teams have you worked for?

A.    I have never been on a SWAT team.

Q.    You've never been on a SWAT team?

A.    I have not.

Q.    You spent a lot of time yesterday enlightening this jury, all 12 of these factfinders, about tactical errors, right?

A.    That's correct.

Q.    Tactical errors coming from you, a man who has never even served on a SWAT team, correct?

A.    I have not.  But I have had extensive training and a lot of entries.  So you don't have to be on a SWAT team to have tactical training.

Q.    My question to you, sir, is that you have never been on a SWAT team; that would be a yes?

A.    I have not.

Q.    Now, once you went to the -- I assume you went to the academy to be an FBI agent, right?

A.    Yes, I did.

Q.    And when you go to the academy, you learn proper procedures for various things to do it the FBI way, right?

A.    That's correct.

Q.    And you always want to do it the FBI way, right?

64

A.   Yes.

Q.   And if you don't, it could violate some internal policies, right?

A.   Yes.

Q.   And the first thing you learn about doing the FBI way is what is called an FD-302 form, right?

A.   Yes, that's our reports.

Q.   It's called an FD-302 form, right?

A.   Yes, it is.

Q.   And an FD-302 form is the official document that an agent -- you call yourselves special agents, but an agent adopts the raw notes of an interview and puts those notes into an official FD-302, correct?

A.   Yes.

Q.   And what you do is when you and a partner, presumably this would be Steph Davis sitting here, in your training and experience, you go interview individuals, as you have discussed doing the last day and a half, in an investigation, you go with a partner, right?

A.   Generally, yes.

Q.   Well, generally.  That is what you did in this case?

A.   We did.

Q.   We are just talking general.

        You generally would get Steph Davis and go interview all these folks, right?

A.    Yes, we did.

Q.    And when you interview people, one of you decides who is doing the note-taking, right?

A.    Yes.

Q.    All right.  And either you would do the note-taking, right?

A.    Yes.

Q.    Or Steph Davis would do the note-taking, right?

A.    That's correct.

Q.    And then there is -- shortly thereafter, the rules require internally a five-day turnaround?

A.    Yes.

Q.    So a five-day turnaround to draft that FD-302, and have it approved, right?

A.    Yes.

Q.    And enter into the queue?

A.    Yes.

Q.    And you, or Steph Davis, would take the raw notes, the rough notes, put into that FD-302.  And it is approved by a supervisor --

A.    Yes, it is.

Q.    -- right?  And so when you put those rough notes, or your experienced colleague here Steph Davis, into an FD-302, you represent to your internal supervisor that the information contained therein is truthful and accurate.

Right?

A.   Yes.

Q.   Truthful, right?

A.   Truthful.  Based on what we are told in the interview, is what we are putting in our report.

Q.   Right.  Based on what you are told in the interview, right?

A.   Yes.

Q.   Because you want to be truthful?

A.   Yes.

Q.   It is an important as an FBI agent that you be truthful?

A.   Absolutely.

Q.   You not deceive or mislead anyone?

A.   Correct.

Q.   You are trained on that?

A.   Yes.

Q.   And it is in your heart to be truthful?

A.   Yes, it is.

Q.   All right.  And when you adopt the notes into an official FD-302, your supervisor then signs off on it, and your supervisor believes the words that you are now typing into this FD-302.  Correct?

A.   Yes.

Q.   If they didn't believe your words, your supervisor would

not approve that FD-302, correct?

A.   Right.   They want to trust what we put in there is accurate.

Q.   Yeah, they don't want to trust you if you are giving them false information, right?

A.   Correct.

Q.   Now, in all of your -- did you say 12 years with the FBI?

A.   Yes.

Q.   Okay.   How many different venues have you sat in a chair like that and sworn testimony under oath?

A.   I have done numerous times.

Q.   How many different venues, not times, how many different places have you testified just like this under oath?

A.   As an FBI agent, it has always been here in Tyler.

Q.   Always been here in Tyler?

A.   Yes.   In Sherman for a Grand Jury, but for the Eastern District.

Q.   In this Grand Jury, you guys chose to go to Sherman in Grayson County?

A.   Yes.

Q.   You didn't want to do it here in Tyler?

A.   The decision was made to go up to Sherman and do it up there.

Q.   You didn't want to do it in Tyler?

A.    (Shakes head.)

Q.    All right  And remind me again, 199 Ruth Street, not 183 Ruth Street, but that is not in Sherman, Texas, but it is in Hawkins, right?

A.    That's right.

Q.    And Hawkins is in Eastern District of Texas in Tyler Division?

A.    Tyler Division.

Q.    Okay.  There are 10 counties in this division we are in right now, right?

A.    I believe there might be 13.  But, yeah, 10, 13, something like that.

Q.    Well, you will agree me that Grayson County is not in this district?

A.    No, but it is in the Eastern District.

Q.    You will agree with me that Grayson County is not in this district?

A.    Not in the Tyler district.

Q.    You will agree with me that Grayson County is not in the Tyler district?

A.    Yes.

Q.    Thank you.

        Now, this video that -- the shortened video, I call it, of Austin Milbourn you spent an credible amount of time analyzing with screenshots, even though we are talking about

a use of force continuum of 90 seconds of a man's decision-making, correct?

A.   Yes.

Q.   All right.  You spent a lot of time going over this video.  And you will agree with me that real life does not occur in a screenshot, right?

A.   No, it does not.

Q.   We don't Monday morning quarterback a use of force continuum, do we, with screenshots?

A.   Strictly on a screenshot, no.  We look at the totality of the circumstances.

Q.   That's right.  You look at the TOC, just like you do when you are an investigator, right?

A.   Yes.

Q.   Because you want to be objective, right?

A.   Yes.

Q.   That is your goal, right?

A.   Yes, it is.

Q.   Presumably, that would be your dear colleague, Steph Davis's goal, right?

A.   Yes.

Q.   To be objective, right?

A.   Yes, sir.

Q.   To be a neutral fact-finder?

A.   Yes.

70

Q.    To not have tunnel vision?

A.    Correct.

Q.    To not have at predetermined outcome?

A.    No.

Q.    To not pick a target and say, I am going to get this person by any means necessary, right?

A.    That did not happen.

Q.    You would never do that --

A.    No.

Q.    -- all of the times you have testified under oath, would you?

A.    I would not.

Q.    I want to talk about this Grand Jury testimony, and I want to explain to this jury how it works if they have never had the privilege of serving their community on a Grand Jury.

A Grand Jury --

MS. BATSON:  Your Honor, I object.  How is this relevant?

THE COURT:  Why don't we take our mid-morning break at this time, ladies and gentlemen.  So we will pause here and give everybody 10 to 15 minutes to stretch your legs, use the restroom, get some coffee.  Okay.

(Jury out.)

THE COURT:  You may be seated.

Mr. Skipper, what is the -- where are you going

71

with the Grand Jury questioning?

MR. SKIPPER:  I am just going to show him some of his Grand Jury testimony.

THE COURT:  For what purpose?

MR. SKIPPER:  To impeach him.

THE COURT:  On what?

MR. SKIPPER:  On a statement that he just talked about on direct examination, impeach him with a prior inconsistent statement.

THE COURT:  Okay.

And what is your objection, Ms. Batson?

MS. BATSON:  Your Honor, going through the Grand Jury process, I guess that is where he was going, that is completely irrelevant.

And the implication that we did the Grand Jury in Sherman versus here because we didn't want to, that is completely inaccurate.

THE COURT:  But you can fix that on redirect.

MS. BATSON:  I understand.

THE COURT:  But, I mean, if he is using his prior testimony for impeachment purposes, I don't see a problem with that.

I agree that the Grand Jury process is generally irrelevant to the case.  So any question beyond impeachment should be avoided.

MR. SKIPPER:  Yes, Your Honor.  I will keep it contained.

THE COURT:  Okay.  Anything else to discuss?

MS. BATSON:  No, Your Honor.

THE COURT:  Okay.  We will be in recess for 10 minutes.

(Recess was taken at this time.)

(Jury out.)

THE COURT:  I do want to make a couple of comments before we bring the jury in and remind people that facial expressions, reactions to testimony, argument by counsel are inappropriate.  Everybody keep a poker face.

Another thought -- I just forgot it.  Microphones, yes, we're apparently having trouble hearing everybody.  Make sure you are speaking in the mic and use your stage voice.

Okay.  Thank you.

(Jury in.)

THE COURT:  Okay.  Thank you.  Please be seated.

Mr. Skipper.

MR. SKIPPER:  Thank you, Your Honor.

BY MR. SKIPPER:

Q.   Agent Crowell, when we broke, I was discussing with you as an FBI agent should always be truthful about what you see and what you hear, right?

A.   Yes.

Q.   You should never direct any of your witnesses to see something, right?

A.   No.

Q.   Never direct any of your witnesses to hear something?

A.   No.

Q.   It is up to that witness to tell you what he or she saw, right?

A.   That's the information we want, yes.

Q.   It is up to that person to tell you what he or she saw, correct?

A.   Right.  We want to hear from them, their observations, what they saw, or what they know.

Q.   It is up to that person to tell what he or she heard, correct?

A.   Yes.

Q.   You understand that it should serve no type of influence in an investigation if someone tells you something contrary to what you want to hear, yes?

A.   Yeah.  No, we want the truth from them.

Q.   It is important to someone who is charged with a federal crime, isn't it?

A.   Yes.

Q.   Now, you gave testimony in the Grand Jury in this case four different occasions, right?

A.   I believe it was three.

Q.   All right  Let me walk through the dates because I think your numbers are off.

September 15th of 2022.

A.   Yes.

Q.   November 10th of 2022?

A.   Yes.

Q.   The date that the actual Indictment was rendered, correct?

A.   Correct.

Q.   February 8th of 2023?

A.   Yes.

Q.   And June the 15th, 2023?

A.   Yes.  I'm sorry.  I forgot about the last time.

Q.   Simple mistake.  Nothing intentional by you, right?

A.   Right.

Q.   No intent to deceive.  Just a mistake, right?

A.   Correct.

Q.   All right.

Now, on September 15th of 2022, you went to the Grand Jury in Sherman, right?

A.   Yes.

Q.   And remind me again, when you testified in the Grand Jury, do you have to raise your right hand?

A.   Yes.

Q.   Do you have to tell the truth?

75

A.    Yes, I do.

Q.    Do you have to swear to tell the truth?

A.    Yes.

Q.    Nothing but the truth?

A.    Yes.

Q.    So help you God?

A.    Yes.

Q.    All right.  Before you went to the Grand Jury on September 15th of 2022 and raised your right hand and took an oath, how many times have you watched that video that the prosecutor has been going over with you all day yesterday?

A.    Numerous times.  I couldn't tell you exactly how many times.

Q.    Numerous times?

A.    Yes.

Q.    Would numerous be more than 50?

A.    Maybe not more than 50, but more than 20.

Q.    More than 20, less than 40?

A.    Sure.

Q.    All right.  More than 20, less than 40.

        And you have also shown this video that the Government has been talking to this jury about all day yesterday to all of the witnesses up to that point, correct?

A.    Yes, we have.

Q.   And up to that point, you had spoken at least to John McQueen formally Monday, August 1st, right?

A.   Yes.

Q.   Spoke to him on the phone the day after, right?

A.   Yes.

Q.   No report was written of that, right?

A.   No.

Q.   Even though you spoke to him for 23 minutes?

A.   No.

Q.   You have spoken to John McQueen, you've spoken to Adam Newell, right?

A.   Yes.

Q.   Spoken to a lot of witnesses and asked those witnesses questions about what they saw on the video, right?

A.   Yes.

Q.   And either your dear colleague here, Steph Davis, was writing the notes, or you were writing the notes?

A.   That's correct.

Q.   And is it fair to say if you are writing the notes, then usually Steph Davis would be asking the questions?

A.   It kind of goes back and forth, yes.  It is not a set determine if I am writing notes I don't ask questions.  It just depends on the interview and what is happening, so it can go both ways.

Q.   Usually, it is easier for the interviewer when you are

77

rolling up on someone and say, hey, I'm doing the talking, and you do the note-taking.  Right?

A.    Yes, sir.  Usually the agent who is leading the interview --

Q.    Right.

A.    -- not necessarily doing all of the talking.

Q.    Okay.  In any event, sometimes she writes notes; sometimes you do?

A.    Yes.

Q.    And then those notes are ultimately put into an FD-302, right?

A.    Yes.

Q.    And you can always tell who the person typing in the letters for the 302 is.  At the bottom of that document it will have your name and her name.  If your name is first, you are the one that is responsible for making the representations therein, correct?

A.    Yes, the first name is the person who actually drafted the 302.

Q.    Right, drafted.  And represented to your supervisor and approved your supervisor based on your representations, correct?

A.    Yes.

Q.    How many of those 302s got kicked back for not being factually accurate?

A.   None.

Q.   How many times have you gone to your supervisor and said, hey, I have since found out that what this person said to me, we wrote that down wrong?

A.   Typically, in that situation, if you were to come across that situation, you would write a corrected 302.  I talked to this person this date and time, and that is what they told me.

Q.   My question is, how many times have you or Steph Davis acknowledged an error that you made in mishearing someone and writing that supplemental 302?

A.   I couldn't tell you.  I can't remember that happening in this case.  I know we talked to the witnesses multiple times.

Q.   That is something that you would remember in any investigation, right?

A.   If it was a significant change, material fact, yes.

Q.   Do you believe that it is significant that you write down something ascribing information to someone the complete opposite of what that person told you?  That would be significant.  I hope you would say yes to that after 14 years of experience.

A.   Yes, I need to see the situation that you are speaking of, but, yeah.

Q.   I will get to that a little bit later.  I just want to

make sure we are on the same page.

A.    Okay.

Q.    Now, September 15th of 2022, after you have watched this video numerous times, anywhere between 20 to 40, you are asked about this event in the hallway on Agent Milbourn's camera by I believe Ms. Batson.

And you said under oath:  At some point they pushed the door open and you see --

MS. BATSON:  Your Honor --

Q.    -- I put my hands up.

MS. BATSON:  -- this is improper.  If he would like to show the witness the statement, then that is one thing.

What page are you referring to?

THE COURT:  Are we looking at the Grand Jury testimony?

MR. SKIPPER:  I am, Your Honor.

THE COURT:  Okay.  Why don't you refer to the page.

MR. SKIPPER:  Page 9.

MS. BATSON:  And the purpose?

MR. SKIPPER:  The purpose is to impeach him on a prior inconsistent statement under oath.

MS. BATSON:  Okay.  Then you are going to ask him about this statement or read it?

THE COURT:  Do you have an objection, Ms. Batson?

MS. BATSON:  It is improper, improper

80

impeachment.

THE COURT: Okay. Go ahead for this moment.

MR. SKIPPER: Thank you, Your Honor.

BY MR. SKIPPER:

Q. Agent Crowell, let me just make this easier. She knows how to do it. We all do. You gave a statement yesterday under oath with this jury that Robert Evans stuck a hand out, a hand. Did I get that right?

A. Yes.

Q. And you said "hand" yesterday?

A. Yes.

Q. You didn't say "hands" yesterday, did you?

A. No, I said "hand."

Q. And the "hand" you said yesterday didn't have an S after the D, did it?

A. No, you can see a single hand come out.

Q. Right. You said a single hand?

A. Yes.

Q. Okay. And that would mean one hand, not two, right?

A. Correct.

Q. Okay. And would you agree with me, in common vernacular, when people say "hands" there is an S after the D, presumably they don't have more than two hands, that means they are showing both hands?

A. Yes.

Q.    Okay.  I will direct your attention to your sworn testimony on September 15th of 2022 before a Grand Jury in Sherman, Texas, in which you said under oath:  You see his hands come out -- hands -- but they force their way into the bathroom anyway.

Do you now acknowledge that you, in fact, said those words under oath on September 15th of 2022, Agent Crowell.

A.    Yes, if the transcript that was certified says I said "hands," then I said the word "hands."

Q.    You said that, right?

A.    Yes.

Q.    Is it fair to say that the Grand Jury relied on the words that you gave them --

A.    Not solely.

Q.    -- in rendering a decision?

I'm sorry?

A.    Not solely.

Q.    Not solely, Okay.

And you are speculating as to what the Grand Jury would rely on, what you said under oath.

A.    I am speculating they would take that into account as part of what they are determining when they make their decision.

Q.    And when you are given a Grand Jury, all of your

82

knowledge and information as a Special Agent of the FBI about public corruption and indicting someone for a 90-second event of their life and split-second decisions, one of those elements is reasonableness.  You know that, right?

A.   Yes.

Q.   We have talked about it?

A.   Yes.

Q.   A use of force continuum?

A.   Correct.

Q.   Totality of the circumstances?

A.   Yes.

Q.   It's what you do every day?

A.   Yes.

Q.   And you will agree with me that when you are testifying against someone, that being Kelly, you are trying to explain to the Grand Jury why he may have acted unreasonable, correct?

A.   Yes, I am trying to provide the evidence.

Q.   That's right.

     And the evidence you chose to provide, the words that you chose to leave your mouth under oath on September 15th before this man was indicted was "hands," correct?

A.   Yes.

Q.   Because that would deceive a Grand Jury to think that he was trying to comply, right?

83

A.    It was not -- there was no deception in my testimony by saying "hands."

Q.    So you didn't mean -- so that was just another -- what would you describe that as?

A.    If I said "hands" instead of "hand," I was just describing it inaccurately because it was a single hand.  But it was not an intention to deceive a Grand Jury into believing just what I am saying, as opposed to what they are seeing on the video because they were shown the video.  They saw it for themselves.

Q.    Okay.  But despite the fact that you can see the same thing all those people saw on the Grand Jury, you still chose to used the word "hands," right?

A.    It was not an attempt to deceive the Grand Jury.

Q.    You didn't attempt to deceive the Grand Jury, but these affidavits we heard -- and we are going to get to those later -- but you think Kelly intended to deceive in his affidavit, right?

A.    I do.

Q.    You do?  Okay.  Good.

        Did you come back later and tell the prosecutor that, hey, you know, my eyes haven't been working when I have watched this video 20 to 40 times, we might need to clarify this before the Grand Jury?

A.    No.  Because we showed them the video, and they saw it

for themselves.  So they did not have to view it solely by my word.  They did not make their decision based on just what I said.  They were provided all of the evidence to make the decision.

Q.   What would be your purpose because you were just -- why were you in there then if they don't listen to what you say?

A.   Because somebody has to present the evidence to them.

Q.   That would be you?

A.   Yes.

Q.   All right.

Now, just to pick up on -- you are talking about this Section 1519 charge you put on Kelly about false statements in an affidavit, you yourself put a false statement in an affidavit regarding some words in a text exchange that you ascribed to Kelly Smith, when, in fact, they came from Buddy Williams.  Correct?

A.   I am not sure what you are referring to.

Q.   Well, let me refresh your recollection.

You have just gone over all of these text messages with the prosecutor about Buddy Williams.  Let me find where we are here.

Is that something that you would normally recall if you gave a false statement in a sworn affidavit?

A.   Would I recall giving -- I don't recall ever putting a

false statement in an affidavit.

Q.    Is that a big enough incident as a Special Agent in the FBI that you would recall -- it seems like something that someone would recall if you made a misrepresentation to a federal judge?

A.    If it was pointed out to me, and it was truthful, I would remember that.

Q.    Well, that is a good segue to where we are going.

Now, let's talk about your drafting of search warrant affidavits.  Pardon me.  Just affidavits, in general. When you draft an affidavit, you do that yourself and usually it is reviewed by someone.  Correct?

A.    Yes.

Q.    Do you know who reviewed this affidavit in this case?

A.    Which affidavit are we referring to?

Q.    The one where you falsely stated that Kelly Smith --

MS. BATSON:  Your Honor, I am going to object.  He needs to show the witness --

THE COURT:  Can you provide the affidavit --

MS. BATSON:  -- the affidavit.

THE COURT:  -- to the witness so we all know what you are talking about?

MR. SKIPPER:  I will, Your Honor.

MS. BATSON:  And may I have a copy as well?

MR. SKIPPER:  I don't have one, Your Honor.  It is

their affidavit.

MS. BATSON:  May I have a copy as well?

MR. SKIPPER:  I don't have one, Your Honor.  It is their affidavit.

MR. SKIPPER:  May I approach?

THE COURT:  You may.

MS. BATSON:  May I see it?

MR. SKIPPER:  May I approach, Your Honor?

THE COURT:  You may.

BY MR. SKIPPER:

Q.   Just a highlighted portion in green, one sentence.

THE COURT:  What is the date of the affidavit, Mr. Skipper?

MR. SKIPPER:  Your Honor --

BY MR. SKIPPER:

Q.   Agent Crowell, if you could look at that, I believe it is November the 22nd?

A.   The date issued was November 22nd, 2022.

Q.   That is the affidavit November 22nd that was authored by you, correct?

A.   That's correct.

Q.   And when you submit an affidavit, you swear to the veracity of the statements contained therein, correct?

A.   Yes.

Q.   And someone reviews that before you submit it, right, in

your office?

A.    It is not reviewed by anybody in my office.  It is reviewed by the U.S. Attorney's Office.

Q.    Oh, okay.  So the U.S. Attorney's Office would have approved this document?

A.    Yes, together.

Q.    Okay.  Together.  You actually review it together before you go see a federal judge?

A.    Yes.

Q.    And in this case you took that statement, that is an affidavit in support of probable cause, and you swore to the veracity and the truthfulness of the statements contained therein, correct?

A.    Yes.

Q.    You raised your right hand just like you did in front of the Grand Jury four different times, right?  Is that right?

A.    That's correct.

Q.    All right.  Just like you did here yesterday, right?

A.    Yes.

Q.    In that affidavit you said that that text exchange, that you were just asked about in front of this jury --

A.    Uh-huh.

Q.    -- with Buddy Williams, you said that Kelly Smith said: Yeah, Mata is hell on his feet and legs.  LOL.

          That is what you said?

A.   That is what is written down there, yes.

Q.   That is what you said?

A.   Right.  It is a simple typo.  I put the wrong person's name in front of who said what.

Q.   Could you repeat that one more time?  I thought you said a typo.

A.   Yes, that is a simple typo of who -- when I am listening to who said what, I said Smith instead of Williams.

Q.   Well, let me ask it this way:  Much like when you are in front of a Grand Jury and you are saying someone is showing their hands in a use of force case --

A.   Uh-huh.

Q.   -- based on the totality of the circumstances, 90 seconds of this man's life, split-second decision, it would help you if you told a federal judge falsely that Kelly is saying, Mata is hell on those feet and legs, laughing out loud, like he has some type of bad purpose or evil motive. Certainly you would acknowledge that?

A.   I will acknowledge there is a typo, and that the search warrant doesn't rely directly on one sentence in the entire affidavit.

Q.   You took those pages of paper, right?

A.   Yes.

Q.   With those words, right?

A.   Yes.

Q.   Every one of those letters, right?

A.   Correct.

Q.   You came over here, and you reviewed that with a federal prosecutor of the United States, right?

A.   Yes.

Q.   As a Special Agent of the FBI, right?

A.   Correct.

Q.   You reviewed that, right?

A.   Yes.

Q.   Even though you had the text right in front of you, right?

A.   Yes.

Q.   Staring at it saying Buddy Williams said, Mata is hell on those feet and legs laughing out loud, you knew it when you drafted that document, right?

A.   Yes, I had the texts with me.

Q.   That's right.

          And then you knew it when you sat there with the federal prosecutor and reviewed it, right?

A.   Yes.

Q.   And you knew when you sat down in front of Judge Mitchell, a Federal Judge, raised your right hand, and you swore to the veracity contained in that document, didn't you?

A.   Yes.

Q.    Thank you.

        MR. SKIPPER:  May I approach and grab that document, Judge?

        THE COURT:  You may.

BY MR. SKIPPER:

Q.    Now, Agent Crowell, it is also important to be truthful about what someone tells you, right?

A.    Yes.

Q.    Be truthful about what you heard with your own two ears, correct?

A.    Yes.

Q.    All right.  Now, you have told the jury yesterday that this guy John McQueen, he's a constable over in Precinct 3, right?

A.    Yes.

Q.    And he doesn't call you on July 25th, right, when the incident happens?

A.    No.

Q.    He doesn't call you after 4:30 at all?

A.    No.

Q.    There is no urgency with John McQueen until the next day, right?

A.    We talked the next day, yes.

Q.    There is no urgency with John McQueen until the next day, right?

A.   Well, there is, because he actually reached out to somebody else before he got to me, trying to figure out who to report this to.

Q.   Tell me on the date and time when that was.

A.   So I got a call on July 25th from a DPS trooper that McQueen and I both know, who told me that McQueen wanted to talk to somebody, and he was going to refer them to me.  We did have urgency, but he didn't know who to talk to.

Q.   Who was trooper's name?

A.   His name is Zachary White.

Q.   Zachary White.

     And what did Zachary tell you that John McQueen told you -- did he tell you how everything went down?

A.   No, he didn't have all of the details.  He just said that McQueen had an issue with what he saw and wanted to report it to somebody.  Thought he had a duty to report it.

Q.   A duty?

A.   A duty to report it.  So he wanted to report it to somebody.  And I guess they know each other well, and that is how it got referred to me.

Q.   Put him in contact with you.  Zachary White?

A.   Yes.

Q.   Then the following day, July the 26th, you have a 23-minute phone call with John McQueen, right?

A.   Yes.

Q.   And you made the decision to not take one note and not type up one report from that phone interview, did you?

A.   I didn't think it was important, because we were setting up an interview to do an official, full interview where I could get all of the information at that time.

Q.   Would you agree with me that 23 minutes is a long time to acquire information?

A.   It's not long.  Sometimes interviews go for hours.  So 23 minutes is not really that long.

Q.   And you would agree with me that you established a pretty tight relationship with John McQueen over the course of this investigation?

A.   As a professional relationship, yes.

Q.   Called him and received calls from him, you and Steph Davis, numerous times?

A.   Yes, he was a witness of ours.  Sometimes you have got to talk to them numerous times.

Q.   A majority of which you have no documentation whatsoever about the substance of those phone calls?

A.   Not every conversation requires a 302.

Q.   Right.  And that gets back to, though, you are trained as an FBI agent to determine what to put in those FD-302s, right?

A.   Yes.

Q.   It is your unilateral decision, you, as the agent,

determine what will be relevant, right?

A.   Yes.

Q.   Only you?

A.   Well, it is written on the notes, and then the 302 is a version of those notes.  I'm taking that information from my memory, from the notes, and putting it on a 302.

Q.   Your memory, rough notes, refresh memory of rough notes, official FD-302, right?

A.   Yes.

Q.   Even though you are allowed to record every individual that you ever interviewed -- you are allowed to do that; you know that?

A.   We can do that.

Q.   That is what "can" means, you are allowed to do that, correct?

A.   Right.

Q.   Okay.  And you and your dear colleague Steph Davis made the decision every time to not record these individuals?

A.   It is not common in the FBI to record every conversation.  In fact, it is very rarely done.

Q.   Because you wouldn't want to do that -- you wouldn't want to have a verbatim rendition of an interview because you want to provide what you want to provide, right?

A.   Actually, the exact opposite.  I'd rather record every one so that it is their words and not mine.

94

Q.   You would rather record every one?

A.   Uh-huh.

Q.   Why didn't you do it?

A.   Because we chose not to.  That's just not how things are done.  And I don't always record everything, and just chose not to do it.  It wasn't in an attempt to pick and choose what I want to report and what I don't.

Q.   Okay.  Now, you have a phone on you, as well, with a regular just recording app.  You could just set it down.  It would take approximately 15 seconds to pick it up and just hit record, right?

A.   I could if I wanted to.

Q.   It's not a hard process that requires a lot of sweat equity, is it?

A.   No.

Q.   And you didn't do that in this case until you talked with a lady named Jessica Mitchell, right?

A.   Yes.

Q.   And Jessica Mitchell is the mother of that young boy that is the subject of the injury to a child?

A.   Yes.

Q.   And despite all of these interviews that you do with all these people, you, and despite your testimony just now that it is quite common to not do that --

A.   Correct.

Q.   -- you and Steph Davis decided to do that when you interviewed Jessica Mitchell, right?

A.   Yes, we did.

Q.   And you did that because she was adverse to your position, right?

A.   We did that because we talked about it and decided it would be a good thing to do so that we have her words recorded as to what was said.

Q.   Yeah.  And now that you have her words recorded what was said, it helps you in the sense that if you are ever questioned, as you are now under oath, regarding the veracity of those statements, whether or not you correctly put those into an FD-302, right?

A.   Yes.

Q.   It is unquestionable; it speaks for itself?

A.   Correct.

Q.   You just hit play, right?

A.   Correct.

Q.   And you sit down.

         Now, on August the 1st, that is a Monday, you ultimately tell John McQueen after you speak to him on that Tuesday, July 26th, hey, come into our office over here on Golden Street, and we'll meet with you.  Right?

A.   Yes.

Q.   And the three people involved in that meeting were

96

yourself, right?

A.   Yes.

Q.   Stephanie Davis?

A.   Yes.

Q.   And an FBI agent named Eon Hedrick?

A.   That's correct.

Q.   And you specifically wanted Mr. Hedrick in there because apparently he had been some type of sergeant in a K9 unit before?

A.   That's correct.

Q.   All right.  Even though McQueen was not a K9 officer, he is there to complain about a law enforcement officer, right?

A.   Right.  We thought that Agent Hedrick might be able ask some questions that we wouldn't know since we are not K9 officers or had not been K9 officers.

Q.   All right.  And you took the notes of that interview?

A.   I did.

Q.   And in that interview, of which you took the notes on this piece of paper, that is your handwriting, nowhere on those notes do you indicate that John McQueen said that Evans was sticking his hands out the door, right?

A.   I have to refresh my memory from my notes.

          MR. SKIPPER:  May I approach, Your Honor?

          THE COURT:  You may.

BY MR. SKIPPER:

Q.    You will see the two highlights there, and the following page is a highlighted version.

A.    (Witness complies.)

Okay.  I have reviewed my notes.  Can you ask the question again, please?

Q.    Nowhere in those notes does John McQueen say anything about Evans sticking his hands out the door?

A.    No, there is nothing in my notes.

MR. SKIPPER:  May I approach and retrieve that document, Your Honor?

THE COURT:  You may.

MS. BATSON:  And, Your Honor, may I review it?

THE COURT:  Yes.

MS. BATSON:  And may I review what was just handed to the witness now?

THE COURT:  Mr. Skipper, if you would let counsel review it before you hand it to the witness.

MR. SKIPPER:  I'm sorry, Your Honor.

May I approach again, Your Honor?

THE COURT:  You may.

BY MR. SKIPPER:

Q.    So nowhere in your rough notes do you say anything about Evans stuck his hands out -- nowhere in those notes did John McQueen say Evans stuck his hands out?

A.    That's correct.

Q.    To make sure he didn't have a weapon, right?

A.    That is not reflected in the notes.

Q.    And in your notes, you specifically wrote that John McQueen said that Evans is being non-compliant by not giving up his hands, right?

A.    That's what it says.

Q.    You actually grabbed the pen and wrote those words on a piece of paper, didn't you?

A.    That must be what he told me at the time.

Q.    Must be, right?

A.    If I wrote it down.

Q.    Let's go to the official document I just put in front of you.  That is the FD-302, that if someone told you what he just told you, should be accurately reflected in that document so you can then show that to your supervisor with no misrepresentations whatsoever.  All right?

A.    Yes.

Q.    Now, go to the bottom there, the last page.  This one is interesting because Steph Davis actually wrote this, right?

A.    She did.

Q.    And then you are just next to her name, right?

A.    Right.

Q.    Even though you wrote the notes, she wrote this?

            MS. BATSON:  Your Honor --

THE COURT: Why don't counsel approach.

(Bench conference.)

THE COURT: Make sure you are speaking into the microphone.

MS. BATSON: Your Honor, he is impeaching this witness with another witness's writing, her report.

THE COURT: Make sure you are speaking into the microphone.

MR. SKIPPER: They are in there. Judge, they did it together. It is a point -- that is the point. He has the document, and he knows --

MS. BATSON: He signed the 302.

MR. SKIPPER: He hasn't signed anything. They --

THE COURT: One at a time.

MR. SKIPPER: Both of their names are on the document. So doesn't remove his ability to testify but knowledge is all I am saying, Your Honor. They both -- they are both on the document submitted. It is not --

MS. BATSON: She authored it, Your Honor. And, of course, both of them are going to be present. But it is -- the notes that each one of them takes, then they offer their report.

THE COURT: You can follow that up on redirect.

MS. BATSON: Okay.

(Bench conference concluded.)

100

BY MR. SKIPPER:

Q.    Agent Crowell, in this official FD-302, your colleague Steph Davis wrote that John McQueen told both of you and Eon Hedrick that Evans stuck his hands out the door to indicate he did not have a weapon, right?

A.    That's what it says, yes.

Q.    Well, that's what it says based on what you said with your notes, right?

A.    That's what it says.  Yeah, the notes are not a verbatim transcript of the conversation we had during the interview.  We are going off our memory and from the notes.  So it is very possible things are going to be in a 302 that are not written on the notes.  And we write 302s without writing notes.

Q.    Right.  But would you agree with me that is the complete opposite of saying subject is being non-compliant by not giving up his hands, and then when you allow someone with you to say, actually, in the official report we are going to submit for the FBI, we think that McQueen probably said Evans stuck his hands out the door to indicate he did not have a weapon?  Certainly, you can agree with me, as 14 years in law enforcement, that those two things are completely diametrically opposed to one another, right?

A.    It depends on the context of when he said that statement.  There was multiple times where he could have said

that he was not being compliant, so you have to have the context behind of when he is saying those statements.

Q.   Do you have another set of notes that is attached to this FD-302?

A.   No.

Q.   You do not.

You understand that that FD-302 was drafted on August the 4th of 2022, right?

A.   Yes.

Q.   And that is a peculiar date, because you remember that Steph Davis on that date, Thursday, August 4th, she met with John McQueen at the Bodacious Barbecue over here at I-20 and 14 in a parking lot, remember?

A.   Yes.

Q.   And on that date, coincidentally the August 4th, one of the things that John McQueen gave her was Austin Milbourn's body worn camera, right?

A.   Yes.

Q.   The same day she gets this very video, despite her having your notes, she remembers that John McQueen said Robert Evans was putting his hands out?  It just happens to be the same day, right?

A.   It is on the same day, yes.

Q.   Well, you couldn't have viewed a video before you had possession of it, could you?

A.    No.

Q.    All right.  Next -- and we are still on the topic of being truthful about what people tell you, okay, that is still the topic we are on?

A.    Okay.

Q.    I want to move on to this guy named Adam Newell.  All right?

A.    Yes.

Q.    And Adam Newell was one of the two Hawkins police officers out in front of the trailer house that day, right?

A.    Yes.

Q.    Who he decided was just to hold back and just work perimeter on the north side of that back side, right?

A.    No, he was working perimeter, as he should have, yes.

Q.    Right.  As he should have?

A.    Yes.

Q.    He never went inside or anything, right?

A.    No.

Q.    You and Stephanie Davis interviewed Adam Newell on August the 16th, 2022, right?

A.    I don't remember the date.  If that is what it says on the 302, yeah.

Q.    We can only rely on what you said, right?  If you said August 16th of 2022, that is what we are relying on, right?

A.    True.

103

Q.   Again, this is an interview you had, just like John McQueen, before your sworn testimony before the Grand Jury on September 15th, 2022, right?

A.   Yes.

Q.   And the notes for Adam Newell specifically state that Adam Newell said, it looked like Evans shoved a hand out of a bathroom --

MS. BATSON:  Your Honor.

THE COURT:  Just a second.

What is the objection?

MS. BATSON:  I am going to object.  He is reading from a 302 instead of asking a question.  It is improper.

THE COURT:  Why don't you get to your question, sir.

BY MR. SKIPPER:

Q.   Do you recall Adam Newell telling you and Steph Davis that it looked like Evans shoved a hand out of the bathroom?

A.   Yes.

Q.   Okay.  So then you will also recall that in the 302 also authored by Steph Davis, you say Evans stuck his hands out the bathroom --

MS. BATSON:  Your Honor?

THE COURT:  Yes.

MS. BATSON:  I'm going to object again.  This is

improper.  He is going over his statement instead of asking him a question.

THE COURT:  Why don't counsel approach.

(Bench conference.)

MR. MACHICEK:  Your Honor, this is classic improper impeachment.  He is attempting to impeach the witness on the witness stand with another witness's recorded statement.  It is a statement that he has neither adopted nor written himself.

It is a violation of Motion in Limine No. 1 that the Court granted during pretrial.

Proper impeachment requires that the witness be confronted with the statement, be given an opportunity to discern the context of that statement and either adopt or refute having made that statement.

What we are doing here is reading 302s into the record, we are reading handwritten notes into the record, and then asking about whether or not they conform to other statements.  That is improper impeachment.

MR. SKIPPER:  Federal rules don't require to be confronted with the statement.  It requires asking the question on whether or not they recall making that statement and then confronting him --

THE COURT:  Are you impeaching him based on something he said -- earlier this morning or yesterday --

where are you going with this?

MR. SKIPPER:  Just with that, Judge, the fact that what he said earlier going into proper protocol examining and interviewing witnesses, that is all.  What they say and what is ultimately reflected in their final report.  That's all.

THE COURT:  Well, I think you need to move on from the 302s.  Unless he is saying something in the 302s that contradicts what he said on the stand, I agree with the Government on that.

MR. SKIPPER:  Okay.  Well, I guess my point is what he said on the stand, Your Honor, it is important to be accurate when you are recording witness statements.  So that is -- I am impeaching him with improper protocol of the FBI.  That is all I'm saying.  You are supposed to accurately record the witness statements.  And when they don't do that, then that would be a violation of the protocol.  That's all I am saying.

He has already acknowledged that is what you are supposed to do.  You are not supposed to change things that haven't been said.  That is all.

MR. MACHICEK:  Your Honor, in response to that, the Defense is not entitled to open their own door for the purpose of impeaching statements that they have elicited during cross-examination.

These aren't topics that were touched on during

direct examination.  They aren't impeaching previous statements made under oath in this case that are relevant to this case.

MS. BATSON:  And the --

MR. SKIPPER:  Under 611(b) --

THE COURT:  One at a time.

MR. SKIPPER:  And under 611(b), the proper mode of examination talks about outside the scope of direct, and the second provision is credibility of the witness, Your Honor, specifically included in 611(b) --

MR. SHOOK:  Judge Kernodle, in response to this witness, he is the leading FBI investigator.  They sponsored him as the case agent testifying to all of his opinions and the investigation to this jury.

We are -- this line of questioning is cross-examining and impeaching him on the credibility of that investigation, the quality of the investigation.

THE COURT:  Well, this is getting far afield.  I mean, what matters in this case is the video, which the jury has now seen four times.  I mean, you know, these discrepancies between notes and reports is getting far afield.  I am a little worried about confusing the jury at this point.

MR. SKIPPER:  Well, I guess, Your Honor, our position is they put up a 1519 count on Kelly and allowed him

to go through at length that he thinks he is lying under oath.  He thinks he's making these false statements.

The very basis of credibility of a witness in an investigation is to say, well, you are also supposed to follow these same rules.

To now shortchange us and not have the opportunity to examine this witness based on all of his testimony that came in on this count, and they are required to, and they are completely opposite statements, Your Honor.  That is what I am saying.

THE COURT:  Are you talking about the notes versus what is in the 302?

MR. SKIPPER:  Yes, Your Honor.  And they go to the reasonableness prong.  They go to a material element they have to prove.

MS. BATSON:  What are you saying?

MR. SKIPPER:  Reasonableness.  The violation of the guy's civil rights --

THE COURT:  What more do you have on the 302?  What is the question?

MR. SKIPPER:  The question is, Adam Newell says it looked like Evans shoved a hand out of the bathroom.  And then final report said Evans stuck his hands out the bathroom.

THE COURT:  Why don't you ask that question, and we

will move on from the 302s.

And you guys can follow up on redirect.

MS. BATSON:  Thank you, Your Honor.

(Bench conference concluded.)

BY MR. SKIPPER:

Q.   Agent Crowell, I have handed you the notes of Adam Newell's initial interview and then the corresponding official FD-302 report.

And have you had an opportunity to the review both of those?

A.   Yes, I have.

MR. SKIPPER:  May I approach briefly, Your Honor?

THE COURT:  You may.

BY MR. SKIPPER:

Q.   And after refreshing your recollection with those documents, sir, would you agree with me that what was written down in the notes of what Adam Newell said is completely opposite of what was represented into the official 302?

A.   I wouldn't say it is completely opposite, no.

Q.   Okay.  Well, would you agree with me that the notes of the interview with Adam Newell said it looked like Evans shoved hand, singular, out of bathroom, right?

A.   Yes.

Q.   And would you agree with me that the final FD-302 made the representation that Evans stuck his hands, plural, out of

the bathroom door before Smith pushed his way into the bathroom?

A.    That is what it says.

Q.    Do you agree that, again, "hand" singular and "hands" plural are two totally different things?

A.    They are different.

Q.    I want to talk about John McQueen for a minute.

You and Steph Davis and others from the Government spoke to him several times, correct?

A.    Yes, we did.

Q.    And the first instance which you have referenced speaking to John McQueen was on Monday, August 1st, 2022, right?

A.    Yes.

Q.    And you have made some notes where you made a report of that incident, correct?

A.    Yes.

Q.    During that interview, he said nothing about Robert Evans reaching out to him a week before his arrest while he was a fugitive on the run within those 34 days.  Correct?

A.    Right.  I don't remember him telling us that at that time.

Q.    If he did, it would be in your notes and report, wouldn't it?

A.    Possibly.  Like I said, my notes are not a verbatim

transcript of the interview.

Q.   Would that not be something important to include in your report based on the fact that a guy had a direct line into a wanted fugitive and he had the ability to speak with him and surrender him?

A.   Well, we weren't investigating John McQueen's actions, so it wouldn't be necessarily relevant to the investigation of the Defendant in the two minutes in the bathroom that we were investigating.

Q.   It wouldn't be relevant to your investigation because you are trying to stay objective, right?

A.   We are objective in what happened prior to July 25th didn't have anything to do with the actions of the Defendant that day.

Q.   It had nothing to do with actions of Kelly Smith that day; is that your testimony?

A.   It did not.

Q.   John McQueen shows up at this trailer house, right?

A.   He was there.

Q.   He was there?

A.   Yes.

Q.   And a person who had had contact with a wanted fugitive, sitting on the outside of that trailer while Officer Tuma, Officer Tuma -- Newell and him stand outside, had a direct line into this individual, and you don't think that was

relevant to this investigation?

A.   No.  Because we weren't investigating the actions of John McQueen that day.

Q.   Of de-escalating a situation?  It wouldn't be relevant for you if John McQueen could make a phone call to the guy that said, I will surrender myself to you?

A.   It doesn't change what happened and the actions of that day we are investigating, it does not change anything.

Q.   And since you told us earlier that -- with McQueen's video you had that no later than August the 1st, right?

A.   Yes, he provided it to us August 1st.

Q.   He brought that over to you at the office, and you had a chance to watch that, right?

A.   Yes.

Q.   And on that video you will notice -- how many times have you watched that video?

A.   John McQueen's video, just a handful of times, not as many.

Q.   You will notice when he shows up, he goes to the other side of the trailer home right there, and Robert Evans's mom calls him?

A.   Which I didn't know at the time.  My initial review of the video, I didn't catch that or notice that, no.

Q.   Your ears --

A.   I know that now, but I didn't.

112

Q.   When is the first time you found that out?

A.   I couldn't tell you.  I don't remember.

Q.   You have never heard that on that video?

A.   I don't remember hearing that on the video, no.  I know now it is on there.  But at the time.  And, again, that doesn't change the facts and circumstances of what we were investigating.

Q.   You know now that it is on there, don't you?

A.   Yes.

Q.   All right.  And you saw when Cheryl Evans calls, you can hear it clearly on his body cam -- he is sitting outside the trailer -- Cheryl Evans calling, right?

A.   Right.  You can hear it on the body cam.

Q.   You've heard that with your ears now?

A.   I have.

Q.   And you saw with your eyes John McQueen turn like this and walk to the side of the trailer, right?

A.   Yes.

Q.   For some unknown reason, he just walks away because Cheryl Evans is calling him, right?

A.   On the body cam, you can see a dog that is behind him.

Q.   Sure.

A.   It appears he is looking towards the dog.  The body camera is facing that way.

Q.   That is Spook, and he has been checking on the dog.  You

have seen the body cam, right?

A.    Yes.

Q.    But for whatever reason, you see Cheryl Evans calls, and walks toward the side, right?

A.    Yes.

(Pause in proceedings.)

THE COURT:  Which exhibit is this, Mr. Skipper?

MR. SKIPPER:  Your Honor, this is the -- John McQueen's body cam.  I will have to get the exhibit number on it.

Your Honor, this is Exhibit 3.

BY MR. SKIPPER:

Q.    Agent, I am first going to show you snippets here.  We are not going to rewatch everything, but this is John McQueen's body cam.

A.    Okay.

(Video played.)

(Video paused.)

(Video played.)

(Video paused.)

BY MR. SKIPPER:

Q.    All right.  Did you hear that?  Did you hear that 452, 303?  Is that him?

A.    Yes.

Q.    All right.  That is Kelly Smith.  His call is 452,

right?

A.   Yes.

Q.   That is his hand signal.

303 is John McQueen?

A.   Okay.  Yes.  I guess I didn't know that.

Q.   You are the lead investigator in this case.  You knew that, right?

A.   No I did not.

Q.   Anyways, the point of that call is, that is when Kelly pulls up, right?

A.   Uh-huh.

Q.   Is that a yes?

A.   I believe it is the time he pulls up.  I don't know for sure.  From this view on the body cam, I can't see what --

Q.   Do you know --

A.   I don't have everything matched up in my mind as far as, like, when people are arriving.  I am going off of what I am seeing here on John McQueen's body cam.  So I don't know if this is one necessarily showing it or not.

Q.   Have you watched all five videos?

A.   Yes, but they all show a different perspective.

Q.   And you know when Kelly Smith pulls up, he is asking John McQueen, because he sees Justin Graham out there, the felon in handcuffs, if that is him.  Right?

A.   If that is what you are telling me, sure.

Q.   Do you have an opinion on it?

A.   I would have to see the transcript to know for sure if that is what is happening at this point.

(Video played.)

(Video paused.)

BY MR. SKIPPER:

Q.   Did you hear John McQueen say "negative"?

A.   Yes, sir.

Q.   Justin Graham is not Robert Evans?

A.   The question was, is that him?  McQueen answers "negative."

Q.   Is there any --

A.   Whoever the Defendant is referring to, McQueen is saying that is not him.

Q.   You don't have an opinion as to any other him or pronoun that Kelly Smith would be referring to?

A.   I can assume, based on my viewing these body cams, that is likely what he is talking about.

Q.   And you are the lead, special FBI agent on this case?

A.   Yes.

Q.   When is the first time -- how many times did you watch this video before you knew that Cheryl Evans was calling, the mother of this man that is barricaded in this trailer, the mother was calling him, when is the first time you found that out?

116

A.    I don't remember.  I just remember not believing it is very relevant to anything.

Q.    Not relevant?

A.    No.

Q.    Your opinion, though, right?

A.    It doesn't change the facts and circumstances of why I am here today.

Q.    You spent a little of time talking about tactics yesterday, even though you are not a SWAT member?

A.    Yes.

Q.    You don't think tactics would have been a good idea to divulge information, hey, by the way, this guy that is barricaded in here, before we send someone in there to an unknown situation, his mother is actually calling me right now.  I can get this guy out with one phone call.  That is not relevant?

A.    In my opinion, I would never bring a family member to a scene like this with a barricaded subject.  We don't know the relationship with the mother, if she is going to make it worse.  No, I would never bring a family member to a situation like this.

Q.    I don't mean physically wheeling the mother to the scene.  I mean, having him call, answer the phone.  Say, hey, get ahold of Robert.  He has been wanting to surrender himself to me for the last week because he trusts me and not

Hawkins, you don't believe that would be a good idea?

A.   I don't think that at this point in this situation, no, I don't think that is necessarily the best idea.

Q.   Okay.  You would rather just send someone in without knowing that information?

A.   I wouldn't have gone in.  I think a reasonable officer in a situation would have surrounded and called them out. They are not going to rush through the door.  That's what a reasonable officer would do.  That is how most training is these days --

Q.   Right.  Your opinion, Mr. Crowell?

A.   Based on training and experience, yes.

Q.   I understand that.  My question was, you don't believe it was relevant in this instance?

A.   No.

Q.   All right.

        (Video played.)

Q.   At 21:25:49, Cheryl Evans is going to call John McQueen.

        (Video paused.)

Q.   Okay.  Do you see him looking at Spook right there.  It is right in front of --

A.   No, he is not.

Q.   He is not checking on the dog, is he?

A.   No.

Q.   Was there some type of pole camera up there that he

wanted to move away from while Cheryl Evans was calling?

A.   Not that I am aware of.

Q.   You are not aware of that, are you?

A.   No.

(Video played.)

(Video paused.)

Q.   Not until a third time you spoke to John McQueen after he testified to the Grand Jury did he tell you that Robert Evans was trying to surrender himself to John McQueen alone, a week prior to this incident.  Right?

A.   That's correct.

Q.   He met with you one time August the 1st, right?

A.   Yes.

Q.   Met with you again briefly that Friday, August 12th?

A.   Yes.

Q.   Met with you again September 23rd?

A.   Yes.

Q.   And then he met with you this time on October 31st, and said, by the way -- it was certainly relevant enough for John McQueen even though it wasn't relevant enough for you -- it was relevant enough for him to say, by the way, I might should have told you that Robert Evans called me, and he wanted to surrender himself to me.

He told you that after you met with him three times, right?

119

A.    Yeah, I believe we asked him about that.

Q.    And in order for you to ask someone a question, that would have meant you got it from someone else.  And that someone else would have been Robert Evans, right?

A.    Yes.

Q.    On October 3rd?

A.    Yes.

Q.    You waited 28 days after Robert Evans told you that information to confront John McQueen about it, right?

A.    I don't think "confront" is the proper term.  Again, we got the information from Robert Evans.  And it doesn't change the facts and circumstances of what we are investigating, so it wasn't really that the important.

Q.    Wasn't really that important for you, was it?

A.    No, because that was not what we are investigating.

Q.    But we want to avoid tunnel vision, right?  We want to stay objective and avoid that is not what we are doing?

A.    Sure.

Q.    Robert Evans tells you this on October 3rd, right?

A.    Yes.

Q.    Despite the fact that you have already met with him twice.  The first time is Friday, August the 12th in the Wood County Jail, right?

A.    Yes.

Q.    You go over there and talk to Sheriff Kelly Cole.  Hey,

let us have a minute with this guy.  Right?

A.   Yes.

Q.   Kelly Cole puts you in the attorney-client conference room, right?

A.   Yes.

Q.   You and Stephanie Davis have at it, right?

A.   We interviewed Robert Evans, yes.

Q.   And at no time during that interview does Robert Evans say, hey, I tried to surrendered myself to John McQueen, does he?

A.   No, not at that time.

Q.   At no point?

A.   No.

Q.   In fact, he tells you specifically that, hey, I was in there using the bathroom?

A.   That's what he told us.

Q.   That salty language he says:  Taking a shit and wiping my ass.

        Right?

A.   Yes.

Q.   And he stuck by it, right?

A.   Yes.

Q.   That is after you told him, you looked at him and said you need to be truthful when you speak.  Because you are a Special Agent with the FBI, right?

A.    Yes.

Q.    He looked at you and he lied to you?

A.    Yes, he did.

Q.    And in your experience of 14 years, even though he hadn't admitted to it yet, you knew he was lying to you?

A.    I thought he was not being truthful.

Q.    That's right.

Where is that on your report?

A.    That is not typically something I would put in my report, that this information was provided to me, and I think they are being untruthful.  I'm just going to write down the information they provide me.

Q.    Right.

It would be important for someone reviewing that document later to know the credibility of that person.  In your opinion, like you said before, you like to say that wasn't relevant, would it be?

A.    It would be relevant to note in my report that I did not believe someone was telling me the truth?

Q.    Yes.

A.    It is not typically something I would do is to put in there a note saying this person is being untruthful to me.  I am documenting what they are telling me.  And if it is something different later, there would be document, which there is, stating this is now the story.

Q.    Right.

A.    And you can see through the documents the difference in what they are telling us.

Q.    I want to get to November 30th, 2022 later --

A.    Okay.

Q.    -- but all of you guys, two prosecutors meet over at Greg Waldron's office across the street here, and the final confrontation was had.

But before that, are you telling me that in all of your years working for the FBI, you have never documented in a 302 whether you believe the witness was being truthful?

I mean, Steph Davis is shaking her head here.  But what do you believe?

A.    I can't remember documenting something like that saying, this person told me this information, yet I am going to document in my report that this is untruthful.

If I were going to do that, I would have the truthful -- whatever I believed to be true or evidence that I had showing he was lying or she was lying in there or documents to support a lie, saying this is what they told me, yet this is the evidence that we have that says otherwise.

But I don't remember ever writing so-and-so told me this information, and then write a note, this is a lie.

Q.    In your entire career?

A.    Not that I can remember.

Q.   All right.

Then on September the 23rd you all met with Mr. Evans again.  I think Ms. Batson brought that up on your direct when he was talking about the foot injury?

A.   Yes.

Q.   The three stitches, right?

A.   Yes.

Q.   And at no point during that interview did Mr. Evans say anything about either calling John McQueen because he trusted him or about actually not being inside using the restroom, did he?

A.   No, he stuck to his story.

Q.   He stuck to his story.  That's a good phrase.  He dug in, right?  You've heard the phrase "he held his mud", right?

A.   Yeah, I have heard that phrase before, sure.

Q.   That's what he did?

A.   Yes.

Q.   You didn't make a note of it on that September 23rd FD-302, because, according to you, that is not relevant to what you are wanting to do, correct?

A.   No, I'm writing down -- my 302 is a reflection of what I am being told, that is what I write down.

Q.   Then on October the 3rd, there is another meeting.

But before we get to that, I want to talk about when

you left the jail.  When you left the jail on August 12th, you specifically told the jail folks that if any law enforcement agency comes to speak with Evans, notify either of the following FBI agents:  James Crowell, and it gives your personal cell number; or Stephanie Davis, and her personal cell number.  Right?

A.    Well, yeah, not our personal numbers, but our working phone numbers.

Q.    You told an elected official and his staff to be sure and call you or Stephanie Davis if any law enforcement agency comes to speak with Evans, right?

A.    Yes, we like to know that information.

Q.    It wasn't a permissive; it was you told them to?

A.    We requested that if somebody came and talked to them, that they would let us know who it was, yes.

Q.    And you believe as an FBI -- a special -- I forget to say that -- a Special Agent of the FBI that you are entitled to make demands of an elected official in the State of Texas?

A.    I wouldn't say we demanded anything.  I'd say we requested that they do it.  We didn't say, you will do this. We said, if this happens, would you call us?  We did not say you have to do that.  You must do this.  It was not a demand.

Q.    So if any law enforcement agency across 254 counties of

this state wants to go talk to Robert Evans --

MS. BATSON:  Your Honor, this is argumentative.

THE COURT:  Sustained.

Let's move on from this topic, sir.

BY MR. SKIPPER:

Q.   October the 3rd you meet with Robert Evans, and you confronted him, right, about lying about using the bathroom?

A.   Yes.

Q.   Did you show him a still shot of the photo?

A.   I believe we did.

Q.   And where is that photo?

A.   It is probably -- part of it would be a still shot of one of the videos.  It would be in there.  I don't know which one it was.

Q.   You confronted him with a still shot of the video, and you said, hey, I know you are lying to me, and you have been lying to me, didn't you?

A.   I don't think we put it that way, no.

Q.   Tell me how you put it, in your discretion.

A.   It was awhile back, so I can't tell you exactly what it was, but, again, we called him back in.  Like you already said, we want the truth.  And sometimes it is not unusual to interview somebody multiple times before we get the truth.

It may be kind of a shock, but people do lie to law

enforcement.  It is very common.  And so we were trying to get the truth from him.

So the conversation just would have been like, let's go over this again.  And, you know, tell him, whatever the truth is, it is what it is.  We need to know.  We are not -- it is not an interrogation.

Q.   Right.

A.   We are not browbeating you --

Q.   Sure.

A.   We are just saying, hey, you need to tell us what really happened.  Why don't you tell us what really happened?

Q.   And despite your best efforts, with a still shot photo that we know, despite him having no running water in this trailer, that you could not have been defecating, cleaning your rear end at the same time this happened.  Right?  Despite your best efforts to do that, he looked at you in your eyes and lied again, didn't he?

A.   He stuck to his story, yes.

Q.   He held his mud, didn't he?

A.   Yes.

Q.   You were made aware from an email from Todd Eddington, that Todd Eddington was --

MS. BATSON:  Your Honor --

Q.   -- irritated during this confrontation.

MS. BATSON:  Your Honor, again, I'm going to

object.  If he wants to -- it is relevant, it is irrelevant, and then what is he -- where is he going with this and what is he asking of the witness?

THE COURT:  Counsel, why don't you approach.

(Bench conference.)

THE COURT:  Where are you going with the question?

MR. SKIPPER:  Yesterday, Your Honor, in his direct about Todd Eddington and the complaints that Kelly made against him, all of this was brought up on direct examination.  And so I am just doing -- this is a segue to talk about Todd Eddington is all it is, Your Honor.

MS. BATSON:  What is the question?  Is it related to the complaint?

MR. SKIPPER:  Yes.  The question is related to this case, the emails that you gave me.

MS. BATSON:  The complaint, the complaint that your client made --

MR. SKIPPER:  That's exactly right.  You talked about this guy yesterday --

THE COURT:  What is the complaint that was made?

MR. SKIPPER:  The complaint was made that he put his home address.  They have already -- they discussed this on direct examination that Kelly made a complaint to Todd Eddington about him posting -- about him posting Kelly's home address online and making this video and so -- and sending a

picture of his penis.

THE COURT:  We are fixing to do the lunch break, and we will figure this out.  I don't want to get into a sideshow.  I can't recall offhand what he said about it yesterday.

MR. SKIPPER:  Yes, Your Honor.  I understood the Court's ruling.  I'd just -- I would like an opportunity if they discuss something, that's all, that I be able to --

THE COURT:  We will discuss it at the break.

MR. SKIPPER:  Yes.

(Bench conference concluded.)

THE COURT:  Okay.  Ladies and gentlemen, we'll take our lunch break at this time.  It's 10 to noon, so I would ask you to be back ready to go at about 10 to 1:00.

Okay.  Thank you.

(Jury out.)

THE COURT:  You may be seated.

So, Mr. Skipper, just remind me about what was said yesterday about Eddington.

MR. SKIPPER:  Your Honor, there was an entire line of questioning about Todd Eddington and the complaint that Mr. Smith filed against Todd Eddington that was made and that they looked at.

And it was presented in the form of minimization by the witness in terms of, well, we didn't think it was

credible. We looked at it. We actually had the U.S. Attorney's Office look at it, and did not determine that to be credible. So this is just a segue in talking about Todd Eddington. I will keep it limited. I have a photo.

THE COURT: Well, I don't want to get into, as I said earlier, a whole sideshow about Todd Eddington. The key evidence in this case is the video in the bathroom. And I am concerned that some of these -- some of your lines of questioning so far and especially if you are going to go down this road with Todd Eddington, that that could mislead the jury, prejudice the jury.

Unless you have a specific question that relates to what was said yesterday on the stand about Eddington, I'm not going to allow it.

MR. SKIPPER: Well, just as far as identifying who Todd Eddington is. I mean, they specifically asked the question, Your Honor, is what I am talking about. They elicited this information from a witness. So I would be precluded from asking any questions about Todd Eddington --

THE COURT: What is the question you want to ask about Todd Eddington?

MR. SKIPPER: Well, the question would be several. That Todd Eddington was the guy responsible for Kelly Smith's complaint that Kelly filed against Todd for doxing his personal home address where he lives with his family, and

sending a picture of his penis to Kelly Smith.

And when Robert Evans is on the video afterwards, when he is on the porch -- I'm not replaying everything, just snippets of that -- and Robert Evans says:  That's all right.  Todd will get everything for me.

And I want to link that up with the jury to know who he is talking about is Todd Eddington.  And that will be six questions, and I'm moving on to the next topic.  I won't do a sideshow, but I just want an opportunity to respond and clarify this is who Todd Eddington is.

THE COURT:  Okay.  Let me hear from Ms. Batson.

Remind me what was said about Todd Eddington yesterday.

MS. BATSON:  Your Honor, Agent Crowell testified that shortly after this incident, this Defendant filed a complaint with the FBI against Todd Eddington, and there was information also that that is who they thought the source was, that FB guy, the Facebook guy.

Todd Eddington, according to the Defendant, he believed was the source of the information.  So, again, it is the Defendant trying to get ahead of the story by contacting the FBI thinking that he is going to dime out somebody that is going to dime out him.

So he says, you are going to be getting a call from Todd Eddington, and Todd Eddington is going to tell you about

this dog bite.  That was the source of the complaint.

Now, Mr. Eddington is on their witness list.  If they want to identify him, bring him in and let the jury see Mr. Eddington.  But showing him a picture of a penis, this threat was not credible, that was the extent.  Showing the picture of a penis is just disgusting and completely irrelevant.

THE COURT:  Well, I will allow any question that relates to what Crowell determined about Eddington and whether Eddington was involved in complaining about Smith.

But other than that, we're not going to get into it.

MR. SKIPPER:  I'll just keep it buttoned up to just the complaint, Your Honor, the complaints that were lodged -- well, I am asking if --

THE COURT:  Well, I hear what you are saying.  I hear what you are saying.

MR. SKIPPER:  And then just identify Todd Eddington with a photo.  That would be what I want put it on, and I am moving on.

THE COURT:  I don't think we need the photo.

MR. SKIPPER:  Okay, Judge.  I'll just do the complaint.

THE COURT:  Okay.

MS. BATSON:  And, Your Honor, to be clear, I think

132

the question needs to be to Mr. Crowell if he did the investigation.

THE COURT:  Correct.  If it has anything to do with what Crowell heard about Eddington with respect to Mr. Smith and whether he -- and the extent of his investigation into Mr. Eddington, to the extent it matters at all.  And, frankly, it is hard to see how it matters.

MR. SKIPPER:  Okay, Judge.

THE COURT:  Okay.

MR. SKIPPER:  I will do that and move on.

THE COURT:  Anything else to talk about before we break for lunch?

MS. BATSON:  No, Your Honor, not from the Government.

MR. SKIPPER:  No, Your Honor.

THE COURT:  Okay.  All right  We are in recess. Thank you.

(Recess was taken at this time.)

(Jury out.)

THE COURT:  Are you ready, Mr. Skipper?

MR. SKIPPER:  Yes, Your Honor.

THE COURT:  Bring the jury in.

(Jury in.)

THE COURT:  Okay.  Please be seated.

You may proceed.

MR. SKIPPER:  Thank you, Your Honor.

BY MR. SKIPPER:

Q.   Agent Crowell, I want to get to the November 30th of 2022 meeting here across the street that yourself and Agent Davis and the two prosecutors had with Mr. Evans.  Okay?

A.   Yes.

Q.   And that was over at his attorney's office, Greg Waldron, right?

A.   Correct.

Q.   And at this meeting is when -- when asked about it again, Robert Evans he repeats the same story one more time saying that he stuck his head out.  He saw -- because he was looking for his dog.

A.   Right.

Q.   Then he came back in, right?  Didn't know officers were there.  And went to the bathroom.  Right?

A.   That's correct.

Q.   So in front of you, two prosecutors, your other agent, and his own lawyer, he lied to you one more time on November 30th of 2022, right?

A.   Yes.

Q.   And at that point, who confronted Mr. Evans about this lie?

A.   His attorney, Mr. Waldron, asked us to leave the room. And they talked.  And when we came back in, is when he

finally told us what actually happened.

Q.    That often happens.  The guy didn't hold his mud anymore because his lawyer said, look, I want y'all to step out.  Let me have a few minutes.  And then when he came back, he said you got me.  I have lied this whole time about taking 22 minutes to use the restroom.  Right?

A.    Yes.

Q.    Even though you knew that, in your experience, all along, correct?

A.    I believed that, yeah, that he was not telling the truth originally.

Q.    Not telling the truth is a lie, right?

A.    Yes.

Q.    All right.  The prosecutor showed you a -- there is a photo here of a text exchange of Kelly's left hand?

A.    Yes.

Q.    What was the relevance of that?

A.    It was just what was in the text message between the Defendant and Mr. Williams.

Q.    Okay.

A.    I don't know if -- we didn't know if that had something to do with he was alleging injuries on that day or something different.  We were unsure.  But it was in the text exchange, and so that is why we took a picture of it.

Q.    What do you mean, you said you didn't know if it had

anything to do with Kelly's injury that day?  Help us understand that.

A.   Because the injury was reported to be to the right hand, and that picture appears to be a picture of the left hand. So didn't know the relevance at the time.  There was not a lot of context in the text message as to what the injury was. He just referred to having surgery, and it shows the picture.

Q.   And you didn't know that was for a carpal tunnel issue, unrelated to July 25th?

A.   We did not know.

Q.   Well, you knew that Kelly Smith injured his right middle finger when Robert Evans slammed the door on him?

A.   Right.  He reported that injury to his finger during that encounter, yes.

Q.   He reported it the very next day, right?

A.   I believe that is correct, yes.

MR. SKIPPER:  May I approach, Your Honor?

THE COURT:  You may.

MS. BATSON:  Your Honor, there is no business record affidavit for this, and I am not sure how it is going to be authenticated to be entered.

THE COURT:  Why don't counsel approach and let's look at it.

(Bench conference.)

THE COURT:  What is it?

MR. SKIPPER:  Your Honor, this is exhibit -- my Defense Exhibit 14.  This was taken out of the business record affidavit that the Government has from the 402 pages that were provided.

Ms. Batson seems to think that I have to show a business record every time I take a document out --

THE COURT:  Has this been admitted?

MR. SKIPPER:  No.  I am about to offer it pursuant to their business record affidavit.

MS. BATSON:  All I am asking is put a business record affidavit with whatever exhibit you are going to admit.

MR. SKIPPER:  I know she is asking me that, Your Honor, but the business record affidavit -- this is the most non-technical issue -- is attached -- that my client signed for 402 pages, that they have already put all of their items in under.  I am just going to say, you realize this was in that document with the business records affidavit that all of these other exhibits have come in.

She is complaining that I'm not attaching another copy of a business record affidavit that serves the purpose for everything they have admitted, Your Honor.

THE COURT:  But has this been admitted as part of your -- the Government's exhibits?

MS. BATSON:  No.

MR.  SKIPPER:  No, but --

THE COURT:  Well, then I think you need to go through the proper admission procedures if you want to admit it as an exhibit.

MR. SHOOK:  It is a part of the business record.

MR.  SKIPPER:  Yes, it is.

MS.  BATSON:  I understand.

THE COURT:  One at a time.

MS.  BATSON:  There is 402 pages that your client provided to us.  We pulled out each exhibit and had that business record affidavit attached to it so that there is no confusion.

MR.  SKIPPER:  There is no rule --

MS.  BATSON:  For entry into evidence -- how are you going to authenticate this?

MR.  SKIPPER:  That business record affidavit that my client signed to you in August --

MS.  BATSON:  Why can't you just attach it?

MR.  SKIPPER:  Why can't I?

MS.  BATSON:  Yes.

MR.  SKIPPER:  Because the rules don't require it. I'm going to put it in -- I'm now asking do you want me to do something?

MS.  BATSON:  I'm asking you to authenticate this.

MR. SKIPPER:  Your Honor --

THE COURT:  What is the problem of just having --

MR. SKIPPER:  Because I don't have a copy of the business record affidavit with me right -- actually, I do.  I do, Your Honor.  I will pull it out.  This is only six minutes of our last --

MS. BATSON:  That's fine.  At least it's not 90 days.

MR. SKIPPER:  Thank you.

(Bench conference concluded.)

MR. SKIPPER:  May I have one moment, Your Honor?

THE COURT:  You may.

(Pause in proceedings.)

MR. SKIPPER:  May I proceed, Your Honor?

THE COURT:  You may.

BY MR. SKIPPER:

Q.   Agent, with regard to the injury that Kelly reported -- his middle, his right middle finger, right?

A.   Yes.

Q.   The very next day he made a claim to HR, right?

A.   That's correct, yes.

Q.   And you knew that, because when you asked him to produce records, "him" being Kelly, he produced all of those records to you on August the 17th of 2022?

A.   Yes, he did.

Q.   And attached to all of those records was a business record affidavit, a certificate of authenticity to which numerous documents were attached, one of those being this HR claim, right?

A.   Yes.

MR. SKIPPER:  Your Honor, at this time we will offer Defendant's Exhibit 14.

MS. BATSON:  No objection.

THE COURT:  It is admitted.

BY MR. SKIPPER:

Q.   Okay.  Agent, I'm showing you here, this is -- you see a date in the upper left-hand corner of Defendant's Exhibit 14, July 26th of '22, 10:22 a.m., correct?

A.   Yes.

Q.   All right.  This is a claim.  You see Kelly Smith.  And it says employer's first report of injury or illness, right?

A.   Yes.

Q.   And it gives the physician's name Kyle Gully, right?

A.   Yes.

Q.   There in Mineola?

A.   Correct.

Q.   It says, date of injury, the previous day, July 25th of 2022, 4:25 p.m., yes?

A.   Yes.

Q.    Left knee and middle finger, right?

A.    Yes.

Q.    How it occurred, executing a felony warrant, right?

A.    Yes.

Q.    This one actually has the right address, not 183.  It says 199 Ruth Street, right?

A.    199 Ruth, yes.

Q.    And it says here, the claim, says suspect use of force, right?

A.    Yes.

Q.    Okay.  You have had this document since no later than August the 17th of 2022, right?

A.    Yes.

Q.    All right.  You also -- you were asked a question, to which I thought you said number 6 meant that Kelly was talking to Buddy Williams.  Pardon me.

        That is the Jason Stanze text exchange, correct?

A.    Yes.

Q.    Jason Stanze, he and his wife Jaz, they own the Houston K9 Academy in Houston, right?

A.    That's correct.

Q.    Used to work for VLK, Vohne Liche Kennels, there?

A.    Yes.

Q.    In Denver, Indiana, right?

A.    Right.

Q.   They have now got their own company down in Houston?

A.   Houston.

Q.   They trained these dogs, right?

A.   Yes.

Q.   Trained Kelly's prior job, Juma?

A.   Yes.

Q.   Actually he and his wife told you, or you now know, that Mata was their previous personal dog?

A.   Yes.

Q.   And he told you that he was odor detection, specifically a bomb dog, right?

A.   Right.

Q.   A bomb dog?

A.   Was a detection dog is what I remember, yes.

Q.   Well, if you will take my word for it without going into your report, is it fair you put "bomb dog" in the notes?

A.   Then, yeah, then that is what they would have called him.

Q.   I don't want to the mislead you with your own notes, but if you could take my word for it on this one.

A.   Yeah, since I don't have my notes in front of me, I will take your word for it.

Q.   All right.  In any event, you know that he reported to you that this dog was a bomb dog, but now this dog has been used to detect narcotics?

A.   Yes.

Q.   And have you talked to any of your people, who have been sitting out here for the last days, about cross-training a dog that has had his olfactory nerve specified to barium and other elements of gun powder --

A.   Not specifically.  Sorry.  Go ahead.

Q.   And then cross-train that dog to then detect the odor of narcotics?  Have any of these guys, that has been sitting out here, told you about the ethics of that?

A.   I don't remember specifically speaking to them about that issue.

Q.   I am just saying, assuming that Jason Stanze told you that Mata was a bomb dog, right?

A.   Right.

Q.   That he and his wife had Mata as a personal dog?

A.   Right.

Q.   And they would take him out on contracts?

A.   Right.

Q.   Out on these refinery facilities and do bomb sniffs, right?

A.   Yes.

Q.   All right.  Assuming, if your notes reflect that, that Jason Stanze said that, you don't know or have any idea about the ethics of cross-training a previous bomb dog to now picking up narcotics?  And you don't know -- in fact, maybe

you do, Jason Stanze, he never told you that he told Kelly that dog was a bomb dog; he never said that, did he?

A.    I don't remember -- I don't know the conversations between Jason Stanze and the Defendant, no.

Q.    Well, did he ever say, hey, I never told Kelly he was my personal dog?

A.    I don't think he told us that, no.

Q.    Now, in this text exchange that Ms. Batson showed the jury, she asked you a question which elicited a response.

And before I repeat that response you gave, I want to make sure of the date that you had these deployment records.  All right?

A.    Okay.

Q.    I just showed you a business record affidavit from August 17th of 2022, right?

A.    Yes.

Q.    That is the day with all of these documents, 402 in particular pages were given to you by Kelly?

A.    Yes.

Q.    No problem.  You want them, you got them.  Right?

A.    Right.

Q.    And included in that big binder of 402 pages were his training records, right?

A.    Yes.

Q.    K9 Mata's certifications?

A.    Yes.

Q.    With not only USPCA but NNDDA, right?

A.    Yes.

Q.    And that is more of a narcotics dog certification, right?

A.    That's my understanding, yes.

Q.    Well, that's your understanding.  You talked all about USPCA, but you didn't mention NNDDA?

A.    I don't know as much about either one of them, but I know a little more about USPCA than NNDDA, yes.

Q.    In any event, you weren't asked about NNDDA, were you?

A.    No.

Q.    All right.  So he is dual certified, isn't he?

A.    Yes.

Q.    All right.  And so in these documents, you had Kelly and K9 Mata's deployment records, right?

A.    Yes.

Q.    And you know in these deployment records, that this July 25, 2022, incident with Robert Evans and the three stitches, was the third deployment of that K9 that resulted in a bite. You know that because you have had these records since August 17th of 2022, don't you?

A.    Yes.

Q.    All right.  And you know that -- because you have had those records since August the 17th of 2022, that, in fact,

of those three deployments in which a K9, Mata, bit this guy's foot, that is the first time that any of those previous deployments resulted in stitches?

A.   Yes.  I remember the Defendant telling me that himself, actually.

Q.   You know all those things.  Yeah, the Defendant told you that, right?

A.   Yes, he did, yes.

Q.   That is the report when he called you on the phone on August 16th?

A.   Yes.

Q.   That you specifically put in your notes section that, I was driving at the time, and I didn't have a chance to take notes, right?

A.   That's correct.

Q.   Okay.  Does your car have a turn signal?

A.   Yes.

Q.   And a shoulder to pull over on?

A.   Yes.

Q.   And a pencil there in your console?

A.   It does.

Q.   You have a pretty good memory of what he told you that day, don't you?

A.   I do.

Q.   All right.  Now, August 17th, those deployment records,

which you have had and been on notice of coming up on an entire year, 365 days, she asked you a specific question, and I want to make sure I heard your response based on what you knew when you gave that response to this jury.

She showed you a photo of number 6.  Do you remember that?

A.    Uh-huh, I do.

Q.    And the question was posed, in other words, like this guy needs another notch in his belt.  Do you remember that line of questioning?

A.    I don't remember the specific question.  But I remember being questioned about that number, yes.

Q.    Well, I will remind you what the specific question is. Do you see this number 6 text that Kelly Smith sent Jason Stanze?

A.    Yes.

Q.    Is that a yes?

A.    Yes, I remember, yeah.

Q.    Does that refresh your recollection of what you said?

A.    Yes.  I said that it referred to his sixth bite because that's what I believed that to mean based on the text messages.

Q.    You told this jury that you believed that was Kelly Smith's sixth bite?

A.    I believe that was what he was telling Jason Stanze.

Q.   You told this jury you believed, even better, that that is what Kelly Smith -- you are getting inside the cranium of this man's head, even though you knew when you said that, that dog only deployed three times with three bites, the most recent of which caused stitches.  You knew that and you told this jury that you thought Kelly was bragging about six bites.  That's what you said, right?

A.   That's what --

Q.   You said that under oath?

A.   Because that is what I believed that to be.

Q.   Right.  Because you like to get into other people's heads and let people know what they are thinking?

        MS. BATSON:  Your Honor, objection.  Argumentative.

        THE COURT:  Sustained.

BY MR. SKIPPER:

Q.   Wrong medicines by jail.  I don't know why this was asked, but I will follow up on it.  Was there any insinuation that they were trying to Jeffrey Epstein Robert Evans, or what was that about?

A.   He just told us what had happened.  So, no, there was no allegation.

Q.   Was he still limping at that time?

A.   I didn't see him walk.  This is what -- we were told that in the jail when we interviewed him the first time.

Later, when he came to our office, I did notice a limp when he walked, yes.

Q.   September 23rd?

A.   I believe that is the date, yeah.

Q.   You and Barry Crouch and your colleague here Steph Davis?

A.   Yes.

Q.   Did he have a crutch?

A.   No.

Q.   Wheelchair?

A.   No.

Q.   Walker?

A.   No.

Q.   Just like a giddy?  A little hitch in his giddy-up?

A.   You can describe it that way, sure.

Q.   Just kind of hobbling along?

A.   Just a little bit, yeah.

Q.   Has he filed a disability claim?

A.   Not that I am aware of.

Q.   Is he going to file a civil lawsuit?

A.   I don't know that.

Q.   Does he have a financial motive to sue someone or any one of the taxpayers in Wood County?

A.   I think that would be a question for him.

          MS. BATSON:  Your Honor, objection.  Relevance.

THE COURT:  Sustained.

BY MR. SKIPPER:

Q.   You also mentioned something about -- on this 1519 charge, this second count, which he wasn't indicted for November the 10th, right?

A.   That's correct.

Q.   You just decided to proceed with one count?

A.   It was not my decision, but, yes, that's what was decided.

Q.   You just decided to present one count?

A.   One count was presented.

Q.   All right.  And then February the 8th of 2023, you decided to go back in time to the same incident and now hit him with an affidavit violation, right?

A.   Superseding Indictment, yes.

Q.   Yes.

A.   Not uncommon.

Q.   You decided to do that, didn't you?

A.   We did, yes.

Q.   Nothing new about those charges.  The same thing existed back in July 25th as they existed when you testified on February 8th.  Right?

A.   Yes.

Q.   Now, you mentioned something about a false statement on an affidavit because the pit bull -- something about

attacking.  You said -- remind me of what you said on your direct examination.  That there was some type of false statement where you wanted to tell the jury that Kelly was making something up because the pit bull really wasn't biting Mata?

A.    Well, if we are specifically talking about what the pit bull was doing, from my observations of the video, the pit bull was not vicious in any way.

Q.    I am just going to play --

MR. SKIPPER:  Your Honor, this is Exhibit 3, just the remainder of the end of it.

BY MR. SKIPPER:

Q.    Since you have watched this probably 20 or 40 times. This is the end of McQueen's video.

A.    Okay.

(Video played.)

(Video paused.)

Q.    Did you hear that with your two ears?

A.    Yes.

Q.    Did you see that with your two eyes?

A.    Yes.

Q.    All right.  He said:  That dog was trying to bite yours?

A.    Yes, I believe that was Constable McQueen that said that.

Q.   That's right.  That is Constable McQueen talking to the guy you said was lying in his affidavit?

A.   Yes.

Q.   About that very thing that he just uttered with his mouth?

A.   That would have been his observations.

Q.   Yes.

Is there a different video that supports your contention under oath that, in fact, Kelly was lying?

A.   There is nothing in the video that shows that dog was being vicious or biting anybody.

Q.   Do you believe McQueen to be as big of a liar as Robert Evans?

A.   I don't believe McQueen to be a liar, no.

Q.   You mentioned that defensive resistance is not resisting arrest; do you remember that?

A.   Yes.

Q.   You are getting hypertechnical with defensive resistance.  Have you previously worked as a state prosecutor?

A.   No.

Q.   Do you do cases with the DA's office?

A.   No.

Q.   Okay.  And just to clear something up, yesterday I believe you were asked a question that you actually knew the

answer to, but there is an inference that Kelly Smith reports to the DA, and you said yes.

A.    Well, I said that in a situation where you're, as Kelly, with a unique situation, the reports that are written by the Constable are going to go to the DA's office if there are charges filed.  So that would be the next place that is going to go to.

Q.    He files that just like an elected sheriff would file his or her reports, right?

A.    Right.

Q.    He is not duty-bound to another elected official; he is duty-bound to the voters of Wood County.  He is an elected official under the Texas Constitution.  You know that, right?

A.    That's correct, yes.

Q.    Now, getting back to this defensive resistance, and you like to talk about what is positive control and what is not positive control.  You mentioned interference with a police K9.

You led this jury to conclude that the only reason that a resisting arrest was filed is because you have to do that to justify use of force.  Right?

A.    I think the -- what I was saying was what appeared to be the conversation between Newell, Adam Newell and the Defendant at the hospital was we have these numerous times

where the Defendant is asking about making sure there is a resisting charge is because -- put on because we have to have -- in a use of force there has to be an opposing resisting arrest charge.

So, therefore, he is saying, I used force; therefore, you have to put this on him.  That is what the conversation is.

Q.   Because that is what happened.  That what he is saying. If someone is resisting arrest -- if I come up to you and don't comply with your commands, resisting a lawful arrest --

A.   Right.

Q.   -- that is resisting arrest.  Have you read the Penal Code lately what resisting arrest says?

A.   Yes, I have.

Q.   All right.  Do you know what section it is in?

A.   I don't have it memorized, no.

Q.   All right.  38.03:  A person commits an offense if he intentionally prevents or obstructs --

MR. SKIPPER:  I will ask the Court to take judicial notice of Texas Penal Code 38.03, Judge --

THE COURT:  Any objection?

MS. BATSON:  With him asking you to take judicial notice, and the Court does so, no objection.

THE COURT:  Thank you.

BY MR. SKIPPER:

Q.   38.03:  A person commits an offense if he intentionally prevents or obstructs a person he knows is a peace officer.

Right?  You talked to the jury all about color of law.  He is wearing his green uniform.  You know?

A.   Yes.

Q.   Or a person acting in a peace officer's presence at his direction from effecting an arrest.

Right?

A.   Right.

Q.   By using force against the peace officer or another.

Right?

A.   Yes.

Q.   And your whole point to this jury, because you want to get in the subjective brain of Kelly Smith, is not that Kelly put a resisting arrest on a guy because he was resisting arrest, it is because he had to do it for a use of force?

A.   To justify his actions, yes.

Q.   Oh, I'm sorry.  That is the adjective you used.  To justify what he did?

A.   Yes.

Q.   Okay.

MR. SKIPPER:  May I have one moment, Your Honor?

(Pause in proceedings.)

BY MR. SKIPPER:

Q.   Agent, I am about to show you some other parts of Eric

Tuma's video, the commanding officer, Acting Police Chief of Hawkins, Texas at this time.  Okay?

A.    Okay.

MR. SKIPPER:  Your Honor, this is Exhibit 6.

BY MR. SKIPPER:

Q.    That would be -- Justin Graham is going to be standing next to him, and this is after he has been bit, and you keep talking about how he is screaming and some language that you used to describe what happened to him and the pain that he was in.

A.    Yes.

Q.    If you will just follow along with me here.

(Video played.)

(Video paused.)

BY MR. SKIPPER:

Q.    Do you see that grin, and he winked at you, didn't he? Winked right there at Eric Tuma?

A.    He winked at, yeah, Eric Tuma, not me.

Q.    He went (descriptive noise) and did his little head like that?

A.    I saw that, yes.

Q.    He is talking about Todd Eddington, isn't he?

A.    Yes.

(Video played.)

(Video paused.)

Q.   He is about to say he has got some Band-Aids inside that he can put this over his three stitches -- the bites that caused these three stitches.  All right?

MS. BATSON:  Your Honor, I would ask that he pose it as a question, not testify.

THE COURT:  Yeah, you are not on the stand, Mr. Skipper.  Make sure you are asking questions of the witness.

MR. SKIPPER:  Yes.

BY MR. SKIPPER:

Q.   Is that right?

A.   I'm sorry.  Say that again.

Q.   He is about to talk about Band-Aids; is that right?

A.   At one point he does.  I assume that is what we are going to listen to.

(Video played.)

(Video paused.)

BY MR. SKIPPER:

Q.   Do you remember when Justin Graham was going to go inside and get a paper towel for him to wipe his brow, and Tuma had to go in with him to prevent the destruction of potential evidence?

A.   Yes.

Q.   And Robert said, nah, I don't want you to go in.  Do you remember that?

A.    I do remember that, yes.

Q.    And Adam Newell says, why?  You got something there you don't want us to see?

Do you remember that?

A.    I do.

(Video played.)

(Video paused.)

MS. BATSON:  Your Honor, objection on relevance.

MR. SKIPPER:  It is admitted into evidence, Your Honor.

THE COURT:  Where are we going with this?

MR. SKIPPER:  When are we done?

THE COURT:  Where are we going with this?

MR. SKIPPER:  Oh, just to give the jury a complete picture of their main witness.

THE COURT:  Okay.  You can continue.

MS. BATSON:  Your Honor, I object to the characterization of our main witness.

THE COURT:  I will sustain that objection.

But you can continue your questioning.

(Video played.)

(Video paused.)

MS. BATSON:  Your Honor, I'm going to object.  Mr. Evans is not on trial.  Mr. Evans is not on trial.

As the witness has said numerous times, the focus

of the investigation was on the two minutes in the bathroom. That's it.

THE COURT:  Why don't you get to your question?

MR. SKIPPER:  Can I just play one more minute and move on?

THE COURT:  Okay.

(Video played.)

THE COURT:  Mr. Skipper.

(Video paused.)

MR. SKIPPER:  Yes, sir.  I will move on.  I thought there was one more part in there, but I will stop.

THE COURT:  Okay.

BY MR. SKIPPER:

Q.   You heard Robert Evans say that he fought to have him in my life?

A.   Right.

Q.   And "him" refers to this young boy Copeland, right?

A.   I believe that who is referring, yeah, his son --

Q.   And the mother --

A.   His son.

Q.   His son that he shares with a lady named Jessica Mitchell, right?

A.   Yes.

Q.   The same Jessica Mitchell that you and your colleague here Steph Davis recorded when you interviewed her?

A.   Yes.

Q.   You know since that time about a month ago that Robert Evans does not contest his divorce -- pardon me, the custody, and she now has full custody?

MS. BATSON:  Your Honor, again, objection on relevance.  How is this relevant?

THE COURT:  Sustained.

BY MR. SKIPPER:

Q.   All right.  We will finish up just going back to the video and going through some of your testimony related to what Ms. Batson showed the jurors here yesterday.  Okay?

A.   Okay.

Q.   This is just the Austin Milbourn video, the shortened version --

A.   Okay.

Q.   -- that you saw 20 or 40 times before you testified on September 15th, 2022.  All right?

A.   Yes.

THE COURT:  Which exhibit is this?

MR. SKIPPER:  I'm sorry, Judge, it is No. 1, the shortened version of the exhibit.  Going to be slowing it down here.

(Video played.)

(Video paused.)

MR. SKIPPER:  Sorry about that, Judge.  I'm just

going to dial this back a little bit on the volume.

THE COURT:  Okay.

BY MR. SKIPPER:

Q.   Now, what I am about to show you is the substance of your previous sworn Grand Jury testimony.  Okay?  How you said hands, and I want you to see, watch right here.

(Video played and stopped.)

THE COURT:  Why don't you just mute it.

MR. SKIPPER:  Yeah, I will do that.

It is not letting me do it with my computer.  Is there a -- I don't know how to do it from here, Your Honor.

Is there not any way to turn off the audio up there?

COURTROOM DEPUTY:  Try it now.  See if it works now.  I pressed the mute button.

MR. SKIPPER:  Your Honor, I do need to show the members of the jury.  This is it.

THE COURT:  Well, you are not going to be able to slow it down.  Just play it regularly.  You will have to ask him questions from that version.

MR. SKIPPER:  Well, I need to show them the version.  This version here.

(Video played.)

(Video paused.)

BY MR. SKIPPER:

Q.   That is a hand coming out right there, right?

A.   Yes.

Q.   You also mentioned that -- when the Government showed you this photo --

A.   Right.

Q.   -- do you see I'm holding up my right and left hand, as they enter the room?

A.   Yes.

Q.   And the representation was made that is what Robert Evans looked like when they entered the room?

A.   Shortly after they entered the room, yes.

Q.   After seven seconds of complete darkness, correct?

A.   As soon as there -- yes, when there was enough light to see it, that's when you see.

Q.   When Austin Milbourn comes around and shows his camera -- shows the flashlight there, right?

A.   Yes.

Q.   And it has been your testimony that Robert Evans never struck Mata?

A.   Never struck Mata.  I didn't see him strike Mata with the plunger or otherwise.

Q.   With the plunger or otherwise?

A.   Correct.

Q.   You have never, as many times as you have watched this video, when he is sitting Indian style in the bathtub where

he reaches out with his right hand and smacks, and you can hear it on camera.  You don't remember seeing that?

A.   I remember seeing him reach out, but I would not categorize that as a strike or hitting.  He is pushing away to try to keep him away from him.

MR. SKIPPER:  She just fixed it for me, Judge.  I'm sorry.

THE COURT:  Okay.

MR. SKIPPER:  But I am just wrapping up after this.

THE COURT:  Okay.

(Video played.)

(Video paused.)

BY MR. SKIPPER:

Q.   So, here again, this is all complete pitch darkness that Kelly is looking at.  Mata is in first.  You understand that, right?

A.   Yes.

Q.   I think there has been some discussion about him -- Kelly going in first, but the dog goes in first, right?

A.   Well, within that short amount of time, the dog goes in and comes right back out.

Q.   Yeah.  He comes back out because Robert Evans jerks him up by his collar; do you remember that?

A.   I think that is after.

Q.   Let's watch.

(Video played.)

A.   Mata is out there.

Q.   Again, complete darkness.  The dog went in first, right?

A.   The dog did go in initially, yes.

Q.   So this is just showing Austin Milbourn coming around McQueen.  McQueen has holstered his taser by now, and apparently doesn't have a working flashlight.  So Milbourn comes around, right?

A.   Milbourn does come around with the flashlight, yes.

Q.   Do you see this hand right here?

A.   Yes.

Q.   You see that.  And that is actually Robert Evans, his right hand is coming under the right leg of Kelly Smith, right?  You can see that very clearly.

A.   Maybe I am not looking at the same thing you are looking at.

Q.   This hand right here?

A.   Right here, yes.

Q.   Robert Evans's right hand?

A.   I can't tell from that picture if it is coming between his legs or on the outside.  Yes, it is close by, and he looks like it is grabbing.

(Video paused.)

Q.   Let me see if I can help from your angle.  He is coming

around this way, okay?  His right hand is going right through --

MS. BATSON:  Your Honor, again, Mr. Skipper is not on the stand.  If he could show it on the video.

THE COURT:  If you could get to your question.  As I said earlier, you are not testifying.

BY MR. SKIPPER:

Q.   And he is grabbing the dog by his collar, right?

A.   It looks like he is grabbing by the collar there.

Q.   And you've mentioned over and over on your direct testimony that Kelly Smith was not giving any commands, right?

A.   I don't remember hearing commands after:  Let go of my dog.

Q.   That's what I want to clarify.  Let go of my dog.  You were asked plenty of times whether Kelly Smith gave verbal commands, and your answer was no.

A.   And I'm pretty sure I said after:  Let go of my dog.

Q.   You will agree with me that "let go of my dog" is a command?

A.   Sure, at that point it was.

Q.   If somebody does not let go of their dog, right?  Right?

A.   Right.

Q.   You are not complying with that command?

A.   Sure.

Q.   And if you continue to hold on to the dog in defiance of a command while you are being struck, that is not complying with a command, right?

A.   Yes.

(Video played.)

Q.   And see here at the bottom, you see where he still has -- the dog is up.  And what do we see there?  Kelly moving his right leg to go over the dog?

A.   Yes.

Q.   Now you see Robert Evans's two hands, right?

A.   On the dog, yes.

Q.   On the dog.

(Video paused.)

Q.   I want to go back to this real quick.  This is Milbourn's camera that I am showing you, but the other instance of when Kelly Smith, on his camera, comes in, right, and your --

A.   We see that.

Q.   You are showing your right and left hand up?

A.   Up, yes.

Q.   Robert Evans is on the way of coming down to grab the dog, right?

A.   Yeah, it shows him leaning down and looking at the dog, yes.

Q.   It wasn't an act of compliance.  He is literally in the

motion of grabbing the dog.  Right?

A.    I think the point was hands are up, nothing in the hands.  That is what we see.

Q.    Well, these are up.  Do you agree with me if my hands remain stationary and they are not in the act of going down to grab the dog, those are two different things; would you agree with that?

A.    Yes.  This is up.  This is down.

Q.    All right.  But you expected Kelly Smith to go in a dark room and choose a different tactic when the guy is coming down and grabbing his dog in one motion?

A.    I don't think I testified to that, no, to say he had to do something different in that moment.

(Video played.)

Q.    Still holding on to the dog, correct?

A.    Yes.

Q.    After he has been struck by Mr. Smith?

A.    I think it was before he strikes him.

Q.    Still holding on with his right hand now.  His left hand.  Right?

A.    He has let go with the left and holding with the right.

Q.    That's right.  Still holding on with the right hand?

A.    Yes.

Q.    Now, he is about to yank -- do you see this right

here?

A.   You can see a hand on the collar, yes.

          (Video paused.)

Q.   And your testimony, I believe, was that Mata was actually standing on his hind legs?

A.   It is what it appeared.  I don't believe the person is going to be able to lift the 60-pound dog in that position. So I don't think that happened.  I think what we see is Mata standing up.

Q.   Okay.  Your testimony is not that he is yanking that dog up by the back of his collar --

A.   Off the ground?

Q.   -- that Mata is like doing a trick?  Standing on his legs?

A.   Are you saying that Mata was off the ground, or just standing up?

Q.   Tell me what --

A.   What is your question?

Q.   Are you telling me that this video right here depicts Mata standing up?

A.   You see Mata in an upright position, yes.

Q.   Okay.  You don't believe that Robert Evans is lifting this dog up by the back of his collar?

A.   I would be very surprised if he had the strength in that position to be able to lift a dog of that size off the

168

ground, yes.  Not many people would.

(Video played.)

Q.   Did you see how his neck was just manipulated right there?

A.   No.

Q.   Right here.  He is going to pull him to the right with his right hand.  Watch the dog's neck.  There and there.  Do you see that?

A.   I see Mata moving to the right -- to the left on our screen.

Q.   Left on our screen, but right.  Still, let go of my dog, right?

A.   Yes.

Q.   And he is not letting go of the dog, obviously, because now Kelly is issuing soft hand blows, right?

A.   Right.

Q.   Still, right?

A.   Still got ahold.

Q.   Hand on the equipment?

A.   Yes.

(Video paused.)

Q.   He is still -- you saw that hand right there?  You have seen this video, I know.  But as he is getting -- you see his hand is still on his collar as he goes down, right?

A.   Yes.

Q.    Still holding the back of this dog's collar?

A.    You can still see it, yes.

Q.    Right.  I am only asking what you can see with your eyes.

A.    Yeah, you can still see it.

            (Video played.)

Q.    There it is again.  Do you see that --

A.    Yep.

Q.    His hand?

A.    Yeah, I see it.

            (Video paused.)

Q.    Frame 21:31:10, still Robert Evans holding the back of that dog's equipment, right?

A.    Yes.

Q.    Despite numerous blows and commands to get your hands off my dog, correct?

A.    Yes.

Q.    Still on the dog, right?

A.    Yes.

            (Video played.)

Q.    Now, Kelly grabs the perpetrator's right hand, correct?

A.    Yes.

Q.    And will remove the right hand from his partner, right?

A.   Correct.

Q.   Do you see that right there, Robert Evans -- watch that. Do you see that?  Do you see him push that dog away?

A.   Kind of push him away, yes.

Q.   Yeah.  First time you ever seen that?

A.   No.

Q.   It isn't?

A.   No, you can see Mata move to the right.

Q.   By Robert Evans's hand?

A.   Pushing him away from him, yes.

        (Video paused.)

Q.   Okay.  But that is your testimony with regard to this that he pushed him; he never tried to injure or harm him?

A.   You can't see the force that is being used, but you just see Mata moving away to the right.

Q.   I guess what I am getting at is earlier you testified that you never saw Robert Evans strike this K9.

A.   I don't see him striking the K9.

Q.   Okay.  So moving something away and striking to you are two different things?

A.   Oh, absolutely.

Q.   Because you are interpreting what is inside --

A.   One is pushing him away and one is hitting him.

Q.   You are interpreting what is inside Robert Evans's brain, right?

A.   No, that is facts.  Moving something and hitting something are two different things.

Q.   Okay.  Let me ask you this:  If you are about to see something on this video where Robert Evans slaps Mata across the muzzle and it moves his head, is your characterization of what you are going to see a move or a slap?

A.   I would have to see it, and I would have to probably see it in full motion to determine the strength and is he just pushing the dog away, or is he hitting the dog.

Q.   Right.  Full motion.  Okay.

But now you guys slowed this down, right?

A.   So we could see every aspect of it, true.

Q.   Right.

You acknowledge you don't do use of force cases frame by frame like we are doing or still shots; you have got to play it out and go back to see what actually happened. Right?

A.   Right.

Q.   You said Kelly Smith comes in here later and throws the dog back in there.  Do you understand -- now I think you have maybe become a semiexpert in K9 training, the handler, who is Kelly, has to handle the dog, right?

A.   Yes.

Q.   And that is his main priority?

A.   Yes, it is.

Q.   To have the dog in there with him?

A.   To control the dog and have control of the dog in the situation, yes, not have him with him but be controlling the dog.

Q.   You can't control the dog if he is down the hallway?

A.   Very true.

Q.   Talking to a pit bull in a non-friendly manner, right?

A.   Right.  You are not controlling the dog.

Q.   You have to stay in control of this situation in dynamic, and recalling the dog back in --

          MS. BATSON:  Your Honor, is there a question?

Q.   -- is what he is supposed to do, right?

A.   Not necessarily, no.  Not from what I have learned in this case from the experts.

Q.   The experts' opinions in this case is that the handler is not supposed to recall the dog when the dog is out somewhere unknown that could be getting into something else?

A.   No, that is not what we were told.  This is --

Q.   But you know they have got to stay -- the handler has got to remain with the dog?

A.   Right.

Q.   Then you see what you were referring to in the plunger, right?

A.   Yes.

Q.   Robert Evans has the plunger.  Kelly takes it out of his hand.  Is that right?

A.   Yes.

Q.   And also the dog's purpose is to defend the handler, right; you understand that?

A.   Yes, they are taught to defend their handler, yes.

Q.   For control purposes they are taught to defend their handler and defend itself?

A.   Yes.

Q.   And the trainer, I believe Stanze, has actually told you that these dogs are supposed to protect themselves if they are assaulted?

A.   That's correct.

(Video played.)

(Video paused.)

Q.   And right here you can see Kelly Smith looking over finally as he is distracted at this point.  He is looking out of the door because of the pit bull?

MS. BATSON:  Your Honor, I'm going to object.  He has already said this witness cannot get into the mind of the Defendant, but yet he is asking him mental questions.

MR. SKIPPER:  I will rephrase, Your Honor.

THE COURT:  Okay.

BY MR. SKIPPER:

Q.   Do you see Kelly Smith looking toward the door?

A.   Yes.

Q.   Okay.  And did Jason Stanze, when you interviewed him -- let me rephrase this.

You told the jury the other day that Kelly is about to put this guy in an arm triangle, right?

A.   Yes.

Q.   And you told the jury that when that happens, he is exposing -- Kelly is exposing Robert Evans's entire right side?

A.   Yes, he did.

Q.   You know that handlers are taught to keep people's faces away from dogs so they don't get bit in the face, right?

A.   That is part of the safety training I believe, yes.

Q.   Right.  And Jason Stanze, you talked to him, right?

A.   I did.

Q.   And he told you --

MS. BATSON:  Your Honor, objection.

THE COURT:  What is your objection?

MS. BATSON:  I'm sorry.  Hearsay.

THE COURT:  What was the question, Mr. Skipper?

MR. SKIPPER:  I'll move on, Your Honor.

BY MR. SKIPPER:

Q.   And you have said before that someone sitting Indian style in a confined bathroom is a good place to put handcuffs on someone?

A.    That's -- you have plenty of opportunity because he is in a weak position.  You have full control over him.  That's what I said.

Q.    To handle the K9 and pull his cuffs out with another hand, I mean, in your non-SWAT experience, this was when Kelly should have put handcuffs on this guy sitting Indian style --

A.    Yes.

Q.    -- applying pressure in the bathtub with his feet.  Right?

A.    I don't see him applying pressure.

Q.    All right.

        (Video played.)

        (Video paused.)

Q.    And right here you mentioned he lifts -- Kelly lifts Robert Evans's chin here?

A.    Yeah, because his left arm is underneath his chin.

Q.    All right.  See if you can watch this right now and tell me if you can hear this slap across Mata's muzzle.

        (Video played.)

        (Video paused.)

BY MR. SKIPPER:

Q.    You could hear that slap, couldn't you?

A.    I can't hear it.  With that audio I can't really hear it.  But I saw his hand come down.

Q.    Yes.

      Did you see his hand slap the muzzle of his dog?

A.    I saw his hand make contact with the muzzle of the dog, yes.

Q.    Did you see the dog, his little ears go down and moved over like this --

A.    Pulled away.

Q.    -- when the hand left his muzzle?

A.    I see a person trying not to get bit.

Q.    That's what you see, right?

A.    That's what I see.

Q.    That's right.

      You don't see a person interfering with a police K9?

A.    Not in this moment.

Q.    Why?

A.    Or arm underneath the chin --

Q.    Because if you had information he was trying to protect this guy's face, surely you would tell the factfinder that information, correct?

A.    I believe that -- I don't have any information that that is what he was doing at this point.

Q.    Right.  If you had it.  Jason Stanze, the multiple times you have talked to him about him having an incident with someone getting their face bit off in training and him taught

to do this move, you would surely explain this and tell this to the jury, wouldn't you?

A.   I believe when I talked to Jason Stanze he never mentioned anything about teaching Kelly how to do that.  He never mentioned that to us.

Q.   All right.

        (Video played.)

        (Video paused.)

BY MR. SKIPPER:

Q.   Anyways, you see this right here, again, Mata is struck. The ears go down.  His head moves.  Is that right?

A.   Yes.

Q.   But your position is that he is simply moving the dog away?

A.   No, that was before.  Now I believe he is putting his hands out.  So he knows the dog is coming to bite him, and he is trying not to get bit.

Q.   And flailing arms are positive control in your non-SWAT experience?

A.   Neck restraint?

Q.   Flailing arms -- sir, this is a simple question.

        Flailing arms are positive control in your non-SWAT experience?

A.   He has a dominant position and more control --

Q.   Are flailing arms positive control, in your non-SWAT

experience?

A.   It depends on the situation.

Q.   In this situation in a bathtub with a non-compliant suspect, been on the run for 34 days, are flailing arms a compliant and positive control?

A.   Not -- if he is trying to fight that officer, but he is not trying to fight the officer.

Q.   In this situation, your testimony is he has positive control of Robert Evans, and that is your sworn testimony?

A.   He has control of Robert Evans, yes.

Q.   All right.

Now, he has control of Robert Evans.  Robert Evans is actually about to reach around with his right hand and grab this dog again by the back, right?

A.   Right.  Because he is trying not to get bit.

Q.   Trying not to get bit?

A.   It's clear.

Q.   Going to follow the dog all the way over here to his right, but he is trying not to get bit?

A.   Yes.  He is pushing the dog away from him.

Q.   Right.

(Video played.)

(Video paused.)

BY MR. SKIPPER:

Q.   So there he goes again, flailing arm, you can see his

179

right hand on the back of that dog, right?

A.   Yep.

Q.   Is that a yes?

A.   That is a yes.

Q.   Now, he has still got it on the back of that dog's neck, right?

A.   He has got his hand on the dog.

Q.   The back of the dog --

A.   But you can't tell from that picture where he has got it.

Q.   And your testimony is that when a suspect, a perpetrator has his right arm not under control, and now these legs are now no longer in the Indian-style position and they are pushed off on the extension of that bathtub, that this is positive control?  In your non-SWAT experience, that is your sworn testimony?

A.   His legs are crossed.  They are not crossed -- they are not pushing back.

Q.   You know what my question is.  He was from Indian style --

A.   Right.

Q.   To now extended all the way out --

A.   He was in that position because the Defendant put him in that position.

Q.   This is Kelly's --

180

A.   He put him in that position.

Q.   So did Kelly come -- is there a frame I haven't seen where he pulled Robert's feet out to push out on his own?

A.   No.  When you put him in the neck restraint and lift them, then the natural instinct is to extend out.

Q.   That is the way you have --

A.   Curled out hands on head.  Perfect opportunity to cuff him before this incident.

Q.   But that is the way the anatomy of the body works, he would automatically do that by Kelly doing it?

A.   I think it is a natural reaction.

Q.   Similar to how when Robert Evans yanks Mata by the collar, he is just kind of standing up?

A.   Again, I don't think he could lift him in that position, no.

Q.   Now, you also said you never saw him, being Robert Evans, kick this K9, right?

A.   No, I did not.

        (Video played.)

        (Video paused.)

Q.   And right here is -- now, the arms comes in, and you will see Kelly has just the right arm, and Robert Evans's left arm is coming out, correct?

A.   Yes.

Q.   And he is about to -- well let's just see if he kicks

the dog.  Watch his foot and watch what the dog does.

(Video played.)

(Video paused.)

Q.   With his right foot, right here, do you see that?  Do you see the foot kick the dog and push the dog backwards?

A.   I see the right foot come up, and I see the dog go backwards.  I would not characterize that as a kick.

Q.   No, you would say he is moving him simply, right?

A.   He is moving him, and he is trying not to get bit.

Q.   Right.  He is moving him --

A.   And defending himself from what is happening.

Q.   -- in a compliant manner, a man who has lied to you countless times in front of his own lawyer, right?  You believe he is trying to defend himself?

A.   Absolutely.

Q.   All right.

And in 90 seconds of Kelly Smith's life, making split-second decisions, you believe he committed a crime?

A.   I do.

Q.   All right.  Is it your testimony that Mata finally apprehended Robert Evans because Kelly told him to, or because the dog was defending himself after that final kick?

A.   It is clear from the video and the audio that he has given the bite command twice right before he bites.

Q.   I'm asking you, sir, if you could listen to my question, is it your testimony that this dog, K9 Mata, was responding to a command by Kelly or doing what it was trained to do and defending itself, that last strike by Evans when Evans kicked him in the chest?

A.   I do not believe that Mata bit because he was defending himself.

Q.   You don't believe that because it doesn't fit your narrative, right?

A.   No, I don't believe that because the bite command was given.

Q.   We can watch it again.  I'm sure Ms. Batson will go over it with you again.  Anything else you want to add I haven't asked you?

A.   No, sir.

          MR. SKIPPER:  All right.  May I have one moment, Judge?

          THE COURT:  Okay.

          MR. SKIPPER:  Pass the Judge -- pass the witness, Judge.

          THE COURT:  Okay.  Ms. Batson.

                     REDIRECT EXAMINATION

BY MS. BATSON:

Q.   Agent Crowell, you have not had -- you are not on SWAT?

183

A.    I am not.

Q.    Made that clear.

       Okay.  But you were a police officer -- or are a police officer?

A.    Yes.

Q.    In law enforcement?

A.    Yes, I am.

Q.    Okay.  Now, do you have to be on SWAT to have tactical training?

A.    No, in fact all officers receive tactical training.

Q.    Every single officer?

A.    Yes.

Q.    Okay.  Is active shooter training considered tactical training?

A.    Yes.

Q.    And every officer has that?

A.    Yes.

Q.    And, basically, tell the jurors please what is tactical training?

A.    So tactical training is essentially training that officers receive to give us different ways to handle different situations in a safe manner.  So it is a way to learn how to do things safer and better, and it is always evolving and changing.

       But it covers a myriad of different things.  It

could be doing search warrant executions.  It could be just arresting people.  There is a lot of different things.  But tactical training is just learning how to do things in a safe way.

Q.    Because the goal is safety --

A.    Safety.

Q.    -- for everybody involved?

A.    Yes, correct.

Q.    So that is the purpose of tactical training?

A.    Yes.

Q.    And, although you are not with SWAT, you have had firearms train?

A.    Yes.  And I am a certified firearms instructor for the FBI.

Q.    You are an instructor?

A.    Yes.

Q.    And, again, part of your duties as an instructor is to teach safety -- people how to use firearms in a safe way?

A.    Yeah, that is number one.  Safety is the number one thing we are there first, and then drills are second.

Q.    Okay.  And all officers are taught, again, tactics, safe tactics?

A.    Yes.

Q.    And it has been demonstrated several times in the video that this Defendant was not safe in the tactical decisions

that he made?

A.   That is correct.

Q.   Now, this is probably the second or third case that I have worked with you?

A.   Yes.

Q.   Okay.  And Agent Davis?

A.   Yes.

Q.   Have you heard me call her Steph?

A.   No.

Q.   It is kind of familiar for somebody who doesn't know somebody, right?

A.   Right.

Q.   And what is her name?

A.   Stephanie Davis.

Q.   Stephanie --

A.   Correct.

Q.   -- Davis.  Not Steph Davis?

A.   Correct.

Q.   Stephanie?

A.   Yes.

Q.   Now, Defense counsel was asking you about when you --

         MS. BATSON:  Oh, the search warrant.  Can I see that again, please?

         MR. SKIPPER:  One moment, Your Honor.  She is needing a document she provided me in discovery.  I just need

to look for it for a moment.

BY MS. BATSON:

Q.   Okay.  Agent Crowell, Defense counsel showed you an affidavit for a search and seizure warrant?

A.   Yes.

Q.   Correct?

And in that he pointed out that it says Smith, which is the Defendant, says, Mata is hell on his feet. Laugh out Loud.  Do you remember that?

A.   I do.

Q.   And you said that it was -- you attributed that statement to Smith in error?

A.   Correct.

MS. BATSON:  If we could pull up Exhibit 34, page 2.

BY MS. BATSON:

Q.   And then here, what is shown here in the blue?

A.   So this is where I pulled the information from -- that I put on the affidavit.  It was the text message between Kelly Smith and Buddy Williams.

Q.   Okay.  And does it say:  Mata is hell on those feet and legs.  LOL?

A.   It does.

Q.   Okay.  And then but before that it says, "yep," on the affidavit?

187

A.   Yes.

Q.   And so we do see a yep and then statement, correct?

A.   Yes.

Q.   And so this one line in an eight-page document?

A.   Yes.

Q.   Is that correct?

A.   That's correct.

Q.   All right.  Attributing the "yep" correctly but not the "Mata is hell on those feet"?

A.   Yes.

Q.   Okay.  All right.  In this eight-page document?

A.   Yes.

Q.   One line?

A.   One line.

Q.   Okay.  All right.

          Then we have the Defendant's affidavit, which we went through line by line?

A.   Yes, we did.

Q.   Correct?

A.   Yep.

Q.   And -- now this is an eight-page document?

A.   Yes.

Q.   This is two-page document, and in these two pages, how many statements were lies?

A.   14.

Q.   Okay.  Not attributing to something that didn't happen, flat out did not happen?

A.   Correct.

Q.   14 in two pages?

A.   That's right.

          MS. BATSON:  And speaking of -- let's go to 33, page 1.

BY MS. BATSON:

Q.   Now, this number 6 right here?

A.   Yes.

Q.   Did you type that?

A.   No.

Q.   Who typed that?

A.   That would have came from the Defendant.

Q.   Okay.  So you are not saying he had six bites; the Defendant is saying he had six bites?

A.   Yes.

Q.   I just wanted to be clear, that is not your testimony; that is his statement?

A.   That's correct.

Q.   Let me deal with this.

          The Defense attorney was asking you about us using the Sherman Grand Jury versus the Grand Jury here?

A.   Yes.

Q.   Okay.  Who made that decision?

A.    You did.

Q.    And is it because I am in the Plano office?

A.    Yes, it is more convenient for you and your time.

Q.    Because I present other cases?

A.    And you are very busy, and you have to present other cases at the same time.

Q.    It wasn't a nefarious purpose for us to not use the Tyler Grand Jury?

A.    No, it was strictly a time management thing.

Q.    All right.  And then Defense counsel was asking you about John McQueen and Cheryl Evans and the call out there?

A.    Yes.

Q.    And then he played where phone identified Cheryl Evans as calling?

A.    Yes.

Q.    Or Cheryl (different pronunciation) or however you say her name?

A.    Cheryl.

Q.    Something like that.

         Did you ever hear any conversation?

A.    No.

Q.    Okay.  Did you hear John McQueen answer the phone?

A.    No.

Q.    Now, is this trial about Robert Evans?

A.    No.

190

Q.   Okay.  What is this trial about?

A.   This trial is about the apprehension of Robert Evans by the Defendant and his actions in doing so and his use of excessive force during that apprehension.

Q.   Now, Defense counsel was asking you about Robert Evans lying time and time again?

A.   Yes.

Q.   You didn't make that note in your 302?

A.   I did not.

Q.   Okay.  Now, because you did not note that in your 302, does that mean that you believed what Robert Evans was telling you?

A.   It does not.

Q.   Did you believe him?

A.   I didn't believe him, no.

Q.   Now, I want to make sure I understand as the Defense counsel was going through the slow motion video, and, yes, we will go through it again as well, that he said soft hand blows.  Did you hear that?

A.   Yes.

Q.   Okay.  Now, soft hand blows, I guess referring to soft controls?

A.   I would assume that is what he is referring to.

Q.   And soft controls are, again, what?

A.   Soft controls are, at least in my experience, is more

hands on, maybe a control lock, something like that, not punches or necessarily using something that is going to cause a lot of pain like a punch.

Q.   And so punching and kicking, those are hard controls?

A.   Yes.

Q.   So it is not a soft hand control?

A.   Not how I would describe it.

Q.   Not displayed here?

A.   No.

Q.   As a matter of fact, would a soft hand control drop somebody to the floor of a tub?

A.   No, I would say that was a fairly hard blow.

Q.   Now, when the Defendant went to obtain Mata from Houston K9 Academy, did he know what kind of dog he was getting?

A.   Yes.

Q.   And he trained with him at that academy?

A.   Yes, he did.

Q.   Is that correct?

A.   Yes.

Q.   And so he had him two years before this incident; is that correct?

A.   Approximately two years, I believe, yes.

Q.   And from the training records, were you able to see that the Defendant has trained with Mata numerous times?

A.   Yes.

192

Q.    Over that two-year period?

A.    Yes.

Q.    And so during that two-year period, he would have known how his dog was responding to training exercise?

A.    Yes.

Q.    And Defense counsel asked you about tactically what you would have done, and you said you wouldn't have gone in there?

A.    Correct.

Q.    Again, what would you have done?

A.    I would have -- as soon as there was a barricaded subject, I would have done just what Hawkins PD initially did, which was to call for help.  If I am out there by myself where there are just two officers, we need more people.

We are going to set up a perimeter, not only just around the house but maybe even further out in case he does try to run.  And then we are going to try open lines of communication with him in order to peacefully get him to come out.

It is not uncommon for these kinds of barricade situations to go on for hours before the person comes out. The person is in there presumably alone.  You don't have any particular facts that says there is anyone in danger in the house.  You are only putting yourself in danger by entering that residence, not knowing what is on the other side of the

door, not knowing if they have weapons or not.

And so, tactically speaking, safely speaking to do that the safest way possible is to surround and call out and try to get them to come out to you where you have cover, where you can protect yourself, and you can get them to come to you.  You can at least try that for a time before you try to go inside the house.

Q.   Okay.  All right.  And then when the Defense counsel was showing you about Constable Smith, the Defendant, going into the dark bathroom --

A.   Yes.

Q.   -- do you remember that line of questioning?

Would you have done that?

A.   No.  I mean, I would have given them -- especially, once there is an open line of communication with the person, I am going to give them the opportunity to come out because it is safer for me for them to come out, show me their hands, and come out safely where I can see what is going on, rather than going into a very small confined space that could be dark and not having any idea what is on the other side of that door.

So as soon as you know where they are at and you have communication with them, you have time.  There is a thing called time, distance, and cover.  You have that opportunity to slow things down, communicate with them, and get them to the come out peacefully.

Q.    Okay.  But that is not what happened here?

A.    No.

Q.    Now, Defense counsel mentioned a statute, Texas Penal Code 38.03, which the Judge took judicial notice of.

In his reading, he says:  A person commits an offense if he intentionally prevents or obstructs a person he knows is a peace officer or a person acting in a peace officer's presence and at his direction from effecting an arrest, search or transportation of the actor or another by using force against the peace officer or another.

A.    Yes.

Q.    Do you remember that?

A.    I do.

MS. BATSON:  If we could go to 1D, page 2.

BY MS. BATSON:

Q.    Is this right here using force against another?

A.    No.

Q.    When the entry is made into the bathroom?

A.    No.

MS. BATSON:  Now, let's go ahead and watch the slow motion video without the sound, please.

(Video played.)

MS. BATSON:  Okay.  Stop.

(Video stopped.)

BY MS. BATSON:

Q.   Okay.  When the dog was going into -- when Mata was going into the bathroom, did the Defendant have to lift his leg in order to get Mata in there?  Did we see that?

A.   Yes, he is lifting his leg over Mata, yes.

Q.   Over Mata.  To make sure he gets in there?

A.   Yes.

Q.   And, again, we are going to see where --

          MS. BATSON:  Well, let's play it.

          (Video played.)

          MS. BATSON:  Okay.  Pause it.

          (Video paused.)

BY MS. BATSON:

Q.   This is where Mr. Evans, according to what Defense counsel was saying and what we can see, he has got Mata by his harness?

A.   Yes.

Q.   Okay.  And as you stated, trying to keep from getting bit?

A.   Right.

          MS. BATSON:  Continue to play it.  Oh, wait.  Back up just a little.

          (Video played.)

          (Video paused.)

BY MS. BATSON:

Q.   And did we see Mata nip him right there?

A.    Yes.

Q.    On the leg, which we saw the photos of the injuries?

A.    We saw the photos of the wounds.

MS. BATSON:  Okay.  Lets play it.

(Video played.)

BY MS. BATSON:

Q.    Okay.  This is quit -- let my dog go or --

A.    Yeah, let go of my dog.

Q.    Let go of my dog.

MS. BATSON:  Stop right there.

(Video paused.)

BY MS. BATSON:

Q.    Who is grabbing the dog right there.

A.    Austin Milbourn.

Q.    So he is grabbing the dog in the same area where Evans did --

A.    On the harness.

Q.    -- on the harness?

MS. BATSON:  Okay.  Let's play it.

(Video played.)

MS. BATSON:  Right there.

BY MS. BATSON:

Q.    Now, what is going on here?

A.    Now Defendant is grabbing Mata by the harness.

Q.    Okay.  Same spot?

A.    Yes.

Q.    Where Evans did, correct?

A.    Yes.

Q.    So we have three different people grabbing K9 Mata in the same area?

A.    Yes.

        MS. BATSON:  All right.  Let's play it.

        (Video played.)

        MS. BATSON:  Okay.  Right there.

        (Video paused.)

BY MS. BATSON:

Q.    Now, what is going on right here?

A.    So Robert Evans has grabbed the plunger and has kind of poked it towards Mata, and the Defendant is now grabbing the plunger.

Q.    Okay.  But right here, where is Mata?

A.    So Mata is being pulled towards Evans by the Defendant.

        MS. BATSON:  Okay.  So can we back that up just a little bit, please.

        (Video played.)

BY MS. BATSON:

Q.    And we see the Defendant grab and drag the dog?

A.    Yes.

Q.    Okay.

A.    Right there.

Q.    And any lifting up of the dog is on whose part?

A.    On the Defendant's part.

          MS. BATSON:  Stop right there.

               (Video paused.)

BY MS. BATSON:

Q.    All right.  We talked about this yesterday about the hand on the head --

A.    Yes.

Q.    -- right?  And, again, is that any type of resistance right here?

A.    No.

          MS. BATSON:  Okay.  Keep playing it, please.

               (Video played.)

          MS. BATSON:  Stop right there.

               (Video stopped.)

BY MS. BATSON:

Q.    Okay.  So right here, what is this called, is it the chin restraint?

A.    Yeah, neck restraint or could be a chokehold.  It's hard to tell from this angle exactly where his arm is, but it is like under the neck, chin area of Evans.

Q.    Okay.  Again, complete control?

A.    He has control over Evans, yes.

Q.    Over Evans.

But, again, is this where he is giving the bite command?

A.    Yes.

Q.    Still giving the bite command?

A.    Yes.

Q.    Not giving the command, labost?

A.    Yeah, the heel command, which is reflected in the affidavit as being given is not being given.

Q.    Okay.  And what is the heel command?

A.    It is labost.

Q.    Okay.  Labost.  Labost.

We don't hear labost at all during this part of the video?

A.    We do not.

Q.    It is come here or bite?

A.    Correct.

Q.    Not labost at any point.

MS. BATSON:  Let's keep playing.  Labost.

(Video played.)

MS. BATSON:  Okay.

(Video stopped.)

BY MS. BATSON:

Q.    What's going on here?

A.    So Evans sees the dog coming.  He's got his hands out. He pushes the dog off to the right, and then the dog goes for

his foot after Evans is moving his foot kind of towards Mata.

Q.   Okay.  Now, you have heard -- or Defense counsel asked you if Kelly Smith was trying to protect Evans's face?

A.   Yes.

Q.   By lifting him up into that armhold?

A.   Correct.

Q.   Wouldn't it be safer to say if he was protecting his face, he wouldn't have given the bite command?

A.   Correct.

Q.   Is being bitten and injured by a dog legal punishment for lying?

A.   No.

Q.   And K9 Mata didn't bite Mr. Evans on his foot until after a few minutes; is that correct?

A.   Yes, during -- right at the end of this whole situation.

Q.   But it wasn't for lack of trying?

A.   Correct.  He did try.

Q.   Approximately how many times was the bite command given by this Defendant?

A.   It was approximately 16 times.

Q.   Okay.  Not once did we hear heel, down, stop, labost, whatever?

A.   Correct.

MS. BATSON:  Can we pull up the three photos, please?  Oh, can they go side by side?

BY MS. BATSON:

Q.   All right.  Agent Crowell?

A.   Yes.

Q.   Right here, what is shown?

A.   So that is Robert Evans grabbing the gear or harness of Mata.

MS. BATSON:  Okay.  Next picture, please?

A.   That is Austin Milbourn having ahold of Mata's harness.

MS. BATSON:  The next one.

A.   Then that is the Defendant grabbing the harness of Mata right before he drags him up to Evans.

BY MS. BATSON:

Q.   Okay.  Again, all three of these individuals would be potentially guilty of the felony offense this Defendant was trying to put on Robert Evans?

A.   Yes.

Q.   Now, I know that Defense counsel was asking you about all of this other stuff about Cheryl Evans calling John McQueen, about Robert Evans playing all of that -- dirtying up our main witness, but does anything about what he was saying, anything change what happened in that bathroom when this Defendant continued to give the bite command, violating

Robert Evans's rights and did not arrest him with least amount of force possible?

A.   No.   None of the conversations between John McQueen, what they did before they entered, or the statements made by Robert Evans after, had, anything to do with what happened in the bathroom.

Q.   And does anything about what was asked of you during all of those rabbit trails change the fact that this Defendant made 14 statements, lies on his affidavit?

A.   No.

Q.   Four days after the incident?

A.   That does not change any of it.

        MS. BATSON:   No further questions.

        THE COURT:   Mr. Skipper.

                     RECROSS-EXAMINATION

BY MR. SKIPPER:

Q.   Agent Crowell, this is the video that I pulled up earlier.   This is Kelly Smith's video.   I'm going to show you where Robert Evans slams the door on Kelly's right finger, okay?

A.   Okay.

        (Video played.)

        (Video paused.)

Q.   Did you see that right there?

A.   Yes.

Q.   But that is when he is there -- Kelly Smith is there on the outside of the door just prior to him giving the command to show me your hands, I don't know if you have any weapons, you are barricaded, brother, right?

A.   That's correct.

Q.   You see Robert Evans, again, slamming that door into Kelly Smith's right hand?

A.   Yes.

Q.   Which would certainly be consistent with this injury claim that he filed the following morning through human resources, right?

A.   Could have happened at that time, sure.

Q.   Pardon me?

A.   Could have happened at that time, sure.

Q.   Yeah.

        Now, I don't know -- Ms. Batson asked you about Steph Davis.  Isn't her name Steph?

A.   No, her name is Stephanie.

Q.   Okay.  Well, there is emails between you two reviewing each others --

A.   Yeah, it would be nothing that colleagues or people that are somewhat close to each other and know each other well may use nicknames or shorter versions of their name.

Q.   Okay.  My understanding was she thought she wasn't called Steph, but you call her Steph?

204

A.   At times.

Q.   If you called her Steph on an email, that would be a previous occasion where you called her Steph, right?

A.   Right.

Q.   All right.  So she goes by Steph sometimes?

A.   She does.  I would say to friends and colleagues, yes.

Q.   Is there any problem with someone calling her Steph?

A.   I would say that it depended on the person and what they want to be called.

Q.   Do you know if she is going to testify in this trial?

A.   I do not know.

Q.   You keep talking about -- I think you said 14 lies that Kelly said in this affidavit?

A.   Yes.

Q.   I know you are a non-tactical, non-SWAT person, but have you heard of what is called "slips and captures"?

A.   I have not heard that term.

Q.   You never heard that term?

A.   Slips and captures?

Q.   Slips and captures.

A.   No, I've never heard that term.

Q.   Have you ever heard of a term "mis-sequencing"?

A.   I have.

Q.   And slips and captures, you have never heard of that. Have you ever heard of a guy named Mike Kmiecik of Sheepdog

Guardian Consulting outside of Chicago?

A.    Yes.

Q.    And having heard of him, you are not familiar with the phrase "slips and captures" which happens to law enforcement officers in high-stress situations during cortisol spikes?

A.    I have not heard of that.

Q.    But you have heard of "mis-sequencing"?

A.    Yes.

Q.    And despite your knowledge of mis-sequencing, you are still telling this jury that Kelly Smith deliberately made false statements -- not like you, because yours was an honest mistake and that it wasn't made to deceive anyone -- but you are saying what Kelly said was an intentional false statement you like to say 14 times.  Right?

A.    I think the number of false statements are indicative of that, yes.

Q.    Yours was, despite you having the text right in front of you, it was reduced to, well, it was just one line, you know, we gave it our best shot.  Right?

A.    It was one line of an eight-page affidavit.

Q.    We will give you a break even though you made that statement with your right hand in a Federal Judge's Chambers, didn't you?

A.    One mistake versus 14 in a short document is a big difference.

Q.   Right.  But do as I say, not as I do, right, because you are the FBI?

A.   I would not equate those two things as the same thing.

Q.   Despite that fact, in your subjective opinion that you wouldn't equate those two things as one and the same you did go in a Federal Judge's chambers and raise your right hand that Kelly Smith uttered those specific words, didn't you?

A.   That was written down.

Q.   And you swore to that you under oath?

A.   I did.

Q.   You've also said -- you didn't really said this, she said all this, that this case isn't about Robert Evans.  It is about Kelly Smith.  It is not about the credibility of Robert Evans.  Right?

A.   It is not.

Q.   It is not.  You don't care about anyone's credibility?

A.   I do care about people's credibility.

Q.   Do you care about the integrity of your investigation?

A.   I do.

Q.   Do you care about someone with a good heart?

A.   Sure.

Q.   Do you care about someone acting reasonable or not?

A.   Yes.

Q.   Does that factor into your own moral compass as an agent who is paid by taxpayers?

A.    I guess I don't understand the question.

Q.    Do all of those things factor in -- do you have a moral compass?

A.    Of course.

Q.    Okay.  And do all of those life experiences factor into how you objectively observe an investigation?

A.    Well, when I am being objective in an investigation, I have to look at the facts and circumstances of that and not put any of my own thoughts and feelings that are outside and absent of that into that.  Try to look at that as its own incident on its own merit.

Q.    Or just misstate what someone told you on a report, right?

A.    Not intentionally misstate.

Q.    But for you -- that is what I want to get down to -- when we are getting down brass tacks.  Okay?  We are in the courtroom looking at a man charged with a federal crime because of -- you are the lead agent in this case, right?

A.    Yes.

Q.    But it appears with regard to all of your testimony, it is okay if the FBI does it, but it is not okay, presuming that this jury believes your testimony, if Kelly Smith does the same thing.  That is what you want this jury to believe?

A.    If you try to equate the two things together, yes, but

they are not the same.

Q.   Right.

You got Mata's records in this case, right?

A.   Yes.

Q.   You actually -- you went over to Kelly Smith's wife's vet clinic in person and served her with a Grand Jury subpoena, didn't you?

A.   I did not do it in person, but it was served.

Q.   You, being the FBI, thought it would be a good idea, as opposed to pushing send on an email --

MS. BATSON:  Your Honor, I'm going to object --

THE COURT:  Let's stay within the scope of the cross.

MS. BATSON:  Yes.  Thank you.  My redirect, yes, Your Honor.

BY MR. SKIPPER:

Q.   I want to talk about this number 6 on Buddy Williams' texts, the one you swore to before a Federal Judge.

She comes back again, she being Tracey Batson, the lead prosecutor in this case, and she asks you if you are saying that that is what Kelly Smith said.  That is what you said, right?

A.   That's what she asked me, yes.

Q.   That's what she asked you, right?

A.   She asked me that.

Q.   And your response to that was yes?

A.   Because that was what was in the text from the Defendant.

Q.   No, the --

A.   The number 6 was sent by him.

Q.   Agent, let me --

        MR. SKIPPER:  May I approach?

        THE COURT:  For what purpose?

        MR. SKIPPER:  To show him -- refresh his recollection yet again what is in the text?

        THE COURT:  You may.

BY MR. SKIPPER:

Q.   Your testimony, again, sir, before this jury was because that's what was in the text?

        MS. BATSON:  Your Honor, may I see what was handed to the witness?

        MR. SKIPPER:  It is the same document you just put in evidence.

        THE COURT:  You need to show opposing counsel anything you are going  to present to the witness, sir.

        MR. SKIPPER:  May I approach, Your Honor?

        THE COURT:  You may.

BY MR. SKIPPER:

Q.   Better yet, she is going to help me.  I am going to use her document because she asked you the question.  All right?

Do you see this document here, it says a number in front of and 6?

A.    Yeah.

Q.    And it is actually the number symbol with 6 on it, right?

A.    Yes.

Q.    Where does the word "bite" exist in this exchange right here?  Where does the word -- that text it says number -- do you know what a pound sign is?

A.    Yes.

Q.    You ever have a rotary phone?

A.    I know what a pound sign is, yes.

Q.    That's a pound sign, and it has got the number 6.  Where in this document does it say "bites"?

A.    It doesn't, but in the context of what was being sent.

Q.    That's right.  You said that after the prosecutor said to say that, correct?

A.    Well, that number 6 that was sent was sent from the Defendant.  I did not say that.  That is what he said.

Q.    No, no.  You said he said -- I want to have the court reporter read it back to you, you said that is what Kelly Smith said six bites.  He didn't say number 6.  You said, no, Ms. Batson, Kelly Smith said 6 bites.  That is what you said.

Would you agree with me that that is not a true statement?

A.    I would say that it is clear that it was an inference based on the context of the text messages that that is what I was referring to.

Q.    Do you recall six minutes ago telling this jury that Kelly Smith said six bites?

A.    It was an inference based on the context of the text message.

Q.    You don't recall saying that Kelly said six bites?

A.    If I did say that, it was because I was inferring that, based on the context of the text message, that he was referring to number 6, on the six bites.

Q.    Is that your way of saying no?

A.    That is the way of saying that is -- I guess I don't understand the full question.

Q.    Is that your way of saying no to a simple question?

A.    Ask the question again.

Q.    The question is this.  I will repeat it again.  Let me know if you don't understand it.

        You said under oath, when asked by Tracey Batson, that that is what Kelly Smith said, six bites.  And I am showing you the document, the text, the same way that you looked at Buddy William's texts that didn't saying anything about Kelly Smith liking feet before you swore to a Federal Judge.  I am showing you the text.

        Do you wear glasses?

A.   No.

Q.   Okay.  Where it says a pound sign and then the number 6. Is there the word bite, B-I-T-E, anywhere in that exchange?

A.   No, the word "bite" is not in there.

Q.   Yet you told this jury that Kelly Smith said that means six bites, right?

A.   Right.  As, again, I explained it was an inference of what it meant based on the context.

Q.   An inference?

A.   Yes.

Q.   But you didn't explain that at the time?

A.   Well, I am explaining it now, clearing it up with your questions.

Q.   Would you agree with me it is important to explain yourself when the prosecutor is asking, as opposed to waiting until I get up and have to follow up?

A.   I think you asked a clarifying question, and I am clarifying it.

Q.   Did you understand it?

A.   Yes.

Q.   You also -- you are talking about labost.  Labost is here -- L-A-B-O-S-T.  Is standing here beside them.  Not -- hozam is recalling them back --

A.   Right.  I know the difference.

Q.   You do?

A.    I testified to that.

Q.    Okay.  Well, the question made it seem like Kelly made no effort to bring the dog back in.  You are talking about heel command.  Hozam is a recall.  He is saying hozam to come back.  He had no reason to say labost.

A.    Except for that was put in the affidavit that he told him -- he gave him the heel command, and that's not what happened.

Q.    Right.  Because you've just testified you have to idea what slips and captures mean, do you?

A.    No, I don't.

Q.    Have you ever read any article from Force Science?

A.    No.

Q.    Have you ever listened to any certified Force Science analyst at any of your special agent trainings you go to in Washington, DC?

A.    We have not used force science in our training.

Q.    Okay.  You have no idea what slips and captures mean?

THE COURT:  We have already talked about this. Let's move on.

BY MR. SKIPPER:

Q.    You said yourself that you wouldn't have even gone into the trailer house?

A.    Not at that time, no.

Q.    Right.  Analyzing this like a Cowboy's loss Monday after

at the water cooler, right?

A.   I think from a reasonable officer's standpoint, that's how I am trying to look at it.

Q.   Okay.  And you are saying that Eric Tuma, apparently the commanding officer on scene and Acting Chief of Police, by virtue of that statement right there, would have been the most unreasonable officer that you have ever worked with when he told Kelly Smith to go inside that building.  Right?

A.   Yes, asked him if he wanted to make entry, and he said yes.

Q.   And Eric Tuma is the commanding officer on scene?

A.   He was the commanding officer for Hawkins PD, yes.

Q.   Acting Chief of Police?

A.   Yes.

Q.   Eric Tuma clearly could have said, Kelly, I am having buyer's remorse.  I don't want you to send the dog in. Right?

A.   Yep.

Q.   And not only did he not do that, he said, yes, I, want will you to send the dog in, right?

        And Austin Milbourn -- we all saw the video; I'm not going to replay all this -- he goes up to the trailer home and he says, police K9, come out with your hands up.  Or what?  What is the last part of that sentence?

A.   You will be bit.

Q.   You will be bit, right?

A.   Yes.

Q.   And then he says, police K9, come out with your hands up or what?

A.   You will be bit.

Q.   You will be bit.

How many times did Eric Tuma walk over there and say, hey, wait a minute now.  We just want to scare this guy.  How many times?

A.   I didn't hear him say.

Q.   Zero.  Goose egg, right?

A.   No, he did not.

Q.   And he is the commanding officer on scene?

A.   Right.

Q.   And yet you, in your non-SWAT, non-tactical opinion, would have said, despite the supervising officer on scene commanding you to send a K9 officer or use any other LTL, less than lethal, device, a 40mm, a bean bag, a taser, you would have defied that order because you, in your non-tactical opinion, wanted to wait more than 22 minutes.  Right?

A.   Yes.  Based on Kelly's own policy.  He has ultimate authority on how to handle his dog.

Q.   Do you understand that we are not here for a violation of policy; do you understand that?

A.    No, I understand that.

Q.    That is not a crime, right?

A.    Nope.  But he has the ultimate decision to send the dog in.

Q.    That's right.  Let's assume you are true.  We are not here -- this Indictment doesn't talk about people who disagree with tactical maneuvers, right?

A.    No.

Q.    Nothing is ever tactically sound, right?

A.    Unfortunately it is never perfect.

Q.    That's right.  You have the doers in law enforcement, and you have paper weights.  Right?

A.    There are people that describe it that way, yes.

Q.    That's right.

        MR. SKIPPER:  That's all I have, Judge.

        THE COURT:  Okay.

        MS. BATSON:  Just a few questions, Your Honor.

        If we can pull up 33, page 1.

                FURTHER REDIRECT EXAMINATION

BY MS. BATSON:

Q.    While we are waiting, the number 6 right here, which text message string is this with?

A.    This is with Jason Stanze, the trainer.

Q.    Okay.  The trainer of Mata?

A.    Correct.

Q.   And, again, right after the pictures is the number 6?

A.   Correct.

Q.   Now, without discussions of what you and Jason Stanze talked about, did you have conversations about this?

A.   Yes.

Q.   And from the conversations, did you infer that this six meant six bites?

A.   Yes.

Q.   Now, Mr. Skipper, Defense counsel, continues to say that Sgt. Tuma, Acting Police Chief of Hawkins PD, was in charge of the scene?

A.   Yes.

Q.   Okay.  Now, is Tuma, Sgt. Tuma, Acting Police Chief Tuma, whatever he was at that time, is he in Kelly Smith, the Defendant's, chain of command?

A.   No, he is not.

Q.   Kelly Smith is the Constable for Wood County?

A.   Yes.

Q.   Not a Hawkins PD officer?

A.   He was not.

Q.   Or constable for Hawkins PD?

A.   Correct.

        MS. BATSON:  Now, if we can go to, I think it is Exhibit 20, page 15.  Again, down at the bottom.  Highlighted this before.  Last sentence.

BY MS. BATSON:

Q.   Any K9 search may be terminated by the K9 handler or constable?

A.   Yes.

Q.   And this is in the Defendant's K9 policy?

A.   That's correct.

Q.   Okay.  So any K9 search may be terminated by him, because he is a K9 handler, or constable because he is the constable?

A.   That's correct.

Q.   So he could have called this off at any time?

A.   Any time.

Q.   Subject to his own policy?

A.   Right.

Q.   Now, when Kelly Smith got there, he was asked to do a building search?

A.   Yes.

Q.   Correct?

A.   That's correct.

Q.   A building search of the residence?

A.   Yes.

         MS. BATSON:  If we could pull up Exhibit 4A, the transcript, page 4, line 12.

BY MS. BATSON:

Q.   Okay.  And I just asked you if Kelly Smith was supposed

to do a building search?

A.   Yes.

Q.   Okay.  And so here we see Sgt. Milbourn saying, I don't know how feel about a building search, correct?

A.   Yes.

Q.   And then Defendant Smith says:  Do you want me to do a building search?

A.   Yes.

Q.   He'll clear it?

A.   That's what he says, yes.

Q.   He will clear the building?

A.   Yes.

Q.   And based on your training and experience in this investigation, what did you take that to mean?

A.   That they were going to enter the residence in order to locate where Robert Evans was within the residence.

Q.   And once, you testified before, Robert Evans is located, then the job of the dog is done?

A.   Yeah, the initial use of the dog is done at that point. That is what they went in for.

        MS. BATSON:  All right.  Thank you.  No further questions.

        THE COURT:  Okay.  Thank you.

        Anything further, Mr. Skipper?

        MR. SKIPPER:  Just briefly, Your Honor.

THE COURT:  Okay.  Five minutes or less.

MR. SKIPPER:  One minute.

THE COURT:  Okay.

FURTHER RECROSS-EXAMINATION

BY MR. SKIPPER:

Q.   You said a building search, and, again, the warnings were, police K9, come out with your hands up, or you will be bit.  Right?

A.   Yes.

Q.   He didn't come out with his hand up, and he got bit, right?

A.   I don't think that you can just say that --

Q.   Well, I just did.  I'm saying, he didn't come out with his hands up, did he?

A.   He did not come out at that time with the hands up, yes.

Q.   That's right.

And so when you testified before that he had his hands out, that helped you in the Grand Jury.  You now know that he grabbed one side of that door frame, just like this, and he was holding the door?

MS. BATSON:  Your Honor, this is outside the scope of cross, of redirect.

THE COURT:  Sustained.

MR. SKIPPER:  That is all we have, Your Honor.

THE COURT:  May this witness be excused?

221

MS. BATSON:  Yes, Your Honor.

MR. SKIPPER:  Yes, Your Honor.

THE COURT:  Okay.  Thank you, sir.  You may step down.

We will take our afternoon break at this time, ladies and gentlemen.  So stretch your legs and get some coffee.  Be ready to go at 5 to 3:00.

Thank you.

(Jury out.)

THE COURT:  Anything to discuss at this time?

MR. MACHICEK:  No, Your Honor.

MR. SKIPPER:  No, Your Honor.

THE COURT:  Okay.  We are in recess until 2:55.

(Recess was taken at this time.)

(Jury out.)

THE COURT:  You may be seated.

Ms. Batson, who is your next witness?

MS. BATSON:  Your Honor, we are calling John McQueen.

THE COURT:  Okay.  I just want to ask about your witnesses.  Are we going to watch the video over and over with each witness?

MS. BATSON:  No, Your Honor.

THE COURT:  Okay.

MS. BATSON:  I'm actually just narrowing it down to

just pages of the transcript.

THE COURT:  Okay.  Yeah, because we have all seen the video multiple times.  We've seen it in slow motion.  We got it.

MS. BATSON:  Yes, Your Honor.

THE COURT:  Okay.

(Jury in.)

THE COURT:  Okay.  You may be seated.

MS. BATSON:  Your Honor, our next witness is John McQueen.

THE COURT:  Okay.  Mr. McQueen, if you would proceed to the witness chair and raise your right hand to be sworn.

THE WITNESS:  Yes, sir.

(Witness sworn.)

THE COURT:  You may be seated.

MS. BATSON:  May I proceed, Your Honor?

THE COURT:  You may.

MS. BATSON:  Thank you.

JOHN MCQUEEN, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. BATSON:

Q.   All right.  Can you pull the mic closer to you and speak into the mic, please?

A.   Yes, ma'am.

Q.    And state your name?

A.    John McQueen.

Q.    And how are you employed?

A.    Wood County Precinct 3 Constable.

Q.    Okay.  How long have you been the Constable for Precinct 3?

A.    Since January 1st of '21.

Q.    Okay.  And what was your prior experience before becoming a Constable?

A.    I have been in law enforcement since 2002.  I have worked in Big Sandy, Tyler ISD Police Department, Gladewater, and the Wood County Sheriff's Office.

Q.    Okay.  And so what is the total number of years in law enforcement?

A.    A little over 21 at this time.

Q.    How many people are in Hawkins?

A.    1300, a little over 1300.

Q.    And do you also volunteer with the Hawkins Fire Department?

A.    Yes, ma'am.

Q.    And how long have you done that?

A.    Since 2004.

Q.    Do you recall what year you graduated from the Police Academy?

A.    2001.  And I had to wait until 2002 to be sworn in on my

21st birthday.

Q.    Okay.  All right.  While you were in the Police Academy, did you receive training on use of force?

A.    Yes, ma'am.

Q.    Okay.  And what is the general rule about how much force a law enforcement can use?

A.    To only use the amount of force necessary to get the offender in custody without injuring them or yourself.

Q.    Is it safe to say that all officers know this rule?

A.    Yes, ma'am.

Q.    Can you use force to punish somebody?

A.    No, ma'am.

Q.    Can you use force if you are frustrated with somebody?

A.    No, ma'am.

Q.    Or if you are angry with them?

A.    No.

Q.    Now, have you heard of the use of force continuum?

A.    Yes, ma'am.

Q.    Okay.  Let me ask you about what is the least -- or the range on the force continuum?

A.    Verbal commands would be the lowest, all the way up to deadly force.

Q.    Okay.  And then what is soft controls?

A.    Soft controls would be soft hands, such as placing someone in hand restraints or guiding them, you know, towards

your car as they are in restraints.

Q.   Okay.  And with soft controls, is that a low risk of injury?

A.   Yes.

Q.   So what is hard controls?

A.   Strikes, kicks, like ASP baton.

Q.   Okay.  And something that can cause physical injury?

A.   Yes, ma'am.

Q.   Okay.  What is non-lethal force?

A.   Such as pepper stray, or OC.  It's called OC spray.  Or a taser.

Q.   Okay.  And what is lethal force?

A.   Your firearm.

Q.   Okay.  Now, based on your training and experience, is it safe to say that law enforcement officers have to have a legitimate reason to use force?

A.   Yes, ma'am.

Q.   Is it also safe to say that, in your training and experience, that a law enforcement officer must assess the situation at any given time to see if the force is required?

A.   Yes, ma'am, because it can change.

Q.   All right.  Now, have you ever -- what is the general rule for a reporting use of force?

A.   You need to report it to your supervisor if you use it.

Like, normal agencies would have a sergeant or lieutenant or whatever, you would report it up to the chain to them.

And then, like myself, I use COPsync as a reporting system.  And whenever I arrest someone, if I have to use force, I do a use of force and send it to the DA's office with an offense report.

Q.   And that's because you are the Constable?

A.   Right.

Q.   So you don't have an immediate supervisor?

A.   No, ma'am, I work for the voters in my precinct.

Q.   Much like the Defendant?

A.   Yes, ma'am, just like.

Q.   Now, much has been made about an individual by the name of Robert Evans.  And does Robert Evans -- do you know his mother, Cheryl Evans?

A.   Yes, ma'am.

Q.   Do you know Robert Evans?

A.   I have met him, yes, ma'am.

Q.   You met him when?  Was it recently?  Or during this incident?  Or did you know him before this incident?

A.   I knew who he was before this.

Q.   Knew who he was?

A.   Yes, ma'am.

Q.   Because the town is only like --

A.   The town is very small.

Q.    All right.  And when -- there were warrants out for Mr. Evans's arrest?

A.    Yes, ma'am.

Q.    Is that correct?

A.    Yes, ma'am.

Q.    And did he call you?

A.    He did, about a week before.

Q.    And what did he say?

A.    He said that he knew he had the warrants.  He said he was in Louisiana working to get bail money, and asked if he could either turn himself in at Wood County Sheriff's Office by having somebody drop him off, or if he could turn himself in to me and me book him in.

Q.    And why did he want to turn himself in to you?

A.    He did not -- he said he did not trust the Hawkins Police Department because of recent issues in their department.

Q.    Okay.  Do you happen to know what those issues are?

A.    It was something with the former police chief, who is no longer there.

Q.    All right.  So Robert Evans called you.  Does he live in your precinct?

A.    Yes, ma'am.

Q.    Okay.  Is he your friend?

A.    No.

Q.   Have you been to his house to eat?

A.   No.

Q.   Y'all gone out to eat?

A.   No.

Q.   What about with his mother?

A.   No.

Q.   All right.  So if it was represented to this jury during jury selection that y'all are friends, would that be credible?

A.   No, that would be a lie.

Q.   Now, on July 25th of 2022 -- you said he called you a week before?

A.   Yes, ma'am.

Q.   On July 25th of 2022, did you go to the residence at 199 Ruth Street --

A.   Yes, ma'am.

Q.   -- in Hawkins?

          And for what purpose?

A.   The Hawkins sergeant, Sgt. Tuma, had called me on the radio and asked me to come over for a warrant search.

Q.   And did you go?

A.   Yes, ma'am.

Q.   When you got there, when you arrived, what information were you provided?

A.   Sgt. Tuma said that they had stopped by the house to

serve the warrants, said the subject looked out the window or the door, and then shut the door and went back inside.

Sgt. Tuma said there was a hole -- said something about there being a hole in the floor of the residence.  So I went to the south end.  It is a mobile home.  And so they are up off the ground.

I went to the south end of the mobile home where the underpinning was off of it.  Because if somebody was going to go through the floor of the house, they would need to come out where the underpinning is missing.

Q.   Okay.  So was like a perimeter kind of set up?

A.   Yes.

Q.   And who was there when you got there?

A.   When I arrived on the scene, it was Sgt. Tuma and Officer Newell with Hawkins Police Department.

Q.   Okay.

A.   Tuma was in front, Newell was on the north end, and I ended up on the south end of the trailer.

Q.   Okay.  So y'all had mostly all of the trailer covered?

A.   Yes, it was a single-wide mobile home.

Q.   So you were set up on perimeter.  And then did other officers arrive?

A.   Yes, ma'am.

Q.   And so how long were y'all set up on this perimeter before other officers got there?

A.   Not very long.  I don't know the minutes.

Q.   Okay.  And who else arrived?

A.   First, it was Sgt. Austin Milbourn with the Wood County Sheriff's Office, and then Constable Smith arrived.

Q.   Okay.  And so when Austin Milbourn came and then Defendant came, were y'all still setting up on the perimeter?

A.   Yes, ma'am.

Q.   Okay.  Y'all weren't just standing around, just hanging out?

A.   No.  I was on the south end, Newell was on the north end, and Tuma was in the front.

Q.   So if it was implied that y'all were just hanging out and waiting for other officers to arrive, that would be also not credible?

A.   True.  The body cam would show that also.

Q.   Okay.  Now, prior to the Defendant's arrival, did anybody come out of that residence?

A.   Yes, ma'am.

Q.   And do you know who that person was?

A.   I believe his last name is Graham.  I am not sure on first name.

Q.   Okay.  Did you see him exit?

A.   Yes, ma'am.

Q.   And was he carrying something when he exited?

A.   Yes, ma'am.  He had a pipe wrench; about an 18- or 24-inch pipe wrench.

Q.   Okay.  Can you show how kind of how big that would be?

A.   (Witness demonstrates.)

Q.   Is that big enough to be a weapon?

A.   Absolutely.

Q.   All right.  And was force used on him to get him to drop that weapon?

A.   No, ma'am.  I gave him verbal commands to drop the pipe wrench -- or the wrench, and he did so.  And made his way off the steps to Sgt. Tuma.

Q.   So you gave him a verbal command?

A.   Yes.

Q.   And he complied?

A.   Yes.

Q.   And, again, that is one of the lowest ranges on the use of force spectrum?

A.   Yes, ma'am.

Q.   All right.  So once the Defendant arrived at the location, what happened after that?

A.   Constable Smith went and made contact with Sgt. Tuma with the Hawkins Police Department.  And I believe Austin Milbourn, the sergeant from the Sheriff's Office, and I remained on the south end.

Q.   Okay.  At some point was it decided that the K9 would be

deployed?

A.   At some point they decided that in their conversations. I was not over there.

Q.   You were not a part of that?

A.   No, ma'am.

Q.   Where you were, could you hear attempts to -- or see attempts to get into the house?

A.   Yes.

Q.   And who initially was trying to get into the house?

A.   It was Constable Smith and Sgt. Milbourn with the Sheriff's Office and K9 Mata were on the porch.  Sgt. Milbourn was kicking the door and was unsuccessful.

Q.   Okay.  He wasn't able to breach it?

A.   No, ma'am.

Q.   Do you know if he kicked it a few times, many times?

A.   It appeared a lot.

Q.   All right.  And then when they couldn't get in, what happened?

A.   Constable Smith asked me to lend them a hand.  So I made my way to the porch.  The trailer house had like three glass doors -- or a door and then three glass -- or windows beside it.  They had a tarp in front of it.  So I pulled down the tarp so I could see in.

     And I didn't want to -- kicking it, I didn't want my foot to go through the glass, you know, and injure

myself.  So I kicked the door, and the door came open.

Q.   Okay.  And so you were the one who breached the door?

A.   Yes, ma'am.

Q.   Okay.  So once the door was opened, what did you see? What is the first thing you saw?

A.   A dog -- or a dog from inside the house came out.  Once I breached the door, I got back down on the ground.  Sgt. Milbourn and Constable Smith were up on the porch.  The K9 comes from inside the house, not the police one, just I guess the home owner's dog.

Sgt. Milbourn leads it off the porch.  I am standing on the ground.  Constable Smith goes in and is yelling for Evans to come out.  And he has his dog with him.

Q.   Okay.  So there is a dog?

A.   A home owner's dog.

Q.   And then Sgt. Milbourn takes the dog out of the house?

A.   Uh-huh.

Q.   And off the porch?

A.   Yes, ma'am.

Q.   All right.  And you are still standing at the door?

A.   Yes -- well, on the ground.

Q.   On the ground.

Okay.  And was the home owner's dog aggressive?

A.   No.

234

Q.   Okay.  Now, who entered the house first?

A.   Constable Smith.

Q.   All right.  And with K9 Mata?

A.   Yes.

Q.   All right.  Was he alone?

A.   Yes.

Q.   Have you ever heard of the term "fatal funnel"?

A.   Yes, ma'am.

Q.   And what is that?

A.   That is where you get trapped in an area where you can't take cover.  There is no cover for you to take.  And it is deadly.  If somebody comes out with a gun or something, you are basically a sitting target.

Q.   Okay.  Would a hallway in this trailer be considered a fatal funnel?

A.   Yes.

Q.   And you said there is nowhere to take cover?

A.   No, ma'am.

Q.   And there is no safe spot?

A.   Huh-uh.

Q.   Can you tell the jury what the difference is between cover and concealment?

A.   Concealment conceals you where you can't be seen.  Cover does that also.  It makes it where you can't be seen, but it also -- it would be like the difference between being behind

a brick wall and being behind a sheet metal wall.  The brick wall will provide you some protection from ammunition rounds.

Q.   Okay.  All right.  Now, you said the Defendant went into the residence, along with K9 Mata?

A.   Yes.

Q.   Where were you?

A.   On the ground beside the porch.

Q.   All right.  At this point had you gone in the house?

A.   No, ma'am.

Q.   All right.  So what, if anything, could you hear was going on inside the house from your position?

A.   I could hear Constable Smith yelling for Mr. Evans to come out.  And I could hear Mr. Evans saying something about if the dog was put up, he would come out.

Q.   So you heard Mr. Evans communicating with the Defendant?

A.   Yes, ma'am.

Q.   Okay.  Did you hear the K9 warnings being given before --

A.   Sgt. Milbourn gave K9 warnings before the door was breached outside.

Q.   All right.  And then, again, what did you hear Mr. Evans saying?

A.   Something about if the dog was put up, he would come

out.  Put his dog up, or something along those lines.

Q.    And what were you hearing the Defendant saying?

A.    He said something about, you are barricaded subject.  I am not putting the dog up, or something along those lines.

Q.    And did you hear Evans continue to communicate with Mr. Smith?

A.    Yes.

Q.    Okay.  Now, based on your training and experience, once you know that a subject is barricaded but communicating with law enforcement, what is the sound tactical thing to do, how to proceed?

A.    The sound tactical thing to do, in my opinion, would be to back out and try and keep communication with them in a safe distance away from them.

Q.    But that is not what happened here?

A.    No.

Q.    Okay.  So at some point did you enter the residence?

A.    Yes, ma'am.

Q.    All right.  And then what did you do when you went inside?  Oh, first, what did you observe when you went in, and then what did you do?

A.    When I entered the residence, Constable Smith and K9 Mata were standing outside the bathroom door where Mr. Evans was at.

Q.    And how did you know he was in there, in the bathroom?

A.    The verbal communication between -- Constable Smith said something about come out.  And Evans said something about he was trying to -- he was taking a shit and trying to wipe his ass.

Q.    Okay.  So you could hear that?

A.    (Witness nods.)

Q.    And so did that lead you to believe that Mr. Evans was in the bathroom?

A.    Yes, ma'am.

Q.    All right.  And from the communications and the area where the bathroom was at, was that consistent?

A.    Yes.

Q.    So when you went in, you said you saw the Defendant standing in front of the bathroom door?

A.    Yes.

Q.    Was he directly in front of it?

A.    Yes, like I am standing -- or like I am sitting at this desk.

Q.    Okay.  And, again, was that a tactically sound position?

A.    Not if someone had a firearm.

Q.    All right.  If you believed they had a firearm, would you stand right in front of the door like that?

A.    I would not.

Q.    And why not?

A.   Because they can shoot through the door.

Q.   Okay.  All right.  And at some point did you push the bathroom door open?

A.   Yes.  Constable Smith asked me to give him a hand.  So I pushed on the top.  I believe it was the left corner of the door.

Q.   All right.  And when you pushed on the door, was there any resistance?

A.   Not when I pushed on it.

Q.   It just came open?

A.   Yes, partially.

Q.   Now, much has also been made about hands.  Did you ever see Robert Evans's hands?

A.   In the video I did.  I didn't see it -- I didn't notice it out there.

Q.   Uh-huh.

A.   The day on the scene.  But after rewatching the video, I saw at least one of his hands come out the door.

Q.   At least one?

A.   Yes.

Q.   And do you remember whose video you watched when you saw that?

A.   I believe it was mine.

Q.   Okay.  All right.  So at least one hand?

A.   Yes, ma'am.

Q.   Now, did you ever enter the bathroom?

A.   No, ma'am.

Q.   All right.  Did anybody else ever enter the bathroom?

A.   Sgt. Milbourn with the Sheriff's Office.

Q.   All right.  Now, we have seen how small the hallway and the bathroom is.  Right?  Did -- how did Sgt. Milbourn get into the bathroom?  Because it is you --

A.   He came around me --

Q.   Uh-huh.

A.   -- and made his way in.  He is much smaller than I am.

Q.   Okay.

A.   Could have played a role in that too.

Q.   How tall are you?

A.   Six four.

Q.   All right.  So once Sgt. Milbourn entered the bathroom, you have the Defendant and then Sgt. Milbourn and then you?

A.   I was in the hallway.

Q.   Uh-huh.

A.   And then Mr. Evans's dog came back in.  I guess it -- whoever had it outside didn't hold it.  It came back in.  And it was not in an aggressive manner.  But, you know, how dogs will play with other dogs and nip at them with his mouth.  He was doing that to the back of K9 Mata's legs.

     With the trailer house hallway being so narrow, I didn't want there to be a dog fight, especially with me in

the middle of it.  So I grabbed the other dog and led it outside.

Q.    Okay.  Now, prior to the other dog coming back in -- and you said the dog wasn't aggressive?

A.    No, he was in a playful manner.

Q.    Okay.  All right.  Did you hear anything that was going on in the bathroom before the dog came back in?

A.    A struggle.

Q.    All right.  And could you hear what Evans was saying?

A.    Not really.  I heard Constable Smith saying something about let go of my dog, or something like that.

Q.    And you didn't hear anything, or you didn't recall anything what Evans was saying?

A.    He said something about, call your dog off, or something along those lines.

Q.    Okay.

A.    There was a lot going on.

Q.    All right.  We have watched the videos quite a bit.  We don't want to watch it again.  But we will go through some of the parts of the transcript.  Okay?

A.    Yes, ma'am.

Q.    All right.  Now, when you take the dog out, do you stay outside?

A.    I take it out off the porch, and then when I come back, I stay at the main doorway going into the trailer home.

Q.   Okay.

A.   So right there at the threshold.

Q.   Okay.

          MS. BATSON:  Your Honor, may I set this up?

          THE COURT:  You may.

BY MS. BATSON:

Q.   Can you see that?

A.   Yes, ma'am.

Q.   Can you still see it?

A.   Yes, ma'am.

Q.   Okay.  Constable McQueen, where are you --

          MS. BATSON:  Can he step down, Your Honor?

          THE COURT:  You may.  You can step down.

BY MS. BATSON:

Q.   Can you tell the jury, please, where you were?

A.   I was right here at this threshold of this door.

Q.   Okay.  That is after you took the dog out?

A.   Yes, ma'am.

Q.   All right.  And at some point, did you go back in?

A.   No, ma'am, I stood there.

Q.   You just stood there.

          Okay.  You can sit back down.

          Were you able to see anything that was going on down the hallway from where you were standing right there.

A.   Yes, ma'am.

Q.   All right.  Can you tell the jurors what you observed?

A.   As I was standing there, the -- as I was standing there, Constable Smith, Sgt. Milbourn were still in the hallway -- or in the bathroom, sorry.  Sgt. Tuma, with Hawkins, was in the hallway.

Then the dog, of course, came back.  And I let -- I had to get it.  But before I led the dog back off the porch, K9 Mata was dragging Mr. Evans down the hallway from the bathroom towards the front door.

Q.   Okay.  So the dog -- the home owner's dog got away -- how many is it, three?

A.   Yes, I believe so.

Q.   Okay.  And so you removed it from the residence --

A.   From inside the residence.

Q.   -- the second time?

And then it got away again?

A.   I removed it from the residence, and I went back to the door.  And that is when K9 Mata was dragging Mr. Evans down the hallway.

And then shortly thereafter, the dog came back, and I led it off of the porch and handed it off physically, and told Officer Newell to hold the dog.

And while I was doing that, there was a priority call that came out over the county channel for a burglary in progress.  So after I took it to Newell, I never went back to

the porch.

Q. Okay. All right. But then -- so what you observed was Mata dragging Evans down the hallway?

A. Yes, ma'am.

Q. All right. And I believe in your report it says that it was the left foot?

A. Yes, ma'am, that's what I put on there. After watching the video, I realized it was the right foot. But as you are standing over someone and they are in the hallway and the dog is dragging them, I got confused of which foot it was.

Q. Okay. But you are clear about what you saw?

A. Yes.

Q. That the dog dragged him?

A. Yes.

Q. Did you see the dog, K9 Mata, run out with the shoe?

A. I saw it run past the door -- the door frame there. Like, on your drawing where it says "front door," it came from that direction and went past the doorway going that direction, not out of the house.

Q. Okay. Did you see a shoe?

A. Yes.

Q. It was carrying a shoe?

A. Yes, ma'am.

Q. You just didn't take it out of the house?

A. No.

Q.   Okay.  Now, when K9 Mata was dragging Mr. Evans down the hallway, were you able to see Mr. Evans's hands?

A.   Yes.

Q.   Both hands?

A.   Yes, ma'am.

Q.   All right.  Did he have any weapons in his hands?

A.   No, ma'am.

Q.   As he was being drug out?

A.   No, ma'am.

Q.   Were there any weapons next to him that he could have grabbed?

A.   I didn't see any, no.

Q.   When Mr. Evans was getting drug down the hallway, what, if anything, did you hear him say?

A.   He asked for the dog to be called off.  And Constable Smith made a statement that said, once you are handcuffed, the dog will be called off.

Q.   Okay.  You said you subsequently left the scene?

A.   Yes, ma'am.

Q.   And why?

A.   There was a priority call for burglary in progress in my precinct, and I was the closest person to it.  I heard the other units checking en route, but they were coming from Quitman.

Q.   All right.  So but before you left the scene, and we

will talk about that, while you were there, did you receive a call from Robert Evans's mother?

A.   Yes, ma'am.  I received a call from Cheryl Evans as I was walking to the south end of the mobile home.

Q.   Okay.  And was that on your -- you have a work phone and a personal phone?

A.   It was on the county cell phone.

Q.   And does your county cell phone alert you to who it is that is calling?

A.   Yes, ma'am, it is set to where -- like, if I have you in my contacts, it will say your name, and then it will ring.

Q.   And that is your county phone?

A.   Yes, ma'am.

Q.   And why did you have her name in your county phone?

A.   She is one of the constituents, and I have had to serve civil papers to her and her family before.

Q.   Okay.  And she is one of the 1300 people --

A.   Yes.

Q.   -- that live in Hawkins?

A.   Yes.

Q.   All right.  And, again, y'all aren't friends?

A.   No, ma'am.

Q.   All right.  Now, did you answer that phone call?

A.   I did not.  I silenced it so it would quit ringing.

Q.   All right.  Now, after you left the scene -- did you

ever talk to her while you were out there at the scene?

A.    No, ma'am.

Q.    Okay.  So after you left the scene, did she call you again?

A.    She did.  She called me when I was getting ready to clear the burglary call.  It ended up being a neighbor seeing someone go to their house -- it was okay for the people to be there, but it was an overcautious neighbor.  So it wasn't a burglary.

She called me when I was clearing that scene, and asked if I could transport Robert Evans to the hospital for Hawkins and then to the jail for Hawkins.

Q.    Why did she ask you to do that?

A.    Because of the trust issues with Hawkins PD.

Q.    Okay.  Oh, let me back up just a little bit.

How did Cheryl Evans know to call you while you were there at the house on Ruth Street?

A.    I can't say for sure, but I would believe it would be because she has a daycare and business across the street from that trailer home.

Q.    Okay.

All right.  Now, when she called -- you said she is a constituent in your precinct, so when she called you at either time -- well, getting into the first time -- the second time, you did answer?

A.   Yes, ma'am, I did.

Q.   And you talked to her?

A.   Uh-huh.

Q.   And was she wanting a copy of your video recording of her son's arrest?

A.   Not when she called me while I was at the other call. She called later, a few days later, and requested that.

Q.   How many days later?

A.   I would have to look at the report.  I am not sure, ma'am.

Q.   Okay.  So when she called you to ask you for the video recording, what did you tell her?

A.   I told her I would work on it and get it done.

Q.   And did she file a formal request?

A.   Yes, ma'am.

Q.   And did you provide it to her?

A.   Yes, ma'am.

Q.   Now, did you watch your video the same day of the incident?

A.   No, ma'am.

Q.   All right.  When did you watch your video?

A.   The next day when I did the report.

Q.   Okay.  And why didn't you write the report that day?

A.   Honestly, it was after time for me to go home, so I went home.

Q.   So now the incident was July 25th, 2022, correct?

A.   Yes, ma'am.

Q.   So the next day, on July 26th, 2022, did the Defendant call you?

A.   Yes.

Q.   And approximately what time did he call you?

A.   Seven something in the morning.

Q.   When he called you, what did he say?

A.   He asked if my report was ready and my body cam was ready, and had made a statement that we have to be on the same page.

Q.   Okay.  Now, he called you early, 7:00 o'clock in the morning?

A.   Yes, ma'am.

Q.   And asked you for your video and your supplement?

A.   Yes, ma'am.

Q.   So what is the difference between a supplement and an offense report -- supplemental report --

A.   And offense report is where you are charging somebody criminally.  With an offense, and you are going to be sending it to a prosecutor for consideration of prosecution.

A supplemental report would be if I show up to assist someone, but I am not actively the one filing criminal charges on them but the other officer is, I would do a supplement report for my part, what I did while I was

there.

Q.   Okay.  So you were responsible for writing a supplement?

A.   Yes, ma'am.

Q.   And then the Defendant asked you if you had your video and your supplement?

A.   Yes.

Q.   And what did you tell him?

A.   I told him I did not.

Q.   Okay.

A.   I told him I would have it ready later that day.

Q.   And then he said, we have to be on the same page?

A.   He said, we have got to be on the same page.

Q.   And what did you take that to mean?

A.   I didn't really think about it then.

Q.   You didn't think about it at that time?

A.   No.

Q.   Now, you watched your video and wrote your report the next day?

A.   Yes, ma'am.

Q.   On the 26th?

A.   Yes.

Q.   And what did you do once you wrote that?  Did you contact the Defendant and tell him that you had it ready?

A.   No.  I told him I would have it -- when he called that morning on the 26th, I told him I would have to ready that

day.  I assumed he would call back later, and say, hey, do you have it ready?  I never heard from him other than the next day --

Q.   Now, before we go to the next day, let me ask you this: I asked you the difference between an offense report and a supplemental report, but I didn't ask you what an affidavit is.

A.   An affidavit is a sworn document that you turn in, to present your charges to the court.

Q.   Okay.  And you filed this with the court?

A.   Yes.

Q.   And swear that what is contained in the affidavit is true and correct?

A.   Yes.  Well, file it with the DA's office and then the court, yes.

Q.   But, again, it is sworn to, everything in it is true and correct --

A.   Yes.

Q.   -- is that correct?

All right.  So then that was the 26th.  The Defendant called you that morning.  Did you hear from him again the next day, on the 27th?

A.   Yes, ma'am.

Q.   Okay.  About what time?

A.   I am not sure.  I think it was 8:00 or 9:00, 10:00

somewhere in there.

Q.   But in the morning?

A.   Yes, ma'am.

Q.   All right.  And then what did y'all talk about?

A.   He asked if I had the supplement report done and the body cam, and I said, yes.  I told you yesterday I would have it.  And he had made the statement again.

Q.   Made what statement?

A.   Got to be on the same page.

Q.   So this is the second time in two days?

A.   Yes.

Q.   Did you know now what it meant?

A.   I had a feeling, but not 100 percent.  So I asked him if he was working as the Constable that day.  And he said, no, that he was -- currently he was at his gun store, and that he would be there an undisclosed amount of time.

So I told him I had to go to the -- office in Quitman and turn in paperwork, and I would make contact with him when I left Quitman and see where he was at and what he was doing, whether he was doing Constable or still there.

Q.   Okay.  And you said he had an idea about what he meant.  What were you thinking?

A.   Well, I felt like -- at that point I didn't know anything about the bathroom situation.  I didn't know anything about the -- what went on in the bathroom.  But, to

me, the dog, K9 Mata, dragging Mr. Evans down the hallway was uncalled for.  So I thought maybe that was what he meant.

Q.   Okay.  All right.  And when you saw K9 Mata dragging him down the hallway -- Mr. Evans down the hallway, did that cause you some concern?

A.   It did.  Actually, I went home that night, and my wife was like, what's wrong with you?  Oh, nothing.  Just some stuff at work.  Because I don't go into details with my wife about work because I don't want her to stress no more than she has to.

So then I was thinking, I was like, well, you know, there is a statute in the Code of Criminal Procedures that says that you shall, shall report -- if you believe there is excessive force, you shall report it to the supervisor.

So, like Constable Smith, I don't have a direct supervisor.  We work for the people that vote us into office. I first made contact with a special agent with the Texas Department of Public Safety, who I have worked with before.

And I asked him, I said, hey, is this something that, you know, I could cover my bases by reporting it to maybe the Rangers or OIG, you know, because it says I have a duty to report it.  So I need to do that.

He said, no, he said, it wouldn't be any of those folks.  He said he had a contact at the FBI.

Q.   And when you say "he," who is your friend?

253

A.    Zachary White.

Q.    Okay.  All right.

A.    He said he had a contact at the FBI that he had worked narcotics cases before and sent me Agent Crowell's number and told me -- he said, call him and see if -- if he can't help you, maybe he can point you in the right direction of who to report it to, so at least you have reported it, and you have covered what you are obligated to do.

Q.    Okay.  So let's back up just a little bit.

On the day that -- the second time when the Defendant called you and said you had to be on the same page, he said he was working at his gun store?

A.    Yes, ma'am.

Q.    Does he own a gun store?

A.    I believe so.

Q.    All right.  Did you meet him at the gun store?

A.    I did.

Q.    And did you give him your video and your report?

A.    Yes, ma'am.

Q.    All right.  And did he review your video or your report at that time?

A.    He kind of just thumbed through the report.  He didn't review the video because we were in the parking lot.

Q.    All right.  And then, based on -- you said on your duty to report, then you contacted -- eventually contacted Agent

Crowell?

A.   Yes, ma'am.

Q.   And the duty to report is -- what does it say?

A.   It says -- I may be off a few words here, but it says if an officer witnesses excessive force, that they shall make a detailed report to their supervisor.

Q.   Okay.  There is a duty and it says "shall"?

A.   It says "shall."

Q.   And it specifically says excessive force by another officer?

A.   Yes, yes.

Q.   And you only saw the dragging down -- the dog dragging him down the hallway?

A.   Yes, ma'am.

Q.   And that is what you reported initially?

A.   Yes, ma'am.

Q.   At some point did you obtain any other videos?

A.   Yes, ma'am.  Sgt. Tuma with Hawkins PD knew that I was going to Quitman to the courthouse, and he asked if while I was in Quitman, if I could obtain a copy of Sgt. Milbourn's body cam and Milbourn's supplemental report so Hawkins could attach it to their case file.

Q.   Okay.  And did you do so?

A.   Yes, ma'am.

Q.   All right.  And once you obtained Sgt. Milbourn's video,

255

what did you do next?

A.   I gave it to Sgt. Tuma, and he watched it on his computer, and I watched it with him.

Q.   So you and Sgt. Tuma watched Milbourn's -- Sgt. Milbourn's video together?

A.   Yes, ma'am.

Q.   Now, once you observed Sgt. Milbourn's video, what did you think?

A.   I felt like I definitely needed to report it to someone.

Q.   Okay.  But you had already made contact?

A.   Yes.

Q.   Had you met with Agent Crowell by the time you saw Milbourn's video?

A.   I think we had talked on the phone.  I'm not 100 percent sure we met in person.

Q.   Now, once you observed Milbourn's video, what did you -- what do you recall observing on the video?

A.   The struggle in the bathroom.  There was a couple punches to the face, and one when Mr. Evans was standing up.

Q.   Okay.  A punch when he was standing up?

A.   Yes, ma'am, on the corner of the -- I believe it was the bathtub, bathtub/shower combo, whatever.

Q.   Was that a punch that knocked him to the bathroom

floor?

A.    Yes, ma'am, he fell on his knees.

Q.    All right.  Did you have any concern about those punches?

A.    I did.

Q.    And why?

A.    Because there was, in my opinion, my professional opinion, there was no reason to do it.

Q.    Did you see Mr. Evans resisting at any point?

A.    I saw him on the video.  He had ahold of the dog's harness, but the dog was trying to bite him.  I think anybody -- tried to grab the dog's harness to keep it from biting.

Q.    Did you ever see Mr. Smith like punch the dog or punch the Defendant?

A.    Mr. Smith punch the dog?

Q.    I'm sorry, Mr. Evans punch the dog?

A.    Oh, no.

Q.    Or the Defendant?

A.    No.

Q.    Did you see a plunger in play on the video, do you recall that?

A.    I saw a plunger that the dog grabbed and went to leave the restroom with it.

Q.    Okay.  Did you ever see Evans with a plunger in his

hand, swinging it?

A.    I did not.

Q.    Okay.  Did you ever see the Defendant with his hands on Mr. Evans?

A.    Yes.  After Mr. Evans was punched in the corner of the shower, he fell to his knees, and his hands were like over his head.  It was like he was trying to protect his head.  And Constable Smith was resting his hands on the Defendant's shoulder -- or on Mr. Evans's shoulders, and calling his dog back.

Q.    Okay.  Now, you are a law enforcement officer, over 21 years experience.  Was there -- the point that you are talking about, that is when Mr. Evans has his head -- hands like this, and the Defendant has his --

A.    Yes.

Q.    -- hands on his shoulders?

A.    Yes, ma'am.

Q.    At that point, could Mr. Evans have been taken into custody?

A.    In my opinion, yes.

Q.    All right.  And is that what you would have done --

A.    Yes.

Q.    -- that situation?

       But that is not what happened?

A.    No, ma'am.

Q.   Okay.  And you said you recall from the video the Defendant calling the dog back?

A.   Yes.

Q.   And do you know what the commands are?

A.   No.

Q.   No.  Okay.  But based on what you observed, a command was given and the dog came back?

A.   It was a different language.

Q.   Okay.

A.   I didn't think he was speaking to any of us.

Q.   All right.

     Again, we are not going to watch the video.  But you've watched your video since then; isn't that correct?

A.   Yes, ma'am.

Q.   All right.  So I will just point out a couple of things in the transcript.

     MS. BATSON:  If we could go -- let's start at page 5.

BY MS. BATSON:

Q.   And I think it is going to be displayed on the screen. So it is Exhibit 3A, page 5.  Do you see it in front of you?

A.   Yes, ma'am.

Q.   All right.  Now, let's start with you on page 8.  So when you say under the house, under the house, what are you

referring to, line 8?

A.   Yeah, I am looking.  You just blew it up real big.

Oh, I was trying to explain to Constable Smith that there was a hole inside the house, or we believed there was a hole inside the house that Mr. Evans could get through and get under the house.

Q.   Okay.  And then after that, line 13, is this the K9 announcements or warnings that you testified to that Sgt. Milbourn gave?

A.   Yes, ma'am.

Q.   And then this portion where the Defendant says, hey, John, you got a leg?  Oh, I'm sorry.  It's on line 17?

A.   Yes.

Q.   And what was going on there that he asked you that?

A.   Sgt. Milbourn was not able to get the door breached open.

Q.   Okay.  And so you got a leg, he's asking you to come help?

A.   Yes, ma'am.

Q.   All right.  And then the Defendant says, you want to swap with him so he can cover that end.  What does that mean?  That is on line 22?

A.   I have no idea.

Q.   Okay.  Were y'all still in the perimeter?

A.   At this point I believe I had made my way to the

porch.

Q.   Okay.  Was the perimeter still set up?

A.   Yes.

Q.   All right.

     Okay.  Page 6, line 3, where the Defendant is telling you, donkey kick that thing, and that is telling you to open the door?

A.   Yes, ma'am.

Q.   Okay.  And then you, in fact, did again, right?

A.   Yes, ma'am.

Q.   All right.  And then, again, entry was made?

A.   Yes, ma'am.

Q.   All right.  And then on line 10, we see Evans saying, my hand are up.  I am trying to wipe my butt or what he says there.  Do you see that?

A.   Yes, ma'am.

Q.   Okay.  And then do we hear the Defendant giving Mata a command?  And you don't know what hozam means, do you?

A.   No, I don't.

Q.   All right.  Page 7, line 1, do you see where Evans is saying, will you put the dog up?

A.   Yes.

Q.   Okay.  And he says, I don't have any weapons; do you see that?

A.   Yes.

261

Q.   All right.  And then the Defendant says, put your shoulder in that door, he is talking to you?

A.   Yes.

Q.   And then that is when you do it, and the bathroom door opens but no resistance?

A.   Right.

Q.   Okay.  All right.  And then we see the Defendant saying foogosh or foogosh --

A.   Right.

Q.   -- do you hear that -- or see that?

     And then Evans says, don't bite me B-I-T-C-H?

A.   Right.

Q.   And this is all picking up on your camera?

A.   Right, on my audio.

Q.   On your audio, okay.

     And then the part, let go of my dog.  Let go of my dog.

A.   Yes.

Q.   All right.  And then the command is again, foogosh, right?

A.   Yes.

Q.   Do you hear that that -- or see that?

A.   Yes.

Q.   Okay.  And then you indicated that Sgt. Milbourn went into the bathroom, again, after the dog came out?

A.    Yes, ma'am.

Q.    All right.  So if we look at page 8, line 22, is this the part where Milbourn is saying, what do you want me to do, Kelly, tell me?

A.    Yes.

Q.    And then what is the response from the Defendant?

A.    Whatever the first word is and then takedown and then the word again.

Q.    Command to the dog?

A.    Yes.

Q.    It is not English?

A.    No.

Q.    All right.  And then page 9, line 2.  And do we see Evans going, ow, ow, ow, help me?

A.    Yes.

Q.    Okay.  Line 11.  Ow, ow?

A.    Uh-huh.

Q.    Do you see that?  All that was Mr. Evans.

Line 13, ow, ow, ow, get the dog off me; do you see that?

A.    Yes.

Q.    Okay.  And then the Defendant tells him at line 15, when you are handcuffed, we will get him off?

A.    Yes.

Q.    Then you have Evans say, ow, cuff, cuff?

A.    Yes.

Q.    So he is asking to be cuffed?

A.    Yes.

Q.    In order to get the dog off.

All right.  Let's see, line 23, you indicate, not vicious.  She is not vicious -- or Newell says, she's not vicious, she's just concerned?

A.    Yeah, that is when I handed off the -- that is when I handed off Mr. Evans's dog to Officer Newell.

Q.    Okay.  So at no time was the pit bull, the home owner's dog, vicious?

A.    No, I wouldn't have grabbed it by its collar around its neck if it was.

Q.    Okay.  Now, based on your review -- and, of course, because you reported it to the FBI, and what you observed, did Evans pose a threat to this Defendant, in anything that you have observed?

A.    Not in my opinion.

Q.    And you thought the force was excessive why?

A.    Well, the dragging down the hallway when he could have been handcuffed.

Q.    And then?

A.    And then the punches in the bathroom.  And now that I have been made aware, the bite commands to the dog, I assume that is what it is on here.

Q.    Okay.  Now, you said you are six four?

A.    Yes, ma'am.

Q.    And do you know how big Mr. Evans is?

A.    Not six four.

Q.    Do you know how big or tall the Defendant is?

A.    Not really.

Q.    Is Mr. Evans smaller than you?

A.    Much.

Q.    Okay.  Is he smaller than the Defendant?

A.    In my opinion, yes.

Q.    Okay.  And you stated that Mr. Evans was cornered in the bathroom?

A.    Yes.

Q.    And then Kelly Smith, the Defendant, was in here?

A.    Uh-huh.

Q.    And he is bigger than Mr. Evans?

A.    Uh-huh.

Q.    And then who is behind him?

A.    The dog.

Q.    No, who's behind -- what person is behind him?  Sorry. That was a bad question.

A.    I'm sorry.  Sgt. Milbourn.

Q.    And you are in the hallway?

A.    Yes.

Q.    So, based on your training and experience and what you

know about the situation in the small bathroom, was Mr. Evans going to be able to get out of that bathroom?

A.    No.

Q.    Now, you said you watched this video with Sgt. Tuma?

A.    Yes, ma'am.

Q.    And then after watching it, did he share your same beliefs?

MR. SKIPPER:  I'm going to object to that, Your Honor, as hearsay.

THE COURT:  Sustained.

BY MS. BATSON:

Q.    And you testified earlier about affidavits, sworn affidavits?

A.    Yes, ma'am.

Q.    And in your position in 20 years, 21 years of law enforcement, have you ever had to file affidavits?

A.    Yes, ma'am.

Q.    All right.  Is it important to be truthful and accurate when preparing your affidavit before submitting it to the Court?

A.    Yes, ma'am.

Q.    All right.  And why is that?

A.    Because what you put on the paper ultimately affects an individual and their families, you know.

Q.    Okay.  Especially when it is an affidavit for an arrest

warrant?

A.   Yes, ma'am.

Q.   Okay.  All right.  And in your review of the video, did you hear any commands being given to Evans that he could comply with?

A.   No.

Q.   Okay.  Were the only commands given to the dog?

A.   Yes, ma'am.

Q.   And did you -- did you see the plunger being swung at the Defendant?

A.   No, I saw the dog grab the plunger leave the room with it -- or try to leave the room with it.

Q.   Okay.  Now, you testified before the Grand Jury in Sherman, correct?

A.   Yes, ma'am.

Q.   Okay.  And was that on or about September 15th?

A.   Yes, ma'am.

Q.   And when you were either going to the Grand Jury or coming back from Grand Jury, did the Defendant call you?

A.   He called me on my way home from the Grand Jury.

Q.   All right.  And did you answer?

A.   No.

Q.   Did you send him to voicemail?

A.   I declined it, just like I did Ms. Evans on the scene out there when she called me.

Q.    Okay.

MS. BATSON:  May I have a minute, Your Honor?

THE COURT:  You may.

MS. BATSON:  Your Honor, I will pass the witness.

THE COURT:  Okay.

Mr. Skipper.

MR. SKIPPER:  I'm sorry, are we going to do a break now?

THE COURT:  No, let's go ahead.

MR. SKIPPER:  Yes, Your Honor.

CROSS-EXAMINATION

BY MR. SKIPPER:

Q.    Constable McQueen, you just stated that you didn't see any commands given to Robert Evans that Robert Evans could have complied with, right?

A.    Correct, didn't hear them.

Q.    Oh, you didn't hear them.

Would you agree with me that, get your hands off my dog, is a command that can be complied with?

A.    Yes.

Q.    And would you agree with me if someone doesn't comply with that command and keeps their hands on the dog, that that command would most likely be given again?

A.    Yes.

Q.    Until that person either complies with the verbal

command or the use of force continuum increases with punches to make that individual comply, correct?

A.    Negative.

Q.    Correct?

A.    No.

Q.    That's a no?

A.    That's a no.

Q.    Okay.  You would not have done that, is that your opinion?

A.    I would not have punched someone because they had ahold of the dog's harness while it was trying to bite them.

Q.    Okay.  And you are not a K9 guy?

A.    I am not.

Q.    Never been trained in K9s?

A.    No, sir.

Q.    But your opinion as to what you would have done is just to allow that person to defy the commands and keep his hands on the K9's harness?

A.    No, my opinion would have been to grab the subject's hands and place him in custody.

Q.    Right.  If you could have done that, right?

A.    Yes.

Q.    Okay.  And you are six four?

A.    Yes.

Q.    If you had been stuck in that bathtub cuffing a guy

sitting Indian style?

A.    I'm sorry.  Can you repeat?

Q.    At six four, you would have had no problem with that tight space, sitting inside a bathtub, cuffing Robert Evans?

A.    No.

Q.    Okay.

And you have been trained -- did you go to Kilgore Police Academy?

A.    I did.

Q.    All right.  And you have been trained in Kilgore Police Academy to try to put handcuffs on a guy in a situation like that, that would be safe?

A.    I was trained on how to try and put handcuffs on a person after he had been sprayed with OC, so I think that would be safe.

Q.    Okay.  You just mentioned that Kelly Smith called you on the day back from Grand Jury on September the 15th, and you immediately declined to answer the call like you did with Cheryl Evans --

A.    Yes.

Q.    -- when you were sitting outside the trailer?

A.    Yes.

Q.    And that you are not friends with the Evans family?

A.    No, sir.

Q.   Yet from July 25th of 2022 to January 26th of '23, you spoke with Cheryl Evans 48 times for 4.2 hours on that phone.

A.   Uh-huh.

Q.   And that is what you did with every constituent in the Hawkins on --

A.   That is what I do with the ones that I have to serve civil papers to regularly.

Q.   That's a lot of civil papers?

A.   It is.

Q.   For the Evans's family, isn't it?

     And you actually take his sister to court when the she misses her court date?

A.   No.

Q.   You've never done that?

A.   No.

Q.   Her sister, Heather?

A.   I offered to go pick her up and bring her to court for truancy court.

Q.   That's right.  She missed her court date because she is not having her kids go to school, right?

A.   Yes, sir.

Q.   All right.  And you offered to do that because you had a friendly relationship with Cheryl?

A.   No.  I offered to do that to other people.

Q.   All right.

A.   Because your kids don't go to school is no reason for the judge to -- if you are down on your luck, it is no reason for them to put you in jail.  Your kids still aren't going to go to school if you are in jail.

Q.   Mr. McQueen, my point is that Heather -- you are familiar with sister, Heather, right?

A.   Yes.

          MS. BATSON:  Your Honor, objection.  Relevance.

          THE COURT:  Overruled.

BY MS. BATSON:

Q.   And you are getting me to my next point about, now that we have established you have spoken to Cheryl over 4.2 hours, it wasn't just some dismissive turning the phone off, I want to make sure I heard your testimony correctly that you just said that on July 26th, the day after this incident happened, that Kelly called you?  You are shaking your head.  Is that a yes?

A.   Yes, sir, 7:00 o'clock in the morning, there about.

Q.   7:00 o'clock in the morning.  About a five-minute phone call, right?

A.   Yes.

Q.   And he asks about your supplement, your report, and your body camera, right?

A.   Yes.

Q.   And that is common with you guys because you have got to

file the case with the local elected DA, right?

A.   Correct.

Q.   And then you said just now that Kelly said, we all need to be on the same page?

A.   Yes, sir.  He said, we have got to be on the same page.

Q.   We have got to be on the same page?

A.   Yes.

Q.   During that conversation.

Yet at that time, you said you had no idea what that meant.  You never asked what he meant by that?

THE COURT:  You need to be sure and verbalize your answers yes or no.

A.   Could you repeat the question?

BY MR. SKIPPER:

Q.   You said -- you told the prosecutor that you had no idea what that meant?

A.   At that time I was not sure, yes.

Q.   And if you are not sure about it, talking to Kelly would -- when you asked him and said, hey, what do you mean by we all need to be on the same page, what did he say?

A.   I didn't ask him.

Q.   You didn't ask him?

A.   No, sir.

Q.   Okay.  And this phone call on July 26th was after the phone call you made through Zachary -- is it White?

A.   Yes.

Q.   That hooked you up with James Crowell, right?

A.   Yes, sir.

Q.   That was a 23-minute phone call you had with James Crowell?

A.   Yes.

Q.   You have seen your phone records, right?

A.   Yes.

Q.   And because there was no report made of that phone conversation, what did you tell James Crowell?  23 minutes is a long time.

A.   I explained the reason why I was calling him.  I told him what I saw.

Q.   Okay.  And because you had already initiated contact with -- he is a Special Agent, you know he is a Special Agent of the FBI, and then you have had a subsequent phone call the very next day, the guy who you have just communicated with James Crowell about calls you at 7:00 a.m. and says words to the effect of -- or the connotation of which you think were important, we need to be on the same page.  You didn't ask Kelly Smith what he even meant by that?

A.   No, sir.

Q.   Did you call James Crowell and tell him what happened,

274

before you went to see him that Monday on August 1st?

A.   Yes, I spoke to officer -- or Agent Crowell.

Q.   You did.  After that phone conversation -- just as a timeline, I want to keep it brief.

July 25th, 2022, was a Monday.  You go home.  Like a lot of spouses, you don't want to get into the day's mess -- my wife is a prosecutor -- of what's going on, you know, compartmentalize?

A.   Right.

Q.   And you wait until the next day.  Kelly Smith calls you that Tuesday morning at 7:00 a.m., right?

A.   Yes.

Q.   I'm just trying to get to the bottom of this whole quote you just said, we need to be on the same page.

And after Kelly Smith says that to you and you don't ask him what he means by that, even though he is the guy you just talked to the FBI about, did you then call James Crowell back and say, hey -- do you call him James or Mr. Crowell?

A.   I don't recall if I called him back or not.

Q.   Do you call him James or Mr. Crowell?

A.   Agent.

Q.   You call him agent?

A.   Crowell.

Q.   Okay.  Agent Crowell.

Did you call him after that and say, Agent Crowell, you might want to know this, considering I am having really bad feelings about what I saw yesterday.  Kelly Smith just called me this morning at 7:00 o'clock when he was asking me to provide my supplement and said, we need to be on the same page.  I would assume you did that, did you not?

A.   I don't recall calling him back.  We discussed it when I was at their office in Tyler.

Q.   When you were in their office in Tyler; is that right?

A.   Yes.

Q.   Is that a yes, sir?

A.   Yes.

Q.   And then you just said that, in fact, Kelly Smith called you -- or you called him the next day, Wednesday, July 27th?

A.   He called me.

Q.   He called you.

This is where -- he has an FFL, federal firearms licensee.  He has a gun store called Armed Texans, right?

A.   Yes, sir.

Q.   So did you drive out there to Armed Texans to drop off all of your stuff?

A.   Yes, sir.

Q.   And you are saying, again, at the gun store next to his home out in Mineola is where on Wednesday, July 27th, he

again said, hey, we need to be on the same page?

A.    No, sir, not at the gun store.  It was on the phone.

Q.    Was it on the phone prior to you going to the gun store?

A.    Yes.  It was Wednesday morning.

Q.    7:00 a.m. again or around that time?

A.    It was a little bit later the next day.  It was a little bit later on Wednesday than it was on Tuesday.

Q.    Okay.  And then you exchanged the information for Kelly to allow him to go file his cases of interference with a police K9 and resisting arrest.  Correct?

A.    Yes, sir.

Q.    After that meeting with him on Wednesday in which you just described this phone call when he repeated himself, we need to be on the same page, did you then call -- you call him Agent Crowell -- back and say, hey, guess what, he has now told us -- "he," being Kelly, has now said this to me two times in a row?

A.    I don't believe I called him.  I believe it was when we were -- when I had the meeting in Tyler.

Q.    Okay.  So you waited that day, you waited Friday, Saturday, and Sunday until you walk into the FBI building here on Golden Street to tell Agent Crowell that information, right?

A.    Yes, sir.

Q.   And in there was Agent Crowell was his colleague Steph Davis, right?

A.   Yes.

Q.   And, also, in that room was a guy by the name of Eon Hedrick, right?

A.   I believe so.  There was another agent in there.

Q.   Before we get to the meeting of August the 1st, when you met Kelly at Armed Texans, his gun store, after you talked to him over the phone on Wednesday, July 27th, and he handed you your supplement, offense report, and the body camera footage -- pardon me, vice versa, you transferred that to him, right?

A.   Yes.

Q.   Did you then take it upon yourself to say, Kelly, what did you mean by this phrase, we need to be on the same page? You said it the other day, and now you have said it again. What did he tell you when you asked him that?

A.   I didn't ask him what he said.  I didn't ask him the meaning of his phrase.

Q.   You wouldn't want to do that, since you have got an appointment with the Special Agents of the FBI the following Monday?

A.   No, sir.

Q.   Okay.  When you met with the FBI on that Monday, do you recall telling them that Robert Evans was resisting and not

showing his hands?

A.   I don't recall.

Q.   Have they not gone over their notes with you at all?

A.   Not really.

Q.   Is that a no?

A.   No, sir.

Q.   All right  Would it surprise you that is what they said you said?

A.   If that is what they said.

Q.   Do you believe that is what you said, if their notes say it?

        MS. BATSON:  Your Honor, is he trying to impeach the witness with the agent's notes?

        THE COURT:  Why don't counsel approach.

        (Bench conference.)

        MR. SKIPPER:  I will move on.  I am moving on.  I am going to get through with this quick.  Yes, sir.

        THE COURT:  Okay.

        (Bench conference concluded.)

BY MR. SKIPPER:

Q.   Agent McQueen, with regard to the statement about Kelly Smith calling you, when you went in on August the 1st on that Monday, you just said he called you one time and said, we need to be on the same page?

A.   He called me the Tuesday following the incident that

morning and then Wednesday morning following the incident.

Q.   You just told them that he called you one time and said, we need to be on the same page.  Do you remember that?

A.   I don't believe so.

Q.   You don't?  You said he called you two times two days in a row, and each time he said, we need to be on the same page?

A.   The incident happened on Monday.

Q.   Right.

A.   He called me on Tuesday morning.

Q.   Right.

A.   And the statement was made.  And then he called me Wednesday morning, and the statement was made.

Q.   I am asking you if you told them -- because the first thing the FBI tells you is, just give us your honest assessment?  You never told the FBI that Kelly Smith called you twice and said, we need to be on the same page?  The conversation was that when he called you Tuesday morning on the 26th, right?

A.   (Witness nods.)

Q.   That's when you said that he said we need to be on the same page?

A.   Yes, sir.

Q.   And you are saying at some point you went back and told the FBI that he called you twice and said the same thing?

A.   He did call me twice.

Q.   Did you tell it to the FBI on August the 1st?

A.   I don't recall.

Q.   Did they not show you any of your statements that you made, with their notes?

A.   Yes, sir.

Q.   You have read them?

A.   A few weeks again I went to pretrial.

Q.   You went to pretrial?

A.   Or whatever it is called, yes, sir.

Q.   Okay.  And do you recall you gave a statement on August the 1st of 2022?

A.   Yes.

Q.   Then they met with you briefly on Friday, August the 12th of 2022, right?

A.   I believe so.

Q.   Met or talked to you.  I think over the phone.  Ms. Batson was on the phone call of September the 13th of 2022?

A.   Okay.

Q.   Do you recall that?

A.   I mean, not the date specifically, but I remember talking to them on the phone.

Q.   October 31st of 2022, another meeting, another interview, report?

A.   Phone call?

Q.   Interview.

A.   At the Tyler office?

Q.   An interview could have been a phone call or in person.

A.   Okay.

Q.   November the 23rd of '22; do you recall that?

A.   Not date specific.  I do remember meeting with them.

Q.   And when you met with them for pretrial, did they give you the documents, and you actually held them in your hand?

A.   No.

Q.   They didn't.

They just read you what their notes say?

A.   No, they were on like a screen.

Q.   A screen.  So you could see it.  You could see this document and prep put up on a screen?

A.   Yes, along with my body cam.

Q.   I want to make sure.  I'm having a hard time on your response.

A.   I'm sorry.

Q.   They put the documents up on a screen for you to review?

A.   The documents were on the table.  The body cam was on the screen.

Q.   Okay.  And at what point did you ever tell the Government that what I said -- what the Government agent said that I said on these particular dates is untrue?  When did

282

you say?

A.    I never said that.

Q.    Okay.  So you adopted those versions as your own?

A.    No, sir.

MS. BATSON:  Your Honor, there is confusion about what he was provided.  May we approach?

THE COURT:  Well, why don't you move on.  I think he has testified that he doesn't recall telling the FBI how many times Mr. Smith contacted him.  I think you can move on past that point.

BY MR. SKIPPER:

Q.    You mentioned that Robert Evans has never been to your home?

A.    No, sir.

Q.    Would there be any reason why he knows where you live?

A.    A lot of people know where I live.  I drive a marked patrol car.  It sits in my front yard.

Q.    Would there be any reason -- my question is not regarding a lot of people.  My question is, would there be any reason why Robert Evans knows where you live?

A.    I live on a public road.  I mean, I guess he could have drove down and seen the car there.

Q.    Are you familiar with the exchange he is having with Adam Newell as Adam is driving to the hospital, and he is talking about cat-fishing holes over there by your house?

A.    No, sir.

Q.    I want to get into the initial response by you on July 25th of 2022.  All right?

A.    Yes, sir.

Q.    And you arrive on the scene.  Already there are Eric Tuma and Adam Newell, right?

A.    Yes, sir.

Q.    And Eric Tuma is, at that point, the Acting Chief of Police, right?

A.    Sergeant and acting, yes.

Q.    Right, he is the Acting Chief of Police because Manfred Gilow has since resigned, right?

A.    Right.

Q.    You told the jury that Robert Evans's distrust with the Hawkins Police Department had to do with the resignation of Manfred Gilow; that's what you said, right?

A.    Yes, sir.

Q.    Well, his distrust is with the Hawkins Police Department because they are the ones who put the warrants on him that he was on the run for 34 days?

A.    And other things going on that the Chief was doing in town that were questionably illegal.

Q.    Sure.  But you didn't mention the first part of that, right?

A.    I mean -- I mean, they knew he had the warrants.

Q.   They put them on him?

A.   Right.

Q.   You said that there is an initial call from Eric Tuma to you.  Because that day you are out at the school --

A.   Yes, sir.

Q.   -- because kids are getting ready to get back to school from summer break, right?

A.   Yes.

Q.   That is Hawkins High School, the Hawkins Hawks, right?

A.   Yes.

Q.   And I want to make sure we are all on the same page.

     What you told the jury is that the information that you received from Eric Tuma, was that on the radio?

A.   Yes, sir.  He had called me on the radio for the warrant service.  Being in the school, I did not have good reception.

     At that time the Hawkins Police Department had what they called Zello.  It is where you can use your cell phone as long as you have WiFi or a good signal.  And it works just like the radio in your car.  So I was able to get back ahold him the phone -- the radio.

Q.   Right.  Because that information that was just discussed with the jury about the hole, the possible hole being over there on the south side, that wasn't shared over the radio signal?

A.   No, sir.

Q.    Because when you show up on the video, obviously, you are saying -- and you said there is a hole under the trailer here, that is a private phone call that you made to the Zello phone to Eric Tuma, right?

A.    It was over the radio.  Everybody in the county can hear it.

Q.    Well, it wasn't over the radio, the evidence that is before this jury, was it?

A.    I used Zello, push to talk.

Q.    Okay.  Let me ask this a different way.

        Are you saying that the radio communications that are on these videos, right -- give me your call sign?

A.    453.

Q.    453.  Right?

A.    Uh-huh.

Q.    Four stands for what?

A.    I don't know.  3 is the precinct.

Q.    Okay.  You just know the last digit for the precinct?

A.    Right.

Q.    That is why Kelly is 452; you are 453?

A.    Right.

Q.    When we hear these radio calls on the video, are you saying the radio calls we hear on the video, you are using Zello?

A.    If I was at the school.  If it was prior to my arrival,

prior to when I got back in my car at the school, yes.

Q.   Will you agree with me, sir, that when you show up and you are talking to Eric Tuma and you are walking away and you said there was a hole in the bottom of the trailer, nowhere in any of this evidence in front of this jury right now is there any radio traffic between you or Adam Newell and Eric Tuma about there being a hole in the bottom of the trailer on this evidence that is before this jury?  Do you understand my question?

A.   Yes, sir.  You are wanting to know how I knew there was a hole in the floor of the trailer.

Q.   That's exactly what we all want to know.

A.   Yes, sir.  Hawkins PD had relayed the information.  They had been trying to get Mr. Evans, not just that day, previous days.

Q.   Right.  And he had been around.  He had put a little fritito (phon.) over there in Jennifer Evans's garage.  All these guys -- you knew he was back in town, right?

A.   I did not.

Q.   You didn't?

A.   No, sir.

Q.   When you sat down with the agents on Monday, August the 1st, you didn't tell them that Robert Evans had actually contacted you a week prior to his arrest when he was in Louisiana trying to raise bond money, did you?

287

A.   No, sir.

Q.   You didn't tell them that Robert Evans trusted you enough to surrender himself to you, and you only, when you went and talked to the FBI on August 1st, 2022, did you?

A.   No, sir.

Q.   When they spoke with you again on Friday, August the 12th, to obtain some other information in this case, you didn't tell the FBI that Robert Evans had reached out to you a week prior wanting to turn himself in, did you?

A.   No, sir.

Q.   And you didn't tell them that he wanted to turn himself in to you because he trusted you?  You didn't disclose that, did you?

A.   No, sir.

Q.   The next report from September the 13th of 2022, you did not inform the FBI again --

MS. BATSON:  Your Honor, again, is counsel trying to impeach this witness with the statements written by the agents?  This is completely improper.

MR. SKIPPER:  It is not completely inappropriate, Your Honor.  He has already admitted to reviewing all of the statements in pretrial prep --

MS. BATSON:  No.

MR. SKIPPER:  -- simple questions that he can recall.

MS. BATSON:  Your Honor, may I clarify?  May I ask the witness --

THE COURT:  Why don't we pause here and take another short break.  And all of my instructions that I have previously given you apply.

So break until 4:30.

(Jury out.)

THE COURT:  Okay.  You may be seated.

Mr. Skipper, what is the question that is pending?

MR. SKIPPER:  The question is just that he hasn't, up until October 31st, made that statement about Robert Evans reaching out to him.  I will make the point.

THE COURT:  Okay.  What is your objection?

MS. BATSON:  Your Honor, Defense counsel has implied in front of this jury that this witness has adopted the 302s from the agents, and that is not correct.  And if I could clarify, while I am standing here and we are not in the jury's presence, what he reviewed because it was not the 302s from the agents.

THE COURT:  Okay.  You can do that.

EXAMINATION

BY MS. BATSON:

Q.  So during pretrial, you said that your video was up on the screen and that there were papers on the table?

A.  Yes, ma'am.

Q.   And were they the transcripts that hadn't been married up yet to the video?

A.   They were whatever was on the screen earlier.

Q.   Right.  The words?

A.   Yes.

Q.   So the transcript, the paper form was on the table that you reviewed --

A.   Yes.

Q.   -- while the video was playing?

A.   Yes.

Q.   Did you review your offense report?

A.   Yes.

Q.   All right.  And did you also review your Grand Jury testimony?

A.   Yes.

Q.   Did you ever review reports of the agents?

A.   No.

Q.   Thank you.

          MS. BATSON:  That's it.

          THE COURT:  Okay.  Go ahead, Mr. Skipper.

          MR. SKIPPER:  I don't have a comment.  I just wanted to approach the bench briefly before we adjourn for the break after we are done.

          THE COURT:  Okay.  We can do it now.

          We will be in recess until 4:30.

(Bench conference.)

THE COURT:  Do you want this on the record?

MR. SKIPPER:  Yes, Your Honor, if it is okay.

Your Honor, I am going to ask -- I know Your Honor made a ruling on, according to --

(Reporter cannot hear the bench conference.)

(Open court.)

THE COURT:  If y'all could keep your voice down so we can hear on the record up here.  If you don't mind going out in the hallway for any conversations.

(Bench conference continued.)

MR. SKIPPER:  Because of the way that the testimony has come in about these statements and what Kelly Smith said, and if the Court is not inclined to change its ruling, I would at least request that we be allowed to make an offer of proof on the record in case --

THE COURT:  Questioning --

MR. SKIPPER:  Yes, sir.  While we have a break.

THE COURT:  Okay.  Why don't we do it at 4:25?

MR. SKIPPER:  Okay.  Thank you.

MS. BATSON:  Your Honor, just so I am clear, outside the presence of the jury and these witnesses, can we clear the courtroom, that there is nobody in here?

If you are going to ask him about that.  It is not about your Defendant.  It is the recording was --

MR. SKIPPER:  The Judge is here.  I don't know why you are talking to me.

MS. BATSON:  Because I am trying to reason with you about revisiting the Court's order.  The Court has already ruled on this in a pretrial.

THE COURT:  I am not changing my ruling unless I hear something completely different.

MR. SHOOK:  He is just asking to make a record.

THE COURT:  He is just making a record.

MR. SHOOK:  That is about our client.

THE COURT:  Are you asking for the public to be cleared from the courtroom?

MS. BATSON:  If we are going to talk about the recording that has nothing to do with their client.

MR. SKIPPER:  That is problematic.  Well, it is a public forum --

THE COURT:  But there are times when it is appropriate.  If he is going to discuss an ongoing investigation, that would be inappropriate --

MR. SKIPPER:  I am not telling you, Judge, I want the record to be sure, what you can do.  I just want to make sure if they are going to close it -- I'll be quiet.  I had a prior experience with it, and that is fine.  I will leave it at that.

MS. BATSON:  Your Honor, by his line of questioning

he is creating the issue that now he wants to address.

MR. SKIPPER:  I am just putting an offer of proof on, Your Honor, is all I am doing.

THE COURT:  Understood.

MR. SKIPPER:  That's all I'm doing.

THE COURT:  Okay.  We will meet back in 10 minutes.

(Bench conference concluded.)

(Recess taken at this time.)

(Jury out.)

THE COURT:  We are going to proceed with, Mr. Skipper, the question we discussed?

MR. SKIPPER:  Yes, Your Honor.

THE COURT:  I am going to ask the public to leave the courtroom at this time.  This is going to be something to be heard outside the presence of the jury, and it may involve some other confidential information.

(Courtroom sealed.)

(This portion of the transcript is sealed and filed under separate cover as Sealed Transcript.)

(Courtroom unsealed.)

(Jury in.)

THE COURT:  Okay.  You may be seated.

Mr. Skipper.

MR. SKIPPER:  Thank you, Your Honor.

BY MR. SKIPPER:

Q.   Constable McQueen, when you are in the hallway with Mr. Smith and you see the door, it is clear from you that Robert Evans is pushing back on that door, correct?

A.   Constable Smith would push on the door, and it would come back, yes.  When I pushed on it, there was no resistance on it.

Q.   Right.  When you came over and pushed on it, it just happened to be -- whatever he did, being Robert Evans, the door came open, correct?

A.   Yes, when I pushed on it, it came open.

Q.   And at that point in time, you determined it was necessary to unholster your taser, correct?

A.   Yes, sir.  I had my holster -- or my taser in the low ready, yes.

Q.   And I am not getting on to you, just the audio --

A.   I am so sorry.

Q.   You had it in the low ready, right?

A.   Yes.

Q.   And that means?

A.   Not fully extended.

Q.   Sure.  But the red dot is painting the back of Kelly Smith, right?

A.   Yes.

Q.   Whatever you observed up until that time and at that time warranted the unholstering of your taser weapon,

correct?

A.    It was better to be safe than sorry, sir.

Q.    Better to be safe than sorry?

A.    Yes.  When I clear a house, I -- if there is two of us, if there are two officers clearing a house, one normally has less lethal and one lethal.

MR. SKIPPER:  Okay.  That's all we have, Your Honor.

THE COURT:  Okay.  Ms. Batson.

MS. BATSON:  No further questions, Your Honor.

THE COURT:  Okay.  May this witness be excused?

MS. BATSON:  Yes, Your Honor.

THE COURT:  Okay.  Thank you, sir.  You may step down.

MS. BATSON:  Can he be completely excused, Your Honor?

THE COURT:  Any objection?

MR. SKIPPER:  No, Your Honor.  Yes, that's...

MR. MACHICEK:  Your Honor, the United States calls Austin Milbourn.

THE COURT:  Okay.

(Pause in proceedings.)

THE COURT:  Sir, if you would please raise your right hand to be sworn.

(Witness sworn.)

THE COURT:  Have a seat.

AUSTIN MILBOURN, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MACHICEK:

Q.   All right, sir, if you will pull that microphone up close.

And if you would please state your name for the jury.

A.   Austin Milbourn.

Q.   With whom are you employed?

A.   The Wood County Sheriff's Office.

Q.   What rank do you hold?

A.   Patrol lieutenant.

Q.   Patrol lieutenant.

Are you a certified peace officer?

A.   Yes, sir.

Q.   For how long have you been a certified peace officer in the State of Texas?

A.   Since of December of 2016, about six-and-a-half years.

Q.   Prior to your employment with the Wood County Sheriff's Department, have you worked for any other law enforcement agencies?

A.   Yes, I worked for the Quitman Police Department for four years.

Q.   And you indicated that you are a patrol lieutenant.

What are you your responsibilities as a patrol lieutenant?

A.    I supervise basically every shift.  I work with the sergeants, for supplies, scheduling, questions, policies and procedures, just make sure we are following everything.

Q.    And do you have any other responsibilities with the Wood County Sheriff's Office?

A.    Yes, I am also a K9 handler.

Q.    And are you familiar with the Defendant in this case, Kelly Smith?

A.    Yes.

Q.    How are you familiar with him?

A.    We worked in the same county.  We trained together.  I have known him basically my whole career, law enforcement career.

Q.    Have you socialized with him outside of work?

A.    Yes.

Q.    Would you consider him to be one of your friends?

A.    Yes.

Q.    If you could, for the purposes of the record, would you identify Constable Smith by an article of clothing he is wearing?

A.    Light blue shirt with a blue tie.

        MR. MACHICEK:  Your Honor, I would ask that the record reflect that the witness has identified the Defendant in open court.

THE COURT:  It will so reflect.

BY MR. MACHICEK:

Q.   Lt. Milbourn, I understand that this probably isn't an easy thing for you.  I want to ask you a question here on the front end about why it is you are testifying.  Do you have a reason why you are testifying here today?

A.   Yes, because I was there when the incident occurred.

Q.   And are you testifying because you dislike the Defendant or you have some sort of animus towards him?

A.   No.

Q.   In fact, you are friends with the Defendant?

A.   Yes.

Q.   Okay.  I want to talk to you a little bit about your background as a K9 handler.

How does somebody go from being a patrol officer to being a K9 handler?  How does that process take place?

A.   Typically, you would be selected by somebody in the administration to go through the training.  Sometimes it is an award, sometimes you are just chosen based off your work ethic and capabilities and stuff like that.

Q.   And about when were you chosen to go through the training?

A.   I went through the training in April of 2021.

Q.   Did you go to school anywhere?

A.   Yes.  I went to Pacesetter K9, which is located in

Liberty Hill, Texas.

Q.   And Liberty Hill, Texas, where is that in relation to -- closest major city?

A.   Closest to Austin.

Q.   And I don't know if I asked you this, prior to working with Quitman PD or with the Wood County Sheriff's Office, where are you from?

A.   I'm from Mineola, Texas.

Q.   And is Mineola in Wood County, Texas?

A.   Yes, sir.

Q.   Now, you indicated that you attended the Pacesetter school in Liberty Hill.  Can you describe for the jury the classes and the training that you undertook in that program?

A.   Yes.  So I went there for three weeks.  Basically, the first two weeks would be going over narcotics detection. Teaching us how to observe the dog's change in behavior. Their alert to the narcotics.  General upkeep of the dog. Just your basic narcotics detection.

        The last week, which would be the third week, was over tracking.  So, basically, teaching us how to read the dog, how to track, how to train tracking, just your basic level entry on a tracker.

Q.   For clarification purposes, would your K9 be classified as a single-purpose K9 or a dual-purpose K9?

A.   He would be classified as a single-purpose K9.

Q.   Can you give the ladies and gentlemen of the jury an idea of what the distinction is there?

A.   He is considered a single purpose, so his main purpose would be narcotics detection, but he also tracks.  So he couldn't -- he is not an apprehension or what you would consider a bite dog.  He just tracks and locates narcotics.

Q.   And, Lt. Milbourn, how is it that you are assigned a particular K9?

A.   There is a selection process.  So these places that train you, they also sell the dog.  So you would go down there and basically evaluate dogs, and then choose the one you felt was the best fit for you and your agency.

Q.   And what is your current K9's name?

A.   Jois.

Q.   Can you spell that for us?

A.   J-O-I-S.

Q.   J-O-I-S, Jois.

A.   Jois.

Q.   All right.  I'm not going to try to say that too many times.

        What language does Jois speak?

A.   Czechoslovakian.

Q.   Okay.  And you said Jois is a single-purpose K9.  So does Jois have a bite command?

300

A.   No, he does not.

Q.   Within the spectrum of commands that you have, have you ever had occasion to give the wrong command accidentally when you really meant to give a certain command?

A.   None that stick out to me, no.

Q.   Okay.  And you indicated that the same kennel that trained you, the Pacesetter down in Liberty Hill, is that the same kennel from which Jois was assigned to you?

A.   Yes, that's where he came from.

Q.   Okay.  And when you received your K9, was he already trained to perform certain tasks?

A.   So he was still kind of considered green, so they had taught him some things.  But, in all reality, I guess they kind of trained us together.  Not completely green, but he wasn't ready to go 100 percent either.

Q.   Okay.  And when we are talking about training a K9, is it conceptually fair to say that when you are training the K9, you are also training the handler?

A.   Yes.

Q.   Okay.  And during the three-week academy that you went through in Liberty Hill at Pacesetters, what were the types of things that you were focusing on?  Was it general concepts in training, or was it very specific scenario-based training?

A.   I would say there is a little bit of both.  There was

some classroom where they went over certain things.  But for the vast majority of it, it would be actually performing the exercises.

So they would have narcotics on vehicles, in luggage, in lockers, just different places inside.  Hide narcotics in pastures.  Just a vast array of stuff.

Tracking, it would start out very small, so maybe 50-yard tracks in an open pasture with nothing there, and then you would progress to longer tracks, maybe through the woods, and stuff like that.  Like a progression.

Q.   While you were training in the three-week program in Liberty Hill, were you able to acclimate your K9 to the entire universe of possible scenarios it might encounter once you got it back here to Wood County?

A.   No.

Q.   So how do you do that with a K9, once you take it from the academy and bring it to your home jurisdiction, what do you do to acclimate your K9 to the different situations it is going to see here in the local jurisdiction?

A.   I would say just in training, you need to train in different environments.

So for me and my dog what that would be is hiding different amounts of drugs in different places just to get it more experience all the way around.

Q.   Do you acclimate your K9 to deal with other

externalities, like noise?  Say, if you are going to be on a
highway, to acclimate them to highway noise?

A.   Yes.  If you had some sort of environmental issue where
maybe the dog didn't perform as well near the highway, you
could do more of that to try to acclimate it.

Q.   And is this training process sort of an ongoing
exercise, to build on successes or to work on failures?

A.   Yes.

Q.   And how often are you training?

A.   We try to train every week.  We don't always get it
every week.  That is the idea.  Sometimes it is too hot, or
you are sick, or you can't get off patrol, or whatever it may
be.  But that is our goal.

Q.   About how many hours are you shooting for?

A.   A minimum of 16 per month, but if we got more, that is
just better.

Q.   And when you are training, is it just you and your K9,
or are you working in a group of K9 handlers and their own
partners?

A.   It could be all the way from just myself, but typically
you are going to see a group.  We try to meet up and go to
different places and learn different things.

Q.   Well, I want to ask you how you respond to certain
things in the field versus how you respond to them in
training.

If you are working with your K9 in the field and you experience a failure in performance or failure in deployment, what do you do in training to address that?

A.    You would try to recreate whatever you struggle with, and then try to teach the dog through it.

Q.    Are you familiar with the concept of not ending on a failure?

A.    Yes.

Q.    Can you explain what that is to the ladies and gentlemen of the jury?

A.    From the way that I was taught, you don't want to end on a failure.  You would like to end on a good note where the dog wins, a positive note.

Q.    Okay.  And so in training, if you have a situation where your dog is failing to perform the task commanded, are you going to -- what are you going to do to address that in a training environment so that you don't end on a failure?

A.    In my opinion, you would need to make it less difficult for the dog to win.

So, say, if you are trying to do a long track and the dog failed, you should do a shorter track, and try to work them through it.

Q.    Okay.  And when you say "win," within this paradigm, this training paradigm, what is a win?

A.    Success.  I mean, the dog did what you wanted it to do.

He found the person that you were tracking.  He found the narcotics that were hidden.

Q.    So if the dog performs the task that was commanded, is that a win?

A.    Yes.

Q.    Okay.  And how is the dog rewarded?

A.    So my dog is rewarded with a toy.

Q.    What kind of toy does Jois get?

A.    A red cone.

Q.    Okay.  My dog gets the red cone with the peanut butter inside it.  Does Jois get that?

A.    I don't give him peanut butter, no, sir.

Q.    Okay.  Now, this concept of not ending on a failure, in a training environment, how does that differ from if there is a failure during a real live deployment in the field?

A.    Well, there is really not much you can do on a failure in the field.  It just kind of is what it is.

Q.    So if you experience a failure in the field, as a K9 officer, what are you expected to do?

A.    I would think you need to go retrain at a training.  If you don't know how, you should reach out to somebody that is more experienced, and they could help you through it.  Or reach out to your vendor, which would be Pacesetter for me.

Q.    Okay.  Well, I think we have taken sort of the long view, but in the immediacy of the situation, right there in

the field if you are experiencing a failure, as a K9 handler, what would you do?

A.   If we experienced a failure on, say, a track, at some point it is just done.  You have to put the dog up.

As far as on narcotics detection, I may not know about that failure.  If he doesn't alert to a car and there was drugs in there, I may never know that, so...

Q.   Now, although you have mentioned that your partner Jois is not an apprehension dog, are those dogs, based on your experience, referred to as bite dogs?

A.   Yes.

Q.   Is that sort of a colloquial term with K9 handlers out here in East Texas, they call them bite dogs?

A.   Yes.

Q.   And do you train with other handlers periodically who have bite dogs?

A.   Yes.

Q.   Have you ever worn the bite suit?

A.   Yes.

Q.   Have you ever been bit while you are wearing the bite suit?

A.   Yes.

Q.   Does it hurt when you are wearing the bite suit?

A.   It can.

Q.   Have you ever been bit when you are not wearing the bite

suit?

A.   Yes.

Q.   Can you describe that for the jury?

A.   It was actually my first day of K9 handler school.  We had selected this one Belgian Malinois dog.  We did a narcotics detection exercise.  I went to him back inside the kennel.  He turned around and bit me on my inner right bicep, and it ended up getting infected.  And I think I spent three days in the hospital for it.

Q.   Now, Lt. Milbourn, I'm not an anatomy major, but I kind of know where a bicep is.  Could you indicate on your body by raising your arm and showing the jury where that is located?

A.   (Witness complies.)

Q.   Is that where you were bit?

A.   Yes.

Q.   Did that hurt?

A.   Yes.

Q.   You said you had to go to the hospital for that?

A.   Yes.

Q.   Do you have permanent scarring in that area?

A.   Yes.

Q.   Within your capacity as a licensed peace officer in the State of Texas, as well as a K9 handler, have you received training on use of force?

A.   Yes.

Q.   When did you first receive that training, and have you received ongoing training since then?

A.   To the best of my memory, I received that in the basic peace officers' academy.

Q.   And where did you attend peace officers' academy?

A.   It was the East Texas Police Academy, but it was a branch held in Quitman.

Q.   A branch held in Quitman, Texas?

A.   Yes.

Q.   So you were trained on use of force in Wood County?

A.   Yes.

Q.   Okay.  Do you continue to receive ongoing education in use of force?

A.   Yes.

Q.   And is that required, that ongoing training and education, is that required to maintain your peace officer's license?

A.   It would be required for me to get a higher license than I have now.

Q.   Do you have aspirations at that?

A.   Yes.

Q.   Now, based on your training in general, what do you understand to be the force you are permitted to use as a police officer?

A.   The least amount of force reasonably necessary to effect the arrest.

Q.   Now, are you familiar with the concept of a use of force continuum?

A.   Yes.

Q.   And does that continuum start with lower levels of force and then graduate to higher levels of force, all the way up to lethal force?

A.   Yes.

Q.   Where on that continuum does the deployment of a K9 fall?

A.   Less lethal.

Q.   So less than lethal?

A.   Less than lethal.

Q.   Is it greater than general presence of a uniformed officer?

A.   Yes.

Q.   Is it greater than the use of verbal commands?

A.   Yes.

Q.   Is it greater than soft control?

A.   Yes.

Q.   Is it greater than hard control?

A.   Yes.

Q.   And is it greater than other less-than lethal implements, such as the batons, tasers, or OC spray?

A.   I'd say it falls right in there somewhere with the taser.

Q.   Okay.

          MR. MACHICEK:  Your Honor, may we approach?

          THE COURT:  You may.

          (Bench conference.)

          MR. MACHICEK:  So I know Your Honor said that we would be going to 5:30.  I've got this witness.  I've got probably another hour or so worth of questions with him.  We are at a good stopping point now before I get into the sort of nuts and bolts of the incident itself.  We have done the background information.  I just wanted to see if the Court wanted me to continue.

          THE COURT:  Yeah, I think we should keep going to close to 5:30.

          (Bench conference concluded.)

BY MR. MACHICEK:

Q.   Now, Lt. Milbourn, were you involved in an investigation on July 25th, 2022, that gives rise to the charges, why we are all here today?

A.   Yes.

Q.   How did you become involved in that incident?

A.   I overheard a Hawkins PD officer say that there was a barricaded individual in the City of Hawkins.

          I asked him if he needed help.  He said, if I

could.  So I did respond.  I cleared another call that I was on and responded.

Q.    Okay.  And do you recall who that Hawkins PD officer was?

A.    I think it was Officer Newell, I believe.

Q.    And as a K9 handler, when you receive a request for service like that one, what do you do?

A.    Just let dispatch know I am going to be responding to that call, and go ahead and head that way.

Q.    Okay.  Do you recall where you responded?

A.    I don't recall the address.  It was in the City of Hawkins.

Q.    And is the City of Hawkins in Wood County, Texas?

A.    Yes.

Q.    When you got to the address in Hawkins in Wood County, Texas, who all else was there?

A.    Officer Tuma, Newell, and Constable McQueen.

Q.    And when you first arrived, could you give us sort of an overview of what you observed, just initially?

A.    There was a trailer house maybe 50 yards from the roadway.  I went down there and talked to Officer Tuma and Newell.  They kind of told me what was going on.  They believed a wanted individual was inside the house.

I think it was Officer Newell that told me they had saw him open the door and then shut the door.

There was also another individual on the scene, a citizen. He was out in the front yard.

Q. Okay. And that citizen that had already -- was on scene, was he sort of being detained there temporarily?

A. Yes.

Q. And, in general, when you arrive for a call for service and there is already officers on scene, what types of information are you trying to gather so that you can be of use to them when you arrive?

A. Just a general description of why we are there, what is going on, you know, who the person is, what we are trying to do.

Q. It is important to gather that information before you deploy your K9?

A. Yes.

Q. And is it important to gather all that information before you make any tactical decisions as to how to address the situation?

A. Yes.

Q. And do you remember -- or do you recall the identity of the individual who was wanted, inside the trailer?

A. Robert Evans.

Q. Okay. Were you made aware of anyone else inside the trailer?

A. No.

Q.   Were you made aware of the existence of a felony arrest warrant?

A.   Yes.

Q.   Who else arrived after you?

A.   Constable Smith.

Q.   And when the Defendant arrived, did he have his K9 with him?

A.   Yes.

Q.   And what is his K9's name?

A.   Mata.

Q.   And during the relevant portions of the encounter with Robert Evans at the trailer in Wood County, Texas, did you have a body cam on that was activated?

A.   Yes.

Q.   Okay.  We are not going to watch the entirety of the body cam.  In fact, we are going to look at some still photos from that body cam.  And what I really want to try to do is allow you to describe what you observed during that encounter, okay?

A.   Okay.

Q.   Once the Defendant arrived on scene, was there a decision made to enter the trailer?

A.   Yes.

Q.   Okay.  And prior to making entry, how much discussion regarding tactics took place?

A.    I would say minimal, probably.

Q.    Okay.  Anybody call for SWAT?

A.    No.

Q.    Okay.  Based on what you understood about the scene, was there an ongoing danger or risk of life to anyone else inside the trailer, aside from the wanted individual?

A.    No.

Q.    What then was the urgency to get inside the trailer?

A.    The only urgency I would say is just to effect the arrest warrant.

Q.    Before the door was breached, who performed the K9 commands?

A.    I gave the K9 warning announcements.

Q.    And just so the jury knows what announcements you gave, can you give us the K9 announcements?  You don't have to yell them at us.  You can just say them into the microphone.

A.    Okay.  It is basically something to the effect of, police K9, come outside now, or we will send the dog in, and you can be bit.

Q.    How many times do you generally do that?

A.    Two to three.

Q.    Okay.  Now, I want to take a small step back.

       Prior to entry into the residence with the K9, was there a discussion had with the other officers on scene about what the purpose of the K9 entry was for?

A.   I don't know that there was an in-depth one, no.

Q.   Is there a distinction between a building search and an apprehension deployment?

A.   I guess -- I mean, you could kind of consider them the same.  If we know somebody is in there, that could be considered the same.

Q.   Okay.  And when you do a search or a track or something like that, what is the goal of a search or a track, as opposed to an apprehension?

A.   So a search or a track would be to locate somebody.  An apprehension would be to send the dog to apprehend.

Q.   So if a discussion had taken place and if a representation had been made that it was going to be a building search, the objective of that would be to what?

A.   Locate the individual.

Q.   Now, where did y'all make entry into the residence?

A.   The front door.

Q.   And how did you attempt to assist with that?

A.   By kicking the door numerous times.

Q.   Okay.  And were you successful?

A.   No.

Q.   About how many times do you think you kicked the door?

A.   I think it was over 20, if I remember right.

Q.   And who came over to help out once that was unsuccessful?

A.    Constable McQueen.

Q.    Was Constable McQueen able to get the door open?

A.    Yes.

Q.    He kicked it a couple of times as well?

A.    Yes.

Q.    It is kind of like loosening the pickle jar, right?

A.    Yes.

Q.    You did the hard work, and he came in at the end, right?

A.    Yes, sir.

Q.    After y'all were successful in getting the door open, what happened next?

A.    We were met at the door by a dog, a dog that was inside the trailer.  I took that dog back out to actually the other citizen that we had detained outside.

Q.    And was the dog being aggressive?

A.    No.

Q.    Was the dog trying to bite you or the Defendant or anybody else?

A.    No.

Q.    Were y'all able, once the door was open, to ascertain where the fugitive was inside the house?

A.    Yes.  I had made a statement for him to come outside. And we could hear a response coming from the bathroom to the right hallway -- or to a room from the right hallway that we figured out later was a bathroom.

Q.   Pretty easy once you got the door open to figure out where he was at?

A.   Yes.

Q.   And when you are doing a search like that and the goal is locating a subject and that subject is communicating with you, what should you do next?

A.   Verbal commands.

Q.   And what typically should be the length of time that you are looking for to give verbal commands to give a suspect an opportunity to surrender?

A.   I would just say a reasonable amount of time for them to come.

Q.   About how much time was taken in this case?

A.   I don't know.  Maybe it was less than 30 seconds by the time I took the dog and came back inside, somewhere in there.

Q.   Is that something, based on your training and experience, that you would consider to be a reasonable amount of time to give a suspect, who is communicating with you, an opportunity to surrender?

A.   If he is just inside the bathroom, I figure he could come out pretty quick.

Q.   Now, once the door is breached, you ascertained where the suspect is, and there is communication going on, who made the decision to further enter into the residence?

A.    Whenever I came back in the house, Constable Smith was in the hallway near the bathroom.  He had moved down there.

Q.    And was anybody with him?

A.    I think Constable McQueen was there.

Q.    At any point between the kicking of the door and the movement of officers to the bathroom where the suspect had been located, did the suspect make any expressions of willingness to surrender himself?

A.    I think he stated something to the effect of he had been going to the bathroom.  I refer to the body camera on that one.

Q.    Prior to going up to the bathroom, were there any additional efforts undertaken on your part or anybody that you observed, to de-escalate the situation?

A.    No.

Q.    Is one way to de-escalate a situation, to continue dialogue with somebody who is talking to you, even if they are not complying with verbal commands?

A.    Yes.

Q.    Did any additional discussion between the breach of the front door and the movement of officers towards the bathroom occur with regards to tactical preparations or decisions once you got into the house?

A.    No, I don't think so.

Q.    Did anyone call SWAT at that point in time?

A.   No.

Q.   Can you describe for us what the urgency was to move so quickly from the doorway to the bathroom, given the situation as it was?

A.   I don't see anything that I could point out other than -- I mean, if he was trying to do something, it would be better to get there quickly.  We don't know that though, so...

Q.   Did you have any indication or evidence at that point in time that anything else was going on that required emergent action?

A.   No.

Q.   So when the Defendant and Constable McQueen and yourself moved towards the bathroom down the hallway to the interior bathroom, did the Defendant have his K9 with him?

A.   Yes.

Q.   Was the K9 on-leash or off-leash?

A.   I don't remember.

Q.   And when everyone came to the bathroom door, do you recall whether or not they were able to open it?

A.   Yes, it did eventually come open.  I think Constable McQueen -- I think he tried, but it didn't come all the way open, but Constable Smith was able to get it open.

Q.   Do you recall what happened after that?

A.   He sent the dog in to apprehend him.

MR. MACHICEK: Ms. McCullars, if we could look at Exhibit 1D-1.

Q. Lt. Milbourn, here is a still frame image from your body camera. Who are we looking at there?

A. That is Constable Smith on the left, Mata at the bottom, and it looks like Constable McQueen to my right with the gray shirt.

Q. Constable McQueen may be a little upset that you are able to identify him on that part of the picture.

Now, where is Mata in relation to the Defendant in this picture?

A. Right behind his -- looks like maybe his left leg.

Q. Do you recall how Mata was deployed into the bathroom from that position?

A. I think it was off lead there, I believe.

Q. And did Mata enter the bathroom through the Defendant's legs, sort of like a goal post?

A. I don't know if he did that or went around. I'm not sure.

Q. Okay. When the door came open to the bathroom, did you have a line of sight on the suspect?

A. No, not immediately.

Q. Okay. How did you gain access to your viewpoint over the bathroom?

A. So as they went in, Evans, he backed up towards the

bathtub, and that created room for me to basically come up there to the doorway.

Q.   Now, when you came up to the doorway, were you able to see the suspect right there?

A.   Yes.

Q.   Did you have your flashlight at the ready, shining into the bathroom?

A.   Yes.

        MR. MACHICEK:   If we can take a look, Ms. McCullars, at Exhibit 1D-2.

BY MR. MACHICEK:

Q.   How did the Defendant react when entry into the bathroom was made?

A.   The word "panicked" comes to mind.  He began to back up.

Q.   And I apologize, I crossed up some terms there.  I am talking about -- when I said Defendant there, I was talking about Mr. Evans, the suspect being arrested?

A.   Oh, okay.  Mr. Evans, that is who I was referring to, he panicked and began to back up.

Q.   Was he being outwardly hostile towards the Defendant?

A.   No.

Q.   Did he make movements to strike the Defendant or strike yourself, in fact?

A.   No.

Q.   You said that he backed up?

A.   (Witness nods.)

Q.   At any point did he grab K9 Mata's harness?

A.   Yes.

Q.   And I don't know if I asked you this earlier, you have had an opportunity to train with the Defendant and his K9?

A.   Yes.

Q.   Are you familiar with the Defendant's K9's bite command?

A.   Yes.

Q.   I am not going to hold you to the accuracy of it, but could you say what you think the bite command is?

A.   Foogosh.

Q.   Okay.  And at the point in time where entry is made into the bathroom, was the Defendant giving K9 Mata the foogosh command?

A.   Yes.

Q.   And in response to that, you said the Defendant initially -- or the suspect initially backed up?

A.   Yes.

Q.   And at one point grabs the harness of K9 Mata?

A.   Yes.

Q.   In response to the suspect grabbing K9 Mata's harness, what commands were given?

A.   Let go of the dog.

Q.   Okay.  And were strikes employed?

A.   Yes.

Q.   Do you recall about how many?

A.   Several.

Q.   Do you recall where the suspect was struck?

A.   I think at that particular area -- or that particular time, I think it was the torso area, upper torso.

Q.   Okay.  Did you ever strike the suspect?

A.   Yes.

Q.   And where did you focus your strike?

A.   The right upper torso area.

Q.   Why did you strike him there?

A.   To get him let go of the dog.

Q.   And how many times did you strike the suspect?

A.   Just once.

Q.   Okay.  Eventually, were y'all able to get the suspect to comply and release the K9?

A.   Yes.

Q.   After the suspect released the K9, did you observe the Defendant continue to strike him?

A.   Yes, as he got into the bathtub.

Q.   Okay.  And when the suspect got into the bathtub and the Defendant struck him, was the suspect being outwardly aggressive towards the Defendant?

A.   No.

323

Q.   At several points in time different people grab K9 Mata's harness.  Did you at any point in time grab K9 Mata's harness?

A.   Yes.

Q.   And why did you do that?

A.   To give him back to Constable Smith.

Q.   When you grabbed K9 Mata's harness, were you intending to injure or kill the K9?

A.   No.

Q.   At any point in time, did you observe the Defendant grab K9 Mata's harness?

A.   As far as Constable Smith?

Q.   Yes.

A.   Yes, I think he did grab it whenever we was in the bathroom whenever I handed it back to him -- handed the dog back to him.

Q.   And when he grabbed K9 Mata's harness, did you believe he was attempting to injure or kill the K9?

A.   No.

Q.   There is a portion of your body camera, if you can recall, where the Defendant grabs the K9's harness and sort of thrusts the K9 towards the suspect.  Do you remember that?

A.   Yes.

Q.   Is that a customary or orthodox method of deployment for

324

a K9?

A.   No.

Q.   Is that unusual, based on your experience with K9s?

A.   Yes.

Q.   And at any point in time during the altercation with the suspect, did you see Evans pick up a wood handled plunger?

A.   Yes.

Q.   What did you see him do with it?

A.   To the best of my memory, I think he was putting it towards the dog, just kind of putting it in his direction.

Q.   Okay.  When you say "putting it in his direction," do you mean was he rearing back and swinging it?

A.   Just pushing it at him.

Q.   Okay.

A.   Not swinging.

Q.   Given the circumstances, did you draw any conclusions as to what he was doing with that?

A.   Pushing the dog back or trying to keep the dog away.

Q.   Okay.  In the manner in which I observed the suspect use that wood handled plunger, did you believe that he was trying to cause serious injury, kill, or maim the K9?

A.   He was just trying to push him back.

Q.   And what would be the purpose of pushing the K9 back at that point?

A.   He didn't want to get bit.

Q.    Okay.  During all of this going on at the same time, was the Defendant continuing to give the K9 the bite command, foogosh?

A.    It was on several different occasions.

Q.    Now, once the suspect was disarmed of the plunger, which was fairly quickly; is that right?

A.    Yes.

Q.    Once he was disarmed of the plunger, what did K9 Mata do with the plunger?

A.    He took it out of the bathroom.  I'm not sure exactly where it went.

Q.    And after K9 Mata took the plunger out of the bathroom away from the possession of the suspect, did you observe the Defendant continue to strike the suspect?

A.    I just remember the one in the bathtub where he fell.

Q.    And when you say "the one in the bathtub," the one what?

A.    The one punch.

Q.    And where did the Defendant land that one punch on the suspect?

A.    I think that was to the face area, the head area.

Q.    Okay.  Now, you said that the suspect fell into the bathroom after receiving that blow?

A.    Yes.

Q.    What did the Defendant do once the suspect fell into the

bathtub?

A.   I think that is when he got him in some sort of arm restraint and sent the dog again.

Q.   I am going to show you another still frame from your body camera.

MR. MACHICEK:   We are going to look at Government's Exhibit 1D-4, please, Ms. McCullars.

BY MR. MACHICEK:

Q.   Do you recall observing the Defendant -- or the suspect, Mr. Evans, being in this position after falling into the bathtub?

A.   Yes.

Q.   And who was standing over him?

A.   Constable Smith.

Q.   And at this point in time in this position, was the suspect a threat to officers or any member of the public?

A.   No.

Q.   Based on your experience as a police officer, as a K9 handler, when you have a suspect in this position, in the fetal position with his hands on his head, is it possible to make an arrest at that point?

A.   Yes.

Q.   Is it possible to complete that arrest without additional use of force?

A.   Yes.

Q.   When you have a position like this one, is that what is commonly referred to as positive control of a suspect?

A.   Yes.

Q.   In your experience, in your training, would an officer need to deploy a K9 on a suspect in this position in order to effect an arrest?

A.   No.

Q.   Would an officer need to deploy a taser under this circumstance?

A.   No.

Q.   OC spray?

A.   No.

Q.   What about a firearm?

A.   No.

Q.   As the Defendant is standing over Mr. Evans in this position with positive control, did you hear him give any commands to place your arms behind your back, put these handcuffs on, stand up, lay down; anything like that?

A.   Not that I recall, no.

Q.   Did you hear him give commands to the K9?

A.   Yes.

Q.   And what commands were those?

A.   Foogosh.

MR. MACHICEK:  Ms. McCullars, if we can look at Government's Exhibit 1B-5, please.

BY MR. MACHICEK:

Q.   This is the same position from your vantage point in the bathroom; is that right?

A.   Yes.

Q.   Can you see where Constable Smith's, the Defendant's focus -- or attention is focused at this point in time?

A.   I believe they are looking at the dog.

Q.   When apprehending a suspect, particularly a fugitive in an apprehension like this one, where should the arresting officer's focus be?

A.   On the suspect.

Q.   Is that why it is difficult to be both the K9 handler and the apprehending officer?

A.   Yes.

Q.   Were there other officers on scene who were available to assist with apprehension?

A.   Yes.

Q.   Were you available?

A.   Yes.

Q.   Were you right there?

A.   Yes.

Q.   Once the suspect was placed in this position, would you have been able to assist Defendant in apprehending the suspect without any additional use of force?

A.   Yes.  We could have used empty hand technique.

Q.   What happened instead?

A.   He sent the dog.

     MR. MACHICEK:  Okay.  If we can look at Government's Exhibit 1D-9, Ms. McCullars.

BY MR. MACHICEK:

Q.   And when you say he sent the dog, are you referring to the bite command?

A.   Yes.

Q.   You mentioned earlier when I was asking you about this altercation in the bathroom that there was a neck restraint employed as well.

A.   (Witness nods.)

     MR. MACHICEK:  I am going to ask you to look at Government's Exhibit 1D-11, please, Ms. McCullars.

BY MR. MACHICEK:

Q.   Is that what you were referring to in the neck restraint?

A.   Yes.

Q.   Okay.  Now, what areas of the arrestee are being exposed by this position here?

A.   Left hand and arm and his legs and his torso.

Q.   If you have a suspect in a position like that, is there a need to deploy a K9 to gain further compliance?

A.   No.

Q.   Is there a need for a taser to gain further

330

compliance?

A.    No.

Q.    What about OC spray?

A.    No.

Q.    A baton?

A.    No.

Q.    When you have this type of control over a suspect, what should be done next?

A.    When he gets his hands behind his back, and get him in hand restraints.

Q.    Now, you mentioned earlier that you had had a pretty bad dog bite on one of your first days as a K9 handler; is that right?

A.    Yes.

Q.    You indicated where you had been bit, right, right, over here?

A.    Yes.

Q.    And the result of that bite sent you to the hospital, right?

A.    Yes, an infection.

Q.    And is that area of the suspect exposed in this position here?

A.    Yeah, yes, sir.

Q.    Did it hurt when you were bit there?

A.    Yes.

Q.   Was it necessary to expose that area and give the K9 the bite command, given the control of the suspect in this circumstance?

A.   No.

Q.   At this point in time, is the suspect a threat to the officers or any member of the public?

A.   No.

Q.   Did you observe the Defendant continue to give the bite command, however?

A.   Yeah, I think it did occur again after this particular photograph or still shot.

          MR. MACHICEK:  Ms. McCullars, if we could look at 1D-15, please.

          THE COURT:  If you could find a good stopping point.

          MR. MACHICEK:  I can stop right there, and start right there.

          THE COURT:  Ladies and gentlemen, we are going to break for the day.  I just remind you not to talk about the case among yourselves or anybody at home and not to look up anything about the case.

          If you'd be back tomorrow morning at 8:45, we will get started as soon as we can.  Thank you.

          (Jury out.)

          THE COURT:  Anything to discuss this evening?

MR. MACHICEK:  No, Your Honor, thank you.

MR. SKIPPER:  Nothing we can't do in the morning.

THE COURT:  Okay.  I ask you to be back here at 8:45 in case we need to take up anything before the jury gets started.

MR. SKIPPER:  We will discuss with them.

THE COURT:  Officer, I will remind you, you remain under oath for tomorrow, and we will get to you in the morning first thing.

THE WITNESS:  Yes, sir.

(Court in recess until 6/28/2023.)


CERTIFICATION


I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.


/s/ Shea Sloan                              August 3, 2023
SHEA SLOAN, CSR, RPR
Federal Official Court Reporter