IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION


UNITED STATES OF AMERICA          )
                                  )        CASE NO. 6:22cr146
     -vs-                         )
                                  )        Tyler, Texas
                                  )        8:54 a.m.
KELLY JASON SMITH                 )        June 28, 2023




TRANSCRIPT OF JURY TRIAL
DAY 3
BEFORE THE HONORABLE JEREMY D. KERNODLE,
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

FOR THE GOVERNMENT:

MR. LUCAS MACHICEK
ASSISTANT U.S. ATTORNEY
110 North College, Ste. 700
Tyler, Texas 75702

MS. TRACEY BATSON
ASSISTANT U.S. ATTORNEY
101 E. Park Blvd., Ste. 500
Plano, Texas 75074

FOR THE DEFENDANT:

MR. CODY SKIPPER
LAW OFFICE OF CODY SKIPPER
2001 Bryan St., Ste 1905
Dallas, Texas 75201

MR. TOBY SHOOK
SHOOK GUNTER & WIRSKYE
2001 Bryan St., Ste. 416, LB 92
Dallas, Texas 75201

COURT REPORTER:          MS. SHEA SLOAN
                         FEDERAL OFFICIAL COURT REPORTER
                         211 W. Ferguson
                         Tyler, Texas 75702
                         shea_sloan@txed.uscourts.gov

Proceedings taken by Machine Stenotype; transcript was produced by computer-aided transcription.

INDEX

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | FURTHER REDIRECT |
|---|---|---|---|---|---|
| AUSTIN MILBOURN | 5 | 18 | 106 | | |
| JEFF HOBSON | 114 | 152 | 180 | 185 | |
| ALVIN GORDON | 188 | 209 | 232 | 234 | 236 |
| JERRY STATON | 236 | 277 | 291 | | |
| DONALD SLAVIK | 299 | | | | |

CERTIFICATION - PAGE 314

4

EXHIBIT INDEX

GOVERNMENT'S
EXHIBIT NO.     DESCRIPTION                                    PAGE

23              Smith County Sheriff's Office                  118
                Canine Operations

24              Smith County Constable's Office                192
                Canine Operations

P R O C E E D I N G S

(Defendant present in the courtroom.)

(Jury out.)

THE COURT:  Good morning.  You may be seated.

So is there anything to talk about before we bring the jury in?

MR. MACHICEK:  No, Your Honor.

THE COURT:  Okay.

MR. SKIPPER:  No, Your Honor.

THE COURT:  All right.  Let's bring the jury in.

(Jury in.)

THE COURT:  Okay.  You may be seated.

Good morning.  And welcome back.

Mr. Machichek.

MR. MACHICEK:  May I proceed, Your Honor?

THE COURT:  You may.

MR. MACHICEK:  Thank you.

AUSTIN MILBOURN, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION CONTINUED

BY MR. MACHICEK:

Q.   Lt. Milbourn, we left off yesterday evening looking at a particular picture.  I would like to pull that picture up and sort of reorient us back to that same line of questioning, if that is okay?

A.   Yes, sir.

MR. MACHICEK: Okay. Ms. McCullars, if we could have Exhibit 1D-15, please.

BY MR. MACHICEK:

Q.   Now, so that we can sort of return to where we were yesterday evening when we broke, can you kind of describe what the suspect in the bathtub is doing in relation to what the Defendant is doing and the K9 is doing in this photograph?

A.   This is where I believe K9 Mata bites him in the foot. This is towards the end of the incident.

Q.   Okay. And whose body cam is this still image taken from?

A.   This is mine.

Q.   This left hand that we see at the bottom left of the photograph that is reaching forward towards the harness of K9 Mata, whose hand is that?

A.   That is mine.

Q.   Okay. Can you explain for the ladies and gentlemen of the jury why it is that you were reaching out towards the back of K9 Mata and the harness just before the bite was engaged?

A.   At this particular moment, I am just not sure what to do in this situation. I think it is likely probably gone too far at this point.

Q.   And when you say "it is likely gone too far," can you

describe for the jury what you mean by that statement?

A.   He shouldn't be bit by the dog at this point.

Q.   Okay.  In fact, at any point in time during or prior to this still image, did you make any requests of the Defendant?

A.   I asked him what I should do.

Q.   Okay.

A.   To tell me what to do.

MR. MACHICEK:  Ms. McCullars, if we could take a look at the transcript, 3A, page 8, line 22, please.

BY MR. MACHICEK:

Q.   Now, is this the statement that you are referring to?

A.   Yes.

Q.   And what was the Defendant's response?

A.   He said to take down.

Q.   When you asked the Defendant, what do you want to do, Kelly, tell me, what are you trying to do?

A.   Just figure out what we need to do.  The dog didn't do what was expected or what I figured what he would do when he was told to apprehend.  I felt like we needed to do something different.

Q.   When you say "something different," can you give us some examples of what those options might be?

A.   Maybe remove the dog from the situation, start back at verbal commands and see if we can get him to surrender at

that point.

Q.    Lt. Milbourn, when you make this statement to the Defendant in the bathroom during this chaotic situation, a moment that you have just told this jury that you believe had gone too far, are you making an effort to intervene in this circumstance?

A.    Yeah, I am just trying to get a reset, like let's think about what we should do.  I didn't know what to do in the situation.

Q.    And based on your relationship, both professionally and personally, with the Defendant, is it easy or hard to do something like this in a situation like this?

A.    Difficult.

Q.    Can you elaborate on that?  Why is it difficult?

A.    Constable Smith was somebody that I highly respect, a mentor.

Q.    And did you observe your mentor doing something you felt he shouldn't be doing?

A.    Yes.

Q.    And was this your effort to try to get him to stop?

A.    Yes.

Q.    Did you eventually observe the Defendant's K9 bite the suspect?

A.    Yes.

Q.    And where on the suspect's body did the bite occur?

A.    On the foot.

Q.    How did the suspect react?

A.    In pain.  I think he began to yell.

Q.    What commands did you hear the Defendant give the suspect at that time?

A.    We began to tell him to roll over onto his stomach.

Q.    Given the circumstances, the size of the bathroom, and the positioning of everyone inside of it, was that possible?

A.    I believe it would be difficult.

Q.    As the suspect was being bitten and drug out of the bathtub and into the hallway, was he an ongoing threat to the safety of the officers or any member of the public?

A.    No.

Q.    Where did he end up?

A.    In the hallway outside the bathroom.

Q.    Did you observe the K9 remove the suspect's shoe from his foot?

A.    Yes.

Q.    Was it after the shoe was removed that the K9 was finally recalled by the Defendant?

A.    Yeah, I think after he removed the shoe, he kind of went back towards the interior of the house, and recalled him.

Q.    Is that the hozam command that we hear on the --

A.    Yes.

Q.   Once this suspect was handcuffed, where was he taken?

A.   To the front porch.

Q.   Okay.  Who did you call once the Defendant was -- or once the suspect was placed on the front porch?

A.   I called for an ambulance to respond to treat him for the dog bite.

Q.   Did you observe the injury to the suspect?

A.   Yes.

Q.   And did you feel like medical treatment was necessary?

A.   Yes.

Q.   While y'all are waiting for EMS to arrive, did you have an opportunity to speak to the suspect regarding any complaints that he had about his arrest?

A.   Yes.

     MR. MACHICEK:  Ms. McCullars, if we could look at the transcript at Exhibit 5A, page 46, lines 25 through 47.  Oh, I'm sorry.  Line 25.  I apologize.

BY MR. MACHICEK:

Q.   Here at line 25, we see the beginning of an explanation by the suspect there.  And if we look at page 47 at the top there.  He continues to give you an excuse.  You continue to speak with him.  And then you make a statement here on lines 7 and 8, you say:  You are too far gone at that point.

     What does that mean?

A.   I meant at the point the dog is told to apprehend, it is

difficult to stop it immediately on the point.  I mean, it takes a minute to stop the apprehension or the bite.  And at some point, it is inevitable once it has been told to apprehend.

Q.   And as a police officer and as a K9 handler, when you are evaluating situations to determine the appropriate amount of force to use, is that evaluation a fluid one that is ongoing as the situation changes?

A.   Yes.

Q.   And is there ever a situation where an individual is not a threat, but it is still okay to use force because it is just too far gone?

A.   No.

Q.   At some point after the incident occurs, another individual arrives on scene carrying a weapon; is that right?

A.   Yes.

Q.   What kind of weapon did that individual have?

A.   A machete.

Q.   Just walks up to a police operation carrying a machete?

A.   Yes.

Q.   Okay.  What did you do?

A.   I asked him to put the machete down.

        MR. MACHICEK:  Ms. McCullars, if we can look at

12

Exhibit 1A, page 25, line 11, please.

BY MR. MACHICEK:

Q.    If we are looking at line 11 at the top there, when you say, you mind putting the machete down, is that what you are talking about when you give verbal commands?

A.    Yes.

Q.    Were you successful in disarming the unknown individual wielding the machete on the scene?

A.    Yes.

Q.    Did you have to deploy an apprehension K9?

A.    No.

Q.    Did you have to use a taser or OC spray or draw your weapon?

A.    No.

Q.    After the incident came to its conclusion and the suspect was brought into custody, did you have an opportunity to speak to the Defendant while he was seated in the driver's seat of his patrol car?

A.    Yes.

Q.    Prior to engaging in that conversation, what did you do with your body cam?

A.    I deactivated it.

Q.    Why did you do that?

A.    At that point I felt that the call was basically over. We were walking back to our cars and stuff.

Q.   Okay.

MR. MACHICEK:  Ms. McCullars, if we could take a look at Exhibit 1A, page 31, line 16, please.

BY MR. MACHICEK:

Q.   Just before you deactivate your body cam as you are approaching the Defendant seated in his patrol car, what statement does the Defendant make to you?

A.   The one that is highlighted here on the screen.

Q.   Okay.  I know you don't want to say the curse word in there, but could you testify for the jury the words around the curse word?

A.   He had my dog, man.

Q.   Okay.  And what was the Defendant's demeanor in reference to the suspect's actions towards the K9?

A.   Well, he was upset about it.

Q.   Do you recall what the subject of the conversation turned to then?

A.   I don't remember the conversation verbatim.  To the best of my recollection, I believe he asked me about if they were going to file resisting charges.

Q.   As a K9 handler that has just experienced a deployment, why would it be important to discuss resisting arrest charges?

A.   It would explain the use of force.

Q.   And after you returned to the other officers on the

14

scene following that conversation, what you did you do?

A.    I turned my body camera back on.

Q.    And did you speak to the other officers on the scene?

A.    Yes.

Q.    And what did you ask them about?

A.    I asked them if they were going to file the resisting charges.

Q.    What are some of the considerations that factor into which agency files which charges?

A.    Based off of jurisdictional purposes where we are at. So that particular call was inside the city limits of Hawkins, so we could expect any additional charges to come from that agency.

Q.    Did you have the authority to file resisting arrest charges?

A.    Yes.

Q.    Did Hawkins PD have the authority to file resisting arrest charges?

A.    Yes.

Q.    And when you inquired to the Hawkins' PD officers whether or not they planned to file resisting charges, were those inquiries prompted by the conversation you had with the Defendant about that?

A.    To the best of my memory.

Q.    Is that a yes?

A.   Yes, to the best of my memory.  I don't remember it verbatim.

MR. MACHICEK:  Now, if we can look at Exhibit 14, Ms. McCullars.

BY MR. MACHICEK:

Q.   You indicated that you had observed the suspect's injuries; is that right?

A.   Yes.

Q.   And who was it again that contacted EMS?

A.   Me.

Q.   And before the suspect was transported to the Wood County Jail, where did he go first?

A.   The hospital in Quitman.

Q.   Now, following the conclusion of the incident and the departure of all of the parties, did you have the chance to review your body cam footage?

A.   Yes.

Q.   Where did you watch it?

A.   At the Wood County Sheriff's Office.

Q.   And who did you watch it with?

A.   Constable Smith.

Q.   About when after the incident did that occur?

A.   A couple of hours maybe.

Q.   Was it the same day as the incident that took place?

A.   Yes.

Q.   And at the time that you and the Defendant viewed the video together were there other law enforcement officers there?

A.   There was officers in the office.

Q.   Okay.

A.   Maybe not directly in the same room that we were, but there was officers there.

Q.   Okay.  And what was the focus of y'all's review of the video at that time?

A.   Just to kind of see everything that happened, and go over it.

Q.   Did the Defendant make any statements to you at that point?

A.   Just brought up the fact about the plunger, the plunger being obtained by the suspect.

Q.   Having had the opportunity to review the video without the Defendant present with you, what are your feelings about the plunger excuse?

A.   It was used to just try to keep the dog away.

Q.   Did the suspect swing the plunger in a manner that was capable of injuring either the Defendant or the K9?

A.   No.

Q.   Did you write a report?

A.   Yes.

Q.   Did you write your report before or after you viewed the

video with the Defendant?

A.    After.

Q.    Do you recall writing that the suspect, Mr. Evans, used the plunger against the K9?

A.    Yes.

Q.    What was the purpose of using that specific language?

A.    I believe it fit with what happened, that he was trying to push the dog away.

Q.    You didn't write that he struck the K9 or swung the plunger at the K9?

A.    No.

Q.    Do you recall writing that the K9 bit the suspect on the foot while he was trying to kick the K9 away?

A.    Yes.

Q.    Can you describe what you meant by that?

A.    He was just in the bathtub, and I think he was trying to kick the dog away from him to avoid being bit.

Q.    And was the amount of force of that kick capable of injuring the K9 or the officer?

A.    Not at that moment, no.

Q.    Based on your observations, your review of the video, and the evidence in the case, do you believe that the Defendant used excessive force against the suspect in the bathroom?

A.    Yes, at the end.

Q.   Do you believe that the Defendant acted reasonably in the use of this excessive force?

A.   No.

MR. MACHICEK:  Thank you, Lt. Milbourn.

Pass the witness.

MR. SHOOK:  May I proceed, Your Honor?

THE COURT:  You may.

CROSS-EXAMINATION

BY MR. SHOOK:

Q.   Good morning, Lieutenant?

A.   Good morning, sir.

Q.   My name is Toby Shook.  I have a few questions for you.

A.   Yes, sir.

Q.   If you don't understand a question I have, let me know, and I will try to rephrase it.  Okay?

A.   Sure.

Q.   Okay.  At the time of this incident last year, you were sergeant; is that right?

A.   Correct.

Q.   You have since been promoted?

A.   Yes.

Q.   Congratulations.

A.   Thank you.

Q.   Let me first start asking you questions about the type of dog you have.  It is a tracking dog; is that right?

19

A.    Narcotics detection and tracking, yes.

Q.    Okay  That is a lot different from an apprehension dog?

A.    Correct.

Q.    They are kind of like comparing apples and oranges, right?

A.    Apprehension dogs just have an additional capability.

Q.    Okay.  But as far as the apprehension goes, you are not trained on deploying apprehension dogs yourself?

A.    No.

Q.    You have worked with them, haven't you?

A.    Yes.

Q.    Okay.  And on this day, you were out on a normal patrol?

A.    Yes.

Q.    Okay.  And you heard this call go out from the Hawkins PD; is that right?

A.    Yes.

Q.    And that was a barricaded suspect that they were making a request for help?

A.    Yeah, I asked them if they needed help, and they told me to come if I could.  So I did.

Q.    That is kind of what you do in Wood County.  It's a smaller county, right?

A.    Yes.

Q.   Lots of small police departments?

A.   Yes.

Q.   The Sheriff's Office, is that biggest department, law enforcement department in Wood County?

A.   Yes.

Q.   So it is not unusual for the different departments to help each other out?

A.   No.

Q.   Y'all are kind of a team out there; is that right?

A.   Yes.

Q.   Help protect each other, help cover each other, help execute anything they need?

A.   Yes.

Q.   Okay.  After -- and you said you would go; is that right?

A.   Yes.

Q.   You radioed in and said I can come that way?

A.   Yes.

Q.   All right.  That is something you volunteered to do?

A.   Yes.

Q.   Okay.  Do you recall when you heard that transmission or shortly thereafter, that you actually called Kelly Smith on the phone?

A.   I don't remember who called who.  I do remember talking to him on the phone though, yes.

Q.   You asked him if -- did y'all discuss him going to the scene as well?

A.   Yeah.  He asked me if I was going.  I told him that I was.  And he said that he was too.

Q.   Did you ask him to go?

A.   No, I think he just said that he was coming.  He asked me if I was going.

Q.   Did you think that was a good thing?

A.   Sure.

Q.   You certainly weren't opposed to him going, were you?

A.   No.

Q.   You told this jury he was your mentor, correct?

A.   Yes.

Q.   Thought he was a good officer?

A.   Yes.

Q.   Thought he would be helpful there at the scene?

A.   Yes.

Q.   Okay.  And you also, shortly after that I guess, heard Constable Smith transmit over that county radio saying, I can ease over that way if you need me?

A.   I would assume so, yes.

Q.   Okay.  Have you reviewed your body worn camera or anything like that, any of the transcripts regarding how that call came in, recently?

A.   As far as radio traffic or --

Q.   Yeah.  How y'all got to the scene and how you communicated with the Hawkins PD?

A.   I don't remember seeing any radio transcripts.

Q.   Okay.  What all have you reviewed?

A.   Body camera footage, my report.

Q.   Was yours the only body camera footage that you reviewed?

A.   No, I have seen others too.

Q.   Have you seen Sgt. Tuma's?

A.   I would have to refresh myself with it to identify it.

Q.   Okay.  Well, the body worn cameras that you reviewed, other than your own, were there other officers there at the scene?

A.   Yes.

Q.   Okay.  It all surrounded this incident, right?

A.   Yes.

Q.   And do you remember how many you watched, different?

A.   No, I am not sure.  I just know that some of them are online, so I have seen them there as well.

Q.   Did you in preparation of your testimony review some of those body worn cameras?

A.   Yes, prior.  Yes.

Q.   So it would be fresh in your mind?

A.   It has been several months, but --

Q.   Okay.  So you have seen, at some point, Kelly Smith's

body worn camera footage?

A.    A portion of it I believe, yes.

Q.    Obviously, you have watched yours?

A.    Yes.

Q.    You have watched Sgt. Tuma's?

A.    I don't fully recall that one.  It is possible.

Q.    Okay.  Officer Newell, the other Hawkins PD officer?

A.    I think I have seen a portion of his.

Q.    And then Constable McQueen?

A.    It is possible.

Q.    Okay.  That is the only ones that were out there with body worn cameras, right?

A.    Right.

Q.    And you know you saw more than one.  Okay.

You arrived at the scene, and you get there before Constable Smith; is that right?

A.    Yes.

Q.    And when you came up, you didn't come in with sirens blaring or anything like that, did you?

A.    I don't think so.

Q.    Okay.  And you immediately got out of your vehicle, and you went and found Sgt. Tuma; is that right?

A.    Yes.

Q.    Do you remember walking up to him and talking to him?

A.    Yes.

24

Q.   All of that is on your body worn camera, right?

A.   Yes.

Q.   And it would be on his body worn camera too?

A.   Yes.

Q.   And you said -- kind of started talking to him about what was going on and what the situation was?

A.   Yes.

Q.   Okay.  And you had already had some of that discussion while you were over the radio, correct?

A.   About the circumstances?

Q.   Yeah.

A.   Yes.

Q.   You knew there was a barricaded suspect?

A.   Yes.

Q.   It was in Hawkins?

A.   Yes.

Q.   You knew that there were warrants out for him?

A.   Yes.

Q.   Do you recall asking to confirm those warrants while you were in your car over the radio asking the dispatcher?

A.   I think I did that when I was on the scene.

Q.   Okay.  One was felony, a warrant, injury to a child; do you recall that?

A.   Yes.

Q.   You are hesitating.

A.   Yes.

Q.   You do remember there was felony warrant for injury to a child, correct?

A.   Yes.

Q.   Okay.  And there were two warrants, misdemeanor warrants, for family violence?

A.   Yes.

Q.   And an evading arrest misdemeanor warrant, correct?

A.   Yes.

Q.   Okay.  Now, at a scene when there are several law enforcement agencies, or at any scene, especially like a barricaded scene, you have someone that is the commanding officer, correct?

A.   That would be the ideal situation, yes.

Q.   Right.  Someone has to be in charge and give directions to all of the other officers?

A.   Yes, sir.

Q.   Since this was in Hawkins' district, Sgt. Tuma was that commanding officer at the scene, wasn't he?

A.   Yes.

Q.   And he is someone you knew, you knew Sgt. Tuma?

A.   Not real well, but I did know him.

Q.   You've worked with him before?

A.   Yes.

Q.   That kind of happens, you work with every law

enforcement agency in the county, correct?

A.    Yes.

Q.    Did you know he was Acting Chief at that time?

A.    Yes.

Q.    Okay.  So, obviously, he would be the commanding officer?

A.    Yes.

Q.    Now, as far as having a commanding officer, he is the one that makes the decisions about whether there is going to be a breach, or how the situation will be handled.  Is that right?

A.    Yes.

Q.    Now, he can get input from other officers, such as yourself?

A.    Yes.

Q.    You can offer ideas, that type of thing?

A.    Yes.

Q.    You didn't try to take over the scene from Sgt. Tuma, did you?

A.    No.

Q.    It was obvious he was in charge, and you did make some suggestions?

A.    Yes.

Q.    Okay.  And you knew at that time that you had a barricaded suspect, and Sgt. Tuma and Officer Newell knew

this suspect, Robert Evans?

A.    Yes.

Q.    Okay.  And they recognized him?

A.    Yes.

Q.    And he locked the door once he saw them?

A.    Yes.

Q.    And that was the situation when you arrived at the scene?

A.    Yes.

Q.    Okay.  Now, there has been some testimony about the use of force continuum.  You know what that is, don't you?

A.    Yes.

Q.    You have been trained in that?

A.    Yes.

Q.    They come in different levels.  The first level for a lawman's use of force is just mere presence in the uniform, correct?

A.    Correct.

Q.    Like you are wearing today?

A.    Correct.

Q.    Badge, John Brown Belt, police vehicle?

A.    Yes, sir.

Q.    When you show up to a scene, if you get called to a scene and step out of that car, the vast majority of people comply right away, don't they?

A.    Yes.

Q.    They defer -- they see that is a police officer.  If you call them over and say anything to them -- I mean, if they are acting up, let's say you go down the street and you pull up, most people are going to comply?

A.    Yes.

Q.    Okay.  The second level is actually making commands?

A.    Yes.

Q.    Is that correct?

A.    Yes.

Q.    And, apparently, in this situation when you got there, the fact that two Hawkins police officers in uniform -- they were in uniform, weren't they?

A.    Yes.

Q.    Showed up in their police cars, that didn't cause Robert Evans to comply, did it?

A.    No.

Q.    Okay. And sometimes that happens when you are out at a scene.  You pull up, you are in uniform, but there are individuals that don't comply, correct?

A.    Yes.

Q.    And we talked about most people do that when you pull up, but when you make a command to someone because you have to take control of the situation, most people comply with the uniformed officer when they do that, don't they?

A.    Yes.

Q.    Okay.  Now, there are some people that don't.

A.    Correct.

Q.    There are just some people that just have a different attitude, that don't comply; is that right?

A.    Correct.

Q.    And it might be just with one officer there, or it could be with 15 officers there?

A.    Yes.

Q.    They just think a little different from the vast majority of people, correct?

A.    Correct.

Q.    And they are not going to follow orders?

A.    Correct.

Q.    And they are not going to comply?

A.    Right.

Q.    There are some people that just don't want to go to jail, do they?

A.    Yes.

Q.    Okay.  And you could have a barricaded suspect in a home, have him surrounded, it is really hopeless to stay barricaded, but they still don't give up, do they?

A.    Right.

Q.    That is just attitude they have that they are not going to go to jail?

30

A.   Yes.

Q.   And that can be a very dangerous attitude to have, can't it?

A.   Yes, it could be.

Q.   You have been trained in the use of force and the dangers -- law enforcement is a very dangerous profession. We all know that, don't we?

A.   Yes.

Q.   Every day when you go to work, you don't know if you are coming home, do you?

A.   Correct.

Q.   You can get involved in a simple traffic situation, someone might be wanted for a speeding ticket or warrant, and they may decide, I am going to kill a police officer?

A.   Yes.

Q.   You have seen that happen?

A.   Just on the news and stuff, never in person.

Q.   Okay.  But you have been trained about those situations, haven't you?

A.   Yes.

Q.   I mean, the people that trained you talk about how dangerous traffic stops can be?

A.   Yes.

Q.   You can have a situation when you are -- stopped someone or investigating someone and they can be perfectly calm, and

then in a split second, they can become violent.  Can't they?

A.    Yes.

Q.    That is just how quickly it can change in a split second; is that right?

A.    Yes.

Q.    And that's why you always have to be very wary of the people you are interacting with?

A.    Yes.

Q.    You have no doubt seen videos, things like that for safety training and that type of thing?

A.    Correct.

Q.    You are aware there are sometimes people will act like they are cooperating and have a weapon on them, and when the officer thinks they are cooperating, they will suddenly pull it out?

A.    I have seen that in videos, yes.

Q.    Could be a gun, could be a knife, it could be anything. Is that right?

A.    Yes.

Q.    And you have been taught that the hands are what you have to really pay attention to, a suspect's hands, right?

A.    Correct.

Q.    The term they use is the hands can kill you?

A.    Yes.

Q.   And a person can have a weapon anywhere on their body, pull it out very quickly with their hands.  That is why you always keep your eye on someone's hands?

A.   Correct.

Q.   That is why you are always issuing orders, let me see your hands?

A.   Yes.

Q.   So in the situation you had there today, on this day you talked to Sgt. Tuma, he gave you background about knowing Robert Evans?

A.   Yes.

Q.   And you had these warrants confirmed?

A.   Yes.

Q.   Okay.  One of the important things when you are out there with a barricaded suspect, when it is a felony, to know what type of felony offense it is they are wanted for, correct?

A.   Correct.

Q.   This one was a crime of violence?

A.   Yes.

Q.   Injury to a child?

A.   Yes.

Q.   Okay.  That ups your caution you are going to take because that person -- obviously, there is at least probable cause they have committed a violent felony?

A.    Yes.

Q.    Even the misdemeanors of family violence, even though they are misdemeanors, that is a violent offense against a family member, a wife, girlfriend, that sort of thing?

A.    It is, yes.

Q.    And there were three of those warrants that you knew were active at that time for Robert Evans?

A.    Correct.

Q.    And then there was an evading arrest?

A.    Correct.

Q.    And those can be either felonies or misdemeanor, correct?

A.    It depends if you used a vehicle or if you have prior convictions, but, yes.

Q.    The vehicle is the felony one?

A.    The vehicle is the felony.

Q.    The misdemeanor is if someone just runs away?

A.    Runs on foot, yes.

Q.    Okay.  And you have experienced that yourself, haven't you?

A.    Yes.

Q.    When someone commits that offense, they see a police officer, an officer gives them an order, and they take off?

A.    Yes.

Q.    Okay.  That is an example of someone that doesn't want

to go to jail?

A.    Yes.

Q.    Someone that is going to defy authority?

A.    Yes.

Q.    Okay.  Now, when you talked to Sgt. Tuma and got the information about the background of Robert Evans, you said an apprehension dog is on the way.  Do you remember saying that to him?

A.    Yes.

Q.    You were talking about Kelly Smith?

A.    Correct.

Q.    Did you have your dog with you as well?

A.    Yes.

Q.    Okay.  But your dog is a tracking, drug-sniffing dog?

A.    Correct.

Q.    So he wouldn't be of any use out there for apprehension, correct?

A.    Correct.

Q.    Okay.  And is that what you -- that is why you told that to Sgt. Tuma, your dog wouldn't be valuable?

A.    Correct.

Q.    Police dogs are tools that law enforcement use?

A.    Yes.

Q.    So you were informing and letting Sgt. Tuma know, hey, we have got a law enforcement tool coming, an apprehension

dog?

A.   Yes.

Q.   Okay.  And when you told Sgt. Tuma that, he said, yeah, we can wait for the dog, then breach.  Do you remember that?

A.   Yes.

Q.   Okay.  And we are talking about breach means forcing your way into the house?

A.   Correct.

Q.   Okay.  So he made that decision that law enforcement, the officers there, were going to breach to arrest Robert Evans?

A.   Yes.

Q.   And he wanted to wait until that apprehension dog got there?

A.   Yes.

Q.   Were you aware that he had already made the decision that there was going to be a breach even before a dog came into the picture?

A.   I don't recall.

Q.   Okay.  But he made that decision?

A.   Yes.

Q.   Okay.

          MR. SHOOK:  Excuse me.

BY MR. SHOOK:

Q.   Now, when you had the on-scene commander make the decision, those are the types of decisions that are made, and then you guys decide to carry out that mission.  Is that right?

A.   Yes.

Q.   And when you have a suspect that has breached, there is lots of things that can be done, different options; is that right?

A.   Correct.

Q.   Like a SWAT team.  Does Wood County have a SWAT team?

A.   We are in the early stages of starting a special response team.  They won't be considered SWAT.  There is not enough people, not enough capabilities.

Q.   All right.  So back on July 25, 2022, y'all didn't have a SWAT team in the county, did you?

A.   No.

Q.   It is a small county?

A.   Yes.

Q.   SWAT teams are expensive, aren't they?

A.   Yes.

Q.   So you knew that Sgt. Tuma and Officer Newell had been out there for some time and had tried to get Mr. Evans to come out, did you not?

A.   Yes.

Q.   Okay.  So waiting him out apparently wasn't working?

A.   Not up until that point it had not.

Q.   All right.  But Sgt. Tuma made the decision that law enforcement was going to breach and force its way into the trailer?

A.   Yes.

Q.   And when a -- have you ever been an on-scene commander at different situations?

A.   Yes.

Q.   When you make that type of decision, you have to consider lots of factors, correct?

A.   Absolutely.

Q.   And, of course, when you are dealing with a fugitive wanted for a violent felony, one of those is public safety?

A.   Yes.

Q.   Okay.  I mean, one of your key points of your job is to apprehend felons or people that are wanted for felony offenses, correct?

A.   Correct.

Q.   Keep the rest of the community safe?

A.   Yes.

Q.   You have investigated family violence cases, cases with injury to children, that type of thing, before, haven't you?

A.   Yes.

Q.   When a person that has committed that offense is out on

the run, are those family members often concerned about, hey, are y'all going to pick him up?

A.    Yes.

Q.    Because they are nervous about what might happen to them?

A.    Yes.

Q.    Okay.  So it is essential that law enforcement gets those people into custody?

A.    Yes.

Q.    Okay.  It is -- I guess it is easy to Monday morning quarterback any kind of tactical decision that is made; is that right?

A.    Yes.

Q.    In fact, that is what everyone does after a tactical entry or arrest has been made, meet about it later and talk about it?

A.    Yes.

Q.    You want to see what went wrong and what went right?

A.    Yes.

Q.    Okay.  But at that time, obviously in Sgt. Tuma's mind, he thought the essential thing to do was breach at that time?

A.    Yes.

Q.    Once the apprehension dog got there?

A.    Yes.

Q.   Okay.  And then you went to the back of the trailer where Officer Newell was; is that right?

A.   Correct.

Q.   Do you remember speaking to him?

A.   Yes.

Q.   You wanted to get some more information from him?

A.   Yes.

Q.   Okay.  You talked about -- or he gave you information about a sheet metal up against the door in the back.  Do you remember that?

A.   I remember we talked about a dog that was supposed to be locked up out back.  I remember that.

Q.   Do you remember him telling you about how that sheet metal came out and thought maybe Evans was looking out at him?

A.   To the best of my memory, I thought he said he looked out the front door, maybe.

Q.   Yeah, at the beginning.  But later on, you don't remember that?

A.   Yeah, it is possible, but I don't remember.

Q.   You do remember Sgt. Tuma talking about a hole in the floor?

A.   I do remember there being talk about a hole.

Q.   And they were keeping watch on that thinking -- they believed Robert Evans might try to get out and get away?

A.    Yes.

Q.    Through that hole?

A.    Yes.

Q.    And Constable McQueen was on the side of where that hole was?

A.    Yes.

Q.    All right.  It was obvious to you that Sgt. Tuma and Officer Newell had been getting information from some source about the layout of that trailer or what Robert Evans might do or be able to hide or get away.  Is that right?

A.    They seemed to be pretty familiar with the situation.

Q.    Okay.  When you first got there, there was a man in handcuffs standing out there talking to Sgt. Tuma; is that right?

A.    Yes.

Q.    Last name is Graham, I think?

A.    I don't remember his name, but the one that was with Sgt. Tuma, yes.

Q.    You immediately joined in to questioning him, didn't you?

A.    Yes.

Q.    He was someone that had been in the house?

A.    Yes.

Q.    And just recently come out?

A.    Yes.

Q.    And y'all were questioning him about whether anyone else was in there?

A.    Yes.

Q.    Okay.  And you took it upon yourself to really question him, hey, man, now is your time not to get in trouble, right?

A.    Right.

Q.    He was a convicted felon?

A.    I didn't know that.

Q.    Do you remember saying that to him, hey, you have been convicted, you don't want to get in any more trouble, do you?

A.    That's possible.

Q.    He said, I sure don't.

A.    Right.

Q.    But he told you he didn't think anyone was in there?

A.    Right.

Q.    Did you believe him?

A.    No.

Q.    All right.  I mean, officers are outside banging on doors, and you are inside.  You know about it if you are in a trailer, don't you?

A.    Yes.

Q.    They are not small -- that are not constructed that if you are outside making noise, you are going to hear it if you

42

are inside the trailer?

A.   Yes.

Q.   Okay.   But he continued after questioning, no, Robert is not in there, I haven't seen him, that type of thing?

A.   He was claiming that nobody was inside.

Q.   Okay.   And one of the questions y'all had about -- well, you were asking about weapons.   He talked about things that were inside the trailer.   Do you recall that?

A.   I think power tools, if I remember right, or just tools in general.

Q.   Jigsaws; do you remember that?

A.   I would have to refer that.

Q.   I don't mean the puzzle, I mean saw blades?

A.   Right.

Q.   But there were tools there, apparently?

A.   Yes.

Q.   Tools can be used as a weapon?

A.   Yes.

Q.   Now, when you were back there talking to Officer Newell, that is -- Constable Smith arrived in his vehicle; is that right?

A.   Yes.

Q.   When you came back around to the other side, you saw Smith out by his vehicle, didn't you?

A.   I think he was up towards the road.

43

Q.   Okay.  Was he bringing his dog at that point?

A.   Yes.

Q.   He had already -- you asked where Kelly was, and Sgt. Tuma told you he went to get the dog?

A.   It is possible.  I don't remember that exact.  It is possible.

Q.   Do you remember walking out and talking to him and kind of briefing him on the situation when he walked up?

A.   Yes.

Q.   He didn't come in with his sirens on, did he, when he arrived on the scene?

A.   No, I don't think so.

Q.   You would have heard that, wouldn't you?

A.   Probably.

Q.   Okay.  I mean, sirens are loud?

A.   Yes.

Q.   And you probably would have remembered if he came in with his sirens?

A.   It is possible.  In our line of work, we see it quite a bit, so it is not really --

Q.   Right.

A.   -- a big deal.

Q.   Okay.  But he didn't appear excited or agitated in any way when he walked up and talked to you, did he?

A.   No.

44

Q. He walked calmly with you as you gave the information?

A. Yes.

Q. And do you remember when he walked up, he got there and looked at Sgt. Tuma, said, where do you want me, boss?

A. It is possible, yes.

Q. Because he knew Sgt. Tuma was in charge?

A. Right.

Q. All right. And while he was there, there was talk about the felony warrant for injury to a child. He wanted to know and make sure it was confirmed?

A. Yes.

Q. That is something you do to make sure the warrant is valid before you force entry and take an apprehension dog in the situation, don't you?

A. Absolutely, yes.

Q. And it had been confirmed more than once, hadn't it?

A. At least once that I was aware of.

Q. Kelly Smith didn't try to take over the scene, did he?

A. No.

Q. He didn't start bossing people around, did he?

A. No.

Q. Okay. He just said, where do you want me, boss, and you started briefing him on the situation?

A. Right.

Q. Okay. Do you recall his name being given, Robert Evans,

and he got the name mixed up, Kelly Smith?

A.   It is possible.  I don't remember that exactly.  But it is possible.

Q.   He didn't know who Robert Smith -- Evans was, as you didn't either, did you?

A.   Right.

Q.   Okay.  So he had no grudge against Robert Evans, did he?

A.   No.

Q.   And do you recall you turned to Kelly Smith and said, I don't know how you feel about a building search, but it is there?

A.   Correct.

Q.   Okay.  That was -- you had already made a suggestion about the apprehension dog and now you said about a building search.

And his response, if there is nobody else in there, I am here to help.  If you want me to do a building search, I can help clear it.  Do you remember that?

A.   Yes.

Q.   Now, there was some questions yesterday about clearing a building and apprehending someone?

A.   Yes.

Q.   And I think the question was that is different, and you said, well, it depends on -- I believe your answer was, it

46

depends on if there is a person that is known to be in the building?

A.    Right.

Q.    Okay.  Can you explain what you meant by that?

A.    I mean, if you send a apprehension dog in to find somebody and he locates that person, the majority of dogs that I have heard about or known about would engage that person whenever they find them.

Say, there was a door or someone in between them, they may bark at the door, scratch at the door, let their handler know, but if they find them, they are likely to be bit.

Q.    Okay.  If they find them, you put an apprehension dog in there when you know someone is in there, they are likely to get bit?

A.    Yes.

Q.    Which is one of the reasons you give K9 warnings?

A.    Yes.

Q.    That say you are going to get bit?

A.    Yes.

Q.    All right.  And y'all knew Robert Evans was in that building, that trailer?  At least you had good information on the officers that you relied on there he was?

A.    Yes.

Q.    So the decision has been made, the apprehension dog --

did Sgt. Tuma ever say, just scare him with that dog?

A.    No.

Q.    Okay.  And then you asked, do you want K9 warnings to be given?

A.    Yes.

Q.    Okay.  And before those K9 warnings were given, you looked at Sgt. Tuma one more time and said, do you want us to -- do you want an entry with a dog?

A.    Yes.

Q.    Okay.  And he said yes?

A.    Yes.

Q.    All right.  So you gave him more than one opportunity. You knew what his decision was as the on-scene commander. Entry with a dog?

A.    Yes.

Q.    At that time you gave the canine warnings?

A.    Yes.

Q.    That is when you shout out in a very loud voice, police K9, come out with your hands up now.  We will send in the dog.  You will be bit.

A.    Yes.

Q.    And do you remember you were right by the trailer when you said that?

A.    Yes.

Q.    No doubt in your mind Evans heard you, didn't he?

A.    You would think so.

Q.    I mean, you have been in trailers.  You know that they are pretty thin-walled?

A.    Yeah, I live in one.

Q.    All right.  There is -- there is several uniformed officers out there, correct?

A.    Yes.

Q.    There is police cars out there, and there is an apprehension dog out there?

A.    Yes.

Q.    And the police officers have been out there for about 20 minutes, at least, at that point in time?

A.    Yeah, I would think at least.  It took me a few minutes to get there, and we had been there for a few minutes.

Q.    I am talking about the Hawkins police, they have been there for a while?

A.    Yes.

Q.    He had to be aware officers were out there, and you yelled loud enough for him to hear, didn't you?

A.    Yes.

Q.    Twice?

A.    Yes.

Q.    And one reason you throw those warnings out is to get a person to comply, come out, correct?

A.    Correct.

49

Q.   We have a dog -- you are saying, we are going to make entry.  Does that work many times?  Do people come out when you yell out those warnings?

A.   Yes.

Q.   Didn't work this time, though, did it?

A.   No.

Q.   That is kind of like you talked about on the use of force continuum, the presence of police didn't work with Evans, correct?

A.   Correct.

Q.   Commands certainly didn't work?

A.   Correct.

Q.   And now an apprehension dog on the scene with warnings saying, you will be bit, didn't get him to come out?

A.   Correct.

Q.   There are some people that just don't want to go to jail, aren't there?

A.   Yes.

Q.   Those people we talked about can be very dangerous?

A.   Potentially.

Q.   When he didn't come out, then y'all got situated.  Do you recall that?

A.   Yes.

Q.   Okay.  Kelly Smith was on the porch with his dog, Mata?

A.    Yes.

Q.    And you were going to try to breach that door at that time?

A.    Yes.

Q.    Okay.  And you made your best effort?

A.    I did.

Q.    Now, trailer doors are usually -- even though they are locked, you can probably usually kick them in, kick them open, right?

A.    Yes.

Q.    Did you anticipate that would be what happened when you kicked it?

A.    Yes.

Q.    I believe -- did you kick forward first, or you did mule kicks first?

A.    I think I had a mixture.  I don't remember what I tried first.

Q.    Then it became pretty evident that just kicking the door hard wasn't going to open the door?

A.    Correct.

Q.    Did you suspect that door might be barricaded some way?

A.    Yeah, at least the first few kicks.

Q.    Okay.  You wound up kicking it 25 times?

A.    Right.

Q.   In fact, you kicked it so many times, your leg started cramping up?

A.   I was tired, yes.

Q.   So, obviously, this wasn't just a normal lock on a trailer door; there was something else going on with that door?

A.   Correct.

Q.   And you learned later that it had been barricaded?

A.   Yes.

Q.   Do you remember what type of -- how it had been barricaded?

A.   I just briefly remember it was something like a small wooden door.  I think Evans said they used it as like a separation device or something.

Q.   Okay.  So after -- and you understand that Graham had been in the house, and he had come out of the trailer, correct?

A.   Correct.

Q.   And then apparently the door was locked behind him?

A.   Yes.

Q.   Okay.  And while y'all were out there, probably while you were out there talking to Sgt. Tuma, Evans was busy barricading that door?

A.   It appears so, yes.

Q.   It didn't just get magically barricaded?

A.    Correct.

Q.    In fact, you said that after he was detained when he was lying about that, didn't you?  Do you remember saying, it didn't just ghostly happen?

A.    Yes.

Q.    Okay.  But he kept lying about that, didn't he?

A.    I think he made an excuse.

Q.    Something fell down; he didn't do that; that sort of thing?

A.    Yes.

Q.    Okay.  So it takes -- well, after 25 kicks you still hadn't gotten it open.  The barricaded door like that takes some thought, some premeditation, does it not?

A.    Yes.

Q.    It takes a person to think about, I am surrounded by the police.  They want me to give up.  I have got active warrants out on me.  But instead of doing that, I am going to make this as impossible as I can for the police officers.

A.    It is possible, yes.

Q.    And that makes it very dangerous for the police, doesn't it?

A.    Potentially.

Q.    And it also is an indication that the person you are dealing with might be a very dangerous individual?

A.    It is possible.

Q.   All right.  Constable Kelly then asked Constable McQueen -- he is a larger guy, isn't he?

A.   Yes.

Q.   Okay.  If he could come over and help?

A.   Yes.

Q.   And then he kicked it about three times, moved some stuff around, and the door started to come open?

A.   Yes.

Q.   It didn't just fly open, did it?

A.   No.

Q.   Because of that barricade?

A.   Yeah, it was the wooden piece behind it.

Q.   Okay.  Now, when you did that, when the door is coming open, you pulled your firearm out?

A.   Yes.

Q.   That is standard procedure?

A.   Yes.

Q.   Because when you are going in, forcing your way into a building, there is a good chance you may have to use your weapon?

A.   It is always a possibility.

Q.   You want to have it ready?

A.   Yes.

Q.   Okay.  And when that door opened, you yelled -- you started yelling commands in there, did you not?

54

A.    Yes.

Q.    Well, the first thing I guess you saw was something that ou didn't expect to see was a dog right there?

A.    Correct.

Q.    Pit bull mix?

A.    Correct.

Q.    And Kelly Smith said, get back -- he was talking to his dog, Mata?

A.    I think I said that there was a dog, and if I remember, I think he told me to grab it, and I grabbed it.

Q.    And that was an essential thing to do, wasn't it?

A.    Yes.

Q.    If you are going to bring an apprehension dog in, you don't want a dog there in the house, do you?

A.    No.

Q.    It could cause a lot of problems?

A.    Yes.

Q.    I could cause confusion with the dog, the apprehension dog?

A.    Yes.

Q.    It could cause a dog fight?

A.    Yes.

Q.    And you grabbed the dog and brought it out?

A.    Correct.

Q.    Okay.  Do you remember what was done with it at that

point in time?

A.    I took it over to the subject that Hawkins had detained, that had just come out of the house.

Q.    Let me back up for a minute.

We have seen that video played a couple of times, so I am just going to go over it with you at this point, just talking like this, okay?

A.    Okay.

Q.    When the door first came open, you heard some yelling from the -- inside the trailer; is that right?

A.    Yes.

Q.    That turned out to be Mr. Evans?

A.    Yes.

Q.    Okay.  And that is when you commanded, show me your F'ing hands, correct?

A.    Yes.

Q.    In a very loud voice?

A.    Yes.

Q.    And that was another attempt by you to get him to comply?

A.    Yes.

Q.    And it didn't work, did it?

A.    No.

Q.    In fact, with those 28 kicks to get that door open, no doubt Robert Evans knew exactly what was about to happen,

police were about to come into that trailer?

A.    Yes.

Q.    Waiting him out wasn't going to work; you weren't going away?

A.    It hadn't worked up until that point, no.

Q.    He could have come out, walked to that front door, and said, okay, I give up, any time while you were trying to kick that door open; but will he didn't do it, did he?

A.    No.

Q.    That would have been it, right, if he would have given up and complied at that point in time?

A.    Yes.

Q.    So you had to leave.  And when you took the dog out, is that when Constable Smith went in with his dog?

A.    Yes.

Q.    Did you see him go in, or were you taking the dog out at that time?

A.    I turned around and took the dog out.  I had to take him a little distance over to the side of the house.  It took me a second.

Q.    But you knew Kelly Smith was making entry with his dog?

A.    Yes.

Q.    And you were doing that quickly.  You wanted to get that dog out but secured somehow and get back into that trailer.

Didn't you?

A.   Yes.

Q.   Because you didn't want Kelly Smith in there by himself, did you?

A.   Yes.

Q.   It is a very dangerous situation to be in a trailer by yourself, law enforcement, in a trailer when you make forced entry?

A.   Yes.

Q.   Now, Constable McQueen had just been on the porch with you, correct?

A.   Yes.

Q.   He's the guy that actually got the door kicked open?

A.   Yes.

Q.   Took him awhile to get in the house after you left, didn't it?

A.   Apparently so.

Q.   Okay.

A.   I think he was in there before I got back though.

Q.   Oh, yeah.  You remember when you were running back, he was just starting to go in?

A.   It is possible.

Q.   Okay.  He had stepped off the porch and was kind of out front.  Do you remember that?

A.   It is possible, yes.

Q.   Okay.   Now, if you are on an entry team or out even securing a perimeter and you see two guys go in and one has to run out with the dog or something, would you, being a law enforcement officer, immediately go in to cover the one, lone officer?

A.   Yes.

Q.   That is your training, correct?

A.   Yes.

Q.   If he is in there by himself, you would go in?

A.   Yes.

Q.   Right away?

A.   Yes.

Q.   You wouldn't have to wait 15, 18 seconds, would you?

A.   No.

Q.   Did you hear Kelly Smith eventually yell, cover?

A.   Yes.

Q.   And when he yelled, cover, that was, I need help, correct?

A.   Yes.

Q.   He wanted someone to help cover him?

A.   Yes.

Q.   That caused you to speed up even more, didn't it?

A.   Yes.

Q.   Okay.   So when you got back in the trailer, Kelly Smith was where?

A.    In the hallway outside the bathroom.

Q.    Okay.  And was he yelling back at Evans, who was apparently behind that door?

A.    Yes.

Q.    Okay.  And did you hear Evans at that time saying, put up the dog, I will come out, or I will give up, or words to that effect?

A.    I would have to refer back to the body cam to be positive on that.

Q.    Do you know what he was saying, or did you just hear yelling?

A.    I remember yelling -- I think he said something about he was trying to go to the bathroom --

Q.    That's right.

A.    -- or finish going to the bathroom.

Q.    That's right.  He yelled that a number -- I am trying to S -- I won't say the whole word?

A.    Right.

Q.    That is what he said he was doing in that bathroom?

A.    Right.

Q.    Which he continued to say after you had him detained outside the trailer, didn't he?

A.    Yes.

Q.    You knew that was a lie?

A.    I didn't see what was happening in there, but --

60

Q.   A pretty good guess that was a lie?

A.   You would think if that was what he was doing, that he would come outside when he figured out what was going on --

Q.   Yeah.

A.   -- at some point.

Q.   All right.

So when Kelly Smith was trying to get in that door, he is saying he is taking an S, he was lying, wasn't he?

A.   It is possible.

Q.   All right.  And Kelly Smith was actually trying to push that door open, wasn't he?

A.   Him and Constable McQueen were.

Q.   Okay.  But at first -- he asked for Constable McQueen's help, but when you first walked in there, he was still at the door trying to push his way in, wasn't it?

A.   I think he told Constable McQueen to shoulder the door. And I think he tried that, but it didn't come open all the way.  And Constable Smith pushed it the rest of the way.

Q.   And that door didn't even have a doorknob on it?

A.   I don't remember.

Q.   If photos show there is no door knob, there is just an empty hole for the door, that would be indicative that there is no doorknob?

A.   Right.

Q.   Which means the only way the door can be held is by

someone on the other side holding it, correct?

A.    Yeah, unless something was blocking it.

Q.    Okay.  And there was no light on in that bathroom, was there?

A.    No.

Q.    Okay.  Let's talk about the lighting situation.

Y'all have been out in the bright sunlight, have you not?

A.    Yes.

Q.    It is July, and it is 4:00 o'clock or so, 4:00 p.m.?

A.    Yeah, it was late in the afternoon.

Q.    Not a cloud in the sky?

A.    Probably not.

Q.    Hot and bright?

A.    Yes.

Q.    Okay.  The trailer, I know, had a tarp on the front that at some point it had to get ripped down, but it was much darker inside, wasn't it?

A.    Yes.

Q.    Okay.  And when you go into a house, when you have been out in the light and you go into a structure like that trailer, your eyes have to adjust, correct?

A.    Yes.

Q.    Okay.  There is a period of time that the eyes are adjusting from being out in the bright into the darker

area?

A.    Right.

Q.    There was no actual lights on in the trailer, was there?

A.    I mean, I couldn't tell you for sure.  I know there was some sunlight coming in the hallway, but there wasn't in the bathroom.  I remember I used my flashlight.

Q.    Right.  You had to use a flashlight, didn't you?

A.    Right.

Q.    It was pitch black in that bathroom, wasn't it?

A.    It was dark.

Q.    You were in that bathroom.  It was really small, wasn't it?

A.    Yes.

Q.    Okay.  You know, and the way it is there is the door and then there is the bathtub with the commode and vanity in between?

A.    Yes.

Q.    Talking about --

         MR. SHOOK:  Your Honor, can I approach get this diagram?

         THE COURT:  You may.

BY MR. SHOOK:

Q.    First, I want you to look at this diagram.  Does that look like a diagram of the --

A.    Yes.

Q.    -- of the bathroom?

You see it is 80 inches, full length, and then shorter from the bathtub?

THE COURT:  Mr. Shook, I'm not sure the jury can see it.  You are going to have to move it back.

MR. SHOOK:  Thank you, Judge.

BY MR. SHOOK:

Q.    Bathtub is here, door is right here.  Is that right?

A.    Yes.

Q.    Bathtub went all the way across?

A.    Yes.

Q.    So if there is no doorknob or a way to lock this door, and if a full-grown man is trying to push his way in and he can't, there has to be some force stopping it on the other side?

A.    Yes.

Q.    And do you know how tall Mr. Evans was?

A.    Not exactly, no.

Q.    He was taller than you, though?

A.    Probably.

Q.    Taller than Kelly Smith?

A.    Probably, yes.

Q.    Six foot, could be six foot tall and skinny?

A.    He could be somewhere in the neighborhood.

Q.   It wouldn't be a problem if he didn't want someone to come in, to put his feet against this bathtub and push back, brace himself?

A.   I would have to do the math on that.

Q.   Okay.  Well, we have got 80 inches total here and then, of course, the 26 inches on the bathtub.  So it is a small, confined space?

A.   It's a small bathroom, yes.

Q.   That might be one way to keep a grown man, a police officer, from being able to push that door open?

A.   If it was possible due to his height, it is possible.

Q.   Okay.  Now, that could be one way he was able to deep keep them out for a while?

A.   It would be a possibility.

Q.   He could also just be pushing on the door standing there, couldn't he?

A.   Yes.

Q.   And could be just moving around in different positions?

A.   Yes.

Q.   But you heard Kelly Smith yell commands, you are barricaded, brother?

A.   I remember him saying, you are barricaded.

Q.   I don't know if you have weapons, show me your hands?

A.   I think he just said, you are barricaded, brother, we

don't know if you have weapons.

Q.    Okay.  So you are in the hallway.  And I think we can see your body worn camera when he asked Constable McQueen to put his shoulder into it?

A.    Yes.

Q.    Okay.  And he had Mata right next to him, did he not, Kelly Smith?

A.    Yeah, he had Mata with him.

Q.    Okay.  And when McQueen was able to push the door open, he was able to shove it, and it did start to come open, didn't it?

A.    I think it did come open some.

Q.    Okay.  Now, you said, I believe, that you saw hands come out?

A.    Yes, I have seen that in the body worn camera, yes.

Q.    Okay.  But when you interviewed -- the first time you interviewed with the FBI was last August; is that right?

A.    Yes.

Q.    And how many agents did you meet with?

A.    Two.

Q.    Okay.

A.    I think.

Q.    Are they here at the table?

A.    Yes.

Q.    All right.  And how many times have you met with them

since then?

A.    Including today and yesterday or --

Q.    Total.

A.    Maybe three.

Q.    Okay.  Meaning, you met with them yesterday and today and one other time in August?

A.    I met with them prior to -- I met with them in August prior to the court, and then yesterday -- or just this week.

Q.    You say court, are you talking about the Grand Jury?

A.    No, I am talking about this, the trial.

Q.    Okay.  How long ago was that?

A.    A couple weeks.

Q.    Okay.  On that first meeting then in August, did you tell them, I saw hands coming out, Robert Evans's hands coming out?

A.    I don't recall.  To the best of my memory, I just remember that there was an issue at the door.  I just remember that.

Q.    Well, do you remember in the Grand Jury you said you saw hands come out?

A.    Yes.  In the -- I have seen that in the body worn camera.  I could see he was there at the door.

Q.    Okay.  But, specifically, I need to know, you used the word, according to the notes and the Grand Jury testimony,

"hands," plural, both hands?

A.    His hands did come out.

Q.    Have you watched your body worn camera since then?

A.    I have watched it numerous times yes.

Q.    Everything happens pretty fast, doesn't it?

A.    Yes.

Q.    Okay.  Did anyone ever show it to you in slow motion?

A.    I have seen still shots of it.

Q.    No, did anyone ever show it to you in slow motion?

A.    I don't remember about slow motion.  I know I have seen still shots.

Q.    Okay.  You can usually see things a little better when they are in slow motion when you are talking about something moving fast, can't you?

A.    Yes.

Q.    When you watch football, college football, NFL football, they are always showing things in slow motion?

A.    Sure.

Q.    I want to show you what is Government's Exhibit 1, just a small portion of that entry, from your body worn camera, okay?

A.    Okay.

        (Video played.)

Q.    When we look here --

        MR. SHOOK:  Would you stop it, please?

(Video paused.)

BY MR. SHOOK:

Q.   We see Constable McQueen, and on the other side of him would be Constable Smith; is that right?

A.   Yes.

Q.   Okay.  And looks like at this point McQueen is moving towards the door?

A.   Yes.

           MR. SHOOK:  Okay.  Please go forward.

           (Video played.)

           MR. SHOOK:  All right.  Stop it there.

           (Video paused.)

BY MR. SHOOK:

Q.   Do you see that hand come out?

A.   Yes.

Q.   Okay.  That is one hand that came out; is that right?

A.   Yes.

Q.   Okay.  And the hand doesn't come out like this, like I surrender, does it?

A.   I think it changes moving forward a little bit.

Q.   Yeah, as it comes out, it does this and grabs that frame?

A.   Correct.

Q.   Wasn't two hands, was it?

A.   Not in this particular moment right here.

Q.   Okay.  And when you grab a door frame, that means your other hand is over here, right, behind that door?

A.   It is a possibility.

Q.   Well, as we see here, the door is not totally open, is it, in this where we have paused the video?

A.   Right.

Q.   So if there is one hand out, could that be consistent with Mr. Evans still pushing back maybe with his left hand and holding with leverage with this hand?

A.   It would be possible.

Q.   That would be consistent with it, wouldn't it?

A.   I would say possible.

Q.   Okay.  And you don't -- from this angle or from if you are looking straight on, that door is only partially opened, you don't know what he has in his other hand, do you?

A.   Not in this particular moment right here.

Q.   You assume when you are going for people, suspects, they have weapons.  You don't assume they don't have a weapon, do you?

A.   You have got to keep it as a possibility, yes.

Q.   We talked about at the beginning of my questions about you have been trained to look for the hands?

A.   Correct.

Q.   The hands can kill you?

A.   Correct.

Q.   So this situation, it is not two hands.  That is real clear, isn't it?

A.   In the still shot, yes.

Q.   Well, it was real clear watching it in slow motion, wasn't it?  You saw the hand come out slowly and grab the door frame, didn't you?

A.   Right.

Q.   Have you ever seen it like this before?

A.   I don't think I have seen it in slow motion like this.

Q.   Okay.  That would be helpful if you had seen it in slow motion?

A.   Yeah.  I mean, I guess it is possible that I have.  I have seen videos numerous times.  I just couldn't tell you.

Q.   But you just thought when you testified to the Grand Jury or talked with the agents that you saw hands came out?

A.   I had seen the still shot.

Q.   Well, the still shot, that wasn't two hands coming out, was it?

A.   Not in this one.

Q.   Okay.  Well, let's watch it a little more.

A.   Okay.

            (Video played.)

                MR. SHOOK:  Stop it, please.

            (Video paused.)

BY MR. SHOOK:

71

Q.   Do you see two hands ever come out there?

A.   Not at this instance.

Q.   Okay.  So Kelly Smith now is forcing his way in with his dog, Mata, isn't he?

A.   Yes.

Q.   Okay.  So you never saw two hands.  You may have thought had you did, but there is only one hand there?

A.   I didn't see it right there.  I am just seeing the one grab the door.

Q.   And we started this video as -- while the door was closed and Constable McQueen was going towards it, correct?

A.   Correct.

Q.   Okay.  Just one hand gripping the door frame when it came out?

A.   Correct.

Q.   Now, you are behind him at that point in time; is that right?

A.   Yes.

Q.   And you heard a struggle, I believe you described it, when Kelly Smith went in there with Mata, right?

A.   Yeah, that is all I could tell.

Q.   Okay.  Would a struggle maybe indicate that Robert Evans was resisting?

A.   It would be possible from this vantage point with the knowledge at that very moment, yes.

72

Q.    Sounded like a struggle?

A.    There was an incident occurring.

Q.    Okay.  Two men fighting, being shoved out, that sort of thing?

A.    It is possible.

Q.    Did you see Mata get shoved out or back out of the bathroom as you were in the hallway?

A.    I know Mata came in and out a few times during this incident.

Q.    Okay.  You don't recall, though, when he first went in and coming back out?

A.    I would refer back to the camera footage.

Q.    Okay.  And that is good point.  Because, really, at that point when we see these things on a camera, it is not like you watching it in that situation, is it?

A.    Right.

Q.    When you are a police officer, in a high-end situation, you are looking for threats, aren't you?

A.    Yes.

Q.    Your attention span gets very narrow, doesn't it?

A.    You can get tunnel vision, yes.

Q.    Especially when your adrenalin gets going and you are fighting with someone?

A.    Correct.

Q.    You are looking for weapons, you are assessing the

threat.  Is he going to get me?  How am I going to get him.
That sort of thing.  Correct?

A.   Yes.

Q.   And that's all you are focusing on?

A.   Potentially.

Q.   You have been in that situation before, haven't you?

A.   Yes.

Q.   Several times?

A.   Yes.

Q.   And when that happens, your focus -- that's why they
call it tunnel vision.  Right at what the threat is?

A.   Yes.

Q.   Because that's what your survival depends on.  What is
going on over here, over here, you are not watching, are
you?

A.   No, not when you get tunnel vision.

Q.   No.  Because that is how our DNA works.  That is how God
made us.  We've got to survive at that point in time, don't
we?

A.   Yes.

Q.   Assess the threat?

A.   Yes.

Q.   Okay.  That includes hearing things.  You are just
concentrating on the threat in front of you, not what
somebody else might be saying or anything like that, did you?

74

A.    Yes.

Q.    And is it fair to say this situation was highly stressful?

A.    Yes.

Q.    Okay.  For everyone involved?

A.    Yes.

Q.    Highly stressful for Kelly Smith, wasn't it?

          MR. MACHICEK:  I'm going to object to speculation at that point.

          THE COURT:  Sustained.

BY MR. SHOOK:

Q.    Did Kelly Smith appear calm during this situation?

A.    I'd say he appeared the way he should, you know, alert and stuff like that in the hallway.

Q.    He wasn't just hanging out.  He's in a struggle inside this bathroom, wasn't he?

A.    Yes.

Q.    Okay.  Now, when that door opened, it was dark.  You are the one that had to shine the flashlight in?

A.    Yes.

Q.    Okay.  And that took you about seven seconds to get in position to light up the bathroom; do you recall that?

A.    Okay.

Q.    And I talked about resisting.  Resisting -- there is a misdemeanor crime for resisting arrest; we've talked about

it?

A.    Yes.

Q.    Resisting is not actually hitting a police officer, is it?

A.    It doesn't have to be, no.

Q.    If you are intentionally striking a police officer in a fight, that is a felony, isn't it?

A.    Yes.

Q.    Resisting is just that, you are not wanting to comply, maybe you are just holding your arm back, pulling away, pushing; that sort of a thing?

A.    That would be considered resisting.

Q.    Okay.  That is resisting arrest?

A.    Yes.

Q.    You are not complying.

       He is resisting arrest also if you are holding a door and won't let officers who are there with a valid warrant to arrest you in, if there is a shoving match with that door?

A.    That could be considered resisting, yes, sir.

Q.    Okay.  The -- I want to show a small portion of the video of when Kelly Smith entered that room.  All right?

A.    Okay.

       MR. SHOOK:  If we could play Government's Exhibit 4 at the entry.

(Pause in proceedings.)

THE COURT:  What is the issue?

MR. SHOOK:  I'm trying to pull up to that spot.

MR. SKIPPER:  I am just pushing on here.

BY MR. SHOOK:

Q.   All right.  Do you see the viewpoint of Kelly Smith's body worn camera just outside the door?

A.   Yes.

Q.   Okay.

MR. SHOOK:  Let's play it forward.

(Video played.)

MR. SHOOK:  Pause it.

(Video paused.)

BY MR. SHOOK:

Q.   All right.  You saw there were several seconds, at least from the camera's point of view, it is very dark in there?

A.   Yes.

Q.   That is when you were outside the hallway?

A.   Okay.

Q.   Okay.  Do you remember being outside the hallway when he made entry?

A.   Yes.

Q.   Okay.  And it didn't get light in there until you actually shined the flashlight.  The light we see is coming from your flashlight, correct?

A.    Yes.

Q.    Okay.  And you see we have a picture frozen there of Robert Evans, his hands?

A.    Yes.

Q.    Do you remember seeing in one of the exhibits from yesterday about him going like this, from this angle?

A.    Yes.

Q.    Like this, questions about whether he is a threat or not?

A.    Yes.

Q.    That was a still shot?

A.    Yes.

Q.    Okay.  Are still shots more accurate of what is going on, or actually the video?

A.    Both representations.

Q.    Okay.  Well, one is showing what is actually happened, how it is moving, correct?

A.    Yes.

          MR. SHOOK:  Continue for a moment.

          (Video played.)

          (Video paused.)

BY MR. SHOOK:

Q.    So he is actually not just standing there with his hands up, he is moving his hands around, isn't he?

A.    He did there, yes.

Q.   When it lights up, he is coming down with his hands down towards the door?

A.   Yes.

Q.   All right.  Now, you made a supplement to this.  I believe you wrote it that night after you got back to your office about the use of force and your supplement.  Is that right?

A.   Yeah.  I don't think I wrote it that night, but in the coming days, yes.

Q.   Okay.  Well, you watched the video, your body worn camera that night?

A.   Yes.

Q.   You didn't type it up that night?

A.   No.

Q.   Do you remember giving it to Constable Kelly the next morning to take to the DA's office?

A.   I don't think it was the next morning.  I think it was in the coming days.  I don't remember exactly.

Q.   All right.  In there you said -- you had written, Evans grabbed hold of the K9 here, and that is when you struck?

A.   It would be a couple seconds after this.

Q.   Yeah.  You actually reached in and punched him kind of in the upper torso area?

A.   Yes.

Q.   Because he had ahold of K9 Mata's gear?

A.    Yes.

Q.    And that is something you are trained -- you don't allow as a dog trainer, do you?

A.    Correct.

Q.    That's how you have been trained?

A.    Yes.

Q.    In fact, you said that your training -- by your training you knew it was dangerous for Evans to hold the gear so that he could unknowingly redirect the K9 to a part of his body?

A.    Yes.

Q.    Explain that, please.

A.    If he was to bring it in close to a sensitive area, I mean, he could cause it to bite him somewhere that would be not ideal.

Q.    Okay.  That is one of the reasons you struck him at that time?

A.    Yeah, he needed to let go of the dog.

Q.    And the other was, your training says if a suspect grabs the K9's gear, that could harm the K9?

A.    Depending on what transpires from that point, yes.

Q.    Depends on the situation that happens after they grab it.  That is why you stop them and ungrab it, correct?

A.    Yes.

Q.    The K9 has kind of a harness on him; is that right?

A.    Yes.

80

Q.   With a handle that you can grab on his back?

A.   Yes.

Q.   He also has a collar, doesn't he?

A.   Yes.

Q.   Okay.  If you grab the collar some way, that could start choking the dog?

A.   Potentially.

Q.   That is one of the reasons you struck him, too, to get him to let go of the dog?

A.   Yes.

Q.   To avoid harm to the dog?

A.   He needed to let go of the dog.

Q.   And that's how you have been trained?

A.   Yes, they are not supposed to.

Q.   But it is part of your training as a K9 officer, if the suspect grabs hold of the dog's equipment, you get him off. If you have to hit him, use strikes, distraction strikes, you do that, don't you?

A.   Yes.

Q.   Okay.  You also wrote that Evans grabbed the plunger?

A.   Yes.

Q.   And then Kelly Smith punched him?

A.   Yes.

Q.   In fact, I think the prosecutor went over the fact that you said -- you had written in there that he swung it at the

dog?

A.    He attempted to use it against the dog, to push it away.

Q.    Now, you say push away.  Now, a plunger, it is wooden, correct?  It is a wooden plunger?

A.    Yeah.

Q.    Okay.

A.    Wooden or plastic, I don't know.

Q.    But that is a weapon?

A.    Depending on how it could be used.

Q.    Sure.  You don't want a wooden plunger in his hand, do you?

A.    No.

Q.    Because it could be use as a weapon?

A.    Potentially.

Q.    That is why you want the hands empty?

A.    Right.

Q.    You can take a wooden plunger and jab it into an officer's throat?

A.    Potentially, yes.

Q.    Sure.  Pretty easy to do, right?

A.    Yes.

Q.    Especially in this case, Kelly Smith is right next to him, he could reach it up there and jab it in his throat?

A.    Potentially, yes.

Q.    That's why you don't let them have anything in their hands?

A.    Right.

Q.    Could hit them in the eye?

A.    Yes.

Q.    Could injure the dog by jabbing it?

A.    Yes.

Q.    So that is a weapon he had?

A.    Depending on how it is used.

Q.    You testified on direct, well, he was kind of just shoving it away.  But, actually, by your training, you don't know what he is going to do with that weapon?

A.    There is all kinds of potential -- potentials here.

Q.    If you were standing next to him when he brought that up, you would have done whatever you could to get it out of his hands, wouldn't you?

A.    I would have tried to get it from him, yes.

Q.    Because he could use that as a weapon?

A.    Yes.

Q.    And I guess it is one thing to look at it over and over again and say, well, he wasn't really using it.  At the time, in that confined space, when that struggle is going on, you are making a split-second decision as a police officer, aren't you?

A.    Yes.

Q.    I mean, a split-second decision?

A.    Yes.

Q.    With tunnel vision?

A.    Yes.

Q.    Okay.  You don't have time to say, time out, let's figure out how to do this --

A.    Right.

Q.    -- at that point in time when the fight is on, do you?

A.    No.

Q.    At another point in time you testified about you saw the dog -- you wrote in the report you saw the dog get kicked by Evans?

A.    Yes, that is towards the end, and he was trying to kick the dog away.

Q.    Okay.  I want to show you a small portion of when that happens, okay?

A.    Okay.

Q.    While we are getting that ready, I will ask you a couple of questions?

A.    Okay.

Q.    Do you remember writing in your report that you saw Robert Evans kick Mata, and then Mata bit him?

A.    Yes.  He tried to kick him away, and then Mata ultimately engaged him after that.

Q.    Okay.  From your training, you know that apprehension

84

dogs are trained to defend themselves?

A.    Yes.

Q.    If a suspect starts to injure a dog, hit a dog, that dog is trained to bite the suspect, correct?

A.    I would say it is more of an instinctive.

Q.    You don't think they are trained to do that?

A.    Yes, that also.

Q.    That is how they train to defend themselves?

A.    Right.

Q.    Because it is not unusual for an apprehension dog to get into a struggle where someone is trying to injure it as they are trying to apprehend them, is it?

A.    No.

Q.    That is common, isn't it?

A.    Yes.

Q.    And if someone strikes a dog, hits a dog, hurts a dog, they will defend themselves by biting them, won't they?

A.    Yes.

         (Video played.)

Q.    All right.  We are going to slow this down and -- okay.  Did you see that?  When Robert Evans slapped the dog on the nose?

A.    Yes.

         (Video paused.)

         MR. SHOOK:  Okay.  If you could go forward.

85

(Video played.)

MR. SHOOK:  Right there.

(Video paused.)

BY MR. SHOOK:

Q.   He strikes the dog on the snout or head, and you see the ear move, don't you?

A.   Yes.

Q.   You didn't actually see that at the time, did you?

A.   No.

Q.   But he struck the dog?

A.   Yes.

MR. SHOOK:  Go forward again, please.

(Video played.)

Q.   That is you reaching in.

(Video paused.)

BY MR. SHOOK:

Q.   Now, do you see that?

A.   Yes.

Q.   That is when he kicked the dog, correct?

A.   I think it comes up just after this.

Q.   Well, do you see his leg extended there; do you see it?

A.   Yes, I see it.

Q.   His right leg?

A.   Right leg, yes.

Q.   You see -- we see in the photo it is going right at Mata's chest?

A.   Yes.

Q.   Okay.

MR. SHOOK:  Go forward, please.

(Video played.)

(Video paused.)

BY MR. SHOOK:

Q.   Did you see Mata flying back?  Do you want to see it again?

A.   Yes.

(Video replayed and paused.)

Q.   Okay.  Do you see that?

A.   Yes.

Q.   Okay.  So he took his leg out hit, him in the chest, and Mata flew back?

A.   Yes.

(Video played.)

Q.   Okay.  Is that when the bite happened?

A.   No, I think it comes here in a minute.

Q.   Okay.  Does that look like he has ahold of him now?

A.   We are getting close, I believe.

Q.   He doesn't have him right now?

A.   Okay.  Yes, there.

(Video paused.)

87

Q.   So he had ahold of him?

A.   (Witness nods.)

Q.   He bit him right after he took his leg out, shoved him back, and kicked him, and then he went in and bit him, didn't he?

A.   Yes.

Q.   Happened like that.  Kick, dog comes up, dog bites?

A.   Yes.

Q.   We just saw it?

A.   Yes.

Q.   You talked about dogs are trained to defend themselves?

A.   Yes.

THE COURT:  Mr. Shook, are you at a good stopping point?

MR. SHOOK:  Yes, Judge.

THE COURT:  All right.  Why don't we take a 10-minute break.  Stretch your legs and get some coffee and follow my instructions that I previously gave.

(Jury out.)

THE COURT:  When we come back, Mr. Shook, I want to make sure we put on the record what exhibit this is on the video.

MR. SHOOK:  Okay.  Yes, Judge.

(Recess was taken at this time.)

THE COURT:  Are we ready for the jury?

MR. MACHICEK:  Yes, Your Honor.

THE COURT:  Okay.

(Jury in.)

THE COURT:  Okay.  You may be seated.

Mr. Shook, just for the record, what exhibit is this video?

MR. SHOOK:  Government's Exhibit 1.

BY MR. SHOOK:

Q.   Lt. Milbourn, I now want to ask you some questions about when Mata bit Robert Evans and him being taken out in the hallway.  Okay?

A.   Okay.

Q.   All right.  You have been trained, and you mentioned it, I believe there at the scene, that when the apprehension dog puts a bite on someone, as you call it, they hold that bite until the suspect is in custody and handcuffed?

A.   Yes.

Q.   Is that right?

A.   Yes.

Q.   Okay.  And the reason for that is to -- if the apprehension officer called the dog off before he was handcuffed, the person could then start fighting again, which could even cause the person to be bitten again.  Am I right?

A.    Yes.

Q.    But it is training, how you were trained, is that right, that if apprehension dog bites the suspect, they hold on to the bite, or trained to hold on to the bite, until that suspect is handcuffed?

A.    Yes.

Q.    And you mentioned that, you mentioned that to Robert Evans himself, didn't you?

A.    It is possible, yes.

Q.    Okay.  And in this case that is what has happened once Mata was kicked and he bit, brought him out of the bathtub, you grabbed his harness; is that correct?

A.    Yes.

Q.    And then Robert Evans was on the bathroom floor?

A.    Yes.

Q.    He was yelling?

A.    Yes.

Q.    Everyone yells when they get bit by a dog, don't they?

A.    The majority, yes.

Q.    It is painful?

A.    Yes.

Q.    That is the strategy behind the apprehension dog, is it not, to, one, if they do have to apprehend, it is going to be painful?

A.    It is part of it, yes.

Q.   All right.  And do you remember as Evans -- you first tried to get him to roll over, correct?

A.   Yes.

Q.   You are trying to get him to roll over so his hands could be handcuffed behind his back?

A.   Yes.

Q.   Do you remember Sgt. Tuma was in the hallway, and he helped when Robert Evans had I think his left arm under him as he started to roll over?

A.   I remember Sgt. Tuma started to help once we got back out in the hallway, yes.

Q.   He actually pulled his arm out and put it behind his back?

A.   It is possible, yes.

Q.   And you had the other arm so they were behind his back?

A.   Yes.

Q.   That is when you started to apply handcuffs?

A.   Yes.

Q.   Okay.  And when you talk about handcuffs, once they are secured, that is when the dog is taken off the bite?

A.   Yes.

Q.   Okay.  And do you remember, as you were trying to handcuff and get Robert Evans, do you know where Kelly Smith was?

A.    I think he was behind me in the bathroom.

Q.    Okay.  He was in the back?

A.    Yes.

Q.    Were you kind of out in the hallway?

A.    Yes.

Q.    And Sgt. Tuma was out in the hallway?

A.    Yes.

Q.    And Robert Evans was actually being drug down the hallway to some extent?

A.    Yes.

Q.    Was Kelly Smith all the way in the bathroom?

A.    Was he all the way in the bathroom?

Q.    Yes.  In other words, he wasn't out in the hallway, was he?

A.    No, not until the end.

Q.    Okay.  Do you remember Kelly Smith telling you, let me know when it is time to get him off, and you said, stand by?

A.    Yes.

Q.    And that's before you were able to get the handcuffs secured?

A.    Right.

Q.    Okay.  And he is saying that while he is in the bathroom because he can't see Mata and where Mata has him by the foot, can he?

A.    Probably not.  He would have to lean out.

MR. SHOOK:  Can I approach the display again, Judge?

THE COURT:  You may.

BY MR. SHOOK:

Q.    Can you see that?

A.    Yes.

Q.    So here is the hallway, correct?

A.    Yes.

Q.    And if Robert Evans is here and you are right outside the doorway with Sgt. Tuma trying to put the handcuffs on, Kelly Smith was back here in the bathroom area?

A.    Yeah.  Because I think I was just outside the door frame in the hallway.  So he would have had to have been behind me.

Q.    All right.  Another diagram here.  Can you -- can you see what I am talking about?

A.    Yes, yes.

Q.    I want to get where the jury can see.

You have got the bathroom here, small rectangle at the top; is that correct?

A.    Yes.

Q.    This is the hallway?

A.    Yes.

Q.    As Robert Evans was brought out by the dog, you were

trying to handcuff him in this area; is that your recollection?

A.    Yes.

Q.    Kelly Smith was behind you inside the bathroom?

A.    Yes.

Q.    The dog was right out here, correct?

A.    Yes.

Q.    Kind of backing into this doorway area?

A.    I think he was -- he was biting him on the foot, and he would be -- Evans's feet was toward the living room area, so it would be the furthest point.

Q.    Okay.  But there is no way Kelly Smith could have seen where Mata was, or that sort of thing?

A.    The only way that would be possible is if he leaned out and looked.

Q.    And he is kind of behind you, looking over your shoulder?

A.    I assume so.  I wasn't looking at him.

Q.    But you recall him saying, let me know when you take it off, and you said, standby?

A.    Yes.  Something to the effect yes.

Q.    Stand by is I will let you know?

A.    Give me just a second.

Q.    Okay.

        Do you remember if you actually did let him know?

A.    I think kind of at that point the dog had removed the shoe, and that's whenever he kind of came by at the same time.  I think he just ended up recalling him.

Q.    Do you recall when you finally got both handcuffs cuffed, either at that time or a split second afterwards, Mata took off that shoe?

A.    Yes, it was right at the same time, yes.

Q.    Okay. I want to the show you that the sequence again.

(Video played.)

(Video paused.)

MR. SHOOK:  Judge, I want to make sure what exhibit this is.  This is Government's 5.

THE COURT:  Okay.

MR. SHOOK:  This is Adam Newell's body camera.  I'm sorry.  This is Tuma's body camera.  It is not -- I misspoke on that exhibit.  That is going to be Government's Exhibit 6, Sgt. Tuma's body camera?

All right.

(Video played.)

(Video paused.)

BY MR. SHOOK:

Q.    Okay.  We just heard you say, stand by --

A.    Yes.

Q.    -- is that correct?

And we saw Kelly Smith behind you in the

bathroom?

A.    Yes.

Q.    And the handcuffing or you are attempting to handcuff is Robert Evans is out in the hallway outside the way of that doorway, down the hall; is that right?

A.    Yes.

            MR. SHOOK:  Okay.  Go ahead, please.

            (Video played.)

            (Video paused.)

BY MR. SHOOK:

Q.    Okay.  We saw the second clip.  And then you stood up?

A.    Yes.

Q.    What did you see the dog do when you stood up?

A.    He got the shoe off and went back towards the living room.

Q.    Okay.  You never said, I have got him cuffed, or anything like that.  You just stood up and I think said --

A.    I just said, all right.

Q.    Okay.  And you saw the dog that is -- actually had the shoe in his mouth at that point?

A.    Yes.

Q.    Okay.  Do you remember that conversation -- I want to make sure it is clear, so I want to show you an exhibit that is one of the transcriptions that we have --

A.    Okay.

Q.   -- in evidence.

MR. SHOOK:  Your Honor, may I approach to show him a portion of transcript 4A?

THE COURT:  You may.

BY MR. SHOOK:

Q.   Looking at page 11, I will have you, if you would, just read the top part of the transcript?

A.   Evans --

Q.   To yourself, please.

A.   Oh.

MR. MACHICEK:  Toby, what page?

MR. SHOOK:  11.

BY MR. SHOOK:

Q.   Do you see that?

A.   Yes.

Q.   Okay.  And do you see where, about the fourth line down, it says Smith, which stands for Kelly Smith, and then there is a symbol UI.  And then it says, when it is time to get him off.  And then your response is, stand by?

A.   Yes.

Q.   That is just what we talked about?

A.   Yes.

Q.   All right.  Lt. Milbourn, I want to ask you some questions now after the arrest when you went over to Kelly Smith's vehicle as he was sitting in it.  Okay?

A.   Yes.

Q.   You answered some questions about that on direct.

First of all, once you started talking to him and he said -- what was the quote you remember him saying?

A.   He had my dog.

Q.   Okay.  And it is not unusual for a police officer that has a dog, trainer, to become attached to them?

A.   Yes.

Q.   I mean, that is what you expect, correct?

A.   Yes.

Q.   There is a bond?

A.   Yes.

Q.   All right.  And so after an incident like this, it wouldn't be unusual for an officer to be upset or perhaps his dog could have been harmed or was harmed?

A.   Right.

Q.   You would feel the same if your drug dog was in an altercation, wouldn't you?

A.   I would be upset, yes.

Q.   Now, you turned your body worn camera off?

A.   Right.

Q.   And the explanation I recall you said was, well, there wasn't really anything else to record at that point in time?

A.   I assumed we were done.

Q.   Do you often times turn on recorders and off when you are at a scene?

A.   No, not typically.

Q.   Okay.  Was there -- well, Kelly Smith didn't tell you to turn off your body worn camera, did he?

A.   No.

Q.   Did y'all have a long discussion there at his vehicle at all after that, or did you go over to Officer Newell's car?

A.   I don't think it was too lengthy, no, maybe a few minutes.

Q.   You weren't entering into any kind of conspiracy to put together some false reports or anything like that, were you?

A.   No.

Q.   Kelly Smith wasn't telling you to do that, and you didn't have the intent to -- any nefarious intent to turn your body worn camera off so it couldn't be recorded?

A.   No.

Q.   You did go over and then on the camera asked Officer Newell if they were putting resisting on him?

A.   Yes.

Q.   A resisting charge --

A.   Yes.

Q.   -- correct?

          Now, from your observations, Robert Evans, during

that time actually was resisting, was he not?

A.   So I would consider the resisting prior to us entering into the house.  He knew we were there.

Q.   When he was holding the door, you have already testified that could be resisting, correct, the bathroom door?

A.   Yes, that could be considered resisting.

Q.   Wasn't allowing the officers in to make the arrest?

A.   Based off the video, yes.

Q.   Okay.  When Kelly Smith first went in that darkened room and you heard the struggling, that could be resisting, correct?

A.   It could have been.

Q.   Resisting is just preventing an officer from taking you into custody, correct?

A.   Yes.

Q.   All right.  Then you went back, and you reviewed your body worn camera that evening or soon after at your offices?

A.   Yes.

Q.   How long did that take?

A.   To review or how long --

Q.   Yes, how long did it take you to just review?

A.   A few minutes.

Q.   Did you review all of it or speed through parts of it?

A.   We sped through parts of it.

Q.    Okay.  Did you have any trouble -- when you play a body worn camera, does it buffer sometimes or freeze up?

A.    It can.

Q.    Do you recall if that was happening?

A.    It would be possible.  So the body cameras that we have, whenever you download them, you are able to review them while they are downloading.  That is where you typically have the buffering issues.

       Once it is downloaded on to, what we call a shared folder, it typically doesn't buffer anymore.

Q.    Do you recall if you were watching it as it was being downloaded?

A.    It is possible.

Q.    Okay.  So it could have been freezing, you fast forward it at some point.  You didn't watch it altogether -- I mean, the whole thing?

A.    We would skip portions, yes.

Q.    Okay.  Now, you met with the FBI.  You testified today that when you were in the bathroom and you went forward, that you thought things had gone too far and you had to intervene.  Is that right?

A.    Yes.

Q.    Okay.  When you talked with the FBI in August, you didn't mention that to them, did you?

A.    No.

Q.   When you went to the Grand Jury and testified September 15th, 2022, sworn oath, you didn't mention that to them, did you?

A.   No.

Q.   When is the first time you ever mentioned that -- the first I heard about it was today when you said it on the stand?

A.   It is just after reviewing everything.  This has been an ongoing issue for a long time.  I learn something new after I watch a different video footage.  It is just a lot.

Q.   No.  When is the first time you mentioned, like, the reason I went forward was because I thought things had gone too far?  You didn't tell the FBI in August, right?

A.   Right.

Q.   You didn't tell the Grand Jurors when you were being questioned about everything that happened and why things were going on, you didn't tell them, did you?

A.   No.

Q.   So when is the first time you went to someone and said, hey, I have got to tell you, this is why I did this?

A.   Be yesterday, I assume.

Q.   Yesterday?

A.   Uh-huh.

Q.   Was it after court or before court?

A.   After.

Q.   Okay.  Has anyone ever talked to you about criminal law offense, if an officer sees excessive force and doesn't intervene, that he can be charged?

A.   Yes, I have heard that, yes.

Q.   Did someone have that discussion with you after this incident sometime?

A.   Yes.

Q.   Okay.  Who was that?

A.   I spoke briefly about it with the prosecutor.

Q.   Oh, okay.  Prosecutor.  When was that?

A.   Pretrial discussion or pretrial meeting, whatever you would call it.

Q.   Would you tell us how long ago that was?

A.   A couple weeks ago.

Q.   Okay.  And she brought it up to you?

A.   She made me aware of it.

Q.   Okay.  So that is when you first got aware of that offense, that you could be charged with it?

A.   Right.

Q.   She told you that?

A.   Yes.

Q.   Did you take that as a threat?

A.   No, I wouldn't consider it a threat.

Q.   Did she tell you that is what she thought happened, and that if you didn't come clean, then they were going to

possibly get a criminal charge?

A.    No, she didn't threaten me, no.

Q.    Made you feel kind of -- did it frighten you, scare you when she brought that up?

       MR. MACHICEK:  Your Honor, this question has been asked and answered.

       THE COURT:  Overruled.

BY MR. SHOOK:

Q.    You said you never thought of that before, correct?

A.    Right.

Q.    Until -- which prosecutor was it?

A.    I spoke about it with Ms. Batson.

Q.    Ms. Batson brought it up.  She is the one that brought it up.  You didn't bring it up or ask her about it.  She brought it up?

A.    Yes.

Q.    And did she cite that specific Texas statute about not intervening at the time?

A.    She just made me aware of it.

Q.    How did she make you aware of it?

A.    While we were discussing, she just asked if I knew about it.

Q.    Oh, Okay.

       Did she say anything about any federal statutes you could get in trouble for?

104

A. I don't remember about federal statutes or anything.

Q. But that Texas one she specifically pointed out to you?

A. I don't remember if it was the Texas one or federal. She made me aware that it is supposed to be that.

Q. Did you get a lawyer after that?

A. No.

Q. Okay. Kind of frightening thinking you might be charged with a felony offense, isn't it?

A. Yeah, it would be, yes.

Q. Okay. Because you certainly didn't mention wanting to go forward back at the scene, did you, back on the July 25th 2022, did you?

A. I don't guess I understand your question there.

Q. Well, your body worn camera was on when you went over there and talked to Officer Newell. You never said, oh, man, that went too far. I was reaching in there to grab him. You never said that, did you?

A. No.

Q. When you went back to look at the body worn camera with the other Wood County officers there, you never said, man, things went too far there. I was going in to intervene. Did you?

A. No.

Q. You never told Kelly Smith that, did you?

105

A.    No.

Q.    When you met with the FBI -- and they questioned you very thoroughly, did they not?

A.    Yes.

Q.    Okay.  You never mentioned it then, did you?

A.    No.

Q.    Okay.  And when you went into the Grand Jury, which meets in secret, took an oath, you didn't mention it then?

A.    No.

Q.    The first time it came in your mind to mention it is after the prosecutor made you aware of it?

A.    Yes.

Q.    And when we say "made aware" means you might could get charged with that?

A.    Right.

Q.    Scary, isn't it?

        THE COURT:  I think we have covered it, Mr. Shook.

        MR. SHOOK:  Thank you.  I will move on.

BY MR. SHOOK:

Q.    Do you remember when you were in the Grand Jury the last question you were asked by a Grand Juror, said:

        Would you ever work with Kelly Smith again?

        And you said:  If he is a certified peace officer, yes.

A.   Yes.

          MR. SHOOK:  That's all of the questions I have, Judge.

          MR. MACHICEK:  Redirect, Your Honor?

          THE COURT:  You may.

          MR. MACHICEK:  Ms. McCullars, can we have Exhibit 1D-2, please?

          May I approach, Your Honor?

          THE COURT:  You may.

                    REDIRECT EXAMINATION

BY MR. MACHICEK:

Q.   Lt. Milbourn, can you please describe the position of the suspect's hands in the photograph, for the jury there?

A.   Kind of turned them like this.

Q.   Are his fingers extended, his palms open?

A.   Yes.

Q.   Do you see any weapons in that photo?

A.   No.

Q.   If an individual has their hands up in the air like this, and a K9 is deployed to bite them, what does that individual do with their hands in general?

A.   They would tend to block the dog.

Q.   They move them from here to here?

A.   Yes.

Q.   Okay.  The photograph that we are looking at right now,

Government's 1D-2, in order to get from this position to this position, where did the hands start?

A.   I would assume higher up.

Q.   Mr. Shook asked you about who the commanding officer on the scene was.  When you arrived, who was the commanding officer?

A.   Sgt. Tuma.

Q.   When you were in that bathroom, who was the commanding officer?

A.   Constable Smith.

Q.   Who was in charge of the K9 in that bathroom?

A.   Constable Smith.

Q.   Sgt. Tuma wasn't in charge of that K9?

A.   No.

Q.   I thought Mr. Shook said he was the commanding officer?

A.   Constable Smith would be responsible for his dog.

Q.   At all times?

A.   Yes.

        MR. MACHICEK:  Let's look at 1D-4, please, Ms. McCullars?

BY MR. MACHICEK:

Q.   Mr. Shook asked you about people who don't want to go to jail, people who try not to get arrested, right, he asked you about that?

A.    Yes.

Q.    Looking at the photograph there in front of you, is that what giving up looks like?

A.    Yes.

Q.    Can you see any weapons there?

A.    No.

Q.    Can you tell the jury whether or not that presents a danger to the officers or the public at that moment?

A.    No.

Q.    Is that a threat?

A.    No.

Q.    Based on your training and experience, is the use of a K9 to bite an individual in that position justified?

A.    No.

Q.    You said you watched your body worn camera.  You testified to what you heard, the reaction of the suspect was after he was bitten.  A person screaming and begging to be handcuffed.  Is that what giving up sounds like?

A.    Yes.

Q.    Now, Mr. Shook asked you about is it possible for somebody to be violent.  Is it possible for somebody to be very dangerous.

      A person in this position that we are looking at on the screen from Kelly Smith's body camera, is he being very dangerous and violent in that position?

A.    No.

MR. MACHICEK:  Ms. McCullars, if we can look at 1D-5, please.

BY MR. MACHICEK:

Q.    Mr. Shook asked you repeatedly about split-second decisions.

A.    Yes.

Q.    Decisions that have to be made in a snap, right?

A.    Yes.

Q.    Looking at the photograph in front of you, does Kelly Smith at this point in time have enough time to look away from a suspect that is so dangerous, so violent that you had to use force against him, can he look away from him here?

A.    He is looking away, yes.

Q.    Does he have time to call the K9?

A.    Yes.

Q.    Does he have time to give repeated bite commands to that K9, to a man in that position?

A.    Yes.

Q.    Does he have time to place that individual into custody?

A.    Yes.

MR. MACHICEK:  Ms. McCullars, if we could look at 1D-10, please.

BY MR. MACHICEK:

Q.   Lt. Milbourn, an individual that is seated cross-legged in a bathtub with a trained police officer trained in Jiu-Jitsu wrenching his arm around his neck, is that person being violent and dangerous at that point?

MR. SHOOK:  Judge, I will object to leading.

THE COURT:  Sustained.

BY MR. MACHICEK:

Q.   Can you tell this jury whether or not that individual is being violent or dangerous?

A.   No, he wasn't.

Q.   Can you tell this jury whether or not that individual in that position is being a threat?

A.   No.

Q.   Can you tell this jury whether or not the use of a K9 to bite an individual in that position is justified?

A.   No.

MR. MACHICEK:  Ms. McCullars, if could look at 1D-12, please.

BY MR. MACHICEK:

Q.   An individual, Lt. Milbourn, seated in a bathtub, with his hands being held above his head in a neck restraint, is that an individual -- can you tell the jury whether or not that individual is being very dangerous and violent at that point?

A.   No, he wasn't.

Q.   Can you tell the jury whether or not that individual is posing a threat to the safety of officers and the public at that point?

A.   No, not at that point.

Q.   Can you tell the jury whether or not the use of a K9 to bite an individual in that position is justified at that point?

A.   No.

Q.   Besides the suspect, the Defendant, and yourself, who else was in that bathroom?

A.   K9 Mata.

Q.   Who else saw what you saw?

A.   I believe Sgt. Tuma was behind me.  I know he was at the end, at least.

Q.   And you have had an opportunity to tell this jury what you saw; is that right?

A.   Yes.

Q.   Can you tell the jury whether or not you saw what you believed to be an unreasonable use of force?

A.   Yes.

Q.   Just because someone is accused of a crime, does that permit law enforcement to punish them prior to seeing a judge or a jury?

A.   No.

Q.   Just because someone has been dishonest, does that

permit law enforcement --

MR. SHOOK:  Judge, I will object.  All this has been asked on direct, asked and answered.

THE COURT:  Overruled.

BY MR. MACHICEK:

Q.   Just because somebody has been dishonest, does that permit law enforcement to punish them, physically harm them before they see a judge or a jury?

A.   No.

Q.   If someone is trying to surrender, is law enforcement permitted to punish them physically before they see a judge or a jury?

A.   No.

MR. MACHICEK:  Just a moment, Your Honor.

Pass the witness.

THE COURT:  Mr. Shook, anything further?

MR. SHOOK:  No, Your Honor.

THE COURT:  May this witness be excused, Mr. Machichek?

MR. MACHICEK:  Your Honor, the United States calls Jeff Hobson.

THE COURT:  I asked whether he may be excused.

MR. MACHICEK:  I'm sorry, Your Honor.  May he be finally excused?

THE COURT:  Yes.

Any objection?

MR. SHOOK:  No objection, Your Honor.

THE COURT:  Thank you, sir.

MR. SKIPPER:  May we approach before?

THE COURT:  You may.

(Bench conference.)

MR. SKIPPER:  Your Honor, before we start with this witness, there is some things I want to bring up with regard to our motion for 404.  This witness has made some statements about him knowing Kelly to be a liar in the past, him having an opinion about him saying Kelly was just trying to, you know, just get a win and get a bite.

There is two specific prior instances with this guy in his interview said that Kelly has called him out to a scene, one of which he alleges that Kelly Smith gave some false information and embellished something.

So I would like the witness to be instructed not to say that or if the Court is going to --

THE COURT:  Who is going to take this witness?

MR. MACHICEK:  I am.  I had not planned on asking him questions about those prior incidents.  I can take some time before he takes the stand to instruct him.

MR. SKIPPER:  Or speculation.  It looks like Kelly is just trying to get a win, to get a bite.

MR. MACHICEK:  I think an opinion with that would

114

be based on the facts developed with his testimony.  He would be entitled to make that opinion if the proper predicate is laid.

THE COURT:  I think it is okay if it is based on just the incident in question, not prior incidents.

MR. SKIPPER:  Okay.  Right.  That is fine.

THE COURT:  Okay.

MR. MACHICEK:  May I have a moment with the witness?

THE COURT:  Okay.

(Bench conference concluded.)

THE COURT:  Just going to take a short, short break.  Stand.  Stretch.  You don't have to take a bathroom break.  I would ask you to just stay where you are.

(Pause in proceedings.)

THE COURT:  Are we ready to proceed, Mr. Machichek?

MR. MACHICEK:  Yes, Your Honor, thank you.

THE COURT:  Sir, if you would please raise your right hand to be sworn.

(Witness sworn.)

THE COURT:  Okay.  You may be seated.

Mr. Machichek, you may proceed.

MR. MACHICEK:  Thank you, Your Honor.

JEFF HOBSON, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MACHICEK:

Q.    Good morning, sir.  Would you please state your full name for the record?

A.    My name is Jeff Hobson.

Q.    And with whom are you employed, sir?

A.    The Smith County Sheriff's Office.

Q.    What title do you hold with Smith County Sheriff's Office?

A.    I am a lieutenant.

Q.    And are you a certified peace officer?

A.    I am.

Q.    How long have you been a certified peace officer?

A.    Be 20 years in August.

Q.    What agencies have you worked for as a certified peace officer prior to Smith County Sheriff's Office?

A.    I worked at the Nacogdoches Police Department.

Q.    And as a lieutenant with the Smith County Sheriff's Office, what kind of duties and responsibilities do you have?

A.    I am currently assigned to the patrol division.  I supervise our criminal interdiction unit, our K9 unit, and I am the SWAT commander.

Q.    What responsibilities do you have as the SWAT commander?

A.    I oversee training, approve the operations plans, just

the day-to-day operations.

Q.    And for the execution of SWAT operations, what is your role in that?

A.    So my team leaders will work up an operations plan.  I review the plan, that it meets the certain criteria.  Then we will -- I will sign off on it, and we will deploy.

Q.    How do you get to be a SWAT commander?

A.    Just worked my way up from -- first got on the team about 12 years ago.  Worked my way up to the team leader spot, and then get appointed by the sheriff.

Q.    You have been on few or many SWAT operations?

A.    I have been on several.

Q.    Are you also a K9 handler?

A.    I am.

Q.    You mentioned that you are a K9 supervisor as well. What are your responsibilities and duties as a K9 supervisor?

A.    I supervise the day-to-day operations, from scheduling, to making sure trainings get done.  Just manage the operations.

Q.    And how long have you been a K9 supervisor?

A.    I guess since the -- I was the first K9 that the sheriff -- the sheriff got elected, and he wanted a unit.  I got selected as the first handler, and then we have been adding dogs ever since.  So I have kind of been the

supervisor since 2012.

Q.   Since 2012.

And how many K9s do you currently supervise?

A.   Right now our unit is four K9 units.  Right now I am in the process of -- we had one we retired.  He aged out.  His handler went to another position, and so now -- just interviewed for the new spot, selected a handler, and then now we will be working on selecting a dog.

Q.   And within your role as a K9 supervisor, are you familiar with the Smith County Sheriff's Office policies and procedures --

A.   Yes.

Q.   -- on the K9 operations?

A.   Yes.

Q.   If you will look in that black notebook to the right of you there and flip over to exhibit tab No. 23 and take a look at that.

If you will take a moment, once you get there, and look through that document and tell me whether or not you recognize it?

A.   (Witness complies.)

Yes, sir, that is our policy.

Q.   I am sorry.  Would you turn over to the microphone?

A.   That is our K9 policy.

Q.   And you are familiar with that policy; that is a policy

that you both follow and implement to those that you supervise to follow.  Is that correct?

A.    Yes, sir.

MR. MACHICEK:  Your Honor, at this time we would offer Exhibit No. 23, the Smith County Sheriff's Office K9 Operations Policies and Procedures.

MR. SKIPPER:  I will object to relevance.  It didn't happen in Smith County.

THE COURT:  Mr. Machichek.

MR. MACHICEK:  Your Honor, this is a basis for the witness's knowledge, and it is relevant to his analysis of the Defendant's actions on the date in question.

MR. SKIPPER:  Your Honor, I just resume the objection to the relevance as it relates to the Wood County policy that we are here on, not what he does in a different county.

THE COURT:  I am going to overrule the objection.

BY MR. MACHICEK:

Q.    And, Lt. Hobson, do you recognize the Defendant, Kelly Jason Smith?

A.    I do.

Q.    Okay.  And would you describe him in the courtroom by an article of clothing he is wearing?

A.    Blue coat.

MR. MACHICEK:  Your Honor, I would ask the record

119

to reflect that the witness has identified the Defendant in open court.

THE COURT:  The record will so reflect.

BY MR. MACHICEK:

Q.   I want to talk to you a little bit about your K9 background, Lt. Hobson.  You said you became a K9 handler back in 2012.  What does it take to become a K9 handler?

A.   Just in general or --

Q.   Yes, sir.

A.   To become a K9 handler, well, obviously, I had to go through an interview with the -- when they posted a position, went through an interview process.  You have to have I guess a good understanding of use of force, be proactive.  Those kinds of things.

Q.   And do you have to attend a school?

A.   You do.  So once you get selected for the position, your agency should send you to a basic handler school.

Q.   And where did you attend basic handler school?

A.   My first handler school was at Worldwide K9 in San Antonio.

Q.   And have you attended subsequent K9 handler schools?

A.   My first dog passed.  My second dog I got from Pacesetter K9 in Liberty Hill, and I attended another basic handler school.

Q.   And can you describe the classes and trainings that you

went through at each of those basic handler schools?

A.    Well, it is a basic handler school.  They teach you the care and day-to-day interactions with your dog.  I mean, from care and feeding, to medical, to case law, you are going to get some -- how odor works, just the basics.

Q.    And how do they go about assigning you to a particular K9 partner?

A.    Well, you should have some kind of idea what you are looking for.  If your dog is going to be assigned to a school, then obviously you want a non-aggressive-type dog that is going to be around kids.

If you are going to work in patrol, you might want one that is a little higher drive.  So just they should match you up with -- or give you choices on what you are looking for.

And then as you are in the school, you are working these dogs and trying to figure out if their personality is going to work with your personality, and so on.

Q.    And since 2012, how many K9 partners have you had?

A.    I am on my second one.

Q.    And what is your current dog's name?

A.    Jack.

Q.    Jack.  And what language does Jack speak?

A.    Jack's command are in Czech.

Q.    And is your dog -- is Jack a dual-purpose dog or

single-purpose dog?

A.    He is dual purpose.

Q.    And can you describe for the jury what that means?

A.    So, obviously, a single-purpose dog has a single purpose, like a bomb-dog only or a narcotics-only.  Your patrol dogs, your dual-purpose dogs, they track, they do patrol work, which is apprehension, and obviously do the narcotics work.

Q.    Because your dog is an apprehension dog, does it have a bite command?

A.    It does.

Q.    And what is your bite command?

A.    Dursh.

Q.    Have you ever accidentally given the bite command when you wanted to give another command?

A.    Not that I know of.  Not that I recall.

Q.    If one of the handlers under your supervision accidentally gave the bite command under deployment, what would you do as their supervisor?

A.    If they accidentally gave the command in -- like in a training or in on the real --

Q.    In a field deployment?

A.    Well, I mean, obviously, you would need to go back and do some training on that.

Q.    And how long have you had Jack?

A.    I have had Jack about four years.

Q.    And in that four-year period of time, how many bites has Jack had in field deployments?

A.    None.

Q.    What about the rest of the handlers under your supervision?  Let's confine it to the last 10 years.  How many bites?

A.    Less than five.  Probably somewhere between three and five.

Q.    Is that in the last how many years?

A.    10.

Q.    Now, you mentioned that you got Jack from Pacesetter?

A.    That's correct.

Q.    When you received Jack, was it already trained to perform certain tasks?

A.    Some.  Just the basics though.

Q.    And when you say "just the basics," what kind of stuff are we talking about?

A.    Well, so the process is usually -- like Jack came from Poland.  So he is probably about a year, year-and-a-half old. He goes to Pacesetter.  They work him for a couple of months and get him imprinted on narcotics stuff, and get his apprehension stuff started, his tracking started.

And then while you are in the basic handler school, you are finishing those tasks they have started, and then you

get your certification.  That is just the basic.  That is just the basics.

Q.   And when we say "just the basics," was Jack already trained to work in all of the different environments he has encountered since?

A.   No, no.  He just knows what he knows from whatever happened in Poland and whatever happened at the basic handler school.  I mean, he only knows what they have shown him. There is a lot of stuff after that.

Q.   So after basic skills training, who is responsible for making sure that Jack is acclimated to the world of variables he is going to encounter?

A.   It is my responsibility.

Q.   And when you say it is your responsibility, what do you do to address those situations?  What do you do to make sure that Jack is acclimated to the environment he is going to be working in?

A.   Well, first, you have to recognize what that is.

So say -- if I can -- so say you get the -- you get back home with your partner, and you go up to the interstate to go to work, and you get him out to run a search on a car and an 18-wheeler goes by four foot from the us going 80 miles an hour.  He may not have ever experienced that.  So if he doesn't do what I want him to do, and he shows that he is -- that is he is -- that he can't do his job right now

because he is worried about this environmental thing.

So now we have to take ourselves from that situation, and we have to go find a place close to the highway, get out, walk around, start getting him acclimated to that situation.

Same thing.  Like, Jack had a problem with stairs that he could see through when I got him home.  So we had to go to the jail and go down the stairs a few times until he figures it out.  So you aren't going to know that until you see that.

Q.    And you mentioned training.  How often do you and the K9s that you supervise train?

A.    We train one day a week.

Q.    And for how many hours?

A.    Eight hours a week.

Q.    And I think I already asked you this, but that training, is it just you and your dog, or is it with other handlers and their K9s?

A.    With manpower being what it is here lately, we've had to do four hours here, four hours there.  Some weeks we get a whole eight-hour day if we don't have projects.  But we like to train together.  We like to train in our group.

Q.    Now, if your K9 or a K9 under your supervision has a failure during a field deployment, how do you react first in the field?

A.   Well, if you are asked to do some kind of task, if somebody has called you to use the tool that you have, and it doesn't work, I mean, it could be several different things, but if it is not working, then you need to call a timeout and put them up, and then try to start recreating that at training to see if you can figure out what the problem is and fix it.

Q.   Okay.  If the environment where the failed deployment occurs is one that requires de-escalation or requires some other task to be performed, do you complete the field exercise prior to going into training?

A.   If you are in a -- well, if you are in a situation on a deployment and what you are asking your dog to do he is not doing, then you need to remove him from that situation.

If he is not doing what you need him to do, then he is no longer a tool.  So you need to stop what you are doing and do something else.

Q.   If a K9 is failing to perform the task commanded, do you just keep giving him the command over and over again?

A.   No.  Like, if you told him to do something, and they don't, maybe you need to approach it in a different way. Maybe you are doing something that he has not seen exactly before, so maybe you need to try to reset, you know, and put them in the position that you know you have been training.

Q.   And how does a failed performance in a field environment

in a real-life exercise differ from a failed deployment in training?  How do you address it differently in training?

A.   So if you are trying to -- if you are working towards some kind of -- if you are working towards some kind of goal that you want your dog -- some task that you are trying to train your dog on how to complete, there is going to be some failures, because they don't -- they don't know.  You want to work towards a win.  You want to work towards getting that dog a win at the end.

Q.   And I guess the question there is, what is considered a win?

A.   Well, it depends on whatever training, whatever you are trying to do.

Q.   So a K9 successfully performing a task commanded, is that a win?

A.   Yes.

Q.   And how do you reward a K9 in a training environment with a win?

A.   Most of the time they just want loved up and want their ball.

Q.   And what does Jack get?

A.   He gets -- he wants his ball sometimes, and sometimes he wants you to scratch him on the head.

Q.   And the other K9s in your unit that you supervise, are they also apprehension dogs?

A.   They are.

Q.   Have you ever worn a bite suit in training?

A.   I have.

Q.   Have you ever been bitten while wearing the bite suit?

A.   I have.

Q.   Does it hurt?

A.   It does.

Q.   Have you ever been bitten without a bite suit?

A.   Not yet.  Well, I take that back.  I have been nipped a knew times by being too slow.

Q.   And when you get nipped, does that hurt?

A.   It does.

Q.   As a certified peace officer in the State of Texas, have you been trained on the proper use of force as a law enforcement officer?

A.   Yes, sir.

Q.   When did you receive that training?

A.   I've been receiving that training since the academy.

Q.   And where did you attend the academy?

A.   Angelina College in Lufkin.

Q.   In Lufkin.

     And do you receive ongoing training on the use of force?

A.   We do.

Q.   And, in general, what is your understanding as to how

much force you are permitted to use as a police officer?

A.    The minimum amount necessary to make your arrest.

Q.    And how is the determination of if and when to use force or what force to use, how is that impacted by new information coming in in real time?

A.    Well, it is a -- it is a constant evolving process.  You know, it can go up and down, up and down.

Q.    And that evolving process, what are the situational factors that you take into consideration in making decisions in that evolving process?

A.    Are you talking about like the force that is getting applied from somebody to you or --

Q.    Right.  What are the things that you take into consideration when deciding to use force as those situations change?

A.    I don't quite understand.

Q.    Okay.  So if you are in a situation where you determine it is necessary to use force, what are the things that lead you to that conclusion?  What are the things that you are looking at in front of you that necessitate your use of force?

A.    Well, the suspect's actions.

Q.    Okay.  And what types of actions are we looking for in determining what level of force to use?

A.    Whatever force that he is using.

Q.   Okay.  And if we are talking about relating different types of use of force implements, where does a K9 associate with other types of use of force?

A.   So our K9s don't fall on a specific -- between taser and ASP baton.  Our K9s are a tool, and it is the handler's discretion how that tool gets applied.  So you have to justify the use of that tool.

MR. MACHICEK:  And if we can go back to Exhibit 23, Ms. McCullars.  If we can look at pages 16 and 17, please.

BY MR. MACHICEK:

Q.   At the bottom of 16, there starts a section there called use of force.  And then if we go to page 17, there is some instructions to K9 officers in your unit.  Is that right?

A.   Right.

Q.   And those instructions tell them sort of the things that they need to be looking for in a use of force with a K9; is that right?

A.   That's right.

Q.   And what are those things?

A.   The reasonableness test.  It is the severity of the crime.  Whether this person is -- what the threat is -- if there is an immediate threat to the other officers or the public or the subject is actively attempting to fight or flee.

Q.   And based on your policy, are your K9 officers in Smith

County permitted to deploy a K9 on an individual simply being verbally non-compliant?

A.   No.

Q.   Would you be permitted to deploy a taser on an individual simply for being verbally non-compliant?

A.   No.

Q.   Are you, as a peace officer, permitted to use force to punish someone?

A.   Of course, not.

Q.   Are you permitted to use force because you are upset or angry about a situation?

A.   No, sir.

Q.   What then is the goal of that use of force?  Why do you deploy a K9?  What is the purpose?

A.   The purpose to -- for -- to deploy your K9, to make an arrest or --

Q.   Yes, sir.

You mentioned that the K9 is a tool.  What is the tool intended to --

A.   The tool is intended to -- just like the first use of force -- or the first on the continuum is just my presence. So just having the K9 out is a use of force.

Obviously, the last resort is having to bite somebody.  You know, usually people are terrified to get dog bit, so usually just having the dog out is a big deterrent.

Q.   And are you trying to gain compliance?

A.   Yes, sir.

Q.   Okay.  And if compliance is gained, what do you do once that is achieved?

A.   You are done.

Q.   Do you continue to apply force?

A.   No.

Q.   I want to talk to you in general about responses to requests for service for a K9 officer.

As a K9 officer, when you receive a request for service, what do you do?

A.   Well, obviously, you know, you go.

Q.   And once you arrive on scene, who do you talk to?

A.   We try to find whoever has got the most information. You want to find out immediately if it is something that requires an immediate action or if it is -- you know, what the purpose is for us to be there.  You want to find out that right off the bat.

Q.   Okay.  And once you arrive on the scene with a K9, who is responsible for the K9?

A.   I am.

Q.   What about the scene commander, is the scene commander in charge of your K9?

A.   No.

Q.   And once a K9 is deployed, who is responsible -- you

Q.   know, who decides when to terminate the deployment?

A.   Still me.

Q.   Scene commander in charge of that?

A.   No.

Q.   I want to talk to you about building searches.  Are you familiar with building searches?

A.   I am.

Q.   Can you describe for the jury what a building search is with a K9?

A.   So it is kind of -- there is different kinds.  Just a basic building search on a what?

Q.   Say you have a barricaded subject?

A.   Okay.  So a barricaded -- a barricaded person is totally different than an active shooter or a hostage situation, right?

So, normally, when you clear a building, you have -- your threats are people, your threats are uncleared spaces, your threats are open doors, and your threats are closed doors.

Well, an active shooter, you pass all that stuff by, throw those tactics to the side, and go deal with the active shooter.  Handle that however you handle it.

On a barricaded person, if there is somebody there in the house by themselves, the only threat -- the only person they are a threat to is themselves.  So when you -- if

you have a barricaded person and you have them contained you, have all of the time in the world to use all of the tools that are available to solve this -- to solve this problem.

So doing a building search with a dog would not be anywhere close to the first thing you did.  So the first thing you would do, if you have it isolated and you have a person in the house that won't come out or won't follow commands, then you are going to try to talk to them.

You are going to try to talk to them a lot.  You are going to try to talk to them on a PA.  You are going to try to get the phone in there.  You have all of the time that you need.

Q.   What are the dangers of deploying a K9 in a situation like that if it is unknown whether or not the individual is armed?

A.   Yeah, you don't know, so you want to get as much information as you can.  You -- a lot of times when the police show up, people are -- they get pretty excited.  They don't know what is going to happen, they don't know what is going on.

So if you just get there and try to talk to them and try to let that situation breathe a little bit, let it calm down, then most of the time you can work it out.

Q.   Okay.  Can it be dangerous for officers and K9s alike to enter a situation with unknown variables?

A.    Going into somebody's house is not -- is not tactically advantaged -- you don't have the advantage.  You just don't.

Q.    And in a situation like that, what is the tactical advantage?  What is your best friend in a situation like that?

A.    Time.

Q.    Can you explain why time is your best friend in a situation like that?

A.    Because, like I said, if there is a person in the house that is barricaded, refusing to come out, you have it contained, you have all of the time that you need to use all of the tools to solve this problem as safely as possible for everybody.

It is dangerous for me to send officers in there.  You can complicate your problem by sending your officers in there.

So you can take time.  You can cut the power.  You can cut the water.  You can introduce some gas in there.  You can do all of these things to make it uncomfortable and make them come out to us.

And a lot of times if you will just give it a little bit and let it calm down, talk to them, you can work it out.

Q.    Is that what is commonly referred to as a surround and call out?

A.    It is.

Q.    And have you, in your experience, seen that work?

A.    Many times.

Q.    Now, if a building search is conducted and a suspect is located in a building and begins to communicate, what is done in that situation?

A.    Keep communicating.

Q.    Can you describe for the jury what tactics you would employ, based on your training and experience, to locate a suspect in a small interior room?

A.    Just like I said before, if there is nothing exigent going -- if there is no emergencies, no person being assaulted, or if they are in there by theirselves, you isolate that room and start trying to communicate with them.

Q.    And when we talk about this concept of a surround and call out, can you tell me what a perimeter is?

A.    So that would be deputies, in my case, officers that would just be on the outside of whatever structure it is that your problem is in.  And just making sure that you have people watching doors and windows to make sure you keep containment on this problem.

Q.    Maintaining a perimeter, would that sometimes look like just standing around?

A.    I mean, I would hope not.  But, yeah, probably sometimes

it looks like that.

Q.    Okay.  And what is the purpose of maintaining the perimeter?

A.    It is to keep that problem isolated.  If it gets out of containment, then you have created a whole other problem.

Q.    If a decision is made to enter a building with a barricaded subject in a small interior room, how does a K9 fit into that circumstance?

A.    So, for us, if we decided to do this, it would be very slow and very methodical because you have already been outside on the PA, talking and trying to communicate.  So there is no element of surprise.  They know you are out there.

So, like, we would probably breach the door, and then back it off a little bit.  Maybe see if we could still talk for a little bit.

If we decided to move forward from that, we would probably -- call casting the dog out.  I use a long line.  I fish the dog out into the -- like, into whatever room you are -- whatever outside door you have breached.

Cast the dog out, and see if you can get -- dogs will give you a proximity alert.  If there is somebody in there, he is going to do something.  So then we would pull him back out.  Then push a couple of people into that room and clear it.  Hold it.

Then we would -- if there is nothing in that room, we would cast the dog out a little bit, and then move people into that, and then just kind of leap frog until we have cleared it.

Q.   You have made mention of what use other individuals in that scenario can be.  What is -- what is the difficulty of entering a scenario like that as a K9 officer, as well as the arresting officer being the same person?

A.   So you are going to need help doing this.  You are going to need to come up with some kind of plan before you ever start this.

Doing -- clearing a house with somebody -- with a barricaded person in it, you know there is somebody in the house.  So you are going to want -- you know, there is unknowns going on there.  You don't know if they are armed.  You are going to need somebody to provide some lethal cover for you and the dog because your primary job is to watch the dog and to do your K9 announcements and -- you got a lot going on.

You have to process things that you see and actions and, you know, you are in charge of this K9.  You can't -- I can't really -- I'm not saying I can't, but it is -- it would be very difficult to get in a gun fight and a dog, and that's a lot.

So you are going to want somebody with lethal cover

in front of you.  You are going to want somebody with lethal cover behind you.  You are going to want to be in the middle of that so -- to create a safe place for you to do your work.

Q.   And is that why planning is important?

A.   Yeah.  Before you ever make any kind of -- even -- I mean, my SWAT guys, we have a debrief.  Everybody knows their job before you go in there.  Because if you go in there and something happens, it is going to be stressful.  So coming up with a plan on the fly, it is going to cause you some problems.

Q.   And even if you are in a situation that requires short-term planning, whether it is based on resource deficiencies or availability of other resources, is planning still important?

A.   It is.

Q.   And can a plan be made even in a shorter period of time --

A.   Yeah, you can make a plan on the fly running.  I mean --

          MR. MACHICEK:  Your Honor, can we approach?

          THE COURT:  You may.

          (Bench conference.)

          MR. MACHICEK:  I'm at a really good stopping point. The next section of questions --

          THE COURT:  How much more time do you think you

have with him?

MR. MACHICEK:  Probably another 45 minutes.

THE COURT:  Okay.  We will break here for lunch.

(Bench conference concluded.)

THE COURT:  Ladies and gentlemen, we will take our lunch break now.  It is 5 to noon.  I will ask that you be ready to go at 5 to 1:00.

(Jury out.)

THE COURT:  Okay.  We are in recess until 5 to 1:00.

(Recess was taken at this time.)

(Jury out.)

THE COURT:  Anything to discuss before we bring the jury in?

MR. MACHICEK:  No, Your Honor.

MR. SKIPPER:  No, Your Honor.

THE COURT:  Okay.  Let's bring the jury in.

(Jury in.)

THE COURT:  Okay.  You may be seated.

And, Officer, I will remind you that you remain under oath.

THE WITNESS:  Yes, sir.

BY MR. MACHICEK:

Q.   Good afternoon Lt. Hobson.  I want to get started to talk about your involvement in this particular case.

Were you contacted by anyone about this case?

A.   Yes.

Q.   And who was that?

A.   FBI.

Q.   Okay.  And what was the purpose of them contacting you?

A.   I was asked to review a video.

Q.   Okay.  Did you do that?

A.   I did.

Q.   Now, I am not going to replay the video again, but I'm going to stop on some key moments within the video to get your analysis as a K9 supervisor, K9 handler, and certified police officer in the State of Texas in East Texas.

Once a suspect is located inside of a building in which they have been barricaded, what should be done with the K9 that is performing the building search.

A.   Use of the supporting officers, and they are holding that threat.

Q.   How would you be able to do that?

A.   You would probably be outside waiting for them to call you up if they need you.

Q.   Okay.  And how is that circumstance altered if a suspect who is barricaded begins communicating?

A.   Then you should allow the officers to continue to communicate, try to de-escalate that, and calm him down.

Q.   Okay.  And if you are the K9 officer on the scene and you are making entry into a house with a barricaded subject, who do you want accompanying you into that house?

A.   Because there is always a threat that somebody may be armed, you want somebody armed in front of you.  If there is a barricaded person, you know they are in there.  You are not doing a search to find them, you have already found them, you know where they are, so you want a lethal cover to escort you basically into where you are going.

Q.   What is the purpose of having that cover in front of you?

A.   Well, you need somebody focused on -- like, that is their job, to provide lethal cover in case somebody comes out of that room and is armed.  Your job is to handle the dog, not -- you can't do it all.

Q.   And when you say "you can't do it all," what are you referring to?

A.   You can't do it by yourself.  You need other -- to do this in a safe way, you are going to need people to help you.

Q.   And when you talk about doing it in a safe way, what types of dangers are you anticipating encountering when you enter in a narrow hallway or stand in front of a bathroom door with a barricaded subject inside?

A.   So from the academy to throughout your career, you

always hear that doors are where most of the gunfights happen.  They call that the fatal funnel.  You probably hear that once a week as a police officer.  So you don't stand in front of the door and knock on it.  You knock off to the side.  People shoot through doors.

But like I said earlier, you need somebody to cover uncleared spaces.  You need somebody to cover open doors.  You need somebody to, what we call pin, have lethal cover on closed doors in case that door opens and something happens.

You are going to need -- in your pre-planning, you are going to need to know how many people -- you are going to need to try to predict how many people it is going to take you to complete this -- fix this problem.

Q.    If you have a limited number of people at your disposal, is it important to plan entry before you go in so that everybody has a role?

A.    Yes.  So you need to -- you need to do what you can to make sure you have competent people.  You need to make sure that you have the tools that you need.  You need to make sure that -- I mean, you have time.  So you need to make sure you have what you need before you go.

Q.    Okay.  And what are the dangers of proceeding into a situation like that by yourself?

A.    Well, like I said, you expose yourself to threats that you don't need to.

MR. MACHICEK:  Ms. McCullars, if we could take a look at 1D-2, please.

BY MR. MACHICEK:

Q.   Officer Hobson, this is a still frame image from a body cam belonging to Kelly Smith.  In the event of locating a barricaded subject inside of a residence where they have their hands up, what is the need to further deploy the K9?

A.   If they are compliant, then they need to take a step back.  You start giving commands, and see if you can get -- work this out.

Q.   What kind of commands would you envision giving in a circumstance like this?

A.   Maybe turn around, put your hands on the wall.  I mean, this is -- it is a small place to try to put somebody down on the ground.  I would probably tell them just to turn around and put your hands on the wall, put your hands on your head.

Q.   And if the K9 under circumstances like this one fails to perform the tasks commanded, what do you do with the K9?

A.   You always want to have control of it.  So if it is not doing what you tell it to do, you need to get control, and you need to put some space between you and your suspect.  And either try to redirect it, if you needed to, or might have to remove it from the situation if it is not doing what you wanted it to.

Q.   And what are the -- what are the dangers of engaging in a physical altercation after you have given the bite command to your K9?

A.   Are you talking about me and the suspect and my dog?

Q.   Yes.

A.   You may get bit, but, I mean, that is part of it.  But if me and the suspect are fighting and the dog is biting him, when he complies, I am going to have to immediately remove the dog.

Q.   And are K9s trained to be touched or grabbed by other handlers during deployment?

A.   I guess that depends on how you train.

Q.   And what are the dangers associated with that?

A.   Somebody could get bit.

          MR. MACHICEK:  Now, Ms. McCullars --

BY MR. MACHICEK:

Q.   There is a still frame image from Government's Exhibit 1 that I would like to show you.

          We have a circumstance here where the Defendant has taken his K9 partner by the harness, and then thrusts the K9 towards the suspect who is backed into a corner --

          MR. SKIPPER:  Your Honor, I would just object to leading at this point.

          MR. MACHICEK:  I'm describing the photograph, and I'm going to ask him a question.

MR. SKIPPER:  I am going to object to leading.

THE COURT:  Overruled.

BY MR. MACHICEK:

Q.   Is it customary or orthodox for a K9 handler to thrust the K9 towards the suspect in a deployment scenario?

A.   I wouldn't.

Q.   Do you train handlers under your supervision to do this?

A.   No.

Q.   Is there any functionality or purpose behind grabbing a K9 and throwing it at somebody?

A.   I don't see one.

MR. MACHICEK:  Ms. McCullars, if we could look at 1D-4, please.

BY MR. MACHICEK:

Q.   Once the suspect, in this case, falls into the bathtub and covers his head with his hands, what dangers are present?

A.   I can see both of his hands.  Looks like he is somewhat Indian style.  I think we have enough control right here to go ahead and make this arrest.

Q.   Okay.  If we return to Exhibit 23 that is up there with you, the K9 policy that you fall under, and look at page 17 at the top.

MR. SKIPPER:  Your Honor, I'm just going to object

for the record.  We have the Wood County policies in evidence.

THE COURT:  Why don't y'all approach.

(Bench conference.)

THE COURT:  What is your objection?  This is to the exhibit that has already been admitted?

MR. SKIPPER:  Yes, sir.  Just relevance, again, for the basis of giving an opinion based on the policy, not applicable to this case.  That's all.

MR. MACHICEK:  Your Honor, the Government has a burden to show reasonableness or unreasonableness of the Defendant's conduct.  Evidence can be shown of what a reasonable officer in a same or similar situation would do. That would be a similar officer with similar training.  This is a similar officer with similar training that abides by similar policies.

They are differentiated by several, and he is not governed by the Wood County Constable's policies.  He is governed by his own.  I'm going to ask him how he goes about following his policies in scenarios like this to exhibit reasonableness of his conduct.

THE COURT:  I'm going to overrule the objection.

You don't have to continue to make it.

MR. SKIPPER:  Yes, sir, I will just make a running objection, for the record.  Thank you.

THE COURT:  Okay.

(Bench conference concluded.)

BY MR. MACHICEK:

Q.   Okay.  Lt. Hobson, if we look at the use of force factors there at the top of page 17 of Exhibit 23, given the photograph that we have just viewed with the suspect falling in the bathtub with his hands over his head, would use of force within the Smith County K9 Operations Policy be permitted?

A.   No.

Q.   Specifically, let's look at subsection (b) here.  The point where the suspect has fallen into the bathtub with his hands over his head, was the suspect an immediate threat to the safety of officer or others?

A.   No.

Q.   If we move down to subsection (c) there.  At this point was the suspect actively resisting arrest, attempting to evade arrest, or attempting to conceal himself?

A.   Doesn't appear to be.

Q.   What should an officer do --

MR. MACHICEK:  If we go back, Ms. McCullars to 1D-4.

BY MR. MACHICEK:

Q.   What should an officer do here?

A.   Grab his hands and put them behind his back, or continue

to give him some commands. Maybe tell him, you know, hey, put your hands behind your back. The dog is not going to bite you. You know, there is still an opportunity to talk.

Q.    And as a K9 handler and as a supervisor of other K9 handlers, would it be appropriate to deploy a K9 for a bite at this point?

A.    No.

Q.    And under your agency's use of force policy, would it be appropriate to employ a taser at this point?

A.    No.

MR. MACHICEK:  Ms. McCullars, if we could take a look at 1D-11, please.

BY MR. MACHICEK:

Q.    Once the Defendant places the suspect into this neck restraint here with his hands over his head, what dangers are present?

A.    I don't know about this one.

Q.    Okay. Does the suspect appear to be an immediate threat to the safety of the officer, in this photo?

A.    I can't really tell what he is doing there.

Q.    Does he have any weapons in his hand?

A.    Not in one of them. I don't know -- I can't really see where the other one is.

MR. MACHICEK:  If we look at 1D-12, Ms. McCullars.

BY MR. MACHICEK:

Q.   What about here, Officer Hobson?

A.   I guess maybe the dog is biting him on the leg here.

Q.   Does it appear that the suspect is actively resisting or attempting to evade arrest or conceal himself?

A.   Like I said, I can't really tell.  All I can see is he maybe got one arm.  I can't really see where the other one is.

Q.   Okay.  Under your K9 policy and under your supervision, would it be appropriate to deploy a K9 for a bite in this circumstance?

A.   I can't really tell based on just the picture.

Q.   And do you recall viewing the video of this case?

A.   I do.

Q.   And do you recall the point at which the Defendant places the suspect into the neck restraint?

A.   I believe I do.

Q.   Prior to this point, was there ample opportunity for the Defendant to bring the suspect into custody?

A.   Yes.

Q.   If a suspect is attempting to comply with officers or begging to be handcuffed, what should be done with the K9?

A.   Well, you should have him back off of the situation and continue to give him commands and put space between you and him and give him the opportunity to do what he says he is going to do.

Q.   Once compliance is gained, when should the deployment be terminated?

A.   When compliance is gained.

Q.   Okay.

     MR. MACHICEK:  And going back to 1D-4, Ms. McCullars.

BY MR. MACHICEK:

Q.   At this point in the scenario, has compliance been gained?

A.   Looked like it.

Q.   If compliance is the ultimate goal and it has been gained, what is the purpose of continuing to deploy the K9 for a bite?

A.   None.

Q.   Based on your training and experience as a lieutenant, K9 handler, K9 operations supervisor, and SWAT commander, do you have an opinion about the Defendant's use of force in this situation?

A.   I do.

Q.   And what is that opinion?

A.   I believe it is inappropriate.

Q.   Do you believe it was excessive?

     MR. SKIPPER:  I will object to leading, Your Honor, in answer to the question.

     THE COURT:  Sustained.

BY MR. MACHICEK:

Q.   Based on your observations and review of the evidence in this case, do you have an opinion as to whether or not the Defendant used excessive force --

MR. SKIPPER:  I would object to leading.

Q.   -- of the suspect?

THE COURT:  Sustained.

BY MR. MACHICEK:

Q.   When an officer deploys a K9 in the circumstance like we are looking at at the scene, and that K9 bites a suspect that is attempting to surrender himself, what type of force would you describe that to be?

A.   Excessive.

Q.   In your capacity as a law enforcement officer, do you write reports and warrant affidavits?

A.   I do.

Q.   When you swear to the veracity of a document, is it important to tell the truth?

A.   It is.

Q.   Generally, when you write reports and affidavits, do you do it before or after you watch the video of the incident?

A.   Usually after.

Q.   Why is that?

A.   Because you are not always going to -- you are not always going to recall every exact moment.

Q.   When a K9 is deployed for apprehension, what kind of charges would you as a K9 handler expect to see?

A.   We should expect to see some resisting arrest.

Q.   If an officer made a deployment where others on the scene weren't planning to file those charges, what would that tell you?

A.   Maybe they didn't believe that the elements of that crime were met.

          MR. MACHICEK:  A moment, Your Honor.

          Your Honor, I will pass the witness.

          THE COURT:  Okay.

                    CROSS-EXAMINATION

BY MR. SKIPPER:

Q.   Lt. Hobson, I heard you say, and I want to make sure we are on the same page before we get going, that you always watched the video before you file the affidavit?

A.   No.  I am sorry.  Are you talking about the -- I write the affidavit at the jail.  I'm sorry.

Q.   Right.

A.   I can't review my video before I get to the jail. Sorry.

Q.   You don't want to intentionally create false memories, right?

A.   No.

Q.   The best memories are what is retained in your brain;

you don't need to rewatch something that creates false memories, right?

A.   Right.

Q.   You want a genuine rendition of what is primacy and recency in your brain, right?

A.   Yes.

Q.   You know that -- you are a lieutenant, right?

A.   I am.

Q.   I notice that you are wearing your uniform and badge. Does Sheriff Larry Smith know you are testifying here today in that capacity?

A.   Yes.

Q.   And representing the entirety of the Smith County Sheriff's Office with your opinions?

A.   I'm sure he does.

Q.   Did you show him the video -- which FBI agent called you and wanted you to look at the video?

A.   Crowell.

Q.   And how many times have you watched this video?

A.   Maybe half a dozen times.

Q.   Did you watch it over the computer, on a Zoom call, or Teams, or in person?

A.   In person.

Q.   In person.  In real time or slowed down or all of these still shots you have been shown on direct examination?

A.    There were videos.

Q.    Would you agree with me that the best way to give an opinion as to whether or not someone acted reasonable -- you said "inappropriate," but I think after about four attempts, I think you finally came around and said "excessive" -- whether someone acted inappropriate, by your own words, in a 90-second frame of their lifetime, it is easier to look at the actual video before you give an opinion.  Right?

A.    Yes.

Q.    All right.  Because, obviously, you told the prosecutor here that I have no idea in this situation what is going on.  It is a freeze frame, right?

A.    Right.

Q.    All right.  You can't give an effective opinion or knowledgeable opinion or one of any intellect with a freeze frame, right?

A.    Yes, sir.

Q.    Now, I want to go back.  Did James Crowell ever say, hey, we have got the Wood County policy that Kelly Smith voluntarily gave me in this big binder, there's 402 pages that Kelly Smith gave them, everything, here you go?  Did he ever say, this is the Wood County policy that Kelly abides by, would you look at this and let me know if you think he is in compliance.  Did that ever happen?

A.    I have never seen the Wood County K9 policy.

Q.   You have never seen the Wood County policy?

A.   No, sir.

Q.   Is there any inch of the entire County of Smith that encroaches upon Wood?

A.   No, sir.

Q.   None.

     Were you familiar that this incident happened in Hawkins?

A.   No.

Q.   You were never told this happened in Hawkins?

A.   Wood County is all I knew.

Q.   Well, you were told it happened in Wood County, right?

A.   Right.

Q.   You know Hawkins contains about 1300 people, don't you?

A.   If you say so, I don't know.

Q.   How many people are in Tyler?

A.   A hundred and something thousand.

Q.   100,000.  How many people are in Smith County?

A.   More than that.

Q.   Is it fair to say you have got a lot of resources compared to 1300 people in one town, right?

A.   Yes, sir.

Q.   And I want to discuss that later, but it is important that when you testify -- and I assume you have testified over

at the DA's office, haven't you?

A.   I have before.

Q.   You have sat there and given testimony before.  That you give the jury the full picture on an objective basis of what your analysis is based on, correct?

A.   Correct.

Q.   So when you are talking about using other resources, it might be important to know you are talking in terms of being here in Tyler versus Hawkins, Texas, right?

A.   Right.

Q.   All right.  Might be good to know whether or not -- you have gas canisters as a SWAT commander?

A.   Right.

Q.   And Hawkins PD doesn't, right?

A.   They have access.

Q.   My question, sir, is it might be good to know to explain whether or not you have access to certain things and other people may not.  It is all about money and resources, right?

A.   Yes.

Q.   Okay.  And you might be able to explain, when we are talking about less than lethal, that is common vernacular in cop terms, that is LTL, right, less than lethal?

A.   Yes.

Q.   You're a SWAT commander.  Let's talk about it.

Hypothetically, for instance, Dallas riots, these peaceful protests turned into riots a few years ago.  And multiple officers are called to the scene from outside Dallas jurisdiction.  Bring with you everything that you have got. I need gas.

That's a type of LTL, correct?

A.   Yes.

Q.   40mm, tell us what a 40mm round is?

A.   It is a 40mm projectile you shoot out of a -- some breaching tool.

Q.   Right.  It is a rubber projectile that is less than lethal on the use of force continuum, correct?

A.   Correct.

Q.   All right.  It is a pain compliance tool, right?

A.   It is.

Q.   A bean bag round, again, it is a projectile that is ejected from something, right?

A.   Right.

Q.   Just like a firearm, except it doesn't have an FMJ, full metal jacket, in the barrel; it's got a softer, yet impactful round, that is less than lethal.  Right?

A.   Yes.

Q.   When that target is struck with that projectile and they feel pain, the purpose is to enforce compliance, right?

A.   Correct.

Q.   To get a different response, maneuver the situation into something that you can control, right?

A.   Right.

Q.   Because safety is the factor, right?

A.   Yes.

Q.   That you go home every day to your family, right?

A.   Right.

Q.   That's all you want to do, right?

A.   Right.

Q.   Just real quick you.  You testified in front of the Grand Jury.  Just one point I want to knock out.  You stated in the Grand Jury that punching Evans to get him to release the K9 was justified.  Do you remember that?

A.   I do not.

Q.   Do you need to be shown to it, or would you take my word from it?

A.   Say it again.

Q.   I am quoting:  Punching Evans to get him to release the K9 was justified.

         Do you recall saying that under oath?

A.   Yes, I believe so.

Q.   There is no problem with that, right?

A.   Right.

Q.   You are a K9 guy?

A.   Right.

Q.    If someone grabs your dog, your partner, this bond that you have created with a good dog, like most people do, like my dog, and someone grabs that dog, your partner, you are going to punch him in the face, aren't you?

A.    I am going to try to get him off of him.

Q.    Well, let me back up a minute.  You are going to tell that guy to take his hands off your dog, aren't you?

A.    Absolutely.

Q.    If he doesn't, you will do what needs to be done to get him to comply with that command, right?

A.    That's correct.

Q.    And that may involve balling up your fist and striking him in the face, right?

A.    That's correct.

Q.    If he keeps holding that dog, you might ball that fist up and hit him again, won't you?

A.    Yes.

Q.    If he keeps holding that dog, go ahead and tell us what you would do again.

A.    Do whatever you need to do to get him separated.

Q.    You would hit him again, wouldn't you?

A.    Do something.

Q.    Even though we are talking about your Smith County policy, I don't know why, but staying on course, I thought I heard you say, before I ask you any other questions I want to

make sure my ears were working, that you said, K9 does not fall into the use of force continuum; it is all officer discretion.

Do you remember saying that?

A.   Yes.

Q.   Is there something that you want to change about that before we go forward?

A.   No.  K9 is not specifically named like a less lethal --

Q.   Okay.  You do not believe that a K9 is a less than lethal use of force as a tool similar to a taser, a 40mm LTL, a bean bag, or OC spray.  Is that your sworn testimony?

A.   No, sir.  It is.  It is not listed in our policy in that use of force continuum.

Q.   And you will agree with me that we are not here -- this guy is not sitting here, Kelly, in a federal courtroom subject to a Federal Indictment based on tactical disagreements, are we?

A.   I don't believe so.

Q.   Well, you know that, right?

A.   Right.

Q.   You guys disagree all the time, right?

A.   (Witness nods.)

Q.   Is that a yes?

A.   Yes.

Q.   And your job is to get better, right?

A.    Right.

Q.    What could we have done better, right?

A.    Yes.

Q.    That's why we do ops plans.  It's called an operation plan, right?

A.    Yes, sir.

Q.    You are the LT, you are the main man in charge, so when someone has a situation that you can control, because you are the commander of special weapons and tactics, correct?

A.    Correct.

Q.    You are relying on the information at the scene delivered by those officers, right?

A.    You verify information that you get, but you -- yes.

Q.    That is my next question --

A.    Yes.

Q.    -- you are relying on that information from those officers at the scene, right?

A.    That's correct.

Q.    That you need to verify, right?

A.    Yes.

Q.    And you are trained, taught, and expected to be completely transparent and open about every situation and bit of information that you know about, right?

A.    That's correct.

Q.    That could help you -- you used a beautiful word, it is

called "de-escalate," right?

A.   Right.

Q.   De-escalation right?

A.   Correct.

Q.   Let's go back to one of these hypotheticals.

Let's say hypothetically that there is a man -- you have actually agreed to go to a scene on a barricaded subject.  And there is an officer on scene that has a direct line of communication with that person who has barricaded himself in that trailer, meaning that suspect has reached out to that officer one week prior to him being found in that trailer home and telling that officer directly, hey, I trust you, I want to turn myself in to you and nobody else, you would expect as a lieutenant, that that information be shared with you, wouldn't it?

A.   Yes.

Q.   Okay.  Because it would prevent an unsafe situation from ever happening in the first place, right?

A.   Yes.

Q.   I will take it one step further.

Let's say that same officer, who is standing outside this trailer where there is a barricaded suspect, prior to 40 seconds of breaching that front door, receives a phone call from that man's mother directly on his phone, let's say her name is Cheryl Evans, just for this

hypothetical, and it says you are receiving a call from Cheryl Evans, would you want to know whether or not that happened?

A.   Yes.

Q.   Because when we are talking about de-escalation, explain how that would help you.  Because, ultimately, you would be responsible, right, you are the LT?  Explain how you would want that information.  It is because it would help reach out to that person, meaning the mom, who this person already knows is barricaded, to get him out and comply.  Right?

A.   Yes.

Q.   All right.  Let's say one of your officers received that phone call and didn't tell you about it until afterwards.  You would be having to do a lot of paperwork, wouldn't you?

A.   Yes.

Q.   Going back to this screenshot of this right here.  Just for the record, I am showing both of my hands, my right and left palm are up, right in the middle of that doorway.  And I'm asking you questions, Lieutenant, because I want things to be fair and not just show you a screenshot to elicit a statement that I want, okay?

         When you see, whatever number exhibit this is that the Government keeps showing -- and I realize you have only watched this video 10 or 12 times, sir, okay -- did you know prior to this that Kelly Smith, when he entered the room with

Mata, there is seven seconds of complete darkness?  Did you know that?

A.   No, sir.

Q.   Seven seconds is a long time, isn't it?

A.   It is.

Q.   In your line of work, a millisecond is a long time?

A.   Yes, sir.

Q.   One, two, three, four, five, six, seven.  And you have been shown a photo after all that time of complete darkness to infer that this man was surrendering.  Did you remember that?

A.   I did not.

Q.   Did you see the part of the video where Kelly is in front of the door -- tactically speaking, great, he shouldn't have been standing in front of the door.  No one is going to dispute that.  I grew up with friends in trailer homes all the time.  You can hear anything in those homes.  I am going to concede everything that you said on that.  He came home. He is alive.  We are good.

        But did you see the part where Kelly is outside the door and he says, show me your hands?  Did you see that part? I don't know if you have any weapons.  You are barricaded, brother.

A.   I remember hearing that.

Q.   And did you see -- or did you ever tell the FBI that you

165

saw hands come out of the door?

A.   I saw -- on the video I saw some partial -- some body -- hand, arm, something in the door frame.

Q.   You saw Robert -- the person behind that door in that dark room that had no functioning light bulb that was controlled by Robert Evans, you saw a hand come out and grab the right side of the door frame, didn't you?

A.   I saw it come out -- I saw it briefly come out of the door frame.

Q.   You don't remember him grabbing the side of the door frame?

A.   I do not.

Q.   Did you see Kelly having trouble getting into the door? It is getting pushed back and forth.  Do you remember that?

A.   Yes.

Q.   Okay.  That would be not complying, right?

A.   That would be barricaded.

Q.   Be not complying with, show me your hands, right?

A.   He wouldn't be showing his hands, right.

Q.   Because his hands are doing something else, pushing a door on to Kelly, right?

A.   Pushing the door closed to keep him from getting in.

Q.   Exactly.  Because he didn't want to go to jail, right?

A.   Probably not.

Q.   Did they ever tell you that he finally admitted that he

didn't want to go to jail?

A.   I don't think anybody wants to go to jail.

Q.   Did they tell you that Robert Evans finally told them, hey, I just didn't want to go to jail, is my question?

A.   I did not hear anybody tell me that.

Q.   Well, you heard on the video where he kept telling them that, I am in here using the bathroom -- used some salty language -- did you hear that part of it?

A.   No.

Q.   You didn't?

A.   No.

Q.   Using the bathroom, over and over?

A.   I did not hear that.

Q.   You keep being asked, Robert Evans is telling you what he is doing.  And your response is always, well, we should soften it up.  We should de-escalate and back up.  Are you telling me you should take a person's word for it?

A.   No, he is barricaded in the house.  We shouldn't be pushing it.  We shouldn't be going in there.

Q.   And he is telling you, look, if you put the dog up and let me finish using the bathroom, I'll come out.  But you would take his word for it right there?

A.   Absolutely for a little bit.

Q.   Sure.

          And, again, I understand that is your tactical

167

opinion.

A.   Yes.

Q.   But we are talking about what you said is inappropriate and what the prosecutor said was excessive.

     So before you testified here today, you didn't ask to watch this video?  You are wearing a Smith County uniform and Smith County badge.  You didn't ask them to see the actual video of what you are going to give an opinion about a fellow officer, that was never asked by you?

A.   I watched the video I was provided.

Q.   How recently?

A.   I don't know.  Maybe a couple weeks.

Q.   Couple weeks ago, in trial prep?

A.   Most recently that I have seen it.

Q.   All right.  Do you know Sheriff Johnwayne Valdez next door in Rusk County?

A.   I do.

Q.   Because you came from Nacogdoches, didn't you?

A.   I did.

Q.   Think highly of him?

A.   I do.

Q.   This is another -- I want to ask you.  I thought I heard you say that a taser can't be used for verbal non-compliance?

A.   Right.

Q.    You said that?

A.    I said that.

Q.    And you believe that?

A.    I do.

Q.    Is that based on your training, your policy, or both?

A.    Both.

Q.    So right now, if I start coming at you right now, with a pen in my hand --

A.    That is totally something different.

Q.    Well, I am going off of your statement, okay?  You said unqualified, without any conditions whatsoever, without cleaning up, what you said.  That's what you said.  When I asked you just now, did you say that -- unconditionally that is what you said under oath, a taser can't be used for verbal non-compliance?

       If I come at you with this pen right now at this pace, you stand up because you are a peace officer --

       THE COURT:  Mr. Skipper, you need to conduct your examination from the podium, please.

BY MR. SKIPPER:

Q.    And you tell me to stop, and I don't, that is non-compliance, right?

A.    It is.

Q.    And this is a deadly weapon, perhaps?

A.    It is.  Could be.

Q.    And you could certainly tase me if you thought it was necessary --

A.    Yes.

Q.    -- right?

When you were younger doing patrol in traffic, you pulled people over for traffic violations, right?

A.    I did.

Q.    Particularly at night, very dangerous situations right?

A.    They are.

Q.    It is dark, right?  And you are coming up on the rear of the vehicle.  Perhaps, the windows are tinted.  Right?

A.    Okay.

Q.    Could be dangerous in that situation?

A.    Yes.

Q.    And not all people, like myself, maybe Toby, pull over and give you non-verbal cues that they are good, in terms of there is not going to be a problem, right?

A.    Sometimes.

Q.    And, meaning, not all people turn over, turn their wheels to the side, roll their windows down, and if it is nighttime, turn the dome light on.  Right?

A.    Right.

Q.    Those are affirmative actions of people, non-verbal, that delivers to you in the rear, while you are running a

plate, that this person is not a threat.  Right?

A.    Maybe not.

Q.    Sure.  It could be a complete setup and booby trap?

A.    Right.

Q.    These days that is really what it is, right?

A.    Sometimes.

Q.    They are baiting you into a trap --

A.    Yes.

Q.    -- Because we are talking about milliseconds, right?

A.    Right.

Q.    And at those times that you pull people over, and let's say you've gotten a person out of the vehicle because you needed to, for whatever reason, it is important that you always see someone's hands.  Right?

A.    Yes.

Q.    Hands kill, right?

A.    Right.

Q.    And especially with these roadside interactions, often times you will pull someone over in the fall or winter, right?  And you will have people sometimes keeping one hand in their pocket or both.  And over and over, Lieutenant, you will say, I told you, keep your hands where I can see them, and they will pull one out.  Right?

A.    Right.

Q.    And it just goes back and forth, right?  That, to you,

when you are younger, and even as you get older, is something that you train to younger people, right, always keep your eyes on the hands?

A.   That's correct.

Q.   Because you never know, even someone luring you in, someone has got something they are about to use, in cold blood use against you.  Right?

A.   Could.

Q.   When you watched these videos -- pardon me, this video with James Crowell here, did you see the part where Robert Evans slapped Mata across the muzzle?

A.   I don't think so.

Q.   Did you see the part where Robert Evans kicked Mata in the chest?

A.   No.

Q.   You are trained -- I think you went to Pacesetter out in Liberty?

A.   I did.

Q.   And before that you were in San Antonio, right?

A.   Yes.

Q.   And you are trained, as well as any other competent K9 officer, that that dog, your partner that you have this bond with, is expected to defend himself --

A.   Correct.

Q.   -- right?

MR. SKIPPER:  Your Honor, may I just have one moment?

THE COURT:  You may.

BY MR. SKIPPER:

Q.   Officer Hobson, I'm showing you --

MR. SKIPPER:  This is Government's Exhibit 1, Your Honor.

(Video played and paused throughout this portion.)

Q.   And I know you have seen this before, but I want to scroll down a little bit for you.  Okay?

You will see a hand come out right here gripping the right side of that door frame, right?

A.   Yes, sir.

Q.   It is not two hands; it's one, right?

A.   Yes, sir.

Q.   And from the time that door opens, there will be closer to seven seconds -- you will see Kelly Smith right here, complete darkness, you will see this man right here, he is actually -- this is a taser he has in his right hand, correct?

A.   Correct.

Q.   He is painting the back of Kelly Smith right now?

A.   He is.

Q.   It is fair to say that would violate some policy?

A.   Yes.

Q.   But at least that person who is deployed -- pardon me, who is holding his taser, feels it necessary at that time to take it out of his holster?

A.   It appears so.

Q.   Based on what he is saying.  Because you don't know exactly what he is saying; you are just looking at the video.  Right?

A.   Right.

Q.   So all this time passes before you were shown that video of this, right, that still shot?

A.   That is coming next.

Q.   From Kelly Smith's body cam when he opens the door, right?

A.   I don't know which part that is.

Q.   I will show it to you.  Here.

        Do you see what I am circling right here?  Right here.  And the collar right here.  Is that consistent with this perpetrator's right arm being under Kelly's right leg holding this K9's equipment, collar, and pulling that dog up under Kelly Smith's groin?

A.   I can see the collar.  But I can't --

Q.   You can't see the hand there?

A.   I can't see the hand.

Q.   You don't see the hand right there and the knuckles winching -- white, gripping that equipment.

Perhaps if I go further.  You will see Kelly lift up his right leg to get his arm out from under his groin.  You will see.  Do you see it again there?  The dog's face is pulled up against the back side of Kelly Smith.

A.   Okay.

Q.   You would be perfectly justified right there, if commands were given to get your hands off my dog, to strike that man?

A.   Yes.

Q.   Correct?

A.   Yes.

Q.   Do you see this right here, Robert Evans's hands are on the dog's equipment?

A.   Yes.

Q.   How many times has that happened to you?

A.   Which part?

Q.   This part right here.  How many times has someone put their hands on your dog in a dynamic situation like this?

A.   Never.

Q.   Never.  You will see here hands still on the dog, correct, in this frame?

A.   That's correct.

Q.   All right.  I guess your dog has never bitten anyone, correct?

A.   No.

Q.   You have no deployments whatsoever with a bite?

A.   None that ended with a bite.

Q.   Right.  Hands still on the dog, correct?

A.   Correct.

Q.   Right hand still now on the dog, correct?  Do you see this right hand right here?

A.   Yes.

Q.   Yanking him by the collar?

A.   Yes.

Q.   Watch what this dog's body does.  It raises up in the air; do you see this?

A.   I do.

Q.   With the perpetrator's hand pulling this dog up into the air, correct?

A.   Yes.

Q.   Did you see that before when James Crowell showed it to you?

A.   I have not noticed it before, no.

Q.   Do you see what Kelly is doing right here.  You would be perfectly fine with balling up your fist and punching this guy right in the face, wouldn't you?

A.   Correct.

Q.   This man is about to be struck in the face with a hard impact fist, and watch what he does with his hands.  His hand stays on the equipment, doesn't it?

176

A.    Looks like it.

Q.    He is about to be hit again.  Watch what his hand does.

      Do you see his hand is still on the dog, right here. We'll go forward.  Do you see that hand still on that dog's equipment, isn't it?

A.    Yes.

Q.    Still he just hit again on that dog's equipment.  You would be just fine continuing to inflict increased pain compliance until that man's hand is removed from your partner, correct?

A.    Yes.

Q.    So, finally, we see Kelly taking his right hand and removing Evans's hand from the equipment.

      Do you see right there another hand?  Right there. Did you see that when James Crowell showed it to you 12 times?

A.    No.

Q.    All right.  There is a pit bull back here.  Did he talk to you about this pit bull coming in and chipping on his legs?

A.    Pit pull?

Q.    Yeah.

A.    I never heard anything about a pit bull.

      (Video stopped.)

Q.    Lt. Hobson, I want to make sure you understood my

question.  You have watched this video 12 times?

A.    I have not seen it 12 times.

Q.    You told me a dozen?

A.    I said half a dozen.

Q.    Pardon me.  Six.

You have never once heard that there was a black pit bull mix in that house at the time, that kept coming in and munching on Mata's back legs?

A.    I have never heard anything about another dog in there.

Q.    And yet you are here giving an opinion that relates to this man's life, under oath, in this courtroom; is that right?

A.    Correct.

(Video played and paused throughout this portion.)

Q.    The prosecutor told you he is throwing the dog on this guy.  He is handling -- his job is to handle the dog at all times, correct?

A.    Correct.

Q.    Be on or near your side.  To protect you, correct?

A.    Correct.

Q.    And to protect itself, correct?

A.    Correct.

Q.    Not be attacked by a pit bull, in another room, right?

A.    Yeah.

178

Q.    Is that right?

A.    Yeah.

Q.    He is pulling him back.  Did you see that?  He is pulling him back with his left hand, right, Kelly?

A.    Kelly, yes.

Q.    Not the perpetrator, Kelly.

Guy's got a plunger.  You would have hit him too, right?

A.    I'd probably put some distance -- I would probably put some distance between me and him.

Q.    You are going to go back to distance.  Okay.  Fair enough.

Would you agree with me that a plunger is a deadly weapon in the manner in which it could be used?

A.    Could be, yes.

Q.    This finger could be a deadly weapon, correct?

A.    Yes.

(Video stopped.)

Q.    All right.  I'm not going to show you the still frames because we are talking about 90 seconds of use of force, totality of the circumstances.  I am just going to play this, okay?

(Video played and paused throughout this portion.)

Q.    I ask you if they showed you where Robert Evans slapped this dog on the muzzle.  Right here.  Watch his ears go down.

Did you see that?

A.   Yes.

Q.   He slapped him on the head, didn't he?

A.   Yes.

Q.   Robert Evans slapped that dog right on the head?

A.   He did.

Q.   Do you see this?  Robert Evans's right hand.  He is actually putting his hand back on this dog's equipment.  Do you see that?

A.   I do.

Q.   Because that is an act of compliance, correct?  That's an act of compliance, putting your hand back on the situation that got you hit six times in the face?  You can say it.

A.   At that point, he is trying not to get dog bit.

Q.   Okay.  Right here.  Again, he is about to -- Robert Evans is about to kick Mata in the chest with his right foot right here.  Do you see that dog go back right there?

A.   Yeah.

Q.   Did James Crowell ever show you that before?

A.   I have seen that part.

Q.   You have seen that one.  So you expect the dog to defend himself, right?

A.   If you have control, then this is -- then you need to down your dog here and get it -- maintain control.

Q.   Lt. Hobson, do you expect your dog to defend himself?

A.    Well, yes.

Q.    Okay.

              (Video stopped.)

              MR. SKIPPER:  May I have one moment, Your Honor?

              THE COURT:  You may.

              MR. SKIPPER:  Pass the witness.

              THE COURT:  Okay.

              MR. MACHICEK:  Redirect, Your Honor.

                        REDIRECT EXAMINATION

BY MR. MACHICEK:

Q.    Lt. Hobson, we will take a look at the video and walk through it together.

              While we are getting that set up, Mr. Skipper asked you about the availability of things -- other less than lethal implements of force that can used in circumstances like this that would be more tactically safe.  He asked you about gas canisters.

              Do you know whether or not Wood County has access to gas canisters?

A.    I have no idea.

Q.    Do you know if Wood County has ever asked for assistance from other counties that have access to gas canisters?

A.    I don't know if they have ever asked.

Q.    Do you have access to gas canisters?

A.    I do.

Q.   If they called and asked you, would you have them available?

A.   We could.  DPS has them.  They have DPS in Wood County, and they are always available.

Q.   Okay.  We will watch this video, and we will stop at certain points, and I'll ask you questions like Mr. Skipper did.

MR. MACHICEK:  This is Government's 1B, Your Honor.

(Video played.)

MR. MACHICEK:  Ms. McCullars.

(Video paused.)

BY MR. MACHICEK:

Q.   At that point in time, Lt. Hobson, does the suspect have his hand on the K9's harness anymore?

A.   No.

MR. MACHICEK:  Okay.  Move forward.

(Video played.)

MR. MACHICEK:  Pause, please.

(Video paused.)

BY MR. MACHICEK:

Q.   At that point in time, Lt. Hobson, does the suspect have his hand on the K9's harness?

A.   No.

Q.   When Mr. Skipper asked you whether or not you would strike a person in the face if they had their hand on your

182

K9's harness, was that the circumstance presented here?

A.    No.

MR. MACHICEK:  Okay.  Move forward.

(Video played.)

MR. MACHICEK:  Pause.

(Video paused.)

BY MR. MACHICEK:

Q.    In this situation here, when you have a -- this type of control over the Defendant -- or over the suspect, you made a comment earlier about downing your dog.  Can you describe what should be done here?

A.    Well, you still may need it.  So, you know, you put it in a down position.  Try to get some handcuffs on.  And if you need to redeploy your dog, you redeploy your dog.

Q.    And if you have control over the suspect, should you maintain the control of the suspect?

A.    Well, yeah, you should.

Q.    And once you maintain control of the suspect, should you continue to deploy your K9 for a bite?

A.    Not if you have control.

Q.    Importantly, once you get a suspect under control, what types of commands should you start giving?

A.    Should have been told already that he is under arrest and what he needs to be doing.

Q.    And at this point in time in the video, we are going to

hear some of the audio come in.  And I am going to ask you who the Defendant is the giving commands to.

MR. MACHICEK:  Okay.  If you can move forward.

(Video played.)

MR. MACHICEK:  Pause, please.

(Video paused.)

BY MR. MACHICEK:

Q.   Who is the Defendant giving commands to?

A.   I don't know.

Q.   Was he giving any commands to the suspect?

A.   I don't hear it.

Q.   Does the Defendant have control over the suspect?

A.   Somewhat.

Q.   Is there an opportunity to effect an arrest?

A.   Yes.

Q.   Is it appropriate under this circumstance to deploy a K9 for a bite?

A.   I don't think so.

Q.   Mr. Skipper asked you some questions about verbal non-compliance and then asked you whether or not someone walking towards you with a weapon raised was verbal non-compliance.

What do you understand verbal non-compliance to be?

A.   Just sitting Indian style in the middle of this room.

Q.   Okay.  And when somebody is running at you with a weapon, is that active aggression?

A.   Yes.

Q.   Are those two different scenarios that require two different use of force responses?

A.   Yes.

Q.   Mr. Skipper asked you a few questions about roadside interactions with individuals.  Roadside interactions and how you would interpret things on the roadside.

     Was this a roadside interaction here?

A.   No.

     MR. MACHICEK:  Ms. McCullars.

     (Video played.)

     MR. MACHICEK:  Ms. McCullars.

     (Video paused.)

BY MR. MACHICEK:

Q.   At this point in time, what is the purpose of the K9 in effecting this arrest?  What benefit is the K9 to effecting the arrest once control is gained over the suspect?

A.   Once control is gained, no -- there is none.

Q.   Mr. Skipper asked you about whether or not a family member would be an appropriate individual to bring over during a barricaded situation.

     Would you bring family members over to negotiate on behalf of the police department --

MR. SKIPPER:  That was not the testimony, Your Honor.  The testimony was, asked if he would call a mother to de-escalate the situation, not bring her physically --

THE COURT:  Is there an objection?

MR. SKIPPER:  That is the objection.  It is improper recitation of the evidence.

THE COURT:  Overruled.

BY MR. MACHICEK:

Q.   Would you bring a family member to negotiate on behalf of the police department to a barricaded subject?

A.   You have to be very careful with that.

Q.   If you believed that an individual was dangerous, possibly armed, and a threat worthy of deploying a K9 for a bite, would you place yourself and your entire body in front of a fatal funnel, in front of a doorway, for seven seconds in front of a dark room?

A.   No.

MR. MACHICEK:  Pass the witness.

RECROSS-EXAMINATION

BY MR. SKIPPER:

Q.   Lt. Hobson, you gave one example of verbal non-compliance, sitting on this floor Indian style, correct?

A.   Correct.

Q.    Well, my hands are in my pocket, and you are telling me to take my hands out, can see no weapon, right?  You can see no weapon, right?

A.    (Witness nods.)

Q.    Is that a yes?

A.    Yes.

Q.    But you can see my hands are in my pockets, right?

A.    Yes.

Q.    And I start walking towards you, and you are verbally saying, show me your hands, right?

A.    Maybe.

Q.    Okay.  If I stand still and you say, show me your hands, my standing, do we just stand here all day?

A.    I mean, if we needed to.

Q.    And I just take a step somewhere else.  And you are saying that at no point in that situation could you deploy a taser?

A.    Not just that, not based on that.

Q.    There are a thousand hypotheticals any lawyer can get here and suggest to you that would require for deployment of a taser, correct?

A.    Correct.

Q.    As far as your policy, in light of what was asked on redirect, you talked about in your policy -- and this prosecutor showed the policy, these elements that you have

written down.  One is the severity of the crime, correct?

A.    Correct.

Q.    Two is whether the suspect poses an immediate threat to the safety of the officers or others, correct?

A.    Correct.

Q.    And three is whether the suspect is actively resisting arrest or attempting to evade, right?

A.    Correct.

Q.    And those are actually the factors in -- it is called the Graham vs. Connor factors, right?

A.    Right.

Q.    You know that, the United States Supreme Court?

A.    Yes, sir.

Q.    And that is what they assess to legally determine whether someone acted reasonably or excessively, correct?

A.    That's right.

Q.    But in your policy, you there, right in Smith County, you take it one step further than the U.S. Supreme Court said, you add on that third element "or concealing himself at the time," right?

A.    (Witness nods.)

Q.    And if that person remains concealing himself, what I read on your policy highlighted in red here, that means you could deploy your K9, correct?

A.    Correct.

Q.   So you take it one step further and allow that, than United States Supreme Court, correct?

A.   Yes.

MR. SKIPPER:  That's all we have, Your Honor.

THE COURT:  Okay.  Anything further, Mr. Machichek.

MR. MACHICEK:  No, Your Honor.  May this witness be finally excused?

THE COURT:  Any objection?

MR. SKIPPER:  No, Your Honor.

THE COURT:  Okay, sir.  Thank you.  You are excused.  You may step down.

MR. MACHICEK:  Your Honor, the United States calls Alvin Gordon.

THE COURT:  Mr. Gordon, if you would head to the witness stand and raise your right hand to be sworn, please.

Stand there and raise your right hand thank you.

(Witness sworn.)

THE COURT:  You may be seated.

ALVIN GORDON, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MACHICEK:

Q.   Good afternoon, sir.  If you will pull that microphone close to you so we can hear your voice.

State your name for the record, sir.

A.    Alvin Gordon.

Q.    With whom are you employed?

A.    Precinct 5, Smith County Constable's Office.

Q.    Where is Smith County Precinct 5 Constable's Office?

A.    Lindale, Texas.

Q.    Where is that in relation to Wood County?

A.    Just south.

Q.    Right next door?

A.    Yes, sir.

Q.    And are you a certified peace officer?

A.    Yes, sir.

Q.    How long have you been a certified peace officer?

A.    For about nine-and-a-half years.

Q.    Where did you go to the academy?

A.    Kilgore.

Q.    And have you worked for any other law enforcement agencies prior to the Smith County Precinct 5 Constable's Office?

A.    Yes, sir.

Q.    And what other agencies have you worked for?

A.    Lindale Police Department.

Q.    And within your employment over at the Precinct 5 Constable's Office, what are your duties and responsibilities?

A.    Bailiffing and civil papers, as well as K9 handler and

patrol.

Q.   You mentioned that you are a K9 handler.  Have you gone to K9 school?

A.   Yes, sir.

Q.   Okay.  Where did you go to K9 school?

A.   Pacesetters in Liberty Hill.

Q.   And how long was the K9 school?

A.   A little over a month, I believe.

Q.   And can you kind of describe what you go through at K9 school to become a K9 handler?

A.   The first two weeks are strictly narcotics with a little bit of tracking on the second week.

Then the third week we tend to do a little bit more tracking, and introduced to the patrol side of it, which is bite work, and things of that nature.

And then the last week of it is strictly just patrol.

Q.   And what is your K9's name?

A.   Blaze.

Q.   Blaze.  What language does Blaze speak.

A.   Czech.

Q.   Is Blaze a dual-purpose or single-purpose K9?

A.   Dual.

Q.   Does that mean that Blaze is an apprehension dog?

A.   Yes, sir.

Q.   Does Blaze have a bite command?

A.   Yes, sir.

Q.   What is that bite command?

A.   Dursh.

Q.   Have you accidentally given a bite command when you meant to give a different command?

A.   No.

Q.   How long have you had Blaze?

A.   For almost -- well, three years, almost four.

Q.   Three, almost four years.

And during that period of time, how many times has Blaze had a bite during deployment?

A.   Zero.

Q.   Now, are you familiar with the Smith County Constable Precinct 5 policies and procedures for K9 operations?

A.   Yes, sir.

Q.   If you will turn to the binder next to you in the tab, Exhibit 24.

If you will look through those documents there and tell me if you recognize them?

A.   (Witness complies.)

Yes, sir.

Q.   And what is it?

A.   Sir?

Q.   Is it the K9 operations policies and procedures for your

agency?

A.    Yes, sir.

Q.    Are you familiar with those?  Are those the policies and procedures that govern your use and maintenance of K9?

A.    Yes, sir.

         MR. MACHICEK:  Your Honor, at this time we would offer Government's Exhibit 24.

         THE COURT:  Any objection?

         MR. SKIPPER:  Same objection, Your Honor.  This is not Wood County.

         THE COURT:  Overruled.

BY MR. MACHICEK:

Q.    Deputy Constable Gordon, do you recognize the Defendant, Kelly Jason Smith?

A.    (Witness nods.)  Yes, sir.

Q.    And how do you know him?

A.    Friends.

Q.    `Do y'all train together with your K9s?

A.    We have.

Q.    Do y'all socialize outside of y'all's profession?

A.    Yes.

Q.    Do y'all go to the same church?

A.    (Witness nods.)

         THE COURT:  If you would verbalize your answer, sir.

A.   Yes.

BY MR. MACHICEK:

Q.   Are you testifying for any reason because you dislike the Defendant, or you would like to see something happen to him that he didn't do?

A.   No.

Q.   And getting back over to Blaze, was Blaze acquired from the same kennel that you were trained at?

A.   Yes.

Q.   And when you received Blaze, was he trained to perform a set of tasks?

A.   Yes.

Q.   And was he specifically trained to perform tasks in East Texas, or what kind of tasks was he performing trained?

A.   I'm sorry, what kind of --

Q.   What kind of tasks was he initially trained to perform?

A.   Just narcotics and tracking and apprehension.

Q.   Okay.  Are K9s, when they are acquired, sort of like a plug and play tool where they are just trained somewhere, and then you bring them to your home agency, and they are ready to go?

A.   Not all the time, no.

Q.   Okay.  What needs to happen to acclimate a K9 to the universe of variables that they are going experience in your

jurisdiction?

A.    Well, we tend to try to make scenarios that they would possibly see out on the street, and kind of acclimate them to that, so that way if they could see it, they could perform it.  So they are just extra training.

Q.    And how often do you undertake this training?

A.    We try to once a week.

Q.    About how many hours?

A.    Eight a week.

Q.    And do you train just you and your K9 or with other K9 handlers?

A.    Other K9 handlers.

Q.    And you described sort of what you do in the K9 training environment.

Are you familiar with the training concept of not ending on a failure?

A.    Yes.

Q.    Can you describe what that is for the ladies and gentlemen of the jury?

A.    So, basically, if they do not perform a certain task, we try to make them feel better and let them know that once we -- if they fail and we try to recreate it again and bring it back in, and once they get rewarded and actually get the bite, as we call it, that is kind of like their reward.  They know that they did good.  So that way we end on a good note,

and they don't feel like they have been punished.

Q.   If you are working your K9 in a real live deployment and you experience a failure, how are you supposed to react in that real-world scenario?

A.   In a real-world scenario, if they fail, then we just -- they get mad.  So we put them up, and we don't let them get that reward.

Q.   How is that different in training?  What do you do when there is a failure in training?

A.   So with a failure in training, we basically do the same scenario.  You still don't reward them at that point in time. You let, what we call the decoy, run away and not let them pursue so that way they know they did bad, and put them up.

But then we will bring them back later again, and try to walk through the scenario again and help them perform it.

Q.   Do you train with other handlers that use apprehension K9s?

A.   Yes.

Q.   Have you ever worn a bite suit?

A.   Yes.

Q.   Have you ever been bitten while wearing the bite suit?

A.   Yes, sir.

Q.   Does it hurt?

A.   No.

Q.    Tough guy.

      Have you ever been bitten while you are not wearing the bite suit?

A.    Yes.

Q.    Does that hurt?

A.    Yes.

Q.    Can it cause permanent scarring?

A.    It can.

Q.    In your capacity as a licensed peace officer in the State of Texas, have you had use of force training?

A.    Yes.

Q.    When did you receive that?

A.    Use of force training, I had it while I was at the academy.  And it has kind of just basically continued through my law enforcement career.

Q.    And the general -- can you tell the members of the jury how much force you are permitted to use as a police officer?

A.    Yes, sir.  The least amount of force necessary to apprehend or to stop the threat.

Q.    And is your analysis of when or if to use force or what force to use, is that impacted by information received in real time?

A.    Yes.

Q.    Can it change over time?

A.   Yes.

Q.   Even within the same scenario, can it change?

A.   Yes.

Q.   And based on your understanding, where, on the use of force continuum, does the use of a K9 fall?

A.   We would typically say right around -- right around taser.

Q.   Going back to your K9 policy that the Government introduced the K9.

     Let's look at Exhibit 24.  Go to page 13, about three-quarters of the way down where it says "use of force." Do you see that there in front of you?

A.   Yes -- yes, sir.

Q.   Can you please describe for the members of the jury the factors that your policy dictates that you consider when using a K9 for force?

A.   The severity of the crime.  Whether the suspect poses an imminent threat to the safety of an officer or others. Whether the suspect is actively resisting arrest, attempting to evade arrest, or concealing themself at the time.

Q.   Are you permitted to deploy a K9 on an individual who is simply being verbally non-compliant?

A.   No.

Q.   Would you be permitted to deploy a taser on a subject who is only being verbally non-compliant?

A.    No.

Q.    Are you, as a peace officer, permitted to use force to punish someone?

A.    No, sir.

Q.    Are you permitted to use force because you are upset or angry about something?

A.    No, sir.

Q.    What then is the goal when you deploy your K9 or use force?

A.    To apprehend.

Q.    And if apprehension can be equated with compliance what do you do once compliance is gained?

A.    Just it depends on the situation.  Some we -- if we tell them -- I'm sorry.

So, typically, what ends up happening is, if they are on the ground being compliant, we can take them off and just let the individual know, you know, hey, don't move, stay where you are at.  If you try to fight or anything, you will get bit again.

And some actually end up leaving the dog on the bite until the individual is handcuffed.

Q.    If compliance is gained prior to the bite, is it permitted to continue seeking the bite?

A.    No.

Q.    Let's talk about requests for services -- for your

services as a K9 officer.

When you receive a request for service from another agency for an assist, walk us through the process and how that takes place and how you respond?

A.   We typically ask, what is the situation?  As far as what is going on.  Is the individual a felon, which has he committed a felony?  And things of that nature.

Q.   And when you are gathering that information, are you gathering it from other officers on the scene?

A.   Yes.

Q.   When you arrive with your K9 on the scene, who is in charge of that K9?

A.   I am.

Q.   Is the scene commander in charge of your K9?

A.   No, sir.

Q.   Once a K9 is deployed, who decides when to terminate that deployment?

A.   The K9 handler.

Q.   Does the scene commander have any control over the K9 at that point?

A.   No.

Q.   Are you familiar with the K9 warnings prior to doing a building search?

A.   Yes.

Q.   What do those sound like?

A.   We typically call out and let them know who we are, that we do have a K9, and that for them to come out with their hands up or the K9 will be deployed and they will get bit.

And we typically try to say that a few times, at least three, to let them know we are about to deploy the K9. And if they don't come out, we deploy.

Q.   Okay.  And what happens in those scenarios if the subject begins to communicate prior to the deployment?

A.   Well, we still continue to give commands for them to come out while we still have our K9 partner with us.

Q.   And what role does the urgency of the situation play in your consideration for deployment of K9 into a building?

A.   Explain that.

Q.   What role does the urgency of the situation play?

A.   If they are like an imminent threat, if they are trying to attack or flee at that point in time, then, yes, we will use them.  Is that --

Q.   When we talk about what dangers could potentially be present if you believe that a barricaded suspect was armed, would you deploy your K9 --

A.   No.

Q.   -- in that situation?

A.   No.

Q.   Why not?

A.   Because if the individual is armed, the K9 at that point

in time is useless.  He can't defend himself with, I guess, a knife or gun, so...

Q.   What other methods are available to address a situation like that?

A.   We have SWAT that you will call to come in to actually help.  They don't have other means to take care of the situation.

Q.   Are you familiar with the term "surround and call out"?

A.   Yes.

Q.   Can you describe for the jury what that looks like?

A.   So, basically, surround the house so that way the individual has -- doesn't have anywhere to go.

And then at that point you can get on the intercom or loud speaker to make announcements and ask for the individual to come out with his hands up.

Q.   During deployment for a building search, once the location of the suspect has been ascertained, what needs to be determined next?

A.   Well, if you find out where the individual is, then you can, what we call, you can stack up on the door, and just find a way to get in, if possible.

Q.   When you say "stack up on the door," what does that mean?

A.   Oh, sorry.  So, basically, when you have at least two --

I would say two to three officers, and you position yourself in a way next to the door where you can actually breach and make entry.

Q.   Where is the K9 located in that stack of individuals?

A.   He will still be with the K9 handler and -- right at the door.  So that way once the -- once someone hit and pushes the door in, you can release your K9 to make entry.

Q.   You mentioned earlier that Blaze, your K9, has no bites?

A.   Correct.

Q.   Have you had experiences where you have deployed Blaze in an apprehension situation?

A.   Yes.

Q.   Why is it then that Blaze has no bites, given the deployment for apprehension situations?

A.   Well, because once I let them know that I have a K9, a lot of times they just give up.  They decide not to.

Q.   I want to talk to you about your involvement in this investigation.

Were you contacted about this case?

A.   Yes.

Q.   By whom were you contacted?

A.   Mr. Crowell.

Q.   Did you have an opportunity to view a video of the encounter between the Defendant and a suspect --

A.    Yes.

Q.    -- on July 25, 2022?

A.    Yes.

Q.    Let's watch a clip of that video and walk through your analysis.

MR. MACHICEK:  This is Government's Exhibit 1B.

(Video played.)

MR. MACHICEK:  Can you pause that?

(Video paused.)

BY MR. MACHICEK:

Q.    We just heard the Defendant say something that, you are barricaded, brother.  We don't know if you have any weapons. Did you hear that?

A.    Yes.

Q.    If you believed an individual to be armed in a barricaded situation, would you position yourself front of the door?

A.    No.

Q.    Why not?

A.    Well, if they did have a weapon, they could shoot through the door and injure you.

MR. MACHICEK:  Ms. McCullars.

(Video played.)

MR. MACHICEK:  Ms. McCullars.

(Video paused.)

204

BY MR. MACHICEK:

Q.    What did the Defendant ask Constable McQueen to do at that point?

A.    I think it sounded like he said, push the door open, or something like that.

Q.    When Constable McQueen reached his hand up and touched the left corner of the door, did the door come open?

A.    Yes.

        MR. MACHICEK:  Ms. McCullars.

            (Video played.)

        MR. MACHICEK:  Ms. McCullars.

            (Video paused.)

BY MR. MACHICEK:

Q.    If a suspect grabs a K9's harness, is it permitted to use strikes to gain compliance for them to let go of the harness?

A.    To let go.

Q.    Once the suspect let's go of the harness, is it permitted to continue to strike the suspect because you are angry about it?

A.    No.

        MR. MACHICEK:  Ms. McCullars.

            (Video played.)

        MR. MACHICEK:  Ms. McCullars.

            (Video paused.)

BY MR. MACHICEK:

Q.  Does the suspect have any weapons or any hands on the K9's harness at this point?

A.  No.

MR. MACHICEK:  Ms. McCullars.

(Video played.)

MR. MACHICEK:  Pause it, Ms. McCullars.

(Video paused.)

BY MR. MACHICEK:

Q.  We saw the K9 in this situation take the plunger and leave the room.  Did you see that?

A.  Yes.

Q.  What does that indicate to you as the K9 handler?

A.  That he is not used to that specific environment, and he possibly could be confused on what is going on.

Q.  At this point in time, with the suspect in this position, can you give me any reason why additional bite commands would be given?

A.  No, sir.

Q.  If bite commands were given in this situation, would that be unreasonable to you?

A.  Yes, sir.

MR. MACHICEK:  Ms. McCullars.

(Video played.)

MR. MACHICEK:  Pause, Ms. McCullars.

(Video paused.)

BY MR. MACHICEK:

Q.   Was the continued use of the K9 and the continued issuance of bite commands necessary to bring that suspect into custody under those circumstances?

A.   No, sir.

Q.   At the point at which the suspect falls into the bathtub and places his hands over his head, what danger is he presenting to the officers or others at that point?

A.   None.

Q.   What should a reasonable officer do under those circumstances?

A.   At that point, take his hands and place them behind his back, and handcuff him.

Q.   Based on your training and experience, was it necessary to deploy the K9 for that bite?

A.   No, sir.

Q.   Based on your training and experience, would it have been necessary to deploy a taser under that circumstance?

A.   Hands on him.

Q.   Could that situation have been resolved with a lesser use of force?

A.   Yes, sir.

Q.   Once the Defendant places the suspect into the neck restraint with his hand over his head, I think it is his

right arm over his head, was the suspect an immediate threat to the officers or public at that point in time?

A.    No, sir.

Q.    Instead of reintroducing the K9 into that situation and continuing to give bite commands, what should have happened?

A.    If he didn't -- from that point he could have put him on the ground and put handcuffs on him.

Q.    Based on your experience dealing with suspects and K9s in apprehension situations, an individual that is on the ground underneath you with his hands on his head, is that a surrender position?

A.    (Witness nods.)  Yes, sir.

Q.    If compliance is gained in that manner, when should the deployment of the K9 be terminated?

        (Reporter asks the witness to repeat his answer.)

A.    You said when it should be terminated?

Q.    Yes.

A.    Immediately.

Q.    She's having trouble hearing you.

A.    I'm sorry.

Q.    If compliance is the ultimate goal, then what is the purpose of continuing to deploy the K9?

A.    None.

        MR. MACHICEK:  One moment, Your Honor.

Pass the witness, Your Honor.

THE COURT: Okay. Let's take a 10-minute break at this point, and we will resume about 2:45.

(Jury out.)

THE COURT: Okay. We are in recess.

(Recess was taken at this time.)

THE COURT: You may be seated.

Let me have counsel approach, please.

(Bench conference.)

THE COURT: I just want, before we get to the next witness, how many more officers are you going to call to go through the video?

MR. MACHICEK: I have got two more witnesses that would go through the video.

THE COURT: Are they experts?

MR. MACHICEK: Experts.

THE COURT: Okay. So that's all you are calling after this?

MS. BATSON: I have one.

MR. MACHICEK: And she has one as well, so three total.

THE COURT: So you have three experts and the video.

MS. BATSON: Not the whole video. I'm just going to do stills, pretty much.

THE COURT: I really hope they are not going to repeat each other's testimony. We have heard kind of the same thing over and over already. I understand experts offer a different perspective, but keep that in mind, please.

MR. MACHICEK: Yes, Your Honor.

MR. SKIPPER: Your Honor, just since we are up at the bench conference now, I know they put in their expert opinions as exhibits, and we are just maintaining our objection to those as being hearsay.

THE COURT: They are not exhibits. I understand they can be used for impeachment.

MR. MACHICEK: Okay.

THE COURT: Okay.

(Bench conference concluded.)

THE COURT: Okay. You can bring the jury in.

(Jury in.)

THE COURT: Okay. You may be seated.

Mr. Skipper.

MR. SKIPPER: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SKIPPER:

Q.   Mr. Gordon, how are you?

A.   Okay.

Q.   You go to church with Kelly at Cross Brand Church, right?

A.   Yes, sir.

Q.   And you also work for his security company, Paladin?

A.   Yes, sir.

Q.   And actually after this event in question, you worked for Tyler Rose Music Festival in Tyler?

A.   Rose Festival?

Q.   You worked security?  For Paladin?

A.   Yes.

Q.   The company that Kelly owns?

A.   Yes, the air show.

Q.   Air show here in town.  That was on October 8th of 2022, right?

A.   Yes.

Q.   Three months after this incident occurred, you did some work for Kelly, right?

A.   Yes.

Q.   And he compensated you for your services?

A.   Yes.

Q.   You and other officers, right?

A.   Yes.

Q.   Defend the safety of the area in which citizens were trying to enjoy themselves for the Rose Festival?

A.   Yes, sir.

Q.   You understand, Mr. Gordon, we are not here to discuss tactical disagreements; that is not why he has been indicted.

211

Right?

A.    Yes.

Q.    Or we are not here to discuss about your policy, because your policy pertains to Precinct 5, right?

A.    Correct.

Q.    That is the Lindale area, right?

A.    Correct.

Q.    I want to talk about, first, some things that were discussed on direct regarding a bite and hold during handcuffing.  Because it may be the way you were trained at Pacesetter, and so I want to clarify.  Because you know Kelly was trained at HK9 in Houston, correct?

A.    Correct.

Q.    By the Stanzes, right?

A.    I believe so.

Q.    And you know HK9, they go through nine weeks of training?

A.    Right.

Q.    And at Pacesetter, you get three, right?

A.    Four.

Q.    Four.  Pardon me.

       And you know with Houston K9, the trainers teach the handlers to maintain a bite and hold until the suspect is handcuffed, in order to avoid that dog coming off bite, whether verbal or with an instrument, and doing more damage

to that suspect or harming another officer.  Right?

A.    Correct.

Q.    So all these questions about the dog, being Mata, biting and holding while Robert Evans is on the ground, that is what Kelly was trained to do, right?

A.    Correct.

Q.    And he was doing what he was trained to do, correct?

A.    Correct.

Q.    All right.  Now, at Pacesetter, am I to understand that they don't train you to bite and hold until the suspect is handcuffed?

A.    It all depends on, like, your policy and how you train.

Q.    Okay.  So that is a no, right?

A.    No.

Q.    Okay.  Do you have, at Pacesetter, peace officers who are training you or military guys?

A.    Both.

Q.    Both.  Who trained you?

A.    Mike.  I can't remember his last name.  But he retired from Boston PD, I believe.  At the time he was --

Q.    At Boston PD?

A.    I believe so.

Q.    And your training was, it is up to the handler's discretion, right?

A.    Yes.

Q.    And you understand that there is various training across the state.  There is nothing uniform across the country regarding K9 handlers.  Right?

A.    Yes.

Q.    In this instance, Kelly, like many others, were taught to bite and hold and do not release until the suspect is fully handcuffed, right?

A.    Correct.

Q.    You have also said that you have never accidentally given a bite command when you should have given a heel command.  That is what you said, right?

A.    Correct.

Q.    And you have done recalls on all of your deployments, not necessitating your K9 to initiate a bite, correct?

A.    Part of our policy is if you have to send your K9, there is a reason we don't recall.

Q.    Well, I guess I understood your testimony to be that you had done deployments before but recalled your animal; there is no bites?

A.    So, yes, I have deployed my K9 --

Q.    Right.

A.    -- on leash, and so I didn't have to recall him.

Q.    This that's what I am saying.

A.    Okay.

Q.   You couldn't be confused to give a call because you have never done that, right?

A.   I've never had to.

Q.   That's right.

A.   He has been on leash, so I didn't have to, no.

Q.   You couldn't be confused on a command which was never given is my point, right?

A.   Right.

Q.   Okay.  And the point of my question is that happens quite frequently in the K9 industry, you will know this, because the language used between a handler and the dog is based on the country of origin of that animal.  Right?

A.   Correct.

Q.   So what language does yours speak?

A.   Czech.

Q.   Czech.  There are a lot of Czech dogs around here.  Do you know what language Mata speaks?

A.   No.

Q.   In any event, the reason for having a foreign language maintained on an animal is safety, right?

A.   Correct.

Q.   Because if you try to maintain the English language with an animal, that is going to cause big problems about a lot of people getting bit at the scene, right?

A.   Correct.

Q.   Because other people could be overheard, and that animal is going to hear someone else saying an English word, right?

A.   Correct.

Q.   And responding to that English word, right?

A.   Correct.

Q.   Because we are all about safety in this industry, right?

A.   Yes, sir.

Q.   And the reason why you have a lot of accidents, whether in training or on the street, is because you are trying to learn a foreign language, right?

A.   Yes.

Q.   And where did you go to high school?

A.   Marshall, Texas.

Q.   Okay.  Marshall.  I went to Kilgore.

        I didn't take Czech in high school, right?  Did you take Czech in high school?

A.   No.

Q.   All right.  So you have to learn these words, on your own terms is what I am saying, right?

A.   Through training, yes.

Q.   Through training.  Just like you do in school, right?

A.   Correct.

Q.   And individuals often make mistakes.  I mean, you know this, right?  You have gone to Pacesetter.  And you know this

occurs in training, and when it occurs in the real world, you go back and train more.  Right?

A.    Correct.

Q.    You note it in your records, right?

A.    Correct.

Q.    When you are training, you say, you know, I need to work on making sure I am giving the right command.  Right?

A.    Correct.

Q.    And if it happens on the street, you work harder and try to get better at it, right?

A.    Yes.

Q.    You also maintain deployment records?

A.    Yes.

Q.    You also maintain deployment records in which you will memorialize when your dog is deployed, right?

A.    Yes.

Q.    And things that you can perhaps you could work on in training, right?

A.    Yes.

Q.    When you are trying to make sure you are doing your best for the safety of you and members of the community with this tool, who is a K9, right?

A.    Correct.

Q.    And you are trying to put your eight hours a week in, right?

A.    Yes, sir.

Q.    You only need 16 hours a month, but you get about 32, right?

A.    We try to, yes.

Q.    You do your best?

A.    (Witness nods.)

Q.    Just like a lot of others, you are just doing your best, right?

A.    Correct.

Q.    And you mentioned that the K9 use of force is equal to a taser, right?

A.    Yes.

Q.    You also know that the commander on scene is the person who makes the determination of what to do tactically, meaning whether to breach or not and by what tool, right?

A.    Well, yes.

Q.    Yeah.  I am not saying once you are inside.  I am saying on the perimeter, you and others would report to an LT or someone in a higher position in the chain of command than you, right?

A.    Right.

Q.    Who has an ops plan.  Whether it is five minutes or, you know, back in the confines in a comfy desk in Tyler where you have a lot of resources, you put an ops plan together. Right?

A.    Yes.

Q.    And you execute that plan, right?

A.    Yes.

Q.    At the direction of the commander on scene, right?

A.    Yes.

Q.    Once you breach, at the direction of the commander on scene, certainly you have more discretion and authority because you are the handler of that animal.  Right?

A.    Correct.

Q.    All right.  Did you hear Kelly say on the video when he told the suspect, you are safe and you are going to jail, do you remember him saying that?

A.    Which part?

Q.    Outside?

A.    I don't -- I don't remember.

Q.    Okay.

A.    Honestly.

Q.    You were saying something.

A.    I don't think they showed me.

Q.    You were saying something.  Repeat what you just said.

A.    I don't think I saw that part.

Q.    You said you don't think you saw that part, or you were going to say you don't think they showed it to you?

A.    I don't think it -- it didn't show on here.

Q.    Okay.  Well, in the times you have seen it in the past,

the video, you don't remember the part where Kelly said, you are safe and you are going to jail?

A.   I don't remember.

Q.   All right.  You also mentioned that on these -- I think you are probably doing long leash deployments, right?

A.   Yes.

Q.   And that is just another tactic, one of your many options, right?

A.   Yes.

Q.   To go in, and you keep them on a long leash?

A.   Right.

Q.   That way you can bring them right back?

A.   Correct.

Q.   And you stated that a lot of times they give up.  "They" being the perpetrators, right?

A.   Correct.

Q.   And you know in this case this perpetrator had a warrant out for felony injury to a child, a child.  You know that, right?

A.   Yes.

Q.   And three other misdemeanor warrants.  Two of those for domestic family violence and one for evading arrest. Right?

A.   Yes.

Q.   And your response was that a lot of times these people

they give up and decide to comply when they hear a dog coming down the hallway, right?

A.    Yes.

Q.    That's why you have never had to deploy your dog on a bite, right?

A.    Correct.  Well --

Q.    Go ahead.

A.    Yeah.  He has been deployed.

Q.    Sure.

A.    For that purpose but yet he has never --

Q.    Right.  But you have had some smart criminals that you have dealt with, right?

A.    Yes.

Q.    All right.  Now, there are some people who don't care about the dog, right, and don't want to comply?

A.    Correct, there can be.

Q.    There are some people who, despite poking their head out of a trailer, staring at two police officers, one of whom actually put the warrants on him, one of whom he actually ran from 34 days prior, shuts the door, locks it, and runs back inside the trailer.  Right?

A.    Yes.

Q.    There are some like him who go into a controlled environment of that trailer, and they select specifically the only room with no working light bulb because it contains

221

complete darkness.  Right?

A.    Yes.

Q.    There are some people who do that, and they barricade themselves in that room, right?

A.    Yes.

Q.    Despite the officers outside saying, come on out; I know you saw us.  Right?

A.    Yes.

Q.    We know -- we know you saw us.  Right?

A.    Yes.

Q.    Some people just stay in that room, in that dark room, that they control in a tactical advantage and don't comply, correct?

A.    Yes.

Q.    Some people who stay in that room wait almost 22 minutes before they are in that room, in the confined, controlled, dark area, and they hear a command right through that wall about three-and-a-half feet in front of them.  Right?

A.    Right.

Q.    That thin trailer home that you and I are familiar with growing up in East Texas, right?

A.    Yes.

Q.    Police K9.  Come out with the your hands up.  What is the last phrase?

A.    Come out with your hands up.

Q.   No, the last part of that is, or you will be bit?

A.   Yeah, or you will be bit.

Q.   There are some people who stay in that room, despite hearing that command, and do not come out with their hands up.  Correct?

A.   Correct.

Q.   Stay in that room until the second command is given.  Police K9.  Come out with your hands up.  Or you will be bit.  Right?

A.   Yes.

Q.   They still don't comply.

        Not yours.  You got the smart ones.  But some people in the one percent club who don't want to go to the jail, defy orders.  Right?

A.   Right.

Q.   Some people who stay there, despite hearing 28 kicks, (demonstrating noise), in succession on their front door, right?

A.   Yes.

Q.   And don't come out of that trailer.  And they sit there seething in the dark confines of that tactical advantage, right?

A.   Yes.

Q.   Because they are part of the one percent club that say, you have got to come get me, right?

A.   Yes.

Q.   How many times have you watched the video?

A.   Estimate?  Three or four maybe.

Q.   Three or four times?

A.   Maybe.

Q.   How did it happen the first time?  You said Agent Crowell called you?

A.   Yes.

Q.   And did you tell them that, hey, I go to church with Kelly, and I am still working security for him?

A.   After the video had started, yes.

Q.   Yeah.  And you actually did security at Cross Brand, you and Kelly?  For any active shooters that may come in, you guys worked security at Cross Brand Church, right?

A.   Yes.

Q.   And you continued to do that after this happened?

A.   Yes.

Q.   Did you tell James Crowell that?

A.   Yes.

Q.   But he still wanted to put you in front of the screen and watch this video?

A.   Yes.

Q.   So as you sit here right now, you have only seen this video three or four times?

A.   I believe so, yes, sir.

Q.    When was the last time you watched it?  Did you do any trial prep for us here?

A.    Yes.

Q.    Just how recently?

A.    Last week.

Q.    Did they show you the part where Robert Evans slaps Mata across his muzzle?

A.    I don't remember seeing that.

Q.    Would you remember if you saw it with your own eyes?

A.    I believe so, possibly.  I don't know.

Q.    All right.  Did they show you the part where Robert Evans kicked Mata in the chest with his foot?

A.    No.

Q.    Did Pacesetter train you and your dog, you are expected and your dog is expected to defend him or herself, right?

A.    Yes.

Q.    At all times, defend you as the officer, right?

A.    Yes.

Q.    And the dog, correct?

A.    Yes.

Q.    If someone tries to hurt your partner, there is a problem, right?

A.    Yes.

Q.    Well, you have a bond with that dog?

A.    Yes.

Q.   And it is your partner --

A.   Yes.

Q.   -- right?

You have a kennel in the back of your car or your truck?

A.   Yes, sir.

Q.   Cold AC in the summertime, good food to eat, and he stays with you and your family at home?

A.   Yes.

Q.   And both of you go home to see your family every night?

A.   Yes.

Q.   The question was just asked of you, they didn't show you on examination here where Robert Evans is smacking this dog in the muzzle, did they?

A.   I don't remember seeing that.

Q.   Or where Robert Evans is kicking this dog in the chest, did they?

A.   (Shakes head.)

Q.   Don't remember that?

A.   No.

Q.   In fact, they asked you about once Robert Evans releases his hand from Mata and asks you an open-ended question whether or not there was any justification for Kelly Smith to strike Robert Evans at that point.  Do you remember that?

226

A.    Yes.

Q.    And your response was?

A.    No.

Q.    All right.  You received use of force training?

A.    Yes, sir.

Q.    If you are trying to arrest me, what side of your belt is your firearm on?

A.    Right.

Q.    You are right-handed?

A.    Uh-huh.

Q.    Just like Kelly, right?

A.    Correct.

Q.    If you are trying to arrest me, and I pick up a plunger with my right hand and I grab your arm, your right arm, with my left hand and that pistol is sitting right there, you don't think it would be reasonable for Kelly Smith to smack that guy in the face?

A.    (Witness nods.)

Q.    Is that a yes?

A.    Yes.

Q.    Here, this is a picture --

        MR. SKIPPER:  I believe it is Exhibit 1B, Your Honor.

        (Video played and paused throughout this portion.)

BY MR. SKIPPER:

Q.   This is -- I paused this video, Mr. Gordon.  And it is depicting Kelly Smith handling his dog as he should, correct?

A.   Yes.

Q.   Should always have your dog at your side, right?

A.   Yes.

Q.   You don't want him outside in another area where he can't be controlled, right?

A.   Correct.

Q.   Especially if there is a pit bull outside, right?

A.   Yes.

Q.   Did they show you the pit bull?

A.   No.

Q.   That is a no?

A.   No.

Q.   When is the first time you have ever heard about a pit bull being in that house?

A.   I want to say someone when they were talking to me had maybe mentioned it awhile back.  I would say it was one of them I believe mentioned something about a pit bull.

Q.   And I'm not trying to trick you.  I am just trying to see what they shared with you.  Okay?

        Do you remember seeing a pit bull in the video coming in and nipping at the heels of Mata?

A.   No.

Q.   And this pause right here, you can see Kelly clearly

holding K9 Mata and handling this K9 with Kelly's left hand, correct?

A.   Yes.

Q.   And with Kelly's right hand, it appears he is removing the plunger from Robert Evans's right hand, right?

A.   Yes.

Q.   And the plunger, and the manner and means of which it is used, could be a deadly weapon, right?

A.   It could be.

Q.   And Robert Evans's left hand is grabbing Kelly's right arm.  Do you see that?

A.   Yes.

Q.   All right.  Certainly at that point you believed that Kelly could strike that man in the face, right?

A.   Yes.

Q.   You see it clearly there, right?

A.   Not clearly.

Q.   There is his arm right there.  Do you see his full arm extended here, sir?

A.   Well.  It is.  Is there any way to lighten it up at all. That's what I meant by it.

          (Video stopped.)

          MR. SKIPPER:  May I approach briefly, Your Honor, with my computer?

          THE COURT:  You may.

229

BY MR. SKIPPER:

Q.   Do you see Robert Evans's arm fully extended grabbing Kelly's right arm?

A.   Yes.

Q.   I'm just going to play these two more parts and ask you if you have seen these before.  Okay?

          (Video played and paused throughout this portion.)

Q.   Robert Evans is going to reach out with his right hand. And tell me if you see him striking K9 Mata in the head. Right here.  Did you see that, his little ears went down?

A.   Yes.

Q.   On the top of his head?

A.   Yes.

Q.   What is your dog's name?

A.   Blaze.

Q.   You would expect Blaze to defend itself at that point, would you not?

A.   Yes.

Q.   You mentioned before, you were asked about Kelly pulling Robert Evans's right arm like this see, we are going to see it in a minute, in an arm triangle, right?

A.   Uh-huh.

Q.   Is that a yes?

A.   Yes.

Q.   You know you are trained to keep your face out of the

way of that K9, right?

A.    Yes.

Q.    Because you can get your face bit off?

A.    Yes.  Well, get bit.

Q.    Have your nose removed, right?

A.    (Witness nods.)

Q.    It happens; is that right?

A.    Yes.

Q.    Happens in training, right?

A.    (Witness nods.)

Q.    You were asked, to leave an impression with the jury, as if Kelly is opening up this man's right side.  Is that what we were to infer from your statement from that, or he was protecting his face?

A.    It looked like he was opening up his side.

Q.    You think he was doing that?  A man that you continued to work for in August of 2022 and did church security for, that he was trying to open him up to get bit on the side.  Is that your sworn testimony?

A.    That's what it appeared to me.

Q.    And slapping the face right here.  And, here, you will see Robert Evans again, he is not pushing the dog back.  He is actually grabbing the dog's collar again, right?  With his right hand.  Do you see his hand on top of this dog right here?

A.   Yes.

Q.   All right.  Kelly grabs it.  Left hand.  This is where you are saying that Kelly, despite Robert Evans's left hand and two feet flailing around is opening this guy's body up.  Right?  That is what you are saying?

A.   That is what it appears to be.

Q.   And right here, do you see Mata get kicked right here?

A.   Or he is pushing him away.

Q.   Pushing him away with his foot.  Is that what you say he wasn't kicking?

A.   That's what it looks like.

Q.   But you have never seen this before, right?

A.   Huh -- there was one -- this isn't the same one.  It was one just like it.

Q.   Watch when he kicks, and his ears go all the way down.  But you think that is a -- a word you use now is "push," right?

A.   Yes.

Q.   When did you stop doing security at the Cross Brand Church?

A.   I never stopped.

Q.   Who are you working for?

A.   I still do security, but it is on our county time.  Paladin stopped months back.

Q.   Months back?

A.   February or March or somewhere in there or something.

Q.   March?

A.   Maybe.  I don't remember the exact time.

Q.   You worked for Paladin --

A.   At the Cross Brand Church?

Q.   That's right.

A.   Yes.  Whenever they terminated their contract with Cross Brand, I continued to work there.

Q.   Of which Kelly is an owner?

A.   Yes.

Q.   So you continued to work for a man guarding a house of worship who you believe committed unreasonable force against Robert Evans.  Is that your testimony?

A.   I still work, yes.

            MR. SKIPPER:  That's all we have, Judge.

            THE COURT:  Anything further --

            MR. MACHICEK:  Redirect.

            THE COURT:  -- Mr. Machichek?

                         REDIRECT EXAMINATION

BY MR. MACHICEK:

Q.   Deputy Constable Gordon, Mr. Skipper asked you a bunch of questions about what some types of people would do.  What about people on their knees in a bathtub with their hands on their head, what are they doing?

A.   They are not doing anything.  They are -- I don't --

they are not a threat if they are like that.

Q.    Is that a dumb criminal, or is that someone who is having their rights violated?

A.    Rights violated.

MR. MACHICEK:  Ms. McCullars, 1D-6.

BY MR. MACHICEK:

Q.    Mr. Skipper asked you about an incident where Mata is hit by Robert Evans's right hand across the nose, and then a separate instance when Robert Evans, as you testified, pushed Mata away with his foot prior to the bite.  Is that right?

A.    Yes.

Q.    Did both of those incidences occur after this circumstance?

A.    Yes.

Q.    Who called that K9 back into that bathroom after this?

A.    The handler.

Q.    If the handler had simply arrested the suspect in this position, would either of those circumstances have happened?

A.    No.

Q.    Instead, what happened?

A.    The dog came back in and continued to bite.

Q.    Who continued to give the K9 the bite command?

A.    The handler.

Q.    And are you familiar with that handler's training within

the concept of not ending on a failure?

A.    Yes.

Q.    Based on your experience with that training concept, what is going on when he calls him back in to the bathroom and continues to give the bite command?

A.    That -- finishing on, like what we said, on a good note basically.  Let him get the bite as a reward.

Q.    Is it reasonable to you, as a K9 officer, to conduct a training exercise on a suspect in real life?

A.    No.

MR. MACHICEK:  Pass the witness.

THE COURT:  Mr. Skipper.

RECROSS-EXAMINATION

BY MR. SKIPPER:

Q.    Mr. Gordon, what you are just showed, I want to just ask you, do you just confirm automatically when the Government asks you a question?  Do you just say yes?

MR. MACHICEK:  I'm going to object to argumentative.

THE COURT:  Sustained.

BY MR. SKIPPER:

Q.    All right.  The question he was just asking you, he specifically said, this man is on his knees.  You are testifying under oath before this jury.  Could you find me anywhere in this video where this man is literally sitting --

is on his knees in a bathtub?

THE COURT:  Mr. Skipper, if you would conduct your examination at the podium.

BY MR. SKIPPER:

Q.   He asked you a question whether this guy is on his knees.  Do you know what the Indian style position is?

A.   Yes.

Q.   That is not a tactical advantage because his feet are in an Indian style and allows his feet to put pressure on the bottom of his body.  Right?

A.   Yes.

Q.   If you are on your knees, it is a significant increase in a tactical advantage for a police officer because their knees are just holding up their weight on a swivel.  You can just push left and right.  Right?

A.   You could.

Q.   So when you are asked a specific question, when you are looking at the video, the same thing that this man is looking at, and you are looking at this right here, asking you if he is on his knees, and you said yes.  Right?

A.   Yes.

Q.   Do you want to change your answer?

A.   Okay.  Yes, he was on -- he was sitting on his butt. Sorry.

MR. SKIPPER:  That's all we have, Judge.

236

THE COURT:  Okay.

MR. MACHICEK:  Redirect, Your Honor.

THE COURT:  One minute.

FURTHER REDIRECT EXAMINATION

BY MR. MACHICEK:

Q.   On his knees, Indian style, on his butt, if the officer arrests him in that dominant position before calling a K9 back in and issuing continued bite commands, do any of those subsequent bites happen?

A.   No.

Q.   Is it reasonable to issue a bite command if he is on his knees, Indian style, or on his butt?

A.   No.

Q.   Thank you.

THE COURT:  Okay.  Anything further?

MR. SKIPPER:  No, Your Honor.  Thank you.

THE COURT:  May this witness be excused?

MR. MACHICEK:  Yes, Your Honor.

MR. SKIPPER:  Yes, Your Honor.

THE COURT:  Thank you, sir.  You may step down, and you are excused.

MR. MACHICEK:  Your Honor, the United States calls Jerry Staton.

(Witness sworn.)

JERRY STATON, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MACHICEK:

Q.   Good afternoon, sir.  Would you please state your name for the record?

A.   Jerry Staton.

Q.   And how are you employed, sir?

A.   I am retired.  But I have my own training -- well, I did have my training business.  I'm not doing training anymore, so I occasionally take expert witness cases.

Q.   Where have you previously worked?

A.   As a police officer, I worked at Austin Police Department for 25 years.

Q.   Okay.  And at the Austin Police Department for 25 years, what different positions did you hold?

A.   Everyone going to the Austin Police Department starts out in the academy to learn to be a police officer, which is about six months.

Then you are a probationary officer working on the street.  I spent a total of almost five years working on the street.  But, of course, I went from a probationary officer to a regular officer and then to a senior officer.

After about five years, I promoted to what they at the time called a sergeant investigator.  They later termed it as detective, but it is the same thing.

When I made detective, I remained on the street but

no longer in uniform.  I was in plainclothes and driving an unmarked car.  And I had citywide jurisdiction.

Q.   What is an emergency response team?

A.   So Austin at the time had a very, very small SWAT team. And instead of tying up an entire district of officers if you had a SWAT callout, they would put together a team of a few officers from each district to support the SWAT team.

So we worked the outer perimeter and trained with the SWAT team, but we were not actually on SWAT.

Q.   What different positions did you hold with the emergency response team?

A.   I was the team leader.  I was in charge of the team. Each captain had one.  So there were five different captains. So we had five different emergency response teams.  It was not a full-time position.  We were full-time patrol.  But we come together again to support the SWAT team on callups.

Q.   And how long did you work in that capacity?

A.   Approximately four years.

Q.   Do you have any experience working with SWAT?

A.   Eight years.

Q.   And what types of things did you do for SWAT?

A.   Well, I was on the entry team, but as a detective on the SWAT team, depending on the secondary jobs that we had, I wrote a lot of search warrants and probable cause affidavits. One of the secondary jobs we had was street narcotics, so...

Q.   Have you ever been an instructor at the police academy?

A.   For three years at Austin, yes.

Q.   And what topics did you teach?

A.   Use of force.  When I say "use of force," so there is the concept of force, how much force to use, what is appropriate.  We will probably get into that a little more as we go through, but the physical skills involved in using force.

So what most people refer to as defensive tactics, I talk about it as being combative skills.  Because in a fight, you are not defensive anymore.  Because if you stay defensive, you lose.  Firearms, pretty much across the board.

Q.   Once you ended your tenure with Austin Police Department, where did you work?

A.   So I retired knowing that I was going to start my own training -- well, training business.  It later evolved into the consultant/expert witness business.  But my plan was to teach advanced firearms and combative skills training throughout Texas.  I think I mentioned to you I knew exactly what I wanted to do, but I had no clue how to do it.

Q.   So where did you end up?

A.   Well, by, I guess circumstance, I ended up starting to do teaching for Taser International.  Tasers were just being

introduced to the street, really right after I left.

But I became a master instructor with them and was teaching a lot of their classes. And then later became one of the first senior masters. I can explain that, if you like.

And as I gained more experience and more exposure teaching through because of taser, then my own training business picked up. People wanted me to come train them after they had come to my class.

Q. And what was your own training business called?

A. It is called Affordable Realistic Tactical Training, and I refer to it as just ARTT.

Q. What types of things did you train people to do in that capacity?

A. So I was also doing some training on my own for TASER, but primarily the trainings through ARTT involved combative skills, advanced firearms classes, risk management classes. And, again, I branched out.

I was teaching the risk management classes for TML, which is the Texas Municipal League. They are sort of the insurance carrier, if you will, for a majority of the big cities in Texas.

I was also teaching for TMPA, which is one of the police associations. I was teaching for CLEAT, which is another police association. So I was teaching a handful of

classes, all pretty much under the use of force umbrella.

Q.   When did you transfer into expert witness and consultant work?

A.   So I didn't really transition.  Once again, I sort of fell into it.

Early on there was a case in Austin where the prosecutors were looking for a -- well, they said a taser expert.  It turned out what they had in the case was a stun gun.

They called TASER International and said, do you guys have somebody who could be an expert witness in taser?  And after some conversations, they said, well, the guy you need to talk to is right down the street.  I was referred to them, and that was my first expert witness case.

And I will tell you that, having taken that case, I realized that, while I did testify as an expert in that case, I truly wasn't, quote, what I would now recognize as a true use of force expert.

So I started attending a number of training conferences and seminars.  I was going to four or five a year for a number of years.  And, actually, then I would say advanced my skill set and my knowledge and depth and breadth of knowledge on use of force, and started doing some expert witness work.

Q.   Since that time have you testified in state and federal

242

court as a expert witness in the subject area of use of force?

A.    Yes, I have.

Q.    Have you testified exclusively on behalf of the government or state or on behalf of the defense?  Where have you testified?

A.    I have testified on both sides of the bench, if you will.  So I have testified for the prosecution and/or the defense in criminal cases.  I have testified for the plaintiff and or defense in civil cases.  Probably more civil cases than criminal cases.  I don't have an exact total.  But a number.

Q.    And are you being compensated in this case?

A.    I certainly hope you pay me, yes.

Q.    And what is the compensation?

A.    For my time and my expertise.

Q.    Okay.  Is the compensation in exchange for a specific opinion?

A.    No, sir.  You can buy my time.  You can't buy my opinion.  I do believe there are people out there that fit that category, but I'm not one of them.

Q.    Well, I want to talk to you a little bit about some of the background and principles underpinning the opinions you render in cases like these.

First, from sort of an elementary basis, I would

like for you to explain for us what use of force means?

A.    So from the concept of use of force, from a police officer's standpoint, is any time you have to do something physical to someone to overcome the resistance they are offering, to be able to get them into handcuffs or get them under control.

There has been some talk in here about the use of force continuum, and they talk about officer presence being the first option on the use of force continuum.  That is not truly a use of force.  But if the officer's presence solves the problem, then no force is needed.

The second step in that is verbal direction. Again, not actually a use of force, per se.  But it is listed in order to teach people, to teach people who are wanting to become police officers the concept that you want to try to stay in the lower area.  You don't want to have to use force unless you has to -- have to.  Excuse me.

Q.    And when you are talking about deciding what level of force to use, what are the types of factors that are considered in that decision-making process?

A.    So there are a number -- actually an unlimited number of factors in making a decision on how much force to use. Primarily, you want to balance the amount of force that you use with the right of the person not to have unnecessary or excessive force used against them.

244

This balancing act includes everything that the officer knows about that particular situation or that person at the time that he or she makes the decision to use force. And it is a fluid, ever-changing -- potentially ever-changing situation.

Q.   And when you talk about the decision-making process being a fluid or ever-changing situation, what impact do those situational changes have on a scenario -- on the given use of force chosen by an individual confronting an issue?

A.   Boy, that was a lousy question.

Q.   It was.

A.   Let's do it again.

Q.   What impact do the changing situation factors have on an officer's decision to use force?

A.   So an officer in the middle of a use of force event is in a very difficult situation, in that he is having to perceive what is going on and adjust his use of force according to how successfully the force he is using is to gain compliance.

In the middle of an all out fight, if you will, if the person you are trying to get under control suddenly stops fighting, then you have to de-escalate just as you have to escalate if that person were to increase his level of resistance.

Q.   Okay.  Let's talk about resistance then.  What is the

distinction between passive resistance and defensive resistance?

A.    And, again, you have heard some of this already.  Some of it may have been a little confusing.  The terms that police are taught and are used frequently are used on the other side of the equation.

So if the person you are trying to arrest is only offering passive resistance, that means he is not doing anything to physically stop you from effecting the arrest.  He isn't trying to help you.  So it is resistance.  He isn't doing what you are telling him to do, so it is resistance.

When it moves up to the next level, the next level actually should be defensive resistance.  And, again, I am going to explain these terms can be confusing because defensive resistance and active resistance are very similar, but they are somewhat different.

I would think best explain it by saying, if a police officer were to walk up to you and tell you, you are under arrest, turn around and put your hands behind your back, and you didn't do that, that is just passive resistance.  He should be doing something other than beating on you with a nightstick or using a taser or whatever.

But if he were to reach up and punch you in the face, you would naturally try to defend yourself.  So you are resisting, but you are defending yourself.  It is defensive

resistance.

But if you were to reach up and grab your hand and try to keep you from continuing to punch him, then that is active resistance.  He is actively trying to stop you from doing something.

There is a fine line, but there are two different levels.  The next level after that is active aggression.

So, again, the same scenario.  You punch him in the face, he punches you back.  All right?  That is active aggression.  If he uses a weapon, then it is aggravated -- excuse me aggravated active aggression.

These terms can get a little confusing, but they are really -- if you stop and think about them, they are really pretty simple.

Q.   Can you please explain what police -- or Force Science is?

A.    Force Science is an institute started by a Ph.D. by the name of Bill Lewinski, but it has expanded to have numerous experts in a number of fields who have tried to put scientific research behind what experienced police officers already knew as far as human limitations in stressful situations.

Force Science, as the name implies is trying to put some science behind using force.  They are probably one of the leaders in the country -- well, they are actually out of

Canada, but they go all over, providing training to bring these principles to police officers and to attorneys who defend and/or -- and/or are going against police officers, whatever, that sometimes a police officer -- or the public will sometimes have an unrealistic expectation of what a police officer should or shouldn't be able to do.

Force Science has put times on the action versus reaction concept that we all understand as police officers, that if you are confronting someone, before you can have a -- make a decision as to how you are going to overcome the resistance, there has to be some exhibition of the resistance.  Action versus reaction simply says the person who is acting has a time advantage of the person who is reacting.

And while that time advantage is just an idea, Force Science puts actual times on it.  I don't want to go on and on.  For example, how long does it take someone from a concealed weapon position, how long does it take them to draw and fire a round?  How long does it take someone who is pointing a gun at you to turn, and you end up potentially shooting that person in the back?  When, because of the lag time in perception, that you thought you were shooting at someone who is pointing a gun at you, and you end up shooting them in the side or back.

So there is a host of ongoing research done by this

institution trying to give, again, some -- some concept of the science behind using force and what the limitations are, human limitations are.

Q.   And you mentioned a compilation of data going into this concept.  What sources are those data compilations being pulled from?

A.   So Force Science is primarily concerned about police-involved interaction and police use of force, but they found that there is some real similarities between what, for example, the airline industry does in stress inoculation for pilots, so that if they have an emergency, how can they train them better to react to the emergency.

The military.  Even sports teams.  A lot of this is centered around looking for better ways to produce better training to have fewer negative outcomes when police officers are put in a position where they have to use force.

Q.   Is it comprised only of hard sciences, or can you describe the distinction between hard and soft sciences?

A.   I will try.  So I am not a scientist.  I have done a lot of scientific study.  I've even done some, what is called, scientific research.  But true science, the hard science are pretty much black and white.

DNA, for example, or dental recognition or fingerprints or blood analysis, and there is a whole long list, I won't go on and on; but, basically, these, what I

call the "hard science," have a better chance of saying this was either yes or no, this was black or white, right, from a scientific viewpoint.

Whereas when you are dealing with individuals and human beings and what is going on inside someone's mind and how they react under stress, all of these things, while they have some scientific background are not true hard science. That is what I call soft science.

Q.    Have you heard the term called "mis-sequencing"?

A.    Yes.   Mis-sequencing is something that human beings under stress may do, and it is nothing more than putting something out of sequence.

I always like to give an example.  You are a police officer, and you are fixing to make an arrest.  And you tell the person, turn around.  And the fight is on.

During the middle of that fight, you may do certain things that you later mis-sequence and remember them happening sooner than they actually did or later than they actually did.  You are just getting them out of sequence.

It is not magic.  It is just human frailties, if you will, and how humans record and put into long-term memory and then are able to recall that memory.

We are nowhere close to infallible.  We are very bad, if you will, at doing that, particularly under stress.

Q.    And what types of situations is that concept associated

250

with?

A.    Primarily, high-stress situations.  And the higher the stress -- and you probably all have referred to or heard the term "survival mode" or "fight or flight mode."  That is actually something that happens to human beings when there is a significant threat, usually a sudden, unsuspected significant threat; and you literally shift the part of your brain that is making the -- that is in control -- I say making decisions.  You are really reacting at that point if it is really high stress.

So when the sympathetic nervous system is activated, a whole host of things happen to prepare you for that fight or flight.  Most people refer to it as an adrenalin dump.

It is much more complicated than that.  There is actually about a hundred different chemicals that are dumped into your system to make you stronger and faster, and this is an evolutionary thing.

It comes back from when man was out hunting for food and got confronted by the saber-toothed tiger.  You had to either run really fast and hope you get away or fight them.  You don't want to fight the saber-toothed tiger, so...

Q.    Importantly, when we are talking about concepts like mis-sequencing, though, is there a specific test that can be rendered on a given individual under specific circumstances

251

to identify mis-sequencing?

A.    No, not really.  So, again when you get back to force science and what they are trying to do is they are trying to educate and to give a possible alternative reason why -- well, for example, why a police officer would say something that doesn't match up to the video.

All right.  You have got a video event.  You have got the police officer giving his report of what happened, and the Force Science human factor studies are one possible reason why the police officer was incorrect.

But there is only one possible reason, and it all depends on how stressed the person was, and that is what is almost impossible to judge.

So this fight-or-flight thing, it is not all or nothing.  It is on a sliding scale from not at all, anywhere up to and including what we call hyper-vigilance where you just freeze.  Because we say fight or flight; but it's really fight, flight, freeze, or faint.  Those are the four options that you have available.

Q.    So as it is employed in your analytical process, do these Force Science concepts replace common sense?

A.    No.

Q.    Now, what is the ultimate goal for the use of force?

A.    Get the volitional compliance or voluntary compliance.

Q.    And what is voluntary compliance?

A.   The person stops resisting, and then all you have to do is put on the handcuffs.

Q.   And can you explain for the jury necessary and reasonable force as it pertains to ultimate issues in cases like this?

A.   Yes, I would like to.  Because you have heard a lot of police officers sit up here, and they were asked a question, how much force are you allowed to use?  And the typical answer from far too many, I'm afraid, police officers is I have to use, I am allowed to use the minimum force reasonably necessary to effect the arrest.

Those are three different things.  They should not be conflated.  And, unfortunately, because of policies, many police officers honestly believe they have to use the minimum force reasonably necessary.

Now, let's break that down, if I may.  Minimum force means you use the absolute least amount of force.  Reasonable force means that the force that you used was reasonable and it is judged -- excuse me -- it is judged by this hypothetical police officer who would be on that scene and would he have -- he or she have used a similar amount of force.

Necessary means you didn't have any choice; you had to use it.  They are three separate things that get glued together.  It actually can be confusing.  I wish police

officers were taught more quickly if they would stick to you are legally allowed to use reasonable force, but they don't, so...

Q.    When you are retained to render an opinion in a specific case, can you describe what happens when you initially start your methodology?

A.    So I first want to do a preliminary review, just kind of skim through and get some kind of idea of what the event was and who the players are, and so forth.  And the more players you have involved, the more complicated it is.  But I want to get a little bit of an idea.

I then want to have a conversation with the person that contacted me and talk about what I have seen up to this point and I haven't spent hours and hours and hours and I haven't made an opinion one way or the other, but I am starting to think maybe -- you know, maybe what I am going to find here would be beneficial to your case and maybe it wouldn't.

So in the very beginning, my methodology includes not only understanding the law and the policies and the concepts and ideal and model policies from a number of different agencies.

But the first thing I want to do is, if the other side had contacted me, from what I know so far, would I be able to -- in this case, for example, would I be able to

justify the force that I see being used by the police officer in this event.

If I can't justify it, then there is probably a pretty good chance that once I get into the weeds, so to speak, that I would be able to render an opinion that that force was, in fact, unnecessary and unreasonable.

Q.   What types of materials do you generally review in this initial process?

A.   Well, you want to review any and all video.  And the video, a lot of people think, tells the entire story.  It does not.  It sometimes tells an awful lot of it, but there is always additional information that is required.

You want to know what the police report said.  You want to know what the suspect said, if possible.  You want to know what the police officer said.  You want to see his report and see what he said happened -- he or she said happened.

You want to look at as much information as you reasonably can, to come to a determination as to whether the force used was reasonable.

Now, I would also like to, I guess, inform you that you have seen a lot of still pictures here since you have been here this week.  That is a double-edged sword.  As I am sure you have already figured out, either side can take those still pictures and paint the picture they want you to see.

Because still pictures do not tell the story.  They may tell specific pieces of a story.

But, keep in mind, and then going back to the Force Science and human beings, this thing happened in real time. Doesn't happen in slow motion.  Doesn't happen in still frames.  Doesn't happen in bits and pieces.  It happened, from the officer's perspective, from the time it started until the time it ended.  And human beings can only focus on one thing at a time.

So if, for example, you show me a still picture with -- well, it comes up a lot here -- with a hand.  Did the officer see that hand?  I don't know.  He may not know.  What was he focused on at the time that that hand appeared and then disappeared?

And we could go down the list, if we wanted to, but, of course, none of us want to because we want to go home before the week is over.  Sorry.

Q.   And so utilizing all of these materials in your extensive review of the materials that you received in this case, what is your standard of review?  What are you looking for?

A.   I am looking, first of all, to see whether or not the force that I observed and tried to get a handle on, whether it meets the objectively reasonable standard.

Going back again to this hypothetical police

256

officer with similar training, with similar experience, would they likely have done what this officer did or something similar.

If they don't -- if it doesn't meet that standard -- and that is the one that is, I guess, the hardest to really lock in, what would the hypothetical police officer do in this situation?  I would think that for a jury -- and, by the way, ultimately that is your job.  I am sure they will tell you that.  You have to decide whether or not what he did was reasonable.  Not whether it was right or wrong, in your opinion, because that is subjective.  Not whether it is right or the wrong, in the officer's opinion, because that is subjective.  But that objectively reasonable from that hypothetical other police officer.

And it is pretty hard to do.  It is hard to not be biased, although everybody is biased.  It is hard to be totally objective.

Q.   So whose knowledge of the circumstances surrounding these use of force decisions is important to your analysis?  Whose knowledge about the situation are you focused on?

A.   Well, primarily, you need to know as much as you humanly can what the officer who used force knew.  Anything that he didn't know, he or she, didn't know, needs to be ignored.

Even if you find out later.  And the classic example, and it happens unfortunately, is a police officer is

holding a gun on someone and says, don't move, and they come out with a cell phone real quick, and they get shot. Well, it turns out it was a cell phone. You have to realize that. But you also have to realize that the police officer in that moment more than likely had no chance of being able to perceive that.

If he doesn't -- if he makes the mistake and doesn't react and gets shot, that is not a good thing.

Q. So having been contacted about this case, have you reviewed all of the types of information that you have described in your methodology for this particular incident?

A. Yes, I have.

Q. What other additional information have you had the benefit of reviewing?

A. Oh, I already provided my opinion before I got additional information before coming here. I also got information from other experts and what their opinions were.

Q. And based on your review of that information and developing your opinion throughout your methodology, what type of situation was the Defendant dealing with in this circumstance?

A. So Constable Smith was dealing with a high-stress situation, but it wasn't the in-your-face, immediate type of thing that would typically cause that intense fight-or-flight

syndrome to be initiated.

You already know the circumstances. Do you want me to know what I know about the circumstances? It is just redundant, but I am happy to do it.

Q. Well, I am going to ask you some questions about what you know. Given the high-stress circumstances, how does that impact the use of force determination, and how does it affect your analysis?

A. Well, when I am reviewing and making a determination on reasonableness of a use of force, I take the guidance that we have been given by numerous case law, and understand that police officers often operate in situations that are intense, uncertain, and rapidly evolving.

Now, to be fair, there were portions of this event that fit that description, but there were portions of this event that, while tense and uncertain, they certainly were not rapidly evolving. All of that needs to be taken into consideration, and the officer there should also be taking that into consideration.

Q. So when you make reference to portions of the event, I would kind of like to proceed by analyzing those identifiable portions in your analysis.

Can you tell us about the first portion of the event that was of significance to you?

A. I think the -- well, the very first portion was the fact

that they knew for a fact that they had a felon that was inside this trailer house that absolutely knew the police were out there and he was not coming out, and had been in the position to prepare himself if they did come in, for some 20 minutes or more.

That is problematic. Because if he is, in fact, going to be willing to offer significant resistance, i.e., he wants to shoot you or blow you up or set the place on fire or whatever, he has had 20 minutes plus to make his plan and prepare. So that was the first.

Q. What is the next portion -- what next significant decision point that we are dealing with?

A. I think the stress involved in this situation was elevated when they realized that someone had come out the front door, but when they went to try to go in the front door -- of course, there is some time in between there -- that the door was locked and later -- shortly later after that, found that it was barricaded.

So that is another element in the -- you know, the level of stress, if you will, that would be on an officer if he is preparing to go into this environment.

Q. Okay. And where does the decision point to enter the trailer start?

A. Well, I believe that decision was made for him, before Constable Smith. So you have heard from folks up here that

says you have all of the time in the world.  And while that is true, at some point in time you don't have all of the time in the world if you don't have the resources.

If you are in a big city and you can put eight or 10 people out on the scene and secure it and trade out people if you have to -- I have been on SWAT calls where we were out there for days.

As a matter of fact, not that it is truly relevant, but our team was one of the first that responded to the Waco tragedy.  So we were out there for a while before anything was done.  We got relieved by the FBI, SWAT, by the way.  Now I digress.

You don't have all of the time in the world.  Common sense at some point says we have to do something with the resources that we have.  And that is where I think they came to the -- not totally unreasonable decision, but not the best decision, but it was the decision that was made, that, okay, we are going to go in and get this guy.

Q.   Okay.  And where does that decision point end then?

A.   Where does it end?

Q.   Right.  Where does the decision point for entry into the trailer end, and we are going in?

A.   I don't know how exactly -- I guess the Chief, the Hawkins Chief, ultimately made that decision.  I guess that

would be the end, once he has decided we are going to do that.  Unless someone talked him out of it.

Q.   And what was the purpose, the stated purpose of the initial entry into the trailer?

A.   Initially, the whole idea, my understanding was, that we were going to find Mr. Evans, locate Mr. Evans, and then go from there.

Q.   Okay.  And once the initial purpose of the entry into the trailer is achieved, what needs to happen next?  What is the next decision point?

A.   Well, you -- the idea is to find him, and shortly after the door was breached, I think it was pretty obvious that he was somewhere down the hall to the right.  I don't know that they knew exactly what room he was in.  But he was communicating.

So it wasn't a matter of, you know, I need a dog now to go find this guy.  Just talking to him, and he is yelling back.  So we know where he is.

So, again, a decision was made, and Constable Smith and his dog went in.  I don't think it was a good decision.  But it was the decision they made.

There were a number of other options that were -- that could have been made, but they weren't.  So we are dealing now -- this is where we are.

Q.   When we talk about other options that could have been

262

made, can you give us some examples to that?

A.   Well, you know, when you have got somebody inside the building, in this set of circumstances is this was probably the stupidest decision he ever made in his life, I guess, because he has got no place he can go.

He knows the cops are outside.  He knows the cops have now shown up with a dog.  And, now, not only does he know that, but he knows his attempts of defeating their entry into the front door have failed.

Time is on your side.  I don't -- you know, you can attempt to communicate and get him to come out.  That is the safest thing for everybody involved.  We keep harping on that, but it wasn't done.  Ultimately, we have to move on to what was done.

Q.   So what was done?  What is the next significant portion in this interaction that is important to you?

A.   Constable Smith made the decision to go ahead and go into the hallway and have his dog and/or himself determine exactly where Mr. Evans was.

Q.   Okay.  And when doing so in a residence with a barricaded subject, what are the initial areas of concern for making that entry?

A.   Well, you have already heard how there is no cover in a trailer house.  But there are places that you can -- you can put yourself that are less risky.  And the worst place to be

is right in front of the door where you know the guy is.

But, again, if you want to get in where he is, ultimately, at some point if he is holding that door, you are going to have to do something to get in there. And, again, we keep dealing with what could have happened. This case is really about what did happen.

Q.   Okay. And so as we are sort of progressing through what did happen, what is the next significant portion in your analysis?

A.   When Constable Smith applied pressure to the door and realized that Mr. Evans was on the other side of the door holding pressure against the door, or pushing back against the door, not willing to come in.

And that is when the conversation that we have all heard before, that I don't know if you are armed. Show me your hands. And all that took place.

Q.   And what significance does that have for your analysis?

A.   Well, at that point, hopefully what Constable Smith would be doing is trying to determine what is the level of risk here? Is there an opportunity for this guy to, you know, to stop resisting and to go ahead and come out. And it wasn't happening. So he continued efforts to go in.

Q.   Once the efforts to go in were made, what is significant about that to your analysis?

A.    While I believe there was significant effort on the part of Mr. Evans to keep them from coming into the bathroom, after Constable Smith asked for assistance, you know, hey, put your shoulder in the door, it looked to me, and you can make your own decisions from the jury box, but it looked like to me that Mr. Evans had kind of given up that effort because the door seemed to open with very little resistance -- or at least part of the way.

Q.    And how does that inform your analysis?

A.    Well, that gives Constable Smith and his dog and the other officers, who, by this time, a little late, but by this time were there, the opportunity to continue into and make apprehension.

Q.    Okay.  And as they continue in to make that apprehension, what is the next significant step?

A.    Well, we have all seen the still photo.  But understand, because of the lighting conditions, because of the close proximity, I don't think anybody can say that Constable Smith was able to determine at that point that anybody was giving up.

        So the next significant event was he continued to tell the dog to -- let's go get this guy, let's bite, foogosh.

Q.    And as that interaction, as that altercation ensues, what is the next significant step?

A.    Well, you don't make it easy do you?  So it's not supposed to be.  I'm sorry.

There was a struggle right there at the door.  So, you know, it is not something we see on video, so we don't know exactly what that struggle ensued.

But in fairly short order, Constable Smith had Mr. Evans backed up into the bathtub.  He was flailing his arms about.  So he was resisting.

I didn't see anything in the video that suggested to me that he was attacking the officer.  He certainly did try to control or at least stop the dog from biting him.  So as this progressed, that actually took a significant part of the next several seconds of the event.

Continued effort on Mr. Evans's part to not get bit or not get bitten any worse.  And a continual effort on Constable Smith's part to overcome that minimal resistance and to continue with the arrest.

Q.    Okay.  We have heard a lot of discussion about a plunger.  Can you describe for the jury how that enters your analysis?

A.    Certainly was what we would refer to as a weapon of opportunity or a potential weapon of opportunity.  But I do not see that being used as a weapon.  I see it used as a -- something to put between him and the dog, Mr. Evans to put between him and the dog to keep him from getting bit.

It was a continued defensive resistance effort that only lasted -- I know it was less than a second, but I learned here earlier that it was 5.2 or 3 seconds -- I'm sorry, .52 or 3 seconds -- excuse my math there.  He had it for a very, very short amount of time.

Q.   And following that very short period of time with the plunger where the Defendant is in the bathtub, what occurs there, and what dangers or risks does he present, in your analysis, for what occurs next?

A.   So the potential danger is always there on any suspect until you frisk them and know for a fact that they do not have any weapon on them.

But, again, from the way this unfolded, the next significant events were the blows or the punches or the distraction techniques, or whatever term you want to use, where Constable Smith was trying to get Mr. Evans to let go of his dog.

And I have no -- even though I have issues with what happened before, I have no real issue with that.  That is absolutely justified.  You do not -- I am not a K9 handler, but I have worked with the dogs.  I was the guy in the bite suit a lot.  And you do not want someone holding on to your dog in that situation, so...

Q.   After the suspect has been removed from touching or grabbing the dog's harness, what happens next that is of

significance?

A.   So as you have seen on the video, the dog takes the plunger and leaves the room.  And Constable Smith ultimately, after another more significant blow, I would say, or strike or punch, or whatever you want to call it, puts Mr. Evans into -- or assists him into a position, and we have been using the term Indian, what -- Indian something.

Q.   Cross-legged?

A.   Cross-legged down in the tub.

     Constable Smith first with one hand and then with both hands on top of him.

     So the situation had a pause right there.  And it slowed down.  It stopped being a split-second or moment-by-moment decision-making -- decisions having to be made, and there was an opportunity at that point, particularly with the training that I understand Constable Smith to have, through joint manipulation or even verbal direction, to not have to reengage the dog.  That didn't happen.

Q.   So, Mr. Staton, I'm going to ask Ms. McCullars to put on the screen 1D-4 for us to look at.

     Is this the moment that you are talking about?

A.   It is.

Q.   Okay.  And if we go to a different angle on Officer Milbourn's body cam, 1D-6, is this a different angle of that

same moment?

A.    That is my understanding, yes, sir.

Q.    Okay.  Now, Mr. Staton, you have indicated one thing just now that I would like you to expound on.  You indicated that this is where the scenario went from being a split-second, decision-making process, to slowing down some.

What significance does this have in your analysis here?

A.    Well, this, if you will, pause in the action, should have been an opportunity to resolve this problem without having to resort to the dog being called back in and told to bite.  That is my opinion.  Not as a dog handler, but as a use of force expert.

THE COURT:  Mr. Machichek, I do think we need to take another break before we hit the final stretch for the day.  Is this a good stopping point?

MR. MACHICEK:  Yes, Your Honor.

THE COURT:  All right.  Let's take 10 minutes.

(Jury out.)

THE COURT:  Okay.  We are in recess.

(Recess was taken at this time.)

(Jury out.)

THE COURT:  Ready.

MR. MACHICEK:  Yes, sir.

(Jury in.)

THE COURT:  Okay.  You may be seated.

MR. MACHICEK:  Okay.  Ms. McCullars, if we could go back to Exhibit 1D-006.

BY MR. MACHICEK:

Q.   Okay.  Mr. Staton, we were talking about the significance of this moment in the interaction.  You had mentioned earlier, before the break, that there was a slowing down in this decision-making process.

For the first time in this interaction, what has the Defendant been able to achieve here?

A.   He has control.  I wouldn't call it complete control.  But he has the -- he has Mr. Evans in a position where, if he wanted to, he could complete the process and get him completely controlled and/or handcuffed.

Q.   Okay.  And what types of use of force would you expect to see, given this situation?

A.   Well, that is going to depend on what Mr. Evans does if and when Constable Smith attempts to manipulate him into a position where he can put the cuffs on.

So if there was a continued stiffening or resistance, then the force would have to be a little bit more dynamic.  But if he reached up and did a joint manipulation and brought one hand behind his back and then asked him to put the other one behind his back, and there was no real resistance, then I would call all of that, what they referred

to earlier, as soft empty hands, which is a very low probability of causing any injury.

Q.   So reviewing the use of force as a sliding scale, we talk about escalation and de-escalation, this moment represents which of those two concepts?

A.   And opportunity to de-escalate.

Q.   What does the Defendant do instead of de-escalating the situation?

A.   Continually calls his dog back in.

Q.   When he calls the dog back in, what does he use the dog for, at that point, that is important to your analysis?

A.   Well, it appears that he is continuing to use the dog to gain control, but he has already got the control.  So I am really not sure how to answer your question.

Q.   From a use of force analysis, how does that impact your conclusion about his decision to use the dog in that circumstance?

A.   That it would be both unreasonable and excessive.

Q.   Now, the continued issuance of bite commands during that process, is that a separate use of force, distinctively, gradually, upticking, or escalating the Defendant's use of force decision after this position has been gained.

A.   Well, not really.  Because he is continuing to try to get the dog to bite, and the dog is not immediately doing what he is telling him to do.

271

So it is really not escalating it.  It is continuing at the same level of I want the dog to go in and do what I could do myself without the dog.

Q.   So what is the next significant event that we see here where there is a next portion, as you described earlier?

A.   Going from memory, I believe the next significant event was when Constable Smith decided to put Mr. Evans in a headlock or neck restraint or chokehold.  It's a little hard to see exactly where his arm is, but it looks like his arm is straight across the throat of Evans, and essentially lifted him up.

MR. MACHICEK:  Ms. McCullars, if we could look at 1D-10, please.

BY MR. MACHICEK:

Q.   Is that what you are referring to right there?

A.   Yes.

Q.   Okay.  And what is significant about this portion of the incident?

A.   Well, this would be an excellent opportunity to apply minimal pressure and talk to Mr. Evans about how it would be in his best interest to stop resisting, if, in fact, he was still resisting, and to put his hands behind his back.  It was to be an opportunity to have a higher level of control, resulting in a -- hopefully, a unresistant handcuffing.

Q.   Did that happen?

A.   No, it did not.

Q.   What did happen?

A.   What did happen was, again, he continued to try to get the dog to reengage.  And, again, Mr. Evans is trying to keep the dog from biting him.  And Constable Smith then, because his -- Mr. Evans's primary way of keeping the dog under control was grabbing the harness with his right hand.  So Constable Smith trapped that right arm, so he eliminated his ability to use that right arm to defend off or fend off the dog.

Q.   The Defendant's decision to direct or command the K9 to bite the suspect in the scenario depicted in Government's Exhibit 1D-10 here, what is your opinion of that use of force decision?

A.   Well, a number of terms apply.  Ultimately, it is my opinion it was unreasonable.  You could also say it was excessive.  And you could also say it was unnecessary.

        MR. MACHICEK:  And then, Ms. McCullars, if we can go to 1D-12.

BY MR. MACHICEK:

Q.   When you talk about the Defendant next going into the position where he has trapped the suspect's arm above his head, is that what is depicted in 1D-12 here?

A.   That's correct.

Q.   And you have described sort of what was going on there.

What is your opinion of the Defendant's continued issuance of the bite command as a use of force?

A.   It almost seems like it is in some kind of feedback loop where that is the only thing he can focus on is the dog and having the dog bite.  There doesn't seem to be any attempt at any other solution to this problem.

Q.   I'm going to draw your attention to Government's Exhibit 20 in the black notebook next to you.

Would you turn to that tab and take an opportunity to view the document that is behind that tab.

A.   Hopefully, I am in the right one, if I am looking at the Wood County Precinct 2 Constable's Office document.

Q.   Was that a document that you were able to review during your analysis of the use of force in this incident?

A.   Yes.

Q.   Okay.  Is it accompanied by a business records affidavit?

A.   Yes.

MR. MACHICEK:  Your Honor, we move to admit Government's Exhibit 20 at this time.

MR. SHOOK:  No objection.

THE COURT:  It is admitted.

MR. MACHICEK:  If we initially turn to page 3 of the document, Ms. McCullars, up at the very top.

BY MR. MACHICEK:

Q.   To the right there, Mr. Staton, who is the approval authority for these policies and procedures?

A.   Constable Kelly Smith.

Q.   And if we turn to page 15, there is a section there titled Use of Force.  Can we take a look at that?

Now, Mr. Staton, have we looked at some other use of force policies from adjacent jurisdictions through both Lt. Hobson and Deputy Constable Gordon?

A.   That is correct.

Q.   And so from those two use of force policies, are we familiar with Sections (a), (b), and (c)?

A.   Yes.  They are taken almost verbatim off of Graham v. Connor, which is the foundational use of force U.S. Supreme Court decision form back in 1989.

Q.   Constable Smith's use of force policy, however, includes an additional subsection, subsection (d); is that right?

A.   That's right.

Q.   Read subsection (d) and give us your expert analysis of that subsection?

A.   The level of force for a police K9 is at the same level of a taser or OC.  Verbal non-compliance is the level of force that the police K9 may be utilized.

I strongly disagree with that.  I think it is unconstitutional.

Q.   Why is that?

A.    Because it is in direct opposite of what (a), (b), and (c) is attempting to get across.

Now, I understand that when you look at use of force and what the handler should consider or what any police officer should consider, these are not the only things. These are a foundational starting point.

But, first, I disagree with the fact that taser and K9 are at the same level.  I have looked at data from literally millions and millions of taser deployments, and the risk of injury is near zero, unless they fall or other complicated injuries.

And the risk of injury, if you have a dog bite someone, is almost 100 percent.  The same with OC spray, the risk of injury is significantly lower.  So I disagree with that part.

But I primarily disagree with the fact that verbal non-compliance is not the level where these levels of intermediate force need to be applied across the board.

Q.    And you mentioned just a moment ago that subsection (d) seems to be in direct contradiction to the three subsections preceding it.  Can you describe what you mean by that?

A.    So in Graham v. Connor, they are trying to give a foundation for teaching police officers -- or they are giving advice, and it has been adopted pretty much across the board nationally.

So the severity of the crime is a significant factor.  The more serious the crime, potentially the higher level of force that would be justified in using to apprehend that person.

The biggest issue is whether the suspect poses an immediate threat for the safety of officers, themselves, or others.  All of these are significant issues.

But, again, this is a starting point.  And then whether the subject is actively resisting in any manner and/or attempting to evade arrest, and in this case, or conceal himself at the time.

Now, the "or conceal himself at the time" is not part of the Graham factors, but it has been adopted as is policy.  I don't think it is unreasonable.  I don't think it is unconstitutional.

Q.   Now, the inclusion of subsection (d), based on your opinion, how does it impact this K9 use of force policy?

A.   Well, it lowers the level of resistance down to basically you could use the dog on just about anybody that isn't complying.

And, again, you know, going back to the force continuum, that is a model for teaching officers how to use and when to use and how much force to use.  In the real world, if you continue to focus on is it reasonable, in looking at the balance, right, is it reasonable to use force,

significant levels of force against someone who is only not doing what you are telling them to do.

Now, situationally, could there ever be a situation where that level of force would be justified? It is possible. But, generally speaking, non-compliance alone, with no other factors involved, does not justify intermediate levels of force. And all of these are intermediate levels of force.

Q.   So shifting gears back over --

MR. MACHICEK:  Ms. McCullars, 1D-004 and 1D-006.

BY MR. MACHICEK:

Q.   Each of the Defendant's use of force decisions related to continuing to deploy the K9 for a bite, following this line of demarcation, this point in the altercation. What is your opinion about this use of force decision?

A.   This is the point where, no matter how I stretch it, I could not justify the force that is being used beyond this point. It is what it is. It is excessive. It is unreasonable.

MR. MACHICEK:  Thank you, Mr. Staton.

I will pass the witness.

                    CROSS-EXAMINATION

BY MR. SHOOK:

Q.   Good afternoon, Mr. Staton.

A.   Good afternoon, sir.

Q.   So some of the things that you brought out, you heard lots of officers asked by the prosecution that the standard was minimal reasonable force.  I think you very matter-of-factly said that is really not the standard; it comes down to reasonable.

Is that what you started out saying I believe in your testimony?

A.   I would still say that.

Q.   Yeah.

When you are having a use of force in a situation with a suspect, you get to use the amount of force that is reasonable.  You don't have to make it a fair fight obviously, do you?

A.   I would agree with that statement, yes.

Q.   Okay.  Also, you -- and you have sat here and watched all of the witnesses; is that right?

A.   Parts of all of the witnesses.  I have been out of the courtroom a very minimal amount of time, that's correct.

Q.   So you have seen a lot of still photographs shown to witnesses trying to get certain opinions out, testimony out, that sort of thing?

A.   That is correct.

Q.   That can be dangerous, as you said?

A.   It is a double-edged sword, yes.

Q.   Because when you just freeze one shot in time, that

doesn't really tell the story, does it?

A.    No.    It does give you clarification sometimes.    Because things happen so fast, you may not be able to full speed see what actually happened.    But, understand, that the officer involved may not have been able to see that either.

So it helps you know what historically actually took place, but it may or may not benefit you as to understanding what the officer perceived at the time.    That is really what this comes down to.

Q.    And another thing is, as far as body worn cameras go, when you are watching the body worn camera, we are not actually -- that doesn't mean that is what the officer is seeing.    I think that is kind of what you are saying; is that right?

A.    That's correct.    Because most of the body worn cameras are somewhere on the torso, and it is pointed straight ahead and fixed and everything is in focus.

Human beings do not focus on everything that is in front of you at one time.    You focus on a very small portion. Now, everything looks to be in focus.    It is actually your brain tricking you because you scan, and your brain records those images.    And so you think you are seeing everything in focus, but you are really only seeing a very small portion.

Under stress, that small portion gets even smaller. You have heard of tunnel vision.    That is all tunnel vision

280

is.

Q.   That is what we mentioned several times, in a high-stressful situation, the focus gets very narrow?

A.   Right.

And, also, with the camera mounted here, if I turn and look over there or turn and look over there, the camera is not going to get that.

There are other issues that show -- that establish a difference between what the camera records and what a person sees.  Lighting conditions, whether the camera has infrared, glare.  There are a number of things that could be on a camera that the officer didn't see.  And there is also things that the officer did see that wasn't on the camera.

Q.   All right.

And, also, I think the photograph that has been shown the most shows Mr. Evans as Constable Smith is entering the background, and the flashlight comes on, and his hands are up or like this.  Actually, he is moving pretty quickly, is he not?

A.   Yes.  I understand that the camera is recording at 30 frames per second, but if you are moving very fast, there can be things that happen in between those frames that are captured.

If you look at a video, you think it is constant.  But it is not.  It is a series of still photographs that look

like it is moving, if it is 30 frames per second or more.

Q.   And, as you said before, a still shot can be somewhat helpful to illustrate something, but really what is happening is there is constant movement in these situations that are rapidly evolving and the bodies are in constant motion.

A.   Well, they are in constant motion until they are not, right?  If everything stops for a portion of time, then it is not in constant motion.  But the potential is there for it to go back in constant motion again, so...

Q.   The Force Science class that you have been to, they also made findings and talked about the human perception?

A.   Quite a bit.

Q.   And perception, what you may see on a camera, doesn't mean a police officer who has got that camera on him, is actually seeing that at the same time; there is a lag time. Is that right?

A.   Again, I think we explained it pretty clear.  But the other thing we didn't talk about is people have emotions and stress, and cameras don't.  So they are just recording what the lens of the camera, whatever light it allows to come in. And people focus on one thing at a time, and emotions have a big part in that.  And stress has a big part in that.

Q.   All right.

        Well, let me get into that in a moment.  Let's talk about -- you said the plunger that was picked up, the wood

plunger, that was a weapon; you could view that as a weapon?

A.   I called it a weapon of opportunity.  It was something that was there that Evans chose to use as a shield.  I don't think he used it as a weapon, but it has the potential to be a weapon, depending on how it is used.

Q.   But as far as Constable Smith's view, he may not view it the same way in his split time when he is seeing it.  He may view it as a weapon that could possibly harm him or his K9 or someone else.

A.   I think any police officer seeing someone pick up something like a plunger would say that there is a potential that that plunger is going to be used against me.  Yes, I don't disagree with that.

Q.   Okay.  As far as the bite goes, when they first entered the bathroom area, there was some type of dog bites going on at that time, correct?

A.   Yes.  There was never what I would call a good bite and hold, but there was some attempts of the dog to nip at or bite or whatever.

Q.   And you haven't rendered opinions that that was unreasonable at all, what happened in that struggle?

A.   I rendered the opinion that I think it was unnecessary, but I understand under the circumstances that it was not unreasonable to use the dog at that point.

Now, again, I am not a K9 handler.  So I give that with some qualifications or lack of qualifications, in that area.

Q.   Okay.  And one of the -- in your report one of the opinions that you had talked about was having the dog stay on the bite.  You said that you have done research and didn't find that was standard procedure.

A.   Yeah.  I tried to find that out.  And, apparently, that wasn't taught for a while, and then it was taught.  I didn't realize there was anybody out there that was teaching that.

But, apparently, I was mistaken.  There are agencies and there are training entities that are teaching police officers to have their dogs stay on the bite until the person is handcuffed.  I don't think it is a good idea, but that is just me.

Q.   Okay.  But at the time -- so that opinion would change a bit in your report if you wrote it over again?

A.   Slightly.  Only that I wasn't able to locate such a policy, but apparently there are some out there.

Q.   And you are not a dog expert, so to speak; you are a use of force expert?

A.   No.  I am a use of force expert and I'm a dog lover, but I am not a dog handler.

Q.   Right.  But you haven't trained people using K9s; you do the training just use of force with officers, not --

A.   Not specific -- I'm sorry.

Q.   Yeah.

A.   Not specific to dogs, that's correct.

Q.   And you first met -- who reached out and contacted you?

A.   I believe it was Special Agent Crowell.

Q.   I'm sorry, who?

A.   James.

Q.   Okay.  And they came and visited you in November of 2022; is that right?  Was that the first meeting you had with them?

A.   November or December of last year.

Q.   December.

A.   December, I believe.

Q.   Okay.

A.   It is possible it was November.  I think I got my first -- well, it was either November or December.  I will just leave it at that.

Q.   How many meetings did you have with them?

A.   Total up until now?  Because we have been meeting every day after the trial, so...

Q.   Well prior to the trial, how many meetings did you have?

A.   One in person and one on a Zoom conference, I think.

Q.   Okay.  And before you had those meetings, had you been

given any of the body worn cameras to view?

A.   Oh, yes.

Q.   Okay.  So you had already reviewed those.  You had your own copies?

A.   That's correct.

Q.   There is an issue that has come up.  And the way you did your report is you kind of have an overview, which I guess is your observations or things you took note of?

A.   Yes.  Trying to make it a stand-alone report so that anyone picking it up that wasn't familiar with the case would have an idea of what took place, from my viewpoint of looking at the various videos.

Q.   In paragraph 5 of that, you had written that Evans was telling the officers -- this is when they are in the bathroom, that he was showing his hands.  And Evans's hands can be seen outside the bathroom door just before force was used to open the door.

     You used the word "hands"?

A.   Yes, that was incorrect.

Q.   When did you find out it was incorrect?

A.   I think after I had viewed the slow motion videos.  I hadn't really -- I try not to look at all of the slow motion or stills before rendering an opinion unless I have a question about something specific.  It was more of an oversight than anything.

Q.   It was just a mistake?

A.   It was a mistake.

Q.   You didn't purposely try to misrepresent that in your report; it was just a mistake?

A.   I did not try to misrepresent it.

And the truth is, even if he had had both hands out the door, again, he wasn't letting the door come open.  So it is a difference without a distinction.

Q.   Well, it can make a big difference if you are being charged with, you know, intentionally trying to falsify a report.  You know the defense for that is a mistake?

A.   I understand what you are saying.  I don't disagree.

Q.   Okay.

You also -- well, let me ask you about that.

So when you say you saw the slow motion videos, was that after your meeting -- you had a meeting at your office or home in Austin; is that correct?

A.   That's correct.

Q.   Who did you meet with then?

A.   I think the two FBI agents and the lead attorney.

Q.   Okay.  Ms. Batson?

A.   Yes.

Q.   And did y'all talk about that issue of the hands coming out of the bathroom at that time?

A.   I don't recall.

Q.    Okay.  Certainly, though, at that time, you had not seen the slow motion and saw that was one hand that was gripping the side of the door?

A.    Yes.  And to be more than fair, the video captured one hand.  I assume there was only one hand.  It is not likely, but it is possible, that the other hand did appear at some point.  But it certainly doesn't show on the video.

Q.    Paragraph 9, it talks about the bathtub in some of the testimony that you have given.  You describe that Evans is on his knees?

A.    That would also be incorrect.

Q.    Okay.  There were two other times I believe in your opinions in your report, you said paragraph 5, you write: Evans is kneeling in a tub.

That would be incorrect?

A.    He is squatting down or sitting down and cross-legged, yes.

Q.    Okay.  And then also later in paragraph 5 in your opinions:  Smith had Evans on his knees in the bathtub.

That he was always on his rear squatting down?

A.    Yes, to my knowledge, and there is nothing on the video that would support the fact that he was ever on his knees.

Q.    Okay.  That was just a mistake on your part.

A.    I am less than perfect.

Q.    I understand.  And how many times had you seen the video

288

before you wrote that report?

A.   Different videos, numerous times.  Portions of videos, far more than just watching the whole videos because there was a lot of relatively dead time where there was nothing happening, but --

Q.   But you certainly --

A.   -- a minimum --

Q.   -- watched the area of the bathtub a lot, didn't you?

A.   Yes, sir.

Q.   And that was the portion of the video that you made the mistake?

A.   Yes, sir.

Q.   Okay.  But that happens?

A.   Yes, sir.

Q.   Okay.  And you were an officer for 25 years?

A.   That's correct.

Q.   And you were an officer before there were body worn cameras?

A.   Oh, absolutely.

      I was an officer before there was in-car cameras.

Q.   You wrote many affidavits during that time?

A.   Not as an officer, but, yes, as a detective?

Q.   Yes.

A.   Yes, numerous.

Q.   Well, as a patrol officer, you would write reports over

incidents you were involved, use of force, things like that, wouldn't you?

A.    That's correct.

Q.    But you didn't have the benefit of looking at a body worn camera?

A.    They didn't exist.

Q.    And the things you now know from Force Science and other things, you don't know if you were always exactly accurate in your report-writing, do you?

A.    I can guarantee you I was not 100 percent accurate, nor is any human being if they have been through a stressful event going to be 100 percent accurate.

Q.    And you certainly weren't intentionally trying to deceive anyone if you made or when you made those mistakes, were you?

A.    No.

Q.    Also, in the report I didn't see where you had ever mentioned that Constable Smith had that finger -- the door slammed on his finger causing an injury?

A.    I actually didn't realize that until later.

Q.    Okay.  That obviously happens -- is an escalation of force if the door is slammed on your finger when you are at the door, does it not?

A.    It was an accident.  I don't think there was any intent at dislocating or breaking his finger, but it certainly would

have increased his stress level a little bit.

Q.   Okay.  I also saw in your report you didn't note anywhere where Robert Evans hit Mata on the snout or kicked Mata in the chest, shoving him back?

A.   I'm sorry, was that a question?

Q.   Yes.  You didn't place that in your report?

A.   No, it's not in the report.

Q.   Did you not see it when you were viewing the video?

A.   I didn't see it clearly until I looked at it on the slow motions.

Q.   Because things happen quickly, and you can see it much better when it is in slow motion?

A.   That is correct.

Q.   But when that foot is put out and Mata is shoved back, the bite happens right after that, does it not?

A.   Very shortly after that, yes.

Q.   Okay.  And one of the things that were happening you testified about was -- there is two different commands being made.  It is the command for apprehend and also "come to me," correct?

A.   Yes.

Q.   And those are coming back and forth sometimes?

A.   Far more of the apprehend or bite commands.  But, yes, there was some interaction between first one and then the other.

Q.   And one of the things that you made note of is K9 Mata was not responding to the apprehension command?

A.   I think that is pretty obvious, that's true.

Q.   But he certainly responded with an apprehension with a bite right when he got kicked in the chest, did he not?

A.   Kicked or shoved, yes, that is just prior to the bite and hold that you would have expected him to have done way earlier in this event.

Q.   And I know you are not an expert in dogs, but you have heard testimony that these dogs are trained to defend themselves if they are injured or assaulted?

A.   I think they receive additional training, but it is a natural reaction for most dogs if you -- you know, if you smack at them or swat at them or push on them or whatever.

Q.   It wouldn't shock you that they specifically train them that way?

A.   No, it would not shock me at all.

MR. SHOOK:  May I have one moment, Judge?

THE COURT:  Okay.

MR. SHOOK:  Thank you, sir.

That's all I have, Judge.

THE COURT:  Okay.

Mr. Machichek.

MR. MACHICEK:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. MACHICEK:

Q.    Mr. Staton, you made some comments that contained some terms that I want to have clarified for the jury.

Can you explain the distinction between a high-stress situation and a life-or-death situation?  And perhaps give us some examples that we might be familiar with.

A.    Certainly.

So there is a lot of times in police work when you are going to find yourself in a high-stress situation.  It might be because you are going into a house, not knowing anything about what is in the house.  It might be that you are making a car stop on a vehicle that was suspected in some kind of crime.  It might be you are in a house on a family disturbance, and you see that the agitation level is rising.  And all of these things create stress.  So there is a number of them.

The life-or-death situation that you are in that house, for whatever reason, and you are suddenly confronted by someone with a knife or gun that is making it obvious they want to do you harm.  This is a sudden, unexpected, a high-stress situation.

And, you know, people experience that too.  You are driving, and you are about to have a car crash.  And you see the car coming and know you can't stop.  That is a high-stress situation that could induce an activation of the

293

sympathetic nervous system or fight or flight.

Q.   And how does the distinction between those two types of situations impact your analysis from the perspective of things like tunnel vision?

A.   So, again, we talked about that you always really have tunnel vision, but it is more astute -- what happens under a high-stress situation is you don't scan as much.  You focus in on the threat and stay there.

So what is going on in your peripheral vision out here, literally, you can have someone walk into the room right in front of you and not see them.

There is a famous video that -- one of the places I saw it was in Force Science training where they have got multiple people passing a basketball.

And in the middle of this, you are told to focus on how many times they pass the basketball.  And in the middle of this, a guy in a gorilla suit walks right out in the middle of the stage, moves around a little bit, and walks off.  95 percent of the people who actually follow the commands, never see the gorilla.

So if you are in a really high-stress situation, that is when this thing kicks in.  If you are in just a stressful situation, it is not the same thing.  You have trained to be able to deal with those higher stress but not life-threatening stress.

Q.    And that was going to be my next question.  If you could expound on that last statement that you made, how does training and experience play into how an individual deals with those types of situations?

A.    So training and experience can help you control some of the aspects of being in high stress.  But because of evolution, there is nothing that you can do to train someone to avoid fight or flight if they are faced with a sudden, life-threatening situation.

So it is two different things.  The more high-stress situations you are put in, the better you are able to deal with it.

This goes back to training, again, from the various entities that we talked about.  Whether it is the airline industry or professional football or professional sports, you know, the training helps you deal with it.  It doesn't eliminate it.

Q.    And so when we are distinguishing types of scenarios between that fight or flight response that you were just mentioning, in your analysis of this incident, was it -- what type of situation are we dealing with here?

A.    This was a high stress, but I wouldn't call it a fight or flight activation on the part of the officer.  If anybody in there was experiencing sudden, intense, feeling of threat, it was the suspect they were going in to arrest.  It was

Mr. Evans.

Q.   Now, Mr. Staton, during the cross-examination with Mr. Shook, you made a statement that in this incident even the level of stress stops for a portion of time.  What were you referencing there?

A.   What I said was you had a pause.  Things are no longer rapidly evolving.  There is an opportunity to take a breath, to reboot, if you will.  Control-Alt-Delete.  Let me, you know, get a handle on this.

There is still a level of stress, but at that point it should have been reduced.  Now, I can't say that it did, I can't say that it was, because I can't get in someone's head and know that.

But, typically, that is the time when you would feel some ease of the tension that the situation has put you in.

MR. MACHICEK:  And, Ms. McCullars, if we could have 1D-006.

BY MR. MACHICEK:

Q.   Mr. Staton, is this the moment that you are discussing when you are talking about that?

A.   Yes, it is.

Q.   And following this moment, the Defendant's use of force by retrieving the K9 and commanding the K9 to bite, what is your opinion about that again?

A.    Unnecessary, excessive, and unreasonable.

Q.    Okay.  Now, there was also some discussion here just a moment ago about report writing, affidavit writing, and an expectation of 100 percent accuracy.

      Is there a difference between generalized mistakes or failing to meet this 100 percent accuracy threshold in the inclusion or omission of material facts?  Is there a distinction between those things?

A.    Yes.  There is actually a big, I guess, discussion still going on within the law enforcement community.  Should a police officer have the opportunity to view his video before he writes his initial report.

      And on one side of the argument, which is very valid is, you don't want him to view the video because you want to know what his perceptions were, not what happens to his memory after he watches a video of the event.

      On the other side of the argument is equally true, if he does watch the video, he has the opportunity to have a much more accurate report.

      I hope I've answered your question.  I may have got off track.

Q.    No.  And within that discussion, is there a distinction in the endeavor to be 100 percent accurate in one's memory and the inclusion or omission of material facts?  Is there a difference, in your analysis, between those two concepts?

A.   Yes.  Even if you are trying to be 100 percent accurate, you could make some minor, you know, what we talked about, time, get things out of sequence.  Or you may have left out something that happened you didn't see or didn't hear or whatever.

But as far as material facts, if you are saying something that actually didn't happen and you say it did happen, that is really outside the scope of what we are talking about here.

Q.   Right.

And so if you said something that didn't happen or -- what would that be indicative of?

A.   Well, if you wrote in your report that three pink elephants came into the room and walked across or whatever, it obviously a fabrication.  It is not something that you misperceived at the time, no matter how much stress you were under.  It would be indicative of being untruthful.

Q.   This business with the plunger being a weapon of opportunity or a potential weapon or anything like that, how was it actually used in this instance?

A.   It was used as a shield to keep the dog from biting Mr. Evans.

Q.   And how long did Mr. Evans have the plunger?

A.   I am told it was .52 or .53.  I just knew it was less than a second.  I wasn't able to get it down that precise.

But he picked it up.  He put the rubber end of the plunger towards the dog's muzzle, and almost immediately Constable Smith took it away from him.

Q.   Now, the last portion of the cross-examination dealt with the moments preceding the bite from Mata on Mr. Evans's foot.  Do you recall those questions?

A.   Yes, the slap and the push or the kick, or whatever you are going to decide it was.

Q.   Did each of those instances occur after the instance that you have noted here in Government's Exhibit 1D-6?

A.   Yes, it did.

Q.   And who called the K9 back into the room, and who gave the K9 bite commands to create that situation?

A.   Constable Smith.

          MR. MACHICEK:  Pass the witness.

          MR. SHOOK:  No further questions, Judge.

          THE COURT:  Okay.  May this witness be released?

          MR. MACHICEK:  Yes, Your Honor.

          THE COURT:  Okay.  Thank you, sir.  Please step down.

          THE WITNESS:  Thank you.

          MR. MACHICEK:  May we approach, Your Honor?

          THE COURT:  Sure.

          (Bench conference.)

          MR. MACHICEK:  As far as scheduling is concerned, I

299

have another expert that is going to last probably about an hour.  I don't know if we want to get started now.

THE COURT:  Then what else do you have?

MR. MACHICEK:  We just have another expert after that as well.

THE COURT:  And that's it?

MS. BATSON:  That's it.

THE COURT:  So you will be done tomorrow midmorning?

MR. MACHICEK:  Yes.

MS. BATSON:  What is considered midmorning?  Like before lunch?

THE COURT:  Before lunch.

MS. BATSON:  Maybe not -- maybe right around lunch.

THE COURT:  Let's do 20 minutes.

(Bench conference concluded.)

MR. MACHICEK:  United States calls Donald Slavik.

THE COURT:  If you would raise your right hand to be sworn.

(Witness sworn.)

DONALD SLAVIK, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MACHICEK:

Q.   Would you please state your name for the record, sir?

A.   Donald Slavik, S-L-A-V-I-K.

Q.   And, Mr. Slavik, what do you do for a living?

A.   I am the executive director of the United States Police Canine Association.

Q.   And what sort of responsibilities do you have in that capacity?

A.   I have the responsibilities for the day-to-day operation of the Canine Association.

Q.   Prior to being the executive director of the USPCA, can you give the members of the jury a little bit of an idea of your professional history?

A.   Yes.  I was a 29-year veteran from the St. Paul Police K9 Unit.  21 of those years I was in K9.  And the last -- I retired as the head trainer.  We had 23 people in the unit.

Q.   Okay.  And do you have any experience in SWAT?

A.   No.

Q.   Okay.  What other work experience do you have?

A.   When I left the K9 unit, I went to ATF and trained explosive dogs for them for like eight years.

Q.   Any other federal agencies that you have been connected to?

A.   Yes.  When I left there, I went to the State Department as an employee, and I was the oversight -- I was a -- I oversaw all of the dogs in Iraq that were assigned to the State Department under contract.

Q.   Okay.  Did you have an opportunity to work with the U.S. Marshal's Service?

A.   Yes, I did.

Q.   Okay.  And what did you do with them?

A.   The U.S. Marshal's service and CIA and ATF, they all worked together in certain projects.  And on some of those projects I was there mostly to train explosive detection dogs.

But at one point, I was asked to put together a team or a plan to train U.S. Marshal dogs as patrol dogs, or what you would call here as apprehension dogs, cross-train to explosives.  And they would cover the fugitive task force teams that are in the United States, plus have some responsibility for maintaining security in the buildings, such as we are in right now, and have explosive detection.

Q.   And have you previously testified as an expert witness?

A.   Yes.

Q.   And in what subject matter?

A.   In all sections of K9, as far as training, certification, management; pretty much the whole thing.

Q.   Okay.  And has that been in the state or federal court?

A.   Yes.

Q.   In both?

302

A.    Yes.

Q.    And are you being compensated for your testimony?

A.    No.

Q.    Are you receiving reimbursement for travel expenses?

A.    Yes.

Q.    But you are not receiving any compensation for your time or work?

A.    That is correct.

Q.    Why is that?

A.    Because I am representing the United States Police Canine Association here.

Q.    And what interest does the USPCA have?

A.    We have our interest in the certifications and things such as that, and also the way this the Defendant is a member of the United States Police Canine Association.  And the actions in this deployment were not very good.

Q.    I want to talk to you about some background principles before we get into that opinion.  I want to talk about K9 training first.

What is meant in reference to K9 training when we describe it as a step-by-step training process?

A.    Yes.  So in K9 training, we never take -- we never train our dogs and give them too much to train for.  We do a step-by-step process.  As they get one function, could be parts of obedience, could be part of detection, but it is all

step by step.

As they complete each step, then we go on to a newer or maybe more challenging step.  And it is an ongoing training all through their lives.

Q.   And can K9s be described as context-specific learners or performers?

A.    Yes.  What that means is that dogs don't think like you and I.  They don't gather information like we do.  When you get some information, you may be able to apply it in every aspect of your life that you can be involved in.

Where dogs are, they learn something, they not only learn what you are trying to teach them, they learn the place they are doing it in.  And if there is somebody that is always standing there, they learn those people are part of that.

So as we change and direct the dogs to do different things, we usually do it in a distraction-free type of environment.  That could be a training field.

And so what we are looking at is to take the dog and give that dog the teaching that they need to accomplish something without distractions, like lots of people, for instance, at a ball field.

Once we get them reliably doing something distraction free, then we will start to do -- put in little, different distractions.

So in the overall picture of this thing, every deployment they go on will be different in some point.  So what we are trying to accomplish for a dog is that they are able to surmount obstacles, be able to work in every environment, be able to do a good job no matter what that job is.

Q.   In that step-by-step process, where does training begin?

A.   In the step-by-step process, it could be obedience.  So obedience is always a big thing in dogs, and even in detection dogs, but patrol dogs for sure.

Start out and with a little obedience, agility.  We have multiple things going on throughout the day.  So as they get better, obedience starts getting tougher.  We start doing distances.  We may do it right here in front of them step by step.  Pretty soon we can give the dogs signals by the door. So that is the kind of thing.

So the agility is we started -- they are really actually walking over two-by-fours.  Pretty soon they are jumping four-feet high.  So that is the type of step-by-step process we are talking about.

Q.   And how does this coincide with that scenario-based training?

A.   The scenario-based training is something that comes later.  So we have certifications all over the United States

305

by many, many associations, and even at the state level. Then at the national -- the governmental level, certain agencies there, will certify through some federal form.

And what it is, is that the certification is an indication that the dog -- is the dog ready to -- can the dog do it?  Can the team do it?

So back up a little bit.  2013 Supreme Court case decision stated that we can do certain things if the dog is certified.  And that means -- like, we can get warrants, or we could get, you know, different things.  A lot of it is based in detection.  So that would be all of the different detection things.

And so it doesn't mean they are scot-free.  That means it gives them the beginnings of a case.

So then as we go through the cases, the people that we maybe arrested, they have some recourse.  They can come to court in front of a judge, and they can say -- the attorneys can say, we don't think that was right.  We don't think they have the records or whatever to back up what they say they can do.  And then the judge, the jury decides whether or not they can.

Q.   Okay.  And so when we are talking about scenario-based training in the step-by-step process, what is the ultimate goal?

A.   The ultimate goal is to be operationally ready.  So

scenario-based training is where -- it was mentioned here, I think, today.

So, basically, what is done -- and the officer was correct when he said we set up little problems.  But one of the things that the context-learning thing means is that they don't generalize from one -- like one area to another.

So we set up different scenarios, things that we think they will run into during their beginning years in deployments.

So during those scenarios, we check to see where they have problems.  And when they have problems, we write them down in training logs, and that is something that we have to fix.

But all dogs will make mistakes as they are going on in their training.  And then if we don't correct them, they will make mistakes in their actual deployment.  So we are trying to fix everything we can as we adjust -- or take the dogs in different places in our cities and counties and stuff, where we work, and try to give them all things that they will be able to -- maybe be able to get involved in.

So the worst deployment you can have is the one you didn't train for, basically.

Q.    And what role do the training records that you are referring to --

A.    Yes.

Q.  -- what role do they play in this process?

A.  The training records are extremely important because they back up what you say you can do.

So you are in -- when you say you can do something, it is usually you can go into anybody's training logs and, say has he practiced this?  Has she done this?  And how did it go?  Did it go well?  So that is what -- training logs are extremely important.

Q.  I want to talk a little bit next about your methodology and how you analyze a specific case.

Once you are contacted about a case, what is the first thing you do?

A.  After I get the information?

Q.  Let's start with the information.  What information are you looking for?

A.  So what I am looking for is -- there is a lot of information.  I think you already see that.  There is a lot of information that we received.

For me, I also like to go over the whole thing and just get a feel for it.  But then there is a step-by-step process where I look.

Like, did Officer Kelly ask for the warrant?  Yes. Did the warnings go out?  I am a two-person warning.  Some guys like to do three, but at least two.  Did they do that? Yes.  Is the guy inside hiding or resisting?  Yes.  So you

are checking through all that to make sure it is there.

Then you just go through the different -- as officer -- Constable Kelly goes through the motions, is everything he is doing proper?  Is it right?  Is the containment by the team outside, did they contain it right?

You really pay a lot attention to the little stuff -- or the big stuff at first.  I go through it many times.  Because as you go through it, you find more things.  Then you have got to back to the beginning and start over and look here.  But that is the process that I look at.

I look at it very quickly.  If I see something wrong, then I go to two different things.  I go to the records, or I go to the original report.  I had the videos first.  I looked at those because I think those are important.  Then it is like either the reports or it is the actual training records.

Q.   Okay.  And when you are determining how -- or analyzing how a dog is deployed in a given situation, are you looking for just what was done, or are you also looking for what wasn't done?

A.   Yes.  Every dog will show you their training.  So when they are out there and working, they will show you what they have been trained to do.  You can see it right away.

And so that is what I look for, to see how the dog actually operated in the environment where he had to do --

whether it is searching or locating somebody or as a use of force or whatever.  You look at all of those.  The dog shows it to you.

And when the dog makes a mistake, then I look at the handler and I say, what did the handler do to cause that?  Because a lot of times it is the handler mistakes that make the dog do something.  So...

Q.   Do you also -- in bite situations, what is the area that you are focusing on when you are analyzing a case that involves a bite?

A.   The bites -- so there is like a directed bite.  Then there is a different kind of a bite where it just happens.  A directed bite is where you tell somebody to go bite somebody.

And then there is the bite where you are searching somewhere, and such as this case of this suspect would have been running down the hallway, what did the dog do?  Did the dog go after him, or did the dog try to stop him?  Those kinds of things are important to see how the dog is operating.

Q.   And in your review of all of these materials and as you are looking for these things, are you trying to get a full picture of the deployment?  If so, what is the benefit of that?

A.   I'm sorry what is the last?

Q.   What is the benefit of a full picture?

A.   Well, the full picture is, as you are going through, it is looking at each statement is a step by step as you are going through it.  And then you take back and think about what happened in this just deployment that jumps out at you.  Or what is wrong with these people or what is right that happened with this deployment.  You are trying get a full picture of the whole picture after you have looked at everything.

Q.   And then once you got that full picture, what role do the K9 records play at that point?

A.   So in this case -- may I use this case?

Q.   Yes, sir.

A.   Okay.  In this case, there was something in the video that jumped out at me right away.  And it was the fact that the dog kept leaving the room.  And the dog didn't engage right away or engaged and left and came back, which is different.  So I went to the records.  My choice here was not the reports, but I went to the records.

So, in the records, the training starts in Houston.  And Constable Smith is there, which is the way it goes.  That is the way you do it.  So he is there, but the dog is very proficient, let's say, at biting the sleeve.  And the bites are something that covers the whole body except for the head.

And so it is to the point where the dog has to be

physically removed from the sleeve or the bite suit, which kind of contradicts what I am looking at in the video.  The dog really doesn't look like he wants to bite, but more so he doesn't look like he even wants to be there because he keeps leaving all the time.

So there is a problem with what the training records are showing on this side for what is happening over here.  So the dog isn't showing us much.

So what is happening with that?  Is the dog is being exposed to a lot of bites by the sleeve, and he is beginning to -- or he has realized that -- it's called a distributive stimulus, which is nothing more than fancy words for cued.  The dog has been cued by the sight of the sleeve that biting will be reinforced.

This is not a bad thing.  This is part of the process.  But he has got that part down.  The next step is to go and train to where the dog -- where it actually would look similar to what it is.

Burglars, bad people, don't run around in bite suits.  So you have to take the dog to the next level and get him to apprehend somebody that doesn't have a bite suit on.

Q.   If I could be allowed to take a sort of step back.  When we are talking about training records, when we are talking about ongoing training to develop these skills or correct these issues, who is responsible for, one, documenting things

in the training records; and, two, for fixing the things that aren't working?

A.   The handler is responsible for all of that, plus they are responsible for making sure their dog gets the training they need.

Q.   Now, moving -- since we have started talking about the incident --

MR. MACHICEK:  Unless, Your Honor -- this might be a good place --

THE COURT:  This might be a good place to stop for the day.

So we will end here, and I just would ask you to be back ready to go at 8:45 in the morning.  All my prior instructions about not discussing the case or not look anything up online, still apply, of course.

All right.  Thank you.

(Jury out.)

THE COURT:  You may be seated.

Mr. Machichek, I would just ask in the morning if you would do something to help with these long, narrative answers.  Make your questions more concise.

And for the witness, answer the question as directly and succinctly as possible.

MR. MACHICEK:  Yes, sir.

THE COURT:  Where are we on the jury instructions?

313

Before the trial began, I think there were two outstanding issues. I have ruled on one of them. Is there just the second issue?

If you want to discuss that this evening and let me know in the morning, that's fine.

MR. MACHICEK: And, Your Honor, that would be in reference to policy violations --

THE COURT: Correct.

MR. MACHICEK: We will confer.

THE COURT: Okay.

MR. SKIPPER: Yes, Your Honor.

THE COURT: All right. Anything else to discuss?

MR. SKIPPER: No, Your Honor.

MR. MACHICEK: No, Your Honor.

THE COURT: Okay. We are in recess until -- did I tell the jury to come back at 8:45?

MR. MACHICEK: Yes, sir.

THE COURT: Okay. We will be back at 8:45 in the morning.

(Recess was taken until 6/29/2023.)

CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.


/s/ Shea Sloan                          August 3, 2023
SHEA SLOAN, CSR, RPR
Federal Official Court Reporter