IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION


UNITED STATES OF AMERICA          )
                                  )       CASE NO. 6:22cr146
     -vs-                         )
                                  )       Tyler, Texas
                                  )       8:52 a.m.
KELLY JASON SMITH                 )       June 29, 2023


TRANSCRIPT OF JURY TRIAL
DAY 4
BEFORE THE HONORABLE JEREMY D. KERNODLE,
UNITED STATES DISTRICT JUDGE

2

<u>A P P E A R A N C E S</u>

FOR THE GOVERNMENT:

MR. LUCAS MACHICEK
ASSISTANT U.S. ATTORNEY
110 North College, Ste. 700
Tyler, Texas 75702

MS. TRACEY BATSON
ASSISTANT U.S. ATTORNEY
101 E. Park Blvd., Ste. 500
Plano, Texas 75074

FOR THE DEFENDANT:

MR. CODY SKIPPER
LAW OFFICE OF CODY SKIPPER
2001 Bryan St., Ste 1905
Dallas, Texas 75201

MR. TOBY SHOOK
SHOOK GUNTER & WIRSKYE
2001 Bryan St., Ste. 416, LB 92
Dallas, Texas 75201

COURT REPORTER:          MS. SHEA SLOAN
                         FEDERAL OFFICIAL COURT REPORTER
                         211 W. Ferguson
                         Tyler, Texas 75702
                         shea_sloan@txed.uscourts.gov

Proceedings taken by Machine Stenotype; transcript was produced by computer-aided transcription.

INDEX

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | FURTHER REDIRECT |
|---|---|---|---|---|---|
| DONALD SLAVIK | 5 | 23 | 57 | | |
| ROBERT EDEN | 61 | 151 | 182 | 191 | |

* * * * * * * *

| | PAGE |
|---|---|
| GOVERNMENT RESTS | 192 |
| RULE 29 MOTION | 193 |

* * * * * * * *

| DEFENDANT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | FURTHER REDIRECT |
|---|---|---|---|---|---|
| DONALD SLAVIK | 5 | 23 | 57 | | |
| ROBERT EDEN | 61 | 151 | 182 | 191 | |

CERTIFICATION - PAGE 285

4

EXHIBIT INDEX

GOVERNMENT'S
EXHIBIT NO.    DESCRIPTION                                      PAGE

21             Mata's Training Records with          69
               Business Record Affidavit

22             Mata's Deployment Records with        69
               Business Record Affidavit

                    P R O C E E D I N G S

                (Defendant present in the courtroom.)

                (Jury out.)

                THE COURT:  Okay.  Good morning.  Are we ready for the jury?

                MR. MACHICEK:  Yes, Your Honor.

                MR. SKIPPER:  Yes, Your Honor.

                THE COURT:  Okay.  Bring the jury in.

                (Jury in.)

                THE COURT:  Okay.  You may be seated.

                Welcome back, members of the jury.

                THE COURT:  Mr. Slavik, I will remind you that you remain under oath.

                THE WITNESS:  Yes, sir.

        DONALD SLAVIK, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

                        DIRECT EXAMINATION CONTINUED

BY MR. MACHICEK:

Q.   Good morning, Mr. Slavik.  Do you recall that we left off yesterday afternoon talking about your background and the experience with K9s and the manner in which you viewed the materials and methodology for formulating an opinion in this case.  Is that right?

A.   Yes.

Q.   I want to get now to your analysis of those materials and those opinions, if that is okay.

Let's kind of walk through everything in a chronological approach.  What of significance did you observe about the Defendant's arrival at the scene, in your review of the materials.

A.   So when Constable Smith arrived at the scene, he came up to the sergeant who was in charge and asked if there was a felony warrant and if he wanted him to do a building search.

Q.   Okay.  And from the outset, what is your impression of the other officers who were already on scene and what tasks they were performing?

A.   Yes.  So the other officers were doing what is called -- they are putting a perimeter around the trailer, which is proper in the way they should do it.

And there were a few people that were standing -- I think it was Sgt. Milbourn was still away from the building. He was probably standing somewhere near Constable Smith.

Q.   Okay.  And you may have mentioned it, but what information did the Defendant seek when he got to the scene?

A.   He wanted to know if it was a felony warrant, if it was verified, was there was there a perimeter set up around the building, and he actually asked to make sure that there was -- the verified felony warrant.

MR. MACHICEK:  Okay.  Ms. McCullars, if we can take

a look at Exhibit 1A, page 11, lines 7 through 10.

And 1A-13, 8 and 9.

There we go.

BY MR. MACHICEK:

Q.    Mr. Slavik, is that what you are talking about when he is confirming the felony warrant?

A.    Yes, sir.

Q.    What is the significance within the K9 community, as you know it, for confirming a felony warrant?

A.    That is usually one of the things that a K9 handler will ask in this case -- such as this case, whether there is a warrant, if it is a felony warrant.  Because some agencies can only use their K9s if there is a felony warrant.

Q.    And is that an automatic green light under all circumstances where there is a felony warrant to deploy a K9?

A.    No.

Q.    Okay.  What other information or what other analysis is required prior to deploying a K9, in addition to the existence to the warrant?

A.    I think the most important thing you want to consider as a K9 handler and deploy your dog is, what is the immediate threat?  Because you have just arrived, what is the immediate threat that is there?

Q.    Now, I want to ask about a particular other officer that

is on scene upon arrival when a K9 shows up to assist.  With regards to a scene commander, when a K9 arrives, who is in charge of that K9?

A.    The handler.

Q.    And why is that?

A.    The handler is usually the only one that knows the capabilities of their dog and particular ways that they deploy.  And while supervisors may be in the area, they do not always know how the K9 will work, and so they usually allow the K9 handler to be in charge.

Q.    Is that consistent with the Defendant's own K9 policy?

A.    Yes, it is.

        MR. MACHICEK:  If, Ms. McCullars, we can look at Exhibit 20, page 15?

BY MR. MACHICEK:

Q.    Mr. Slavik, if you will take a look at the decision to utilize and terminate K9 use, at the bottom there.

        What, in that policy, is consistent with what you just provided to the jury?

A.    It is the decision to send -- if the decision is to send the K9 into a situation which the handler deems unsafe or harmful to the canine or which may be beyond the capabilities of the K9, it will be made at the discretion of the handler.

        Now, once the Defendant arrives on scene --

        MR. MACHICEK:  Ms. McCullars, if we can look at

Exhibit 1A, page 13, lines 2 through 7.

BY MR. MACHICEK:

Q.   What -- can you describe what a building search is and what the request for a building search would mean?

A.   Yes.  So the primary purpose of the dog, to begin with, is locating ability that they have.  So a building search is nothing more than looking for the suspect or someone in the building to make sure that they know where he is and they know what -- they know what position he is in.  It is just a search to find the guy.

Q.   Okay.  And if a building search is a search to find someone, when is the building search completed?

A.   When they find that person.

Q.   When a decision is made to breach a building for the purpose of conducting a search, when that decision is made, what consideration should be discussed prior to entry?

A.   I think when you are going to look at something like that, you want to the make sure that you have everything covered.  Of course, we already talked about that.  But you want to make sure you give proper warnings to the suspect.

In addition, those warnings tell people -- innocent people that are in the area that the police are here, and they are going to be doing something with the K9.

Q.   And how does that comport with what occurred in this case?

A.   They gave a couple of warnings on the outside by Sgt. Milbourn, and then came inside.  And I think almost right away Sgt. Milbourn gave another warning, and there was a dialogue right away coming from some place inside the trailer.

Q.   And what is the significance of that dialogue, from your perspective?

A.   That the suspect -- you had a very good idea where the suspect was at already within the building.  So it may have not been necessary to use the K9, but the K9 can still certainly be there because of the threat.

Q.   And once a suspect is located during the course of the building search, what should happen next?

A.   In this case, I think it should have been a dialogue. Because the suspect and Sgt. Milbourn and -- had some kind of a dialogue.  At least Sgt. Milbourn called out the warning, and then the guy was talking about what he was doing in the bathroom, and it was pretty obvious that you could hear him in the area.  So you could have started some type of dialogue with him.

Q.   From the perspective of a K9 handler, K9 trainer, what options are available to you at that point in time?

A.   So the purpose of using a dog as a use of force is for compliance.  It is not to do anything else.  So it doesn't necessarily mean that every time you go into some operation

or deployment that you are looking to use the dog as a use of force. It is to gain compliance from a suspect.

Q. And after locating the suspect within the building, what decision was made by the Defendant in this case?

A. To push open the door.

Q. Okay. At that point in time, had there been any communications with the on-scene commander about that next step?

A. Not that I could hear.

Q. And what significance does that have in your analysis?

A. In my analysis, it means that Constable Smith took over control of the situation, took over control of the deployment, and decided to go in himself.

MR. MACHICEK: Ms. McCullars, if we can take a look at 1A, page 16, lines 11 through 20.

BY MR. MACHICEK:

Q. What is the significance, Mr. Slavik, of the options available to an individual under these circumstances, to a law enforcement officer under these circumstances, for giving commands?

A. In front of that door before he goes in, he could have or could have made a request or a command to the suspect to come out, and -- because if he didn't, he was going to send the dog in and he may be bitten.

Q. And did the Defendant make statements to the suspect

from that position by the door?

A.    Yes.  He made reference to -- he is putting his hand -- I am putting my hands up.  Hey man.  You know, that he is trying to do something.  He is there.  He is not -- he is resisting or he is standing behind the door.  He is opening the door trying to put his hand out.

Q.    And does Constable Smith make any statements to the suspect who is inside?

A.    At one point he says, you know, I don't know if you have a gun, and the suspect says, I don't.  And he just pushes through.

Q.    And the statements made by Constable Smith, would you characterize those statements as being commands?

A.    No.

Q.    Were those instructions that were capable of being followed by the suspect?

A.    No.

Q.    Now, after this brief failure to communicate, there is a decision to enter the bathroom.  Are there still other options available at that point?

A.    Yes.  In my report I indicated that when he stood in front of the doorway like that, he showed us his concern for any danger that was there, which is nothing.  He just stood in the doorway, which is not good tactics for a police officer.  And then he proceeded to give commands for the

13

dog.

Q.   Okay.  Upon entry, the commands you said were to who?

A.   The dog.

Q.   Were there any commands, upon entry, to the suspect?

A.   No.

Q.   The only commands to the suspect came after when?

A.   Well, just to leave my dog -- you know, take your hands off my dog, or something like that.

Q.   Okay.  Were there any commands given to the suspect prior to that?

A.   No.

MR. MACHICEK:  Let's look at Exhibit 1A, page 16, lines 17 through 25.

BY MR. MACHICEK:

Q.   Mr. Slavik, this represents the portion of the transcript where entry is made into the bathroom.  I want to ask you, based on your review of this portion of the transcript and the page immediately after this at the top, let's look how many -- how many commands did the Defendant give the K9 to bite?

A.   At the doorway, he stood there and gave approximately seven commands to the dog to bite.

MR. MACHICEK:  And so if we look starting on line 20, down to the bottom here, and then we go to page 17, lines 1 through 9.

BY MR. MACHICEK:

Q.    You have approximately a total of how many commands?

A.    In my report I had mentioned approximately seven.

Q.    And what are you thoughts about this?

A.    Most K9 handlers need one, and the dog is in there.  I thought it was interesting that he used seven real quick, boom, boom, boom, and then the dog went in.  And the dog came out.  That was my first point I realized something was not right when the dog backed out of there.

Q.    And when you give a K9 approximately seven commands, and the dog not only doesn't do what he is commanded to do but leaves the room, would that constitute a failure?

A.    Well, there is failures can be started right from this.  A dog is trained to bite someone and hold on and not leave go.  That is where the dog should be at.  When the dog leaves go but doesn't stay committed, that is a problem.  When he backs away, that is a really big problem.

Q.    And when things like that occur, when those problems arise, what should a K9 handler do in that situation?

A.    Well, the dog is, right off the bat, showing some deficiencies in training.  So there is something that is going on that is wrong, and possibly the handler should back away with his dog.

Q.    Now, if we look through lines 13 through 20 of the same page, what does the Defendant do instead?

A.    What is he doing?

Q.    Right.

A.    He is still commanding the dog to go.

Q.    After the dog initially exits the bathroom, does the Defendant call him back in?

A.    Yes.

Q.    And when the K9 is reintroduced into the situation, what commands are given to the K9 at that point?

A.    To bite.

Q.    Okay.  And approximately how many more commands were given to the K9 at that point?

A.    I think there were four.

Q.    And what are your thoughts about this?

A.    It is really interesting in the fact that the dog is failing to deploy properly.  The officer -- or the Constable Smith is still commanding his dog to bite, to bring him into the fight.  And the dog comes and goes and leaves, and it is very confusing as to what is happening there.  Because why would the dog leave like that?  Why would he just go, and takes off.

        THE COURT:  Sir, I am going to ask you if you would lean forward a little bit.

        THE WITNESS:  Sure.

        THE COURT:  Thank you.

BY MR. MACHICEK:

16

Q.    Given the circumstances immediately preceding these commands here, is there some sort of expectation that the dog is going to suddenly perform a task that it has failed to do immediately prior under the same circumstances?

A.    Well, there is concern that the dog is not performing well or not performing what he is trained to do so that there is an issue there.

So what the issue is right during this deployment is not known.  It just seems that the dog has failed.  There is some training issue with the dog.

Q.    And if you are in a real-life situation with a K9 who is failing to perform what he is trained to do, what should be done?

A.    Well, you should -- you should stop -- in some situations the handler could be in danger for the dog failing to do the job they are trained to do.

Q.    Now, when you say "you should stop," do you mean that Constable Smith has to just throw his hands up and walk out of the room --

A.    No, not at all.  I mean, it is time there that the dog is -- whatever you are trying to do is not working.  The dog is being deployed.  He is given a command to bite.  He goes up and bites.  He comes off.  He may bite later.

But in police -- in police K9 deployment, you don't want a dog that bites, goes, bites, comes back.  And what you

have is bites all over the place.  That does not look well.

That is not the job.  It to hold on, gain control, gain

compliance, and then you take the dog off.

Q.   Now, at this point in time following these commands,

Mata leaves the bathroom again with a plunger, and we see a

circumstance arise that is depicted in Exhibit 1D-4.

MR. MACHICEK:  Ms. McCullars.

BY MR. MACHICEK:

Q.   What is your impression of the situational change in the

circumstances here and what should happen?

A.   In this picture, you are looking at a totally compliant

suspect that is being held down or just had -- Constable

Smith has ahold of his shoulder.

Q.   Okay.  And what opportunity does Constable Smith have at

this point?

A.   He is in control.  The suspect is in compliance.  He has

the hands on top of his head.  All he has to do is take his

cuffs out and cuff him.

Q.   And what would an appropriate command sound like?

A.   From Constable Smith to this person?

Q.   Yes, sir.

A.   I'm not sure I understand.

Q.   If you are going to conduct an arrest, take out your

handcuffs and cuff this individual, what commands would you

give this individual?

A.   I don't think he would have had to give any.  He was just sitting there.  You could have just taken the cuffs off and said, this is it.  It is over with.

MR. MACHICEK:  Okay.  And if we look at 1D-6, Ms. McCullars.

BY MR. MACHICEK:

Q.   Mr. Slavik, this is the same situation from another officer's vantage point.  If we look up in the top left of this photograph, we can see the Defendant's face.  Where are his eyes trained in relation to the suspect?

A.   He is looking for his dog.

Q.   And what is the purpose, what is the goal of this law enforcement operation?

A.   To gain control of the suspect.

Q.   Okay.  And what is your impression then of the Defendant's focus away from the goal of the operation?

A.   When you look at the video, he is waiting for his dog to come back so he can give him commands to bite this guy.

Q.   At this point in time, you have indicated what should happen under this circumstance.  Were there any attempts, at this point, to bring the arrestee into custody?

A.   No, absolutely not.

MR. MACHICEK:  If we can look at Exhibit 1D-10, please, Ms. McCullars.

BY MR. MACHICEK:

Q.   Mr. Slavik, if you could give us your impression of this situational change once the K9 is recalled back into the bathroom?

A.   This is a point where Mr. Evans is being restrained by Constable Smith.  And the dog is moved in.  And Mr. Evans is putting his hands up to try to keep the dog away.

         MR. MACHICEK:  And if we can look at 1D-12, Ms. McCullars.

BY MR. MACHICEK:

Q.   Mr. Slavik, given the Defendant's focus on the K9 and the manner in which he is controlling the suspect, would you please describe for the jury what you are observing from your vantage point?

A.   What I am observing is Constable Smith taking control of Mr. Evans's arms and lifting him up, and he is making his right side of his body totally vulnerable for the dog to bite.

Q.   And based on your expertise as a K9 handler and K9 trainer, what does this indicate to you?

A.   That he is trying to train this dog on Mr. Evans, who has no protective covering or anything.  Just vulnerable.

         MR. MACHICEK:  Ms. McCullars, if we can look at 1A, page 17, lines 23 to 25.

         Now look at page 18, lines 1 through 2.

BY MR. MACHICEK:

Q.    Mr. Slavik, are any commands given to the arrestee at that point in time?

A.    No.

Q.    How many commands is the K9 given to bite?

A.    Two.

Q.    Now, following the circumstance depicted in 1D-12, the K9 does execute a bite after approximately seven commands. Leaving the bathroom, four more commands after being recalled, and leaving the bathroom, another two commands after being recalled again, the K9 finally executes a bite is that.  Right?

A.    Yes.

Q.    Where does the K9 take the suspect after that?

A.    He grabs his foot and bites his foot and drags him out of the bathroom.

Q.    Okay.  We have heard a couple of witnesses ask questions about leaving the bite on until the cuffs are placed on the suspect.  What is your analysis of that concept as a whole?

A.    The idea that you can leave your dog bite someone until he is handcuffed is an old, old concept that no longer is acceptable in all situations.

       When you have -- the idea is to get your dog off the bite as soon as you can.  And what you are looking for is compliance by the person.  And in this case, there are two other officers there that can take this suspect and handcuff

him.  So you can take the dog off of the bite.

Well, there are situations where you might want to do it, and that would be if the K9 handler is alone with a dog and a person somewhere, and you would be justified possibly to leave the cuffs on.

But in the situation where the suspect is complying, he has got his hands up in the air, he is begging them to stop, there are two other officers that are there that could help him secure that person.

Q.    And after the K9 drags the suspect from the bathtub and into the hallway and the arrest is finally completed, what object does the K9 remove from the suspect and depart with?

A.    The shoe.

Q.    What is the significance of items like the plunger or the shoe and the K9 departing the situation with those items?

A.    The shoe is definitely a trophy.  He has got a trophy from the guy.  He is happy.  He is walking out the door.  He leaves by himself.  He is not called, told to leave, to stop the bite.  He just picked up his trophy and is running towards the door.

Q.    Now, having reviewed the totality of the situation, would you characterize the use of the K9 in this scenario as a successful deployment or a failed training exercise?

A.    It is not a successful deployment.  It is one of the

worst things we can see a K9 handler do is make somebody defenseless and then send his dog on to bite him.  That is not acceptable.

Q.   And is it reasonable to conduct a training exercise on unwitting arrestees?

A.   No, it is not.

Q.   Is it reasonable to command a K9 to bite a suspect who is surrendering with his hands on his head?

A.   No, it is absolutely not.

Q.   Is it reasonable to allow a K9 to drag a suspect into a hallway before executing an arrest that can be made?

A.   In this case, it was not.

Q.   Now, I think that one of the things we are going to hear is that, based on your position as the executive director of the USPCA --

MR. SKIPPER:  Object to leading, Your Honor.

THE COURT:  Sustained.

BY MR. MACHICEK:

Q.   Is the Defendant certified by your organization?

A.   Yes.

Q.   And what do you have to say about that?

A.   What do I have to say about that?

Q.   Yes, sir.

A.   Certifications are generally a beginning test for K9 teams at all disciplines to make sure that they have enough

training to continue on.

So once they pass a certification, that should be the information they need to go on and practice what they need for all of the possible situations they could put their dog in and under the rules and guidelines of their law enforcement agency and the laws.

Q.   And who's responsible for making sure that their K9s are adequately trained to address the situations in which they are being deployed?

A.   It is always the handler's responsibility.

Q.   And does your organization endorse the Defendant's conduct in this case?

A.   They do not.

Q.   Is that why you have come here to testify?

A.   That is why I am here.

MR. MACHICEK:  Pass the witness, Your Honor.

(Pause in proceedings.)

THE COURT:  Which exhibit is this, Mr. Skipper?

MR. SKIPPER:  Your Honor, this is Exhibit 4.

May I proceed?

THE COURT:  You may.

CROSS-EXAMINATION

BY MR. SKIPPER:

Q.   Mr. Slavik, we just ended with you telling the jury that you are here as an ambassador and executive director of the

24

United States Police Canine Association?

A.   Yes.

Q.   And because of that, you wouldn't want a guy like Kelly Smith to be affiliated with what you guys like to call the gold standard, right?

A.   That's not what I am saying.

Q.   Well, let me make sure we are on the same page.

          USPCA doesn't endorse what Kelly Smith did, right?

A.   No.

Q.   All right.  How many members does USPCA have?

A.   Roughly around 3,000.

Q.   3,000.

          Across the entire country?

A.   Mostly east and midwest.

Q.   And you took over for a guy named David Ferland, did you not?

A.   Yes.

Q.   What month and date was that?

A.   June of 2019.

Q.   And there was a man in your and David Ferland's industry named Terry Fleck, right?

A.   Yes.

Q.   And he was the man that gave out the monthly newsletter and apprised all of your members and officers who wanted to

become knowledgeable on state and federal case law applied to every K9 discipline, monthly, correct?

A.    Yes.

Q.    And he passed away several years ago?

A.    Yes.

Q.    And a man stepped in and took that position of Terry Fleck, correct?

A.    Yes.

Q.    Do you see him in the courtroom today?

A.    Yes.

Q.    Have you seen him during the past few days?

A.    Yes.

Q.    Do you know his name?

A.    Mike Kmiecik.

Q.    Mike Kmiecik, right.

      And tell us all the company that he took over and expanded for Terry Fleck?

A.    Repeat the question.

Q.    He took over for Terry Fleck, did he not?

A.    Yes.

      MR. MACHICEK:  Your Honor, I'm going object to relevance at this point.

      MR. SKIPPER:  I will get to the relevance, Your Honor.

      MR. MACHICEK:  I think it is improper character

evidence.

THE COURT:  Why don't y'all approach.

(Bench conference.)

THE COURT:  What are you doing?

MR. SKIPPER:  The relevance is that he called Mike Kmiecik and asked him for a 50 percent discount for all of his members.  And Mike said, sure.

THE COURT:  The witness?

MR. SKIPPER:  Testifying, yes, sir.  And Mike Kmiecik said he would do that.

THE COURT:  I don't understand.

MR. SKIPPER:  Well, it is relevant to the credibility of his opinion.

THE COURT:  He asked for a 50 percent discount to membership --

MR. SKIPPER:  For his monthly membership to Sheepdog Guardian.  He is the guy that -- our witness provides a monthly newsletter for legal updates.  And Don Slavik called our expert, not during this trial, just --

THE COURT:  When?

MR. SKIPPER:  Like a year and a half ago whenever he replaced this guy --

THE COURT:  For a discount?

MR. SKIPPER:  Just to say, hey, would you mind giving all our 3,000 members --

THE COURT:  I don't see how that is relevant.  I don't see how that is relevant to the case.  This happened before the incident that we are here about.

MR. SKIPPER:  Sure.  It is relevant as far as -- and he is a contributing member to USPCA.

My point is that in the industry if this guy is asking our guy to help his guys, that he has now trashed on the stand, that is what just happened, it couldn't be more relevant to what he just said, what was extracted from the Government to say we don't endorse this activity, when the very person who was going to endorse this activity, you reached out and said would you contribute to my company with articles to inform my members?  Would you also give my guys a discount?  It is relevant --

THE COURT:  I'm sorry.  I'm not seeing the relevance.

MR. SKIPPER:  Okay.  All right.  Thank you, Judge.

(Bench conference concluded.)

BY MR. SKIPPER:

Q.   Mr. Slavik, you will agree with me that the way to assess use of force cases is not by still screenshots, correct?

A.   It is a way to do it.  I mean, I don't know if it is no good.

Q.   When the standard of U.S. Supreme Court in Graham v.

Connor is totality of the circumstances, you do not do a still shot frozen in time of a 90-second encounter --

A.   Right.

Q.   -- you would run the video, right?

A.   Sure.

Q.   Now, I want to get back to your definition of a building search.  You said that the definition of a building search is, quote, looking for the suspect?

A.   Yes.

Q.   All right.  Your definition of a building search is not to search, locate, and apprehend?

A.   No.

Q.   Okay.  And that is on your standard?

A.   No.  The job is to locate the suspect.  What happens after that depends on the suspect.

Q.   You have never heard anyone in any authority in your industry, that you may or may not know, train officers that a building search is search, locate, and apprehend?

A.   I am sure that people might say that, but it might not necessarily be true in all cases.

Q.   And you wouldn't be familiar with anyone saying that, perhaps who contributes to your members as far as writing articles?

A.   I am not aware.

Q.   Now, you mentioned to the jury that when we arrive on

scene, your most important thing to consider is the immediate threat, right?

A.   It is one of them, yes.

Q.   You just -- you grabbed that one Connor v. Graham [sic.] factor of three, and said that is the most important?

A.   And I also said it is valid to ask what the felony, misdemeanor, whatever the circumstances are on the case, yes.

Q.   Right.

You have to because there are different types of felonies, right?

A.   Yes.

Q.   There is different types of misdemeanors, right?

A.   Yes.

Q.   This isn't a felony for having five pounds of marijuana, right?

A.   No.

Q.   This is a felony for injury to a child, right?

A.   Yes.

Q.   A kid?

A.   Yes.

Q.   And these are misdemeanors, not for stealing some diapers that a lady needed for her kid because she didn't have any money, right?

A.   Yes.

Q.   Or a packet of hot dogs to feed her kids, is it?

A.   Yes, but it is also not a green light.

Q.   Mr. Slavik, let's just do this back and forth, okay?

A.   We are.

Q.   This isn't -- this isn't about someone stealing a packet of hot dogs, is it?

A.   No.

Q.   All right.  This is about misdemeanors for assault, family violence on his wife, right?

A.   Yes.

Q.   And his kid, right?

A.   Yes.

Q.   And for evading arrest, right?

A.   Yes.

Q.   All of which occurred under the thumb of the commanding officer and assistant chief -- pardon me, Acting Chief of Police Eric Tuma, right?

A.   Yes.

Q.   34 days prior to this incident --

A.   Yes.

Q.   -- right?  Okay.

     And before we get to the immediate threat and what you discussed with the jury, the most important thing in any situation, in particular a tactical deployment, is officer safety, correct.

A.    Yes.

Q.    Okay.  Now, you and others have given opinions that, but for Kelly Smith tactically not doing X within this residence, perhaps this whole incident could have been avoided, correct?

A.    It is possible, yes.

Q.    You understand -- let me ask you this:  How many times have you reviewed these videos?

A.    Quite a few.

Q.    When is the first time that you found out that John McQueen a week prior had received a phone call from Robert Evans while he was a fugitive from justice in the law-abiding citizenry?

A.    I don't recall.

Q.    Do you recall now that I told you?

A.    Sure.

Q.    Okay.  How far prior to you sitting in that chair right now did you recall being informed about that?

A.    I guess I don't -- I didn't -- it is the phone call that he received on the corner of the house?

Q.    No, before that?

A.    I don't know if I ever heard that one.

Q.    Okay.  You have never before heard that Robert Evans reached out to Constable John McQueen directly -- and, remember, Constable John McQueen is the guy on the south

side --

A.    Uh-huh.

Q.    -- talking about this phone call that I am going to get to?

A.    Yes.

Q.    You have never been told that Robert Evans called him and said, because I don't trust the Hawkins Police Department, I will voluntarily surrender myself to you, John McQueen?

A.    I have heard that in the courtroom.

Q.    And before you walking into this courthouse on Monday, you did not know that existed?

A.    I don't think so.

Q.    It is fair to say, since you have been designated an expert, that had that information been shared before deployment ever happened, you may not even be sitting in that chair right now?

A.    It's possible.

Q.    Now, let's get to the phone call.

When did you figure out that the mother of the man who reached out to John McQueen a week prior, while he was a fugitive and told a law enforcement officer while he was a fugitive, that he would surrender himself, that the mother had called John McQueen --

MR. MACHICEK:    Your Honor.

Q.    -- when did you find that out?

MR. MACHICEK:  I am going to object to relevance and introduction of statements not in evidence.

THE COURT:  Sustained.

BY MR. SKIPPER:

Q.    When did you find out that the mother had called John McQueen, sitting on the outside of that trailer?

A.    In this courtroom.

Q.    How many times have you watched John McQueen's body cam before testifying today?

A.    A couple of times, anyway, for sure.  I didn't specifically watch for his body cam.  I am sorry.  I take it back.  I didn't specifically watch for the telephone call.  I didn't hear that.

Q.    Yeah, you can't watch for a telephone call --

A.    Yes.

Q.    -- you have to use your auditory senses, right?

A.    Yes, I apologize for the misstatement.

Q.    Would it not be important when you are giving an opinion against a fellow officer where the standard is based on the totality of the circumstances, to make sure that you have all of the credible, transparent information at the time before you render an opinion?

A.    I don't -- I am rendering an opinion on the actual deployment.

34

Q.   Sure.

     But you are here talking about tactics, which this case is not about.  So I am asking you tactically, let's get back to the business of, if you knew that, and you wanted to expound on tactics, which is not a crime, wouldn't you want to have all of the information before you render an opinion, that of which you are doing right now?

A.   Sure.

Q.   And it is your opinion and testimony that you have not heard of that phone call?

A.   Just did here in the courtroom.

Q.   In this courtroom?

A.   Yes.

Q.   That this man's mother is reaching out to the Constable, right?

A.   Right.

Q.   Since you have been talking about tactical decisions, is it also fair to say that had that information been shared with anybody, let alone the Acting Chief of Police and on-scene commander, you would not be sitting in that chair right now?

A.   I am not sure that is correct.  Are we not still looking for the suspect?

Q.   Is it possible tactically that had that information been shared you would not be sitting in that chair right now?

MR. MACHICEK:  I am going to object.  That is gross speculation.

THE COURT:  Sustained.

BY MR. SKIPPER:

Q.   You stated that, after the K9 commands were given, that Kelly and Austin Milbourn immediately went inside, right? There was no downtime, essentially.

A.   I think Officer Milbourn -- Officer Milbourn gave another command at the doorway right prior to entering the building.

Q.   Well, we have left out a major component of your testimony, is the 28 separate kicks that are bolting through that trailer --

A.   Uh-huh.

Q.   -- in that time span before Austin Milbourn reaches his head and says K9, firearm deployed, show me your F'ing hands. Right?

A.   Sure.

Q.   That is kind of a big deal, 28 kicks, isn't it?

A.   I am not sure why it is.

Q.   Well, because when you say he immediately went inside, that is not immediate; it is 28 kicks, right?

A.   Okay.  28 kicks preceded it.

Q.   And when you say -- when Kelly breaches the door, immediately this person is trying to surrender, it is

36

important that that person is in complete blackness for seven seconds; is that correct?

A.    I said he was having dialogue.  I didn't say he wanted to surrender then.

Q.    Exactly.

But my point being, that seven seconds of darkness does not equate to when you finally get light inside, that that individual is trying to surrender.  Correct?

A.    Are we talking about going in the bathroom now?

Q.    That's right.

A.    I don't know what Kelly saw as far as light.

Q.    We are talking, again, about policy violations.  It is your testimony -- and I want to make sure I understand that -- that the on-scene commander and Acting Chief of Police of Hawkins who is in control of that scene --

A.    Uh-huh.

Q.    -- was not in charge of deciding whether to approve the tactical, less than lethal instrument that was going to go in that residence?

A.    I guess what I am saying is that he didn't probably know about it because Mr. Smith never told him he was going to go inside.

Q.    Well, you saw on the camera where Kelly Smith comes up and says, what do you want me to do, boss?  Right?

A.    Building search.

Q.   And then Austin Milbourn suggested a building search?

A.   (Witness nods.)

Q.   And then Austin Milbourn, before he goes in, he gives the warning.  He looks over here and says, let me get the dog.  Yes.

You never see Eric Tuma come over and say, I just want you to scare him, did you?

A.   That is not what a building search is.

Q.   You never saw Eric Tuma come over and say, I just want the dog to scare him, did you?

A.   That's correct.

Q.   Okay.  You never saw him, Eric Tuma, after the first kick on the door, run up the porch and say, hey, man, you are holding that dog as if you are going to send that dog in; that is not what I want to the do.  Did you see that on the video?

A.   No.

Q.   After the third kick, did you see Eric Tuma do that?

A.   No.

Q.   After the 15th kick, did you see him do that?

A.   No.

Q.   After the 21st kick, did Eric Tuma run over and say, you know what, this is getting completely out of hand.  I am on the on-scene commander and Acting Chief of Police.  It looks like they are about to send that dog in there and that dog

could bite somebody.  Did you see that?

A.   No.

Q.   Did you see him on the 20th kick do that?

A.   No.

Q.   How about the final -- just before the final kick, on kick number 27, did he run up, Eric Tuma, and say, I know you gave the K9 warning that you will be bit and I know you are kicking, and it looks like the dog is going to go in, did he say, you know what, this is getting crazy; stop doing this?  Did he do that?

A.   No.

Q.   You said that you were shown a transcript that said that when Kelly is outside the door, he didn't give any commands.  You were shown a transcript that said that Kelly is saying, I can't see your hands.  Right?

A.   I don't know if I -- I don't know if all of that was said, but I am following you.

Q.   Do you remember seeing a transcript that the Government put up that depicted the quote of, I can't see your hands?  Okay?  Do you remember that?

A.   Yes.

Q.   Do you remember being asked, Kelly did not give any commands on the outside of the door, right?

A.   Yes.

Q.   And you said he did not give commands from the outside

of the door, right?

A.    Yes.

(Video played.)

(Video paused.)

BY MR. SKIPPER:

Q.    He just said, come out, and show me your hands, did he not?

A.    Yes.

Q.    That is a command, is it not?

A.    Yes.

Q.    It is not what they showed you, I can't see your hands, is it?

A.    No, that is not it.

Q.    All right.  When Kelly Smith said come out and show me your hands, what did he do?  He slammed the door back toward him, didn't he?

A.    I think it was already shut.

(Video played.)

(Video paused.)

THE COURT:  Can you turn the volume down?

MR. SKIPPER:  I'm doing it, Judge.  This is just the way it is -- I am just going to mute it, Your Honor.

BY MR. SKIPPER:

Q.    Since you have walked through this video, on -- this one is of Austin Milbourn's, is it fair to say you have seen this

several times as well?

A.   Yes.

Q.   And you noticed initially upon entry when Austin Milbourn comes with the flashlight, that Robert Evans has his right hand under Kelly Smith's groin, right?

A.   Under Kelly Smith's what?

Q.   Groin, between his --

A.   Yeah.

Q.   -- legs?

A.   You are talking about when they are inside?

Q.   Yes.

A.   Okay.

Q.   Once he enters, Kelly enters after seven seconds of darkness --

A.   Yes.

Q.   -- and Austin Milbourn comes around and illuminates the door frame there, the first thing you see is, coming around, and Robert Evans's right hand is under Kelly Smith's groin and is holding on to Mata's collar, right?

A.   Yes.

Q.   Is pulling tight on to his groin, correct?

A.   Yes.

Q.   That is an uncomfortable position for a police officer to be in, having pressure applied to his groin area, right?

A.   Well I, am not sure how much pressure was being applied,

but I would say it might be uncomfortable, yes.

Q.   Well, let's assume it is being applied, and you being a man, it is uncomfortable for a man to have pressure applied to their groin area, is it not?

A.   Yes.

Q.   And when that happens, his hand is right there.  And Kelly has a side arm on his right side, does he not?

A.   Yes.

Q.   And then commands are given, let go of my dog, right?

A.   Yes.

Q.   And you have no problem with Kelly Smith striking Robert Evans for failing to comply with those commands, do you?

A.   No.

Q.   All right.  Now, when Robert Evans pulls up and grabs the plunger, did you say that he is poking the plunger at Kelly?

A.   This morning?

Q.   Whenever.

A.   He was pointing it at him.  He was pointing it at the dog.

Q.   He grabs Robert Evans -- he actually steps up into the bathtub, right?

A.   Okay.

Q.   Is that right?

A.   Yes.

Q.   And he grabs the plunger, right?

A.   Yes.

Q.   That could be a deadly weapon, right?

A.   It wasn't, though.

Q.   That could be a deadly weapon, right?

A.   It could be.

Q.   Just like my finger can be.  It just depends on the manner and means of which it is used, right?

A.   Yes.

Q.   How long were you a police officer in St. Paul?

A.   29 years.

Q.   29 years.  Okay.

     So he stands up in the bathtub, grabs the plunger, right?  Right?

A.   Yes.

Q.   And he swings it up.  When Robert Evans is grabbing Kelly's arm, Robert Evans is using his left hand to grab Kelly's right arm, forearm.  He is swinging it up.  And Kelly Smith grabs that plunger immediately.  Right?

A.   Yes.

Q.   And you all like to talk about how this happened in less than a second, right?

A.   Yes.

Q.   Less than a second is a life-changing event, potentially, is it not?

A.   Say that again.

Q.   Less than a second in use of force cases could be a life-changing event?

A.   Yes, but it wasn't.

Q.   It could be a life-changing event, right?

          MR. MACHICEK:  Asked and answered, Your Honor.

          THE COURT:  Sustained.

BY MR. SKIPPER:

Q.   And he -- Kelly grabs that plunger, right?

A.   Yes.

Q.   And moves the plunger away.

          Did you recall seeing Robert Evans kick the dog while he is in that bathtub?  Standing up in the corner, bracing himself like this, did you recall him, Robert Evans, actually kicking the dog at that time or kicking at Kelly?

A.   I don't think I ever saw him kicking at Kelly.

          (Video played and paused throughout this portion.)

Q.   Do you see his hand, Robert Evans, still on the equipment there, on the right there?  Do you see that?  Right here?  Where I am pointing to.

A.   Well, I don't know if that is his hand or not.  It is pretty blurry.

Q.   Do you see that thing right there?

A.   Yes.

Q.   You don't think that is his hand?

44

A.   I see it.

Q.   Okay.  Just let me know if you don't see it.  Do you see his big hand right there?

A.   Yes.

Q.   Yanking that back.

Do you see, again, he is holding on to the collar, right?

A.   Yes.

Q.   Watching the lower right, right here, you are going to see hand push this dog right here.  Did you see that?

A.   Yes.

Q.   The dog flew backward?

A.   Yes.

Q.   Evans hit the dog?

A.   He kicked the dog?  I'm not sure.  How I see that.

Q.   See that.  Didn't see that?

A.   I see the dog moving over.

Q.   Oh, just moving?

A.   I thought you said kick the dog.

Q.   Saw a hand forcefully pushing a dog backwards?

A.   Okay.

Q.   Okay?

A.   Yes.

Q.   Okay.  All of these things -- you have seen the tools here on the floor, and things of that nature, right?

A.    Yes.

Q.    Did you talk about the pit bull in your report?

A.    I don't think so.

Q.    Did you know about the pit bull?

A.    Yes.

Q.    All right.  Had no impact on your opinion?

A.    No.

Q.    Whatsoever?

A.    No.

Q.    External factors, nipping, a pit bull?

A.    No.

Q.    On a dog?

A.    No.

Q.    None whatsoever?

A.    No.

Q.    And, here, did you see the knee right there?  Robert Evans is now coming -- standing up in the bathroom.  You see his knee right there coming down.  He is up.  This is Kelly holding the dog with his left hand.  You can see Robert Evans's arm extended here.

        MR. MACHICEK:  Your Honor, I am going to object to counsel testifying.

        THE COURT:  Sustained.

BY MR. SKIPPER:

Q.    Do you see when the plunger comes up?

A.   Not in that picture.

Q.   Kelly grabs it?

A.   I don't see it in that picture.

Q.   Do you see it swinging up, right there?

A.   He is not swinging it.  He is bringing it up.

Q.   He is bringing it up, not swinging it up?

A.   Yes.

Q.   Okay.

     Do you agree with me, though, that the direction that is going is up, right?

A.   Yes.

Q.   And up is Kelly's face?

A.   It is the dog's face too.

Q.   Sure.

     And had you seen here where the suspect in the bathtub, he kicks Mata -- pardon me.  First, he strikes Mata's muzzle, did you see that, later after this --

A.   It is later, correct?

Q.   Once Kelly Smith pulls up on the chin?

A.   Yes.

Q.   And Robert Evans slaps the dog on the muzzle, right?

A.   I'm not sure he actually -- oh, yes, you are correct.

Q.   We are going to watch that.

A.   I am trying to figure out where you are at.

Q.   And then later the dog -- kicks him right before the dog

bites his foot, right?

A.    No, I don't think he does that.

Q.    You never saw him kick the dog?

A.    No.

Q.    Okay.  But --

A.    I thought --

Q.    -- this part right here, it is your testimony that Kelly should have tactically cuffed him in the bathtub, right?

A.    He should have cuffed him, yes.

Q.    He should have cuffed him.

And you know that Robert Evans has not been searched at this point, right?

A.    And that didn't stop Constable Kelly from going in there.

Q.    Robert Evans has not been searched at that point?

A.    Not as far as I know.

Q.    Okay.  And there is a bathtub, of which you think Kelly Smith can lean down and place handcuffs on this man properly?

A.    Yes.

Q.    Without causing any injury to himself or that perpetrator, that is your opinion?

A.    He could have controlled that person, yes.

Q.    And you usually put handcuffs on them in that situation?

48

A.    Yes.

Q.    Or --

A.    Or had one of the officers come in.  And they are standing right there.

Q.    Sure.

Okay.  This screenshot right here that we see, Kelly Smith looks up.  That is right when Robert Evans says, hey, she is attacking my dog, right?  Do you recall that?

A.    I don't know if that is correct or not.

Q.    Do you recall Kelly Smith taking his eyes off of the perpetrator and looking straight toward the door?

A.    Well, I can see that.

Q.    That is what I am asking you.  Is that what this video depicts?

A.    Yes, he is looking for his dog.

Q.    Well, you did hear something from the guy sitting outside.  I just want to make sure you are seeing what I am seeing.  All right?

A.    I'm sorry.  Go ahead.

Q.    And you see right when Mata comes in, that Kelly Smith pulls his head back, right?  Let me play it for you since I have talked about we don't need to do freeze frames.

But it is important to understand --

A.    Yeah, I understand.

Q.    -- if he is taking his eye off the perpetrator, and

realizes what is about to happen, because it looks like his dog is coming right for the face of Robert Evans.

Immediately, just explain to me what you see on this video?

A.   Yes, he pulls him back.

Q.   He pulls him back.

MR. MACHICEK:  Your Honor, I'm going to object to a misrepresentation of the evidence.  At that point in time, Constable Smith is recalling the K9 into that situation.  It is an incomplete representation for the witness's opinion.

THE COURT:  I would just ask that counsel avoid trying to characterize what the video shows.  The questions should be presented to the witness.

MR. SKIPPER:  And, Your Honor, just because the audio is bad, I will rephrase it a different way.

THE COURT:  Okay.

MR. SKIPPER:  I didn't want to blare our ears with the audio.

BY MR. SKIPPER:

Q.   Constable Smith, during this, is recalling the dog, correct?

A.   Yes.

Q.   And the handler has to be in control of the dog, right?

A.   One would hope so, yes.

Q.   Sure.  I mean, I know what your opinion is, that he is

intentionally doing these things, but the standard is the handler has to recall the dog and be in control of the dog, right?

A.   Yes, he should be yes.

Q.   Okay.  And not having the dog out somewhere else being subject to injury or getting into some type of dispute with a mixed pit bull, correct?

A.   Yes.

Q.   Okay.  I understand what your opinion is, but the point is that is up to the factfinder to determine what that recall was for, correct?

A.   Sure.

Q.   Let's assume that your opinion holds water.  Let's assume that Kelly is recalling this K9 with hozam command, in order to inflict pain and destruction on this perpetrator who has chosen to confine himself within the quarters of a bathtub.  Let's assume that is accurate, okay?

A.   Yes.

Q.   Do you follow me?

A.   Yes.

Q.   And the guy who you say is intentionally trying to train his dog --

A.   Yes.

Q.   -- if that were true, not only would he not pull him away, he would keep his hand on him and --

MR. MACHICEK:  Your Honor --

Q.   Shove his face into the dog?

MR. MACHICEK:  -- counsel is testifying.

THE COURT:  Why don't you get to your question.

MR. SKIPPER:  It is cross-examination, Your Honor.  That is my question.

MR. MACHICEK:  He can ask questions.  He cannot testify.

THE COURT:  Just get to your question.

BY MR. SKIPPER:

Q.   That is my question, sir.  Do you understand my question?

A.   Yes.  You are telling me that he pulled the dog -- he pulled Evans up away from the dog.

Q.   No, I am not telling you anything.

A.   Oh.

Q.   I am asking you, if you want a factfinder to believe that Kelly Smith, you have testified to this, intentionally training his dog on this guy, who was on the run for 34 days for an injury to a child, was intentionally doing that by recalling the dog into the room -- you with me?

A.   Yes.

Q.   The last thing he would do, Kelly Smith, would be to pull his head out of the that dog's face in that situation?  Surely you are seeing what I am seeing?

A.    I am seeing what you are seeing.  But when it continues, doesn't he open Kelly's -- or Evans's body --

Q.    He hasn't done that yet, but I am going to get to that.

A.    Well, you are asking me a question about this.

Q.    The question is about right here.  I understand that we can't do a frame-by-frame analysis.  I am pausing it for this section of the totality of the circumstances because you have given an opinion.  Okay?

A.    Yes, sir.

Q.    There are several things that are about to happen?

A.    Yes.

Q.    This is first.

      If your hypothesis, theory, and ultimate conclusion before these factfinders is that Kelly Smith is a cowboy villain, not worthy of USPCA recognition --

      MR. MACHICEK:  Your Honor, I'm going to object to argumentative.

      THE COURT:  Sustained.

BY MR. SKIPPER:

Q.    If your theory is that Kelly Smith is trying to have this dog come in here and intentionally attack this perpetrator for training purposes, the last thing he would do in that first instance is pull his face away from the dog?

      MR. MACHICEK:  Asked and answered.

      THE COURT:  Sustained.

BY MR. SKIPPER:

Q.   Now, you see here where Robert Evans comes down.  Do you see his little ears flop.  He smacked him on the head.  Right?

MR. MACHICEK:  Your Honor, he is testifying.

THE COURT:  Mr. Skipper, you need to stop describing the video.  You are not even asking questions at this point.  So if you have any further questions for this witness, you need to get to them.

BY MR. SKIPPER:

Q.   Did you see that?

A.   Yes.

Q.   All right.  What happened there?

A.   He pushed the dog away.

Q.   He pushed him away?

A.   Yes.

Q.   Okay.

Do you see that hand right there?

A.   Uh-huh.

Q.   All right.  Whose hand is that?

A.   I wasn't watching the video.  I was watching you.  I see the hand now.

Q.   Whose hand is that?

A.   It looks like Milbourn's.

Q.   This hand right here?

A.   It is Evans's.

Q.   What is that showing right there?

A.   It is showing him pushing the dog away, I believe.

Q.   Arm under control?

A.   Pardon me?

Q.   What did you just see there?

A.   He pushed the -- he pushed the dog away.

Q.   He pushed?

A.   Yes.

          (Video stopped.)

Q.   You stated that leaving a bite on until cuffed is an old concept that is not used anymore, correct?

A.   It shouldn't be, yes.

Q.   But you know that it is used.  In fact, Houston K9 Academy uses it and many others --

A.   It doesn't make it right.

Q.   You, in fact, know it is used in training and officers still do that, correct?

A.   Yes.

Q.   Your opinion of right or wrong does not dictate how trainers choose to do their curriculum, correct?

A.   Yes, but it doesn't make it right.

Q.   Your opinion is you would expect the handler to comport with the way they were trained, correct?

A.   No.  No.

Q.    You would not?

A.    No.

Q.    Okay.  When you are trained as a police officer, if -- hypothetically, because you have been qualified as an expert -- in St. Paul, and they are teaching you how to handcuff a suspect who has his arms flailing, for instance, let's just say that, and they instruct you, even in 1983, that you should never pull out a pair of handcuffs if the hands are flailing because those cuffs -- let's say you have one on, could be used as a weapon.  It is coming around.  It could hit the perpetrator.  It could hit you.  If that happened to you in 1983, and then when you are trying to you have a suspect, you deliberately obey that training --

MR. MACHICEK:  Your Honor, is there a question here?

THE COURT:  Sustained.  If that is an objection, I will sustain it.

BY MR. SKIPPER:

Q.    You would expect, your testimony is, sir, for Kelly to ignore his training and release the dog as soon as Evans is out of the tub?

A.    Oh, I thought we were talking about the handcuffs.  I am confused as to what you are asking me now.

Q.    On the bite?

A.    Yes.  Okay.

Q.   You have testified, on the bite, he gets him out of the tub?

A.   Yes.

Q.   You have testified that it shouldn't be trained anymore to bite and hold until the perpetrator is handcuffed, right?

A.   That is not what I said.  I said that, today, that you do not -- you want to get the dog to release as soon as possible.  That means that when the suspect has given in, he has complied, you have officers to help, you do not keep using the dog as a use of force because it becomes excessive at some point.

     In the past, even when I had a K9, yes, that was -- we did do the handcuffing all the way to the end, but it has been found you shouldn't do that anymore.

Q.   And you understand that there are still places, specifically here in Texas, that still do that?

A.   Yeah, but it doesn't make it right.

Q.   I am asking you whether you know they still do that?

A.   I don't know.

Q.   You don't know?

A.   No.

     MR. SKIPPER:  Okay.  That's all we have, Your Honor.

     THE COURT:  Okay.  Mr. Machichek.

MR. MACHICEK:  Ms. McCullars, if we could look at 4A, page 7, lines 13 through 25.

REDIRECT EXAMINATION

BY MR. MACHICEK:

Q.   Mr. Slavik, the interchange between Mr. Evans and the Defendant here, what is it indicative to you -- what does it indicate to you that Mr. Evans is attempting to do?

A.   Mr. Evans is trying to -- he is still talking, which is good.  And he is trying to -- he is trying to come out, but he doesn't want the dog around, is what it is.

Q.   And does interchange take place before or after the Defendant enters the bathroom?

A.   Before.

Q.   In training situations with K9s where you are using a decoy, do you let the decoy get bit in the face?

A.   No.

Q.   So even in training, you are not going to deploy a K9 to bite the face?

A.   That's correct.

Q.   In your 29 years as a law enforcement officer in St. Paul, Minnesota, how many homicides by plunger did you investigate?

A.   None.

Q.   You were asked questions about the pit bull in the residence, and you said that it didn't factor into your

analysis. Why not?

A.   I didn't see anything that was -- that the pit bull was going to do. I didn't see either dog react to each other in a negative way. And Mata was heading out of the bathroom. I don't know where he was going.

MR. MACHICEK: Ms. McCullars, if we can look at 1D-4, please.

BY MR. MACHICEK:

Q.   At this moment, Mr. Slavik, can you tell the members of the jury whether or not the suspect's hands are flailing?

A.   No, they are not.

MR. MACHICEK: If we can look at 1D-6, Ms. McCullars.

BY MR. MACHICEK:

Q.   Mr. Slavik, tell the ladies and gentlemen of the jury whether or not you see the suspect's hands flailing at this point?

A.   No, they are not.

Q.   At what point after this do the suspect's hands begin to start flailing?

A.   When the dog comes in.

Q.   Who calls the dog?

A.   The handler.

Q.   And is that at the point in time where you have described to this jury that the Defendant turned this into a

training exercise?

A.   Yes.

Q.   Now, Mr. Skipper asked you a bunch of questions about who said what outside, phone calls, and things like that. Does any of that information change what happened in that bathroom?

A.   No.

Q.   Does any of that information change your opinion as to the reasonableness of what happened in that bathroom?

A.   No.

Q.   And what is that opinion?

A.   My opinion is that corporal -- or Constable Smith at some point during this used the -- Evans as a tool to train his dog to bite.  Because it was pretty obvious that the dog was not -- was just running around the room.  He is in, he is out, he is all over the place.  He is not doing what a trained police K9 should be doing.  He then pulls him in there, and he uses him for a -- something to bite.

Q.   And what is your opinion as to the reasonableness of that conduct?

A.   It is terrible.  It is not reasonable at all.  Imagine the damage that could have happened to that guy?

Q.   Is it reasonable in circumstances like this to train a K9 on a live human being just to try to get a win?

A.   No.

60

MR. MACHICEK:  Pass the witness.

THE COURT:  How much more?  Are you finished?

MR. SKIPPER:  We are going to move on.  Nothing further.

THE COURT:  Let's take our break at this time.  So a 15-minute break.

(Jury out.)

THE COURT:  May this witness be excused?

MR. MACHICEK:  Yes, Your Honor.

MR. SKIPPER:  Yes, Your Honor.

THE COURT:  Thank you, sir.  You are excused.  We will be in recess for 15 minutes.

(Recess was taken at this time.)

(Jury out.)

THE COURT:  You can be seated.

How many more witnesses does the Government have?

MS. BATSON:  Your Honor we have one more witness.

THE COURT:  Okay.  And then do you think that will take to the noon hour?

MS. BATSON:  I'd say yes, just to be on the safe side.

THE COURT:  Okay.  Then we will revisit -- I know there is an issue with respect to the Defendant's witnesses. We can discuss that after -- maybe before lunch or after lunch.

MR. MACHICEK:  Yes, Your Honor.  Happy to do that.

THE COURT:  Okay.

(Jury in.)

THE COURT:  Okay.  You may be seated.

Ms. Batson.

MS. BATSON:  Thank you, Your Honor.  At this time the Government calls Robert Eden.

THE COURT:  Mr. Eden.

(Witness sworn.)

THE COURT:  Be seated.

MS. BATSON:  May I proceed, Your Honor?

THE COURT:  You may.

MS. BATSON:  Thank you.

ROBERT EDEN, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. BATSON:

Q.   Good morning, Mr. Eden.

A.   Good morning.

Q.   Can you tell the jury who you are and what you do for a living?

A.   My name is Robert Eden.  I am a retired police officer from Canada.  I run a company called Eden K9 Consulting & Training Corporation, which is based out of Calgary, Alberta.

Q.   And what is Eden Consulting?  What kind of business is

it?

A.    We do multiple things.  Basically, for 20 years we ran something called the International Police K9 Conference, where we put roughly 4,000 dogs through our programs during that period of time.

I also run something called the K9 Activity Tracking System, which specializes in records management. And we specialize in records that maintain all of the training and deployment records of police dogs.  Most of that is down here in the United States.

Q.    Okay.  All right.  And you stated that you are a police officer?

A.    I am retired, yes.

Q.    Retired.

Okay.  How many years were you a police officer?

A.    28.

Q.    28.

And was that -- all of that in Canada?

A.    Yes.

Q.    And then you mentioned that you are experienced with K9s?

A.    Yes.

Q.    Okay.  And were you a handler at some point?

A.    Yes.

Q.    And for how long?

A.   16 years.

Q.   And have you trained K9s during that time?

A.   Yes.

Q.   And then how many years training K9s, experience do you have?

A.   About 40.

Q.   About 40?

A.   Yes, ma'am.

Q.   Four zero?

A.   Yes, ma'am.

Q.   Now, if I know you have done a lot in your career.  But have you published books?

A.   Yes, ma'am.

Q.   And how many?

A.   Three.

Q.   And what was the subject matter of those books?

A.   All on police K9.

     The first was done in 1984, called Dog Training for Law Enforcement.  The second one was done in 1994.  That was called K9 Officer's Manual.  And my most recent was done a year ago, and that is K9 Supervisor's Manual.

Q.   Okay.  And are these books relied on in your industry?

A.   Yes, very much so.

Q.   Okay.  Have you written articles, several articles with the same subject matter?

64

A.    Yes.

Q.    And have those articles also been published?

A.    Yes.

Q.    And have you developed training programs?

A.    Yes.

Q.    And conducted seminars?

A.    Yes.

Q.    Can you tell the jury, please, what is considered a dog team?

A.    A dog team basically is a handler and a dog.  That is the team.

Q.    Okay.  Can you tell them how the team comes together?

A.    It varies.  In the United States -- or just by -- for comparison purposes, in Canada, all of us are assigned dogs or raise our dogs from what we refer to as green dogs.

In other words, I will get that dog, and I will have a period of 12 to 14 weeks as I go through the training process.  So I will train that dog from scratch.

Down here in the United States, there are still agencies that do that.  However, there are a lot of vendors now that provide dogs for police agencies, and they do the pretraining on the dog.  And I have seen training courses as little as two weeks to put a police dog out in service after the officer is assigned to a dog.

Q.    All right.  But yours is normally 14 weeks?

A.    Correct.

Q.    All right.  And let me back up.

      You live in Canada, but you travel to the United States?

A.    Extensively, yes.

Q.    All right.  And then have you done any seminars, training in Texas?

A.    A number of them, yes.

Q.    And is that for TCOLE credit?

A.    It is for TCOLE credit, so it is part of the Texas Commission on Law Enforcement.  There are some that are patrol related, but the more significant number of those are on K9 management supervision.

Q.    Okay.  And that is what TCOLE, tell the jury what TCOLE is?

A.    Texas Commission on Law Enforcement basically is a certification body that officers can collect certification for certain courses that are provided to them.

Q.    So you have been an instructor and presented at those training programs?

A.    Yes.

Q.    All right.  Have you done any work overseas?

A.    Yes.

Q.    And can you tell the jury about that?

A.    Brazil.  In 2005 I went to Brazil.  It was part of a

joint operation between America and Canada. I was hired, actually, by the Pentagon. I traveled to Brazil, and went down there and spent five weeks developing our first ever explosive detection dog program they had within the country. And that was in preparation for the 2007 Pan American Games.

Q. All right. Approximately how many dog teams have you trained?

A. I knew this question was going to come. It is hard to say. I have had hands on with at least 4,000 dog teams over my career.

With all of the courses that I have given, working hands on with handlers and dog teams, as far as individual patrol dog courses that have run for our 14-week school, I would say in excess of 30 teams.

Q. And have you assisted numerous police departments in setting up and developing their K9 programs?

A. Yes. In 2003 one that comes to mind, Phoenix, Arizona, Police Department was having difficulty with their unit at the time. They were considering disbanding their unit. And they hired me to come in and redevelop their unit from scratch. And I spent three months in Phoenix redeveloping their unit and put it back on the road.

Q. And in 2021 did you help the Canadian Government out on a project?

A.    Yes.

Q.    Tell the jurors about that one, please.

A.    I developed the protocol or standards that were to be used for, again, explosives dogs that are used by our embassies.  We have a hundred and seventy -- the Canadian Government has 176 embassies around the world.  And I was asked by the Canadian Government to develop the standards by which explosives dogs would be trained that would be used in those embassies.

Q.    And are you considered one of the foremost experts in the field of dog training?

A.    Yes.

Q.    All right.  And so given that experience, have you testified as an expert in court?

A.    Yes.

Q.    Was that on few or many occasions?

A.    Many.

Q.    Now, can you tell the jurors, please, you said you have been a handler.  How many dogs have you had?

A.    Two.

Q.    All right.  And how long?

A.    Eight years each.

Q.    And those were your dogs that you used to deploy?

A.    That's correct.

Q.    All right.  In this particular case, were you asked to

review documents and videos in an excessive force case?

A.   Yes.

Q.   All right.  And what items were you provided for your review?

A.   The first items that were provided to me were the videos, the body camera videos of each officer that was on scene at the time.

I was then provided documentation that went along with the events of the time.  That included the policy for the Wood County Constable Precinct 2.  It included the training records for Constable Smith and K9 Mata.

I was provided subsequently with some information about other -- I believe it was the Smith County policy as well.

Q.   Were you also provided K9 Mata's deployment records?

A.   Yes.

Q.   Training and both deployment.

In that binder that is right there by the side of you, can you look behind tabs -- 21 first?

A.   20 --

Q.   21, please.

A.   Yes, ma'am.

Q.   All right.  Do you recognize what is behind Exhibit 21?

A.   Yes.

Q.   And what is it?

A.   It is the training summary, the training records of K9 Mata.

Q.   Okay.  And on that first page of 21 do you see something that says business record, certificate of authenticity and domestic business record?

A.   Yes.

MS. BATSON:  Your Honor, at this time I move to admit Government's Exhibit 21.

MR. SKIPPER:  No objection, Your Honor.

THE COURT:  It is admitted.

BY MS. BATSON:

Q.   Then if you could look behind tab 22, please.

A.   Yes, ma'am.

Q.   All right.  Do you recognize what is in that document?

A.   These are the deployment records of Constable Smith and K9 Mata.

Q.   Okay.  And do you see that same business record at the beginning?

A.   Yes.

MS. BATSON:  Your Honor, at this time I move to admit Government's Exhibit 22.

MR. SKIPPER:  No objection, Your Honor.

THE COURT:  It is admitted.

BY MS. BATSON:

Q.   So, Mr. Eden, you said you got the videos, written documentation, and then also these records; is that correct?

A.   Yes, ma'am.

Q.   Now, based -- well, when you get all of the documents to determine whether excessive force was used, can you tell the jury how you start your analysis?

A.   The first thing I did before I started going into any of the written documentation, I review all of the video to ascertain, without any other influence, what I see on the video.

And then from there, I proceed to make notes and proceed in the investigation, and subsequently come up with a report based on that.

Q.   Approximately how many times would you say you have watched the videos in this case?

A.   I honestly couldn't tell you.  I know that I spent weeks and weeks going over.  Hundreds, I would say.  Breaking everything down in very fine detail.

Q.   And then, based on your review, were you able to come to a conclusion as to whether or not excessive force was used?

A.   Yes.

Q.   And what was that opinion?

A.   In my opinion, I felt that excessive force was used in this case.

Q.    Now, what methodology or principles did you apply to reach that conclusion?

A.    The main principles would be those of Graham v. Connor, whether it met all three pillars of Graham v. Connor.

Q.    Can you tell the jurors what those three pillars are?

A.    The seriousness of the crime.  It would be -- the crime involved would be the first one.  The danger to the officers at the time of the arrest.  Or to -- also to other citizens that might be in the area.  And, I'm sorry --

Q.    Just so we know, Mr. Eden, you got sick yesterday; is that correct?

A.    Yes.

Q.    And you are sick even this morning?

A.    I am having a rough day this morning.  I apologize.

Q.    Okay.  Is one resisting?

A.    Yeah.  And is the suspect attempting to resist arrest or has an avenue for escape that he is trying to use.

Q.    All right.  Now, can you tell the jurors please, because you have been a K9 handler, when does the training of a K9 begin?

A.    It depends on the individual agency.  Most dogs that we start, would start usually around 12 to 14 months of age as far as the formal training is concerned.  But we might raise those dogs from the time that they are from six or eight weeks of age and raise them up in preparation for this.

Because we can analyze the dogs as they are younger and determine whether they have the behavioral capabilities and be able to handle stressors and so on and so forth as they grow into their sort of teenagehood, and they are in a position to do the training and handle the stresses of the training.

So it depends.  I mean, here in the United States most of these dogs here are imported from Europe.  And so -- and that is simply because they have got the number of dogs to be available to provide for us.  And that is why they are brought in the from the United States.

So a lot of the dogs are kind of pretrained, but a lot of it is more sport trained, as opposed to police trained.  Or that can easily be converted over to law enforcement-type training.

So, as a result, it helps to shorten the amount of training time that is required to put that dog on the roll.

Q.   You mentioned some of the dogs come from Europe.  What specific countries?

A.   Belgium, Holland, Czechoslovakia, Hungary, Germany. Those would be the main ones.

Q.   All right.  Now, once you have initially trained the dog, is it important to keep building upon the fundamentals or the basics that they have learned?

A.   Absolutely.  Normally agencies are required by policy to

train so many hours a week.  It is up to the individual agency.  The accepted number of hours today is 16 hours a month minimum.

However, you will find -- like, when I was a handler, I trained every day with my dog.  Even if it is 15, 20 minutes, I would go and work my dog every single day.  Maybe give them one day off a week where I didn't have to do anything.  To keep that dog up to a proper standard time, you would want to be able to put the time into the dog to be able to make sure he is capable of doing the job on their own.

Q.   And what environmental factors can affect the dog's performance?

A.   Environmental factors -- in most dogs, if it is a dog that is well trained, and the dog -- it is more than training.  I need to get into this just a little bit.

More than just the training of the dog.  We've talked a lot and heard a lot about training the dog here. But a lot has to do with what is inside the dog itself.  Is it capable of handling certain stress?

Some dogs will have, for example, a very difficult time on slippery floor surfaces.  So you get the dog on a slippery floor surface, and that dog will just break down. It doesn't have the tactile part of it -- the dog doesn't like it.  So it won't perform on a slick floor, for example.

Okay.  So environmental can make a lot of

difference.  Whether -- if you go into a small, confined space, if it is a slick floor, that type of thing. Environment can make a huge difference on how a dog performs.

Now, having said that, dogs that have difficulties with that should not be police dogs.  Dogs -- like any police dog that is deployed on the street should be a dog that has been properly vetted to ensure that it doesn't have environmental issues before it is assigned to an officer and then put out in training.

Q.   Okay.  So how do you overcome those environmental factors to determine if the dog is going to be able to perform on the street for a police officer?

A.   There are some things that you can do to improve it. Because a lot of times it has to do with when the dog is going -- so if it is a younger dog that might be seven or eight months old and he is insecure in some cases, you can graduate the dog through some of those issues if the issue isn't too bad.

However, there are some issues you can't train out of a dog.  There are some issues that you can't -- there is genetics in the dog, and then there is training.  And if the genetics aren't there, you are not going to be able to train -- if it is an extreme issue, you are not going to be able to train that out of the dog.

Q.   So can you tell the jurors, please, also why it is important to keep training records.

A.   Training records are vital to be able to -- it does multiple things.

First of all, it supports you when you do certification.  When you get a certification from anybody, such as the United States Police Canine Association, the North American Police Work Dog Association, or any other similar association, that certification really is only a moment in time.

It says, yes, the dog has met that particular standard.  But if you don't have the training records to back that up, then the certification may not stand in Court because it has been recognized by the courts that it is only a moment in time.

The records also provide the ability for trainers and for handlers to see what their dog is doing over a period of time.  So if the dog fails an event that is a training event, you document that.  And then you document the steps that you take to overcome that particular problem until that dog is up to standard and is meeting the requirements that are demanded of them.

Q.   So it is important to keep good training records?

A.   Absolutely.

Q.   So how can you use those training records to understand

76

how a K9 is performing?

A.    Just by reading through the records, you can tell whether there is problems with the dog if the records are properly written.  That is paramount.  If the handler is documenting things properly, it will give you insight into the behaviors of the dog, the type of training that they have had, basically what they have done, and what they both have gone through during their training process.

Q.    So while you are training with your dog, are you also looking for deficiencies?

A.    Absolutely.

Q.    Okay.  And then, perhaps, ways to address those deficiencies to see if they can be overcome?

A.    Yes.

Q.    And if you had a K9, say, for two years and you have trained like you are supposed to, you are going to notice those deficiencies?

A.    Absolutely.

Q.    All right.  What is the purpose of deploying the K9?

A.    The primary focus of any police dog is that -- as a search tool.  Whether it be for narcotics, explosives, or to find a suspect that is hidden in a building, that is the absolute primary purpose of the dog.

        And, basically, over 90 percent of your deployments, that is the sole purpose of the dog at that

point.

Q.    Okay.  It is used as a tool to locate.  And one of the instances you gave was to locate a suspect?

A.    Correct.

Q.    So the primary job is to locate, say, a suspect.  Once that suspect has been located, is the job over?

A.    It depends on the circumstances.  The suspect will always dictate the circumstances, in most cases will dictate the circumstances by what happens subsequent to that.  If the dog goes in and the suspect is aware the dog is there, the suspect gives up, wants to come out, then it ends at that point.

However, if the suspect isn't going to come out, if the dog is able to reach the suspect and ample warning has been given, then the dog may go in and should go in and bite the suspect at that point, in order to obtain compliance from him at that particular point in time.

If the dog can't reach him, then the next step would be to pull back and then regroup with your team.  The dog becomes a tool that is in the background.  One of a number of tools that can be used to flush a suspect out from where he is located at.

So then it becomes a team effort.  Where initially the dog is upfront, the dog becomes the back of the stack, so to speak.

Q.    Okay.  And what do you mean by that?

A.    Once you regroup, the idea is to do -- in this particular case, negotiate with the individual to come out without having to deploy.  If necessary, you want to try and avoid that if you can.

      You would enter with a team of officers as tactically sound as you possibly can and continue dialogue to try to talk the suspect out.

Q.    Okay.  All right.  Sticking with the deployment, so first is to locate?

A.    Yes.

Q.    And then that could end whether or not the suspect complies, like you said, right?

A.    Yes.

Q.    And the next thing is, what, apprehension?

A.    Yes, if necessary.

Q.    If necessary.

      All right.  And, again, if necessary, if the suspect doesn't give up, or there is no communication?

A.    Correct.

Q.    All right.  Can you deploy a K9 if somebody is verbally non-compliant?

A.    No.

Q.    Okay.  And why not?

A.    It goes against everything as far as -- it goes against

the United States Supreme Court law.  I mean, you just cannot deploy a dog because somebody is lifting you off.  You just can't do that.  It is unacceptable.  It is not a punishment tool.  It is a compliance tool.  It is like a taser.  It is like a baton.  It is like any other tool you would have on your tool belt.  If you need to do it in order to bring a suspect safely into custody so that you are safe and the suspect that you are working with comes back safe, that is why you use that tool.

Q.   You said it is not a punishment tool?

A.   No, it is not a punishment tool.

Q.   Now, you have reviewed Constable Smith's policy, correct?

A.   Yes.

Q.   And is there a portion of that policy that goes against case law?

A.   Yes.

Q.   And which part is that?

A.   If I recall, it is section (d) on his policy that he wrote.  He added one after the three pillars of Graham, which is exactly -- it was something that stood out to me immediately when I went over it.

MS. BATSON:  If we could pull up Exhibit 20, please, page 15.

BY MS. BATSON:

Q.   And, Mr. Eden, I think you can, like, draw on this or highlight.

Just tell the jury which part of this -- Constable Smith's K9 policy is against case law.

A.   (Witness complies.)  All right.

Q.   And, again, why is this inapposite of the case law that is out here?

A.   Because you can't deploy a dog to bite somebody simply because they are being verbally abusive to you.  It is just wrong.  It is against everything that I know as far as case law is concerned.

Q.   Have you seen this in any other policy?

A.   Never.

Q.   And just to be clear --

MS. BATSON:  If we could go to page 3 of the same exhibit.  Thank you.

BY MS. BATSON:

Q.   All right.  And do we see up here who actually approved this K9 policy?

A.   Yes, Constable Kelly Smith.

Q.   And then the date, the issue date?

A.   Yeah, 9/11/2020.

Q.   And then while we are on this exhibit, if we could look at page 15, again, at the bottom.  And can you read the last sentence right here?

A.   Any K9 search may be terminated by the K9 handler or constable.

Q.   Now, based on your training and experience is that accurate?

A.   Yes, absolutely.  The final decision, basically, to deploy is always left up to the K9 handler, and that K9 handler always has the final decision when that dog should be removed.

Q.   And then why, why is that?

A.   He is in control of the dog.  Once a K9 handler shows up on scene, all responsibility transfers from everybody else on scene over to that dog handler, simply because the dog handler is the one that understands how his dog performs -- how it is going to perform.

     So in order to keep thing as safe as possible for other officers on scene, they need to be in line with how they are directed by the K9 handler himself so that nobody gets hurt unnecessarily.

Q.   And you have been in the courtroom and heard some of the testimony?

A.   Yes.

Q.   Prior to you getting sick?

A.   Yes.

Q.   And you were out most of yesterday afternoon --

A.   Yes.

82

Q.    -- and some this morning.

Did you hear that -- kind of like it is the blame game, that everything that happened is the other officer's fault and not --

MR. SKIPPER:  Your Honor, I'm going to object to leading.

THE COURT:  Sustained.

BY MS. BATSON:

Q.    Did you hear anything about the blame game?

A.    Well, I heard it --

MR. SKIPPER:  Object to leading, Your Honor.

THE COURT:  Overruled.

A.    I heard it, but I also noted it.  It became very apparent to me that that was the direction that this case was going to go when I read through the reports of Mr. Kmiecik and the other Defense lawyers.

Q.    Okay.  And what stuck out to you that was the direction it was going to go?

A.    Because in the reports that I read from the Defense, there was no responsibility put on Constable Smith in any way.  It was all blamed on the other officers, and it was very clear that that was the direction that it was going to go.  It didn't make sense to me.

Q.    Why not?

A.    Because the responsibility fell on Constable Smith.  He

is the one that is in charge once he decides to deploy his dog.  It is entirely up to the K9 officer to manage things at that point in time.  The various reasons for the other officers not coming into play, to be frank, I was actually surprised at the tact, as it were.

MR. SKIPPER:  I object to that statement, Your Honor --

THE COURT:  Overruled.

MR. SKIPPER:  -- that tact.

BY MS. BATSON:

Q.   Now, we just saw like where a K9 is on the same level spectrum as a taser?

A.   Generally, yes.

Q.   Okay.  And why do you say "generally"?

A.   Because it -- to give you an example, a taser, when it is deployed, can bring a suspect into custody.  And the suspect is left with only two small prong points when the prongs are removed from the individual that are used to conduct the electricity through the body.

Whereas, a dog I consider maybe a little more as far as use of force is concerned because it is another form of pain compliance.  But it can cause injury to an individual or be permanent.  It can leave scarring or permanent injury.

Q.   Okay.  Where a taser is more temporary?

84

A.    Correct.

Q.    Okay.  And then a dog bite is more permanent?

A.    Correct.

Q.    Can you use force and deploy a dog if you are angry?

A.    No.

Q.    Or frustrated with somebody?

A.    No.

Q.    Upset with somebody?

A.    No.  It is the same as any other tool in the tool kit. It is just another tool to use.

Q.    And as you say, it is not a punishment tool?

A.    No.

Q.    In your experience, 40 years of training dogs, 16 years of owning dogs, have you ever given a dog the wrong command?

A.    No.

Q.    Okay.  You have never given the dog the bite command when you meant to tell him to heel?

A.    No.

Q.    Or the bite command when you tell him to "come here"?

A.    No.

Q.    Now -- and why is that important to be accurate in the your commands?

A.    Well, it is important because the dog has an understanding of what is going on.  But, to be clear, command

of a dog -- or command to a dog is not the end-all, be-all. Command to a dog is also complying with situational circumstances at that particular time.

Unless I have trained my dog to do it -- if I was to take my dog and to send my dog on somebody that is just sitting passively in a chair, I need to train my dog to understand that picture.

But if I have got my dog sitting beside me, and I've got somebody standing beside me and I'm just visiting with them or there is somebody sitting in a chair and I command my dog to bite that individual, it is very unlikely that dog is going to bite that individual unless he has been trained to do it in that situation.  It is just -- a lot of it is the command combined with the situational circumstances.

In some cases, you will have the dog bite without even being commanded because the circumstances are, for example, an officer wrestling with a suspect, and the dog will engage almost automatically because it is part of the process.  It is something that the dog understands.  The dog immediately launches without being told.

So it is a combination of both the command and the circumstances at the time that create the end result.

Q.   Now, when you were a law enforcement officer and you had your K9, did you respond to scenes in order to assist other

law enforcement agencies?

A.    Yes, every day.

Q.    And then when you got to a scene, what is the first assessment that you did?

A.    I wanted to determine what the crime is from the other officers on the scene.  Usually, I will know that prior to arriving because it will come across the radio as it has been dispatched.  So we have a fairly good understanding what we are going to do.

I also want to make sure there is a proper perimeter set up.  Whether it be -- if the suspect, in our case in Canada, one of the things that we use our dogs for extensively is tracking.  So we want a containment area set up that locks that suspect down to, say, maybe six square blocks so if he happens to run across a street, and he is seen by somebody that is doing containment so we can pick up on that a little bit quicker.

But the idea behind containment is to put that suspect to ground as much as possible and hold him there so that he doesn't go anywhere.  And most suspects, if you go through things like criminal psychological profiles, they have a pattern that takes place.

And even at night if they just see red and blue lights, for example, flashing off of nearby buildings, at that point once they come out of their flight process, they

will usually stop and go to ground right there.  They won't even try to cross.

And that is just one example of why we do containment, to put them to ground so the dog can then catch up.

Q.   Now, you mentioned something about setting up a perimeter.  Did you see if the perimeter was set up at the scene?

A.   Yes.

Q.   When you get to a scene --

A.   Yes.

Q.   -- if the proper perimeter has been set up?

A.   Correct.

Q.   You looked at these videos and other documentation in this particular case.  Did you see officers setting up a perimeter?

A.   Yes.  They were on each side of the trailer in this particular case and were properly holding that for the dog to show up and do that search.

Q.   Okay.  Again, you have seen the videos?

A.   Yes.

Q.   Were the officers just standing around?

A.   Well, they are communicating back and forth, but they are making sure there are points where they can see.  Should Evans have come out of the trailer at any point, they would

have had strong visual capability seeing him try to leave.

Q.   So to the outside, if we come up on a perimeter, it might look like officers are just standing around, but they are actually doing something?

A.   Yes.

Q.   All right.  Do you ever go in -- with your dog, do you ever go in a situation at home without backup?

A.   No.

Q.   Why not?

A.   It is dangerous.

Q.   All right.  In this particular situation, did you see Constable Smith do that?

A.   Yes.

Q.   All right.  And when you first saw that, what did you think?

A.   It didn't make sense to me.  There was plenty of people on scene.  He had plenty of people that he could have taken with him.

It didn't make sense to me at all that he would proceed down that hallway.  It didn't make sense to me the speed at which he proceeded down the hallway.  He basically gave one warning with the dog and immediately released the dog.  There was no time given.

There were a lot of things that happened in that very initial sequence that bothered me.

The fact that, as soon as he is doing that, Evans, you know, reaches out with his hands and is saying something, and it can be seen in the hallway.  Evans is doing that from point on, and he sends the dog anyway.  At this point, there is really no need for the dog.

I felt he was putting himself at unnecessary risk.  Should Evans have been armed, it would have been very much a lethal situation for Constable Smith.

Q.   Now, how, based on your training and experience when you come to a scene and say the subject is barricaded, right, how would you have processed and performed in that situation?

A.   The first thing that would have happened, usually the on-scene commander would be attempting to conduct dialogue with the suspect.  If there was no proper connection between the officers and the suspect at that point in time, we would try doing announcements through a PA that would be on one of the cars, that we could try to reach out to the suspect and tell him to surrender at that particular point in time.

If we got nothing at that point, then we maintain a perimeter, and we would use whatever means we had available to us at that time in order to flush that individual out.

It might be something that is quite simple.  Turning off the power.  In this case, it would have been -- no air conditioning would have been the first thing.  That would -- that would be my primary one right there.  I would

90

continue to try dialogue.

If it didn't increase the pressure on the individual to come out, I would then go a next step and, for example, maybe toss him a canister of gas, OC spray, and get him to try to leave the trailer by the use of those tools.

Only when all that has failed and significant time has gone by, would we then proceed to go and enter that building.

Q.   Okay.  And why is it -- is it more safe to stand outside and do all of the things that you just told the jury about?

A.   Yes.  It is always -- distance is your friend when you are involved in these situations.

Q.   Okay.  What about time?

A.   Time is also your friend.  Patience is a major thing in policing.  Patience won't ever kill you.

MS. BATSON:  Now, if we look at Government's Exhibit, page 12.  Oh, 20, page 12.

BY MS. BATSON:

Q.   All right.  Right in there where it says "the handler." Wait.  Do you see that?

A.   You just covered it all up.

Q.   Thank you.

MS. BATSON:  I will let you do it.  The third sentence.

THE COURT:  Which exhibit is this?

91

MS. BATSON:  This is Exhibit 20, Your Honor, page 12.

BY MS. BATSON:

Q.   And Mr. Eden, where it starts, "the handler"?

A.   The handler will wait a reasonable amount of time for the occupant to respond before starting the search.

Q.   Okay.  And did that happen here?

A.   No.

Q.   All right.  Thank you.

So if -- you said something about if there is communication going back and forth between a barricaded suspect and law enforcement, right?

A.   Correct.

Q.   And why is that important?

A.   Because you get a feel and an understanding from where the suspect is coming from.  And in some cases they are very angry.  They are threatening to shoot everybody that comes inside.  They are being aggressive verbally to you.  There is all sorts of delay tactics they might use.  In this case, Mr. Evans wanted to delay being taken into custody as long as possible, so he might have been trying to make excuses.

You get all sorts of reactions from people.  You want to try to ascertain where their head is at before you actually do an entry.

Q.   Okay.  So is it your opinion that Mr. Evans didn't want

to go into custody?

A.    Oh, yeah.

Q.    You know many people who do?

A.    No.

Q.    All right.  So what if you aren't getting any communication from the suspect inside?

A.    At that point the dog would be deployed.  He would be at the threshold of the door.  The warning would be called into the building.  You do a minimum of two, just to ensure that the warnings have been called in.

And in some communities you would call it in two languages.  Down here it is frequent to call it in English, as well as in Spanish, before the dog is released.  And then give the dog -- the suspect ample enough time to be able to come out.

Much depends on the size of the building too.  You may also go and search a certain distance into the building and then yell another warning into the building.

This is vital.  Because in a lot of cases, there is other people in that building.  In this case there wasn't.  But it is vital that you do those warnings so that somebody else that might be in that building can call out to you.

It might be somebody that is legitimately supposed to be in that building, but it has been an unsecured door reported as a burglary, when, in fact, it is not.  It could

be the person that owns the building that is actually in there.  So the warnings serve a multiple purpose.

Q.   Okay.  And so, like, there is a failure to communicate; you are not getting a response back.  Is it important to come up with a plan before entering the building?

A.   Yes.

Q.   And why is that?

A.   Because everybody should be assigned a responsibility before they enter into that building.  So one would be, all right, you are going to be handling the cuffs.  You have got lethal overcover.  Those type of responsibilities are going to be assigned each individual so that when they enter into the building itself, it is done so -- as efficient and -- as efficient and quickly as possible without pushing too quickly ahead.

In other words, you want it to be efficient all the way through without having to make plans on the go.  You don't want to do it on the fly.

Q.   Sometimes you just have to?

A.   Sometimes you do.

Q.   So, like, in a plan you said somebody would cuff him, and then somebody else would be -- what did you say, lethal cover?

A.   Lethal overcover.  Somebody will always have their weapon drawn.  So should the suspect suddenly emerge with a

firearm, then that person's responsibility is to suppress that individual's attempt to fire.

Q.   And in that scenario where everybody has a responsibility, where would the K9 be?

A.   At that point in time, if the suspect has been located and they are going in to get him, if it is not -- you know, if it is a situation like active shooter or -- it is an active shooter situation, you wouldn't have a dog deployed. You are basically on the go.

In this particular case, I would have other officers.  And the reason for this is because we know where Mr. Evans is at.  It is very apparent right upfront because you can see the hands coming out.  Right in the very beginning when he calls the warning out, you can see Mr. Evans down the hallway talk, and he starts dialogue right away.

So there is really no further need for the dog from the very beginning.  It is done.  You know where he is at. So you can stay where you are at and call him out to you.

But if they did have to go out there to get him and because of that dialogue failing -- in this case I don't know that that was the case -- however, the dog would be at the back of the stack.  Other officers would proceed ahead of the dog because the dog is not being required to do a search. The dog is there as another use of force tool, should he be

needed at that point.

Q.   Mr. Eden, you just said that you could see Mr. Evans's hands as Constable Smith is walking down the hallway?

A.   Correct.

Q.   All right.

        MS. BATSON:   We are going to pull up a portion of this Exhibit 4.

        (Video played.)

BY MS. BATSON:

Q.   Watch the arrow.

        MS. BATSON:   Can you back it up again?

BY MS. BATSON:

Q.   Watch the arrow, and tell me what you see right there.

A.   Very clearly there are hands.  He knows where the suspect is at that point.

Q.   And this is from Kelly Smith's video?

A.   Right.

        (Video stopped.)

Q.   I know you have probably heard the term "surround and call out"?

A.   Yes.

Q.   Can you tell the jury what that means?

A.   Basically, you are maintaining control over the area. You have surrounded the area, and you are doing containment, and it is a matter of just calling the suspect out to you.

It is very similar -- I don't know how many have looked at a felony car stop. It is very similar to that where you stop a vehicle. You deal with it as if the suspects inside the vehicle are armed. And you call each one out back to you, to your area of control.

You don't want to have to step into the suspect's area of control, by any means, because that area of control that he has got, he knows what weapons he has available to him. He knows what it looks like. He has the advantage where he is at.

So to call him out is to the bring him in your realm of control. Bring him out to where it is safer for you to take him into custody.

Q.   It is key to not give up control?

A.   Correct.

Q.   So and what you are saying is, like, when you go into their area of control, their house, they have the control?

A.   Correct.

Q.   And does that present a whole host of other problems?

A.   It can.

Q.   Like what?

A.   Access to weapons, for one. The ability to know what else is in the building before you go in. When you go into these buildings, you are blind to what is actually in there. It just puts you at a serious disadvantage any time you are

going into an unknown.

Q.    In review of this case and the entry into Mr. Evans's residence, what did you see initially that caused you concern?

A.    The release of the dog, first of all, when he knows where he is at, I didn't understand the necessity at that point.  I would have just waited for other officers to come, and then come up with a plan to take Mr. Evans into custody at that point.  I would not have proceeded down the hallway so quickly.

He basically sent the dog straight down as soon as the hands came out and were visible.  He sends the dog out.

Mr. Evans is starting to have communication with Constable Smith at that particular point in time.  However, we lose that, because as Constable Smith starts down the hall, he keeps tapping on his Axon body cam, and it suppresses everything that Mr. Evans says as he is proceeding down the hall.  You can't hear it.  So I don't know what was said during that period of time by Mr. Evans.

The other thing is, we talk about tactics and how dangerous things are and so on and so forth, but Constable Smith never drew his weapon.  He takes his leash, and it is something that we train very strongly against, but he takes his leash and he wraps it around his body and clips it.  So it is an easy way to carry.  And it is quick and dirty, and a

98

lot of handlers will do it.  They will either clip it around their waist or clip it around their body.

It is dangerous because it offers a suspect something to grab on to.  In fact, as you go on later on into the videos, you will find on Constable Smith's body cam, you will find that leash is actually around the neck of Mr. Evans, unintentionally, but it is around the neck of Mr. Evans where he could just reach up and pull it down and could have provided a very distinct disadvantage to Constable Smith at that point in time.  It is not a safe way to put your equipment away.  You need to roll it up real quick and put it in your cargo pocket and proceed.

MS. BATSON:  If we can look at Exhibit 1D, page 4.

BY MS. BATSON:

Q.   Is this what you were just describing?

A.   Yes.

Q.   And, again, is this the leash?

A.   Yes.

Q.   All right.  And then why is this concerning?

A.   Well, it offers Evans an opportunity, if he wanted to, if he was really wanting to resist, it is something that this is around the shoulders of Constable Smith.  All he has got to do is reach up and pull it forward.  It would have taken Constable Smith off balance.  It is just dangerous.  We just don't recommend that you handle your equipment that way.

99

Q.   Okay.  But here we don't see Mr. Evans doing that?

A.   No, he makes no attempt to do so.

Q.   Okay.

        Now, I believe we are at the point where the Defendant is walking down the hall.  We just saw the hands out.  And then what after that caused you concern?

A.   The next thing that caused me concern is when I saw Constable Smith basically lean up, and his actions -- his actions don't meet with what he is saying.  He leans up with both hands straddling the door, and he is basically telling Evans that he doesn't know if he is armed.  It didn't make -- it didn't make sense to me.

Q.   And why not?

A.   You just don't do that.  To say you are concerned about him being armed and just lean up outside the door, there is obviously no concern on Constable Smith's part about Evans being armed.  So why is he saying it?

        It came out on body cam that that is a concern of his, but his actions don't match with what he is saying for the body cam.

Q.   Okay.  Because he is standing in front of the door?

A.   Absolutely right in front of the door.

Q.   And I know -- I know it is a trailer, but is there any particular way that you would have proceeded going down that hallway, which we have heard the term a "fatal funnel"?

A.    If I had concerns or if I had to go down that and I had concerns about him being armed, I don't know what equipment these officers had with them.

But if I absolutely had to, and I didn't have a SWAT team or an ERT team available to me, the first thing I would try to obtain would be a body bunker before I go down that hallway.

A body bunker is a piece of equipment like you can -- it is like a big shield, and you can hold it in front of you.  It has got bulletproof glass, bullet-resistant glass.

You can see through a small port, and you can proceed down the hallway using that as cover.  It is like a mobile cover.  I would -- it is a dangerous position to be in.  There is no real easy way to deal with those types of circumstances.

Q.    Would you just have proceeded down the hallway in the manner that --

A.    I would have waited where I was at, called for cover, and started dialogue or continued the dialogue which had already been started.  The dialogue was started from the get-go.  There wasn't any reason to go any further.

Q.    And why?

A.    They had dialogue going with Mr. Evans.  Depending on what Mr. Evans's reactions were, if they continued the

dialogue, started to call him out, and they didn't deploy the dog, and Mr. Evans had agreed to come out at that point, he knows the gig is up.  He knows he is not going anywhere.  He has got no avenue of escape from where he is at.

So they could call him out the same as what I described earlier in a felony car stop, have him come out. They could tell him to lay down in the hallway.  And then go up and cuff him.  Or they could have him actually come all the way back to him, walking backwards towards them and have him lay down in front of them where they have got the locus of control and cuff him at that point.

Q.   Okay.  Now, in your review of all of the videos, do you hear Mr. Evans numerous times saying, I'll put my hands out, put the dog up?

A.   Yes.

Q.   Okay.  And what significance is that to you?

A.   He is trying to surrender.  That is one thing that was consistent throughout the whole video, with all of the different videos as well.

Mr. Evans continually asks -- he is terrified of the dog.  That is quite apparent.  The dog has already done its job just by its presence.  It has de-escalated the situation.

Mr. Evans doesn't want to deal with this dog.  He is terrified of this dog.  He is not making any threats.  He

is not doing anything overt.  He just wants this dog to go away so he can out --

MR. SKIPPER:  Your Honor, I would object to speculation at this time of what Robert Evans was doing.

THE COURT:  Sustained.

BY MS. BATSON:

Q.   All right.  From what you have observed and you heard, did it appear that he was resisting?

A.   No.

Q.   Okay.

All right.  Now, you said that the dog at this point did its job?

A.   Yes.

Q.   All right.  And, again, what job was that?

A.   Just presence only.  Just presence only.

Q.   Because once Mr. Evans knows that the dog is there from the announcements --

A.   It appeared to me that he was willing -- or could have been willing to come out and dialogue continued at that point.

Q.   And based on your training and experience, would you have even deployed the dog?

A.   No, I would have basically stayed where I was, waited for cover, and called him out to me, and then proceeded from there depending on what the suspect does at that point.

The decisions that we make are based on what actions the suspect takes.

Q.   Do you think that the deployment of the dog escalated the situation?

A.    Absolutely.

Q.   Okay.  And why?

A.   As you go through the videos and you watch each one, Mr. Evans attempts to give up numerous times, but he reacts when he sees the dog in his close proximity.

So just as he is getting ready to come out and the dog turns around and comes back towards the bathroom door, he shuts the bathroom door real quickly because he doesn't want the dog coming in.

I never saw what he did at any point in time as an attempt to avoid arrest or to resist arrest, as much as I saw him not wanting that dog to come in and bite him.

Q.   Okay.  So now we are at the point where the Defendant is in front of the door, right?  He is standing in front of the door.  And then do you recall what happens next, how the door is opened?

A.   Yeah.  There is a point in time where the dog -- or, sorry, where the door comes open just a slight amount, and they are conversing at that point.  But the dog -- you know, he calls out to the dog I believe at that point.  As soon as the door starts to open, he is calling to the dog.

It was a returning command that -- I believe it was to come into his vicinity because the dog had lost interest, and he was trying to get him to come back as the door opened.

Q.   And that is important right there.

What do you mean the dog lost interest?

A.   The dog wandered off from where Constable Smith was at that particular point in time.  Not far.  But as the door started to swing open, Constable Smith called out excitably, hozam, hozam, trying to get the dog back from where he was at the door.

When that happened -- you have to understand that these are Hungarian commands.  Fogd, foogosh, and hozam, they are all Hungarian commands.  Constable Smith understands those.  I notice in his reports he talks about it being a recall command.

But Mr. Evans doesn't know that.  Mr. Evans -- and remember I said that it is situational, as well as what the command is combined.  Mr. Evans has no clue what commands are being told to the dog.

So even though in his mind Constable Smith is recalling the dog back to him, Mr. Evans doesn't understand that is not a bite command.  He is still concerned, though, that the dog is in an excitable situation and is going to bite him.

Q.   So Mr. Evans knows some commands are given, and they are not to him?

A.   Yes.

Q.   Because they are in a different language?

A.   Not at that point, no.

MS. BATSON:  Ms. McCullars, can we play the shortened version of Exhibit 1, please.

(Video played.)

(Video paused.)

BY MS. BATSON:

Q.   Defense counsel has questioned other witnesses about this entry right here in seven seconds of darkness?

A.   Yes.

Q.   Were you in here during any of that testimony?

A.   Yes.

Q.   Okay.  And what is your take on that?

A.   I understand what they are trying to do.  However, there is lots of ambient light out in the hallway before these flashlights are turned on.  This suspect is only three foot inside.  Where he is standing, it is only about three, three-and-a-half feet, maybe inside the door.

And where they talk about him not being able to be seen with his hands up as Constable Smith enters, I find that extremely difficult to accept.

Q.   And why?

MR. SKIPPER:  Your Honor, I'm going to object to speculation in this opinion.

THE COURT:  Overruled.

BY MS. BATSON:

Q.   It is based on what you have observed on videos?

A.   Based on what I have observed in the videos and also my own experience.  I have been in similar situations like this, and ambient light doesn't stop at the doorway.

When you have ample light outside the door, the next room you go into, if you go into a room that is that small, it is going to be -- it is going to have a fair bit of light that is going to cast into that room.

Q.   Okay.  And so it is not seven seconds of complete darkness?

A.   No.

Q.   But if it had been seven seconds of complete darkness, in a situation where, say, a suspect could be armed, seven seconds is a long time?

A.   Yes.

Q.   Wouldn't you agree?

A.   Yes.

Q.   And is that -- anything could happen in that seven seconds?

A.   Correct.

Q.   And in a dangerous situation where a weapon can be

drawn, how many seconds does it take to draw a weapon and shoot and kill somebody?

A.   It depends on the individual, but it is just a very split second.  It doesn't take long.

Q.   So seven seconds, if you were in the situation, would you anticipate that if harm was going to come to you, it would come in that time?

A.   It would have come in that time or even prior to that time through the door.  There was ample opportunity.

          MS. BATSON:  All right.  Continue to play.

          (Video played.)

          MS. BATSON:  Thank you.

          (Video paused.)

BY MS. BATSON:

Q.   All right.  What is going on right here?

A.   The dog is trying to engage Mr. Evans, but the dog unfortunately is not a dog that I would put on the street. This is a dog -- if you see a good police dog that has the got the behavioral necessity of what it needs to be on the street, that dog would have gone in, straight in very hard without hesitation, taken one bite on that individual and held on tight.  He would not have let go.

          Mr. Evans would have had no opportunity to grab the dog like this.  It is not clear on here, but when you do look at this very closely step by step, Mr. Evans has actually

reached out and he has got a finger -- he has actually had time to put a finger through the ring of the collar.

So he is actually -- the vast majority of the struggle that is going on here is on a single finger of Mr. Evans.  If the dog had twisted, it could have caused a lot of injury to Mr. Evans's hand just by twisting because he got his ring -- or his finger caught in that ring at that point.  But he is lifting the dog by the ring of the collar.

And he is not lifting the dog.  The dog is actually pushing up on his hind end, and his hand goes up with it, so on and so forth.  He is not controlling the dog at this point.

Q.   Mr. Smith is not controlling the dog?

A.   No -- well.

Q.   Or Mr. Evans?

A.   Mr. Evans is not controlling the dog at this point.

Q.   What is he trying to do?

A.   He just doesn't want to get bit.  He is just trying to keep this dog back.  And, like I said, if the dog had what it takes to be a police dog, that dog would have gone in and bit him hard.  He would have had no opportunity to do this.

Q.   Now, you said that if this dog had been a strong dog?

A.   Yes.

Q.   He would have gone in and bit and --

A.   Yes.

Q.   -- wouldn't have let go?

A.   Correct.

Q.   So what is your opinion about this dog?

A.   The dog is what I would refer to as a demo dog.  He is a good dog to take for public relations.  He is a good dog to take to demonstrations to the public, to bring positive rapport between police officers and the public.  This is not a dog that I would ever deploy on the street.

Q.   And would you have seen that in your training?

A.   Absolutely.

Q.   And if you would have seen that in your training but your training records don't reflect that about the dog, is that a problem?

A.   Yes.

          MS. BATSON:  All right.  Continue, please.

          (Video played.)

          MS. BATSON:  Stop, please.

          (Video paused.)

          MS. BATSON:  Thank you.

BY MS. BATSON:

Q.   What is going on here with Mr. Evans?

A.   Mr. Evans is still attempting to prevent himself from being bit by the dog.  I don't understand why it is necessary at this point.

          If I was in this situation, I would not.  The dog

110

is in the way.  I would just call the dog out, put him down, tell him to down, and take control of Mr. Evans.  Mr. Evans is not a threat in the any way, shape, or form. Mr. Threat -- or Mr. Evans is not threatening the officer at this particular point in time.  He basically is -- just basically trying to prevent himself from being bit.

Q.   Okay.  Now, I don't know if you were in here when Defense counsel asked Mr. Slavik if Mr. Evans had been searched?

A.   Correct.

Q.   Were you in here?

A.   Yes.

Q.   We don't see a search of Mr. Evans; is that correct?

A.   Correct.

Q.   All right.  But what is your opinion as to whether or not Mr. Evans was armed?

A.   I never saw anything that would indicate to me that he is armed.  He is in shorts.  He hasn't got a lot of places to hide anything.  It is possible he might have something.  We see the back, his front.

We have basically seen all of Mr. Evans.  This has basically been going on for some time now.  There is no indication to me that there is a weapon being held or in the possession of Mr. Evans.

Q.   And has Mr. Evans been struck at this point?

A.    Oh, yes.

Q.    All right.  And pretty hard?

A.    Yes.

Q.    All right.  Did any weapons fall out?

A.    No.

Q.    And then was he also, like, backed into the corner of the tub when the strikes hit?

A.    Yes.

Q.    Okay.  Any sign of weapons at that point?

A.    No.

        MS. BATSON:  All right.  Continue to play.

        (Video played.)

        MS. BATSON:  Stop.

        (Video paused.)

BY MS. BATSON:

Q.    Right here you hear the hozam?

A.    Yes.

Q.    And he is telling him to come back?

A.    Yes.

Q.    After he has been removed from the situation?

A.    Yes.

Q.    And Mr. Smith and Mr. Evans are the only ones until this point in there?

A.    Yes.

        MS. BATSON:  All right.  Continue, please.

(Video played.)

MS. BATSON:  Stop right there, please.

(Video paused.)

BY MS. BATSON:

Q.    What is going on in -- right here?

A.    Constable Smith has got Mr. Evans in a very vulnerable position here.  He can't go anywhere.  He is trapped in a corner.  He is attempting to feed the dog into Mr. Evans is what is happening here.  He is lifting the dog up and basically putting him on Mr. Evans.

The problem that he is having here that he may not understand is that when you try to force a dog forward, you are going to get an opposite reaction from the dog.  In other words, they will have a tendency to not understand that because it has not been done in training.

So what ends up happening is the dog is resistant.  It is like an opposite and equal reaction.  You get forced forward.  The dog says, oh, what is going on here?  And he starts pushing back.  And that is what I believe is what you are seeing here.

It is not uncommon from -- I have seen it in another case recently that I did in Arizona where the handler tried to put the dog real quickly on a very aggressive suspect really quickly when he suddenly attacked an officer, and the dog pulled back immediately simply the dog didn't

understand what was expected.

What would have worked here, if he truly wanted to get this dog to bite and understood what was going on, and I believe he did truly want to get the dog to bite, but didn't understand what he was doing, if he put back pressure on the dog, the dog would have wanted to go forward more because the dog is trained and developed that way.

Back pressure will get the dog to go forward simply because the dog is trained to hold on.  And the harder that back pressure is, the tighter the bite comes once the bite occurs.

So he is doing something here with the dog that the dog doesn't understand.  He is trying to do something that logically makes sense to Constable Smith, but the dog doesn't understand it.

Q.   And so we have seen Constable Smith drag this dog up to Mr. Evans?

A.   Correct.

Q.   And you indicated that he was trying to get him to bite?

A.   That is what it looks like to me, yes.

Q.   And use him as a training tool?

MR. SKIPPER:  May I object to leading again, Your Honor, at this point?

THE COURT:  Sustained.

BY MS. BATSON:

Q.    And you indicated that Mr. Evans was in a vulnerable position right here?

A.    Yes.

Q.    And why?

A.    He is totally open.  He has got his arms open.  He is just -- he is doing everything in his power to avoid being bitten, but he is totally open to the dog.

        If this was a dog that was an aggressive police dog, like a well-trained police dog, he would have been totally taken out by the dog.  It wouldn't have been an issue.

Q.    So it is a good thing that he wasn't?

A.    Yes.

Q.    All right.  Now, at this point when Mr. Evans is vulnerable, backed into the corner of this tub, is he trying to reach for any weapons?

A.    Not that I am aware of.

        MS. BATSON:  All right.  Let's continue.

        (Video played.)

        MS. BATSON:  Stop right there, please.

        (Video paused.)

BY MS. BATSON:

Q.    So that punch right there, was the dog in the picture?

A.    No.

Q.   But have you looked at our Indictment?  Have you looked at the Indictment, actually?

A.   I don't believe so.

Q.   Okay.  All right.  Would it surprise you that everything before this, the Constable is not charged with that; he is not charged with the punching as being excessive force?

A.   No.

Q.   Okay.  All right.  You think that is excessive right there?

A.   Given the circumstances.  You have to take everything into context.  All of this is unnecessary, in my mind, from the point that he first entered.  So, to me, it is all inclusive.

            MS. BATSON:  Let's continue.

            (Video played.)

            MS. BATSON:  Stop right there.

            (Video paused.)

BY MS. BATSON:

Q.   Now, Mr. Eden, is this also a position of vulnerability?

A.   Yes.

Q.   For Mr. Evans?

A.   Yes.

Q.   Why so?

A.   He can't push up with his legs.  He has got his hands on

top of his head trying to protect himself.  The dog left with the plunger.  He is totally susceptible to arrest at this point.  There is no issue with him at this point.

Q.    So here -- is the game over right here?

A.    Oh, yes.

Q.    Take him into custody?

A.    Absolutely.

Q.    And from this point on forward is the basis of the Indictment.

A.    Okay.

Q.    Now, let's go back and talk about the plunger.  Did you see Mr. Evans grab the plunger?

A.    Yes.

Q.    All right.  What was your position in review of that was used for?

A.    I replayed that over and over again trying to understand why it became such an important issue with Constable Smith. All that happens in this -- and you can take things and blow them into something that maybe they necessarily aren't.

        For example, is it a deadly weapon?  Well, anything, as it has been stated already, can become a deadly weapon, depending on how well you are trained in it and how you use it.

        However, when you look closely at the video, it is convenient because it happens to be sitting at the end of

the -- near where Mr. Evans is at.  And he just reaches down, and he takes it by the very end.  He is not holding it up where he can swing it properly and make any contact with the rubber end of it, if he could.

He is holding it by the very end.  It almost would be hard for him to even manipulate it properly.  He is right at the very tip of it holding on to it.  And what he does is he brings it up and very quickly puts it in front of the nose of Mata, trying to keep the dog back.

That is all -- that is all he wants.  Once again, it's all he wants is for the dog --

MR. SKIPPER:  I'm going to object to speculation as to what Robert Evans wants or is feeling or is saying.

THE COURT:  Sustained.

A.   I apologize.

BY MS. BATSON:

Q.   What do you see?

A.   I see him hold it right in front of the dog, right in front of the dog's nose.

Q.   Okay.  Do you see him swinging the plunger?

A.   I don't see him swing it at Constable Smith.  I don't see it swinging it at the dog in a manner to harm the dog in any way, shape, or form.  And he has it in his possession.

Depending on who is doing in the calculations, I came in, it was less than a half second when I did it on my

time quote.  I may have been off.  He said it was possibly --

another witness said it was I think .53 of a second.  But

still it is around a half a second.  There is not any time

for him to do anything with that.

And from that point, Constable Smith takes it away

immediately.  It is a reactive response from Constable Smith,

I believe.  He just quickly takes it and dumps it at the end

of the tub, at which point K9 Mata sees his opportunity

there, and he considers it a play toy, and he grabs it and

leaves the room, basically fetches it out of the room.

Q.   It has been in his face, like you said?

A.   Yes, it has become a play toy for him.  This is not a

serious dog.  This is a dog that has got some major, major

issues.

(Video played.)

MS. BATSON:  Stop, please.

(Video paused.)

BY MS. BATSON:

Q.   All right.  So at this point, like everybody stated,

Mr. Evans could have been taken into custody?

A.   Yes.

Q.   But we see the Constable call the dog back?

A.   Yes.

Q.   And attempt to try to bite him?

A.   Yes.

119

Q.   Is he engaged at this point?

A.   No.

(Video played.)

MS. BATSON:  Stop right there.

(Video paused.)

BY MS. BATSON:

Q.   Now, there has been some questioning about slapping on the dog -- right here, as a matter of fact, on the dog's nose, right?  Do you think this is an attempt to harm the dog?

A.   No.

Q.   All right.  And what do you believe this is?  What is happening here?

A.   I believe it is an attempt to avoid being bitten.

MR. SKIPPER:  Your Honor, may I have a running objection to this witness speculating about what is in Robert Evans's head.

THE COURT:  Well, I don't think you need a running objection.

MR. SKIPPER:  Speculation.

THE COURT:  But just make sure your questions are based on the witness's observation of the actions of the video.

MS. BATSON:  Yes, Your Honor.

BY MS. BATSON:

Q.   All right.  What do you observe Constable Smith doing right here?

A.   He has got his arm around the throat of Mr. Evans.  It appears that he has started to lift him up.

Q.   All right.  So we see Mr. Evans in a position like this where he can be arrested and vulnerable?

A.   Yes.

Q.   And so is Constable Smith, based on your training and experience, taking him from a position where he could put handcuffs on him to a position where he can't?

A.   He is beginning to.

Q.   All right.

     MS. BATSON:  Let's continue to play then.

     (Video played.)

     MS. BATSON:  Oh, then right there.

     (Video paused.)

BY MS. BATSON:

Q.   He gave the bite command.  You just heard that?

A.   Yes.

Q.   Is this the position that you are talking about where he can't --

A.   This would be where he is no longer in a handcuffed position at this point.

Q.   And who puts Mr. Evans in this position where he can't be handcuffed?

A.    Constable Smith.

Q.    Okay.  And so, again, we are here, and then we get to here, and then the bite occurs?

A.    Correct.

MS. BATSON:  All right.  Go ahead and play.

(Video played.)

(Video paused.)

BY MS. BATSON:

Q.    Do you see a kick to Mata, a kick?

A.    I would refer to it as a -- more of he is trying -- more of a push on the dog to try to back the dog off, it appears to me.

Q.    Now, the area that is exposed in this position, what is this called?

A.    Thoracic area.

Q.    Okay.  If this had been a strong dog and he had latched on to this area, could serious damage have been done?

A.    It could be potentially devastating.

Q.    And, again, the bite command is being given here?

A.    Yes.

Q.    Not the heel command, not the hozam -- not labost?  You don't hear that at all --

A.    No.

Q.    -- in this part, which is heel?

And then hozam to come back.  All we hear is

122

foogosh, foogosh?

A.   Correct.

Q.   Okay.

MS. BATSON:  All right.  Play it, please.

(Video played.)

(Video pause.)

BY MS. BATSON:

Q.   Now, much has been made about one hands, two hands.  How many hands do we see here?

A.   Two.

Q.   All right.  Do we see any of -- either hand, left or right, try to grab any weapons as he is being drug out the tub?

A.   No.

Q.   Or drug down the hallway?

A.   No.

MS. BATSON:  Okay.  Can we continue to play?

(Video played.)

(Video paused.)

BY MS. BATSON:

Q.   Do we see any weapons at all in this pants area, shirt area of Mr. Evans?

A.   No.

Q.   Okay.  And then he and Constable Smith have been in that bathroom for quite some time together, correct?

A.    Yes.

Q.    And then we didn't see any weapons?

A.    There is no weapons.

Q.    Drawn or reached for, correct?

A.    Correct.

            (Video played.)

            (Video paused.)

BY MS. BATSON:

Q.    Do you see the leg yanked?

A.    Yes.

Q.    Because the dog has bitten?

A.    Yes, he is on an extremity, on a foot.  That is also notable.  Because a weak dog, a weak dog will bite feet or extremities like the hands because they don't have to come up and confront the man.

            A dog that is a strong dog will use his entire body to fight, and will come up as tight in as he possibly can and confront the individual.  It is very rare to have a dog that will bite on the foot or bite on the hand.

            In some cases, it is a sign of a weak dog.  Feels safe basically on an extremity where he can't be -- he is not fighting the man as a whole.

Q.    I believe that's --

            MS. BATSON:  If we could pull up 1D, page 2, please.

BY MS. BATSON:

Q. Okay. Mr. Eden, what is shown in this particular photograph?

A. That's Mr. Evans. From what I can observe here, basically he is afraid of the dog coming in. The dog is going to be --

MR. SKIPPER: Object again.

THE COURT: Sustained.

MR. SKIPPER: Afraid of the dog.

BY MS. BATSON:

Q. Just --

A. I apologize.

It looks like to me like Mr. Evans is in a totally surrendered position.

Q. All right. And at this point is the bite command being given; do you recall?

A. I believe it was, yes.

Q. Okay. And you stated, I think on here, that Mr. Evans is not too far back, and it is a small bathroom?

A. Correct.

Q. It has been said it is the size of -- almost the size of a queen sized mattress --

A. Yes.

Q. -- which is pretty small?

And you said he is like three feet in?

A.    If that.

Q.    Okay.  All right.  So not too far.  And you said there is enough ambient lighting because you have been in situations like that before?

A.    Yes.  I just can't see it going from light to just pitch black, that depth of darkness that he wasn't being able to be fully seen properly.

Q.    Okay.

MS. BATSON:  All right.  If we could go to the harness picture.

BY MS. BATSON:

Q.    Now, this particular picture was taken from Defense counsel's expert witness.  Do you recall seeing this?

A.    Yes.

Q.    All right.  And what do you see here, Mr. Eden?

A.    You can see the index finger of Mr. Evans through the ring of the collar of the dog.

Q.    Were you in here when Agent Crowell testified it would be hard for Mr. Evans to have been lifting that dog up?

A.    Oh, yes.

Q.    Okay.  And do you share the same view?

A.    I totally agree.  This dog would probably, I am estimating, but maybe weigh about 75 to 78 pounds.  Mr. Evans is bent over.  He has got his arm fully outstretched.  He has got one ring -- or one finger through the ring.

It appears to me that as the dog tries to move forward, the dog lifts up on his back legs, and he is not moving forwards because Mr. Evans has got his finger in the ring.

THE COURT: Which exhibit is this, Ms. Batson?

MS. BATSON: It is the Defense -- oh, Your Honor, I'm sorry. I need to move to admit this exhibit. It was from I believe it is Mr. Kmiecik's report.

Would that be correct, Mr. Shook?

THE COURT: But it is a still shot of a body cam?

MR. SKIPPER: I have no idea what it is from.

MS. BATSON: It was in your report.

MR. SKIPPER: Do you want to mark it?

MS. BATSON: Yes. It is a still from Exhibit 1.

THE COURT: Okay.

MS. BATSON: Mr. Milbourn -- or Lt. Milbourn's --

THE COURT: And you want to admit it?

MS. BATSON: Yes, Your Honor. It's 1D-18.

THE COURT: Any objection?

MR. SKIPPER: Another still photo, no, Your Honor.

THE COURT: Admitted.

MS. BATSON: And, again, this came from Defense counsel's expert witness report; is that correct?

MR. SKIPPER: Your Honor, I thought you just said

Austin Milbourn's camera?

MS. BATSON:  It did.

THE COURT:  No, I think -- is it from --

MS. BATSON:  It is from Austin Milbourn's camera, but the still photo was retrieved from their expert witness's report.

THE COURT:  Okay.

BY MS. BATSON:

Q.   All right.  And, again, based on what you have observed, would Mr. Evans be able to lift that dog up in the position that his finger was --

A.   Not in my experience, no.

Q.   You said the dog weighed about, what, 70, 75 pounds?

A.   I am only guessing, obviously.  Depending how much weight they have on -- I'm guessing between 70 and 78 pounds.

Q.   Now, based on your training and experience, is it safe for the K9 handler to also be the arresting officer?

A.   No.  Normally, the purpose of the dog handler, he needs to control the dog.  So his focus will always be on the dog. Once he has compliance with the suspect, an arresting officer, somebody that has been assigned to that position, which wasn't done in this case or somebody that is with him, they would automatically take that responsibility, and they would go in and go hands on with the individual so that the

handler can go through the process of calling the dog off, and getting into a position to complete the handcuffing procedure.

Q.   Okay  Just real briefly about the training records.  You did observe those, and now they have been admitted into evidence?

A.   Yes.

MS. BATSON:  Specifically, Ms. McCullars, if we could pull up Exhibit 21, page 37.

Okay.  And if we could zoom in up at the top where it says "goal."

BY MS. BATSON:

Q.   All right.  Now, Mr. Eden, what does this training record reflect?

A.   So the goal of this -- and I found this in a number of records.  As a matter of fact, I believe -- I believe it was a total of 23 records that were entered with this as a goal or what the purpose of or objective of this training.

It is to focus on using proper cover, and this is in the building search, proper cover and K9 control as you progress through the search.

Use voice commands during the search to acclimate the dog to working with cover officers.  And in this case they have got a scenario set up there.

And the scenario is that the suspect was seen

running into the building on the second floor after being a suspect in a copper theft.

So, basically, this training is ideally what should have happened in this circumstance if Constable Smith and his dog have gone through the training to do this properly, and he has done it properly on at least 23 occasions during his training but has not done so in this particular case.

Q.   Okay.  So you are saying -- are you saying that this dog has been trained to do building searches?

A.   Yes.

Q.   And consistent with what was done here?

A.   Yes.

Q.   Okay.  And they were successful?

A.   It was inconsistent with what was done in this particular case.  This case was inconsistent with what occurred during training.

In the training, he has got back-up officers and is training the dog to specifically move through the building with cover officers.

In this case, for whatever reason, Constable Smith went through the building by himself with the dog without any cover officers.

Q.   Okay.  So what occurred here is not consistent with what the dog had been trained to do?

A.   Correct.

Q.    Now, you said there are probably 23 of these building search records?

A.    With the records that I obtained, I counted 23 in total.

Q.    Were there any in these trainings records where the suspect surrendered?

A.    Yes.  Also, in those cases, there were eight training records that I found where the dog was deployed, searched and located the suspect, and the suspect surrendered, and the dog was not required to bite.

      So in those cases, in both -- in that particular case, that training is tantamount to what occurred here -- or what should have occurred here.

Q.    All right.  Again, when you are in this position, when Mr. Evans is in this position, it is your opinion that that is when he could have been taken into custody, one of the times, once the dog is deployed?

A.    One of the times, yes.

Q.    So is it reasonable for an officer, a K9 handler, to order the bite command when the suspect is in a position where he can be arrested?

A.    No.

Q.    Now, if there are six bites in a two-year period of having a dog, would you say that that was a lot?

A.    Depends on the number of apprehensions -- or, sorry, the

number of arrests in total that particular individual has. And it depends on the area that the individual is working in and the client base.

Q.   Okay.  So, say, if there is 10 deployments and three bites in 10 deployments, hypothetically, that is, what, 30 percent?

A.   Yes.

Q.   Let's talk about escalation commitment.  What is that?

A.   Escalation of commitment is where you have embarked on a project of some sort or some type of event where mistakes are being made, but you continue without diverting from what your initial goal is.  Regardless of how bad it gets, you just continue going down that rabbit hole, so to speak.  It is commonly referred to as an escalation of commitment.

Q.   Apply that term to the actions here, please.

A.   This would be, in my opinion, would be a perfect example of escalation of commitment.  The dog continually fails over and over again.

I don't see at any point in time really that the dog was necessary to be used, to start off with.  But as it gets worse, rather than stepping out of the situation and sort of reassessing what the situation is and calling the dog off and getting into training later on down the road and fixing the problem, if it had been a legitimate deployment, it is a situation where Constable Smith continues over and

over and over again to obtain a bite for his dog, which I just -- I don't understand, from my perspective, although I have seen it before.

And it was very common back in the early years of training before people started to clamp down and started doing things more ethically.

There were departments that it was not unusual to go out and do whatever you could to get a street bite to make sure the dog would go through a transition where the dog would obtain a bite on a real person.

Because the equipment come into play. When you have a dog that is trained on protective sleeves, on bite suits, and so on and so forth, that dog knows that picture. And knows he can bite it.

As a matter of fact, dogs will relish the opportunity to do that. However, when they see somebody that has got no equipment on, they don't see it as the same picture, and frequently need to be worked very hard in order to even get them to bite a person.

And we now have training techniques that we do, such as muzzle techniques, and so on and so forth, that we can do to build that.

And muzzle techniques, basically, just for your own knowledge so that you can understand that, is that the dog has got what we refer to as an agitation muzzle that is put

on, and he fights the man.  And he goes in there, and it is about engaging in a fight with a suspect.

And the suspect, or decoy in these cases of training, knocks the dogs down.  And the dog has to keep going and getting in there and continually be fighting.

You are building the intensity of the dog.  And as you continue that type of training, the dog has a strong desire and understanding that he can bite -- even though he can't bite, he is trying to bite an individual without any equipment on.

So this it takes away that what we refer to as equipment fixation from the dog and helps to build the dog's ability and desire to just go ahead and make an apprehension on a person without any protective equipment on.

THE COURT:  Ms. Batson, I think this is a good stopping point for our lunch break.

So I am going to give you an extra 15 minutes today, so if you would be ready to go at 1:15.

(Jury out.)

THE COURT:  I'm going to ask y'all to be back at 1:00 so we can talk about defense witnesses.  Okay?

MR. SKIPPER:  Okay.

THE COURT:  We are in recess.

(Recess was taken at this time.)

(Jury out.)

THE COURT:  Please be seated.

Okay.  So what is the issue with the Defendant's witnesses.

MR. MACHICEK:  Your Honor, I just want to be cautious moving forward and make sure that the rulings consistent with the Court's holdings following the pretrial hearing on the Government's motion in limine are carried forward through the testimony of the Defense witnesses.

I know that we may have some Defense experts testifying.  And there was particular areas that were identified in Government's Motion in Limine 20 regarding substantive information about the victim in the case, not known to the Defendant at the time of the incident in question.

The relevancy objection with that up until this point has dealt with what the Defendant knew at the time. The portion of it now, dealing with expert testimony, would be whether or not those facts underlying any opinions about the victim would be admissible.

And it is my understanding of the Fifth Circuit that underlying facts otherwise inadmissible are not rendered magically admissible just because they are the basis of an expert opinion.

THE COURT:  Okay.  Mr. Skipper.

MR. SKIPPER:  We have admonished the witnesses,

Your Honor.

THE COURT:  Say it again.

MR. SKIPPER:  We have admonished the witnesses.

May we approach just for one minute.

THE COURT:  Sure.

(Bench conference.)

MR. MACHICEK:  I didn't want to be too vague in my description of those areas, but in specific those areas would be the victim's alleged methamphetamine use, any suicidal ideations on the part of the victim, or any voice mails or anything associated with suicidal ideations, any unknown prior statements about firearms possession, and the facts and circumstances underlying the charges contained in the warrants.

I know that there has already been quite a bit of testimony about the title of the charges in the warrants.  I don't have any issue with that.  That would just be relitigating the unadjudicated charges in those warrants.  I want to make sure we stay away from those, particularly within the sticky concept of expert opinion -- bases for the expert opinion.

I am not challenging his ability to testify or anything like that, I just want to be careful about the admissibility of the statements that come in through that testimony, as well as my ability to cross-examine an expert.

MR. SKIPPER:  And, Your Honor, we have no problem with that.  We wouldn't ask our experts to opine on any of those matters.  Why it did come up is --

Assuming this is your last witness, is it?

MR. MACHICEK:  Yes.

MR. SKIPPER:  We need to move for Rule 29 after that.  I know you know that.  I'm just saying as far as expediency with everyone here.  I have never really done that at the bench like this before you have closed or rested for testimony.  Seems odd to take 10 minutes --

THE COURT:  Well, just --

MR. SKIPPER:  Just letting you know that's what I want to do.

THE COURT:  My view is none of that Mr. Machichek has mentioned is relevant, so I expect none of that --

MR. SKIPPER:  We have made admonishments, Your Honor, yes, sir.

(Bench conference concluded.)

THE COURT:  Are we ready for the jury, Mr. Machichek?

MR. MACHICEK:  Yes, Your Honor.

THE COURT:  Ms. Batson.

(Jury in.)

THE COURT:  Okay.  You may be seated.

Mr. Eden, you can return to the witness box.  You

remain under oath, sir.

THE WITNESS:  Yes, Your Honor.

MS. BATSON:  May I proceed?

THE COURT:  You may.

BY MS. BATSON:

Q.   Okay.  Mr. Eden, before we broke for lunch, we were kind of wrapping up.

MS. BATSON:  So let me pull up Exhibit 1D-10, please.

BY MS. BATSON:

Q.   All right.  And what is shown here?

A.   It appears that Constable Smith has got his left arm around the throat of Mr. Evans as the dog is coming in.

Q.   Okay.  And what is the significance of the Defendant having his arms around his throat or chin, throat area?

A.   As you play the video of this particular section of activity, when I played the video on this, you can actually see during the video as it starts to take place and, Mr. Evans is begging for the dog to no, no, no, to stop.

MR. SKIPPER:  Your Honor, I object again.

THE COURT:  I'm sorry?

MR. SKIPPER:  I'm going to object to Mr. Evans begging, that characterization.  Speculation.

A.   Mr. Evans is saying no, no, no.  What occurs here is that you see his face start to change color.  And it becomes

more flushed.  And as you listen to the video, his voice actually changes.  He is having a harder time speaking.

When you look at it closely as it is running through and you break it down -- and still shots are very important for this -- you can see that it is a straight armbar chokehold straight across the throat of Mr. Evans.

This is something that is not permitted by police policies in most cases because of the danger of the potential to cause significant injury to the hyoid bone, which basically supports the esophagus.

And this is why there is great concern in the police community with regards to chokeholds --

MR. SKIPPER:  I'm going to object to the characterization of a chokehold.  He has not been qualified as a tactical instructor --

THE COURT:  Overruled.

A.    It is not the same as carotid control.  This is a straight armbar chokehold that is straight across the throat.

And the reason I am familiar with that is because during my basic nine-month police academy that I went through, I had -- one part of my hyoid bone got broken in training.  So I am familiar what this feels like to me and what it is.

And if I had no significant damage.  It healed.  It was fine.  But the lucky part is I didn't have both sides

that were injured at that particular time.  So I am familiar with it.

Q.  And you stated you can actually hear Mr. Evans's voice change?

A.  Yes.

Q.  I don't think we talked about this, the pit bull, the presence of the pit bull?

A.  Yes.

Q.  Did you see that on the videos?

A.  Yes.

Q.  Did that cause you any concern?

A.  No.  I think it made things a lot more confusing, which is natural, given the circumstances.  I never saw any engagement between the two dogs at any point in time that caused any major concern, other than just the confusion of having to deal with an extra situation that was going on at the time.

Q.  All right.  And before we broke for lunch, I had asked you like a percentage -- bite ratio percentage?

A.  Yes.

Q.  With your company, do y'all keep records that determine bite ratios?

A.  Yes.

Q.  All right.  And explain that to the jury.

A.  So a bite ratio is a calculation, an algorithm in the

computer system, that calculates -- and we do it by demographic, as well as just taking general information, the number of bites a police dog has, compared to the number of arrests that that dog has made.

So if I have one bite for every 10 arrests that I have made with that police dog, then it is basically a 10 percent bite ratio.

And the systems that I have are designed to remove out of that calculation any arrests that are the result of a detection-only deployment of that dog.  Because there is no opportunity for the dog to get a bite during a detection-only deployment.

Q.   All right.  And then for the records that you kept, what is the ratio?

A.   I actually just pulled them out for the State of California, as they were recently having issues there.

MR. SKIPPER:  Object to relevance.  We are in Texas, not California.

THE COURT:  Overruled.

THE WITNESS:  I can give you --

THE COURT:  Overruled.

THE WITNESS:  I can give you the national stats, Your Honor.

A.   The national stats I pulled 30,500 I believe.  For those number of arrests, we had -- it was around 1800 bites, which

calculated out to nationally, nationwide, 6.2 percent bite ratio.

Q.    Nationwide?

A.    Nationwide.  Which would be an average -- it would be a norm.  Depending on where you are at, that could adjust.

Q.    Now, there was some testimony about the high stress of this situation.  Do you recall that?

A.    Yeah.

Q.    Okay.  Do you think this was a high-stress situation, based on your training and experience and from your review of everything?

A.    It didn't start out that way, no.  It never became a high-stress situation as the way that I believe it is being considered.

Q.    Okay.  Why don't you believe this was a high-stress situation?  And give us an example of what a high-stress situation would be?

A.    A high-stress situation would be something where the offender is known to have a weapon hand.  You would never deal with anything much differently if they don't have a weapon.

          But where it is the middle of a gun fight, or you are getting into a situation where the offender is being aggressive, you know that he is armed with a knife or handgun, your stress levels, by nature, are going to go up.

That would be considered a stressful situation.

I have gone into hundreds of these types of situations, and it is pretty routine.

Q.   What about this situation led you to come to the conclusion that it is not high stress?  What actions were taken on the part of the Defendant?

A.   Well, the initial part was that he immediately surrendered, as soon as he started calling out the warning -- just before the dog was released was the first thing and he showed his hands, and then basically he wants to give up at that point.  But when he sees the dog coming, then things change.

Q.   I'm sorry, Mr. Eden.  I meant the high-stress part on the Defendant.

A.   I don't see any of that.  He walks down the hallway.  He is not trying to maintain any level of cover whatsoever.  He leans up against the door.  When it opens up a little bit, he actually puts his fingers in the crack of the door, and it gets shut on them at some point.

There is absolutely no attempt to be tactical or safe in any way, shape, or form.  He leans up against the door when he is talking to the suspect on the other side.  If the suspect had been armed and had intended on using a weapon, that would be considered suicide.  It is just -- a lot of policing is common sense.  That is not even common

sense, let alone tactical.

Q.   So any stress on the Defendant's part, would you say that was self-induced?

A.   Yes.

Q.   Okay.

All right.  And in your expert opinion report, did you make notice of some misstatements in what actually happened on the video and then what was recorded in the sworn affidavit?

A.   There were significant; a number of them.  Yes.

MS. BATSON:  And, Ms. McCullars, if you could pull up the affidavit, please, with the highlights, page 2.

This is Exhibit 16, Your Honor, page 2?

BY MS. BATSON:

Q.   Okay. Mr. Eden, we have numbered several of the misstatements.  Start with the first portion.  What was number 1?

A.   I maintained cover, not knowing if Evans was armed.

And we see clearly in the videos that that didn't take place at all.

Q.   2?

A.   I gave K9 Mata the heel command in order to keep him beside me to be close for an apprehension and officer protection.

Any commands that were given, the dog was basically

off on his own and doing his own thing.  He didn't go down the hallway with Constable Smith, as it appears what his intention here.

Q.   Okay.  And then number 3?

A.   I maintained physical control of K9 Mata, hoping Evans would open the door and comply.

I didn't see that.  All I saw was the dog running around loose inside the building.  I never saw where he had any physical control at any point in time.

Q.   And then number 4?

A.   Evans was still not complying with verbal commands and continued to exhibit defensive resistance.

The problem that I had with that particular statement is that there were no commands really given to any great extent there for him to follow.

Q.   He couldn't comply with the commands not given?

A.   He couldn't comply with what wasn't being said.

We were finally able to open the bathroom door...

Q.   Let's go back.  What about the defensive resistance, anything there?

A.   At that point you could -- I would say resistance maybe, in that he is holding the door closed so that the dog isn't able to access him if he holds the door closed.

Q.   Okay.  Number 5?

A.   We were finally able to open the bathroom door.  And

Evans continued to scream at officers, and was still not complying with verbal commands to get on the ground.

This is one that I definitely did not hear any verbal commands for him to get on the ground.  I don't recall anywhere at that point until after he has been bitten does that ever take place.

Where it says:  We were able to finally open the bathroom door and Evans continues to scream at officers.

The only screaming was not at the officers in an aggressive matter.  He is saying things like, no, no, no.  And, get the dog off.  He is asking to put the dog up, I will come out, that type of thing.

That is what I got out of the videos.

Q.   Okay.  And then the next one, "he was standing"?

A.   He was standing in the bathroom upon entry, in a defensive stance.

And Constable Smith writes this in his report.  He himself writes this.  It in his own verbology.  It makes it clear that he saw the suspect standing there with his hands up.

Q.   Once the door was open?

A.   Yes.

Q.   No issue about noting about lighting?

A.   Nothing like that at all.  It was clear to him that he was standing inside in what he referred to as a defensive

stance.

Q.    And this is the one where Mr. Evans's hands were up --

A.    Yes.

Q.    -- defensive stance?

And what is the difference between defensive stance and defensive resistance?

A.    Defensive stance, he is standing there just basically with his hands up.  If he was being more resistive, he would be attempting to maintain the door closed.

Q.    Number 7, "Evans was still not complying"?

A.    Evans was still not complying with verbal commands and soft empty hand control.

As I saw it, Evans was not really in a position to do so.  There wasn't a lot as far as verbal commands that were given that were clear.  Because, in my opinion, he was in survival mode at that point.

There was no trust between him and the officer.  And that is vital when you deal with -- in law enforcement, you do whatever you can to build a rapport with whoever it is you are dealing with.  You need to communicate with them and have some sort of rapport with them.

And it seems that every time there was an opportunity for that, any time there was an opening of the door or anything like that, it became an attempt to get the dog on the suspect, as opposed to using other techniques in

order to accomplish the goal.

Q.   Okay.  Numbers 8 and 9?

A.   I removed his head from the harness and maintained control of K9 Mata, due to the close quarters of the bathroom, in order to keep Evans from being injured in the face.

This didn't make sense to me.  I think that at some point Mr. Evans let go because all he had was the ring on the collar.  When it is blurry, it looks like he has ahold of the whole collar, but when you look at it closely, it is a finger through the ring of the collar is what he has got trying to hold -- he is holding it at arm's length.

I don't know -- I never saw anything where there was any intentional attempt to protect Evans from the dog.  That statement just didn't make sense for me.

Q.   Okay.  And then in your training, do you ever train a dog to bite the face?

A.   Absolutely not.  We would do everything in our power to never have that happen.

Q.   Number 10?

A.   So, to go back in context a little bit past the yellow part, it says:  I called K9 Mata back in order to keep him in the bathroom and maintained physical control of him, due to Evans being isolated in the bathtub.

He then goes on to say:  Evans continued to yell

and picked up a wooden handled plunger and attempted to strike me and K9 Mata.

At no point in that video does he ever attempt to hit Constable Smith.  And at no point in the video does he attempt to hit the dog with the plunger.  He simply places the plunger between him and the mouth of the dog is all he does.  And it is there for a half a second.

Q.   The dog takes the plunger which he thinks is a toy?

A.   Once it has been knocked out of his hands by Constable Smith, it drops into the bathtub.  K9 Mata takes the opportunity, fetches his toy, and leaves the bathroom.

Q.   Number 11 -- oh, and -- yeah, number 11.

A.   A hard empty hand strike was applied, and he knelt down in the tub.

Q.   Did you see him kneeling down --

A.   He collapsed into the tub.  It was quite apparent that that particular strike took him down into the tub.

Q.   Okay.  12?

A.   While seated in the bathtub, he covered his head, thinking that the K9 was going to bite him, yet only the heel command is being given.

Again, as I said earlier, foogosh, fogd, those terms, hozam, whatever it is, the suspect isn't going to understand.  You can't expect the suspect to understand Hungarian commands that are being given to the dog.

The dog, as I mentioned earlier, also goes, not only by command, but also by situation.  If it is an excitable situation, the likelihood of a bite occurring is going to be high.

Q.    Okay.  And in this one where he says:  Yet only the heel command was given.

The labost, do we hear that at all?

A.    No.  And there is no heel command being given.  But, again, it wouldn't matter to Evans because he wouldn't understand it anyway.

Q.    Right.

But the Defendant gave the heel command -- I mean, the bite command?

A.    The bite command, yes.

Q.    All right.  Number 13?

A.    Evans kicked at K9 Mata with his right foot, and K9 Mata defended himself by apprehending Evans's right foot.

Q.    And this is the kick of the dog that you have been hearing about?

A.    It depends on the interpretation of the witness.  In my opinion, he was trying to push the dog back so as to prevent a bite.

One of the things that is very telling about a lot of police dogs that are weak is that they will bite extremities.  They don't want to fight the man.  I don't know

150

if you recall going through this or not, but they will go for the extremities.

This is an opportunity for Mata to take a bite without having the courage to fight the man, per se. He has an opportunity there. The gentleman has pushed out with his foot, and he has bitten onto that foot, and he has got his success at that point.

Q. Okay. And then lastly, number 14?

A. Once handcuffs were applied, K9 Mata was immediately released off the apprehension.

K9 Mata was never released off the apprehension. He was never told to bite release. He was still tugging and pulling, even while he was being handcuffed. And from what I can tell, even a little bit afterwards, he was never directed to come off the bite.

What happened is that he was losing his grip on it for a little bit, but he still had the shoe and was able to pull the shoe off. And, again, it is a similar type of performance or reaction. To him it is a toy. And he runs out of the -- he runs out of the trailer with the toy -- or with the running shoe.

Q. Okay.

All right. Based on the totality of everything that you have reviewed, do you believe that unreasonable force was used that violated Mr. Evans's constitutional

right?

A.    Absolutely.

MS. BATSON:  Your Honor, I will pass the witness.

MR. SKIPPER:  May I proceed, Your Honor?

THE COURT:  You may.

CROSS-EXAMINATION

BY MR. SKIPPER:

Q.    Mr. Eden, are you a Force Science certified analyst?

A.    No, I am not.

Q.    Are you testifying in your capacity as a use of force expert?

A.    No, I am not.

Q.    You are here testifying in your capacity as a K9 training expert, correct?

A.    That's correct.

Q.    Have you ever been a defensive tactics instructor?

A.    No.

Q.    Have you ever served on a SWAT team?

A.    I have not been assigned to SWAT.  I have done many deployments with SWAT.

Q.    Have you ever been assigned to a SWAT team?

A.    No.

Q.    All right.  You have given a lot of opinions about tactical situations and your opinions about those.  I just wanted to make sure your background in that.  Your background

seems to be that it is more focused on K9 training, correct?

A.   It is focused on K9 training; however, tactical operations is something that is very significantly taught as part of K9 tactics, as well as just general police work.

Q.   Have you ever been a defensive tactics instructor, is my question?

A.   No.

Q.   You are Canadian, correct?

A.   Yes, sir.

Q.   And you made this statement earlier that, with regard to this Section 4 of the Wood County policy -- and no offense about that, by the way.  I like watching hockey.  You made a statement earlier that Section 4 of the Wood County policy that you reviewed, I believe you said was contrary to the United States Supreme Court, not the Canadian Supreme Court, but the United States Supreme Court.  Did you say those words?

A.   I believe I did, yes.

Q.   Okay.  And you, in fact, wrote your last K9 Supervisor's Manual I guess a few years ago, correct?

A.   Two years ago.

Q.   Two years ago?

A.   Yes, sir.

Q.   A few years ago.

And you asked Michael Kmiecik to edit that manual for some U.S. case law authority, and he did that for you?

A.   Yes.

Q.   You acknowledged him for that, didn't you?

A.   Yes.

Q.   You relied on him for his authority on U.S. case law?

A.   Yes.

Q.   This is your book that you wrote, right?

A.   Yes, sir.

Q.   You even made an inscription inside:  Especially for Mike Kmiecik?

        Right?

A.   Yes.

Q.   Mike, I appreciate all you do in stepping in where Terry chose his legacy to continue.  Hoping this book can add something in some small way.

        Correct?

A.   Yes.

Q.   And you have made a lot of money off this book, haven't you?

A.   No.

Q.   No?  You give them out for free?

A.   An author on a book like this is in very narrow numbers. It is a very specialized book.  And I am not J.R. Tolkien or anybody that is well-known as far as the public is concerned.

It is a very narrow.

And author makes 13 and a half -- and I am at the top of the rung.  I make 13-and-a-half percent off the wholesale value of the book that is sold.

Q.   And Mike gave it to you for free, right?

A.   I gave it to Mike as a gift for assisting me, yes.

Q.   Mike edited your book for free, right?

A.   He didn't edit the book, no.  He went through sections of it for me that I preferred to have him look through to make sure I was on track with what I was doing.

Q.   He provided a service for you which assisted you in publishing this K9 Supervisor's Manual?

A.   Absolutely.

Q.   For which he never asked for any sort of compensation, correct?

A.   That's correct.

Q.   Okay.  And he actually received a personal acknowledgment in your book --

MS. BATSON:  Your Honor, objection for relevance.

THE COURT:  Sustained.

BY MR. SKIPPER:

Q.   Do you know the case that you say section (d) violated? You said the United States Supreme Court.  Do you have a cite for that case?

A.   No, I'm sorry, I don't.  I just know that everything

155

that I have been taught down here is that you can't send --
you can't use excessive force on somebody that is just
abusing you verbally.  That goes against everything that
happens in Canada, as well as down here in the United
States.

Q.   You always say down here in the United States.

A.   Sorry.

Q.   It is geographically -- I understand what you are saying
though.

But getting back to that section (d), did you know
that a guy named Alvin Gordon who testified here, whose
policy is that, contains similar language?

A.   No.

Q.   Anybody else's policies that you have reviewed in this
case contain similar language?

A.   Not the ones that I reviewed, no.

Q.   All right.  K9s, you mentioned it is all about context,
correct, when you are talking about these training records?

A.   Yes.

Q.   Situational scenarios, right?

A.   Yes.

Q.   You want to make them familiar with something they have
never experienced, right?

A.   Correct.

Q.   Driving down a highway at 80 miles per hour and some kid

156

is blaring his music, right?  Anything which is something that a dog has never perceived before, his sensory perceptions.  Maybe not that, but when you are out on a scene and you are training, doing something, putting them in situations that they are not familiar with.  Correct?

A.    That is correct.

Q.    Okay.  Apprehension and where someone maybe evades arrest on a four-wheeler, right?

A.    I'm sorry.  I didn't hear the last part.

Q.    Do you know what a four-wheeler is, like an ATV?

A.    Oh, yes.

Q.    Okay.  Perhaps, one of your situations involves someone evading arrest on a four-wheeler, and that dog has issues -- I think you called Mata weak.  That is your description of this dog, right?

A.    Yes.

Q.    And you would want to train this animal later, on situational awareness, if the animal had problems with apprehending, following commands with someone on a four-wheeler, for instance, right?

A.    As long as the four-wheeler is stopped, yes.

Q.    Well, you know what I am asking you.  In a contained, controlled environment, you are trying to train that animal to not react and crank up the stress levels because he has seen and been in that situation before?

A.    Correct.

Q.    Just like this handler?

A.    Correct.

Q.    They are one bond?

A.    Yes.

Q.    Okay.  Now, let's talk about that because you wanted to tell the jury about Kelly's training records.

How many times that you looked through these training records was the situation like this in this case where a person is inside and grabs the back of the dog's collar in a room of this size?

A.    There was not enough detail in the reports that were written that would be able to tell me that.

Q.    Okay.  That would be important for you to know, right?

A.    That's correct.

Q.    Okay  Did you see that Mata -- with the -- his certification is both USPCA certified -- yes?

A.    Yes.

Q.    And NNDDA certified?

A.    Yes.

Q.    Were there ever any issues in which the certification individuals noted that Mata is having some type of issues during certification?

A.    I -- no, no.

Q.    Did you ever inquire into USPCA that you believed that

Kelly is committing reckless behavior by allowing this animal to roam the streets and ask and inquire why this dog keeps getting certified?

A.   I'm sorry.  I don't understand the question.

Q.   Did you ever call USPCA and ask them for any records regarding certifications they may have on Mata?

A.   No.

Q.   Did you ever call NNDDA and ask them --

A.   No.

Q.   -- about records?

A.   No.

Q.   Because it seems like you are giving an opinion that based on what Mata was doing in training, that he should not have been certified by these organizations, correct?

A.   Not necessarily.

Q.   Well, when you say that the dog is having issues with X in training and because Kelly didn't fix X in training, he shouldn't have put him on the street; ergo, it looks like Kelly is trying to get a bite.  That is your opinion, correct?

A.   That would be my opinion, yes.

Q.   So a reasonable, credible, reputable expert would certainly inquire with those authorities at some point to say, why do you keep certifying this dog --

A.   Because it is totally understandable --

Q.   -- if there are issues?

A.   -- as to why they would certify this dog.

Q.   It is understandable?

A.   Certainly, it is.

Q.   Okay.  You have had two dogs, two apprehension dogs?

A.   Yes.

Q.   English or foreign language?

A.   English.

Q.   Now, you have testified that you have never given a dog the wrong command?

A.   Correct.

Q.   That is perhaps because you speak English, right?

A.   That helps a lot, yes.

Q.   Now, do you speak French?

A.   Don't go there, no.

Q.   I want to talk about what you said in your report versus what the Government just showed you with this big red arrow, two different things, okay?

     In your report, consistent with the testimony of everyone in front of this jury, right as Kelly is in front of the door, and Constable McQueen is behind him --

A.   Uh-huh.

Q.   -- you see on that video Robert Evans's hand come out and grab the right side of that door frame, right?

A.   I'm sorry.  When?  At what point?

Q.    When Kelly is inside --

A.    Okay.

Q.    -- in front of the door where you basically just say he should not have the been in that position --

A.    Right.

Q.    -- if he actually believed that Robert Evans could have had a gun --

A.    Uh-huh.

Q.    -- and right when he asks Constable McQueen, hey, put your shoulder in this door, and the door gives in, you see Robert Evans stick his hand out --

A.    Yes.

Q.    -- and grab the frame?

A.    Yes.

Q.    In your report you put "hands" plural, right?

A.    Yes.

Q.    That is not accurate?

A.    That is not accurate.

Q.    Mistakes happen, right?

A.    Yes.

Q.    You are an infallible man?

A.    Boy, I wish I was.

Q.    Spinning back on that because this is the first time we have analyzed this, the big fat arrow exhibit I haven't been provided until I got here in court today, but since it is

there, the Government --

MS. BATSON:  Your Honor, I'm sorry.  I am going to object because the implication is that we did not turn over this video, and he has had the video.

MR. SKIPPER:  With the big arrow on it?

THE COURT:  Let's leave aside the comments, the sidebars, Mr. Skipper.  That is what I talked to you about yesterday.

MR. SKIPPER:  Yes, sir.

BY MS. BATSON:

Q.   This is when Kelly comes in after Austin takes the dog out, right?

A.   Yes.

Q.   And on Kelly's body camera, you see what appears to be hand or hands coming out of this door, right?

A.   Yes.

Q.   And it is from the body camera, a perspective of Kelly's Smith's body cam, right?

A.   Correct.

Q.   And you don't know what Kelly is focused on, right?

A.   Correct.

Q.   Pertaining to the body camera, is all I am saying?

A.   Correct.

Q.   Because your head is always on a swivel when -- you are a police officer, right?

162

A.   Yes, retired.

Q.   Okay.  Retired now, but you used to be.

They are good, but they can't always tell you the perspective and perception of that actual officer who has that strapped to his or her chest, correct?

A.   Correct.

Q.   In fact, a reasonable officer would be dialed in on his dog or her dog, right?

A.   Not at that point.

Q.   Okay.  That is your opinion?

A.   (Witness nods.)

Q.   Okay.  It is your testimony that you believe that the big fat arrow thing is that Kelly would have seen that, and that would have been his cue, based on your training and experience, to pull that dog out of the hallway?

A.   Yes.  But we don't know what Kelly saw.  However, having said that, any time that I have deployed in a situation like that, I usually have my gun drawn, and I am totally focused on down range.  So I would not have missed something like that.

Q.   Do you train your guys to be ambidextrous?

A.   In what respect?

Q.   In that respect.  You know what respect I am asking.

A.   With regard to what side to put the dog on or where to draw a weapon from?

163

Q.    If you are coming in on a leash --

A.    Uh-huh.

Q.    -- and if I am right-handed -- there has been a lot of talk about drawing a firearm?

A.    Correct.

Q.    So my sidearm is on my right side with my right hand. Do they then just go on with their left hand and then draw their firearm so I am walking with dog and have a pistol?

A.    So when you are doing tactical entries such as this, where you are going to do basic entry to do a search with a dog, in most cases your dog is always -- in all cases, your dog is always on the opposite of your weapon side.

So if you are a right-handed shooter, the dog is heeled on your left-hand side.  If you are a left-handed shooter, the dog is heeled on your right-hand size.

So there should not ever be a need in order to change the lead from one hand to the other.

Secondly, when you -- sorry.  Excuse me.

When you go into a situation such as this, the focus that you need to have at this point is on tactics.  You need to have a back-up officer with you.  You don't ever want to be in a situation where you have got a lead in one hand and a gun in the other?

Q.    Yes.  That would be very dangerous.

A.    That is just not -- yeah, that is not wise to do.

164

Because if you do get in a shooting and the dog gets excitable and starts to move quickly and you are holding on to it hard, the dog will push you off target.  It becomes an extreme disadvantage.

Q.   And speaking of the lead, you made it a point to say how reckless it was for Kelly to hang the leash around his neck. Do you remember that?

A.   Correct.

Q.   And you have never seen anyone hang their leash around their neck?

A.   I have seen lots of officers are doing it.  It is -- either the way that Constable Kelly did, or the other method, quite frequently, is around the waist.

And both are -- they are basically a lazy way of dealing with your equipment, rather than taking that extra second to roll it up and put it in a cargo pocket where it is out of the way.

Q.   So, in general, anyone who hangs a leash around in their neck is just generally and tactically unsound?

A.   It is.

Q.   And, frankly, they are just lazy?

A.   I never said that.  I said it is a lazy way of doing that.  It becomes a habitual thing frequently through training.

Q.   Okay.

A.    Because they don't train like they deploy.

Q.    And I thought you said that when Kelly is leaning down in the bathtub, that the leash was actually wrapped around Robert Evans's neck?

A.    You could see it draping down under his -- goes right down the side of his neck --

Q.    Well, the question --

A.    -- on the video.

Q.    Draping down versus around his neck are two separate things, right?

A.    I guess it depends on your perspective.  To me, it looked like it was around his neck.

Q.    Much like you say push and I say hit, you say wrapped around and I say hanging down; is what I am asking you?

A.    Yes.

Q.    Your perspective based on your opinion is that that leash is not hanging down; it is actually wrapped around the man's neck?

A.    It is just draped over.  It is not a situation where it is intentional or where it is being used in any way, shape, or form.  It is just in an appropriate location where it can easily be grabbed by Mr. Evans.

Q.    You focus a lot on Mr. Evans and, in fact, indicated how you thought the tactics had changed now that we are blaming everyone else and that Kelly Smith's actions are not

consistent with statements.  Right?

A.   Correct.

Q.   All right.  And is it fair to say that Robert Evans's actions aren't consistent with --

MS. BATSON:  Your Honor --

Q.   -- his statements?

MS. BATSON:  Robert Evans is not on trial.

THE COURT:  What was the question?

BY MR. SKIPPER:

Q.   Is it fair to say that Robert Evans's actions aren't consistent with his statements?

THE COURT:  I'll sustain the objection.

BY MR. SKIPPER:

Q.   Well, when Robert Evans is yelling out of the room, I am showing you my hands, when there is no hands being shown, that would be inconsistent with the verbiage.  Right?

A.   I don't know what is going in behind that door.  When you are saying I'm showing you my hands, does he get an opportunity to do so?

Q.   Well, two separate things.  We are talking about the cooling off period here in a moment.

For the question as it is now, there is many times where Robert Evans is saying things like, I am showing you my hands, and the actions, at least from the video that we have seen, are not consistent with those statements.  Correct?

A.    I would have a hard time totally agreeing with that.

Q.    Okay.  You don't agree there is a little of downtime where you can't see hands coming out of the door when he is saying, I'm showing you my hands?

A.    There is a lot of downtime where you don't see hands coming out the door.  Where the problem comes in is that there are times when he does attempt to open the door, and every time he does, a dog goes in.

Q.    I'm saying right in the hallway.  He is telling him how he is using the restroom and cleaning himself, not sticking his hands out.  You can see it, right?

A.    When the dog is deployed, the hands come out the first second or two of the video.

Q.    You talked about a building search, on your direct.  And do you disagree that the definition of a building search is to search, locate, and apprehend?

A.    I wouldn't disagree with that.  I would qualify it.

Q.    And as far as the pit bull goes, you don't believe that had any issue or effect on your opinion that you have rendered in this case?

A.    No.

Q.    External factors coming into a situation to put an unannounced stimulus on the K9, nothing like that would bother you?

A.    I don't think it affected the dog in any way, shape, or

form during the deployment.  I think the dog shows enough issues even without the attendance of the pit bull at the scene.

There was no confrontation between the two dogs. Absolutely none.  One of the officers I remember on one of the tapes telling that -- telling Constable Smith that the dog was coming in to confront the dog -- his dog.  However, it was also later mentioned that it was done in a playful manner.

So there was really no confrontation that took place there.  Added confusion, yes.  But interfered with what was taking place, it shouldn't have, no.

Q.   And you understand that the proper legal standard is from an objective officer's standard?

A.   Absolutely.

Q.   And that is a segue into the seven seconds into this doorway of what you say is not complete darkness.  Because the photo that you used in your report is of the one we have been seeing, right, where you said he is in a defensive stance?

A.   I took it as a surrender.  He sees the dog coming in with Constable Smith, and he is just giving up.  And it is not just from that photo or that still shot or still fog capture, it is from Constable Smith's own statement that he sees him standing there in a defensive stance.

Q.    That is what I just said.  Constable Smith said a defensive stance --

A.    Yes, so --

Q.    You said surrender.  I'm trying to make sure we understand.  They have charged him with lying in an affidavit.  So Constable Smith is the one who said defensive stance?

A.    Correct.

Q.    You made the conclusion that Kelly is lying because you think that he is surrendering and touching the sky?

A.    I never said he was touching the sky.  It looked like to me had his hands open, showing them like they wanted him to, as they were asking him to.  And they walk in on him, and he is in that position.  I took that as a surrender.

Q.    Did you have any other photos that you can illustrate prior to that seven-second interval where it is pitch black and you see that red dot dancing around?

A.    I see the red dot dancing around, but it certainly wasn't pitch black.

Q.    On the video it is not?

A.    I don't believe so.  You can see it bouncing off the back of one of the officers.

Q.    Right.  I am asking you, since you had -- you say it is not pitch black, could you find any other photos prior to the one like this where he is in a defensive stance, you say he

is surrendering that would be consistent with your opinion that he was surrendering, and there is not a struggle?

A.   No.

Q.   Okay.  At least not on the body camera, right?

A.   No.

Q.   Would you agree with me that the photo that you put in your report shows Mr. Evans bending over, and his hands were out front, right?

A.   Yes.

Q.   They are not legs locked, hands touching the sky --

A.   Correct.

Q.   -- right?

Do you agree with Mr. Staton's opinion yesterday that we no longer require people to put their hands on the wall?

A.   I wasn't here for Mr. Staton's.

Q.   Okay.  Well, I will ask you a question.  Do you any longer require, like a Kojak moment and say, get your hands up on the wall?  Do you do that, or was it like an '80s tactic?

A.   No.

Q.   Okay.

I understand you said you are not a certified analyst with Force Science, right?

A.   Correct.

Q.   But have you in all of your training and discussing things with Mike Kmiecik, perhaps questions you have asked him, are you familiar with the phrase "mis-sequencing"?

A.   Not that I can speak to, no.

Q.   Do they teach that in Canada?

A.   No.

Q.   Are you familiar with the phrase "slips and capture" error?

A.   No.

Q.   They never taught that in Canada?

A.   No, not that I am aware of.

Q.   Going back to -- how many red numbers were on the affidavits that you marked, was it 14?

A.   14.

Q.   Did you help prepare that?

A.   No.

Q.   All right.  There was also one of the other statements that you said that Kelly wrote that is inconsistent with what is on the video, that he maintained Mata to be close for protection?

A.   That was one of them.

Q.   All right.  That is based on your conclusion that Kelly is just trying to get a training bite, right?

A.   No, it is based on what I saw at that particular section of the video.

Q.    Well, I guess my question is, if -- Mata is running out of the room, right, you are trained to keep that dog by your side, right?

A.    It depends on the circumstances.  If the dog runs out of the room and it is a total failure, I am going to forget about the dog at that point and continue through the process of apprehending the individual and handcuffing him.  Because the dog at that point has become a liability for me, right?

Q.    And show me in the training records where that has happened?

A.    Where what has happened?

Q.    You just said a scenario, it depends, so has Kelly seen that before?

A.    I don't know not whether he has or not, not necessarily in his training records.  But, like I said, in some cases --

Q.    And in his deployments have you see that?  You went through all of the deployments?

A.    Not that I have seen.

Q.    Okay.  It is contextual, right.  It depends -- you mentioned earlier, you said this word "context"?

A.    Yes.

Q.    If that animal and that handler have seen that situation before, right?

A.    So the situation that they see before doesn't have to be exact.  There is a lot of latitude.  The dogs learn, and they

start to sort things out for themselves.

You don't have to see -- or the dogs don't have to see things exactly the same every single time.  I may never -- going back to your previous example, I may have never trained my dog on a four-wheeler, to apprehend somebody on a four-wheeler, but I would probably have no issue with sending my dog on a four-wheeler if I sent them on some other circumstance that requires apprehension.

Q.   A dune buggy, I'm just saying if he failed in that situation, you would try to train him to be more familiar with that type of apprehension --

A.   Correct.

Q.   -- that's all I'm saying?

My original question, that hasn't been answered though, is that when you train your people, you train the handler to keep the dog by his or her side because it is about officer protection and K9 protection, correct?

A.   It depends on what is going on at the time.  There will be times that I will send the dog out ahead of me and put him down, and then I will find a safer way to approach while the dog is out on point.

When I get up to this point, I might send him out ahead.  It depends --

Q.   Okay.

A.   -- on where the circumstances are.

Q.   Let's take a circumstance where you have an individual in a bathroom, and you are unfamiliar with there being an external factor involved, let's say it is a mixed pit bull mix?

A.   Uh-huh.

Q.   A black pit bull mix.

A.   Uh-huh.

Q.   And you turn around and distracted and look out the door, and you want to recall your dog because you don't him to be around the other dog, right?  That is a possibility?

A.   That is a possibility, yes.

Q.   But it is your conclusion that the only reason that Kelly Smith is recalling Mata in this situation is so Mata can get a training bite, right?

A.   I have never once suggested that it is for a training bite, to start off with.  I don't believe I said that in my evidence in chief.

However, you would have to go back and look at the -- what was being said by Constable Smith at the time that that was taking place, what commands he was giving the dog.

Q.   Well, then why did you say that is indicative of a false statement, maintained to be close for protection?  That is the statement -- number 2 in the big red 2 that they flagged, what about that?

A.    I don't see where he is maintaining him close to be for his protection at all.

Q.    Could that be because Robert Evans has his hands all over him?

A.    In what respect?  Robert Evans was, in my opinion, in survival mode.  His hands were flailing around all over the place.  There was no -- in my opinion I never saw any intentional gun grab, as it has been inferred, or any intent to harm Constable Smith, or anything in that way, shape, or form throughout the entire event.

Throughout the entire event, not once does Mr. Evans ever close his fists.  He is totally open handed the entire time.  He is unarmed.  There is no indication of any attempt to cause any harm to Constable Smith.

Q.    You said he is unarmed?  You said he is unarmed?

A.    Yeah, if I was in that situation, knowing he is not searched yet, I can understand where you are going. However --

Q.    Well, and the question -- in all fairness, Mr. Eden, where I am going is, my question is, you have said he is unarmed?

A.    Correct.

Q.    You don't know that.  Because we are here for an objective reasonable standard, right?

A.    Okay.

Q.    You found out later he was unarmed.  In fact, he was never searched.  But my question is, at that point, you don't know if he is unarmed?

A.    Yeah.  I would suspect very highly that he was unarmed, given that we had him in and out of that bathtub.  Both sides of him were seen, and he is in shorts.  It is very --

Q.    And you understand that is not the legal standard, right?

A.    I accept that.

Q.    Well, you are here talking about how a policy violates U.S. Supreme Court law, and you are giving an opinion, again, about how you would infer this person is not armed, and yet it is not based on the legal standard of the United States a reasonably objective officer based on the totality of the circumstances.  You understand that is the legal standard in this country, right?

A.    It is the same legal standard in Canada.

Q.    Well, good.  So my point is, you don't know whether or not at that time Kelly, being objectively reasonable, thought or didn't think that Robert Evans was armed?

A.    I would concur.

Q.    Thank you.

        Just touching on this again.  When Kelly put in his affidavit that Evans was in a defensive stance, it is your opinion that he was not being truthful, he, being Kelly,

because, again, Robert Evans looked like he was complying and surrendering.  Correct?

A.    Correct.

Q.    Okay.  You also -- I'm sorry.  The prosecutor also put a big number 7 next to this statement:  Evans was still not complying with verbal command and soft empty hand control.

I don't want to play this again.  You have been sitting in here in and out during the week.  You don't believe that when Kelly Smith is saying, let go of my dog, that is a command?

A.    Yes.

Q.    Okay.

A.    Yes.

Q.    And when Robert Evans doesn't release his partner, his dog, his buddy Kelly strikes him in the face, right?

A.    Yes.

Q.    And when he continues to do that, Kelly continues to strike him in the face, right?

A.    Correct.

Q.    Does your training in Canada justify you punching Robert Evans in the face if he is holding on to your dog and not letting go when you tell him to?

A.    This is where context comes back into play.  At this point in time, in my opinion, there was no need for the dog to bite Mr. Evans.

Q.    Okay.

A.    So in that case it makes the use of force against Mr. Evans to punch him -- all he is trying to do is protect himself.

Q.    Right.

A.    If this was a down and out fight and Mr. Evans is attempting to get away --

Q.    Right.

A.    -- then, yes, it would be applicable.  In this case, it is not.

Q.    And in Canada do they allow you, as an expert, to testify as to what is in the, quote, unquote, victim's head? Do they allow you to testify to that in Canada?

A.    No.

Q.    But you do here?  You do here?

A.    I apologize.

Q.    You noted that with regard to the collar-grabbing, that Evans -- is it his pinky that is stuck -- you said a finger is stuck somewhere?

A.    I don't believe it is his pinky.  I believe it is another finger.  I can't recall what it is.

Q.    So that is Kelly's fault that the perpetrator got his finger stuck in a dog that he never -- stuck in the dog's collar that he never should have been touching to begin with, that is Kelly's fault?

A.    No.

Q.    Okay.  When Kelly removed Evans's hand, because you said he was lying about this, did it seem difficult for Kelly to remove this guy's finger from whatever part of the collar you say it is stuck in?

A.    I am not sure what you are -- I don't think it had anything to do with Constable Smith.

Q.    I removed Evans's handcuffs -- hand from the harness and maintained control of K9 Mata due to close quarters.

That is you said lie number 8 in the affidavit?

A.    I believe that during the punching event, I believe that Evans just let go, due to the punching, and the confrontation that he was being confronted with --

Q.    So the finger is out by this point, but he is just holding on to the collar?

A.    I don't know what point that changed.  I honestly don't know at what point that changed or if he is holding on to the collar.  Where I saw it there and he blew it up and looked at it, was through the ring of the collar.

Q.    Do you think Kelly was lying about the plunger attempting to strike me and Mata?

A.    That is obvious in the video.

Q.    You don't see him grab it, being Evans, and swing it up like this over to his face?

A.    There is no attempt to overtly strike Constable Smith,

it goes straight out toward Mata is where it goes.

Q.   While he is doing that, did you see Robert Evans holding on to Kelly's right forearm -- Robert, with his left hand, is holding on to Kelly's right forearm.  Do you see that in the bathtub?

A.   Yes.

Q.   And his sidearm is right here, right?

A.   Yes.

Q.   On his right side?

A.   Yes.

Q.   But that wouldn't bother you.  You have said before, there is no intentional act in trying to grab that firearm, correct?

A.   There is no overt attempt.

Q.   Have you ever had anyone with their arm stuck between your groin, applying pressure up into your groin?

A.   I have never put myself in that position.

Q.   My question to you, sir, just let me know if you don't understand it, have you ever had anyone have their arm under your groin?

MS. BATSON:  Your Honor, first I'm going to object to facts not in evidence.  There is no evidence there is pressure on the Defendant's groin.  And it has been asked and answered.

THE COURT:  Sustained.

BY MR. SKIPPER:

Q.   You also said Evans kicked at K9 Mata with his right foot and K9 Mata defended himself.  What about that statement, again, is inconsistent with the video?  That is lie number, you said, 13.

A.   K9 Mata didn't have to defend himself.  He just grabbed the foot as an opportunity.  There was no -- when I look at the video, he got -- there was an extremity that was offered to him, and he took it at that point.

Q.   After he got kicked in the chest.  Your dog would do that, too, wouldn't he?

A.   My dog would have had the suspect way before this.

Q.   We all understand you have got a junkyard dog, and Kelly has a weak dog.  But based on your training, if someone would have kicked your dog in the chest, your dog would have grabbed that foot that just kicked him in the chest?

A.   Probably the lower calf, just knowing the dog.

Q.   Either way?

A.   He would have reacted accordingly, absolutely.

Q.   Pain compliance would have been in full effect, correct?

A.   Oh, yes.

Q.   Okay.  The last lie is number 14.  K9 Mata was released off the apprehension.  You saw on the video where -- and you hear on the video where Kelly tells Austin Milbourn, let me

182

know when I can get him off, right?

A.   Okay.

Q.   Is that a yes?

A.   Yes.

Q.   And then Austin Milbourn says, stand by, right?

A.   Yes.

Q.   And Austin Milbourn and Eric Tuma are manipulating Robert Evans's wrists to try to get him under control and in handcuffs, correct?

A.   Yes.

Q.   And Kelly is actually inside the door frame, right?

A.   That's correct.

Q.   When Mata is around here.  He is literally inside the bathroom?

A.   Correct, yes.

Q.   Upon that click of the handcuff, it is almost instantaneous that Mata pulls that shoe off?

A.   Correct.

Q.   All right.

MR. SKIPPER:  May I have just one moment, Your Honor?

THE COURT:  You may.

MR. SKIPPER:  Pass the witness, Judge.

REDIRECT EXAMINATION

BY MS. BATSON:

183

Q.   Okay.  Mr. Eden when Defense counsel first got up, he asked you about Alvin Gordon's policy being inapposite of case law.

MS. BATSON:  If we could look at Exhibit 24, page 13, please.

BY MS. BATSON:

Q.   Okay.  All right.  Mr. Eden, see where it says "use of force"?

A.   Yes.

Q.   And then (a), (b), (c)?

A.   Yes.

Q.   Are those consistent with the Graham standards?

A.   Yes.

MS. BATSON:  If we could pull up Exhibit 20, page 15.

BY MS. BATSON:

Q.   Okay.  Now, this is the Defendant's use of force policy. And, again, (d), is that consistent with the Graham standard?

A.   No.

Q.   So when Defense counsel says that Mr. Gordon's policy is inapposite of case law, we just saw that was not true --

A.   Correct.

Q.   -- from the first one.

Now, the training records and the deployment

records that you reviewed, those were given to us by the Defendant, right?

A.   I assume so, yes.

Q.   Okay.  The business record affidavit has his name on it.

A.   Yes.

Q.   So any training records we have, came from him?

A.   Correct.

Q.   It is not our responsibility to go get his training records.  He provided them?

A.   Correct.

Q.   And if there is any documentation in -- or no documentation in the records that were provided, that this happened in a small bathroom, there is no way for us to know?

A.   Correct.

Q.   Analyze what you get?

A.   Correct.

Q.   Now, were you in here when Mr. Slavik testified about his opinion about the Defendant?  Were you in here?

A.   I don't recall.  Was that this morning?

Q.   Yes.

A.   Yes.

Q.   Okay.  All right.  And do you recall what he told this jury about his feelings about the Defendant and why he was here testifying?

A.    Yes.

Q.    And what was that?

A.    That he felt that the use of force was unnecessary.

Q.    Now, there was no follow-up question to this, so I want to ask you, there was a line of questioning about certifying the K9 and a question why it was understandable to certify the K9.  And you said it is understandable?

A.    Yes.

Q.    Why the K9 was certified?

A.    Yes.

Q.    Why is it certified or understandable it is certified?

A.    Certifications are very basic.  And a lot of dogs can pass a basic certification where the equipment is being used, the dog will bite and not have any fear of it because the dog has been trained over and over again to bite a sleeve.

It doesn't necessarily mean that the dog will perform well on the street.  That comes through experience and training and additional training.

A certification, regardless of what association it is, is only a snapshot of that moment in time on that day.  A dog may even get lucky and do well on that day, or you can also conversely have a dog that is extremely well-trained and then fail on the date of certification because something goes sour, something goes wrong and the dog doesn't perform like he usually does.

So that is important to note that that is the value and importance behind good records management for any police dogs.  You must maintain a strong and thorough record of all of the training that you do, and you need to be detailed so that it is easily understandable so that you can ascertain how the dog is doing and if there are any issues with that dog.  And if there are, what steps you take to correct those issues.

Q.   Okay.  And then there was a line of questioning about searching and apprehending, and you said I need to qualify it.  Do you recall that?

A.   Yes.  There was a question with regards to a building search, something to do with search and apprehend, I think was -- search, locate, and apprehend.

All right.  The reason I said to qualify that is because it is two different things.  It is not all encompassing as one event, necessarily.

You can send a dog in to search and locate an individual, and then if you have got him trapped and he is there and has no place to go, the dog isn't going to necessarily have an opportunity to apprehend, and it may not be necessary to use the dog to apprehend.  So the dog isn't used for that purpose.

Any time that you deploy a dog for a building search there is a potential for that dog to obtain a bite if

the suspect who is hiding and trying to evade arrest is attempting to -- or is within reach of the dog when the dog finds that person.

But if he is out of reach or he is behind a closed door, at that point you have an opportunity to regroup and then think about your next steps.  But it is two different things.  One is a locating tool.  The other is a compliance tool.

MS. BATSON:  Okay.  If we could pull up the highlighted affidavit, please.

BY MS. BATSON:

Q.   Now, I want to clear up some confusion on number 6 where it says:  He was standing in the bathroom upon entry -- he was standing in the bathroom upon entry in a defensive stance.

Do you see that?

A.   Yeah.

Q.   Number 6.

A.   Yep.

Q.   Okay.  Now, the significance of that statement is what, in your opinion?

A.   To me, Constable Smith clearly sees him as soon as he opens the door.

Q.   Right.  It is not the part about the defensive stance; it was the fact that he notes he was standing in the

bathroom?

A.    Correct.

Q.    Showing that he sees him?

A.    Correct.

Q.    Now, you had stated that at some point that the dog is a liability and that you wouldn't focus on him anymore?

A.    Correct.

Q.    At what point was that?  Was that when he runs out of the room?

A.    Yes.  Any time you end up in a situation where the dog becomes confused and doesn't understand what is happening, that dog becomes a liability.

So unless you have got total control on your dog to be able to do hands off control, be able to manipulate that dog, recall him, put him down, do whatever is necessary to keep him from interfering with what is taking place, then that dog becomes a liability.  And you basically need to go back to work to get the job down so you can then get out and retrieve your dog and put him away.

Q.    So if the dog is weak, that could make him a liability?

A.    Absolutely.

Q.    All right.  And then there was this line of questioning about what the Defendant believed, reasonably believed if he was unarmed?

189

A.   Correct.

Q.   All right.  Now, when you were a law enforcement officer, would you consider yourself a reasonable officer?

A.   I believe I am, yes.

Q.   Okay.  And would you reasonably believe in this situation that Evans was armed?

A.   I would have -- in that situation at the point in time when I am dealing with him that much, I would believe it would be very unlikely if he was armed.  He probably would have brought it into play by now, and there was nothing to indicate anywhere that he was armed.

Q.   Okay.  Again, we have gone over this.  Were there any command to Evans for him to comply with?

A.   No.

Q.   Once they entered the bathroom.

     All right.  Then Evans's finger on the dog's collar, I believe the question was, was that the Defendant's fault, do you recall that?  Was it the Defendant's fault that Evans's finger was on the collar, or something like that?

A.   No.

Q.   Okay.  But if the finger was on the collar, it is in a position where it happened because the dog shouldn't have been deployed?

A.   Correct.

Q.   All right.  Now, before going into the bathroom, the

Defendant says, show me your hands, right?

A.    Yes.

Q.    Do you recall that?

And then at a point or two, Mr. Evans does that?

A.    Yes.

Q.    Okay.  But the Defendant never said, hands up?

A.    No.

Q.    Never said, get on the ground?

A.    No.

Q.    Now, again, on the commands, we don't hear the heel command?

A.    Correct.

Q.    We hear the bite command?

A.    Yes.

Q.    Foogosh?

A.    Fogd, foogosh, both, both.

Q.    And then the hozam, come back?

A.    Correct.

Q.    All right.  Even after Mata had pulled the shoe off and ran out, was the heel command given?

A.    I don't recall.

Q.    Okay.  Was the release command given?

A.    No.

Q.    Now, if someone did swear under oath that a heel command was given, that would be false?  At any point, we don't hear

the heel command?

A.   We don't hear the heel command.

         MS. BATSON:  Your Honor, may I have a minute?  I will pass the witness.

         THE COURT:  Okay.

                    RECROSS-EXAMINATION

BY MR. SKIPPER:

Q.   Mr. Eden, the United States Supreme Court case of Graham v. Connor, there are three factors.  What are those three factors?

A.   Graham v. Connor, the seriousness of the offense that the subject is being arrested for, the danger to the officers and nearby citizens that could be harmed.  I don't have the exact legal terminology.  And the resistance given by the suspect, and basically his attempt to escape, the ability to escape.

Q.   Right.  Nothing about concealment, correct?

A.   Correct.

Q.   All right.  So those two policies, the point is, have concealment in addition to the three factors in Graham v. Connor.  You saw that, right, concealment?

A.   Okay.

Q.   Did you see that?

A.   No.  It is not something that I have paid attention to.

Q.   Well, concealment is verbal non-compliance, correct?

A.   If he is not complying, yes, it could be considered that.

MR. SKIPPER:  That's all I have, Judge.

THE COURT:  Anything further?

MS. BATSON:  No, Your Honor.

THE COURT:  May this witness be excused?

MS. BATSON:  Yes, Your Honor.

MR. SKIPPER:  Yes, Your Honor.

THE COURT:  Okay.  Thank you, sir.  You may step down.

Ms. Batson.

MS. BATSON:  Yes, Your Honor.  At this time the United States rests its case in chief.

THE COURT:  Okay.

All right.  Ladies and gentlemen, we are going to take a short break at this time.  And just if you would stick around and be ready to go in 15 minutes.

(Jury out.)

THE COURT:  Okay.  You may be seated.

Government rests.

What says the Defendant?

MR. SKIPPER:  Your Honor, may I go ahead and make a motion from the podium?

THE COURT:  You may.

MR. SKIPPER:  Your Honor, the Defense now moves for a motion for judgment of acquittal pursuant to Rule 29.

THE COURT:  Okay.  I want to ask you some questions, if you would return to the podium.

So on the four elements on the first count, are you conceding -- would you concede the third and fourth elements under color of law.

MR. SKIPPER:  Under color of law and injury, yes, Your Honor.

THE COURT:  Then what is your position on the first element?

MR. SKIPPER:  Well, the first, when it comes to reasonableness, and reasonableness applies to whether or not there is an actual constitutional violation before you get to the willful component.

We don't believe that, in light of the -- that there is sufficient, credible testimony to send back to the jury at this point, certainly that they could determine it has been proved beyond a reasonable doubt to even bypass that element and get into the willfulness component.  That is our position.

THE COURT:  I'm sorry.  Say that again.

MR. SKIPPER:  We don't believe there has been sufficient evidence presented.

THE COURT:  You think there is not enough evidence

on the first element?

MR. SKIPPER:  Yes, Your Honor, of reasonableness, yes, Your Honor.

THE COURT:  Okay.  All right.

Anything further?

MR. SKIPPER:  No, Your Honor.

THE COURT:  Okay.  Ms. Batson.

MS. BATSON:  Your Honor, I believe that the video evidence addresses the first prong.  You can look at the video and see the actions during the incident.  And it is the best evidence for a jury to find the Defendant guilty.

THE COURT:  Okay.

MS. BATSON:  OF that element.

THE COURT:  Okay.

MS. BATSON:  Okay.  And then did you want me to address the willfulness?

THE COURT:  You may.

MS. BATSON:  Then for the willfulness, Your Honor, the actions during the incident, of course the Defendant recalling the K9 and repeated bite command given to the suspect once he is in a surrendered position, dragging the dog over there to bite him.

Afterwards he filed the false affidavit which shows concealment.  And his background and training and experience also leads evidence to willfulness.  He knows better.

And as far as acting color of law, of course, he was at work, and we saw the pictures, and Mr. Skipper has conceded those.

THE COURT:  Okay.

Anything further, Mr. Skipper?

MR. SKIPPER:  May I just address the willfulness component?

THE COURT:  Sure.

MR. SKIPPER:  Presumptuous on my part for not doing it the first time.  I was just saying that they haven't gotten to the level to go to the willfulness component.

But there is not sufficient evidence, since willfulness is a specific intent crime, of which they have to establish a bad purpose or evil motive at the time that Kelly Smith is specifically intending to do something that he knows the law forbids.  Specifically intending to violate someone's Fourth Amendment right against an unreasonable seizure.

There is not any sufficient evidence to establish -- this is not a general intent crime -- that he is specifically doing something with an evil motive to violate Robert Evans's constitutional rights, of which Robert Evans hasn't even been called as a witness even with that concession, Your Honor.  That's all we have to add to that.

THE COURT:  I'm going to reserve ruling on that motion.

196

Anything further before we break?

MR. SKIPPER:  No, Your Honor.

MS. BATSON:  No, Your Honor.

THE COURT:  Okay.  Let's break for 10 minutes.

(Recess was taken at this time.)

(Jury out.)

THE COURT:  You ready?

MR. SKIPPER:  Yes, Your Honor.

THE COURT:  Mr. Skipper, you ready?

MR. SKIPPER:  Yes, Your Honor.

THE COURT:  Bring the jury in.

(Jury in.)

THE COURT:  Okay.  You may be seated.

First witness.

MR. SKIPPER:  Yes, Your Honor.  The Defense calls Michael Kmiecik.

THE COURT:  Mr. Kmiecik.

(Witness sworn.)

THE COURT:  Be seated.

MICHAEL KMIECIK, DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. SKIPPER:

Q.   Sir, would you please state your name and spell your last name?

A.   It is Michael W. Kmiecik, II, K-M-I-E-C-I-K.

Q.    Where are you from?

A.    I am from Bartlett, Illinois.

Q.    Outside of Chicago?

A.    25 miles west of the city, correct.

Q.    Are you a peace officer?

A.    Yes, I am.

Q.    And how long have you been a peace officer?

A.    I've been a peace officer for -- July 9th of this year will complete my 24th year.

Q.    And are you a nationally-recognized expert in both use of force and K9?

A.    Yes.

Q.    Do you agree with the opinions of the Government's experts?

A.    Absolutely not.

Q.    Let's talk about why.

       You said you are an officer there in Bartlett?

A.    Yes, sir.

Q.    Now, when did you first start, what year was that?

A.    I started in law enforcement in 1995 with the Glendale Heights Police Department, another Chicago Metropolitan suburb, as a community service officer, which is a civilian employee, enforcing municipal ordinances, parking, animal complaints, things like that.

Q.    Did you then transfer over to the City of Bartlett?

198

A.    I do, in 1999.

Q.    Did you work your way into becoming a K9 handler?

A.    Yes, I did.

Q.    And prior to that and even currently, do you belong to a task force, the MFF task force?

A.    Yes.  So I am the K9 team lieutenant for the Northern Illinois Police Alarm System Mobile Field Force, which is MFF part of it.

          We pretty much handle -- as a tactical team, we handle all mass arrests, crowd control, riot control. Everywhere outside the City of Chicago, covering the entire Chicago Metropolitan area from the Wisconsin state line, down to the Indiana border.  Covers about 634 square miles with a population of about 2.1 million people.

Q.    You are one of how many individuals?

A.    On that team, 125.

Q.    Fair to say you have tactical training?

A.    Yes.

Q.    Quite a bit?

A.    Yes.

Q.    Still serve in that capacity?

A.    Correct.

Q.    As far as when you became a K9 handler, do you remember what year that was?

A.    That was 19 years ago, 2004.

Q.   Okay.  And how many handlers do you have in Bartlett?

A.   Currently one.

Q.   How many at that time did you have?

A.   Two.

Q.   Is that about average for a city of 40,000?

A.   Yes.

Q.   Depending upon the resources you have at the time?

A.   Correct.

Q.   Do you remember where you did your training for K9, becoming a handler?

A.   Yes.

Q.   Where was that?

A.   So I started my training at Tom's K9 Kennels, which is in the Chicago northwestern suburbs of the City of Chicago, which is a approved vendor through the northeastern multiregional training.

     We are controlled by the Illinois Law Enforcement Training and Standards Board, which is akin to the Texas Commission on Law Enforcement, or TCOLE, here in Texas.

     And we have mobile training units.  So the northeast multiregional training is one of our mobile training units, so it is approved by the Illinois Law Enforcement Training and Standards Board.

Q.   Okay.  And as far as your training at that particular time in your class, how long was your training, your K9

training?

A.   It was 380 hours, which is about eight weeks of training.

Q.   Similar to Houston K9, about eight or nine -- about nine weeks, right?

A.   Correct.

Q.   Now, going back to your multidistrict task force, are a majority of your callouts to other agencies?

A.   Almost exclusively they are.  As well as my K9 jobs, almost exclusively are.

Q.   And do you have a single-purpose or a dual-purpose?

A.   Right now I have a multipurpose.  He is trained as a patrol dog, which is an apprehension dog, which we have heard a lot about over the last couple of days.

     He is also a narcotic contraband detector dog looking for drug odors.  And he is a cadaver, or human remains detection dog, as well.

Q.   So in addition to being a narcotics, apprehension, tracking, officer protection, and you also have him now qualified as a cadaver dog?

A.   Correct.

Q.   You would help families find the remains, perhaps, of their loved ones, correct?

A.   Correct.

Q.   Now, do you know of an individual named Terry Fleck?

A.    Yes, I do.

Q.    Who is Terry Fleck?

A.    Terry Fleck was my mentor.  He was the leading expert in the United States on K9 case law and K9 standards throughout the United States.

Q.    And did he pass away a few years ago?

A.    In March of 2019, he passed away, yes.

Q.    And who assumed his role as being the case law authority for K9s across the country?

A.    I did.

Q.    Would you explain how that process took place?

A.    Sure.  I was basically Dr. Fleck's hand-picked successor because he knew that he was ill and wanted to kind of keep his legacy going.

He ran a, for lack of a better term, a law library, for K9 case law throughout the United States.  And he would go out and instruct K9 handlers throughout the United States on K9 search and seizure-related issues.

He had asked me to the take over that position after his passing, and that's what I did.  And we have grown and expanded that in my company, which is Sheepdog Guardian Consulting.

Q.    And as the owner of Sheepdog Guardian Consulting, do you provide members with monthly mailers?

A.    Yes.

Q.   That I am holding up here, for example?

A.   Yes.

Q.   And do those mailers contain K9 use of force, search and seizure, supervisor liability case law from the Supreme Court of the United States to a member's particular circuit, to the state --

A.   Yes, we --

Q.   -- and their particular discipline.  Go ahead.

A.   Yes.  We track all K9 case law, regardless of the discipline, whether it be patrol, a narcotic, cadaver, supervisory issues.  We track that case law, and we keep it. It is the most comprehensive of K9 case law.  We keep that on an online website so our members have access to it.

          As part of that, we do send out the monthly newsletter that updates handlers on the latest case law that have come out over the past month.

Q.   Okay.  And K9 handlers and other peace officers will pay a monthly subscription to access that information, right?

A.   Yes.

Q.   And to also access your web page?

A.   Correct.

Q.   Your often give discounts to peace officers?

A.   We do.

Q.   Did you do it for all of the USPCA members out there?

A.   Yes.  We were contacted by the executive director of the

United States Police Canine Association, Mr. Don Slavik, who wanted to get the USPCA members a discounted rate on information from our website, our newsletter.

Q.   And how much of a discount did you agree on?

A.   50 percent, so $25 a month.

Q.   So it is normally $50 a month --

A.   I'm sorry.  $50 a year.  So it is $25 for the year.

Q.   I'm sorry.  $50 a year, go to 25.

Now, with regard to your ownership of Sheepdog Guardian in taking over Dr. Fleck, did you also expand into consulting and auditing?

A.   Yeah.  So we have some additional services.  We do policy consulting for K9 units across the United States.  We also do auditing for K9 units across the United States.  We have some notable clients, the United States Department of the Interior, National Parks Services.

I consulted with them to write their K9 policy -- or rewrite their K9 policy, as well as United States Department of Interior, Fish and Wildlife, consult with them to rewrite their K9 certification program.

So those are some other services that we provide.

Q.   Okay.  And is it fair to say that you are very beneficial to an industry like this that has no uniformity, so to speak?

A.   We try to be, yes.

Q.    National standards is what I am saying.  There is no national standards for the K9 industry, right?

A.    There are no national standards.

Q.    Okay.  Now, you mentioned that you are often asked about audits.  How does that work?  Will an agency reach out to you for training to review written curriculum or training protocols?  Just give an example of how that would work.  Hey, can you train our new K9 officers?

A.    So we don't do the training aspect of it.  What we are looking for is, while there is no national standard, we do have some standards that we have throughout the industry, primarily that come out of the courts.

So we are adjusting and adapting to court rulings and things of that nature.  There are some organizations that are out there currently, scientific organizations, that are like a think tank group of organizations.

It started back actually in 2001, 2003 in that area with the Scientific Working Group on Dogs and Orthogonal Detector Guidelines, known as SWGDOG.  Dr. Fleck and some other notable industry people were part of that.  And the goal of that think tank group was to provide best practice standards for detector dogs across our industry.

In 2014 that funding ran out, and that was picked up by the National Institute of Standards and Technology.  And there are subcategories, the Academy of Standards Board,

which I am an observer on, as well as American Academy of Forensic Sciences, and the American National Standards Institute, also known as ANSI.

And it is the same concept. What they basically did is they took the 39 approved guidelines from SWGDOG, and they are trying to revalidate them from a scientific validation standpoint to try to come up with these best practice standards for the industry.

Q. And that's in an effort to help people get better, right?

A. Correct, yes.

Q. Make sure they are doing it the best possible way?

A. Right.

Q. You try your best, right?

A. Yes.

Q. Now, do you go to different states throughout the country upon request of these agencies?

A. I do. So -- and the policy consulting, the K9 audit side of things, what we do is we try to we look at their K9 teams policy. We look at the training records, deployment records, and then provide recommendations that are best practice in order to improve their unit, improve their policies, and improve their training records and deployments.

Q. Okay. Have you visited Texas?

A.   I have -- I am down in Texas quite a bit.  As a matter of fact, Texas is one of our largest accounts.  I have done K9 unit auditing here in the State of Texas.

Also, we -- I teach K9 search and seizure across the United States.  And we do a lot of teaching here in Texas.  And the officers that come to our seminars, our classes, get continuing education credit through the Texas Commission on Law Enforcement, TCOLE.

Q.   Okay.  And you are going where I am going.  We use this acronym called TCOLE, right?  And that is the Texas Commission on Law Enforcement, and that is just the -- like the accrediting agency just like you would have there in Illinois, right?

A.   Correct.  It is the governing board for law enforcement in the State of Texas.

Q.   And you report your continuing legal education hours to, and things like that?

A.   Correct.

Q.   Okay.  Maintaining standards and practices and everything that allows you to maintain a badge right?

A.   That's correct.

Q.   Be a certified peace officer?

A.   That's correct, yes.

Q.   Okay.  I want to talk about tactics in response to what we have heard throughout this trial as a tactical expert

before we get into the use of force part.

And before I do that, I want to ask you about whether or not you are a certified analyst with Force Science.

Q.   I am.  I am a -- in July of 2022, I was certified as a Force Science analyst.  I am also certified as a use of force instructor.  I'm trying to remember.  I think that was back somewhere between 2010 and 2012.

In 2018 I went to the Human Factors Research Group, Threat Pattern Recognition Use of Force Instructor course.  That was formerly known as Pressure Point Control Tactics, or PPCT?

Q.   Give us a summary of what Force Science Institute does with regard to brain activity reaction time in this current arena that we are in with regard to law enforcement?

A.   Yeah.  So Force Science, what they do is they research from a scientific standpoint the human factors that go into officer use of force.

And the concepts that are being used by Force Science, they are not groundbreaking concepts.  This isn't new science or anything.  What they are doing is applying sciences from elsewhere into the human component of police officer use of force.

A lot of it, as the Government experts, Jerry Staton said, comes from sports because of the human factors

behind sports. It comes from psychology. It comes from a whole host of sciences. And basically to apply these human components, not just for movement, right, the study of how things move, which is biomechanics, not just the actual physical component, but the psychological component, the memory component, all of that that goes into a police officer's use of force.

Q. And an example which could be something called "delayed reaction time" where an officer, it would appear on a video might shoot someone as they are turning away or as their back is facing them, and that is because of the way the brain processes an action, there is a delayed response. Correct?

A. Correct. And how Force Science -- that is their groundbreaking, that is their groundbreaking sciences. They have actually done the published studies as to the timing as to how offenders move versus the timing as to how police officers can react.

And a lot of that comes from our average citizenry, right, how fast can the average person react? How fast can the average person pull a firearm on a police officer and then turn to run away?

And when the officer reacts to that, you know, where would those bullets be placed if the officer shot? So those are the type of things that they kind of research.

Q. Okay. And as a certified Force Science analyst, are you

familiar with the terms "mis-sequencing" and "slips and capture error"?

A.    Yes.   Those aren't specific to Force Science.   That is not new research.   Slips and capture errors has been researched by the psychological community extensively.   We look at it in the airline industry.

So let's just talk about slip and captures, if I may.

Q.    Yes.

A.    A slip and capture error is when there is a slip between thought and action or a slip between a thought and your verbal communication.

So every person in this room has experienced slips and capture errors in their life.   It is not uncommon.   I do a lot of traveling.   I rent cars.   I go to different locations.   I get into an unfamiliar car.

If you have ever been inside an unfamiliar car, you go to stick the key where you think the ignition would be because that is where it is on your car, but it is in the incorrect spot.   Because it is just -- your brain slips -- your brain tries to initiate an action, and then it slips off the rails, and it goes to a more stronger action that has been reinforced.

So that would be an example of a slips and capture.   We have all seen videos or heard things where police officers

had inadvertently pulled a taser -- I'm sorry, pulled their firearm thinking that they were pulling a taser.

That is a classic example in law enforcement of a slips and capture error.  The brain went to initiate the motor function to pull the taser, but slipped off the rails and initiated a more stronger action, that drawing of the firearm.

So that would be a classic example of a slips and capture error.

Q.   Okay.  And the response to that in law enforcement community years ago was to start trying to promote what is called a cross draw for the taser, correct?

A.   Yes.  Because when tasers, I am an Axon instructor. Axon International is the parent company to TASER.  I'm a TASER instructor.

When tasers first came out, the officers -- a lot of officers were carrying their tasers on the same side as their firearm in like a drop holster.  So rather than grabbing the taser, which we don't have as much training for typically than our firearms, they would grab their firearm instead of their taser.  So the thought slips off the rail to the action.

Q.   Captured through the action?

A.   Captured through the action, correct.

Q.   Now, let's talk about mis-sequencing, okay?  Explain

this concept to the jury.

A.   So mis-sequencing, this is a memory issue.  Our brains just do not record like a video camera.  The way that our brains work is, it is taking small little snapshots and kind of stitching things together.  That's our memory.  Memory has to be encoded.  So this is about memory recall, mis-sequencing, right?

And when we are under stress, our brains aren't necessarily encoding all of the information.  And so when we try to recall that information at a later time, we sometimes will mis-sequence certain events that occurred.

We had a situation, I was the officer in charge during a DUI enforcement detail.  Back in my department, we had a big steroided guy come up into our booking room under arrest, and he started fighting with us.  And there were seven of us in there.  There was multiple taser deployments.  There was pepper spray flying all over the place.  People grabbing here, and people grabbing there.

I went back and wrote my report.  You know, I did it while it was fresh.  We didn't have body cams or anything at that particular time.  Wrote the entire report out.  When I pulled the booking camera footage of it and compared it to my report, almost the entire sequence was off.  Who grabbed what body part, who sprayed, who tasered, and where that taser deployment went.

The brain just doesn't remember certain things. Because what happens in -- when we are focused on something very intently, what happens is, is we don't see out of our peripheral because it is not important to us.  Right?  The brain says, this is not important information, so I am not going to take it in.

In many cases it actively suppresses information that is unimportant to us.  So that is why you would see officers who write a report and it doesn't seem to match up with the body camera footage of it and things like that. That would be an example of mis-sequencing.

Q.    Okay.  Chaotic situation, combined with stress, cortisol and adrenalin spikes?

A.    Well, it doesn't even have to be chaotic situation. Because we get into -- again, this is not new science.  We get into something called inattentional blindness.

Inattentional blindness comes in when you are intently focused on a particular object, right?  So it is also known as perceptual narrowing.

And what happens is, like, if you were at the movies and you are sitting in the front row there and you have the big, huge movie screen in front of you and you are watching this movie through a paper towel tube, right, you are seeing only bits and pieces of it.

And the Government expert Jerry Staton brought up a

very, very common study that had come out.  It is the gorilla study.

I don't know if you guys recall, but they have a video that is out there, and there are three basketball players wearing black and three basketball players wearing white.  And the participants were asked, follow -- tell us how many times the white team passed the ball to each other.

And as you are focused, intently focused on counting how many times the white team passed the basketball back and forth, a gorilla -- a man in a gorilla suit walks into the frame, dances around, and then walks off of the frame.

And what Jerry Staton said is exactly the same thing that happened in my Force Science class, which was 95 percent of us did not see the big gorilla walk in because we were intently focused on the task in hand.

That is a non-stressful situation.  We are sitting in a classroom.  There is no threats.  There is no high stress.  All we are doing is sitting there focused on a screen, and we are trying to count basketballs.

THE COURT:  I am going to stop you for a minute.

Counsel, please approach.

MR. SKIPPER:  Yes, Your Honor.

(Bench conference.)

THE COURT:  I would ask you to tighten this up a

little bit.  These long, narrative answers are tiring.

MR. SKIPPER:  I will tighten it up, yes, sir.

THE COURT:  Thank you.

(Bench conference concluded.)

BY MR. SKIPPER:

Q.   Mr. Kmiecik, getting back on the gorilla example, just to tighten this up, is it important, or as you are explaining, that even in your environment watching it with students, the gorilla example, right, that is a non-stressful situation in which you are watching the gorilla -- pardon me, you are asked if you remember seeing the gorilla in the least stressful moment possible, and a lot of the people miss seeing the gorilla.  Correct?

A.   High percent.  95 percent, yes.

Q.   Which I want to link back later, because the Government's expert brought this up, the basketball passing with the gorilla, to explain the Government's theory of this case when Kelly Smith's hands are on Robert Evans's shoulders in the bathtub and Kelly Smith gets distracted and focuses on the bridge of that door.  Right?

A.   That's correct.

Q.   And so is it fair to say that Robert Evans is the gorilla in the bathtub in this case?

A.   Yes.

Q.   Okay.  And I want to circle back to that point later.

All right?

Let's -- I want to do this by chapter.  From a tactical perspective and then we will get into the Graham v. Connor and use of force continuum.  Okay?

Tactically, you mentioned that the task force that you are on now, you are one of 126 officers.

A.    125, yes, sir.

Q.    125.  How many square miles do you cover?

A.    About 634.

Q.    It's a large area?

A.    It is.

Q.    And if you are requested to come to a scene, right, for assistance, do you expect the chain of command?

A.    Yes.

Q.    Do you expect there to be some type of supervisor on scene within that municipality or county in Illinois that you are assisting with?

A.    So, yes.  The agency that our team goes to assist always retains the ultimate authority as to how to best handle the situation.  We might give them options.  They retrain the authority as to which option they want deployed.

Q.    Okay.  And I want to apply this example here, just to move this up to July 25th of 2022.  Were you asked and requested to provide an opinion in this case with regard to Kelly Smith?

A.    Yes, I was.

Q.    Okay.  Let's jump into July 25, 2022, on a Monday.  And I will ask you, when this incident happens and you see Kelly Smith arrive, let's just start there from that point.  Upon Kelly Smith's arrival, what occurs?

A.    So from what I saw on the body cams and through my review of the material, Constable Smith exits his patrol car. He is still down by the road.  And he asks the Acting Chief of Police of the Hawkins Police Department, Eric Tuma, if he needs a dog.

Q.    Okay.  And what does Acting Chief of Police Tuma say?

A.    He responds, we might need a dog at that particular point.  And then he says, why don't you get him?

Q.    So Kelly Smith didn't exit his vehicle with the dog?

A.    Correct.

Q.    Kelly Smith then goes back to his vehicle and gets the dog?

A.    He does.

Q.    Then what happened?

A.    At that point -- in reference to Constable Smith?

Q.    Yes, Constable Smith is coming down the driveway.

A.    Right.  So Constable Smith meets with Sgt. Austin Milbourn of the Wood County Sheriff's Office, and they have a discussion, a quick briefing.  Sgt. Milbourn gives Constable Smith a very 10,000-foot overview of the situation.  And they

begin to walk, and they meet with Acting Chief Tuma.

Q.   Okay.  There is a felon there --

MS. BATSON:  Your Honor, object.  This is direct examination.  So he needs to ask questions.

THE COURT:  No leading.

MR. SKIPPER:  Yes, Your Honor.

BY MR. SKIPPER:

Q.   When he walks up, "he" being Kelly Smith, what happens next?

A.   As Constable Smith walks up to Acting Chief Tuma, he has got Sgt. Milbourn with him.  He has got K9 Mata with him.  And there is an individual by the name of Justin Graham that is standing with Acting Chief Tuma.  And they begin to discuss the scenario, what is transpiring at this time.

Q.   Okay.  Is that important to have some type of operational plan, whether formal or informal?

A.   It is vital.

Q.   It is vital because of officer safety?

A.   Well, it is vital, not just because of officer safety, but also for safety of the offender, for safety of the others that might be in the area as well.

Q.   And based on your training and experience, what do you expect to obtain in that briefing from the Acting Chief of Police and person in charge of that location?

MS. BATSON:  Your Honor, I am going to object to

speculation.

THE COURT:  Overruled.

A.   So you would expect in these briefings as your getting the entire information as to what is going on -- and when I say the entire information, I am saying of not just who the offender is, what crimes are they wanted for, we also want to know, what is the background?  What is the criminal history of this individual?  Are they known to be armed?  Have they ever been armed in the past?  What is the history of why we are there?

Q.   Right.

A.   So we are looking at the entirety of the scene, the totality of the scene.

Q.   Now, please tell the jury what happens next during this debriefing?

A.   During this debriefing, what I observed is we have a perimeter established around Mr. Evans's single-wide trailer. They inform Constable Smith that they had seen him and that he had locked himself inside there.

As this is going on, there is some other information that is coming in from another police officer that was on the scene about a dog being in the back.

And they -- Sgt. Milbourn from the Wood County Sheriff's Office asks Constable Smith and Acting Chief Tuma, how do you feel about a building search?

Q.   And what is the response to that?

A.   And Acting Chief Tuma said yes.

Q.   Okay.  Is there also an instance where the channel is closed?

A.   Yes.  So once it is determined that Constable Smith confirmed after that point that there was nobody else inside or nobody else would need to be inside, innocent parties, Sgt. Milbourn asked if Constable Smith wants him to do K9 warning announcements.

     And as Sgt. Milbourn walks up to the trailer to give these K9 warning announcements, he gets on the radio and he asks the dispatcher to close the channel.

Q.   And before we get to that point, did you ascertain if Kelly Smith, in fact, confirmed whether or not there was a felony warrant?

A.   Yes.  During that briefing, Constable Smith directly asks, there is a warrant.  He said yes.  He says it's a felony warrant.  And both Sgt. Milbourn and Acting Chief Tuma confirm that there is a felony warrant, not just a felony warrant, but felony warrant for violence to a child.

Q.   And it is important that you know the specifics of that, correct?

A.   It is.

Q.   Because there are different kind of felonies, right?

A.   Right.

Q.   Okay.  I interrupted you when you said the channel was closed.  What is the significance of closing a channel?

A.   So for -- one of the things we have learned from September 11th in law enforcement is communication is vital. And communication always breaks down.

So when a police officer gets on the radio and asks for that radio channel to be closed, that is significant because that is a perceived emergency that is happening, or there is some type of perceived need to keep the channel clear so officers who are on scene have immediate communication with each other.

Q.   Just with the perimeter -- the team on scene, correct?

A.   With the team on scene, and with the dispatcher for medical response, other assist agencies, and things like that.

Q.   Right.  The outer teams that are coming into that scene there?

A.   That's correct.

Q.   Now, you mentioned the K9 warnings, correct?

A.   Yes.

Q.   Do you recall who issued those K9 warnings?

A.   Sgt. Milbourn did.

Q.   Was there any issue, based on your training and experience, in the words used in the K9 warnings?

A.   No.  Those warnings that were given by Sgt. Milbourn

were consistent with what we would expect to see in our industry.

Q.   And then what happens next?

A.   At that point the officers decide that they are going to breach, and they come up to the east entry door to the residence.  And they check to ensure to see if it was locked or not.  And they were unable to gain access to the interior.  So they began kicking in at the door.

Q.   And who were the officers you are discussing?

A.   So up at the door was Constable Smith with K9 Mata, as well as Sgt. Milbourn.

Q.   And is there another individual -- if I am looking at the trailer at Kelly and Austin, to their immediate left on the south side of the trailer, is there another individual there?

A.   So the south perimeter officer would have been Constable McQueen.

Q.   Did you notice, observe, or hear anything when you reviewed his body camera?

A.   Yes.  So a couple of notable things.  As the K9 announcements were being made, you could hear the K9 announcements on Constable McQueen's body camera.  He would have been the furthest officer away from that where the K9 warning announcements were made.

         I also heard some type of a phone call announcement

from a Cheryl Evans.

Q.   Did you learn during the course of your review, that Robert Evans's mother is named Cheryl Evans?

A.   I did, yes.

Q.   Based on your training and experience as a tactical officer and expert, would that have been information that should have been shared at that time?

A.   That should have been shared immediately.

Q.   Had it been shared, very possibly you wouldn't be sitting in this chair right now?

A.   That is very possible.

Q.   So getting back to the porch, it is Constable Smith and Deputy Milbourn, correct?

A.   Correct, yes.

Q.   And who is doing the kicking?

A.   The initial kicks were by Sgt. Milbourn.

Q.   Okay.  And is Sgt. Milbourn successful, or does someone else have to come in?

A.   No, as he is kicking, he is trying to do a rear donkey kick to this door unsuccessfully.  And then he turns around and does some front thrust kicks to the door.

And as he is doing this unsuccessfully, Constable Smith calls out for Constable McQueen.  He asks him, hey, John can I get a leg?

Q.   And does John McQueen do that?

A.    He does.

Q.    How many kicks, to the best of your recollection, does Constable McQueen do?

A.    There were 28 total kicks, and I believe that Constable McQueen had three of those.

Q.    Before the door is breached?

A.    Correct.

Q.    Do you have an approximate time from the minute that Robert Evans stuck his head out to Tuma and Newell, from the moment John McQueen breached that door?

A.    Approximately just shy of 22 minutes.

Q.    Okay.  And what happens next as the door is breached?

A.    As the door is breached, we see Constable McQueen step back, and there is a black pit bull mix dog that immediately presents itself at the threshold of this breach point or this entryway.

Q.    Okay.  And what happens with the pit bull?  As far as once that is breached, the door, and you see the pit bull, does any officer or officers draw their firearm?

A.    Yes.  Sgt. Milbourn had his firearm out, which is significant.  Because, to me, that is a police officer who perceives a threatening situation.  We don't take our guns out for light and transient causes.  So he perceives that there is some type of a situation going on before -- he announces -- there is an announcement made, police K9, right

there at the threshold.  And then they see this dog.

They yell out dog, dog, dog, which is communicating with each other to make sure they don't have a situation between K9 Mata and this pit bull that is there.

Q.   And does Deputy Milbourn do something with that K9?

A.   Yes.  Sgt. Milbourn, reaches in and grabs ahold of the black pit bull, and brings him out of the house and eventually hands him off to Justin Graham, who is still kind of on the northeast side of the trailer there.

MR. SKIPPER:  May I approach, Your Honor?

THE COURT:  You may.

A.   Thank you.

BY MR. SKIPPER:

Q.   Is Justin Graham the one handcuffed behind his back?

A.   Yes.

Q.   And where is Adam Newell at this time?

A.   Adam Newell is a police officer with the Hawkins Police Department.  He was watching the northwest perimeter side of Evans's trailer.  And he begins at that time when the dog comes out.  And Sgt. Milbourn is kind of trying to hand off the dog to a handcuffed Justin Graham.  That is when Newell starts to make his way kind of over to that particular area.

Q.   Okay.  And let's go back to the breach point.  We saw a video here today with the big arrow and with Kelly's body

camera.  And I want to get into body camera footage.

And while that may be the best we have, that is not always indicative of what the individual is seeing, based on an objective reasonably officer -- objective reasonable officer standard under the totality of the circumstances.

Could you explain this for us?

A.    Sure.  The body cam is a two-dimensional depiction from where the body cam is actually positioned.  And it is a double-edged sword.  It does give us an idea of generally what is occurring at this particular scene, but it does have significant limitations to it.

Body cam videos, they see better in light than the human eye does.  It doesn't pick up if the officer were turning his head to look this way or this way.  Those perspectives would obviously not be seen or be presented within that body cam footage.

Q.    Did you say the body cam sees better in certain situations than the human eye?

A.    Yes.  In lower light or darkness, the body cam -- the body cam images tend to see better than what the human eye would see, yes.

Q.    Well, on that point, is it fair to say that is quite inconsistent with what the previous witness testified to, that seven-second gap, correct?

A.    Absolutely.  Completely different.

Q.   Once -- let's go back to the -- Milbourn is in the yard, right?

A.   With the dog, we are talking?

Q.   Yes.

Let's just start where Kelly calls for cover.  What do we see Milbourn doing as he comes in?

A.   So as Sgt. Milbourn enters into Mr. Evans's trailer and begins to work his way down the hallway, we see Constable Smith and we see K9 Mata and then we see Constable McQueen standing kind of towards the end of that hallway there.

Q.   At any point did the on-scene commander, Eric Tuma, prior to the breach, come on the porch and say, no, I don't want you to do this?

A.   There is no officer that is on the scene that ever objects to anything that is occurring here.  Sgt. Tuma, Acting Chief Tuma, does not.  Constable McQueen does not.  Officer Newell does not.  Sgt. Milbourn does not.  There is nothing on any of the body cams where there is any police officer on scene objecting to it.

Q.   Does Illinois carry a similar statute regarding an officer's duty to interfere and assist his fellow officers?

A.   Yes.

Q.   Now, can you -- can an on-scene commander delegate accountability?

A.   No.

Q.    What is the definition of a building search?

A.    So a building search is to search, locate, and apprehend, in terms of K9.

Now, there are two schools of thoughts as to the way the dogs are trained.  One methodology is in a bark and hold, and the other methodology is in a bite and hold.

About 70 to 80 percent of our dogs in the United States are trained in the fight and hold methodology versus the bark and hold methodology.  So the majority of our dogs are trained when they are commanded to search an area or building that if they can locate the offender inside and they have access to them, that they would, in fact, bite them.

Q.    And if your definition of a building search and what you just explained includes search, locate, and apprehend, the latter word being "apprehend"?

A.    Correct.

Q.    You would expect that dog to apprehend, correct?

A.    Correct, bite.

Q.    Doesn't apprehend with his claws, does he?

A.    It does not.

Q.    Now, I want to first play you the video of the body camera video of Constable Kelly Smith.  Let's walk through that, okay?

A.    Okay.

MR. SKIPPER:  Your Honor, this is Exhibit 4,

Government's 4.

(Video played and paused throughout this portion.)

BY MR. SKIPPER:

Q.   Now, you have heard the testimony of Robert Eden from Canada?

A.   I did, yes, sir.

Q.   Do you agree with his opinion regarding the placement of Robert Evans's hands here, that he was trying to surrender?

A.   No, this is not a surrender position.  I do not agree with that opinion.

Q.   Is this position consistent with what Kelly Smith put in his affidavit?

A.   This is a defensive resistant, active resistant posture.

Q.   Now I am playing the video, and I know I paused it, but why is it problematic to do use of force cases with still shots?

A.   The Axon body cam records at a frame rate of 30 frames per second.  So when you are looking at one frame you are looking at one-thirtieth of a second in time and space.

And use of force events don't happen in isolation like this.  They happen in their totality.  So looking -- you are looking at one-thirtieth of a second in time and space here.

Q.   Okay.  And please tell the members of the jury why your

opinion is this is some type of defensive resistance?

A.    Sure.  As a defensive tactics instructor, what we would want to see is somebody who has their body weight over their center of gravity.  They want the center of gravity.

So when somebody is getting ready to fight or go into some type of active posture, what we would see is you are going to see a drop in their center of gravity.  We have this leaning forward and towards, which is what is depicted here.

Q.    Have you ever heard the phrase touch the sky, hands up?

A.    That would be consistent with surrender.

Q.    Just for the record, you are sticking your hands straight up in the air, correct?

A.    Straight up in the air, yes, sir.

Q.    Is that what Robert Evans is doing here on this body camera footage?

A.    No.

Q.    What is just below Robert Evans's two hands right there?

A.    That would be K9 Mata's head.

Q.    What am I showing you right here on the screen?

A.    Right there you could see Robert Evans's hands on top of K9 Mata.

Q.    Okay.  And we also see -- what am I pointing at right

here?

A.    So that would be Constable Smith's leash.

Q.    Do you recall Bob Eden's testimony about the leash?

A.    Yes.  So in the industry, a lot of handlers keep their leashes wrapped up kind of up the back of their neck.  Some keep it up around their waist.

Now, there has been a push, over the last several years, for officers to stop wearing their leashes up there.  I just disagree with this.  This is exactly how I wear my leash when I am working.

The reason they say you shouldn't do that is somebody can grab it, right, and pull you.  But I am wearing an outer vest carrier that has my ballistic vest in it.  They can do the same thing and grab it.  So I just disagree with the safety concern that is alleged by that.

Q.    You wear your leash just like Kelly wears his leash?

A.    Identical.

Q.    There is also a follow-up here that we will see in the bathtub of where the leash is, according to Bob Eden, around his neck, being Robert Evans.  Do you remember that?

A.    I do remember that, yes.

Q.    Is that what you see in the video?

A.    I do not see that, no.  I don't see it around Robert Evans's neck, no.

Q.    What do you see in the video?

A.    I see the slack in the leash draping down as Constable Smith bends down.

Q.    If someone hit your dog in Illinois -- pardon me.  If someone grabbed your dog's equipment where you work in Illinois, would you be justified in striking that perpetrator?

A.    Yes, absolutely.

Q.    Your dog is your partner, right?

A.    Correct.

Q.    What do we see here on the lower right where I am circling?

A.    You see Robert Evans's hand grabbing ahold of K9 Mata.

Q.    Okay.  Fair to say at this point he has been struck multiple times by Constable Smith?

A.    That's fair, sure, yes.

Q.    When testifying in use of force cases, when analyzing use of force cases, do you ever compartmentalize when you give an opinion, or is it necessary under the law to give an opinion based on the totality of the circumstances?

A.    Right.  Just as other experts have said up here on the stand, the controlling standard in the United States is Graham v. Connor, which is a Supreme Court of the United States' decision that was rendered in May of 1989.

        And those standards require that we look at the severity of the crime at issue.  We look at whether the

suspect poses an immediate threat to the safety of officers or others.  And whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

As part of that analysis, we are to look at it from the perspective of the reasonable police officer on the scene without the benefit of 20/20 hindsight.

Q.   Okay.

A.   In its totality.

Q.   In its totality.

And I didn't hear you say concealment as a part of the U.S. Supreme Court standard in Graham v. Connor?

A.   The concealment of a suspect.

Q.   Well, you saw these two policies here, in particular, that added an additional item to consider, and that is concealment, right?

A.   Correct.  I think that was an extension of the active resistance is what I think it is, no more than that.

Q.   Sure.  Poor question.

These policies went a little bit above and beyond what Graham v. Connor includes in their elements, correct?

A.   Yeah, I agree with that.

Q.   And concealment could be verbal non-compliance, right?

A.   That is correct, yes.

Q.   You have heard one individual say yesterday that, in fact, that policy would be unconstitutional.  And you heard

Mr. Bob Eden say today that is contrary to U.S. Supreme Court precedent, right?

A.   Yes, I absolutely disagree with both of them.

Q.   And tell us why you disagree with both of them.

A.   Well, as an individual that tracks K9 case law, the circuit court of appeals are split on this particular issue because it does come back to the active resistance.

Some of the circuits say that willful non-compliance, verbal non-compliance, is actively resisting arrest.  Some of the circuits say it is not.  Some of the circuits haven't even opined on it as it relates to dog deployment issues.

So to give a carte blanche this is unconstitutional, I simply disagree with that because there are federal circuit courts on here that say, in fact, it is constitutional.

Q.   Now, here I am showing you this photo, a bit blurry, but what am I circling here?

A.   That is K9 Mata and an arm.

Q.   And what about on the floor here.  We have never gone over -- are there items strewn about the floor there?

A.   There are tools strewn throughout the floor, which is consistent with what Mr. Justin Graham had told the officers prior to their entry.

Q.   The guy that came out of the house with a pipe wrench?

A.   That is correct, yes, sir.

Q.   What is a weapon of opportunity?

A.   A weapon of opportunity could be anything.  Anything that is right there and that the person might have access to.

Q.   Did you ever see these guys search Robert Evans?

A.   No.  There was no mention of that, nor did I see it on the body cams.

Q.   Now that I am on that topic, as a tactical expert, why is that important?

A.   Well, you want to make sure that the person is unarmed. So until that person is searched for weapons, we don't know if they are armed.  That is a key element to the second Graham factor, is this person an immediate threat to the safety of officers or others.

       I take people as you are armed until I determine otherwise.  Right?  I patted you down and searched you for weapons.

Q.   Is it fair to say you don't just take their word for it?

A.   No, I do not.

Q.   You have seen situations where people have been ambushed on their word alone?

A.   Yes.

Q.   You heard Bob Eden that he would assume by that point

that Robert Evans had no weapons on his person because he is wearing a pair of shorts.  Did you hear that?

A.    I did.

Q.    What is your opinion about what he said?

A.    I absolutely disagree with him on that.

People conceal weapons in many, many places. Shorts -- just because somebody has shorts on does not mean that they are unarmed.

Q.    Okay.  And what do we see here?  You can see this on your screen, I am circling?

A.    So that is Mr. Evans standing with one foot in the bathtub and one foot out of the bathtub.

Q.    Are there items and other things that are in the bottom of this bathtub?

A.    Yes, there are.

Q.    Okay.  What did you now just see there?

A.    In terms of Mr. Evans's foot?

Q.    Yes.

A.    Mr. Evans's foot is -- the right foot that had been outside of the bathtub is actually canted up on his toes as if he is moving it into the bathtub.

Q.    Okay.  And what do you see right here?

A.    So right here I see an individual, Mr. Evans, bracing himself -- or using the bathtub to brace himself into -- to get a position of stability.

Q.   Is that a tactical advantage?

A.   Yes.  Any time somebody elevates their position over a police officer, that would be a tactical advantage over that officer.

Q.   What am I circling right here?

A.   That would be the wooden handled plunger.

Q.   The Government has made light of our position on that. Do you agree with the Government's position that this was merely just something to poke at Kelly with?

A.   No, I disagree with that characterization.  In the video I see when Robert Evans grabs it, he swings it in an upward manner towards K9 Mata.

Q.   Just because you grab an instrument that could be a deadly weapon less than one second --

        MS. BATSON:  Your Honor, can Mr. Skipper go back to the podium like you told him?

        THE COURT:  I'm sorry?

        MS. BATSON:  Ask his questions at the podium.

        THE COURT:  Generally, you need to be at the podium.  If you are running your video, I will give you that leeway.

        MR. SKIPPER:  May I ask for permission?

        THE COURT:  You may.

BY MR. SKIPPER:

Q.   Now, what is coming toward Kelly Smith right here?

A.   That would be Mr. Evans's left foot.

Q.   Did you see that?

A.   Can you back that up again?

Q.   In the frame where Mr. Evans picks up his left foot, you can see it on your monitor to see where it goes.

Can you see what I am circling right here?

A.   Yes.

Q.   Did you see that?

A.   I did see that, yes, that is Robert Evans's kicking K9 Mata in the face with the heel of his shoe -- the sole of his shoe and the heel.

Q.   On Kelly Smith's body cam, correct, does the foot strike the body camera?

A.   Correct.

Q.   Watch the -- what are you seeing here on the screen?

A.   So what happened is, is just as that kick comes in, you can actually see that body camera go back.  And then you see Mr. Evans reach down and pick up the plunger and is swinging the plunger upward.

Q.   And what is upward?

A.   Upward is where K9 Mata is.  It is also where Constable Smith is in proximity.

(Video stopped.)

Q.   Officer Kmiecik, now I want to show you the shortened video.

238

MR. SKIPPER:  I believe this is 1B, as in boy, Your Honor.

(Video played and paused throughout this portion.)

BY MR. SKIPPER:

Q.   What was that that just passed in the picture here?

A.   I'm sorry, I didn't see it.  If you could back it up a little bit.

Oh, that is Austin Milbourn's handgun.  That is the slide of his handgun.

Q.   Do you agree with Bob Eden's opinion about Kelly Smith being able to see with ambient light at his back?

A.   I do not agree with that.  We have all been in situations where we have walked from light into dark or we have walked from dark into light, and it takes time for our eyes to adjust.

And on top of it, we watched just a couple minutes ago from -- actually from Constable Smith's body cam viewpoint, and it was pitch black inside that room.  You just saw the laser, red dot from the laser on the taser kind of dancing around in the room.

Q.   At this point in the video, is Constable McQueen holding this taser in what is called the low ready position?

A.   No, that is not a low ready.

Q.   When you say painting someone's back with a laser, what does that vernacular mean?

A.    Basically, it is taking -- this particular model is the TASER X26.  It has a laser where you can mark the top dot that comes out on that.

When we are talking about laser painting, it is taking that laser dot and putting it all over an individual's back or body or particular area.

Q.    Is that tactically sound what Constable McQueen is doing?

A.    No, that is not.

Q.    What do we see right here on Austin Milbourn lighting the room up?

A.    So that is Robert Evans's hand on K9 Mata's collar.  And you can see K9 Mata's head kind pressed up against Constable Smith's thigh, just under his firearm.

Q.    And the top of K9 Mata's head is just at the bottom of what?

A.    That would be Constable Smith's firearm, his holster.

Q.    Explain the significance, in your training and experience, of that situation right now with the perpetrator?

A.    What we have -- we have a couple of issues going on here.

Number one, I have been struck during fights, in the genitals.  It is not a pleasant feeling.  That is number one issue that is going on here.  The hand is right up

underneath Constable Smith's groin area there.

The other thing is, this hand is in relatively close proximity to Constable Smith's firearm. So that is a dangerous situation. Nobody's hand should be that close to a police officer's firearm.

Q. And as far as the sensory nerves there, is it fair to say, in your training and experience, that the officer -- an objectively reasonable officer, would be feeling something in and around his upper thigh near that firearm?

A. Yes, absolutely. Touch is the fastest sensory perception.

Q. Of all?

A. Of all of the perceptions.

Q. Now, when the perpetrator hypothetically is pulling on that collar, is it consistent with Mata's head coming close to the very bottom of the firearm?

A. Yes.

Q. Would that be a problem for you?

A. That would be a huge problem for me.

Number one, depending on where my focus is attentioned, do I know that is K9 -- do I know that that is my dog's head, or is that something else that is getting close up by my firearm.

Q. And we heard something from Bob Eden about the perpetrator's finger being stuck in the collar. Do you

241

recall that?

A.    I do.

Q.    What was the significance of that, if any?

A.    I don't know what the significance is.  I don't know why -- well, let me put it this way:  I don't know why it is not insignificant.

I think it is significant.  But, again, this police dog is a law enforcement tool.  Nobody's hands other than law enforcement should be on this the dog unless, of course, there is permission from the handler.  The mere fact that Mr. Evans here has grabbed on, whether it is with one finger or an entire hand, is irrelevant.  He should not be touching this law enforcement tool.

Q.    Okay.  And what am I pointing at here?

A.    So right here you see Mr. Evans's left arm and hand right about Constable Smith's waistline, kind of encroaching on, again, the firearm area.  It appears actually that his forearm is on Constable Smith's leg.

Q.    Did you see there where Evans moves his left hand back the two-hand control on the dog's equipment?

A.    Yes.

Q.    What is that depicting right there?

A.    So this is depicting that the dog is coming up off the ground.

Q.    Is he standing on his hind legs like Bob Eden said?

A.   I don't believe so.  I believe that, in fact, this is Robert Evans's right arm bringing K9 Mata up.

Q.   Let me rephrase that.  Is the dog voluntarily standing up on his hind legs?

A.   I don't think so.  But even if it were, the reason that the dog is going up on his hind legs on his own volition is because he is feeling pressure.  You can see here that the dog is feeling pressure up on his collar.  So whether Evans was able to physically lift him up or whether the dog went up because he felt pressure on the collar --

Q.   Is irrelevant?

A.   Is irrelevant.

Q.   And what do we see right here about to happen?

A.   Well, right here you see Constable Smith about ready to punch Mr. Evans.

Q.   And then you have seen a few strikes.  Is Mr. Evans still on the dog's equipment?

A.   Yes, that is correct.

Q.   What am I pointing at here?

A.   So that is the mix, black mix pit bull that had reentered the home.  That was the dog actually that Sgt. Milbourn initially took out of the house.  It has escaped from Justin Graham and Officer Newell and ran back into the house.

Q.   The felon who was handcuffed behind his back holding the

dog?

A.    That's correct, yes, sir.

MS. BATSON:  Your Honor, he needs to ask a direct question and quit leading.

THE COURT:  No leading.

And, also, if you can get to a stopping point, I think we can take one more break until we enter in the final stretch.

MR. SKIPPER:  This is fine, Your Honor.

THE COURT:  Let's take a break for 10 minutes.

(Video stopped.)

(Jury out.)

THE COURT:  Okay.  We are in recess for 10 minutes.

(Recess was taken at this time.)

(Jury out.)

THE COURT:  Ready?

MR. MACHICEK:  Yes, Your Honor.

THE COURT:  Okay.

(Jury in.)

THE COURT:  Okay.  You may be seated.

Mr. Skipper.

MR. SKIPPER:  Thank you, Your Honor.

BY MR. SKIPPER:

Q.    Officer Kmiecik, before we get back to this video, I have a few questions.

Is it common or uncommon for handlers that work in a foreign language to mistakenly give the wrong commands?

A.   Oh, that is common.  I use English commands, and I use the wrong commands sometimes.

Q.   You yourself have done that?

A.   I have, yes.

Q.   With English?

A.   With English, yes.

Q.   Mr. Eden was asked if Robert Evans's actions were consistent with his words.  I will ask you the same question. Were Robert Evans's actions consistent with his words?

A.   No.

Q.   Is that a problem?

A.   It is a problem for law enforcement because that shows a resistance to -- resistance to the law enforcement efforts.

Q.   And picking back up on the video.

(Video played and paused throughout this portion.)

Q.   Are you trained and do you train, advise, or consult about a handler controlling their animal?

A.   Yes, I do.

Q.   Is that important?

A.   It is incredibly important to keep control over the actions of the dog.

Q.   Do you agree with the opinions that have been rendered thus far that Kelly Smith is intentionally throwing his

animal on the perpetrator?

A.    No, I do not.  In fact, I think he is holding K9 Mata back and away.

Q.    Okay.  And do you agree with the opinions rendered thus far that Kelly recalling his animal is consistent with trying to get a bite?

A.    I do not agree with that.  I think that is consistent with a handler trying to keep control over his dog.

Q.    And are handlers supposed to be trained that?

A.    Yes.

Q.    Do you see Mr. Evans grabbing his left arm?

A.    I did, yes, sir.

Q.    I've paused the video, and I want to go back to the example that the Government's expert attempted to explain to show consistency with this example.  Okay?

MS. BATSON:  Your Honor, if he could ask a question.

THE COURT:  Get to your question, sir.

BY MR. SKIPPER:

Q.    With the gorilla passing -- in the passing of the basketball.  Could you explain if that is applicable in this situation?

A.    I think it is.  Because what is important is what is Constable Smith attending to at this particular point.  Just like the example of the basketball being passed around, what

is his intentional focus on.

From the time that K9 Mata picks up the plunger and leaves the room, Constable Smith's attentional focus is shifted from Mr. Evans to wherever K9 Mata went.  He is obviously not focused on what Mr. Evans is doing on this portion of the video.

Q.   And if you know, did Robert Evans give any verbal cues that something may have been happening?

A.   Just after this portion of the video, Mr. Evans looks to his right in the same direction that Constable Smith is looking at and says, she is attacking my dog.

So, again, shifting focus, this shifting attentional focus.  In this scenario, Robert Evans is the gorilla in the room.  He may be there.  Constable Smith's hand may be on him.  But Constable Smith is not -- his attention is clearly not focused on Mr. Evans.

Q.   Okay.  And explain how the way Mr. Staton explained his situation of that example with the gorilla is different, in fact, applied to this situation, as far as stress levels.

A.   Right.  So going back to what I was talking about earlier, you know, watching that gorilla in the room video, that is under very -- that is under low stress.  We are just sitting here.

We are not in any danger.  There is no safety concerns.  We are not in an unfamiliar area.  We are not

dealing with an offender.

Here, we are in an unfamiliar -- or Constable Smith is in an unfamiliar area.  He is dealing with an offender who he knows has failed to surrender for 20 minutes, who failed to surrender for two K9 warning announcements, who failed to surrender for 28 knocks at the door, who grabbed his dog, who, you know, so -- kicked at him, used a plunger.  These are all things, you know, going back to the perspective of the officer on the scene in its totality.  And with all of that stuff going on, Evans is the gorilla that is being missed here.

Q.   And is that the legal standard for objective reasonableness, the totality of the circumstances?

A.   The totality of the circumstances is the Supreme Court decision in Graham v. Connor.

Q.   Before we continue with the video, you have heard the Government's experts opine and actually use a phrase "chokehold," right?

A.   Yes.

Q.   And before we get there, based on your training and experience and expertise as a K9 expert, as well as a use of force expert, are the actions of Kelly Smith when K9 Mata reenters the room, that of someone trying to get a bite?

A.   I don't believe so, no.

Q.   What are his actions consistent with?

248

A.    His actions are consistent at this particular point as to calling the dog back to him, to regaining control over his dog.

Q.    What just happened on the video?

A.    What I see is Constable Smith actually moving his hands from where his palms are just kind of leaning on top of Mr. Evans, to actually grabbing and pulling Mr. Evans up and away from the dog.

Q.    Okay.  And based on your training and experience, what is that consistent with?

A.    That is consistent with Constable Smith actually protecting Mr. Evans's face.

Q.    How is Mr. Evans sitting in this bathtub?

A.    He is sitting cross-legged or, you know, Indian style. He does have a center of gravity, very low.

        This is important from a defensive tactic standpoint because a person in this position actually has an extreme amount of power.

Q.    More than you would if you were on your knees?

A.    Oh, significantly more than if you were on your knees. If you were on your knees, that would be an advantage to me as a law enforcement officer because you are more off balance.  This gives Mr. Evans actually a significant amount of balance and control.

Q.    Do you have an opinion with whether or not any of these

249

strikes that you have seen from Evans to Mata are in any way consistent with trying to defend himself?

A.    I think, you know, there are -- the majority of these are, in my opinion, are assaults on the dog.  That is the majority of them.

Q.    And what did we just see there?

A.    We basically see Constable Smith is doing a head control technique where he brought his left forearm up underneath Mr. Evans's chin.

Q.    And tell me again with your tactical training, you gave us an acronym earlier how you were trained.  What is that?

A.    That is Human -- HFRG, which is Human Factors Research Group, Threat Pattern Recognition Use of Force instructor. That is the old pressure point control tactics, or PPCT.

Q.    At any point does Constable Smith give the perpetrator a chokehold?

A.    No.  That is a resounding no.

Q.    A resounding no?

A.    A resounding no.  That is not a chokehold.  Is it an uncomfortable position for Mr. Evans, yes, it is --

Q.    It is called non-compliance?

A.    -- that is the point of the maneuver.

Q.    Going back to the video, describe what was just depicted here, what Mr. Evans -- what the perpetrator is doing to the K9.

A.    So as K9 Mata comes up and starts to make -- coming back into the bathroom and as Constable Smith puts his forearm up underneath Mr. Evans's chin, we can see that Evans slaps the dog in the face.

Q.    Do you agree with the Government's experts that the perpetrator is simply pushing the dog?

A.    That is not a push, nor is that a defensive maneuver.

Q.    What else can you see here?  Are both of Mr. Evans's hands under control?

A.    No, his hand are not under control whatsoever.

Q.    What do we see here with Mr. Evans's right hand?

A.    Mr. Evans is grabbing on to K9 Mata's collar, it would appear, or at least in the area of K9 Mata's collar.

Q.    Does it appear that his pinky finger got stuck on this time?

A.    No.

Q.    And what do we see here again?

A.    That would be Mr. Evans's right hand over -- actually, on the back of K9 Mata's neck just right at or above the collar.

Q.    And how about the new leg positioning?

A.    So what Mr. Evans has done is he has gone from a cross-legged position to an extended position with his feet, which is actually giving him balance in this particular position.  It is a stabilizing position is what he is doing.

He is stabilizing.  Giving himself power to push off the bathtub there.

Q.    What just happened right here?

A.    So Constable Smith takes the very hand that was just on top of the back of K9 Mata's neck at or above that collar and brings it up off of that and up -- in close by Mr. Evans's neck.

        Now, it appears, to me, from this is that Constable Smith is protecting Mr. Evans's face, just as he did, in my opinion, previously.  We don't train our dogs -- Mr. Eden is correct, we don't train our dogs to bite in the face or neck because serious damage could come of that.

        But people do get bit in the face and head by police dogs based on their position at the time that the dog contacts them.  So, to me, this is Constable Smith protecting Evans's face.

Q.    Okay.  And to the extent it has been opined that Constable Smith is opening up Mr. Evans, what am I pointing at right here?

A.    So I disagree 100 percent with any testimony where Mr. Evans is being opened up by Constable Smith.  Constable Smith's leg is actually protecting Robert Evans's side here, thoracic, if you would like to, cavity, as well as the bathtub actually is protecting Mr. Evans as well.

Q.    And what just happened there?

A.   I know that this has been characterized as a push, that the dog was just pushed.  But when somebody puts their foot on you and pushes that away, I think all of us would characterize that as a kick.  The dog is being kicked here by Mr. Evans.

Q.   Okay.  And based on your training and experience in being a K9 handler and expert in this area, would you expect your K9 to react and defend itself if this happened to yours?

A.   I would expect any patrol dog to defend itself in this scenario.

Q.   That's reasonable for that patrol dog to do that?

A.   Absolutely it is, and they trained to do so.

Q.   And, here, what is this picture depicting?

A.   That picture is depicting K9 Mata coming in for the bite of Mr. Evans's right foot.

Q.   And what does this depict here, these hands that are one hand in one?

A.   That appears to be Mr. Evans's left hand gripped onto -- I'm not sure exactly whose arm that is.

Q.   Do you recall an officer helping him come out of the tub?

A.   Yeah, I am pretty sure this is Sgt. Milbourn's arm and hand there.

Q.   You testified earlier that you often come to Texas and

do audits and reviews for police departments?

A.    Yes, sir.

Q.    Do you have an opinion as to whether or not officers in Texas are being trained to bite and hold until handcuffs are placed on the perpetrator?

A.    Well, it depends on the situation.  The situation will dictate that.  The dog should be left on the bite until the person is compliant and subdued.  At this particular point, Mr. Evans is not compliant or subdued, so...

Q.    Okay.  Do you have an opinion, based on your training and experience in audits in this area, whether or not Houston K9 teaches this, in fact, to maintain the bite and hold until the suspect is in cuffs?

A.    Houston K9 does teach their K9 handlers to keep the dog on the bite until the perpetrator, the offender is in handcuffs, secured in handcuffs.

Q.    And where did Constable Smith receive his training?

A.    Houston K9.

Q.    During the process with the extraction from the bathtub, what are the officers attempting to do?

A.    The officers at this time are ordering Mr. Evans to get on the ground, get on the ground.  They are ordering him to roll over.  None of which is being heeded by Mr. Evans.

Q.    Based on where I paused this and based on your recollection of reviewing all of the body camera footage, and

in the essence of time, what is your memory or recall in regard to, number one, which officers are here; and, two, the positioning of each officer?

A.    Sure.  So, actually, we will just start with who is on the screen right now.  That is Acting Chief of Police from the Hawkins Police Department, Sgt. Eric Tuma.  Directly below -- if you are looking at the screen there, directly below Acting Chief Tuma would be Sgt. Milbourn.  And then directly behind Sgt. Milbourn but still inside this bathroom would be Constable Smith.

Q.    Inside the bathroom?

A.    Inside the bathroom, yes, sir.

Q.    And did you hear Constable Smith tell Austin, let me know when I can get him off?

A.    I did hear that, yes.

Q.    And do you recall what Austin Milbourn's response was?

A.    Yes.  Sgt. Milbourn said, stand by.

Q.    Did officer Milbourn ever say anything after, stand by?  To the best of your recollection, did the dog just come off on its own?

A.    Sgt. Milbourn, I don't recall saying anything at that particular point.

Q.    Okay.  Do you recall watching Eric Tuma's video with regard to the angle where you can see this a little bit better?

255

A.    Yes, absolutely.

Q.    Okay.  And describe for the jury what you saw from Eric Tuma's angle with regard to Kelly's positioning and right when Austin Milbourn stands up, and what happens with the K9?

A.    So as Acting Chief Tuma and Sgt. Milbourn are handcuffing Mr. Evans, it is almost immediate or instantaneous, as soon as the second handcuff starts to click on and Mr. Evans is in full handcuffs and subdued, that is when K9 Mata actually is able to take Mr. Evans's shoe off of him.  So that is the bite right there.

        (Video stopped.)

Q.    Officer Kmiecik, I want to move to the second count, which is called a 1519 charge.

        You have heard about this throughout the course of this trial with regard to statements that Kelly Smith made in his affidavits and it being presented by the Government's theory based on what is on the body cam video that those are inconsistent statements and, therefore, misleading and deceptive.

        Do you understand that?

A.    I do.

Q.    Do you agree with the Government's opinions on that topic?

A.    I do not agree with them.

Q.   And I want to go back to -- as far as -- the first one that Mr. Eden discussed in -- you remember you saw the 1 through 14?

A.   Yes.

Q.   And red numbers?

A.   Uh-huh.

Q.   The first one involved being not armed.

MR. SKIPPER:  May I have just one moment, Your Honor?

May I have one moment, Your Honor?

THE COURT:  Okay.

Ladies and gentlemen, if you want to stand up and stretch, you are welcome to do so.

(Pause in proceedings.)

THE COURT:  Ready?

MR. SKIPPER:  Yes, Your Honor.

THE COURT:  Okay.

BY MR. SKIPPER:

Q.   Officer Kmiecik, I found the first one.  It is the sentence that:  I maintained cover not knowing if Evans was armed.

Do you recall the explanation given by, I believe it was Bob Eden, why he believed that was somehow misleading?

A.   Yes, I do.

Q.    Okay.    And do you agree with his opinion?

A.    I don't agree with his opinion.    Having done many thousands of building searches myself, in an area where there are single-wide trailers, I mean, there is really -- there is no cover within these trailers.

Cover is something that is going to stop a bullet. That is not what we have here.    Bullets will rip through these walls without question.    So there is really no place within this particular trailer to go for cover.    So what I think is being described is concealment.

Q.    Now, with regard to the second statement, if -- it was: I gave K9 Mata the heel command in order to keep him beside me to be close for an apprehension and officer protection.

Do you recall that?

A.    I do, yes.

Q.    Do you agree with Bob Eden's opinion?

A.    No.

Q.    That was deceptive by Kelly?

A.    No.    Multiple times he was calling -- Constable Smith was calling the dog to him.    Calling the dog to a heel or calling the dog to you, I just don't see the relevancy of that.    They are both the same thing.

Q.    Then the third is:    I maintained physical control of K9 Mata hoping that Evans would open the door and comply.

Did you hear Mr. Bob Eden give an opinion on that

statement?

A.    I did, and I disagree with it.  I watched -- on the video you could see that Constable Smith reaches down and actually grabs K9 Mata as K9 Mata comes out of the mobile, home what we now know is the bedroom there.

Q.    The next question that Mr. Eden was asked to render an opinion with regard to statements that Kelly put in his affidavit:  Evans was still not complying with verbal commands and continued to exhibit defensive resistance.

       Do you recall that?

A.    I do, yes, sir.

Q.    And do you agree with Mr. Eden's opinion on that point?

A.    I do not.

Q.    Do you agree with Mr. Eden's opinion that the perpetrator was actually trying to surrender, in that still photo?

A.    I do not agree with that.

Q.    The next, number 7 I have:  Evans was still not complying with verbal commands and soft empty hand control.

       Do you agree with Mr. Eden's opinion on that?

A.    No.  That, in fact, happened.

Q.    The next statement:  I removed his hand from the harness and maintained control of K9 Mata due to the close quarters of the bathroom, in order to keep Evans from being injured in

the face.

Do you recall Mr. Eden being asked whether or not he believed that Kelly was giving a true statement then?

A.    I do.

Q.    Do you agree with Bob Eden's opinion?

A.    I don't.  I can see multiple times on the body cam of Constable Smith having direct physical control over K9 Mata.

Q.    And:  I released K9 Mata in order to defend against the wooden handled plunger and gave the apprehension command to assist with the apprehension.

Do you agree with Mr. Eden's opinion that Kelly was being deceitful for that statement?

A.    I don't.

Q.    And if, in fact, there were commands given that were different than what Kelly wrote in this affidavit, based on your training and experience and as an expert in tactics, as an expert in K9, as a certified analyst with Force Science, do you have an opinion, based on what you have discussed earlier, with mis-sequencing of events?

A.    I do.

Q.    Would you explain to the jury what that opinion would be?

A.    This was a situation, it is 90 seconds.  It is happening very quick.  And the key to this is putting yourself in the

perspective of the officer who is on the scene, right?  So this quick sequencing that is occurring, the memory is simply not going to -- your mind is not going to sequence everything correctly.

It is going to get, what Force Science tells us, it is going to get the gist of what happened.  That is what we remember.  What was the gist.  And then as we start to recall things, we will know that we did certain things, but we may actually mis-sequence them when we tell back the story or write the affidavit.

Q.   I believe there is four more.  My colleague got 10.  So I will stop there, and they can ask you on cross.

And I appreciate you getting 10.

Officer Kmiecik, do you have an opinion, based on the totality of the circumstances, of whether Constable Smith's actions on July 25th of 2022 were reasonable.

A.   I do.

Q.   And what is that opinion?

A.   I think they were absolutely reasonable, based on the totality of the circumstances.  And, again, it is the key, we cannot look at things in isolation, in one-thirtieth of a second time frame.  They have to be considered in their totality from that perspective of that officer that is on the scene.

Q.   Does the law allow you to have a mechanical

application?

A.    No.   Graham v. Connor, the Supreme Court of the United States specifically rejected a mechanical application of force.

Q.    Officer Kmiecik, based on your training and experience and being an expert in tactical and K9, do you have an opinion of whether or not Constable Smith's actions on July 25th of 2022 were excessive?

A.    I do.

Q.    And what is that opinion?

A.    They absolutely were not excessive.

Q.    Officer Kmiecik, to the extent that the term "necessary" -- pardon me, the term "unnecessary," which does not apply legally, was used on that witness stand, do you have an opinion, based on your training and experience, based on a totality of the circumstances on whether or not Constable Smith's actions on July 25, 2022, were unnecessary?

A.    I do.

Q.    And what is that opinion?

A.    I think that all of the actions here were necessary in order to gain Mr. Evans's compliance and bring him into custody.

Q.    If you were in that situation, based on your training and experience, would you have done the exact same thing?

A.    That is exactly how I look at this when I look at these use of force cases, is, if that were me, would I have done the exact same thing?  The answer to that is a resounding yes, for this situation.

            MR. SKIPPER:  Pass the witness, Your Honor.

                            CROSS-EXAMINATION

BY MS. BATSON:

Q.    Mr. Kmiecik, how are you?

A.    I'm well.  Good afternoon.

Q.    Good afternoon.

            Can you tell the jury how much you are getting paid to be here?

A.    Yes, I am getting paid $150 an hour for research and consultation, and $250 an hour for trial testimony.

Q.    So what is your bill so far?

A.    I have no idea.  I'm sorry.  I have not calculated that out yet.

Q.    So how many -- you haven't calculated it at all?

A.    I have a running tally of what I have done.  I have not added up the amount of time or hours as of yet.

Q.    How many research hours do you have?

A.    I have a running tally.  I couldn't tell.  I'm sorry, ma'am.

Q.    You don't know the trial hours either?  How many hours have you been out here?

A.   I arrived yesterday at like 1:00 p.m.-ish.

Q.   Now, do you have SWAT training?

A.   I have tactical training, not specific to SWAT.

Q.   I think we have all heard, probably before you got here, that all officers have tactical training; would you agree?

A.   A minimal level of tactical training, I would agree.

Q.   So is it your testimony you would not agree that all officers have had tactical training?

A.   No, I would agree that there was a minimal.

Q.   My question was, have all officers had tactical training?

A.   Yes.

Q.   Okay.  All right.  Now, I hate to go back to this, can you ballpark how many hours and what your running total bill is?

A.   Can I ballpark?

Q.   Yeah, just for what you have done so far before you got here and since you have been here?

A.   Ballparking 50, 60.

Q.   I'm sorry?

A.   50, 60, maybe.

Q.   50, 60 thousand?

A.   No, hours.

Q.   Oh, 50, 60 hours.

A.   I thought that was your question.  I'm sorry.

Q.   50, 60 hours so far.  Is that at the 150 or 250?

A.   That is 150.

Q.   So you haven't starting billing for the 250 yet?

A.   No.

Q.   Now, you are with Force Science; is that correct?

A.   I am not with Force Science, no.  I am a certified analyst.  I have been to the certified Force Science Institute.  I am a graduate of their class.

Q.   So what does that mean that you are certified through that?

A.   That means that I have been -- I've gone through their 40-hour-plus training class.

Q.   Okay.  And then how much did you pay for that class?

A.   How much did I pay for that class?

Q.   Yes.

A.   My agency sent me to that class.

Q.   How much did your agency pay for the class?

A.   I don't know.  I'm sorry.

Q.   You don't know.  How long ago was it?

A.   July of last year.

Q.   Now, on the Force Science website, it says that it is unbiased scientific principles and processes to determine human behavior in high-stress and deadly-force encounters?

A.   Uh-huh.

Q.   Would you agree with that?

A.    I agree, yes.

Q.    Okay.  Because that is the website says, high-stress and deadly-force encounters.  Right?

A.    Yes.

Q.    That is accurate.

      Okay.  And then somebody paid for the class said: This class is a little more than training on how to get away with police brutality.

      Do you know that?

A.    No.

Q.    And it has been described as pseudoscience.  Can you tell this jury what pseudoscience is?

A.    Pseudoscience would be junk science.

Q.    So if you look up Force Science training and it comes up pseudoscience, do you think that is accurate as well?

A.    No, I don't agree with that characterization.

Q.    Even if it is on there multiple times?

A.    Even if it is on there multiple times, I don't agree with that characterization of it.

Q.    And it says there is little basis for this scientific research, and there is misinformation that runs rampant to anyone in this pseudo science, Force Science.

      Do you know about that?

      MR. SKIPPER:  May I object to hearsay?  Let the witness know what in the world she is reading from other than

Google.

THE COURT:  What are you reading from, Ms. Batson?

MS. BATSON:  From the website and then reviews.

THE COURT:  From Force Science?

MS. BATSON:  Yes.  When you Google it, Your Honor, and some of the reviews from the Force Science.  And then what I read initially was what they have on their website, how they describe what they do.

THE COURT:  Okay.  I am going to sustain the objection.

BY MS. BATSON:

Q.   Now, when did you become a K9 handler?

A.   2004.

Q.   2004?

A.   Yes, ma'am.

Q.   And how many dogs have you trained?

A.   Trained, I am not a dog trainer.

Q.   You have a dog?

A.   Yes.

Q.   You are a handler?

A.   I am a handler.

Q.   With a dog?

A.   Yes, ma'am.

Q.   And you haven't been to any training?  You don't train your dog?

A.    I'm sorry.  I thought your question was, how many dogs have I trained?

Q.    But you train with your dog?

A.    Train with the dog, a handler.

Q.    Right.  How many dogs have you trained with?

A.    I didn't understand your question.  I misunderstood you. I thought you were asking how many dogs I've trained.

Q.    Well, I'm going to ask you that one next.  How many dogs have you trained with?  Sorry.

A.    I have handled two dogs.

Q.    Two dogs.  And do you currently have a dog?

A.    Yes, ma'am.

Q.    And how long have you had that dog?

A.    I have had that dog since May of 2014.

Q.    And what is that dog's name?

A.    Luther.

Q.    And how many dogs have you trained?  I think you said none?

A.    Correct.

Q.    All right.  Now, Defense counsel is asking you about you giving Mr. Slavik a discount for your company; do remember that?

A.    Yes.

Q.    What company?

A.    Sheepdog Guardian Consulting.

Q.   Okay.  What do you do for them?

A.   I am the owner.

Q.   What is it your -- what do you do at that company?  What does your company do?

A.   Oh, so we run a comprehensive law library for K9 case law.  We do policy consulting for K9 departments with K9 units.  We do K9 auditing.

Q.   Okay.  And is Mr. Slavik the only company that USPCA, that you have given a discount to.

A.   No.

Q.   How many discounts do you give out?

A.   I think there's four or five of them.  I don't handle that aspect of the business, but I think there is four or five of them.

Q.   Okay.

     Okay.  I was trying to get this down.  Was it inattentional blindness?

A.   Inattentional blindness.

Q.   Inattentional blindness.  People fail to see what is right in front of them?

A.   Yes, correct, ma'am.

Q.   And then you said there is a gorilla in a basketball game?

A.   Oh, it was the video that your expert was talking about, Mr. Staton.

Q.   Okay.  And then I may have missed this, did you say that Evans was the gorilla?

A.   In the video, comparable to the video.

Q.   The gorilla is the distraction?

A.   The gorilla is -- no, the gorilla is -- there really is no distraction.  The distraction is that in the video you are asked to focus on a particular task, right?  So you are focusing on how many times the white team versus the black team passes the basketball back and forth to each other.

During that time as you are focusing on how many times the basketball is going back and forth, that is when the man in the gorilla suit comes in, dances --

Q.   As a distraction?  As a distraction?

A.   I wouldn't characterize it as a distraction.

Q.   Okay.  In the scenario you just gave, the basketball is the objective?

A.   Passing of the basketball.  Counting how many times the team counts -- or passes the basketball.

Q.   Well, isn't the arrest of Evans supposed to be the objective?

A.   Yes.

Q.   Okay.  So he is not the basketball?

A.   He is not the basketball.

Q.   He is not the basketball.  All right  But you said the basketball is the objective.

270

All right.  Let's move on.

Where did you get your psychology degree?

A.   I don't hold a psychology degree.

Q.   You don't?  Okay.  So where in this DSM-V -- do you know what the DSM-V is?

A.   I am familiar with it.

Q.   Okay.  What is it?

A.   It is the -- it is the diagnostic tool for psychology and psychiatrists.

Q.   Okay.  Where does this Force Science fall in that -- it's called the Diagnostic and Statistical Manual, right?

A.   Correct.

Q.   Where does this Force Science fall in there?  Is that in there anywhere?

A.   I have no idea.

Q.   So is it basically, you know, you are saying that there is this science and you just plug in whatever facts, and then just call it done, call it science?

A.   I don't agree with that characterization.

Q.   Okay.  Now, how many times have you interviewed Mr. Smith?

A.   Interviewed Mr. Smith?

Q.   Yes.

A.   Never.

Q.   You have never interviewed him?

A.   Huh-uh.

Q.   Oh, I thought you had said that there were some interpretations of the video about what Smith was thinking and what he was intending, but you are making all these -- you are a Defense witness, right, and you have never interviewed him?

A.   No, I never interviewed him, no.

Q.   Would you agree that the totality of the circumstances includes the video plus the audio?

A.   Yes.

Q.   Okay.  Was there any particular reason why we didn't hear the audio as you were narrating what was going on?

A.   Because it wasn't played for me.  I have no idea.

Q.   Okay.  I will play it.

          MS. BATSON:  Can we play the shortened version of Exhibit 1, please?

          (Video played.)

          MS. BATSON:  Pause it.

          (Video paused.)

BY MS. BATSON:

Q.   All right.  And so I was a little confused about your testimony.  Were you saying that Mr. Evans was never trying to surrender?

A.   I don't see him trying to surrender, no.

Q.   Okay.  And do you know what the bite command is?

A.    What K9 Mata's bite command is?

Q.    Yes --

A.    Foogosh.

Q.    -- what is it?

And how many times right here in this part do we hear it?  Right there.  It is right in front of you on the screen you?

A.    Oh, you want me to count right there?

Q.    Yes, please.

A.    Two, foogosh, foogosh.

Q.    And this is like when the bathroom door is opening, correct, right?

A.    Correct.

Q.    Okay.  And then the bite command is given right here before the dog enters, but we see his little nose right there, right, see it?

A.    It would appear, yeah.

Q.    And the bite command is given twice as the doors open; do you see that?

A.    I do.

        MS. BATSON:  Okay.  Can you play.

        (Video played.)

        (Video paused.)

BY MS. BATSON:

Q.    The dog backs out.  Do you see that?

A.   I do.

Q.   All right.  I forgot to count the number.  So here we see one, two, three, four.  Four in this sequence right here of the bite command, correct?

A.   Correct.

        MS. BATSON:  Okay.  Keep playing.

        (Video played.)

        MS. BATSON  Stop.

        (Video paused.)

        MS. BATSON:  All right.  Keep going, please.  I'm sorry.

        (Video played.)

        MS. BATSON:  Stop.

        (Video paused.)

BY MS. BATSON:

Q.   So when we hear, this dog won't quit biting me, you take that to mean that the dog has already bitten him?

A.   I did not see that on the video.

Q.   But why would somebody say that a dog is biting them if they are not?

A.   I don't know.

Q.   Okay.  All right.

        MS. BATSON:  Let's play.

        (Video played.)

        (Video paused.)

BY MS. BATSON:

Q.   Bite command again.

MS. BATSON:  Okay.

(Video played.)

Q.   Okay.  That is three more.  Three more.

MS. BATSON:  Stop.

(Video paused.)

BY MS. BATSON:

Q.   Okay.  So how many years were you a law enforcement officer?

A.   I am currently law enforcement.  And 24 years in July.

Q.   All right.  And as a law enforcement officer, are you saying right here that an arrest could not be made at this point?

A.   An arrest cannot be made.  The Constable is not even focused -- his attention isn't even focused.

Q.   Well, I mean, that is on him.  But are you saying that he could not have arrested him right here --

A.   I disagree with you that is on him.

Q.   When this -- Mr. Evans is in this position, you are saying that his hands could not be put behind his back or an order -- command given to put his hands behind his back?

A.   So as a handcuffing instructor, we don't handcuff somebody until they are under control.  Mr. Evans is not under control here.

MS. BATSON:  Your Honor, may I approach Mr. Machicek?

THE COURT:  You may.

BY MS. BATSON:

Q.   If I am grabbing Mr. Machicek right here, and his hands are on his head, you are telling me I don't have control of him?

A.   You are freeze-framing one-thirtieth of a frame here, one-thirtieth of a second.  That is not looking at this in its entirety from the perspective of Constable Smith knowing what --

Q.   What is escalation commitment.  What is escalation commitment?

A.   Escalation commitment?

Q.   Uh-huh.

A.   We don't use that term.

Q.   You have never heard it?

A.   I have never heard it, no.

Q.   Did you hear it today in the courtroom?

A.   I heard it being discussed.

Q.   Okay.  Well then, tell me what you heard, please?

A.   I don't recall, I'm sorry.

Q.   So I just want to be clear, that you have watched these videos and it is your opinion that Mr. Evans was never -- he was always resisting?

A.    There was resistance the entire time, yes.

Q.    The entire time?

A.    In its totality, yes.

Q.    Okay.  And so you are saying the kicking and swatting at the dog, they are not reactive movements to keep from getting bitten?

A.    I don't think so.

Q.    Okay.  And begging to be cuffed is not evidence that he is not resisting?

A.    Well, he didn't comply --

Q.    How many when he was handcuffed --

A.    -- to be cuffed until the very end when he was handcuffed.

Q.    Well, do we need to play the video?

        MS. BATSON:  Let's play it.

        (Video played.)

        (Video paused.)

Q.    Okay.  Two more times, the bite command.

        MS. BATSON:  Go ahead, please.

        (Video played.)

        (Video paused.)

BY MS. BATSON:

Q.    You hear all of that, and even in this part where there is actually a command given, it's your testimony that Mr. Evans was not complying even with those commands?

A.    That is my testimony.

Q.    That he is not complying?

A.    That he is not complying.

Q.    Okay.  Now, right here -- you said this right here is surrender, when your hands are up here?

A.    I would agree with what you are doing there.

Q.    Right there.  All the way up.

Okay.  But when my hands are all the way up, I don't have a dog coming after me; would you agree with that?

A.    Well, that is not the scenario that is presented before --

Q.    Do you see --

A.    -- us, counselor, sorry.

THE COURT:  I would just remind counsel and the witness not to talk over each other.  Okay?

BY MS. BATSON:

Q.    This is what you just did.  You put your hands all the way up here.

A.    Correct.

Q.    So I am doing what you did like this.

Okay.  Do I have a dog coming at me?

A.    No.

Q.    So is it your testimony in front of this jury that Mr. Evans needed to be like this for full surrender when he

has this dog, who has been given eight maybe bite commands coming at him?

A.   Well, my testimony is, is in this one-thirtieth of a second, this, to me, does not appear to be a surrender.  This appears to be an aggressive posture.

Q.   Against the dog who is coming in under a bite command?

A.   That is what it appears to me.

Q.   All right.  Now, there was some testimony -- now, it is important, as a law enforcement officer, for you to document what goes on at a scene, right?

A.   Agreed 100 percent, yes, ma'am.

Q.   But you testified, I believe, that at some point in this video, that Mr. Evans could have reached for the Defendant's gun?

A.   I didn't say he could have.  No, I never testified to that.

Q.   But he was in a position to access it or something like that you said?

A.   His hand clearly, from what I was shown and what I viewed, was in close proximity to Constable Smith's firearm. Yes, ma'am.

Q.   And you wouldn't think that would be something important that a law enforcement -- I mean, sir, I have been prosecuting 30 years, and I have worked with a ton of law enforcement officers.  If somebody was close to somebody's

gun, believe you me, it is going to be in a report.

Don't you think that would be something that you would document, too, as a reasonable officer if that happened?

A.   It depends on the context of what we are discussing, what is part of it.  I mean, this context would be the dog scenario.  If I felt that, I probably would document that, but --

Q.   Any report, not just in this scenario, if you are a law enforcement officer and somebody is in a position to get to your gun, don't you think you would document that?

A.   I think a report is a summary of the events.

Q.   Agreed.  Agreed.  But I am talking specifically as a law enforcement officer, if somebody can get to your gun while you are on your job, you don't think you would put that in a report?

A.   I would put it in the report, but everybody, you know, at some point --

Q.   Yes, you would put it in the report.  All right.  Okay.

Okay.  Let's talk about the Graham factors.  Now -- and let me just tell you before you start, I have a patrol summary that you and Terry Fleck wrote, right, in January of 2021.  Do you recall writing this?

A.   Yes.

Q.   All right.  So let's discuss the Graham factors.  Now, you stated -- well, tell me what they are first?

A.   The Graham factors are, the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

Q.   Okay.  Now, out of those three, which one do you say is the most persuasive?

A.   I think that it is the immediacy of the threat or whether the suspect poses an immediate threat to the safety of officers or others.

Q.   Okay.  I think it says:  Immediacy of the threat.  In other words, the severity of the crime is an issue and whether he was actively resisting arrest is also an issue, but they are less persuasive than the threat immediacy.

        Do you recall that?

A.   Uh-huh.

Q.   Where in any of this is Mr. Evans posing an immediate threat to the safety of officers?

A.   Well, that statement needs to be qualified number one. Number two --

Q.   Well -- okay.

A.   Go ahead.

Q.   No, no, I don't understand.  I mean, I read what you

said.  There is no qualifications before or after it.

A.   Right.

Q.   It is this statement.

A.   Right.  And I stand by that, but, again, there has to be a little qualification to that.

Q.   Okay.

A.   You are a federal prosecutor so you know how the Graham factors work, right?  So the Graham factors are factors weigh in favor of the officer or they weigh against the officer. While we would certainly --

Q.   Let me ask the questions.  I did ask you about the Graham factors and what was the most important one to you, right?  Right?

A.   Yes, ma'am.

Q.   Now, you indicate in here that the primary purpose for the dog is consistent -- I mean you would disagree with everything else that Robert Eden said, so let me ask you this:  Do you agree a police dog's primary purpose is to locate?

A.   Yes, I agree with that 100 percent.

Q.   You have that written here?

A.   I agree with that.

Q.   So once the location has occurred, and that was the primary goal, right, then the dog is done with his job; would you agree?

282

A.    No.

Q.    No.  Okay.  So after the suspect is located and that is the goal, then why else would you have the dog?

A.    Well, if you continue on in there, there is two purposes for the dog.  The primary purpose being a location tool and the secondary purpose of being a tool of force.

Q.    Right.  But you don't get to the secondary tool until -- if the primary goal is reached.  Why do you need to go to the secondary goal if you reach the primary goal of the location?

A.    Because once the person -- the suspect is located, if they don't comply or they are resistant, then they might be used as a tool of force.

Q.    Okay.  But when you say nationwide approximately 95 percent of the time the mere presence of a K9 de-escalates the need for use of force?

A.    (Witness nods.)

Q.    So then, in your own words, why would you need to go to line -- or the second part of the purpose if the de-escalation can occur at the first part?

A.    Well, counselor, as you just stated, 95 percent of the time it is effective.  5 percent of the time it is not.  So that leaves 5 percent of the time where people do not surrender and comply, as Mr. Evans did not.

Q.    All right.  Now, we can -- we'll have to agree to

disagree on that.

THE COURT:  Ms. Batson, if you could get to a stopping point for the day.

MS. BATSON:  Okay.  Your Honor, this is --

THE COURT:  This is good?

MS. BATSON:  Yes.

THE COURT:  Okay.

All right.  Ladies and gentlemen, we will stop here for the day.  My previous instructions still apply.  I ask you to be in the room in the morning at 8:45 ready to go.

Thank you.

(Jury out.)

THE COURT:  Okay.  You may be seated.

How much more time do you think you will need?

MR. SKIPPER:  Two hours, Your Honor.

THE COURT:  With this witness or total?

MR. SKIPPER:  Total.

THE COURT:  Total.

MR. SKIPPER:  Total, yes, sir.

THE COURT:  So you think we would get to closings tomorrow?

MR. SKIPPER:  It would be our preference, Your Honor, yes.

THE COURT:  Do you guys see it any different, Ms. Batson?

284

MS. BATSON:  No, Your Honor.  I believe -- I'm sorry.  I believe we can get to closing.  Do you want us to work on the charge conference?

THE COURT:  Yeah.  There was one outstanding issue. I don't know if y'all have had a chance to discuss it.

MR. MACHICEK:  We haven't had a chance to discuss it.  We have exchanged proposals, and we will continue to discuss those two proposals --

THE COURT:  Okay.  Are there any other differences other than the two that we previously identified, one of which I have already ruled on?

MR. MACHICEK:  No, there are no other differences of opinion within the charge.  We have two separate proposals for that one charge that we are working out together.

THE COURT:  All right.  Okay.  Anything else to discuss?

MR. SKIPPER:  No, Your Honor.

MS. BATSON:  No, Your Honor.

THE COURT:  Okay.  We are in recess until 8:45 in the morning.

(Recess was taken until 6/30/2023.)

CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.


/s/ Shea Sloan                          August 3, 2023
SHEA SLOAN, CSR, RPR
Federal Official Court Reporter