IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION


UNITED STATES OF AMERICA        )
                                )       CASE NO. 6:22cr146
     -vs-                       )
                                )       Tyler, Texas
                                )       8:57 a.m.
KELLY JASON SMITH               )       June 30, 2023










TRANSCRIPT OF JURY TRIAL
DAY 5
BEFORE THE HONORABLE JEREMY D. KERNODLE,
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

FOR THE GOVERNMENT:

MR. LUCAS MACHICEK
ASSISTANT U.S. ATTORNEY
110 North College, Ste. 700
Tyler, Texas 75702

MS. TRACEY BATSON
ASSISTANT U.S. ATTORNEY
101 E. Park Blvd., Ste. 500
Plano, Texas 75074

FOR THE DEFENDANT:

MR. CODY SKIPPER
LAW OFFICE OF CODY SKIPPER
2001 Bryan St., Ste 1905
Dallas, Texas 75201

MR. TOBY SHOOK
SHOOK GUNTER & WIRSKYE
2001 Bryan St., Ste. 416, LB 92
Dallas, Texas 75201

COURT REPORTER:            MS. SHEA SLOAN
                          FEDERAL OFFICIAL COURT REPORTER
                          211 W. Ferguson
                          Tyler, Texas 75702
                          shea_sloan@txed.uscourts.gov

Proceedings taken by Machine Stenotype; transcript was
produced by computer-aided transcription.

INDEX

DEFENDANT'S
WITNESS                  DIRECT   CROSS   REDIRECT   RECROSS


MICHAEL KMIECIK                     4       23          28

DENNIS BRADY             29        58       87

JOHNWAYNE VALDEZ         89       108      114         115


                            * * * * * * * *

                                 PAGE

DEFENSE RESTS AND CLOSES         116

GOVERNMENT RESTS AND CLOSES      116

CHARGE CONFERENCE                117

JURY CHARGE                      120

CLOSING STATEMENTS

     BY MS. BATSON               138

     BY MR. SHOOK                157

     BY MR. SKIPPER              174

     BY MR. MACHICEK             184

JURY NOTE                        191

VERDICT                          192

JURY POLLED                      193


CERTIFICATION – PAGE 195

4

P R O C E E D I N G S

(Defendant present in the courtroom.)

(Jury out.)

THE COURT: Okay. We ready?

MR. MACHICEK: Yes, Your Honor.

MR. SKIPPER: Yes, Your Honor.

(Jury in.)

THE COURT: Okay. Please be seated.

Welcome back, members of the jury.

Ms. Batson.

MS. BATSON: Yes, Your Honor.

THE COURT: Sir, you may be seated.

MS. BATSON: May I proceed?

THE COURT: You may.

MS. BATSON: Thank you.

MICHAEL KMIECIK, DEFENSE WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION CONTINUED

BY MS. BATSON:

Q. Good morning.

A. Good morning.

Q. Okay. So yesterday I think we kind of talked over each other. So I apologize. But if you could answer my questions, and I will let you finish so that we don't talk ever each other and make the court reporter upset.

A. Yes, ma'am.

5

Q.   I want to make sure I am saying your name right.  Is it Kmiecik?

A.   Kmiecik (different pronunciation).

Q.   Okay.  Mr. Kmiecik.

You teach de-escalation, correct?

A.   That is a portion of the use of force component.

Q.   Do you teach it?

A.   Yes, that is a portion of my component of my use of force lectures.

Q.   What you teach.

Okay.  Now, we see Mr. Milbourn -- or Lt. Milbourn now, drew his gun.  Did you see that?

A.   Yes, ma'am.

Q.   And did you ever see the Defendant draw his weapon at all?

A.   No, ma'am.

Q.   All right.  Now, on the summary that you authored that we discussed yesterday, is it true that the handler makes the decision to escalate or de-escalate the dog's level of response?

A.   I am sorry.  Can you repeat that?

Q.   Sure.

The handler makes the decision to escalate or de-escalate the dog's level of response?

A.   That is part of the component, yes, ma'am.

6

Q.   Okay.  What is the other part?  Because they are not listed here.

A.   Well, the other part is that we are talking about use of force in its full context.

Q.   No, in this section we are talking about the bark and hold versus the bite and hold?

A.   Correct.

Q.   Right.  So it is not under the use of force part of your paper.

So what are the other components?

A.   The other -- well, that is what I am trying to answer your question, ma'am.

Q.   Okay.

A.   The other components of de-escalation involve the totality of what Graham v. Connor says out of the Supreme Court.

Graham v. Connor says -- the Supreme Court says in Graham v. Connor a lot more than the three Graham factors.

Q.   Okay.  Normally, the legal part of the trial doesn't come before the jurors.  They are factfinders, and the Judge is the Judge of the law --

MR. SKIPPER:  Your Honor, I am going to object to sidebar, and the fact that their entire witness list --

THE COURT:  Sustained.

MR. SKIPPER:  -- has talked about the law.

THE COURT:  If you would just keep your examination to questions.

MS. BATSON:  Yes, Your Honor.

BY MS. BATSON:

Q.   Wouldn't you agree that the handler is the one that makes the decision to escalate and de-escalate?  Just yes or no.

A.   I'm sorry, repeat the question again.

Q.   The handler makes the decision to escalate or de-escalate the dog's level of response?

A.   Same answer.

Q.   Okay.  Which is yes?

A.   That is a component.

Q.   Okay.  All right.

And then under your use of force, a police officer may not continue to use force against a suspect who has been subdued and is complying with the officer's orders.

Is that correct?

A.   That is correct, yes.

Q.   Okay.  Once a suspect surrenders, any use of force, K9 or otherwise, must immediately stop from this point on.  Unless you can articulate why the suspect was a continued threat, the use of force will be excessive.

A.   I agree with that, yes.

Q.   Okay.  Now, I just want to make sure that I heard you

correctly yesterday.  You did not interview the Defendant?

A.   Correct.

Q.   Okay.  So when you testified yesterday that when he bent cover, you said he meant concealment instead of cover.  How do you know that?

A.   I don't think that was my testimony.

Q.   You don't think you said, I think he meant concealment instead of cover?

A.   I said I think it is concealment versus cover.

Q.   Okay.

A.   I don't think I said --

Q.   So that was just speculation on your part?

A.   I don't agree with that.

Q.   Okay.  All right.

Now, without interviewing the Defendant, how do you dispute at least the 10 things that you identify in the affidavit as being true?

A.   Can you expound upon that, what 10 things you are referencing?

Q.   The 10 things that Defense counsel went over with you out of the affidavit.  And before he could even finish reading them, you were like, I disagree, I disagree, I disagree, that whole line yesterday.  You were saying, I disagree, I disagree with every point that he pointed out in the affidavit.  But how did you know to disagree with those

without interviewing the Defendant?

A.    I'm sorry.  I don't understand your question, counselor.

Q.    The Defendant wrote a report, right?

A.    Yes.

Q.    And then we have identified as least 14 misstatements. Yesterday Defense counsel went over at least 10 of those 14. And you disagreed with those 10, right?

A.    Okay.  Yes, ma'am.

Q.    How did you disagree with those without interviewing the Defendant, who wrote the report, and say that they are true?

A.    Oh, very simply, ma'am.  I read the actual affidavit, and then I viewed the reports and the body cam.

Q.    Just like everybody else?

A.    Yes.

Q.    But, again, not interviewing the Defendant.

       So without interviewing the Defendant, how do you know that he meant to give the heel command instead of the bite command?

A.    I don't know that to be a fact.  I don't know if that is true or not true.

Q.    You don't.  Okay.

       Now, much has been made about the seven seconds of darkness when entering the bathroom, right?

A.    Yes, ma'am.

Q.    Now, if you can see his hands, would that change your mind?

A.    No.

Q.    It wouldn't?

A.    No.

Q.    So if you can see his hands and that he is giving up, that would not change your mind?

A.    If I can see his hands, and he is giving up?

Q.    Yes.

A.    Is your question?

Q.    Right.  Would that change your mind?

A.    That would change my analysis.

Q.    Okay.

A.    That is not what I heard.

Q.    I understand that.  But my question is, if you could see his hands and that he is giving up, would that change your mind?

A.    If I could see his hands, and he was giving up, that would change my analysis.

Q.    Okay.  All right.

        All right.  And, again, yesterday you discussed you have been a law enforcement officer a long time, and it is important to put truthful statements in your affidavits and your offense reports.  Agreed?

11

A.    Agreed.

Q.    Okay.  Now, just to be clear, if a suspect reaches for a gun or even the thought of that, you are going to document that in a report?

A.    Well, I wouldn't know what the suspect's thought process is.  I would know if somebody was grabbing on to my gun --

Q.    You would document that?

A.    If somebody was grabbing on to my gun, I would certainly document that, yes, ma'am.

Q.    Or even if they attempted to reach for it, you would document that?

A.    If I knew that they were reaching for it?

Q.    Yes.  You would document it?

A.    If I knew that, yes.

Q.    And if there were pressure on your groin area to where you could have been injured in that area, you would have documented that as well?

A.    If I remembered that after a tense and certainly rapidly-evolving situation, I would, yes.

Q.    Okay.  And that's a good point, if you remember it later.

       Now, there is offense reports, correct?

A.    Correct.

Q.    And then there is supplemental reports?

A.    Correct.

Q.    Okay.  And so supplementals come after the offense report.  And so if something comes to you later, then you write a supplemental, correct?

A.    You would.

Q.    Yes.

And then you testified about protecting Evans's face, that the Defendant was trying to protect Evans's face?

A.    That is what I saw.

Q.    So wouldn't you agree with me that the way to protect somebody's face is not to give the bite command at all?

A.    That is one method.

Q.    Okay.

A.    It is not the only.

Q.    Okay.  Now, one of the -- I think that you said yesterday your expertise is case law?

A.    Yes.

Q.    Okay.  Are you familiar with the case of Becker v. Elfreich?

A.    I am, yes.

Q.    Isn't it true that a lot of the facts in that case are similar to this?  Yes or no?

A.    Yes.  And there are other cases --

Q.    I am asking you --

A.    -- it is also similar to.

Q.    -- about this one though?

A.    Yes, ma'am.

Q.    All right.  And those facts are similar to these?

A.    They are not identical.

Q.    I didn't say identical.  I said similar.  There is no case that is going to be identical across the United States. They are all fact-specific, correct?

A.    Agreed, yes.

Q.    But in this particular case, it is similar to this case, right?

A.    It is similar.

Q.    Okay.  All right.  And in that case, well -- let's just suffice it to say that in the case it talks about, as the threat changes, then so should the degree of force used by the officer?

A.    That's correct.  And they were citing Cyrus v. Town of Mukwonago.

Q.    Okay.  They were citing what?

A.    Cyrus v. Town of Mukwonago, a Seventh Circuit case.

Q.    I don't see that cite in here.  But, okay, I will take your word for it.

A.    It is in the case law if you read the actual case.

Q.    Okay.  Well, I have it here.

        Okay.  And let's see, oh, this goes back to your report.  Would you agree with me that -- and back to your

report, that you state that presence of a K9 de-escalates the need for force?

A.    It can, yes.

MS. BATSON:  Now, Let's look at Exhibit 1D, page 8.

BY MS. BATSON:

Q.    Now, I just want to make sure I heard you clearly, sir, yesterday.  You said that you would run your dog the same way as the Defendant ran his dog?

A.    Yes, ma'am.

Q.    Okay.  So in this instance right here, you are telling this jury you would continue to give the bite command, and while you are pressing down the suspect and his hands are in a vulnerable position, and he is cross-legged there?

A.    I think that is a little bit misleading because we are looking at --

Q.    I'm saying --

A.    -- one-thirtieth of a second.  I am trying to answer your question, counselor.

This is one-thirtieth of a second.  One-thirtieth. This is not taking into consideration the totality of the circumstances that has occurred here.  This is one-thirtieth of a second, a still image.

Q.    Okay.  And we can watch the video again, and this is just a freeze frame of what happened in the video.

A.   It is a freeze frame, ma'am.  It is a still image taken from a body cam, a two-dimensional, from the perspective of the body cam, in one-thirtieth of a second.

Q.   But what I am asking you is, whether you play the video or look at this still shot, you would give the bite command if you had a suspect in this position?  Yes or no?  Just yes or no, sir.

A.   I can't answer that.  That is not a yes or no question, ma'am.  It is a totality of the circumstances, and I think that's --

Q.   Okay.

A.   -- not what we are looking at here.

Q.   All right.  And, now, are you saying this is a stressful situation?

A.   This is a tense, uncertain, and rapidly-evolving situation.  Stress.

Q.   Is it a high-stress situation?

A.   Tense, uncertain, and rapidly evolving --

Q.   Okay.

A.   -- is high stress.

Q.   Oh, so you are saying it is high stress.

     Okay.  All right.  So if it is such a high-stress, tense, evolving, why do we see Constable Smith strolling down the middle of the hallway in the fatal funnel?

A.   Well, that is a tactical question, and I don't think we

are here for tactics.

Q. Can you answer my question? If it is such a stressful situation, why is he strolling down --

A. Well, I have been in positions very similar to this --

Q. I'm not asking you --

A. -- that I am walking down a hallway that has little, if any, concealment; little, if any, cover. I am not exactly sure where else Constable Smith would be walking, ma'am.

Q. Or could have stayed outside?

A. Well, that is a tactical decision, but we are not here to discuss tactics, I don't think.

Q. Well, we have been discussing tactics. But you are right, the case is not about tactics.

A. Yes, ma'am, you are right.

Q. But we are talking about stressful situations. If it is such a stressful situation, then why do we see Constable Smith standing in front of the door for 25 seconds?

A. Again, that is a tactical -- that is a tactical decision.

Q. Okay. And, again, entering alone?

A. If we are talking -- you are asking my opinion about that, which it sounds like you are, I am just making sure, a tense, uncertain, rapidly-evolving situation, your expert said high stress, it includes -- and I agree with that -- it includes a police officer encountering an armed individual.

I agree with that.

That is a tense, uncertain, rapidly-evolving situation.  I agree with your experts when they say as a police officer facing somebody armed with a knife.

But tense, uncertain, rapidly-evolving also includes much more.  It includes responding and going into somebody's home that is poorly lit.  It includes walking into somebody's house that you are unfamiliar with.

Q.   You are being non-responsive to my question.

A.   I am answering your question.

Q.   No, sir, you are not.  You are not.

THE COURT:  Why don't you reask the question.

And, sir, if you would keep your answers brief and responsive to the questions.

THE WITNESS:  Yes.

BY MS. BATSON:

Q.   If it is such a high-stressful situation, then why do we see -- let me back up -- to the Defendant standing in front of the door for 25 seconds?

A.   Again, I think that is a tactical analysis, which we are not here for.

Q.   So, again, high-stress situation, that is what your testimony is, tense, evolving, all that stuff?

A.   Part of Graham v. Connor is tense, uncertain, and rapidly-evolving.

Q.   But, sir, whatever stress you say that this Defendant was experiencing, I can guarantee you that Mr. Evans was experiencing much greater stress?

A.   I don't know that to be true.

Q.   Okay.  All right.

Now, one of the things that you talk about is mis-sequencing?

A.   Yes, ma'am.

Q.   Now, I looked that up in Google, and it is nowhere to be found.  So what is the definition of "mis-sequencing."  I mean, literally, it is not a word.

A.   Mis-sequencing is when you are recalling memory from an event, and you simply document or misremember the sequence of the events.

Q.   Okay.  There is no scientific test for this mis-sequencing, though, is there?

A.   I am not aware of whether there is or is not.

Q.   You are not?

A.   I am not aware whether there is or is not.

Q.   Okay.  Now, without interviewing the Defendant, how can you tell this jury that the lies that were in his affidavit are mis-sequencing?

MR. SKIPPER:  I object to lies.

BY MS. BATSON:

Q.   Or misstatements.

THE COURT:  Overruled.

BY MS. BATSON:

Q.    How can you say that they are mis-sequencing, a word that is not a word?

A.    What word did you use, ma'am, I'm sorry, misstatements?

Q.    Mis-sequencing.

A.    I would disagree with the characterization of misstatements.

Q.    Okay.  But my question is, how -- without interviewing the Defendant, how can you tell this jury that, with 100 percent certainty, that those statements in that affidavit are mis-sequencing?

A.    Again, my same answer as before.  I watched all of the body cam evidence, and I went through and reviewed all of the records that were provided to me.

Q.    Okay.  Now, I think Constable Smith has 25 years of experience as a law enforcement officer.

A.    If you say so.

Q.    Okay.  You didn't know that?

A.    That sounds about right.

Q.    Okay.  And how did you find that out without interviewing him?

A.    Again, I am saying it sounds about right.  I also testified I am not -- that I don't agree or disagree with you on that.  If you tell me that he has, then...

Q.    I just want to make sure, sir, that you have just told this jury and -- that this Defendant because of the mis-sequencing, that he cannot be a credible witness when he writes a report, an offense report.  And in 25 years of experience, do you know how many cases this Defendant has worked?  And when you say the words "mis-sequencing," how many innocent people do you think are in prison for mis-sequencing?

        MR. SKIPPER:  I am going to object to that entire --

        THE COURT:  Sustained.  Why don't you reask your question.

        MR. SKIPPER:  -- line of questioning.  I am going to ask --

        THE COURT:  Mr. Skipper, you can sit down.  I sustained your objection.

        Why don't you reask your question, ma'am.

        MS. BATSON:  Yes, Your Honor.

BY MS. BATSON:

Q.    Outside of this case, if it is convenient for the term "mis-sequencing" to be used at any point in our justice system, don't you think that that undermines our justice system?

A.    No, I don't.

Q.    Okay.

Now, you indicate in your -- and this is not the report that you provided to Defense counsel, but you indicate that in post-arrest interviews -- or post-bite interviews, I'm sorry, that it is -- you have to corroborate what happened in a videotape.

Do you recall saying that in your -- page 21?

A.    In my summary --

Q.    In your patrol notes?

A.    In my patrol summary --

Q.    Yes.

A.    Okay.  Yes, ma'am.

Q.    So one of the things you said:  This must be corroborated on videotape.  It is the handler's responsibility to ensure that this is done.

A.    That is the recommendation.  I'm not familiar with whether Constable Smith has seen that or not.

Q.    I didn't ask that.  You are the witness.  And this is your statement.  So you said:  It must be corroborated on videotape.  And it is the handler's responsibility to either do this or make sure it is done.

You agree with that?  It's your own statement?  You agree with that?

A.    Ma'am, yes, I certainly agree with that, yes.

Q.    Okay.  And then you also say that once you lock in the suspect witness's testimony immediately, this will prevent

22

false accusations or statements?

A.    Correct.  It doesn't say about watching the videotape before or after you write a report.

Q.    I am not talking about that.  I am not talking about -- we are not talking about the affidavit.  What we are talking about is that you say that you need to corroborate the witness's statement on videotape, lock it in immediately, to prevent false accusations.

A.    The witness statement.  Or where -- you are actually confusing two separate issues there.  One is corroborate the videotape, one is lock a suspect into an interview.

Q.    You have both listed under post-bite interviews?

A.    I agree they are under post-bite interviews, but they are two separate.

Q.    Okay.  All right.

       MS. BATSON:  Let's play the clip, please, of the suspect on the porch.

           (Video played.)

           (Video paused.)

       THE COURT:  Okay.  And which exhibit is this?

       MS. BATSON:  This is going to be Exhibit 5.  I think it is Exhibit 5, Your Honor.  We will get that.

       THE COURT:  Okay.

       MS. BATSON:  Oh, 4.  Your Honor, Exhibit 4.

BY MS. BATSON:

Q.   Sir, so according to what you wrote in how to document a post-bite interview by videotape and immediately after it happens, this is the documentation that you are referring to; isn't that correct?

A.   That is the recommendation, yes, ma'am.

Q.   Okay.  Now, sir, I will just -- all of this, what you are testifying to, again, is just trying to spin the narrative.  And it truly is an attempt to justify unjustifiable conduct.  I know you are not going to agree.  But would you agree?

A.   No, ma'am, I do not agree with you.

        MS. BATSON:  Thank you.  I will pass the witness.

        THE COURT:  Okay.

        MR. SKIPPER:  May I, Your Honor?

        THE COURT:  I'm sorry?

        MR. SKIPPER:  May I?

        THE COURT:  Yes, you may.

                    REDIRECT EXAMINATION

BY MR. SKIPPER:

Q.   Officer Kmiecik, what you just saw on that clip of Robert Evans, that wasn't necessarily a post-deployment interview, was it?

A.   No.

Q.   It was Robert Evans running his mouth, wasn't it?

A.   Yes.

24

Q.   Does he like to run his mouth unsolicited?

MS. BATSON:  Objection, Your Honor.  He hasn't even interviewed the Defendant.  How is he going to know that about Mr. Evans?

THE COURT:  Overruled.

A.   It would appear from the video, yes, sir.

BY MR. SKIPPER:

Q.   And Eric Tuma, the Acting Chief of Police, likes to just sit there and listen to Robert Evans run his mouth, doesn't he?

MS. BATSON:  Your Honor, objection.

THE COURT:  Sustained.

BY MR. SKIPPER:

Q.   Mis-sequencing and slips and captures, I want to expound on that because you were asked about that on cross-examination, just so --

MS. BATSON:  Your Honor, I object.  I didn't ask about slips and captures, only mis-sequencing.

THE COURT:  Okay.

BY MR. SKIPPER:

Q.   Let me ask you how that works in the K9 industry when we are talking about a command given.

In this instance, an apprehension command versus the heel command and how that works in the K9 industry, based on your expertise as a certified Force Science analyst just

like --

MR. MACHICEK:  Your Honor, I would object to an industry standard.

THE COURT:  Let's have one lawyer from the Government on this witness.  Okay?

MR. MACHICEK:  Yes, Your Honor.

THE COURT:  Is there an objection?

MS. BATSON:  Okay.  Your Honor, the objection is any testimony about industry standards that are not related to this case.

MR. SKIPPER:  I don't even know -- is that a legal objection, Your Honor?

THE COURT:  Why don't counsel approach.

(Bench conference.)

THE COURT:  What was the question?

MR. SKIPPER:  I am asking him about how commands related to his expertise as a Force Science analyst, how K9 officers can get commands mixed up, based on what she was asking him on cross-examination.  I'm just following up on what has opened up.

THE COURT:  And what is the Government's objection?

MS. BATSON:  Just so I am clear, you are going to ask him about the mis-sequencing part of the video?

MR. SKIPPER:  Yes.  What you talked about, not having a definition --

MS. BATSON:  Mis-sequencing part --

MR. SKIPPER:  Yeah, about your Google search.

MS. BATSON:  I did do that.  I did do that.

MR. SKIPPER:  I am looking at her because she is the court reporter.  I'm making sure I am not blocking the microphone.  Is that okay with you?

THE COURT:  Guys, let's --

Is there an objection to the question?

MS. BATSON:  Yes, Your Honor.  He didn't interview the Defendant.  So for him to say that the Defendant meant to give the heel command when he, in fact, gave the bite command, it is improper.

MR. SKIPPER:  It is not improper, Your Honor.  The entire basis -- their allegation -- they didn't interview my client either.  It's consistent with his expertise.

THE COURT:  As long as the question is related to his expertise, what he observed on the video, it is okay.

Obviously, if the witness starts to talk about what was in the mind of the Defendant, when he hasn't interviewed him, then that's something you can object to.

MR. SKIPPER:  Thank you, Your Honor.

(Bench conference concluded.)

BY MR. SKIPPER:

Q.   Officer Kmiecik, do you recall Jerry Staton, the Government's expert, being a Force Science analyst?

A.    I do.

Q.    Okay.  Now, getting back to my question, can you explain for the jury, based on your training and experience and expertise as a certified Force Science analyst, regarding mis-sequencing, how everything that you viewed, reviewed, saw, and listened to in this case would be consistent with mis-sequencing regarding giving a bite command versus a heel command?

Can you simply explain that?

A.    A bite command versus a heel command.  When officers are under high-stress, tense, uncertain, rapidly-evolving situations, officers tend -- officers tend to use commands that don't fit with what they are intending to do.

I have watched video after videos of handlers giving wrong commands, police officers telling people to put their -- show their hands up, when clearly their hands are up.  So that would be consistent with what I saw in the videos and the review of the material.

Q.    Okay.  And later when the extraction of the bathtub, when there are commands given in terms of get on the ground, get on the ground, would that certainly be a command?

A.    Yes, absolutely.

Q.    Okay.  Some type of command?

A.    Correct, yes.

MR. SKIPPER:  May I have one moment, Your Honor?

28

THE COURT:  You may.

MR. SKIPPER:  Pass the witness.

THE COURT:  Okay.  Anything further, Ms. Batson?

RECROSS-EXAMINATION

BY MS. BATSON:

Q.   Sir, mis-sequencing is a made-up term by Force Science, agreed?

A.   No, I disagree.

Q.   Okay.  All right.  Would you agree -- have you every tried to look it up, that word?

A.   Did I Google it, no, I did not Google it.

Q.   So where do you get this definition?  Is it from Force Science?

A.   It was -- I learned it -- about mis-sequencing, at Force Science, yes, Force Science Institute.

Q.   And Defense counsel referenced Jerry Staton, the Government's witness, and Jerry Staton said mis-sequencing cannot be attributed to a specific individual in a specific circumstance, according to what he also found out from Force Science.  Agreed?

A.   I don't agree with him on that, no.

MS. BATSON:  Okay.  All right.  No further questions.

THE COURT:  Okay.  Anything further?

MR. SKIPPER:  No, Your Honor.  Thank you.

29

THE COURT:  May this witness be excused?

MR. SKIPPER:  Yes, Your Honor.

THE COURT:  Ms. Batson?

MS. BATSON:  Yes, Your Honor.

THE COURT:  Thank you, sir.  You may step down.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Mr. Shook.

MR. SHOOK:  Your Honor, Defense calls Dennis Brady.

(Witness sworn.)

MR. SHOOK:  May I proceed?

THE COURT:  You may.

DENNIS BRADY, DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. SHOOK:

Q.   Mr. Brady, would you state your name and spell your last name for the court reporter, please?

A.   My name is Dennis Brady, B-R-A-D-Y.

Q.   How are you employed, sir?

A.   I am a principal with Denshaw Group, LLC, a private investigations and security consulting firm licensed by the State of Texas through the Private Security Bureau.

Q.   How long have you been employed in that capacity?

A.   Since July of 2016.

Q.   Okay.  Prior to July 2016, how were you employed?

A.   I retired as a Supervisory Special Agent of the Federal

Bureau of Investigation on July 31st of 2016.

Q.    All right.  You have been in law enforcement for quite some time?

A.    I started in law enforcement with the Boise Police Department in 1983.

Q.    Let's back up a little bit.

Before joining the Boise Police Department, did you go to school in that area?

A.    I went to Boise State University from 1978 to 1983.  I was on an athletic scholarship.  I took a business finance degree.

Q.    Upon graduating from that school, what did you do then?

A.    I got employed by the Boise Police Department.

Q.    Okay.  Tell us a little bit about your experience there and the training that you had?

A.    March 2nd, 1983, I was hired by the Boise Police Department assigned to an interim training program.  I was sent to work at the Boise Airport.

Boise, at that time, was a city of about 130,000 people with about a 150-man police department.

I finished the intern program within seven months and was assigned to field training.  I was on a probationary period for 18 months.

Before the probation period was over, I was assigned, selected -- recruited and selected for the Boise

Police Department Special Operations Unit, which was the Boise Police Department's SWAT team at that time.  It may still have the same name.

Part of that training, I was sent for training with the Federal Bureau of Investigation, with the Idaho State Police, and with the Los Angeles County Sheriff's Department Special Enforcement Bureau.

At that time, the area of Boise had an active Aryan Nations problem, Aryan Brotherhood and Aryan Nations, Christian identity movement, armored car robberies.  So we had consistent training with the FBI, the Idaho State Police, and surrounding agencies.

And we sought training from the experts in the area with the tactics that we wanted to use, which was the Los Angeles County Sheriff's Department Special Enforcement Bureau.

I was given enhanced training in firearms, defensive tactics, personal defensive tactics, group defensive tactics, and overall tactical training, what to expect at the scene of a crisis, a crisis or incident.

Q.   How long were you with the Boise Police Department?

A.   I was there until the FBI recruited me and selected me. On February 23 of 1987, I went to Quantico.

Q.   Did you receive additional training at Quantico?

A.   New agents training.  Start all over.  All of the

32

basics.  It is like any other police academy, but with the FBI version of it on a Marine Corps base.

At that time there were a number of Marines in the Bureau, several in my class that had been overseas in the Beirut Embassy bombing.  We learned, you know, the usual things.

At the end of training, I was assigned to the Dallas office of the FBI.  I reported on June 1st, 1987.

Q.   What types of cases did you work on as an agent with the FBI?

A.   My first assignment was to the Dallas Division's Reactive Squad, which at that time was Squad No. 6.  It was generally called the bank robbery squad, but it actually handled more than that.  We handled kidnapping, extortion, violent fugitives, bank robbery, armored car robbery.  And we were seconded throughout the area to the resident agencies in arrest.

By 1991 I was recruited to apply, and selected with the Dallas Division SWAT Team.  I got one of the fully-funded positions.  So I was sent for the basic squad school, basic FBI school in Quantico, two weeks long.

And right after that, I was sent for advanced tactical options training, advance SWAT school, enhanced weapons training, enhanced personal training in terms of maintaining your physical skills, maintaining your physical

fitness.

I was trained in enhanced defensive tactics, group tactics, and tactical operations. How to respond -- you know, how fast you should respond, what equipment you should respond with, and who you should be turning to for intelligence information when you get to the crisis site.

Q. And how long were you on the FBI Dallas SWAT program?

A. I was in the SWAT program until 2006. I trained, you know, two to three times a month regularly with the rest of my teammates.

Over time I was moved kind of through the ranks. It is a collateral duty. It is not a full-time job. You are still maintaining your investigative case load, but you are also expected to take on this new assignment for no extra money but just a lot of extra gear and training.

I became a defensive tactics instructor, and provided training to the general agent population. I became responsible for the Dallas Division SWAT selection program, scripted a series of events provided to us by Quantico to determine who was suitable among the available applicants to become a member of the SWAT program.

I was an element leader and assistant element lead breacher for a fairly standard period of time. I was generally the one who went through the door first in the Dallas Division SWAT incidents.

34

Q.   And did you have a position change in the FBI in 2001, September of 2001?

A.   So by 2001 my squad assignments had moved from violent crime, bank robberies, fugitives, and the like, to gang and organized crime.  And I started on a Jamaican task force working with other officers.

I had already been working with DP officers and other officers on the violent crimes task forces.  This is a relatively new gang task force that were organized crime and drug enforcement task force investigations, OCDETF.  We identified the main supplier, to the group of Jamaicans that I was working as a member, of the Mexican Drug Cartel.

I was transferred to the squad with my case load to handle those types of cases in which it was a high-intensity drug-trafficking area, HIDTA squad, OCDETF squad.

I was responsible for Title III applications.  I was a case agent, supervising wire agent.  I wrote the affidavits, dozens of them.  I wrote dozens of search warrants, wire intercepts, all that.

We knocked off loads, arrested bad guys, seized money, cars.  And 9/11 came.  And I was one of the agents that was known, you know, if you needed a wire, Dennis could have it for you in about eight hours, at least the initial affidavit.

So on 9/11, I took that package of skills to a new

target set.

Q.    Okay.  And did that eventually lead to your assignments overseas?

A.    Yeah.  In 2006, as I was getting out of the SWAT program, I was finishing up paramedics school.  I was a nationally registered paramedic, licensed in the State of Texas, working under the supervision of the doctors in the FBI.

And I was recruited by the unit in the national security branch I was working for to be an interrogator in Iraq on a specialized task force.

I worked in Balad, Iraq, with Central Intelligence Agency personnel.  I joined Special Operations Command personnel.  The U.S. Government's best CT people.

I worked with DEVGRU, which is SEAL Team 6.  1st Special Forces Operational Detachment Delta, Delta Force.  I worked with the SIS.  I worked with MI6, BSIS, British Secret Intelligence Service.  And a whole host of other military and -- and all of the Five Eyes partners, plus the coalition partners.

I received some recognition from my work there.  I was recruited, selected, promoted to be the Assistant Legal Attache in Sana'a, Yeman.  I had a choice of Yemen, Bagdad, or Islamabad, some Kurdish spots.  But Yemen was good.

As I moved through that assignment, early in it

Umar Farouk Abdulmutallab, the underwear bomber of Northwest Flight 253, his -- the guy who planted the bomb was a Yemeni, and the guy that recruited him was also a Yemeni.  And they were in our area of responsibility.

I was assigned to create an interrogation program for detainees in the custody of the Yemeni Intelligence Services.  I did that.  And I received some recognition for that.

I was recruited, selected, and promoted to be the On-Scene Commander for FBI operations based in Bagram, Afghanistan, which is now a GS-15 position.  Yemen was a 14.  Agents in the field are 13, 14, 15.

I was responsible for the interrogation of detainees at the temporary screening facility, again, with people that I knew already on a first-name basis.  DEVGRU, Delta, CIA, and working through the intelligence community in JSOC.

I also had some additional assignments regarding corruption, rule of law, human rights issues, and general investigation of things that happened on the base in Baram, Afghanistan.  At that time it was a minimum of 30,000 people on that base all the time.  Lots of stuff happening.

At the end of that one-year assignment, I was recruited and selected to be the Operational Unit Chief of the High-Value Detainee Interrogation Group, at the time the

U.S. Government's interagency team that interrogates terrorists detained anywhere worldwide.

Again, I worked with the same people.  You know, the JSOC partners, the HIG partners, the intelligence community partners.  And we had a number of successes.  So I got awards there too.

And they recruited me to be a term Senior Executive Legal Attache.

THE COURT:  Mr. Shook, excuse me, sir.  Is there a question pending?

MR. SHOOK:  Yes.  I will move on.

THE COURT:  Okay.  Thank you.

BY MR. SHOOK:

Q.   Eventually, you were reassigned or came back to the United States?

A.   I retired.

Q.   All right.  And since that time you have been working as a private investigator?

A.   Yes, sir.

Q.   All right.  You have been retained as a consultant and expert on use of force matters related to this case?

A.   Yes, sir.

Q.   And have you reviewed body cam -- body cams from the officers involved, case filings, the information that was provided in discovery?

A.    Yes, sir.

Q.    All right.  And in reviewing that, you have been here for some of the testimony of some of the Government's experts; is that correct?

A.    I had a trial in state court earlier this week.  So I came for the second half of Tuesday, second half of Wednesday, and all day yesterday.

Q.    All right.

And do you have -- did you form -- were you able to form some opinions about the reasonableness of the use of force used by Kelly Smith in this case?

A.    I did.

Q.    And what is the opinion, as far as whether his force was reasonable?

A.    My opinion is that the use of force by Kelly Smith on the July 25, 2022, arrest of Robert Evans was reasonable.

Q.    Now, I want to go into some specific opinions and some of the facts that have been brought out in this case.

First of all, the situation on the 25th of July, 2022, out at that trailer with the barricaded suspect, can you tell the jury how that works as far as what the on-scene commander does.

A.    The on-scene commander is the senior representative of the agency that owns the situation.  We determine who that is by who holds the warrant and who owns the turf.

So this incident happened in Hawkins Police Department, and it comes from a warrant filed by Sergeant, then Acting Chief Eric Tuma. So Tuma, by default, is the on-scene commander.

Q.   And what duties does an on-scene commander have at the scene?

A.   The on-scene commander needs to secure the appropriate resources to resolve the situation.

First, he needs to acquire the necessary intelligence, understand the background of what he is dealing with. He should be continually assessing the personnel on the scene, the number of personnel, who they are, what skills they have, what abilities they have, what he needs, what equipment they need, what training do they have, and who else can assist them.

He also needs to determine how long he has to resolve the situation. None of these situations happen in a vacuum. Other things were happening in Wood County on July 25, 2022.

From the actions of the officer on the scene, there is some sort of a time imperative. Indeed, as we watched the end of the tape, McQueen leaves because there is another call, a burglary in progress.

Q.   So at the time that Kelly Smith arrived and reported to Sgt. Tuma, Acting Chief Tuma, was a plan made or was a

40

decision made as to how the officers would proceed?

A.    Early in the situation, Tuma decides, we are going to make entry.  And we hear him say several times on the tape, when this gets here, we will make entry.

First, it was when McQueen gets here, we will make entry.

And, second, it is, well, when Austin gets here with his dog, we will make entry.

And when Kelly -- when Constable Smith gets here with his dog, because Milbourn's dog is not an apprehension dog, I guess, they decide to make entry when Smith arrives.

Q.    All right.  And there has been a lot of testimony about clearing a building or clearing a building when there is a known suspect.

From your training and experience, what is clearing a building when there is a known suspect?

A.    Clear, to me, means enter the building, locate and apprehend the suspect, and mitigate the threat.

Q.    And a lot of your training with the SWAT team has to do with clearing buildings.  I think you testified that you participated in that quite often?

A.    Yes.

Q.    What is -- first of all, when teaching someone these types of tactics, what is the goal?

A.    Tactical training is teaching human beings.  You have

always got to realize that there is physical, emotional, mental limitations.  Everybody has got them.  You are teaching human beings to do something that is inherently unsafe, that is a threat to their life, safety, and well-being.

You are teaching them to do it in the safest manner possible.  You are not teaching them to be safe.  You are teaching them to be as safe as they possibly can.

Q.   And --

A.   You are also teaching them that they are making choices, and that each of the choices has consequences.  Maybe even second and third order effects that they may not anticipate without running scenarios through in their mind.  It's a big part of it.

Q.   All right. And the plan to go into this trailer at this time, can you describe what that plan was and then how it was executed?

A.   I didn't particularly identify a plan from Tuma, other than pushing somebody else to do it, you know, pushing somebody else to breach, pushing somebody else to enter, pushing somebody else to do something.  But, from my point of view, Tuma completely failed as an on-scene commander.

Q.   All right.  But the order was given to breach, and when someone breaches a door, an officer -- first of all, are -- police officers at least get basic tactical -- learn basic

tactics when they are in the academy and on the force?

A.   They should have some foundation level of tactical training.  You know, you have an implicit assumption that when we arrive at the scene we are all there for a common goal.  We are all on the same team.

And that we all have a baseline level of physical and mental conditioning, we have a baseline level of firearms expertise, and we have a baseline level of defensive tactics training.  It is an assumption that you make.

Q.   And in this case, when the door is breached -- first of all, how is that usually done?  What does your experience and training tell you on that is done?

A.   You know, we did it with tools.  I started in 1983 out of the Boise Police Department.  And I realize not every agency has the same level of budget, personnel, training.  But rams are cheap.  They are easy to make.  Sledge hammers are available at Home Depot.  So are pry bars.

You know, you can open a trailer door by kicking it 28 times, or you can slap a pry bar in there, and peel that thing in about five or 10 seconds.

Q.   Now, Mr. Brady, there has been testimony about other things that could have been done.  Is that true of any type of operation like this?

A.   Every operation is an opportunity to improve.

Q.   Okay.  At some point, though, there has been testimony

43

about waiting longer, doing things, cutting power, that type of thing.  But, obviously, every department is different as far as the resources.  Every situation is different.  Ultimately, though, the decision was made to go in at this time.

A.    Yes.

Q.    And that decision -- can you tell us how that decision has to be made at some point in time?

A.    Somebody has to make that decision, and somebody has to cover the ground.  Sooner or later some police officer wearing green or blue or brown, or whatever, has to take his badge and his gun up to the door and do what he can do to resolve the situation, to arrest the bad guy.  It has to be done.

Q.    And in this particular case when the door is breached, were there some mistakes made?

A.    Yes.

Q.    Can you tell us about that?

A.    So when -- the breach is bad.  It is poor.  It is not the worst I have ever seen, but it is among them.

          The door is partially open.  All right.  It is not all the way open.  It is open between 25 and 30 degrees.

          So they could see looking through the door down one hall.  But they cannot see another 150 degrees of the field of view.  They are looking down the hall, and they see a dog.

That is all they can see.

Eventually, they pull the dog out.  After some more command, after some more conversations, after some yelling down the hall, they pull the dog out.

Q.   Was that a good decision?

A.   I think that is a good decision.  You have a lot of options with that dog.  The most humane thing is take the dog out.

You know, a foundational level of training kind of like I received, most tactical officers know to carry a hunk of parachute cord, rope, string in one of their pockets because it comes in handy in situations like this.

You could have tethered that dog somewhere.  It was a choice they made in their equipment selection to take the dog outside and hand it to -- Mr. Graham, is that right?

Q.   Right.

A.   A man with his hands handcuffed behind his back, who is currently unguarded and alone on the perimeter of this scene.

Q.   Now, once that is done, though, that is done by, at that time Sgt. Milbourn, correct?

A.   I think Sgt. Newell came over to guard him.  He was the entire perimeter team and guarding Graham and holding the dog all at the same time -- or Officer Newell, not Sgt. Newell. I think Tuma was back with them.

45

Q.   After the dog is taken out though and Kelly Smith enters the building, are you supposed to enter a building by yourself?

A.   You should be assuming that somebody is coming behind you.  I mean, it is a reasonable assumption on Kelly's part that somebody is going to cover his six, his back side.

Q.   Is that what the basic training is and basic tactics?

A.   Yes.

Q.   And how is the situation set up for that to happen?  Was there an officer available?

A.   Yeah.  McQueen breaches the door and steps back so that others can make entry.  That is fairly standard.  You don't want the breacher to stagger through the door after kicking it in.

He should get it open, as open as he can get it, and he should step back.

And then the breacher is usually number two or three in the stack, the stack of people that is going through the door.  Polyester and Kevlar, pulling the door and going through it, heading in usually specifically predetermined directions.

Q.   Now, in this case Milbourn left with the dog, so someone needed to fill the void?

A.   Yes.

Q.   And did that happen at that time?

A.    Did not.

Q.    And Constable Smith went down the hallway.  We have heard lots of testimony about the dog going, wound up in a bathroom door.  Do you remember how long he was in the hallway by himself?

A.    33 seconds.  I think in my report that is what I cited.

Q.    Okay.  Was that a good thing to happen when you are entering a house?

A.    That is just disastrous.  That's awful.  That is abysmal.

Q.    Did that put Constable Smith in a bad position?

A.    Risked his life.

Q.    Now, I want to ask you about some specifics because some expert opinions have been given regarding that.

Let's move to that bathroom door when Constable Smith is on one side, and Mr. Evans is on the other side.

You have heard experts testify and give opinions about was Evans just trying to surrender at that time.  And this should have stopped all of that.  Do you agree with that opinion?

A.    I do not agree that Evans was ever attempting to surrender, not once, not at that point.  Evans has been told what the terms of the surrender are.  Come out with your hands up.  Come out with your hand up, or you will be bit.

Come out with your hands up.

He has had it related to him several ways.  He has been told to come out with his hands up.

Q.    When Evans responds, will you put the dog up, doing things like that, what is your response to that type of comments back from Mr. Evans?

A.    You should continue to press the situation as the officer on the scene.  Are we to believe that Constable Smith is taking orders from Evans now?  Or are we to believe that we let the bad guys tell the police what to do, to dictate the terms of their arrest tactics and surrender?  I don't think that is going to work in the long run for American law enforcement.

Q.    Going on with that, you have heard testimony about when finally the door is opened, it is pushed open, and we have seen on the video some struggle that happens at the beginning of the door.  And then the jury has seen the video from Constable Smith's camera and also a still shot of Robert Evans with his hands up.

You have heard experts testify that they feel that was an indication of Robert Evans surrendering.

Do you agree with that opinion?

A.    I do not.

Q.    Tell us why, please.

A.    That's a single frame from a moving picture, 30 frames a

second.  All right.  Evans's hands are blurry.  They are blurry because they are in motion.  Evans's knees are bent.  He is bent forward at the waist.  And he is assuming -- widening his base.  He is assuming a combative stance.  You can call it a defensive stance, whatever.  Evans is standing there prepared to resist arrest, which he does.

Q.   You have also -- there was some opinions by Mr. Eden that the fact that Constable Smith had been struggling with Mr. Evans for some seven seconds and not been shot, injured, or anything, that it was highly unlikely that Evans was armed at that point.

Do you agree with that opinion?

A.   I do not.

Q.   Tell us why, please.

A.   I think that might be the dumbest thing I have heard in a long, long time uttered by a police officer.  Just because you haven't been shot at the onset of the situation means you are dealing with a peaceful subject?  I am sorry, but that is stupid.

Q.   And the further opinion that Evans was in shorts so he likely did not have a weapon, did you agree with that weapon?

A.   That is the second dumbest thing I have heard in a long, long time.  If you show up here to the courthouse in your shorts, they are going to run you through the metal detector.

49

If you show up at the airport in your biker shorts, your spandex biker shorts and your spandex T-shirt, they are going to run you through the metal detector.  All right?

People hide weapons in all kinds of places.  I'm sorry, but that is just a dumb thing for him to say.

Q.    When you are in a -- and you have seen the videos -- in a small room and in a struggle with a suspect that you are trying to apprehend, do you have time to fully assess what they are wearing or whether you think you have weapons?

A.    You don't have time to do anything but engage in the action in which you were entered.

Q.    Mr. Eden also entered opinions, I think some of the other experts did as well, that Mr. Evans was not taking aggressive action toward Constable Kelly, was in survival mode.

Do you agree with that opinion?

A.    I have an opinion about Evans's mental state, yes, I do. I authored a report, and it is in there.

Q.    All right. Did you feel that this was -- would you describe Evans's actions as resisting arrest?

A.    Yes.

Q.    We also heard a lot of testimony about when Robert Evans is in the bathtub, and we saw a still shot of when Constable Smith has two of his hands on his shoulders and Mr. Eden, and other experts have said at this point Constable Smith has

positive control.

In your opinion, is that positive control?

A.    That is not positive control.

Q.    What is positive control, based on your experience and training?

A.    Positive control in this situation is handcuffs, which are a temporary restraining device, what we teach the FBI agents.  This is a temporary restraining device, have been fully applied, both cuffs are on, both cuffs are double-locked, and you have positive hands on Robert Evans so that he is not able to resist further or flee.

People in handcuffs still resist.  People in handcuffs can still flee.  You need to control your arrestees.

Q.    There is also expert's opinion rendered about Mr. Evans could be handcuffed with his positions on his head at that particular time while he is down in the bathtub.

Do you agree with that?

A.    You and I are old enough that we cannot get our shoulders to articulate into the position that Robert Evans was actually in.  Because elbows are close to his center line, dropped down to his center of gravity, although his hands are on his head, he is in a position of advantage for him.  He is contained within the tub, which protects him.  He is braced within the tub.  His legs are pressing against it.

51

Again, we don't know what is in the tub underneath Evans.  Kelly hasn't had time to assess what is in the tub. There are tools on the floor.  There could be tools in the tub.  There could be weapons in the tub.  There could still be weapons in Evans's pockets.  Evans is not in control in that position, absolutely not.

Q.    What is the problem if you try to handcuff someone in a position that he was in at that time?

A.    If you handcuff one hand while it is in a position where the suspect has the mechanical advantage, the physical advantage, you have just handed him a weapon.  Cuffs come in two kinds nowadays.  They have hinges, and there is the old ones from my day that are on a short chain.

If you put the handcuff on one hand, you have handed him an impact weapon and a flail that he can use against you if he pulls away from you.  He can cut you with that single blade edge.  He can smack you in the head with the cuffs.

You don't want to hand somebody a weapon that they can use against you.  It would be poor technique to handcuff him in that position, as it would be poor technique to tell him to put his hands on the wall, thus furthering his mechanical advantage.

We have not been teaching people to tell suspects to put their hands on the wall since the 1980s.  It is not

done.  Prisoners practice it in prison, pushing back off of the wall.  We know not to do that.  Good policemen know that.

Q.    I want to go to another subject regarding the plunger. There has been a lot of testimony about Robert Evans picked up a plunger.  Mr. Eden and others said that the plunger was not being used as a weapon.

Do you agree with that opinion?

A.    That is not true.

Q.    Can you describe or elaborate on that in your answer?

A.    I don't want to go into great detail about where that plunger has been, right?  That is why you have that plunger in that trailer.  I don't know how that septic system works.

If you take Robert Evans at his word that he has been using the commode, okay, but we know where the plunger goes, first of all.

Then if he is just jabbing the business end of the plunger at you, he is -- you know, that is kind of gross.  I probably don't need to draw that picture any further.

But he can also do a lot of other things with that plunger, which is why Kelly takes it away from him.  He can jab you with the other end of the plunger.  There are any number of situations where police officers have jabbed subjects with their batons.

That plunger will work the same way.  Anything in

the midline, solar plexus, chin, throat, all of those things are vulnerable to a wooden club used in a jabbing motion.

You can also use that plunger to run it between Kelly's arm and chest area, crank, pull it -- forearm lock. Pull him to the ground to get another position of advantage.

You know, we don't see a whole lot of assistance being given to Kelly by these other officers at the scene. We don't see them helping him in the fight. He is there on his own. And I think at a very instinctive level he knows that. That plunger is a threat to Kelly's life.

Q. In fact, there was an opinion rendered by Mr. Eden that he only had the plunger for less than a second, so it wasn't a real threat.

Do you agree with that opinion?

A. No. He only had the plunger for less than a second because Kelly took it away from him. He recognized the threat for what it was, and he mitigated the threat in the instant.

Q. And there has also been an opinion rendered that the punch to Robert Evans after that delivered by Constable Smith was not reasonable and unnecessary.

Do you agree with that opinion?

A. I do not.

Q. Tell us why.

A. That is in one continuous motion. He has just taken the

54

plunger away.  Within a second or two, three at the most, he bends his knees and he strikes.  He strikes a resisting subject, an actively resisting subject, who has just assaulted him.

And from the video, we don't know if Kelly knows about all of the various assaults that have happened.  But Mata has been assaulted, Kelly has been assaulted, and it looks like that assault is going to continue if Kelly doesn't do something about it and do it right now.

Q.   Now, the one other opinion I want you to address is Mr. Eden said that when Constable Smith reached down and put his forearm under Robert Evans's jaw, that was a chokehold?

A.   I disagree with that.

Q.   Tell us why.

A.   We hear Robert Evans speak.  I was a paramedic.  One of the things that we are taught as a paramedic is to talk to people.  All right.  If you walk up and you talk to somebody, you know they are breathing, because in order to speak, you have to move air.  Evans is speaking throughout the course of that.

Eden also talked about how Evans is flushed or changing color.  Well, as Kelly is exerting energy attempting to legally arrest Robert Evans, Robert Evans is exerting energy illegally resisting arrest?

Q.   There was other opinions that have been expressed about

whether this is a high-stress situation.

Do you have an opinion about that?

A.    I do.

Q.    What is that opinion?

A.    I have been all over the world.  I have been through doors.  I have been in the killing fields.  You know, I have ridden on helicopters with the SEALs on our way to deal with people.

This is a high-stress situation.  Kelly is in a fight for his life.  We teach policemen that when they are being assaulted during the course of making an arrest, that they are in a fight for their lives, which they are, and Kelly was.  This is a high-stress situation.

Q.    And that is how officers are trained to view it if they are in conflict with and trying to subdue a resistant suspect?

A.    Yes.  That is how we train everybody from the first day at the police academy, and it is how we continue to train them from my time in law enforcement.

Q.    All right.  There were also opinions expressed by experts regarding an affidavit, police report that Constable Smith wrote that, as alleged by the Government, were intentional misrepresentations to deceive or impede a federal investigation by the FBI.

Do you have an opinion about that?

A.    I do.

Q.    Can you tell us that?

A.    I don't believe that is true.  In the course of my employment as a private investigator, I have accepted a lot of court-appointed work through attorneys that we both know.

I have worked in federal courts in the Northern District, I work in Dallas County, I have cases in Collin County, and I have cases in Dallas County.  I review a lot of police body worn camera.

From the point of view of someone representing the defendant, the criminal, the person that is going forward, I review a lot of police reports from the point of view of opposite the police.  There are no perfect police reports, and all prosecutors know that.

Q.    Are those intentional lies by the police when they write those reports?

A.    No.

Q.    Mr. Brady, based on all of your training, your experience, the totality of the circumstances, do you have an opinion as to whether Constable Kelly Smith's actions on July 25, 2022, were reasonable?

A.    I do.

Q.    Based on your training and experience and totality of the circumstances, do you have an opinion as to whether Constable Kelly Smith's actions on July 25, 2022, were

excessive?

A.    I do.

Q.    I'm sorry.  I actually didn't ask you on the first one, but what is your opinion on that?

A.    I believe that Kelly's actions were reasonable.  I believe that Kelly's actions were not excessive.

Q.    And, finally, based on your training and experience and the totality of the circumstances, do you have an opinion as to whether Constable Kelly Smith's actions on July 25th, 2022, were necessary?

A.    I do.  I believe they were necessary.

MR. SHOOK:  One moment, Judge.

Thank you, Mr. Brady.

I will pass the witness, Your Honor.

THE COURT:  Okay.

Let's take a short 10-minute break at this time.

(Jury out.)

(Recess was taken at this time.)

(Jury out.)

THE COURT:  Counsel, are we ready?

MS. BATSON:  Yes, Your Honor.

THE COURT:  Okay.  Let's bring the jury in.

(Jury in.)

THE COURT:  Okay.  You may be seated.

Mr. Machichek.

MR. MACHICEK:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. MACHICEK:

Q.   Good morning, Mr. Brady.

A.   How are you, sir?

Q.   I am doing well.

My name is Lucas Machicek.  I work with the U.S. Attorney's Office in Tyler, Texas.  Have we ever met before?

A.   I don't think so.

Q.   I don't think so either.  So if I ask a question and it doesn't make any sense, just do like Mr. Staton did a couple days ago and tell me I asked a bad question, and I will try again.  Okay?

A.   I won't scold you like that.

Q.   All right.  You know, we heard a lot about your background and training and experience, and I have got some questions for you just very briefly about some of this stuff.

The case that we are here for this jury today, this week, didn't involve any Jamaican crime syndicates or anything like that?

A.   It does not.

Q.   No wiretaps or organized crime involved in this case?

A.   No, sir.

Q.   SEAL Team 6 wasn't at 199 Ruth Street in Hawkins, Texas,

last summer?

A.   We wouldn't know.  We wouldn't have seen them.

Q.   We wouldn't know, right?

        The underwear bomber wasn't in there sewing bombs into underwear, right?

A.   He didn't actually sew it, but that's okay.

Q.   We didn't see any interrogations of terrorist suspects in Yemen or anything like that?

A.   You did not.

Q.   Okay.  What we saw and what this jury has seen throughout the week was the apprehension of a wanted person inside a trailer at 199 Ruth Street in Hawkins, Texas.  Is that right?

A.   That's right.

Q.   You mentioned very briefly before the analysis with Mr. Shook that use of force involved analysis of threats as it is ongoing in a situation.

        Do you remember talking about threats in the relation to the reasonableness of force?

A.   Yes, sir.

Q.   And within that concept, I want to make sure that the jury understands that there is a difference between immediate threats and potential threats, right?

A.   Yes, sir.

Q.   Okay.  And there is a lot of potential things, a lot of

possibilities that could happen, but then there are also things that are happening right there in front of you. Right?

A.    Yes, sir.

Q.    Okay.  So based on that understanding, let's walk through that scenario one more time together.  Okay?

If we could look -- and I know that there has been a lot of criticism, before we get into this, about using still frame images.  But there are some benefits to that, as well, aren't there?

A.    As long as you are aware -- it is like anything else. As long as you are aware of the limitations of the evidence that you are using, then, yeah, it is okay to use it.

Q.    And when you are looking at still frame images, it allows you to contextualize the things that you are looking at.  You don't have to watch the video over and over and over again.  Is that right?

A.    I find it more helpful to watch the video in slow motion, but then you can't hear the audio.  So I have to go back and forth over and over again.

Q.    And if you are making reference to, say, things that the jury has already seen, you want to give them a bookmark, a reference point so that we don't have to relive the experience over and over again.  Right?

A.    I am not saying that it is dishonest to just use still

frames.  I am saying it doesn't show the totality of the circumstances.

Q.   Okay.  So it is an exercise that can be helpful and efficient, but as long as you understand that there is a totality of the circumstances surrounding it?

A.   We are in a circular discussion.  So, yes, sir, I am going to agree with you.

Q.   All right.  Thank you.

I want to look at a still image, and I want to reference back to a circumstance that presented itself to Constable Smith back in July of 2022.

MR. MACHICEK:  Ms. McCullars, if we could have Exhibit 1D-4 up on the screen.

BY MR. MACHICEK:

Q.   I know the suspense is killing you, but --

A.   I might have seen this before already.

Q.   Exactly.

Now, Mr. Brady, we have seen this image before.  We have seen if from several different angles.  Is that right?

A.   That is correct.

Q.   This image is what you and Mr. Shook talked about just a moment ago where the Defendant is sitting in the tub with his hands over his head.  Is that right?

A.   His hands are on top of his head.  His legs are crossed beneath him.  His back side, his bottom, is down against the

tub.  Yes, sir.

Q.    That is consistent with sitting in the tub, right, crossed legs with your bottom on the ground?

A.    Yes.

Q.    My daughter calls it criss-cross applesauce.  Is that familiar to you?

A.    I have heard that before.

Q.    All right.  Now, an individual in this position, you described some potential threats during your direct examination with Mr. Shook.

What are the immediate threats of this individual?

A.    The immediate threat is there is an object, a tool just outside the tub well within his wingspan.

Q.    Is he reaching for that tool?

A.    He has not yet.

Q.    Does he reach for the tool?

A.    He doesn't.

Q.    He does not?

A.    (Shakes head.)

Q.    And your testimony just a moment ago with Mr. Shook was that you cannot handcuff a suspect in this position?

A.    I said you should not.

Q.    Should not handcuff a subject in this position?

A.    I said it was a bad idea.  I said other words about it.

63

But it is a bad idea.

Q.   Should you attempt to handcuff a suspect in this position?

A.   I think you should not.  My opinion was you should not.

Q.   And so it is your testimony in front of this jury, that a suspect in this position, the only option available to you is to sic a dog on him to bite him?

A.   That is not what I testified to.

Q.   Okay.  The option chosen by Constable Smith when this scenario presented itself to him, though, was that he sicced the dog to bite him, wasn't it?

A.   My understanding is that Kelly decided to continue to use force, and the force that he had elected to use that day was K9 Mata, and that my understanding, as I recall, is that he did give an apprehend call right here, which to a dog means bite.

Q.   Right.  And I understand the lengthy explanation that he chose to use force.  The force he chose to use was the dog, right?

A.   Yes, sir.

Q.   And he gave an apprehend command, and that means he was commanding the dog to bite this individual in this position, right?

A.   That's correct.

Q.   You made a curious statement to Mr. Shook that I want to clarify to the jury.  You indicated in your direct testimony this is a life or death situation; is that right?

A.   I believe it is.

Q.   Are you telling this jury that, given a life or death situation, that Constable Smith could have removed his firearm from his holster, placed it to the back of this individual's head and pulled the trigger?

A.   I am not.

Q.   He wouldn't be justified in the use of deadly force?

A.   Not at this time.

Q.   Not at this time.  Okay.

     Because the first part of your testimony when you were discussing tactics and how to go into a building and how you have experienced going in the building in a tactical way, the goal there is to end the scenario in the safest manner possible.  Right?

A.   Yes, sir.

Q.   You talked about what clearing a building means?

A.   What it means to me, yes, sir, in my experience, yes, sir.

Q.   You said it goes enter, locate, apprehend, and mitigate the threat, right?

A.   Yes, sir.

Q.   And the focus in this clearing of a building was the

apprehension of Robert Evans, right?

A.    That's correct.

Q.    The focus wasn't to have Mata, the K9, bite Robert Evans, right?

A.    That was not the goal.

Q.    You mentioned some things about the time imperative regarding the decision to enter the building, right?

A.    Yes, sir.

Q.    You mentioned that it is a small rural police force, limited resources, things like that, that go into that decision-making process.  How that sausage gets made, right?

A.    Yes, that's a good description.

Q.    Okay.  And one of the things that you mentioned was that there was a call in for a burglary in progress that was answered by John McQueen.  Is that right?

A.    That's correct.

Q.    Were you here for Constable McQueen's testimony?

A.    I was not.

Q.    So you are not aware that the burglary in progress was just an overzealous neighbor calling about somebody showing up at a house?

A.    I am not surprised that that is how it was resolved.

Q.    One of the things that was kind of concerning about the direct testimony that I want to explore with you a little bit

is the fact that you weren't able to identify a plan prior to entry.  Is that right?

A.    That's correct.

Q.    You said:  It seemed as though the only plan was for Tuma to shove the plan off on to somebody else.

Right?

A.    That's what I believe.

Q.    If Tuma was unwilling to make a plan, whoever took the reins and decided to do the entry, they should make a plan, right?

A.    I don't know that that is the case.

Q.    Well, from a tactically sound position, you think it is best to make a plan, right?

A.    I do.

Q.    And if one person is not willing to make a plan and the person who decides to go into the building, it would be tactically sound for them to make a plan.  Right?

A.    I think there was a series of assumptions that Kelly made, that people were going to follow him into the building, that they were based on his experience.  He has dealt with these people before.  I haven't.

But, no, when I -- if you are asking me what I would have done when I walked up to the scene?  Sure.  I would have got back in my car and drove away as soon as I looked at these guys.  I wouldn't have done it.

Q.   Now, you used a word in your answer right there, a series of assumptions.  And I want to talk to you about some of the assumptions that you testified about earlier.

Once you decide that you are going to enter a building and whatever minimal or non-existent planning that takes place prior to entry in that building, you testified it is not a good idea to go in by yourself.  Right?

A.   I testified that he did go inside by himself.  I testified that the reason that he was inside by himself was not his fault, that it was other people failing to act.

Q.   So the decision to go into a building alone, if it were you, would that be a sound decision?

A.   For me and the people that I am with on the scene, I don't have to tell them to come into the building with me when I go through the door.

For me, the people that I am with, the people that I select, that I train, they know to go with me.  The people that I am with know that when I go into a darkened bathroom, that we are going to fill up that bathroom with polyester and Kevlar.  They are going to be right there with me.  Those are the people I know.  Those are the people I go with.

Q.   And those are the people that you plan with, right, before you go in the house?

A.   Plan and train with them, the ones that I know, the ones that I work with.  That is an implicit assumption of law

enforcement that I talked about.  We are all on the same team --

Q.   Right.

A.   -- when we show up to arrest the bad guy.

Q.   And the people that you work with, they are going to plan with you before you go into a building, right?

A.   We are going to have a conversation.

Q.   And everybody is going to have assigned roles and know what to do, right?

A.   We are going to have an honest conversation about the background of the bad guy, to start.

Q.   And once you have decided what to do, once you have decided you are going to enter that building, you are going to have a conversation with your trustworthy compadres and y'all are going to mete out tasks.  Y'all are going to say who is in this stack, who is the breacher, who is second position, who is cover position.  You are going to make those decisions.  Right?

A.   That is the normal course of business.

Q.   And you have got all of this training and experience, and if you are the most experienced and best trained person on scene, are people going to look to you for that information?

A.   In my experience, the people on the scene should look to the on-scene commander, the guy who owns the ground, the guy

69

who owns the warrant.  This was Tuma's responsibility.

Tuma's plan was for somebody else to breach the door and for somebody else to go inside.  Kelly's assumption that they were all on the same team, that they were going to follow him, fill up that door with polyester and Kevlar, didn't happen.

Q.   Now, you are not telling this jury that you can tell them what Kelly was thinking at that time, are you?

A.   I don't know exactly what Kelly was thinking.  I don't know what Tuma was thinking.  I don't know what Robert Evans was thinking.

Q.   But you do know what would be tactically sound in a circumstance like that?

A.   I do know what would be tactically sound in this situation, yes.

Q.   And the tactically sound thing to do would be not to enter the building alone, right?

A.   The tactically sound thing to do would be for the other officers to follow Kelly.  The decision to enter had been made.  Kelly implemented the decision in the way it was briefed to him.  You are going in.  You are going to do a building search.

What was not briefed to him was that the rest of them were going to stand on the porch while he did that.  No. Kelly implemented the part of the plan that was briefed to

him.

Q.   So you are telling me that an individual who has been given authorization by a scene commander to go into a building, they have no discretion whatsoever?  They just have to go in the building no matter what, can't talk to anybody, have no responsibility to make sure, hey, are you behind me?  You coming with me?  Let's go.

A.   Once Kelly is standing there at the breach point, he shouldn't be turning around looking at anybody else.  He should be able to rely that the people that are with him have the same goal that see him going through the door.

Anybody with a fundamental level of tactical training knows when one guy goes through the door, another guy goes through the door.  Not in 33 seconds.  Right now.

Q.   And he should be able to rely on the plan that has been constructed prior to entry, right?

A.   The plan that was constructed such as it was.  Somebody else breaches the door and you go inside.  That is the plan that they have.  That is the plan that was briefed to him.

A more comprehensive plan, if that is your question, that might have been advantageous.

Q.   The more comprehensive plan would have been advantageous.  I think we can agree on that point.

A.   I think we are on the same side there.

Q.   And the result of the poor planning here is what you

described as a disastrous and abysmal situation leaving Constable Smith in the hallway for 33 seconds by himself. Right?

A.   The six Ps of ineffective planning took effect.  You are familiar with those.  There are probably some bad words in there.  I probably shouldn't say that.

Q.   We will leave the six Ps to the imagination.  How does that sound?

        Now, when Constable Smith is in front of the bathroom door for 25 seconds, he does give Robert Evans some commands, right?

A.   He does.

Q.   He says, show me your hands?

A.   I'd have to look at my report.  Is that okay?

Q.   I'm going to show you a transcript of it if that would help you recall.

A.   That would be perfect.

        MR. MACHICEK:  Let's look at Exhibit 4A-6, all the way down at line 25 and then on to 7, line 1.  So if you can pull up 6 first.  Line 25 at the bottom.

BY MR. MACHICEK:

Q.   Come out and show me your hands.

A.   That is at the breach point.

Q.   Okay.

A.   Milbourn has already given -- no, Milbourn gives his

command after that.  Milbourn gave the two prior commands before the breach started.  So this is the third command, if you are excluding Tuma and, you know, at the initial onset ordering Evans to come out.  Right?  Telling Evans, he has identified all of those things.

Q.   And if --

A.   So this is the fourth or fifth time Robert Evans has been told that, we are the police, we are here, and we are here to arrest you.  Is that correct?

Q.   I haven't counted them out, but if that is what you are saying, that is what this jury can judge.

A.   You accept that script.

Q.   Okay.

A.   Yes, sir.  I am not allowed to ask the questions.

Q.   That's right.

A.   I am an interrogator.

Q.   I will ask you a few more.  I will give you a chance to talk.

A.   All right.

Q.   Now, when we were talking about escalating use of force to gain compliance, part of that escalation is the introduction of things like the presence of a K9, right?

A.   Yes, sir.

Q.   And upon the introduction of the presence of a K9, if Mr. Evans had shown his hands, would that at least be partial

compliance?

A.   I don't know.  You know, I know where you are going with the arrow and all of that.  I don't agree that that is partial compliance.  I don't know.  I really -- I suspect -- again, the investigation that I have conducted that is written in my report, I don't believe that it was an intention on his part to comply.

Q.   Now, if you give two commands and one of the two commands is show your hands, and if an individual shows their hands -- let's take it away from Robert Evans -- is that partial compliance?

A.   Not necessarily.  We are here -- we are talking about potentials and hypotheticals.  If you are asking me can I hypothesize about a situation where someone would feign compliance by sticking his hands out but not truly complying and baiting you in, I can conceive of that situation.

Q.   And, Mr. Brady, I think we are getting way more complicated than my question was.

A.   I am just answering it.

Q.   I am asking you a simple question.  If you give an individual two commands, and they comply with one of the two commands, is that partial compliance?

A.   And I am telling you no.

Q.   Okay.  Well, let's talk about showing hands.

          MR. MACHICEK:  Ms. McCullars, if we could take a

74

look at Exhibit 4B.

BY MR. MACHICEK:

Q.   Before we play it, Mr. Brady, are you familiar with the Defendant's body camera at the time of this arrest?

A.   I have reviewed it.

Q.   And did you review the portion of the body camera where the Defendant is standing in front of the bathroom door just before the breach is made into the bathroom?

A.   I have.

Q.   And this is after the suspect, Robert Evans, has been told to show his hands and come out, right?

A.   He has been told to surrender at least five times or six times by this point.  I believe Sgt. Milbourn, now Lt. Milbourn, has also given a command, his third command.

So Kelly has given his command, Lt. Milbourn three commands, and Newell and Tuma two or three commands at the beginning.  This is like the seventh command.

Q.   And, Mr. Brady, my question, sir, was one of those commands to show his hand?

A.   Come on out.  Yes, sir.

Q.   One of the commands was to show his hands, right?

A.   Yes, sir.

Q.   Okay.  And you mentioned that sometimes it is helpful, instead of using a still frame to give you some context, to slow a video down and watch it, even though you don't get the

sound, right?

A.    It distorts the sound.

Q.    Right.

Well, we are not going to listen to distorted sound, but this is a slowed-down clip to give us some context.  Is that okay?

A.    Oh, yeah.  I am good.

MR. MACHICEK:  Ms. McCullars, 4B.

(Video played.)

MR. MACHICEK:  All right.  If you will stop right there.

(Video paused.)

BY MR. MACHICEK:

Q.    Whose hand are we looking at on the door there?

A.    I think we are looking at Kelly's left hand on the door, yeah.

Q.    It is his body cam.  Fair to assume the left hand coming forward --

A.    Thumbs here, so it is the left hand.

MR. MACHICEK:  Ms. McCullars, please.

(Video played.)

MR. MACHICEK:  If you will pause there.

(Video paused.)

BY MR. MACHICEK:

Q.    Right next to where Constable Smith's left hand is at

the top left of the screen, is there another hand there?

A.    There is one hand there.

Q.    Okay.  And does that hand have a weapon in it, can you tell?

A.    It does not.

MR. MACHICEK:  Ms. McCullars.

(Video played.)

Q.    The door is opened.  We see an individual moving.

MR. MACHICEK:  Pause that, Ms. McCullars.

(Video paused.)

BY MR. MACHICEK:

Q.    Initially, as we see the individual moving, does he have at least one of his hands up in the air?

A.    He does not.  I see both hands.  So I would say his right hand is where the laser aiming device for the taser is. His left hand is close to his midline at about waist level.

Q.    Okay.

MR. MACHICEK:  And, Ms. McCullars, if we could back it up a couple of seconds so that we can see how the right hand goes to his chest where the laser device is.

(Video played.)

Q.    Do you see that right hand there?

A.    The right hand never goes above shoulder level, from what I see.

Q.    Does the right hand, prior to going to the chest area

where you see the laser on it, does it appear to be palm forward and fingers extended?

A.    Palm down.  I see palm down.

Q.    Okay.

MR. MACHICEK:  And, Ms. McCullars, if you would pause right there.

(Video paused.)

BY MR. MACHICEK:

Q.    At the same time this is happening, the K9, Mata, has been ordered into the bathroom and given an apprehension command.  Is that right?

A.    I believe that is correct.

Q.    Okay.  My question for you, Mr. Brady, is, if I am an individual standing with my palms forward, fingers extended, empty handed, and a police K9 is commanded to bite me, am I required to stand still in this position and allow that police K9 to bite me lest I be accused of continuing to resist arrest?

A.    Had that situation, the position that you are assuming, occurred on this camera or ever happened in this instant -- in this incident, if Robert Evans had assumed the position that you are in right now, then I would say yes to your question.  However, I never saw Robert Evans assume that position.

Q.    And, Mr. Brady, if an individual is in this position and

a police K9 is given an apprehension command and is rushing toward them, where is it likely their hands are going to move?

A.   If they decide to resist arrest, they will move towards the K9.

Q.   So the hands, if they are in this position, would move towards the K9; that is your testimony?

A.   In order to resist arrest.  If you decide to comply and remain still -- we have heard a lot of testimony that the dog has a brain and will recognize you are not a threat.

Q.   And so --

A.   Hypothetically speaking, of course, if that happened, because it didn't happen.

Q.   So let me -- I don't mean to interrupt you, but I want to be clear that your testimony is, if an individual is in this position, a police K9 is sicced on them to bite them, and they move their hands here to protect themselves, they are resisting arrest?

A.   If they are standing completely upright with their hands in the air, I don't believe that the police K9 is going to bite them.  That is my answer --

Q.   Okay.

A.   -- sir.

Q.   If the police K9 is going to bite them, is it your testimony that they have to continue to stand still and let

that happen?

A.    I don't know how that applies to this situation.  It is a hypothetical question.  So I would have to see body camera of what actually happened, to render an opinion whether it was resisting arrest or not.  I would need more actual facts.

Q.    It's difficult to answer hypotheticals that would make a person paying you guilty, right?

A.    You know, I don't know that I make anybody guilty.  These are the factfinders.  This is the Judge.  You are the prosecutor.  I certainly respect your position, but you are the one that chose to bring this case.  We are here because of your office.

        MR. MACHICEK:  If we can continue the video.

        (Video played.)

        MR. MACHICEK:  Pause it there.

        (Video paused.)

BY MR. MACHICEK:

Q.    You indicated that, during your direct examination, that Mr. Evans was in a combative posture, right?

A.    Yes.

Q.    An individual who steps back and raises his hand palm forward, fingers extended, is that a combative posture?

A.    His palms are not forward and his fingers are not extended and his body is not in the position you are in.

80

Q.   The fingers on the screen and the hand on the screen that we are all looking at with own eyes right now, Mr. Brady, is that palm forward?

A.   The hands are extended away from the body.  His knees are bent.  He is bent at the waist.  He is leaning forward. He is not in the position you were just in.

MR. MACHICEK:  Ms. McCullars.

(Video played.)

BY MR. MACHICEK:

Q.   We see the K9 come back into the room, and the lights come back on.  Is that right?

A.   Well, I think Lt. Milbourn got his flashlight in there. So we have got more ambient light.

(Video stopped.)

Q.   You indicated in your direct examination that in situations like this, that things are happening so quickly that sometimes you don't have time to evaluate the situational changes that are going on.  Is that right?

A.   I think that that is true in some instances, yes.

Q.   And if you are a law enforcement officer who has been given government authority to exercise force against a citizen of the United States, don't you have an obligation, a duty to make sure that you are not using force that is excessive, as the situation changes?

A.   That's the state of the law, yes.

Q.   So do you have a duty to focus on those situational changes and adjust your use of force as it is appropriate?

A.   Yes, sir.

Q.   I'm going to back to Exhibit 1D-004.

Mr. Brady, it is not your testimony that this situational change involving the Defendant and Robert Evans in the bathroom at 199 Ruth Street in Hawkins, Texas, on July 25, 2022, it is not your testimony that the only way to get this man into handcuffs is to sic a dog on him to bite him, is it?

A.   I would use force to apprehend him.  The tool that Kelly chose to use that day was K9 Mata.

Q.   Now, Mr. Brady, I want to go back to the concept of a potential threat versus an immediate threat.  Because I think there has been a lot of discussion, some of it light-hearted about the plunger, right?

A.   Yes, sir.

Q.   We have described all of the things that -- all of the nefarious things that could happen with the plunger, right?

A.   I don't think I got all of them out, but...

Q.   You got quite a few, didn't you?

A.   Yes, sir.

Q.   Did any of those things happen?

A.   No.

Q.   Was the Defendant able to quickly disarm the suspect of

that plunger?

A.    Yes.

Q.    And once the Defendant disarms the suspect of the plunger, does if have any impact whatsoever on the immediacy of the threat involving that plunger?

A.    The fact that Kelly was able to take the plunger out of Robert Evans's hand does not change the fact that the plunger is still there and that the plunger is still in the tub. Evans is in the tub, Kelly is standing outside the tub.

All of the elements of the equation are still there.  The plunger is still a threat even if it is not in Evans's hand, and we know the plunger is a threat because Evans used it as a threat.

Q.    Is the plunger still a threat after K9 Mata goes into the bathtub, picks it up, and carries it out of the bathroom?

A.    The plunger -- that plunger is no longer a threat.  That particular implement is no longer a threat because K9 Mata removed it.

Q.    And Mata removing the plunger removes the immediacy of that threat?

A.    The threat that the plunger posed.  But as we look in this picture, to your exhibit, we see the other tools that are on the floor, the other objects that can be used as weapons.  This is a guy who decided to pick up a

83

field-expedient impact weapon.  There are a bunch more of them on the floor.

Q.   A field-expedient impact weapon, are we still talking about the plunger?

A.   We are talking about all of the tools on the floor now.

Q.   Okay.

Now, where are his hands at this point?

A.   They are on top of his head.

Q.   Is he reaching for tools on the ground?

A.   His hands are moving.

Q.   Is he reaching for tools on the ground?

A.   I don't know.  He doesn't, but he can, and that is where we are talking about potential threats.  He is in motion, and his hands are moving too.

Q.   And I think that is the concept I am trying to convey to the jury with your testimony here is that you see all of these potential threats, but then you say none of those threats happened.  Correct?

A.   I think any reasonable police officer would have perceived these potential threats.

Q.   Under this circumstance where the suspect has placed his hands on top of his head, there is other objects in the room, you have indicated that you would use force.  Right?

A.   Given the totality of the circumstances, being a

reasonable police officer, understanding the nature of the crime for what this individual has been arrested for, the fact that he has fled previously, and the fact that he has just immediately prior to this resisted arrest, yes, sir, I would use force to apprehend him in this situation.

Q.    My question for you then is, would you pull out an ASP patent or a baton and hit him with it?  You, Mr. Brady, would you pull out an ASP or a baton and hit that man in that position?

A.    I would do what Kelly did.  I see that the threats are on the floor.  I would remove him from the floor by lifting him up --

Q.    I'm sorry, Mr. Brady.  Can I interrupt you right there? I have got a question about that answer that you just gave right there.  You said you would remove him from the floor?

A.    I would lift him.

Q.    Now, Mr. Brady, you do realize that just prior to this individual being apprehended in handcuffs, he was drug across that very same floor, don't you?

A.    That is not accurate.  He was drug -- in this instance, he was not drug across the floor in this position.

Q.    Now, Mr. Brady, you have talked about all of these potential threats, all of these potential weapons on the floor of the bathroom, you understand that prior to being arrested, prior to being placed in handcuffs, in this very

incident, this suspect was dragged across that floor?

A.   After Mata grabbed his foot, Evans's foot, after the pain compliance technique was applied, the dog's bite on the foot, Evans was lifted across the floor.

Kelly had ahold, on the video, of Evans. Lt. Milbourn had ahold of Evans's hands.  They removed him from the bathroom, not by the dog dragging him, by Evans scooting and moving and because he was in pain and didn't want to be in pain anymore.

Kelly and Milbourn assisted Mata while the pain compliance was applied, sir.  So, again, respectfully, because I certainly respect your office and your position, I disagree with the way you just characterized the evidence, sir.

Q.   Well, Mr. Brady, my question to you is, that if all of these potential threats are on the floor just outside the bathtub, why then do Sgt. Milbourn and the Defendant place the suspect in a position where he would have those objects, those potential threats within his immediate reach?  Why would they do that?

A.   I would argue in response to your question that I don't feel that your question accurately represents the evidence in this case.

Secondly, I would say that Kelly lifted Evans, pulled him up, removed him from the floor.  Evans resisted.

Evans was not complying still at this point.  So as Kelly puts what they are calling an arm triangle on Evans and has his thigh close to Evans as he is trying to lift Evans --

MR. MACHICEK:  Your Honor, I am going to object to non-responsive.

THE COURT:  Sustained.

BY MR. MACHICEK:

Q.   Mr. Brady, you indicated that in this circumstance, with this individual in this position, you would use force.  Would you pull out your taser and tase this man in this position?  Would you, Mr. Brady, tase this man?

A.   I never carried a taser.

Q.   That's a no?

A.   I would -- the choice I would select would be a pain compliance technique.

Q.   Okay.  And pain compliance techniques include joint locks, right?

A.   Yes, sir.

Q.   They include placing a Defendant's hands behind his back and putting handcuffs on him, right?

A.   That is not a pain compliance technique.  That is how you handcuff a person from a position of surrender.

Q.   Before you handcuff a person, is it customary to give them commands to place their hands behind their back?

A.   It is.

Q.   When Robert Evans was in this position in the bathtub, Kelly never gave him commands to put his hands behind his back, did he?

A.   I don't know that -- I think I said a couple of times that I would have lifted him off the floor and used a pain compliance technique to apply the handcuffs to get him to submit.

Q.   And you wouldn't have used a dog, you would have used that pain compliance --

A.   I never had a dog.

Q.   Never had a taser, never had a dog?

A.   Never had a taser, never had a dog.

         MR. MACHICEK:  Pass the witness, sir.

                    REDIRECT EXAMINATION

BY MR. SHOOK:

Q.   Mr. Brady, you were asked a number of questions about the weapons, the plunger and weapons on the floor, the fact -- but, in fact, they weren't used.  Ultimately, they weren't used.  Is that 20/20 hindsight?

A.   It is the very definition of 20/20 hindsight.

Q.   And is that what we use when analyzing whether --

         MR. MACHICEK:  Objection.  Leading.

         THE COURT:  Sustained.

BY MR. SHOOK:

Q.   Do you have an opinion if that is the standard that is

used in these use of force situations?

A.    My opinion is that we do not use 20/20 hindsight to evaluate use of force situations.

Q.    It is the perceived threat at the time?

A.    It is the perceived threat.  It is the officer's perception.

MR. MACHICEK:  Your Honor, I am going to object to a misstatement of the law.  It is not a perceived threat.  It is the immediacy of the threat.

THE COURT:  I will sustain the objection.

A.    I'm not sure what I am supposed to answer.

THE COURT:  Reask the question, Mr. Shook.

BY MR. SHOOK:

Q.    Is it the immediacy of the perceived threat --

A.    Yes, sir.

Q.    -- is the issue in this type of situation?

A.    Yes, sir, it is.

MR. SHOOK:  That's all I have, Judge.

THE COURT:  Mr. Machichek.

MR. MACHICEK:  No further questions for this witness, Your Honor.

THE COURT:  May this witness be released?

MR. MACHICEK:  Yes, Your Honor.

THE COURT:  Mr. Shook?

MR. SHOOK:  Yes.

89

MR. SKIPPER:  We will call Sheriff Johnwayne Valdez.

THE COURT:  If you would, please stand here and raise your right hand to be sworn, sir.

(Witness sworn.)

JOHNWAYNE VALDEZ GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. SKIPPER:

Q.   Good morning, Sheriff.

A.   Good morning.

Q.   Would you please state your full name and spell your last name for the jury?

A.   Johnwayne Valdez, V-A-L-D-E-Z.

Q.   And how are you currently employed?

A.   I'm the Sheriff of Rusk County.

Q.   Elected Sheriff?

A.   Correct.

Q.   You share a county line here with Smith?

A.   I do.

Q.   Just to our immediate right, right?

A.   (Witness nods.)

Q.   How long have you been a peace officer?

A.   For 38 years.

Q.   And let's start at the beginning.  When did you first become a peace officer?

90

A.    I graduated the academy in August 1st of 1985.

Q.    You grew up in Winnie?

A.    Yes, sir.

Q.    In Chambers County?

A.    Yes, sir.

Q.    From 1985 did you receive any training at the academy?

A.    Yes.

Q.    Which academy did you go to?

A.    Lamar University in Beaumont.

Q.    And then where did you go to work after that?

A.    Chambers County Sheriff's Office.

Q.    How long were you there?

A.    Several years.  I was detached from Chambers County for some time working in an undercover capacity.  So I traveled a lot to different counties assisting them.

Q.    When you say you traveled a lot, is that in a task force capacity?

A.    Correct.

Q.    Explain that for the jury, how you worked together to effect a goal, so to speak, to reduce crime?

A.    I worked extensively in narcotics trafficking task forces both in the Harris County area, all the way to Orange County and started migrating north after about four years being down there, and went to the Deep East Texas Task Force that was at that time located in Nacogdoches County.

Q.   Okay.  And how long did you stay there before moving somewhere else?

A.   I stayed there until '92 at the task force working undercover until I went to work for the Nacogdoches Police Department.

Q.   Nacogdoches?

A.   Yes.

Q.   Home of the Lumberjacks?

A.   Yes.

Q.   How long were you there in Nacogdoches?

A.   At the police department?

Q.   Yes, sir.

A.   Until '99.  And I transferred over to the school district for several years before moving on to the Sheriff's Office.  When Sheriff Bridges was elected, he brought me in with him as a patrol sergeant.

Q.   Let's talk about your time in Nacogdoches.  Did you ever serve in the capacity on a SWAT team?

A.   Yes.

Q.   How long were you on the SWAT team, if you can even recall?

A.   Probably '94 until I left Nacogdoches County.

Q.   Okay.  And learned specifically training on defensive tactics and response teams and things of that nature?

A.   Correct.

Q.   Then I believe you said -- I cut you off -- you went to work for Nacogdoches ISD?

A.   Correct.

Q.   And was it about that time you became a K9 handler?

A.   Correct.

Q.   Could you give us an approximate date on that?

A.   About '02 whenever we started exploring the opportunity of being a K9 handler due to drug problems, not only in the schools, but also at the time there was no K9 unit available inside Nacogdoches County.

Q.   Okay.  And do you recall where you did your training?

A.   Yes, at Texoma K9 in Lawton, Oklahoma.

Q.   How long was your training?

A.   It was two weeks.

Q.   And the K9 that you had when you first started, was that a single-purpose or dual-purpose?

A.   Correct, single-purpose.

Q.   And for what type of odor detection would that be?

A.   Narcotics.

Q.   Narcotics.

     And would you use your dog there in the schools?

A.   Yes.  And as needed elsewhere in the county.

Q.   That is what I was going to ask.  The resources available at the time through grant money, you would loan yourself and your K9 partner out to other individuals who

might need that.  Correct?

A.    Correct.

Q.    All right.  Now, was there -- how long did you stay there in that capacity with a single-purpose dog?

A.    I had two dogs that were single, and that was -- Chino was my first dog.  I went back to Texoma K9 after retiring him and got Dasti.

Q.    Dasti.  Was that another single-purpose?

A.    Correct.

Q.    And did you ever get a dual-purpose?

A.    Yes.

Q.    Okay.  Could you tell us what date you decided to do that?

A.    After a couple of years of having Dasti, we actually progressed him into a dual-purpose where I kept him until I went to work at the Sheriff's Office, which would have been in 2012 -- I'm sorry, 2013.

Q.    Okay.  So you had Dasti, the dual-purpose, when you migrated over to the Nacogdoches County Sheriff's Office?

A.    Correct.

Q.    So now you, yourself, are capable of helping other individuals out with both apprehension and narcotics detection, correct?

A.    Correct.

Q.    Trafficking, as well -- pardon me, tracking as well?

A.    Yes.

Q.    Ever do any cadavers --

A.    No, sir.

Q.    -- or anything like that?

A.    No.

Q.    Now, while you are there, how long were you there at the Nacogdoches County Sheriff's Office?

A.    Until I took office.

Q.    Until the voters elected you in?

A.    Uh-huh.

Q.    Was that three or four years ago?

A.    Yes, three years ago.

Q.    As far as the apprehension dogs go, have you yourself ever issued the wrong command on your dog?

A.    Yes.

Q.    And do you speak English to your dog or a foreign language?

A.    A foreign language.

Q.    Let's go back to your first dog.  Where was your first dog from?

A.    He was actually -- excuse me, what we considered a DDR dog, he was an East German dog, so it was mainly Czech.

Q.    Okay.  It was Czech.

       Then your second dog?

A.    Czech.

Q.    Czech.

And then do you have a third dog now?

A.    Correct.  Well, had a third dog after Dasti was retired due to age.  And we purchased Lex.

Q.    Okay.  What language did Lex speak?

A.    Czech.

Q.    So you had to learn Czech.

Would you explain for us the reason why that happens, in terms of the language?

A.    Depending on the age of the dog when you purchase them, they were trained in another country because that is where that dog came from.

We see no purpose, or me personally, didn't see any purpose at all in changing the language of the dog to fit me because it would just add more confusion to the training once the K9 handler purchases the dog.

Q.    And also does it have to do ultimately with safety at the scene and call recognitions if it is in English versus a foreign language?

A.    Correct.

Q.    Prevents a rebite potentially if a dog comes off-bite at the scene?

A.    It can.

Q.    I've asked about your SWAT training.  Did you ever serve as a TCOLE instructor?

A.    Yes.

Q.    And in what subjects?

A.    Tactics.  Both firearms tactics, as well as less lethal, and also sniper.

Q.    Sniper?

A.    Yes.

Q.    So you have been called to some stressful situations?

A.    Yes.

Q.    The times you have been called out in those stressful situations, could you tell us about how the chain of command goes on scene and who is in charge of that scene?

A.    You should have an incident commander on scene whenever additional units start showing up, whether it's SWAT or just another agency or another officer that shows up after the fact.

Q.    Okay.  Is that on-scene commander in charge, regardless of how short or long any ops plan is?

A.    Correct.

Q.    Have you also served as a hand combat instructor for TCOLE?

A.    Yes.

Q.    Also, a K9 supervisor?

A.    Yes.

Q.    Now, when you were elected Sheriff of Rusk County, did you have to relinquish your -- I would assume so -- your duty

and role as a handler?

A.    Unfortunately, yes.  That is really the only thing I miss.

Q.    Okay.  And how many K9 handlers do you guys have in Rusk County right now?

A.    Right now currently we only have one for the Sheriff's Office.  The PD has a couple of dogs in Henderson.  Kilgore also has some as well.

Q.    But do you guys work collectively and help each other out?

A.    Correct.

Q.    For instance, in Kilgore, the north side is Gregg, the south side where I grew up in, on your end of town --

A.    Uh-huh.

Q.    -- you are split?  Kilgore has the north side of Gregg with Maxey Cerliano, and the south side is you, correct?

A.    Correct.

Q.    Have you reviewed some video footage of an incident regarding Constable Kelly Smith that occurred on July 25, 2022?

A.    Yes.

Q.    And do you have an opinion, before I show you that video, as to whether or not the actions of Kelly Smith on July 25, 2022, were reasonable?

A.    I do have an opinion.

Q.    And what is that opinion?

A.    That they were reasonable.

Q.    Based on the totality of the circumstances at that time?

A.    Correct.

Q.    Before I hit play, do you recall, if you recall, the first time you were shown this video, the main thing that stuck out in your mind the very first time you watched this video?

A.    Yes.

Q.    What instance would you specifically recall, and would you tell us what that was?

A.    From the time --

Q.    Yeah, the first time you watched it.

A.    From the beginning of the video?

Q.    Just the time before I hit play, is there any instance in this video that we are about to watch again that stuck out to you?

A.    Several things.

Q.    Okay.  I will go ahead and hit play, and we will go through it.  Okay?

A.    You bet.

          (Video played.)

          (Video paused.)

Q.    I just paused the video.  Is there anything in that

99

picture that would be concerning for you as a K9 handler?

A.    In this section right here that is paused?

Q.    In this particular frame?

A.    Yes.

Q.    As far as what I am circling?

A.    Uh-huh.

Q.    Right down here?

A.    Correct.

Q.    Okay.  And tell us what would be concerning about this part?

A.    The fact that the suspect has his hands on the K9's harness/collar.  And where his other hand is right there at the bottom, correct, right there, where his ability to have a free hand is what is going to be able to influence the dog's direction, not only his snout, but also being able to come up and punch the Constable as well.

        MR. SKIPPER:  May I approach briefly, Your Honor?

        THE COURT:  You may.  And what exhibit is this that we are watching?

        MR. SKIPPER:  This is Exhibit 4, Your Honor.

        THE COURT:  Okay.

BY MR. SKIPPER:

Q.    Have you ever had a perpetrator or assailant put his hand on your dog?

A.    I have not in an actual event.  In training, yes.

Q.   And if an assailant puts their hands or hand on your dog, what are you trying to do as a handler?

A.   Protect the dog.

Q.   And would you protect the dog by giving a command?

A.   Correct.

Q.   And if that person didn't comply with the command, what would you do?

A.   Well, at that point -- the dog is in danger at that point.  Otherwise, I would not be giving this person a command.  So I would escalate this encounter to make sure, one, my dog is safe; and, two, that I am safe.

Q.   And, again, what do we see here I am circling?

A.   The dog being held by the suspect.  At that point the suspect has the ability with that left free hand, he actually touched what looks to be his -- one of his pouches on his MOLLE gear, and probably also the ability in close proximity to his firearm.

Q.   Okay.

         (Video played and paused throughout this portion.)

Q.   Again, what do we see here?

A.   Both hands are controlling the K9.

Q.   Okay.

         What do we see right here?

A.   The hand is underneath controlling the collar.  I can't tell if his thumb is underneath the collar or not, but he has

101

a good enough hold on this dog where, in my opinion, picking the dog up is not only controlling it, but in the dog's thought process is going to be he is being corrected for something.

Q.   In terms of -- are you talking about in a contextual scenario, relating that back to training?

A.   Correct.

Q.   In a dog's brain?

A.   Uh-huh.

Q.   Left an imprint for a search situation?

A.   Correct.

Q.   Do we still see the hand there, Sheriff, correct?

         Do you still see the hand there?

A.   Correct.

Q.   What do you see here, the lower left of the screen that I am pointing at?

A.   That was the pit bull that was removed from the trailer in the initial entry into the structure, which apparently has gotten loose and managed to get back in the house.

Q.   Based on your training and experience in law enforcement, particularly as a K9 handler, could that be problematic?

A.   Extremely.

Q.   Have you ever had that happen?

A.   No, sir, I have not.

102

Q.    Particularly with a pit bull?

A.    Correct.

Q.    And why could that be problematic?

A.    A couple of things.  One, the fact that the pit bull could attack the dog.  It would depend on a couple of factors, whether they are both males, one of them trying to establish dominance over the other, or trying to do the exact same thing that your dog does for you in the K9 world, protect the handler.

      This dog, in his mind, could be trying to protect the owner, which would have been probably the suspect.  So a confrontation could happen which would not end well for either dog.

Q.    Is your job as a handler to handle your dog?

A.    Correct.

Q.    And keep your dog close to you?

A.    Correct.

Q.    Are you trained to do that?

A.    Yes.

Q.    Are you expected to do that?

A.    Yes.

Q.    Do you see Kelly Smith anywhere throwing this animal, just keep watching here, on to the suspect?

A.    No, sir.

Q.    Based on your training and experience, what is Kelly

doing with his left hand and what is the assailant doing with right hand?  That's gritty.

A.   Yes, sir.  Kelly is controlling his dog by having his hand on the harness so he can control the movements of the dog, whether it be either forward or side to side.  It looks like there is something in the other guy's hand.

MR. SKIPPER:  May I have one moment, Your Honor?

BY MR. SKIPPER.

Q.   Do you see this item coming up now --

A.   Yes.

Q.   -- in his right hand.

When I say "his" I apologize.  In the assailant's right hand?

A.   Correct.

Q.   What is being shown here that I am circling?

A.   That is the Constable controlling his dog.

Q.   What did you just see right now?

A.   The Constable grabbing what looks to be a plunger that is being swung at him.

Q.   Okay.  Much has been made about a plunger and the rubber end of it, in somewhat irresponsible humor, I will say. Could this be a deadly weapon in a manner in which it is used, a plunger?

A.   Yeah, for the dog and for the handler.

Q.   And in your training and experience, can anything be a

104

deadly weapon?  Your finger and the manner in which it is used?

A.    Yes, correct.

Q.    Again, I will ask you, you are trained to have your dog near your side; is that right?

A.    Correct.

Q.    You don't let someone else handle your partner?

A.    No, sir.

Q.    All right.  What just happened here?

A.    The dog chose to come back in and reengage.  I don't hear if he is giving him commands to do so.  But he does reenter the picture.  He is going toward what looks like the suspect's right arm and also his head, at which point the Constable makes sure that the safety of the suspect's head is clear from being bitten and pulls him away from the dog.

Q.    Are you trained to do that?

A.    Yes.

Q.    I just paused that.  Do you see what is paused here?

A.    Yes.

Q.    What is that showing?

A.    That is a right arm strike to the top of the head of the dog.

Q.    Has an assailant ever struck your dog?

A.    In training, yes.

Q.    And in training if an assailant strikes your dog, does

the dog bite someone in a bite suit or sleeve?

A.   Yes.

Q.   Are they trained to defend themselves?

A.   Correct.

Q.   And what do we see right here that I am circling?

A.   His hand once again.

Q.   The assailant's hand?

A.   The assailant's hand, I'm sorry.

Q.   What happens right here?  What you are seeing?

A.   Right here the assailant is continually attempting to grab the dog and try to control the dog.  The dog pulls back. He is standing upright, right there beside the bathtub.

        At this point the Constable pulls him away again, because it is not an optimal area for this particular bite to happen.  His torso is exposed, so he is pulling the body away from the dog.

Q.   It's your opinion that Constable Smith is actually pulling him away the dog?

A.   Yes.

Q.   Much like you testified earlier about him pulling his face up?

A.   Correct.

Q.   Why would he do that?

A.   The way we work with K9s and bites, we try to focus the dogs on extremities, whether it be upper arm, not preferably

the lower arms or the legs.  There is too much vital stuff in your torso.  There is too much vital organs, ribs.  And also, obviously, your head.

Q.   Okay.  My question is, I guess if there has been opinions given that Kelly Smith was opening this perpetrator up to be bit on his vitals, do you agree with that opinion?

A.   No, sir.

Q.   Would that be the smartest thing to do by leaving the front side of your thigh in front of that?

A.   Yes.

Q.   If you had that intention, right?

A.   Correct.

Q.   Because technically you are not ever supposed to put yourself between the job and perpetrator?

          MR. MACHICEK:  Your Honor, at this point I'm going to object to leading.

          THE COURT:  Sustained.

BY MR. SKIPPER:

Q.   What happens right there?

A.   He attempted, again, to grab the dog with his hand and failed to do, so he kicked the dog, the K9.

Q.   Sheriff, would you remind me where you were trained again, at your school?

A.   For my initial handlers?

Q.   For your apprehension, I apologize.

A.    Texoma K9.

Q.    Okay.  Texoma K9.

And were you trained as far as when it is appropriate to release the dog off the bite?

A.    Yes.

Q.    Meaning waiting until the handcuffs are applied, or how were you trained?

A.    Wait until the handcuffs are applied.

Q.    Is this still -- this practice still taught at training facilities in Texas?

A.    Yes, and also in Oklahoma and also in Arkansas.  I did an advanced class in Little Rock K9.  Still the same thing applies.  Our training is the dog stays on the bite until that person is in control, in handcuffs.

Q.    Okay.  And you expect your employees to do the same?

A.    Correct.

Q.    Sheriff, based on what you know in the video footage here, do you believe this suspect, Robert Evans, was resisting arrest?

A.    Yes.

Q.    And based on your background, training, and experience and the totality of the circumstances, not the hindsight of 20/20, do you have an opinion as to whether or not Constable Kelly Smith's actions on July 25, 2022, were reasonable?

A.    I do.

Q.   And what is that opinion?

A.   His actions were reasonable.

Q.   Based on your experience and training and the totality of the circumstances, not 20/20 hindsight, do you have an opinion as to whether or not Constable Kelly Smith's actions on July 25, 2022, were excessive?

A.   Yes, I do.

Q.   And what is your opinion on that?

A.   None of the actions were excessive.

Q.   And, finally, even though there is no verbiage of unnecessary containment in the law but because some persons have opined about this term, based on your training and experience and the totality of the circumstances in a non-20/20 hindsight, do you have an opinion as to whether or not Constable Kelly Smith's actions on July 25, 2022, were unnecessary?

A.   Yes, I do.

Q.   And what is your opinion?

A.   They were very, very necessary.

Q.   Okay.

        MR. SKIPPER:  We pass the witness, Judge.

        THE COURT:  Okay.

        Mr. Machichek.

                    CROSS-EXAMINATION

BY MR. MACHICEK:

Q.   Sheriff Valdez, good morning.

A.   Good morning.

Q.   My name is Lucas Machicek.  I work with the U.S. Attorney's Office here in Tyler.  Have we met before?

A.   No, sir.

Q.   Now, I know I've worked with some of your deputies.  But we have never worked any cases before, have we?

A.   No, sir.

Q.   All right.  Now, I just have a few questions about some of the answers that you gave.  If I ask you something that you don't understand, let me know, and I will ask it again and try better?

A.   Sure.

Q.   Mr. Skipper asked you about -- you've had three separate K9s, right?

A.   Actually, four.

Q.   Four separate K9s.  All of them spoke Czech?

A.   No, sir.  My last one did not.

Q.   Last one didn't speak Czech.  What language did they speak?

A.   It was Dutch.

Q.   Dutch.  So three Czechs and a Dutch.  Sounds like a joke.

         Now, you indicated that you have, before, given the wrong command.  Was that in Czech or Dutch?

A.   The most times I have ever given a wrong was when I went from three Czech dogs to one Dutch.  And I gave the dog the command in Czech.  The dog doesn't know Czech.  He only knows his Dutch commands.

Q.   So the mistakes in giving a wrong command was you used the wrong language for the command you were trying to give; is that fair?

A.   Well, that is one of them, yes.

Q.   Okay.

A.   But not all of them.

Q.   Have you ever found occasion to give, accidentally, in a real-life situation, the bite command when you didn't mean to?

A.   In a real-life situation?

Q.   Yes, sir.

A.   No.

Q.   I haven't been in one.

     And based on your experience as a K9 officer all of these years with four separate K9s, what is your understanding on where the use of a K9 falls on the use of force continuum?

A.   It is less than lethal.

Q.   Okay.  What else are the types of implements that are less than lethal?

A.   You have got chemical agents, pepper spray.  You also

have tasers.  There is BolaWrap.  There is ASP baton.  And several others.

MR. MACHICEK:  Ms. McCullars, 1D-4, please.

BY MR. MACHICEK:

Q.   Now, Sheriff Valdez, as part of your duties as the elected Sheriff, you are responsible for a lot of different deputies?

A.   Yes.

Q.   And you want to make sure you hire deputies that understand the use of force continuum like you do, right?

A.   Correct.

Q.   And you don't want deputies that aren't going to understand the use of force continuum or aren't going to follow the use of force continuum, right?

A.   Correct.

Q.   You want deputies that are going to use appropriate force in the appropriate circumstances; is that right?

A.   Sure.

Q.   You don't -- you don't want deputies that use excessive force, do you?

A.   No, sir.

Q.   That would be bad, wouldn't it?

A.   Yes.

Q.   All right.  If a deputy finds himself in a situation where the goal of a law enforcement operation is to apprehend

a suspect and the suspect presents himself in this manner, would you expect one of your deputies to use a K9 to bite him, that we are looking at on the screen here?

A.   What manner?

Q.   With his -- seated position, inside a bathtub, with his hands on his head?

A.   I don't follow that one.

Q.   If an individual who is being apprehended is in a seated position in a bathtub with his hands on his head, would you want one of your deputies to sic the K9 on him to bite him?

A.   How long has he been sitting there?

Q.   Seconds.

A.   This is a still photo.  I don't know how long this has transpired.

Q.   If an individual is in a seated position inside a bathtub with one of your deputies standing over him with both hands on his shoulders with his hands on his head, would you want one of your deputies to hit him with a baton?

A.   He doesn't have both hands on his shoulder.

        MR. MACHICEK:  Ms. McCullars, go to 1D-6, please.

BY MR. MACHICEK:

Q.   If an individual is in a seated position in a bathtub with both hands on top of his head, would you want one of your deputies to hit him with a baton, in this position right here?

113

A.    Hit him with a baton?

Q.    Right.

A.    No, sir.

Q.    If one of your deputies had an individual in a seated position with his hands on his head inside a bathtub, would you want one of your deputies to tase an individual in this position?

A.    That particular deputy?  If that is the one that you are depicting?

Q.    Yes.

A.    Well, he can't do that.

Q.    Would you want him to if he can't do it?  Would you want a deputy to tase somebody in that position?

A.    You can't in that position.

Q.    Would you want him to dry stun him?

A.    Well, both hands are on this guy.

Q.    Right.

A.    So you can't tase him.  If he is trying to control him, he can't tase him.

Q.    What would you want one of your deputies to do in a circumstance where they are exercising dominant control over an arrestee with an arrestee's hands on his head?

A.    Based on this picture, I can't give you an answer on that.

Q.    If you believed in an arrest circumstance that an

arrestee was attempting to grab your firearm, your sidearm, would you document that in your report?

A.   Would I?

Q.   Yes.

A.   If I knew that is what happened, yes.

Q.   Okay.  If you believed that had gone on, you would put it in your report?

A.   Well, not believe.  I would have to know that it happened.

Q.   Sheriff Valdez, if one of your deputies had an arrestee in a circumstance like this and the goal of the law enforcement operation was to bring that person into custody, would you expect them to try to put handcuffs on that individual?

A.   Rephrase that question.

Q.   If your deputies are trying to arrest someone and they have him in a position like this, that we are looking at on the screen right here, would you expect them to attempt to put handcuffs on that individual?

A.   At the correct time, yes.

          MR. MACHICEK:  Pass the witness.

                    REDIRECT EXAMINATION

BY MR. SKIPPER:

Q.   I'm going to give you a chance to actually answer the question because you said "at the correct time," right,

Sheriff?

A.    Correct.

Q.    All right.  Please tell us why you said "at the correct time," if you will?

A.    This is not the correct time, for obvious reasons.  First being, we don't know if this suspect is armed.  We don't know what weapons of opportunity he has on his person.

We see in the video what there is in his general vicinity.  For example, the plunger, the crescent wrench on the floor, the hacksaw blade.  But you don't know what is on this person.

In order for you to put handcuffs on somebody, you are going to have to maintain control of them.  We try to put them in a down position, flat out on the ground so we can start the patdown after they are handcuffed, to make sure they have no weapons on them.

Q.    How many grandkids you got right now?

A.    One and one on the way.

Q.    Would you like to go home every night and see them?

A.    (Witness nods.)  Yes, I would.

MR. SKIPPER:  That's all we have, Judge.

THE COURT:  Anything further, Mr. Machichek?

MR. MACHICEK:  Very briefly, Your Honor.

RECROSS-EXAMINATION

BY MR. MACHICEK:

Q.   Sheriff Valdez, in the picture we are looking at on the screen, that Mr. Skipper just showed you, can you see any weapons in that individual's hands?

A.   No.

Q.   And you indicated just now to this jury that you would complete the patdown of an individual after you have the handcuffs on him?

A.   Correct.

        MR. MACHICEK:  Pass the witness.

        MR. SKIPPER:  That's all we have, Your Honor.

        THE COURT:  Thank you.

        May this witness be excused?

        MR. SKIPPER:  Yes, Your Honor.

        MR. MACHICEK:  Yes, Your Honor.

        THE COURT:  Thank you, sir.  You may step down.

        MR. SKIPPER:  Your Honor.

        Members of the Jury.

        The Defense rests.

        THE COURT:  Okay.

        Anything further from the Government?

        MR. MACHICEK:  Your Honor, if it pleases the Court.

        Members of the Jury.

        The Government closes.

        THE COURT:  Ladies and gentlemen, you have now heard all of the evidence.  We have got some work to do to

117

get the instructions ready for you.  We will go ahead and take our lunch break now.

It's still not time to deliberate.  So no discussing among yourselves or with anyone else, the case.

I will ask you to be back ready to go at 1:00 o'clock.  We will do our best to be ready at that time for you.  I will give you my final instructions and be able to hear closing arguments from counsel.

Okay.

(Jury out.)

THE COURT:  Okay.  You may be seated.

So you all have seen the jury instructions.

Any objections at this point?

MR. MACHICEK:  No, Your Honor.

MR. SKIPPER:  No, Your Honor, not on the prelims.

MR. MACHICEK:  Yeah, they are -- the proposed instructions that the Court showed us this morning included an agreed instruction that we conferenced about overnight.  I think that is appropriate.

THE COURT:  Okay.  So you have seen the -- we are going to go finalize it.  If you have any objections, you need to let us know now.

MR. SKIPPER:  I'm just letting the Court know I just saw the prelims.  We don't have the --

THE COURT:  Well, you saw the preliminary

instructions that I gave on Monday.

MR. SKIPPER:  I'm sorry.

THE COURT:  What about the final instructions?

MR. SKIPPER:  The final instructions, that's fine.

THE COURT:  Okay.  And have you seen the verdict form?  Was that part of what was shown to you?

MR. MACHICEK:  I haven't had an opportunity to look at the verdict form, but I can look at that fairly quickly.

THE COURT:  Okay.  We will get that to you.  What I would like to do is have everything ready so when they come back at 1:00, I will read the instructions.  I let the jurors have copies so they can follow along.  And then we will hear closings from counsel.

MR. MACHICEK:  Yes, Your Honor.

MR. SKIPPER:  Our only proposal on the verdict form would be to have "not guilty" first.

THE COURT:  Well, we will look at how we do it typically, and you can object if that is your position.

MR. SKIPPER:  Yes, Your Honor.  May we ask how much time the Court is going to --

THE COURT:  Well, that is what I was going to get to.  So how much time do you think you need for closings?

MR. MACHICEK:  45.  We would probably ask to split it, first close 30 minutes, second close --

THE COURT:  15.

MR. MACHICEK:  15.

THE COURT:  Okay.

MR. SKIPPER:  We will split ours in half.

THE COURT:  So 45 -- you agree to 45?

MR. SKIPPER:  Yes, sir, total.  And we will figure it out.

THE COURT:  All right.  Okay.  So 45 each.

MS. BATSON:  Your Honor, if I am going to take 30 minutes, then can I get a two-minute warning?

THE COURT:  You may.

MS. BATSON:  Thank you.

THE COURT:  Okay.  Anything else?

MR. MACHICEK:  No, Your Honor.

MR. SKIPPER:  No, Your Honor.

THE COURT:  Okay.  We are in recess until 1:00 o'clock.

(Recess was taken at this time.)

(Jury out.)

THE COURT:  Let me make sure I have your argument breakdown.

So, Ms. Batson, you are going to go 30 with a two-minute warning?

MS. BATSON:  Yes, Your Honor.

THE COURT:  And then Mr. Skipper and Mr. Shook, 15 or --

MR. SHOOK:  Judge, if you could just -- I will begin.  And if I hit 25 minutes, just let me know.  I may sit down early, but 25 minutes.

THE COURT:  Okay.  And then you will take the remaining 20?

MR. SKIPPER:  Yes, sir.

THE COURT:  Okay.  And then Mr. Machichek for 15.

MR. MACHICEK:  (Nods.)

THE COURT:  Okay.  Are we ready?

Okay.

(Jury in.)

THE COURT:  Okay.  You may be seated.

Okay.  We are in the homestretch.  And what you have there in front of you is just a copy of what I am going to read to you.  You are welcome to follow along, put it down and ignore it, listen, make notes, whatever you want to do.

Members of the Jury:

Now that you have heard all of the evidence in the case, it becomes my duty to give you the instructions of the Court as to the law applicable to this case.

In any jury trial there are, in effect, two judges. I am one of the judges; the other is the jury.

It is my duty to preside over the trial and to determine what testimony and evidence is proper for your consideration.  It is also my duty at the end of the trial to

explain to you the rules of law that you must follow and apply in arriving at your verdict.

First, I will give you some general instructions which apply in every case, for example, instructions about burden of proof and about -- and how to judge the believability of witnesses.

Then I will give you some specific rules of law about this particular case.

And, finally, I will explain to you the procedures you should follow in your deliberations.

Duty to follow instructions.

You, as jurors, are the judges of the facts.  But in determining what actually happened, that is in reaching your decision as to facts, it is your sworn to duty to follow all of the rules of law as I explain them to you.

You must follow only the law as I instruct you in these instructions.  You should disregard any statements of law made by the lawyers or any witness.

You have no right to disregard or give special attention to any one instruction or to question the wisdom or correctness of any rule I may state to you.

You must not substitute or follow your own notion or opinion as to what the law is or ought to be.  It is your duty to apply the law as I explain it to you, regardless of the consequences.

It is also your duty to base your verdict solely upon the evidence, without prejudice or sympathy.  That was the promise you made and the oath you took before being accepted by the parties as jurors, and they have the right to expect nothing less.

Presumption of innocence, burden of proof, reasonable doubt.

The Second Superseding Indictment, or formal charge against a Defendant, is not evidence of guilt.  Indeed, the Defendant is presumed by the law to be innocent.  The Defendant begins with a clean slate.

The law does not require a Defendant to prove his innocence or produce any evidence at all, and no inference whatever may be drawn from the election of a Defendant not to testify.

The Government has the burden of proving the Defendant guilt beyond a reasonable doubt.  And if it fails to do so, you must acquit the Defendant.

While the Government's burden of proof is a strict or heavy burden, it is not necessary that the Defendant's guilt be proved beyond all possible doubt.  It is only required that the Government's proof exclude any reasonable doubt concerning the Defendant's guilt.

A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all

of the evidence in the case.

Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in making the most important decisions of your own affairs.

Evidence - excluding what is not evidence.

As I told you earlier, it is your duty to determine the facts.  To do so, you must consider only the evidence presented during the trial.

Evidence is the sworn testimony of the witnesses, including stipulations, and the exhibits.  The questions, statements, objections, and arguments made by the lawyers are not evidence.

The function of the lawyers is to point out those things that are most significant or most helpful to their side of the case, and in so doing, to call your attention to certain facts or inferences that might otherwise escape your notice.

In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in the case.  What the lawyers say is not binding upon you.

During the trial, I sustained objections to certain questions and exhibits.  You must disregard those questions and exhibits entirely.

Do not speculate as to what the witness would have

said if permitted to answer the question or as to the contents of an exhibit.

Also, certain testimony or other evidence has been ordered removed from the record, and you have been instructed to disregard this evidence.  Do not consider any testimony or other evidence which has been removed from your consideration in reaching your decision.

Your verdict must be based solely on the legally admissible evidence and testimony.

Also, do not assume from anything I may have done or said during the trial that I have any opinion concerning any of the issues in this case.  Except for the instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your verdict.

Evidence - inferences - direct and circumstantial.

In considering the evidence, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience.

In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts which have been established by the evidence.

Do not be concerned about whether evidence is direct evidence or circumstantial evidence.  You should consider and weigh all of the evidence that was presented to

you.

Direct evidence is the testimony of one who asserts actual knowledge of a fact, such as an eyewitness. Circumstantial evidence is proof of a chain of events and circumstances indicating that something is or is not a fact.

The law makes no distinction between the weight you may give to either direct or circumstantial evidence.  But the law requires that you, after weighing all of the evidence, whether direct or circumstantial, be convinced of the guilt of the Defendant beyond a reasonable doubt before you can find him guilty.

Credibility of witnesses.

I remind you that it is your job to decide whether the Government has proved the guilt of the Defendant beyond a reasonable doubt.  In doing so, you must consider all of the evidence.  This does not mean, however, that you must accept all of the evidence as true or accurate.

You are the sole judges of the credibility or believability of each witness and the weight to be given to the witness's testimony.  An important part of your job will be making judgments about the testimony of the witnesses who testified in this case.

You should decide whether you believe all, some part, or none of what each person had to say, and how important that testimony was.

In making that decision, I suggest that you ask yourself a few questions.

Did the witness impress you as honest? Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome of the case? Did the witness have any relationship with either the Government or the Defense? Did the witness seem to have a good memory? Did the witness clearly see or hear the things about which he testified? Did the witness have the opportunity and ability to understand the questions clearly and answer them directly? Did the witness's testimony differ from the testimony of other witnesses?

These are a few of the considerations that will help you determine the accuracy of what each witness said.

Your job is to think about the testimony of each witness you have heard and decide how much you believe of what each witness had to say.

In making up your mind and reaching a verdict, do not make any decisions simply because there were more witnesses on one side than on the other.

Do not reach a conclusion on a particular point just because there were more witnesses testifying for one side on that point.

You will always bear in mind that the law never imposes upon a Defendant in a criminal case the burden or

duty of calling any witnesses or producing any evidence.

Impeachment by prior inconsistencies.

The testimony of a witness may be discredited by showing that the witness testified falsely or by evidence that at some other time the witness said or did something or failed to say or do something which is inconsistent with the testimony the witness gave at this trial.

Earlier statements of a witness were not admitted in evidence to prove that the contents of those statements are true.  You may not consider the earlier statements to prove that the content of an earlier statement is true; you may only use earlier statements to determine whether you think the earlier statements are consistent or inconsistent with the trial testimony of the witness and, therefore, whether they affect the credibility of that witness.

If you believe that a witness has been discredited in this manner, it is your exclusive right to give the testimony of that witness whatever weight you think it deserves.

Expert opinion.

During the trial you heard the testimony of Robert S. Eden with Eden Consulting Group and Donald E. Slavik with the United States Police Canine Association, who expressed opinions concerning police K9 handling and training; and Jerry Staton, owner of Affordable Realistic Tactical

Training, who expressed opinions concerning police practices and the use of force.

You also heard the testimony of Michael W. Kmiecik, owner of Sheepdog Guardian Consulting, LLC, who expressed opinions concerning police K9 handling and training, police practices and the use of force; and Dennis Brady, owner of Denshaw Group, LLC, who expressed opinions concerning police practices and the use of force.

If scientific, technical, or other specialized knowledge might assist the jury in understanding the evidence or in determining a fact in issue, a witness qualified by knowledge, skill, experience, training, or education may testify and state an opinion concerning such matters.

Merely because such a witness has expressed an opinion does not mean, however, that you must accept the opinion.  You should judge such testimony like any other testimony.  You may accept it or reject it and give it as much weight as you think it deserves, considering the witness's education and experience, the soundness of the reasons given for the opinion, and all other evidence in the case.

Transcript of recorded conversations.

Several of the exhibits have been identified as typewritten transcripts of oral conversations which can be heard on audio or video recordings received in evidence.  The

transcripts also purport to identify the speakers engaged in such conversation.

I have admitted the transcripts for the limited and secondary purpose of aiding you in following the content of the conversation as you listen to the recording, and also to aid you in identifying the speakers.

You are specifically instructed that whether the transcripts correctly or incorrectly reflect the content of the conversation or the identity of the speakers is entirely for you to determine based upon your own evaluation of the testimony that you have heard concerning the preparation of the transcripts and from your own examination of the transcripts in relation to your hearing of the recording itself as the primary evidence of its own contents.

And if you should determine that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent.  It is what you hear on the recordings that is evidence, not the transcripts.

Caution - consider only crime charged.

You are here to decide whether the Government has proved beyond a reasonable doubt that the Defendant is guilty of the crime charged.  The Defendant is not on trial for any act, conduct, or offense not alleged in the Second Superseding Indictment.

Neither are you called upon to return a verdict as

to the guilt of any other person or persons not on trial as a Defendant in this case, except as you are otherwise instructed.

Caution - policies and training.

The Government has introduced evidence of policies and training the Defendant received while employed as a law enforcement officer.  This evidence has been admitted for a limited purpose.  You may use it only to determine whether the Defendant acted willfully, as I will describe that state of mind to you.

It is, of course, wholly up to you to determine whether the Defendant violated any policy or acted in contravention of his training.

If you find that he acted in contravention of policies or training, then I caution you that not every instance of inappropriate behavior on the part of a law enforcement officer rises to the level of a federal constitutional violation.

It is possible for a law enforcement officer to violate department policy or act contrary to his training without violating the United States Constitution, just as it is possible for a law enforcement officer to violate the Constitution without violating a specific policy.

For this reason, proof that a Defendant violated policy or acted contrary to training is relevant to your

determination of willfulness, but is not relevant to your determination that the Defendant violated a victim's constitutional rights.

In other words, if you determine that the Defendant violated a policy of his employing law enforcement agency, or acted contrary to his training, you should consider that evidence only in determining whether that particular Defendant acted willfully; you should not consider that evidence in determining whether the Defendant's actions violated the Constitution in the first instance.

Caution - punishment.

If a Defendant is found guilty, it will be my duty to decide what the punishment will be.  You should not be concerned with punishment in any way.  It should not enter your consideration or discussion.

Single Defendant - multiple counts.

A separate crime is charged in each count of the Second Superseding Indictment.  Each count and the evidence pertaining to it, should be considered separately.

The fact that you may find the Defendant guilty or not guilty as to one of the crimes charged should not control your verdict as to any other.

On or about.

You will note that the Second Superseding Indictment charges that each offense was committed on or

about a specified date.  The Government does not have to prove that the crime was committed on that exact date, so long as the Government proves beyond a reasonable doubt that the Defendant committed the crime on a date reasonably near the dates stated in the Second Superseding Indictment.

Second Superseding Indictment - Count 1.

Count 1 of the First Superseding Indictment -- I believe that is supposed to say Second Superseding Indictment -- charges the Defendant with a violation of 18 USC, Section 242, deprivation of civil rights.

Title 18, United States Code, Section 242, makes it a crime for anyone, acting under color of law, willfully to deprive any person of a right secured by the Constitution or laws of the United States.

For you to find the Defendant guilty of this crime, you must be convinced that the Government has proved each of the following beyond a reasonable doubt:

First, that the Defendant deprived the person, R.E., of a right secured by the Constitution or laws of the United States by committing one or more of the acts charged in the Second Superseding Indictment.

Second, that the Defendant acted willfully; that is, that the Defendant committed such act or acts with a bad purpose or evil motive to disobey or disregard the law, specifically intending to deprive the person of that right.

Third, that the Defendant acted under color of law.

And, fourth, that bodily injury resulted from the Defendant's conduct.

The Second Superseding Indictment charges that the Defendant deprived R.E. of the following right:  To be free from unreasonable seizures, which includes the right to be free from the use of unreasonable force by a law enforcement officer acting under color of law.

You are instructed that this right is one secured by the Constitution and laws of the United States.

To find that the Defendant was acting willfully, it is not necessary for you to find that the Defendant knew the specific constitutional provision or federal law that his conduct violated.

But the Defendant must have a specific intent to deprive the person of a right protected by the Constitution or federal law.

Acting under color of law means acts done under any state law, county or city ordinance, or other governmental regulation, and acts done according to a custom of some governmental agency.  It means that the Defendant acted in his official capacity or else claimed to do so but abused or misused his power by going beyond the bounds of lawful authority.

Bodily injury means (A) a cut, abrasion, bruise,

burn, or disfigurement; (B) physical pain; (C) illness; (D) impairment of a function of a bodily member, organ, or mental faculty; or (E) any other injury to the body, no matter how temporary.

Second Superseding Indictment - Count 2.

Count 2 of the Second Superseding Indictment charges the Defendant with a violation of 18 USC, Section 1519, destroying, altering, or falsifying a document in a federal investigation.

Title 18, United States Code, Section 1519, makes it a crime for anyone to knowingly alter, destroy, mutilate, conceal, cover up, falsify, or make a false entry in a record, document, or tangible object with the intent to impede, obstruct, influence the investigation or the proper administration of a matter within the jurisdiction of any department or agency of the United States or any case filed under Title 11, or in relation to or in contemplation of such a matter.

For you to find the Defendant guilty of this crime, you must be convinced that the Government has proved each of the following beyond a reasonable doubt:

First, that the Defendant knowingly altered, destroyed, mutilated, concealed, covered up, falsified, or made a false entry in a record, document, or tangible object.

Second, that the Defendant acted with the intent to

135

impede, obstruct, influence the investigation, or the proper administration of, or in relation to, or in contemplation of a matter.

And, third, that the matter was within the jurisdiction of the Federal Bureau of Investigation, which is an agency of the United States.

There is no requirement that the matter or investigation have been pending or imminent at the time of the obstruction but only that the acts were taken in relation to or in contemplation of any such matter or investigation.

The Government is not required to prove that the Defendant specifically knew the matter or investigation was within the jurisdiction of a department or agency of the United States.

In other words, you need not find that the Defendant knew he was obstructing, impeding, or influencing a matter that was federal in nature.

A tangible object is one used to record or preserve information.

Willfully.

The word "willfully," as that term has been used from time to time in these instructions, means that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids, that is to say, with bad purpose either to disobey or disregard the law.

Knowingly.

The word "knowingly," as that term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally, not because of mistake or accident.

Duty to deliberate and verdict form.

To reach a verdict, whether it is guilty or not guilty, all of you must agree. Your verdict must be unanimous on each count of the Second Superseding Indictment. Your deliberations will be secret. You will never have to explain your verdict to anyone.

It is your duty to consult with one another and to deliberate in an effort to reach agreement, if you can do so. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors.

During your deliberations, do not hesitate to reexamine your own opinions and change your mind if convinced that you were wrong. But do not give up your honest beliefs as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

Remember at all times, you are judges, judges of the facts. Your sole interest is to seek the truth from the evidence in the case, to decide whether the Government has

Case 6:22-cr-00146-JDK-JDL    Document 100    Filed 08/09/23    Page 137 of 195 PageID #:  2687

137

proven the Defendant guilty beyond a reasonable doubt.

When you go to the jury room, the first thing that you should do is select one of your members as your presiding juror, who will help to guide your deliberations and will speak for you here in the courtroom.

A verdict form has been prepared for your convenience.  The presiding juror will write the unanimous answers of the jury in the spaces provided for each count of the Second Superseding Indictment, either guilty or not guilty.

At the conclusion of your deliberations, the presiding juror should date and sign the verdict.

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case.

You may not use any electronic device or media, such as telephone, cell phone, smartphone, iPhone, BlackBerry, or computer, the Internet, any Internet service, or any text or instant messaging service, or any Internet chatroom, blog, or website, such as Facebook, LinkedIn, YouTube, or Twitter, to communicate to anyone any information about the case or to conduct any research about the case until I accept your verdict.

If you need to communicate with me during your deliberations, the presiding juror should write the message

and give it to the Court Security Officer.  I will either reply in writing or bring you back in the courtroom to respond to your inquiry.

Bear in mind, that you are never to reveal to any person, not even to the Court, how the jury stands, numerically or otherwise, on any count of the Second Superseding Indictment until after you have reached a unanimous verdict.

We will now hear closing arguments from counsel.

MS. BATSON:  May it please the Court?

THE COURT:  You may.

MS. BATSON:  Counsel.

Ladies and Gentlemen of the Jury:

Good afternoon.  You are finally here to closing arguments.  Before I begin, I just want to tell you that I thank you for your service.

Serving as a juror in a criminal case is one of the highest honors that we have.  And it is truly, truly because of you that the wheels of justice continue to turn.

Now, as I told you in opening statement, this case is about a Constable, his K9, and his violation of a citizen's constitutional right, and then his coverup.

Now, during this trial, you heard about a case called Graham v. Connor.  Normally, that might not be put before you, but since it is, we are going to go ahead and

139

discuss it.

There are three basic elements of that case:  The severity of the crime, the immediacy of the threat, and the resistance to arrest or attempts to flee.

You will see this in some of the policies under the use of force for Smith County and also the Defendant's own policy.

Okay.  So, first, the severity of the crime.

We heard that Robert Evans had warrants for his arrest.  He had three misdemeanor warrants and one felony. The felony was an injury to a child.

Now, just -- I don't want anything that Defense counsel or that has come out in this trial to make y'all think that we condone anything that happened.

If Robert Evans is guilty of injury to a child, he will have his day in court.  If he is found guilty, that is on him.  This is not his trial.  He is not on trial here.

But all of the three factors, they do determine the reasonableness of an officer's actions.  So the fact that the Defendant knew about this warrant, it is important.  It is absolutely important.  But don't get side-tracked. Mr. Evans -- this is not Mr. Evans's trial.

The immediacy of the threat.

You heard through the testimony that when the officers got to 199 Ruth Street in Hawkins, they maintained a

perimeter.  They maintained a perimeter and did the right thing.  They didn't have enough officers.

So what did they do?  They called back-up.  They had to maintain that perimeter until back-up arrived.  And then once back-up arrived, then sort of a plan was made that they would make entry.

Entry was attempted over and over and over.  You saw and heard the 20-plus kicks that it took to try to open the door.

Once the door was open -- and you will have the transcripts and the video and y'all can watch all that as much as you want, slow it down, play it fast, whatever.

But you will see that prior to going into the house, once the door was opened, once McQueen was able to finally kick it in, you will hear the Defendant say, let my dog in.

Okay.  So he walks in, and then we showed you the video, the one with the red arrow, where there was conversation going on, and Mr. Evans is saying, I will come out.  I will come out.  Don't put the dog on me.

But the Defendant walks down the fatal funnel without his gun drawn.  Without the gun drawn.  That's important.  There is no -- if you are a law enforcement officer, you are going to have your weapon drawn.

If you are thinking there is any type of threat

that could take you out and not get you home safely, you are going to have your weapon drawn.

Instead, he walks down the fatal funnel without his gun drawn.  He stands in front of the door of the bathroom. 25 seconds he stands there.

You have heard all of the testimony about it being a trailer home and that there is no cover and a bullet can go through the walls just like that, but yet he stands in front of the door.  There is no immediacy of the threat.

You heard all of the witnesses from the Government, McQueen, Milbourn, Hobson, Gordon, Slavik, Staton, and Eden, there was no threat.  All of these have combined law enforcement experience I'm sure over 100 years.  They all said there is no immediate threat.  There is absolutely no reason for -- to give additional bite commands.

You will see -- or you have seen that there is so many times when commands could have been given to Robert Evans to lie down, put your hands up, put your hands behind your back, walk back to me, all of that.

But that didn't happen.  Instead, there was bite after bite after bite command.  And there is no reason for it.  There was no threat.

All of them said Smith used excessive force, the force wasn't reasonable.

Now, then Defense counsel kept saying 90 seconds,

90 seconds changes his life.  And 90 seconds, giving him the benefit of the doubt, would have been longer than the 60 seconds that we calculated.

But just to let you know, this is not a split-second decision.  A minute is a long time.  And when you are a law enforcement officer, you do have to make split decisions.  You have to assess the situation, assess the threat, and determine how to handle that threat like that (snapping fingers).  Not a minute.  Not 90 seconds.  It is a fluid situation, and you are trained as a law enforcement officer to adjust to the situation.

(Video played.)

(Video stopped.)

MS. BATSON:  That is the 60 seconds that makes up Count 1 of this Indictment.  From the time when Mr. Evans had his hands on his head and could have been taken into custody, everything after that was excessive force.  Everything.

You saw in this portion of the clip that there was another officer present.  It was Officer Milbourn.  He didn't go in and assist.  Why?  Because he was deferring to his mentor.

He told you and -- reluctantly.  You could tell he did not want to testify against his mentor.  But he came in because he did what was right.  He knew what he saw happened there.  And he didn't report it initially, but he knew what

happened in that bathroom was wrong. And he told you that. He said at some point he just knew it was too far gone. So he was asking the Defendant, what do I do?

But what did the Defendant do? He said, bite, takedown, bite. Bite, takedown, bite. Not heel, not anything else. Bite, takedown, bite. He is still trying to get this suspect, Mr. Evans, bit.

Mr. Evans -- I mean, the Defendant, he was in control of Evans, he was in control of the situation, and he was in control of Mata. You have heard time and time again, all these K9 handlers come in and tell you that it is the K9 handler's responsibility, number one responsibility, to control the dog. That is their number one responsibility.

The third prong, the resistance to arrest or attempts to flee.

The video shows multiple, multiple attempts to surrender. Mr. Evans was trying to surrender.

Now, did he come out at first? Absolutely not. But like you heard Mr. Eden say, the dog did his job. Because once the dog got there and he knew that that dog was present, he attempted to give up. He was terrified of that dog.

And I submit to you, ladies and gentlemen, all of us, if we were in that situation, would be terrified of a dog bearing on you that is given the bite command.

All of his actions, ladies and gentlemen -- again, you can watch the video and interpret for yourself; that is your job as factfinders.  But he was terrified of that dog.  Absolutely.

All his flailing, all his bending down so the dog wouldn't get him, you can hear it.  And you can hear the fear in his voice.

Another thing is he is not getting out of that bathroom.  Mr. Evans is about this big.  He is backed up in a bathroom.  There is nowhere for him to go.  He steps in the tub to take him further away from the dog.

So you have him in the bathroom and then you have the Defendant, and then you have Milbourn and then you have McQueen.

And you have seen McQueen.  He is a big guy.  There is no way that this Defendant -- that Robert Evans is getting out of the tub -- out of that bathroom.  There is absolutely no way.  So there is no way he is going to flee.  And, again, I have already told you he wasn't resisting arrest after he knew the dog was present.

Now I will go over the law that is applicable to this case.  And I will tell you, ladies and gentlemen, you might not like the law.  Both of the cases -- or both charges that this Defendant is charged with, you might not like the law.  But you took an oath as jurors to follow the law.

I have been a prosecutor for 30 years, and I have had to prosecute some cases that, you know, I wasn't too thrilled about, but that was the law, and I had to prosecute the law because that was the duty that I took as a prosecutor to defend the laws of the United States.

So here we go.

The Defendant deprived Robert Evans of a right secured by the Constitution of the United States.  Everybody, no matter who it is, we all have the right to be free from unreasonable seizure of our person, especially during an arrest.  Right?  No matter who you are.

And, again, Robert Evans, he is really a non-issue in this case.  This is not his trial.  But he has the right, just like we all do, to be free from a Fourth Amendment violation.  If what happened to Robert Evans, who is not a law-abiding citizen, it could happen to anybody.  And we just want to ensure that doesn't happen, that every right of every citizen is protected.

Right here.  I told you from this point on, this is where the Indictment started.  Because, here, you see Milbourn's hand right there.  You see the Defendant's hand on his head, and you see Kelly Smith the Defendant.

Mr. Evans is in a defenseless position right here. He is sitting Indian style in the tub.  I don't know if you ever tried to stand up from an Indian-style position.  It is

just not going to happen.

If he had arrested him at this point, game over. Game over. Absolutely we would not be in this courtroom right now if he had been arrested right here. But he didn't.

Then he is in a defenseless position here. You can see -- you know, Mr. Evans has on shorts. And, granted, a search was not conducted of him. There wasn't time. There wasn't time. From the time that the door opened and the Defendant entered, all you see is, foogosh. That's all you hear. Trying to get him to bite. There was no time to do a search.

If proper procedure -- and I know we are not talking about protocol and procedure, but if the Defendant had given this suspect the time, the time to surrender, we wouldn't be here either.

Right here. And you will see, ladies and gentlemen, again, on the video, he has him in this position. He doesn't arrest him. But what does he do? He calls the dog back in and tells the dog to bite. Foogosh, foogosh, foogosh.

Then after this, he is already in a defenseless position. He takes him to an even more defenseless position. He calls the dog back. And then what does Evans do? There has been much -- he hit the dog's nose. Yes. Where are the teeth? In the dog's face. So he is going to try to keep

that dog from biting him.  That is his number one concern right here.

What does the Defendant do?  He puts him in a more defenseless position by grabbing him up under here, up under his chin and up under his neck, again, while giving the bite command.  It is not labost, heel.  It is not, you know, go away, or whatever that command will be.  No.  It is bite. Hozam, come here.  Foogosh, bite.

Then he takes him to the most defenseless position possible.  Just imagine, right here, he is telling this dog to bite him.  You can see right here, in this picture alone, no access to weapons.  You heard all this testimony about these tools that are on the side.  Never was that in any report.

And, ladies and gentlemen, I submit to you that when an officer fears that his life is in danger or there is something there that could take him out, it is documented all day long.  Trust me on that.  And there is nothing in the report that indicates that Evans was going for any tools.

Certainly, you see it right here.  He is not -- the Defendant has already punched him several times and dropped him to the floor of the bathtub.  If there were any weapons, knives or anything, look how thin these shorts are, they would have fallen out.

I mean, the fact that a complete search hasn't been

done, there just wasn't time.  If he had been taken into custody with his hands on his head like this, and then put his hands behind his back -- which is easy to do -- then a proper search could have been done.  There just wasn't time, and it is because of the Defendant's actions.

But this right here, ladies and gentlemen, this is an extremely dangerous position.  This is the most defenseless position that Mr. Evans is in.

If this had been a strong dog, he would have bit Mr. Evans right in his flank.  And the pain and potential damage from that type of bite, it could have been catastrophic.

But what does the Defendant do?  He continues to give bite commands when Mr. Evans is in this defenseless position that he put him in.

Now, second to this is that the Defendant acted willfully; that is, that the Defendant committed this act with a bad purpose or evil motive to disobey and disregard the law, specifically intending to deprive the person of that right.

Well, I submit to you that there was a specific intent to deprive Mr. Evans of his right.

So for willfulness.

You heard Defense counsel tell you -- I think in his opening, right, or maybe even in jury selection, that

willfulness was going to be the big issue, and there was going to be a fight over willfulness.

I submit to you, ladies and gentlemen, there is no fight over willfulness.  The Defendant knew it.  He did it, and he hid it.  He knew it.

This Defendant has approximately 20 to 25 years of experience as a law enforcement officer.  Please keep that in mind.  I mean, this is not some junior officer that has been on the force less than a year.  He is the Constable of Precinct 2.  He has lots of law enforcement experience.  He knows better.

He has been trained for hand-to-hand combat.  He has been trained in use of force.  He created his own K9 policy, listing the three Graham factors.  But what does he do?  He adds another one.  The fourth one that you saw.

And everybody said it was unconstitutional because it protects him, and it gives him free rein to do whatever he wants for his K9.  If something bad goes -- happens in the field in a real-life situation, well, I can fall back because it is verbal noncompliance.

Verbal noncompliance, what is that?  It is giving you free rein to do whatever you want with your K9.  And that, ladies and gentlemen, is unconstitutional.  It is a violation of the law.  And you cannot have that as a crutch to fall back on for bad behavior.

150

Like I said, everybody says that the K9 handler is responsible for the K9.  Whatever actions were done with that dog is the Defendant's responsibility.  He is the one who released that K9.  He is the one who could have called him back and gave him the bite commands, and he didn't.  He did not call him back.

The K9 is a tool.  Everybody who had a K9 told you that the primary focus of the dog, the number one job, is to locate the person.  That is it.  Once the person is located, then you have to reassess.  And they said the suspect drives whether you move to number two, which is the apprehension.

(Video played.)

MS. BATSON:  Watch the red arrow.  Go in.  Says, let my dog in.  Red arrow.  Raise his hands.  See.  What does he say?  Bite him.

(Video paused.)

MS. BATSON:  He knows where he is.  First of all, he has been telling them he is in the bathroom, what he is doing in there.  And then you see his hands when he goes in.

This is from Constable Smith's body camera.  This is not from Milbourn's.  This is what Constable Smith sees when he walks in.  When the conversation is going on.

I will come out.  I will put my hands out.  He is telling him where he is.  So once the dog is deployed, and you know where the suspect is, which is right here.  Again,

game over.  That doesn't happen.  He did it.

Again, we just saw Evans's hands sticking out of the door.  Knowing where Evans was, he still deployed the K9.  He gave absolutely no commands to which Evans could comply once they got into the bathroom.  He gave the bite command several times even when Evans was trying to surrender.

In the bathroom part you see where Mata is not in the bathroom.  Sgt. Milbourn -- Lt. Milbourn puts him back in the bathroom.  The Defendant grabs the dog, pulls him over to the tub in order to give the bite command.  Pulls him over to the tub in order to make sure that his dog gets a win.  He restrained Evans with his hands on his shoulders and then gave the bite command two more times.

At the end, Evans is begging, begging to be cuffed.  Because what have they told him?  We can't get this dog off of you that is tearing you and jerking your body up and down until you are handcuffed.

So what does he say?  Cuff, cuff, cuff, cuff, cuff, so he can end the pain and this nightmare.

According to the Defendant's own policy, he knows he has the authority to call that dog off.  He knows it, but he doesn't.

He used Evans as a training tool.  The experts told you that.  They told you that when he put Evans into those defenseless positions time and time again, that he was trying

to get his dog a win.

And you cannot, no matter who the citizen is, whether they are an upstanding citizen or they are not, you cannot use a citizen of the United States as a training tool for a dog.  That is illegal and against the law.  And you have got to be held accountable for that.

Again, there was ample opportunity to arrest.  Give commands, stay outside, whatever tactically could have been done.  But siccing this dog on this citizen, that is not it.

He didn't down his dog.  You see the part where his hands are on his head, and the pit bull comes back in, and Evans says, he's trying to attack my dog.

And at that point when the Defendant looks over and sees the dog, he didn't down his dog.  He could have said labost right then, right there.  Right?  There are other officers there.

And I want to make sure that the picture is painted that at this point Constable Smith is not in that small trailer by himself.  There are other officers there.  But he has taken so much control of the entire situation.  Tuma is still outside, right?  I know they want to say he is still on-scene commander, but once entry was made into that house with the dog, everybody has told you, it becomes the handler's responsibility to control the situation and control the dog.

So at this point the Defendant is in control, and he did not down his dog.  He continued to exhibit control over Evans moving him through various stages of defenseless positions instead of arresting him.

The compliance was there.  He already had him restrained on his shoulders.  If compliance is gained, then you cannot -- you absolutely cannot continue the bite.  That is illegal.

All right.  He hid it.  Right away he starts spinning the narrative.  What does he do?  He sends text messages to his trainer telling him, here is the injuries, you know, number 6.  Telling his friends, oh, we had to wrestle a pit bull, all that kind of stuff.

He starts trying to justify his actions from the very beginning.  He knew what he was doing was wrong.  What does he do?  He follows them to the hospital, to Quitman Hospital, which I found out is like 23 minutes from here.  Right?

So he follows him to the hospital -- the Defendant follows him to the hospital where Evans goes.  What does he do?  He is trying to assure that the resisting arrest charge is added.  Because he knows that's what he needs in order to justify what he has done.

He starts claiming that there was an immediate threat.  Nope.  Then you hear about the swinging of the

plunger.

Ladies and gentlemen, before the whole plunger incident happens, you can look and listen to everything, the bite command is given 15 times before the plunger is ever picked up by the Defendant.

Now, I am sure Mr. Evans -- don't know his mindset -- but I am sure he doesn't speak, you know, Hungarian, or whatever this dog is trained in.  But he figures out pretty quickly, I am sure, what the bite command is.  If you have heard something 15 times and you see the dog trying to react to it, you are going to figure it out pretty quickly.

So by the time he picks up this plunger, 15 times all he has heard is foogosh, foogosh, foogosh.  So he is, I submit to you, in a heightened position of trying to keep himself from getting bit by this dog.

So if a dog is coming at you and you are in this -- they were making a big deal about this -- this position, this is total surrender.  But if the dog is coming at you at this level, I submit to you, you are not going stay in this position.  You are not going to stay and say, come get me, dog.

No.  You are going to be, like, get this dog off of me.  That is your primary concern.  So, yes, you are going to grab the harness.  You are going do whatever you can to keep

that dog away from you.

They made a big deal about kicking the dog.  Well, keep in mind, that is when he is in his most defenseless position.  He is like this, ladies and gentlemen.  This whole thing is exposed.

He has figured out what the bite command is.  He knows that once he hears it now, I'm like this, his dog has all of this, has all of this area to get to me now.  And so, of course, he is going to lash out.  He is going to do whatever he can to keep that dog off of him.

I told you about how this Defendant was lying in his text messages.  And you have seen those.  He didn't give the heel command.  He continued to give the bite command.

And then, then, ladies and gentlemen, you heard that he watched the video.  He goes to the hospital to make sure that they are going to put the resisting to justify his actions.  Then he goes back and watches the video.  Watches Milbourn's video.

What does he do after that?  He writes an affidavit.  A sworn affidavit.  He doesn't file it until four days later.  But he writes it on the 25th, the day of the incident.

Then you hear all this nonsense about mis-sequencing.  Ladies and gentlemen, I submit to you that that is a complete insult to all of the officers who are

carefully recording the accurate and truthful information in their affidavits that they are going to swear to and submit to the court. This whole nonsense about mis-sequencing, it completely undermines the credibility of other law enforcement officers and the credibility of the justice system.

And I can't even tell you how insulting it is that that whole line of questioning even came in, in this type of trial. Because what the witnesses were telling you by that is that if you are shown an offense report or an affidavit by a law enforcement officer, oh, you have got to think, is this mis-sequencing in what they are putting in there?

This is ridiculous because there are millions of officers who do the right thing on a daily basis. This nonsense is just -- it is insulting.

Okay. Color of law. The Defendant acted under color of law. There is no dispute he was working in his official capacity as a Wood County Constable. He abused his power by using more force than was reasonably necessary.

The Defendant's conduct resulted in injury, bodily injury. You can see him screaming out here in pain. And not trying to grab any weapons. Then here is the injuries that this Defendant sent to his trainer, number 6, bragging about how many bites his dog has had in a two-year period.

Count 2. The Defendant filed a false affidavit.

That is basically what this says, intending to influence the investigation under the matter that the FBI was investigating.

Ladies and gentlemen, right here, there is -- I only have a few minutes now, so I have got to speed up. Here, we outlined 14 misstatements.  But you will have all of these exhibits to take back with you.

But the key thing is -- there are several, just flat-out lies.  But the one here is that while in the bathtub, he covered his hand thinking that the K9 was going to arrest him -- or going to bite him.

Why is he thinking that the K9 is going to bite him?  Because he has figured out what the commands are, and he is trying to keep the dog away.

Then yet -- then it says, yet, only the heel command was given.  We do not hear labost not one time during this whole thing.  And there is also no command to release the bite, so...

Again, it is the Constable, his K9, his violation of a citizen's constitutional right, and the subsequent coverup.  He is guilty of both charges, ladies and gentlemen, and we ask you to find him guilty.

Thank you.

MR. SHOOK:  May it please the Court.

THE COURT:  You may proceed.

MR. SHOOK:  Counsel.

Members of the Jury:

I am going to start out for the Defense, and Mr. Skipper will follow up after my remarks.  The first thing I want to do is thank you for your jury service.  It is one of the most -- it is one of the biggest privileges you can do, other than, of course, serving our country, protecting, and law enforcement.

Serving as a juror, that you are actually taking part in a place in the Government and in the system.  If you haven't done it before, I am sure now you realize in doing this how important the Constitution is, how important the jury system is of the jobs that you are doing.

You know, we bring you down here, you are summoned down here, and you don't have a choice in that.  But you have a choice whether you listen, whether you pay attention.

You have been very patient with us.  You have listened intently the entire week, and that is all we can ask.  That is all we can ask.  We appreciate that.  I am sure you are going to take your oath to your heart and follow the law and render a true verdict in this case.

I want to talk a moment about what I talked to on my 30 minutes that I had during jury selection.  I want to remind you that -- the most important thing I wanted to talk about are these constitutional rights.

Next Tuesday is the 4th of July. I talked about that on voir dire. That is when this country became free. That is when our Founders felt strong enough that the British empire was under too much tyranny, too much control. So much so that they risked their lives, and many lost their lives, to fight for independence, and they won.

And out of that grew the Constitution. 10 years later it became official. One of the most remarkable documents, legal documents ever constructed.

The Founders were afraid of tyranny from the Government. And they wanted the citizens protected by it, and that is why they constructed the Constitution.

That is why they broke the Government down into three branches. You have the legislative branch that passes the laws. You have the executive branch, which enforces the laws. That is this branch. And then you have the judicial branch. And these branches can counteract each other.

And the most important part of the judicial branch is the right to a jury trial.

Judge told you the long history of jury trials. The United States uses it more than any other country in the world, which is why we have the greatest criminal justice system. It is the cornerstone of this criminal justice system because the Founders knew that it is powerful.

The executive branch is powerful. They have

unlimited resources.  A citizen doesn't have a chance against them unless he has some protection.

And the number one protection is this:  The right to a jury trial.  12 citizens that act as a buffer between the prosecution and the accused citizen; 12 citizens that are a shield because they, by their oath, listen to the evidence, require the prosecution to meet the highest burden that we have in this law, beyond a reasonable doubt.

They enforce the presumption of innocence.  They enforce the fact that this burden never shifts from this table, that the Defense isn't required to prove anything.

They enforce the Fifth Amendment, that you don't have to sit up and incriminate yourself and expose you to that if you don't want to.

And that is your job this day.  You have taken on that duty, and I am sure you will fulfill it.

We talked a lot about what reasonable doubt is.  And the Judge gives you the definition of it.  And it is common sense stuff.  He says use your common sense.  It is the highest burden.

We talk about reason because -- not just any doubt.  You can't have some ridiculous, unlogical doubt thrown in that would cause you -- and then no one could ever be held accountable.  It has to be a reasonable doubt, one based on logic.

And that is why he kept saying the Government, the prosecution, must rule out every logical reasonable doubt that they can get a conviction on before they can get a conviction.

And I want to illustrate that point very carefully to you.  Because, you know, as we grow up, we hear these terms, but unless we see them in action or unless you are in that chair, unless you are part of the system, you don't think about it every day.  But it is important to think about it and how important that role is.

I talked about -- illustrated -- I know I gave you the example of maybe 20 watchable reasonable doubts that get raised on an issue, that through the evidence, through questions from the lawyers, from an argument, or just something you noticed on your own, could be raised in your mind.

They have a duty to rule out every one of those.  If they rule out 19 of them and one is left, there is only one verdict, not guilty.  Doesn't mean innocent.  It means not proven.  It doesn't mean you are not a good citizen.  It means you followed your duty, the shield.  You protected the citizens.  Because they didn't meet their burden.

It could be 100 logical reasonable doubts, and if they prove 99 of them, it is still not guilty.  Because that is how high it is.

162

Now, my concern was, well, maybe some of you think that is too risky, it's too hard for the prosecution. That makes someone who may have committed a crime go.

We asked about that. All of you were fine with it, accepted that law, will enforce that law, and follow that. You told me back then on Monday. I am going to hold you to that now. Because they can't do that in this case, folks. They can't do it at all, on either count.

We went over, and you see in the charge the two counts and the language necessary. And I told you there is going to be two issues, not just one, two.

What is reasonable and willful on Count 1.

Count 1 is the count of the -- where they allege that Kelly Smith's actions, the injuries caused by him, were unreasonable, that they have to prove that beyond a reasonable doubt, that they had to rule out every logical reasonable doubt raised by the evidence that Kelly Smith's actions weren't reasonable. They have to rule that they were not reasonable. And if they fail, it's game over. Not guilty. Not guilty.

And we told you it is our contention, and always has been, that they will never rule out every reasonable doubt regarding that specific issue.

But there is more, because in that particular statute, the legislature put in "willfully." You can find --

163

a jury could find someone -- an action by a police officer was unreasonable, and they could still find not guilty because you have to go to the next step, willful, if you believe it was unreasonable.

And the Judge gave you specific instructions on that because it is what we call a specific intent crime, which is very rare.  A specific intent crime.  Because most of them, like the second count is knowingly, you intentionally do something, which you could do very quickly if you wanted to.

But a specific intent crime for willfully is -- you will find that in the instructions when it talks about Count 1.  That the Defendant acted willfully, that is, that the Defendant committed such act or acts with bad purpose or evil motive.  Disobey or disregard the law specifically intending to deprive the person of that right.

So even if you got past the reasonableness issue, they could never overcome their burden here, that Kelly Smith out there was acting with evil purpose.  That is why they tried to put on this evidence of, oh, he is trying to use him as a dummy, he wants him to get a bite, things like that, because they have to meet that element.  And they can't get there.

The other instruction has to do with policies.  They put in evidence of policies, that Kelly Smith violated

his own policy, or his policy was unconstitutional.  In other words, he was setting himself up to try to protect himself. I guess their theory is he thought he might do this in the future.

The Judge tells you about policies, and cautions you about policies and training, in that the only time that you can consider that is on this issue of willfulness.  Not reasonableness.

The Court clearly instructs you that a police officer could violate a policy, and that doesn't mean he has violated someone's constitutional rights.  The instructions are clear on that.

You only consider that issue of violating a policy to be used in determining if Defendant's actions violated on the willfulness aspect.

Let's talk a bit right now about the reasonableness, that Kelly Smith's actions were unreasonable when he used force.

Police officers do have to use force.  They don't want to.  But it is part of their job.  That is why they are trained the way they are.  And they have to prove beyond a reasonable doubt that his actions were unreasonable --

We heard a lot of talk from this table in questions from police officers that, hey, what is the standard? Minimum -- it comes out to, no, it is just a minimum amount

of force at the time.  That's all he can use.

That's not the standard.  It is the reasonableness. The full circumstances of everything from an objectionable [sic.] officer's viewpoint of the facts of that case.  It is reasonableness, not minimum amount of force.

And their own witness, expert Mr. Staton, came up from Austin, their use of force expert, when he got called -- they paid him.  They retained him.  He is qualified.  He took the stand, and one of the first things he said on his own, is, hey, I have been hearing people ask questions saying what -- the standard is minimum amount of force to be used. That is wrong.  That is not the standard.  That is wrong.

Well, the people asking that were at this table. It is reasonableness.  He said you can use force.  Sometimes you can use a lot of force, as long as it is reasonable under the facts and totality of the circumstances.  Their own expert had to put on that evidence.

When we are talking about ruling out every logical reasonable doubt, there is many raised in this case.  One thing I want to point out is, is Ms. Batson talked about Robert Evans.  He is named in the Indictment.  He is the victim of their crime.  And she spent a lot of time in her argument what he was thinking and what he was doing.

We didn't hear from Robert Evans.  He didn't come through this door and get on that witness stand and get sworn

in to answer questions. The victim, the person named in the Indictment, didn't testify. They chose not to put him on. That is reasonable doubt all on its own. It shows how weak their case is.

What are they afraid of? Why won't they sponsor their victim? I was a prosecutor too, 23 years and 6 weeks. No time when I ever prosecuted a crime of violence where there is a victim, that victim wasn't in the courtroom, unless they were dead because it was a murder case or they were in a coma.

But they made the conscious choice not to call Robert Evans. You think he could enlighten us on a few things? What happened on the 25th of July in that house when the police are out there 22 minutes, when he locked that door, when he barricaded that door, when he wouldn't come out of the bathroom?

But they didn't call him. You can't speculate. You can't substitute an FBI agent to take the stand and try to say, hey, here is what is going on. Here is what he was thinking. A prosecutor can't be substituted. But they didn't call him.

And they can't overcome that, because you can't speculate on things that Robert Evans would have told you or felt or anything like that. But they chose not to do that. I have never seen it, and I will be practicing law 40 years

in November.  Ever.

THE COURT:  Mr. Shook, let's stick with the evidence in the record.  Okay?

MR. SHOOK:  Yes, Judge.

Talked about reasonable doubts.  Ms. Batson said we know that the Defendant knew where Robert Evans was right away, and he sicced the dog on him, because right when he enters, we saw his body cam, and we saw two hands come out in the back.  You heard from, again, Mr. Staton, their own witness.  He is a guy that has also attended Force Science classes.

And I talked to him about that specific issue.  And he said, no, body worn cameras, they are good, we can see everything, but they don't reflect what the human eye sees.  When I asked him questions about that, he said, yeah, that is a two-edged sword.

Just because an officer has a body worn camera on doesn't mean he is seeing everything that is on the camera because the camera captures lots of stuff, where the human being focuses just on about -- especially when it is a high-tension area, about five to seven degrees.  Our expert said the same thing.  Force Science.  Because that is the danger.

They want to say he stuck his hands out in the hallway real quick, so that is how he knows.  There is no

evidence of that.  They can't overcome every logical reasonable doubt even raised about that issue, just the fact that a hand comes out.  There is no way.

She says he knew where he was because he is saying, find him, to his dog.  He was ordering his dog to find him because he wanted to locate him at that time, not that he knew where he was.

Other witnesses you didn't hear from that are essential.  The on-scene commander, Sgt. Tuma, we didn't see him at the witness stand.  He is the one that got the original warrant.  He is the one that called for help.  He didn't make the stand.

The other Hawkins officer that was out there, Officer Newell, he was at the scene.  We know that from the body worn cameras.  They choose not to call him either.

Ms. Batson doesn't like things that were said about Force Science from our expert, that this is just kind of junk science about this mis-sequencing, and this is made up.  Let me Google it.

She has forgotten that their expert is a big Force Science guy testified about that.  Yet when our expert testifies, she tries to impeach him with that, that you can't believe this.  But the day before, their own expert talked about Force Science.

He talked about that video of how you can get

distracted by passing of the basketball and the guy in the gorilla suit.  He is a Force Science guy, yet they want to attack our expert with the same reason, same science.

Lt. Milbourn.  Now, he was called to the scene.  He volunteered and he testified, yeah, Kelly Smith, he didn't want to come running in that scene, when you talk about this issue of willfulness.  He wasn't running up with sirens blasting, trying to get involved.

He came up and said, Kelly said, where do you need me, boss?  Got out there.  He put the dog out.  Robert Evans knew they were out there.  But they gave the K9 warnings.  We have a police K9.  We are going to put the dog in.  Come out with your hands up.  Put the dog in.  You will be bit.  It was clear what is going to happen.  But he refused to come out.  He refused to come out.

But the interesting thing about Lt. Milbourn was he said, as Ms. Batson argued, he had a change of heart, that right before he testified he had to come forward and say he thought things had gone too far.

Now, he certainly didn't say anything that day.  We saw the body cam afterwards.  He seemed perfectly normal, fine with what was going on.

And he, certainly, in August when he talked to the FBI at length, he didn't mention that.  He certainly didn't do it in the Grand Jury.  And then when I started asking him

when did you have this change of mind, right before I was coming down to testify.  Had to pull the information out of him.

How did that happen?  Well, I was informed that maybe my actions or lack of actions could be against the law. I heard about that.  Someone made me aware of that.  Who?  He didn't want to tell.  Who told you that?  When?  Two weeks ago before the trial, and I was getting prepared.  Well, who told you?  A lawyer.  The prosecutor.  How sly.

You see why the Founders put the system how it is because the prosecution and the governments can be powerful. Put that seed, you could be prosecuted.  We need somebody. We are not calling the victim.

MS. BATSON:  Your Honor, I am going to object. There is no evidence that I ever said to him that he could be prosecuted.

THE COURT:  Sustained.

MR. SHOOK:  You saw how frightened he was.

Another area of reasonable doubt, the bite issue in the tub.  We have heard lots of evidence.  Talking about mis-sequencing.  I know they don't want to believe in it, mis-sequencing, but it is kind of just common sense stuff. You could be distracted in a high-stress environment.  And no doubt at all this was a high-stress environment.  Any time you have to force your way into a house, it is a high-stress

environment.

This whole arguments that, hey, he didn't have a weapon, it turns out he didn't go for a weapon, or a weapon wasn't on him.  That is not the point.  That is that 20/20 hindsight that you can't judge this case from.  It has to be at that moment in time the officer's perception of what is going on.

And as far as the bite, their theory of the case is Kelly Smith kept commanding the dog to bite.  But we know that the dog was confused.  We know the scene was chaotic and he wasn't biting.  As the expert said, he wasn't performing, he wasn't performing in the bathroom.

But we know when he bit, when Robert Evans -- because we had to show it in slow motion -- turned and kicked him back where he was shoved up in the air.  And right after that, when he came back down, he bit him.

And every one of those experts, the Government's experts, the Defense experts, anyone that came in there that was a dog handler, said, yes, dogs are trained to defend themselves if they are assaulted.  He didn't bite when he was commanded to, but he bit right when he was kicked.  And if they can't overcome a reasonable doubt about that, then they can never convict Kelly Smith.

This second count, this is the count about all of the -- that they claim were intentional misrepresentations.

And they have got 14. I lost count of all. They will put things like, maintain cover. Didn't call him over at this particular time. They pick this thing apart and say you should convict him of a federal crime because this was intentional.

You know, I asked Mr. Staton, I said, hey, you were a police officer before body worn cameras, do you think you might have made a mistake or two when you wrote out an affidavit? And he said, oh, probably every time.

Or Mr. Brady today, he has never seen a police report match totally up with the body worn camera. It is just human nature. I tell you, you know -- and I've prosecuted cases, if a police officer goes up to make a case, they make up evidence -- if they are out in the field or do it in a way, they have a conspiracy, yes, there are cases like that. This isn't this.

This is, as has been explained, explained whatever -- not every one of these accusations that they are theory -- aren't even things that were -- were wrong. But the ones were it is mis-sequenced or he didn't write it down correctly, something you want to convict someone of?

Because, think about it, in the instructions it says but if it was a mistake -- it has to be intentionally -- if it was a mistake, you can't convict him.

Well, every one of their experts had mistakes in

their reports.  Two hands, I saw hands.  Well, now that you have seen, well, now that I saw it in slow motion, yeah, there is only one hand.  Every one of them had that in their report.  Were they willfully doing that, intentionally trying to deceive?  No, they made a mistake.

Mr. Staton, he three times in his report had Robert Evans on his knees.  Was he on his knees?  No.  That was a mistake I made.

Agent Crowell, he swore to it in front of a Federal Judge.  He put it in a search warrant affidavit that Kelly Smith was saying, ah, he likes to bite the feet.  He attributed it to him.  He looked at it and said, okay, that was a mistake.

THE COURT:  There's 25 minutes, Mr. Shook.

MR. SHOOK:  Thank you, Judge.

Mistake, that's all these are.  If there is anything wrong, it is a mistake.

Folks, Mr. Eden, their expert said, you know, he couldn't believe how much blame was being placed on everyone other than Kelly Smith.  Blame game he called it.

As far as blame, is Robert Evans.  Robert Evans is the person that was wanted for 34 days for a felony injury to a child, family violence, to evading police.  And he was evading arrest, which is a very dangerous thing to have a person evading arrest.

Robert Evans is the one that when spotted by the police who knew him on site and said something to him, locked that door because he didn't want to be arrested.  That is his mindset.

Police officers out there in uniforms, cars, he didn't care.  Robert Evans is the man, who not only locked the door, but then took the time to barricade the door because he wasn't going to jail.

When the police arrived with reinforcements, when they arrived with the apprehension dog and they warned him, this dog will be put in if you don't come out, he refused to comply.  You will be bit, he refused to comply.

When they started to kick the door in, it took 28 kicks to get in, he could have come out any time.  And this wouldn't have happened if he had just complied, but he refused to comply.

When he wouldn't open that door and surrender at the bathroom, when he pushed back and refused to comply, he could have ended it there, but he wouldn't do it.  That is his mindset.  That's whose fault this is.

Thank you.

MR. SKIPPER:  May it please the Court.

Members of the Jury:

Ms. Batson said that what Mike Kmiecik told you was insulting to the credibility of the justice system.  And I

will respond to that very succinctly.

As a former state prosecutor, as a former federal prosecutor, the only thing that is insulting the credibility of the justice system is the fact that the Government has charged this man with a federal crime for daring to do his job, that the Federal Government by making that decision, in its infinite wisdom, is having you spend your taxpayer dollars, take away from your family for five days, to listen to them --

MR. MACHICEK:  I am going to object to evidence not in the record about spending time --

THE COURT:  Why don't you move on to the evidence in the record before the jury, sir.

MR. SKIPPER:  Prosecute Kelly Smith for doing his job.

So when she says it is insulting to the credibility of the justice system, and you have a seal of our Government on her PowerPoint, my grandfather --

MR. MACHICEK:  I object --

MR. SKIPPER:  They opened it up, Your Honor.

THE COURT:  Why don't counsel approach, please.

(Bench conference.)

THE COURT:  Your closing needs to be based on the evidence in the court, not on your personal experiences, on your grandfather, you know that.

176

MR. SKIPPER:  Well, Your Honor --

THE COURT:  And I don't know what you mean by "they opened it up."

MR. SKIPPER:  When they put a PowerPoint, I wasn't given a copy of, but seals on the PowerPoint of the Department of Justice and the FBI, it is buttressing their argument, none of which is put into evidence.

She said she was a prosecutor about five times on her examination, for 30 years.  Toby can't say how long he was a prosecutor?  We are just responding to what has come out in the trial, Your Honor.

And then she gets up and says that it is insulting to the credibility of the justice system that our expert witness would talk about something he has been qualified to talk about.

THE COURT:  I'm not talking about any of that. Just stay away from your personal grandfather stories, those sorts of things.  You can respond to argument based on the evidence in the court.

MR. SKIPPER:  All right.

THE COURT:  Okay.

(Bench conference concluded.)

MR. SKIPPER:  Here is the Government's victim in this case, the phantom who declined to submit himself to the crucible of cross-examination, on that piece of furniture

right in front of you, declined his opportunity, despite his initials being printed in that Indictment, to come into this courtroom, this gorgeous federal courtroom, raise his right hand, swear to tell the truth, the whole truth, and nothing but the truth so help me God.

This is the victim of this case.  That is the Defendant, Kelly Smith.

(Video played.)

(Video stopped.)

MR. SKIPPER:  Again, manipulation of the situation: You know how a woman gets.  When they are mad, they will say anything.

Put him on the stand.  We have no burden.  This man is the victim in a federal prosecution, the chief pony they put their saddle on, trying to kick this thing to the finish line.

(Video played.)

(Video paused.)

MR. SKIPPER:  Now he is thumping his chest:  He didn't knock me out though.

This is the man that is the victim of this case before he goes on to talk about getting a Band-Aid. Manipulation of the situation, all right, that is what this man does.

Robert Evans stays in control of his environment,

and he manipulates people for his own benefit.  He does not comply.  And then he runs his mouth out here on the porch.

This is not a post-arrest interview.  It is him yapping.  That is all it is.

(Video played.)

(Video paused.)

MR. SKIPPER:  A little bit later on, you guys remember the wink, where he tells them, don't worry about it, Todd Eddington will get everything, and he goes like this (demonstrative noise).

That's the victim they are trying to get kicked across this finish line.

And this guy is the Defendant.

The incredible irony that surrounds a guy like Robert Evans is, the piece of clothing he decided to put on his upper torso on the day he chose to do what he did, is a T-shirt that reads:  It's way too peopley outside.

That's what Robert Evans does.  That is what people like Robert Evans do.  He is the one percent who takes a guy like Kelly, who could actually be out doing his job, helping a crime victim, helping someone who needed to be helped, and he did that when he heard the radio call.

He did that when those officers, who we now know don't know how to clean up their own mess; they don't want to clean up their own mess.  He responded.  After they stepped

in their own dog's waste on the side of the law, they didn't want to clean it up.  Kelly cleaned it up.

And this is their victim.

And that is their Defendant.

And he responds to a guy who had been on the run for 34 days knowing that he was wanted.  Reaches out to John McQueen, folks.  This man has the audacity to make a phone call and flaunt, thumb his nose at the badges all over this country.  Laughs at them and says, I determine when I surrender.  You don't negotiate with that.

When my dad came in, when I was little, from work, I'm in there laughing, he gives me one warning with my brother.  He gets home from the East Texas Salt Water Plant. Keep it down.  If I don't keep it down, that belt comes off. That belt hurts.  I stop complaining.

MR. MACHICEK:  Your Honor, I'm going to object to equating discipline of a child to reasonableness in an excessive force case.  It is a misstatement of the law.

THE COURT:  Sustained.

MR. SKIPPER:  These are not complicated laws or facts.  I said it the other day, I'm going to say it again, warning, police K9, come out with your hands up, or you will be bit.  He said it twice.

There is a police K9.  There is a dog.  Robert Evans did not come out.  Guess what happened?  He got bit.

And Robert Evans, when he called John McQueen, John McQueen did not relay this to anyone that this guy will surrender himself to me and me alone and no one at Hawkins, because for some reason, he trusts me.

Well, we found out that John McQueen had spent 4.2 hours from July to January talking to Cheryl Evans.  You don't think that guy is a friend of the Evans family?  That is absurd.

Then when John McQueen gets to the scene, he walks around the trailer, gets a phone call.  Cheryl Evans calling.  And like any officer who thinks it is just normal to get that type of communication, he walks around the trailer, for some unknown reason, does something with his hands, and comes back around.

So when we are going over the law and the counts here, it is not complicated.  Our world has become complicated for no reason.  We now have the Internet, since I got out of high school.  We now have social media.  But it is very simple.  These are very simple issues.  Order, comply, or don't comply, and there is a consequence.

That is life.  That is how we live.  That is how we raise our kids.

So Kelly responds -- and we have all heard.  I'm not going to play it on video again.  And he goes in -- let's talk about our experts.  Because all of our experts were use

of force experts and K9 guys, except Dennis.

You heard from Dennis Brady, all of his experience. Was this reasonable? Yes. Was it excessive? No. Was it unnecessary? No, it was necessary.

You heard from Sheriff Valdez, same questions, same answers, the elected Sheriff, not a deputy from Smith County.

The people voted Johnwayne Valdez into office. Do you think he had to come in here? That is the difference between Jeff Hobson, who is a deputy, and Johnwayne Valdez.

MR. MACHICEK: Your Honor, I'm going to object to the characterization Hobson is a deputy. He testified from the witness stand that he was a lieutenant. That is a misstatement of the evidence.

THE COURT: Sustained.

MR. SKIPPER: Jeff Hobson is a non-elected sheriff. How about that? Johnwayne Valdez was elected by the people. And he came in and gave you unvarnished opinion. They had every opportunity to attempt to dice him up. Didn't happen.

And then Mike Kmiecik, you heard from him, for what we are now saying is junk science because they are over here Googling their iPhones during his direct examination to figure out what Force Science is.

Despite the fact that they paid for Staton, who sat in front of you the previous day, that I am a certified analyst of Force Science. But when we put our expert up for

Force Science, it is as if we don't know who this person is.

Just absorb it.  If you don't like Robert Evans, absorb it.  Deflect it.  But sponsor the witness that brought you the piece of paper that is trying to put this man away.  It's simple.

The three things I told you this case is about, when we give you the Paul Harvey version, the rest of the story, three things, credibility, integrity, and reasonableness.

I told you on Monday afternoon, one side of the room has those three things.  The other side does not.  Goose egg.  Strike out.  Strike through.

That is what this case is about.  It is not difficult.  It is not complicated.  But they want to complicate things the way they present the evidence.  And even in their PowerPoint.

They mentioned the text message.  They are trying to prosecute this man for texting his friends to say, how can we get better?  What you do with a training group?  Those text words.  James Crowell knew it.  He sat up and told you about it.

She brings up the text messages that Buddy William sent to Kelly, his friend Buddy from Sulphur Springs, and Buddy said, Mata likes those feet.  LOL.

But yet James Crowell, an FBI agent, wearing that

FBI lapel pin right there on his left side, comes into a Federal Judge's chambers and swears that Kelly Smith made that statement.  Why?  Because it pursues and confirms a predetermined narrative and outcome.

THE COURT:  Mr. Skipper, you have two minutes.

MR. SKIPPER:  Thank you, Judge.

THE COURT:  That this man, their victim, was unreasonably seized.

And this man, the Defendant, caused it.  That's what it is all about.

And then the text number 6 that they know had nothing to do with bites.  His training records are in there. The deployment records are in there.  There's three.  They knew it.  They represented it in a way that they knew was not true.

This prosecutor is going to get up and talk about how we could have subpoenaed so-and so.  It doesn't work that way, folks.  The burden stays right here the whole time. This is a not guilty on two counts, without question.  You don't even get to willful unless you get past reasonable.

This guy did reasonable actions on July 25th of 2022.  He is a good man, he's a good officer, he's a good dad, he's a good husband.  And if someone was banging on my door (demonstrating) at night with my wife and my kids in my house, I would have that man Kelly Smith on my speed dial.

We are finished, Judge.

MR. MACHICEK:  If it pleases the Court.

Counsel.

Members of the Jury:

We are in the homestretch.  You've had a long week, heard a lot of things.  Heard a lot of testimony and heard a lot of opinions.  And I feel like we are almost full.  Our cup is almost full.

But I would be not doing my duty if I didn't come up here and answer some of the questions that Mr. Shook and Mr. Skipper just posed to you.

A society is judged by how we treat the least among us.  And if it is okay to do something like this to Robert Evans, then it is okay to do it to anybody.

We heard a lot about Robert Evans.  We have heard a lot about why he deserved to have this happen to him.  Think about that.  The United States, the FBI, the U.S. Attorney's Office, we don't pick the victims in these cases.

Who picks the victim?  That man right there.  He gets to choose who the victim is.  He gets to choose who he decides to sic his dog on.

He gets to choose an individual that he thinks no one is going to care about, or at least he hopes so.

We heard a lot about who we didn't hear from.  Let's talk about who we did hear from.

Your instructions given to you by the Court tell you that the evidence that you are to consider in this case is the testimony and evidence that came into this courtroom through that witness stand.  That is what you are supposed to focus on.

This entire discussion about what is not here is not what is in your instructions.  Follow your instructions. Use your common sense.

Mr. Shook and Mr. Skipper want to talk a lot about Force Science and the testimony about it that came in through the witness stand.  And we heard some interesting analogies. We heard a story about a video or an exercise with a basketball and a gorilla, right, heard a lot of conversation about that.

Ms. McCullars, if we could look at 1D-006.

When Kelly Smith goes into the residence at 199 Ruth Street in Hawkins, Wood County, in the Eastern District of Texas, his objective, his stated purpose is to locate and apprehend Robert Evans.

Robert Evans is not the gorilla.  Robert Evans is the basketball.  The objective is to apprehend that man. Instead, for Kelly Smith, the objective became I need to get my K9 a bite.  He chose a different objective.  He chose the wrong objective.

A lot of talk about Robert Evans's choices to not

come out.  As soon as the door is open, he is yelling, I have got my hands up.  I will come out.  Put the dog away.

You get to watch the video.  You get to listen to what he says.  And you get to use your common sense.

Discussion about Sgt. Milbourn coming in here and having a change of heart.  He was specifically asked whether or not he was threatened by anyone, and what did he say?  No.

Sgt. Milbourn, from that witness stand, exhibited more bravery than the Defendant did in that bathroom.  He came in here, and when called upon to do the right thing, the difficult thing, he got up there and told the truth.

It wasn't easy for him.  He knows this man.  He respects this man.  But he knows what he did was wrong.  He knows he shouldn't have done it.  He tried everything that he could muster in the moment to stop him.

And when Alvin Gordon was called upon to tell the truth about what he had seen, he did the same thing, and he stepped up and did the difficult, correct thing.  Because sometimes doing the right thing is not easy.

Realizing that what you are doing is not working and cutting it out and doing something different, is hard. Admitting that you have failed in what you are trying to do is difficult.  It is embarrassing.  But you have got to do the right thing anyway.

And when you deploy your K9 over and over and over

again, commanding that dog to bite a man who was trying to surrender, and that dog fails, you have got to use a different tool.  You have got to use one that ain't broke.

But that is not the choice he made.  He didn't make the difficult choice.  He made the choice, instead, to stand over a man --

Exhibit 1D-4, please.

-- who was sitting in a bathtub with his hands on his head, to call the K9 back in the room, and to continue to give him the bite command over and over and over again.

That is the choice that was made in that circumstance.

You notice Mr. Shook and Mr. Skipper talked for a total of 45 minutes, and not once did they talk about the video in that bathroom.  And why not?  Because they know it is what makes their client guilty.  It is easy to talk about what everybody else does wrong so that you don't have to talk about what you did wrong.

That is what they do.  When the evidence is insurmountable, we talk about everybody else.  That is what happens.

Talks about a kick of the K9 and a bite coming in after that.  Right?  He left out an important detail, though, a detail that was absent in the slow-motion replay and every single one of those witnesses.  The detail was the audio.

The dog didn't bite in response to the kick.  The dog bit in response to repeated commands to bite a man who was surrendering to law enforcement custody.  That is when the dog bit.

I'm going to talk about this affidavit.  We just dismiss mistakes.  Right?  Everybody makes mistakes. Typographical errors happen.  You can't be 100 percent accurate.  That's what Jerry Staton said.

But what Jerry Staton said that they didn't tell you about, that they didn't remind you about is that there is a difference between a simple mistake, a typographical error, and a material addition or omission.

It is indicative of dishonesty when somebody adds a statement that didn't happen.  It is not mis-sequencing.  It is not slips and captures.  It is a lie.  That is what it is. When you say you gave the heel command and you didn't give the heel command, that is a lie.

Mr. Skipper reminded y'all of the two expert witnesses that testified on their behalf, and Johnwayne Valdez who came in here from Rusk County.

But he didn't remind you of the other folks that you heard from, the two other officers who were there, the two other officers, Constable McQueen and Austin Milbourn, who were in the room when it happened, that saw it with their own eyes, and they told you what they thought.

They didn't tell you about the other two K9 officers who are handlers in this jurisdiction, that run dogs in the same places, who saw that video and knew, knew that it wasn't right.

Didn't tell you about the other experts who came in and told you exactly why what happened wasn't right.  They all agreed with the same thing that our common sense tells us when we watched that video.

You know, often times we hear on the news, on the Internet, at our own dinner tables, somebody should do something about this.  This isn't right.

Members of the jury, you are that somebody.  You have the opportunity to tell people in this jurisdiction, the Defendant in this case and people just like him, that this type of stuff isn't going to fly here.  We don't treat the least among us this way.  We are not that society.

And what is that something?  What does this somebody have an opportunity to do?  It is to find the Defendant guilty of exactly what we have all seen on that video, what we have all seen in that affidavit.

You know, we watched that video, we saw the numerous attempts over and over for the Defendant to get that dog to bite that man.  We saw the failures.  We saw the Defendant offer up a human being to be bitten by a dog like a chew toy.

And we saw the dog give the Defendant exactly what he wanted.  And we saw that dog finally capitulate and give the Defendant the win he was looking for.

Members of the jury, it has been a long week, and I have noticed your careful attention to all of the testimony.  And the United States is grateful for the sacrifice that each and every one of you made in this case.

We are going to ask you to find the Defendant guilty on both counts, and we look forward to receiving your verdict.

Thank you so much.

THE COURT:  Counsel.

Okay.  Ladies and gentlemen, now, by law, Jurors No. 13 and 14, you are alternate jurors, you are not allowed to deliberate with the jury.  So when you go back into the jury room, I'd ask that you take your things, and you guys are free to leave.

I am not officially releasing you at this point, in case we need to bring you back for some reason.  We will reach out to you and let you know if and when a verdict is received.

So all of my instructions still apply to the two of you not to discuss the case with anybody or try to look anything up online.

Okay.  The remainder of you, you can now retire to

the jury room to begin your deliberations.  Just a reminder, that first note will be your jury foreperson.

Okay.

(Jury out for deliberations - 2:53 p.m.)

THE COURT:  Okay.  We are in recess.

(Recess was taken at this time.)

(Jury out.)

(Juror Note No. 2 - 4:11 p.m.)

THE COURT:  Okay.  Counsel, if y'all would approach.

So the note is about asking for a copy of the highlighted numbered affidavit, which is not an exhibit, as I understand it.

MR. MACHICEK:  I don't believe it is an exhibit.

THE COURT:  Okay.  So I would propose -- we did pull the Fifth Circuit Pattern Instruction on demonstrative evidence.  We could draft something that says, that copy is an illustration.  The exhibit, whatever exhibit number that is, is in evidence, and you have it for your purposes.

MR. SKIPPER:  Yes.

MR. MACHICEK:  I wouldn't have any objection to that.

MR. SKIPPER:  Yes, Your Honor.

THE COURT:  Any objection?

MR. SKIPPER:  No objection.

THE COURT:  That is Exhibit 16.

Okay.  I will draft something up, and we'll send it back.

MS. BATSON:  Thank you.

(Pause in proceedings)

THE COURT:  If y'all would just take a look and confirm.

Thank you.

(Recess was taken at this time.)

(Jury out.)

THE COURT:  Okay.  We have a verdict.  The Court Security Officer present?

(Pause in proceedings.)

THE COURT:  We are ready if they are ready.

(Jury in at 5:31 p.m.)

THE COURT:  Okay.  You may be seated.

I would ask the Foreperson to please stand.  Has the jury unanimously returned a verdict?

FOREPERSON:  We have, Your Honor.

THE COURT:  Okay.  If you would hand it to Ms. Wimberley for me to inspect.

I am now going to publish the verdict.  I would just ask that each of you pay attention.  I will poll you afterwards to ensure this is your verdict.

Would the Defendant please stand?

As to the offense charged in Count 1 of the Second Superseding Indictment, deprivation of rights under color of law, we, the jury, find Kelly Jason Smith:  Not guilty.

As to the offense charged in Count 2 of the Second Superseding Indictment, falsification of a document, we, the jury, find Kelly Jason Smith:  Not guilty.

It was dated today's date and signed by the Presiding Juror.

I'm going to ask each of you, if you would please stand and affirm this is your verdict.

THE COURT:  Mr. Foreperson, is this your verdict?

FOREPERSON:  Yes, sir.

THE COURT:  Next juror, is this your verdict?

JUROR:  Yes, Your Honor.

JUROR:  Yes, Your Honor.

JUROR:  Yes, Your Honor.

THE COURT:  Okay.  Is this your verdict?

JUROR:  Yes, Your Honor.

JUROR:  Yes, Your Honor.

JUROR:  Yes, Your Honor.

JUROR:  Yes, Your Honor.

THE COURT:  Just go down the line.  Is this your verdict, sir?

JUROR:  Yes, Your Honor.

JUROR:  Yes, Your Honor.

194

JUROR:  Yes, Your Honor.

JUROR:  Yes, Your Honor.

THE COURT:  Okay.  Thank you.

You may be seated.

Thank you again for all of your work this week. Long days, and I know, as I said early on, I know that many of you have traveled quite a ways to be here.

And as the lawyers have acknowledged, you have paid attention and taken good notes, and we really appreciate your service.

You are welcome to exit through the jury room.  You can stick around awhile, if you would like.  I would like to come shake your hand personally and thank you in person, but you are free to leave.  Thank you.

(Jury out.)

THE COURT:  Okay.  Mr. Smith, you are discharged.

Anything further from counsel?

MR. MACHICEK:  No, Your Honor.

MR. SKIPPER:  Your Honor, there is some property, if the Court can make an oral ruling, I think Kelly has got a cell phone and a faraday bag in Steph Davis's office.  If we can have that returned.

THE COURT:  Any objection?

MR. MACHICEK:  No objection, Your Honor.

THE COURT:  Okay.

MR. SKIPPER:  Thank you.

THE COURT:  We are dismissed.  Thank you.

(Court adjourned.)


CERTIFICATION


I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.


/s/ Shea Sloan                          August 3, 2023
SHEA SLOAN, CSR, RPR
Federal Official Court Reporter